FILED

2006 Sep-29 PM 04:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA


MARK SAMUEL LANDERS        CASE NUMBER _____

Place of Confinement:        St.Clair Correctional Facility,
                             Springville, Alabama

Prisoner Number:             AIS# 193732 G4A-104


MARK SAMUEL LANDERS,        )
                           )
        Petitioner          )
                           )
VS.                        )
                           )
RALPH HOOKS, WARDEN,       )
   ST. CLAIR CORRECTIONAL  )
   FACILITY                )
                           )
And                        )
                           )
TROY KING, ATTORNEY GENERAL )
   FOR THE STATE OF ALABAMA, )
                           )
        Respondents         )


## **PETITION FOR HABEAS CORPUS**

COMES NOW the Petitioner, Mark Samuel Landers, pursuant
to Sections 2241 and 2254 of Title 28, United States Code, and
petitions the Court for a writ of habeas corpus, and in
support of this petition avers as follows:

1.    (a).  The judgment of conviction Petitioner is
challenging in this proceeding was entered in the Circuit

1

Court of Elmore County, Alabama at Wetumpka, Alabama.

    (b). The case number of the case in which the said conviction was entered is CC96-421.

    2. (a). The date of the judgment of conviction was July 1, 1997.

    (b). The date of sentencing was July 1, 1997.

    3. The sentence imposed upon Petitioner in the said case was life imprisonment without parole.

    4. In the said case Petitioner was convicted on one count of one crime.

    5. Petitioner was convicted of capital murder.

    6. (a). Petitioner entered a plea of not guilty.

    (b). Petitioner did not enter a plea of guilty to any charge against him.

    (c). Petitioner was tried by a jury.

    7. Petitioner testified only at trial. Petitioner had no pretrial hearing and had no evidentiary post-trial hearing.

    8. Petitioner appealed the judgment of conviction entered against him.

    9. (a). Petitioner appealed to the Court of Criminal Appeals of Alabama.

    (b). The docket number of the case in the Court of Criminal Appeals of Alabama was CR-97-0194.

(c).    The Court of Criminal Appeals of Alabama affirmed the judgment of the Circuit Court of Elmore County, Alabama.

(d).    The Court of Criminal Appeals of Alabama affirmed the judgment of the Circuit Court of Elmore County, Alabama on December 15, 2000 and denied application for rehearing on March 2, 2001.

(e).    The decision of the Court of Criminal Appeals of Alabama was not officially reported and there is no citation. A copy of the Memorandum issued by the said Court at the time of its decision on December 15, 2000 is attached hereto as Exhibit 1.

(f).    The said appeal to the Court of Criminal Appeals of Alabama was based, inter alia, on the following grounds:

(1).    Whether the Petitioner was denied constitutional rights when the Prosecution destroyed and did not produce for inspection at the pretrial request of Petitioner    certain material and exculpatory physical evidence, or physical evidence favorable to the defense of the charges against the Petitioner, and deprived Petitioner of the opportunity for examination and testing of the said physical evidence and the development of rebutting expert testimony

3

regarding the same, including:

(A). The skull of the deceased which the Prosecution used and presented expert testimony about at trial and which it contended illustrated the Prosecution's theory of the manner and means and the occurrence and conduct by which the deceased was killed.

(B). Blood specimens allegedly taken from the frame of a pair of eye glasses allegedly collected at the scene of the alleged homicide which the Prosecution tested and analyzed and offered evidence at trial of the results of its tests and analyses as proof that the blood was the blood of the deceased and established that the eye glasses from which the said specimens were removed were the eye glasses of the deceased and that the condition of the eye glasses illustrated the manner and means by which the deceased was killed.

(C). Blood specimens on the lens of eye glasses allegedly found at the scene of the said alleged homicide which the Prosecution contended were the eye glasses of the deceased and which the Prosecution contended illustrated its theory of the manner and means by which the deceased was killed.

4

(2). Whether the Petitioner was denied constitutional rights by the conduct of the Prosecution in destroying and not producing at Petitioner's request the State medical examiner's statutorily required record in the form of his original notes regarding his examination of the body of the deceased, from which examination the medical examiner concluded the deceased's death was caused by an accident.

(3). Whether the Petitioner was wrongfully convicted and denied due process of law because the evidence in support of his conviction was not sufficient to have led a rational trier of facts to find Petitioner guilty beyond a reasonable doubt.

(4). Whether the Petitioner was denied due process of law by being denied the right to representation by counsel of his choosing when the trial court refused to adjourn the trial until after the funeral of the father of Petitioner's lead counsel who died during the course of the trial.

(5). Whether the Petitioner was denied due process of law because of delay by the Prosecution for over four years in the initiation of the prosecution against him.

(6). Whether the Petitioner was prejudiced and denied due process rights when the Prosecution was permitted

to introduce evidence of collateral misconduct on his part.

(g). Petitioner sought further review by a higher State court.

(1). Petitioner sought review in the Supreme Court of Alabama by a petition for writ of certiorari to the Court of Criminal Appeals of Alabama.

(2). The case number in the Supreme Court of Alabama was 1001070.

(3). The Supreme Court of Alabama first granted a writ of certiorari, but later quashed the writ.

(4). The Supreme Court of Alabama granted a writ of certiorari on August 30, 2001. A copy of the order granting the writ of certiorari is attached hereto as Exhibit 2. On June 18, 2004, the Supreme Court of Alabama entered an order quashing the writ of certiorari granted on August 30, 2001. A copy of the said order quashing the writ of certiorari is attached hereto as Exhibit 3. On June 18, 2004 the Court of Criminal Appeals of Alabama entered a certificate of affirmance of Petitioner's judgment and conviction.

(h). Petitioner did not file a petition for certiorari in the United States Supreme Court.

10. In addition to the direct appeal and petition for writ of certiorari described above, Petitioner has previously

filed a petition for post-conviction relief in State court under Rule 32 of the Alabama Rules of Criminal Procedure.

11. (a). (1). The petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure was filed in the Circuit Court of Elmore County, Alabama.

(2). The case number of the said petition for post-conviction relief was CC-96-421.60.

(3). The date of filing of the said petition for post-conviction relief was May 31, 2005.

(4). The nature of the proceeding was a petition for post-conviction relief from judgment under Rule 32 of the Alabama Rules of Criminal Procedure.

(5). The grounds raised in the said petition were as follows:

(A). A deprivation of constitutional rights by the destruction or disposition of and the failure of the Prosecution to produce and disclose to the Petitioner and allow examination and testing of physical evidence favorable to Petitioner which Petitioner had specifically requested to be produced, including the skull of the deceased, a blood specimen found on the frame and a blood specimen found on the lens of eye glasses allegedly found at the scene of the said homicide, a blood sample removed from the body of the deceased

7

which was tested and the results of the test presented as evidence by the prosecution, and to allow examination of records or notes of an initial examination of the body of the deceased by the State's medical examiner which he was statutorily required to make and which were favorable to the Petitioner.

(B). The denial of constitutional rights of the Petitioner, including the right to a fair trial and the right to counsel of his choosing, which occurred when the trial judge refused a request for a short delay in the prosecution following the completion of the evidence and before closing arguments for the Petitioner's lead counsel to arrange for and attend the funeral of his father who had died on the day the presentation of evidence was completed.

(C). The denial of due process of law and the rendering of Petitioner's trial fundamentally unfair because, to the prejudice of the Petitioner, the Prosecution delayed the initiation of the prosecution against him for over 55 months after the occurrence of the event on which it was based and for over 4 years after the Prosecution had acquired all of the evidence it presented against Petitioner at trial.

(D). The denial of due process of law and the rendering of Petitioner's trial fundamentally unfair

because the Prosecution failed to disclose and correct false evidence presented against Petitioner.

(E). Newly discovered evidence refuting and contradicting primary evidence presented by the prosecution against the Petitioner at trial.

(F). The denial of due process of law by the failure of the indictment against the Petitioner to give notice to Petitioner of the specific charge the Prosecution intended to prove, and did prove, against him at trial which prevented Petitioner from preparing to meet and defend against the said charge and which amounted to the Petitioner being tried and convicted for an offense the indictment did not charge, specifically in that the indictment charged that Petitioner caused the death of the deceased by one specific occurrence and conduct - running over and crushing him with a bulldozer - whereas the proof offered at trial by the Prosecution abandoned this alleged conduct and occurrence as the cause of the death of the deceased and proved that the death of the deceased resulted from different conduct and a different occurrence - being struck in the left temple by a blunt instrument.

(G). The denial of due process of law and the rendering of Petitioner's trial and conviction

fundamentally unfair and in violation of rights guaranteed by the United States Constitution in that the evidence presented at trial in support of Petitioner's conviction was not sufficient to have led a rational trier of facts to find Petitioner guilty beyond a reasonable doubt of the offense charged.

(H). The failure of the indictment returned against the Petitioner to confer subject-matter jurisdiction on the Circuit Court of Elmore County, Alabama to try and convict the Petitioner based on the evidence presented against him at trial, in that the conduct and occurrence described in the indictment was different conduct and a different occurrence from that shown by the evidence at trial.

(6). Petitioner did not receive a hearing where evidence was given in support of his petition for post-conviction relief.

(7). The Circuit Court of Elmore County, Alabama denied the Petitioner's petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure. A copy of the order of the Circuit Court of Elmore County, Alabama denying the said petition for post-conviction relief is attached hereto as Exhibit 4.

(8). The petition for post-conviction relief was denied on September 23, 2005.

(b). Petitioner has filed no second petition for post-conviction relief in a State court.

(c). Petitioner has filed no third petition for post-conviction relief in a State court.

(d). Petitioner appealed the denial of his petition for post-conviction relief to the Court of Criminal Appeals of Alabama. On April 21, 2006 the Court of Criminal Appeals of Alabama, by an unpublished memorandum, affirmed the denial of Petitioner's post-conviction relief petition. A copy of the said memorandum is attached hereto as Exhibit 5. On May 12, 2006 the Court of Criminal Appeals of Alabama denied Petitioner's application for rehearing. Petitioner timely petitioned the Supreme Court of Alabama for a writ of certiorari to review the decision of the Court of Criminal Appeals of Alabama. On June 7, 2006 the Supreme Court of Alabama granted in part the petition for writ of certiorari. A copy of the said order of June 7, 2006 is attached as Exhibit 6 to this petition. On September 15, 2006 the Supreme Court of Alabama quashed the writ of certiorari previously granted. A copy of the said order of September 15, 2006 is attached as Exhibit 7 to this petition.

12. The following is a statement of the grounds on which Petitioner claims he is being held in custody by the Respondents in violation of the Constitution, laws, or treaties of the United States. To facilitate an understanding of the grounds of this petition Petitioner includes a preliminary background statement.

### Background

The Petitioner was convicted of capital murder by a jury verdict returned on May 9, 1997 and he was adjudicated guilty and sentenced to life imprisonment without parole on July 1, 1997. The indictment on which he was tried charged him with the murder of Robert Landers, Sr. The deceased and alleged victim was the Petitioner's father.

No witnesses testified to observing the occurrence in which the deceased was killed. The evidence against the Petitioner was entirely circumstantial. The core of the prosecution evidence was opinion testimony from a medical examiner employed by the Alabama Department of Forensic Sciences, Dr. James Lauridson, based on his examination of the body of the deceased and tissue specimens taken from it.

Certain facts surrounding the death of the deceased are undisputed. On the evening of February 12, 1992 the body of the deceased was found in rural Elmore County. The body was

partially underneath one of the tracks of a crawler tractor (bulldozer) with which the deceased had been working at this location earlier in the day. The body had sustained extensive crushing injuries and obviously had been run over by the bulldozer which was resting on the body.

Law enforcement officers investigated at the scene where deceased's body was found on the evening of February 12, 1992. The bulldozer was moved to permit the removal of the deceased's body. The body was turned over to the medical examiner on the next day, February 13, 1992. On that date the medical examiner conducted an examination of the body. From the examination of the body on that date the medical examiner concluded that the deceased had been killed by accident when he was run over by the bulldozer. The investigating law enforcement officers reached the same conclusion.

On March 3, 1992 the body of the deceased was exhumed from its burial site and brought again to Dr. Lauridson for examination. On this occasion Dr. Lauridson performed an autopsy and other examinations of the body. Later, by a report dated March 13, 1992, Dr. Lauridson concluded the deceased died as a result of a homicide.

The Petitioner was indicted and charged with capital murder on October 4, 1996, over four and one half years after

13

the deceased was killed.

The theory the Prosecution advanced at trial was that the deceased was killed by being struck by a blunt instrument on the left temple and that the perpetrator subsequently ran over his dead body with the bulldozer under which his body was found. The Prosecution had no direct evidence to prove this theory. Its case against the Petitioner was entirely circumstantial. The Prosecution presented no evidence of a "blunt instrument" that was connected to an injury inflicted on the deceased. The Prosecution presented no evidence that Petitioner was present or that he participated in any way in the occurrence which resulted in the deceased's death. The Prosecution presented no evidence that any other person at the instance of the Petitioner caused the death of the deceased. The testimony supporting the Prosecution theory was the opinion testimony of Dr. Lauridson, the medical examiner, and the opinion testimony of a technician employed by the Alabama Department of Forensic Sciences.

The opinion of the medical examiner were based on: (1) his examination of the skull of the deceased and the nature and location of the injuries on it which he described based on his examination; (2) his examination of a pair of eye glasses found at the location where the deceased's body was found; (3)

14

his assumption, based only on the results of the ABO testing of blood stains found on the glasses, which was found to be the same blood type as a blood specimen taken from the body of the deceased, that these glasses were the glasses of the deceased; (4) his conclusion that the fact that the eye glasses had a bent or deformed left leg showed the deceased was struck on the left temple with a blunt instrument; and (5) his conclusion that the identified injury to the temple killed the deceased and preceded in time the body being run over by the crawler tractor (bulldozer). The Prosecution offered no definitive or substantive evidence that the deceased was killed by being run over by a bulldozer. The Prosecution did not argue that the deceased was killed by being run over by a bulldozer, contending instead that his death was caused by a blow to the left temple by a blunt instrument.

**GROUND ONE**: Petitioner was denied due process of law and the trial and conviction of him was rendered fundamentally unfair and violated rights guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution because the indictment returned against him did not give him notice of the conduct and occurrence the Prosecution intended to prove, and did prove against him, at trial as constituting

15

the offense with which he was charged and of which he was convicted; and by reason thereof Petitioner was denied and deprived of the opportunity to meet the said charge and defend against it and the evidence used to convict him and was denied the right to be heard on the specific charge the Prosecution intended to and did prove at trial as the basis for his conviction; because the proof of the conduct and occurrence constituting the charged offense presented by the Prosecution at trial in support of the charge made against the Petitioner in the indictment was different from the conduct and occurrence alleged in the indictment.

(a). (1). The indictment returned against Petitioner by the grand jury alleged:

The Grand Jury of said County charge that before the finding of this Indictment, MARK SAMUEL LANDERS whose true name is to the Grand Jury unknown, otherwise as stated, did, intentionally cause the death of Robert R. Landers, Sr., by running over and crushing him with a bulldozer, for a pecuniary or other valuable consideration, to-wit: the proceeds of a life insurance policy on Robert R. Landers, Sr., in violation of Section 12A-5-40(a)(7), Code of Alabama, 1975, against the peace and dignity of the State of Alabama. (Emphasis added).

(2). The evidence presented by the Prosecution at trial as proof of the indictment was that the deceased was killed by "blunt trauma" as a result of being struck on the left side of the head by a blunt instrument. The evidence

16

presented by the Prosecution at trial, as well as the Prosecution's argument at trial, disavowed the allegations of the indictment as to the conduct and the occurrence which caused the death of the deceased and substituted therefor another occurrence and other conduct not alleged in the indictment as causing the death of the deceased.

(3). The indictment did not give notice to the Petitioner of the accusation that the death of the deceased was caused by a blow to the left temple with a blunt instrument, the conduct and the occurrence the Prosecution presented evidence to prove at trial and which was the basis for Petitioner's conviction.

(b). Petitioner has exhausted all State remedies as to Ground One.

(c). Petitioner did not raise the issue of Ground One on direct appeal of his conviction.

(d). (1). Petitioner raised the issue presented by Ground One by a post-conviction petition under Rule 32 of the Alabama Rules of Criminal Procedure in the State trial court.

(2). The issue raised by Ground One was raised by a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure. The petition was filed in the Circuit Court of Elmore County, Alabama at Wetumpka,

Alabama. It was docketed as Case Number CC96-421.60. The Circuit Court of Elmore County, Alabama rendered a decision denying the said petition on September 23, 2005. A copy of the order of the Circuit Court of Elmore County, Alabama denying the said petition is attached hereto as Exhibit 4.

(3). Petitioner did not receive an evidentiary hearing in the Circuit Court of Elmore County, Alabama of his petition for post-conviction relief.

(4). Petitioner appealed the denial of his petition for post-conviction relief.

(5). Petitioner raised the issue presented by Ground One in the said appeal.

(6). Petitioner appealed to the Court of Criminal Appeals of Alabama in Montgomery, Alabama. The case was docketed in that Court as Case Number CR-05-0627. On April 21, 2006 the Court of Criminal Appeals of Alabama affirmed the order of the Circuit Court of Elmore County, Alabama in an unpublished memorandum opinion, a copy of which is attached hereto as Exhibit 5.

(7). Petitioner raised the issue presented by Ground One in his appeal of the denial of his post-conviction petition to the Court of Criminal Appeals of Alabama.

(e). Petitioner sought to review the decision of the Court of Criminal Appeals of Alabama by filing a petition for writ of certiorari in the Supreme Court of Alabama after having an application for rehearing denied by the Court of Criminals of Alabama on May 12, 2006. On June 7, 2006 the Supreme Court of Alabama granted in part Petitioner's petition for writ of certiorari. A copy of the said order of June 7, 2006 is attached hereto as Exhibit 6. However, on September 15, 2006 the Supreme Court of Alabama quashed the writ of certiorari previously granted. A copy of the said order of September 15, 2006 is attached hereto as Exhibit 7.

**GROUND TWO:** The Petitioner was denied due process of law and the prosecution and conviction of him was rendered fundamentally unfair and violated rights guaranteed to the Petitioner by the Fourteenth Amendment to the United States Constitution in that the evidence presented against the Petitioner at trial was not sufficient to support a finding by a rational finder of facts that the Petitioner was guilty beyond a reasonable doubt of the offense charged against him in the indictment.

(a). No evidence presented at trial showed the Petitioner was present when the deceased was killed and no

evidence connected the Petitioner with the conduct and occurrence which resulted in the death of the deceased. The Prosecution's evidence at trial was entirely circumstantial. The proof against the Petitioner was not strong and was, in fact, non-existent. The Prosecution presented no evidence of a confession or admission by the Petitioner of the offense with which he was charged.

(b). Petitioner has exhausted his State remedies as to Ground Two.

(c). The issue raised by Ground Two was raised on the direct appeal of Petitioner's conviction.

(d). (1). Petitioner raised the issue presented by Ground Two in a post-conviction proceeding in the State trial court.

(2). Petitioner filed a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Elmore County, Alabama at Wetumpka, Alabama. The said case was docketed as Case Number CC96-421.60. The Circuit Court of Elmore County, Alabama rendered a decision denying the said petition on September 23, 2005. A copy of the order of the Circuit Court of Elmore County, Alabama denying said petition is attached hereto as Exhibit 4.

(3). Petitioner did not receive an evidentiary hearing of his petition for post-conviction relief.

(4). Petitioner appealed the denial of his petition for post-conviction relief.

(5). Petitioner raised the issue presented by Ground Two in the said appeal.

(6). Petitioner appealed to the Court of Criminal Appeals of Alabama in Montgomery, Alabama. The case was docketed in that Court as Case Number CR-05-0627. On April 21, 2006 the Court of Criminal Appeals of Alabama affirmed the order of the Circuit Court of Elmore County, Alabama in an unpublished memorandum opinion, a copy of which is attached hereto as Exhibit 5.

(7). Petitioner raised the issue presented by Ground Two in his appeal of the denial of his post-conviction petition to the Court of Criminal Appeals.

(e). Petitioner sought to review the decision of the Court of Criminal Appeals of Alabama by filing a petition for writ of certiorari in the Supreme Court of Alabama after having an application for rehearing denied by the Court of Criminals of Alabama on May 12, 2006. On June 7, 2006 the Supreme Court of Alabama granted in part Petitioner's petition for writ of certiorari. A copy of the said order of June 6,

21

2006 is attached to this petition as Exhibit 6.    However, on

September 15, 2006 the Supreme Court of Alabama quashed the

writ of certiorari previously granted.    A copy of the said

order of September 15, 2006 is attached to this petition as

Exhibit 7.

**GROUND THREE**: The conviction of the Petitioner was obtained

following a trial that was rendered fundamentally unfair

because of a denial of due process of law and a denial of

rights guaranteed to the Petitioner by the Fourteenth

Amendment to the Constitution of the United States by the

failure of the Prosecution to disclose and produce to the

Petitioner upon his request and by the destruction or disposal

of tangible evidence favorable to the Petitioner which the

Prosecution had in its possession, including the skull of the

deceased, a blood specimen taken from the frame of a pair of

eye glasses, a blood specimen from the lens of a pair of eye

glasses, and a blood specimen taken from the body of the

deceased.    The Prosecution had custody of and access to each

of these items and examined and analyzed each of them and

offered expert scientific testimony regarding them at trial.

The Prosecution willfully and in bad faith destroyed or

disposed of each of these items before trial and before

producing them for inspection and testing by Petitioner and deprived the Petitioner of the opportunity for examination or testing of them and the development of evidence favorable to his defense. Each of these items was significant and critical evidence in the prosecution and conviction of the Petitioner.

(a). (1). At Petitioner's trial the prosecution contended, and presented evidence to prove, that the deceased was killed by being struck on the left temple by a blunt instrument and not by being run over by a bulldozer as the indictment alleged. To substantiate this conclusion the Prosecution offered the expert testimony of a State medical examiner regarding his conclusions from an examination of the skull of the deceased and his description of how the injuries sustained by the skull were consistent with being struck by a blunt instrument and inconsistent with being caused by the crushing impact of being run over by a bulldozer. After the medical examiner completed his examination of the skull it was disposed of by the medical examiner. At the time this prosecution was commenced this evidence was not available for examination and evaluation by the Petitioner or Petitioner's experts and was not produced by the Prosecution in response to the Petitioner's request for production and disclosure.

(2). As proof of its contention that the deceased was killed by being struck on the left temple by a blunt instrument the Prosecution offered as evidence a pair of eye glasses allegedly recovered from the location where the deceased's body was found. These eye glasses had a bent or deformed left leg. The Prosecution contended these eye glasses were the eye glasses of the deceased which he was wearing at the time he was killed and that the deformity in the left leg matched the location of an injury to the skull of the deceased revealed by the medical examiner's examination of the skull and that this deformity tended to prove that the deceased was struck by a blunt instrument on the left temple in a manner which caused his death.

(3). To link the eye glasses with the deformed leg to the deceased, and to prove that these glasses were the glasses of the deceased and were being worn by him at the time he was killed, the Prosecution offered evidence that it took a specimen from a blood stain found on the frame of the eye glasses and analyzed this blood specimen and found by the ABO analysis method that it was Type O blood. The Prosecution also took a blood specimen from the body of the deceased and analyzed it by the ABO method and found that it was Type O blood, and offered this coincidence of blood types as proof

24

that the eye glasses with the deformed left leg were the eye glasses of the deceased. The Prosecution offered no more definitive analysis of the blood specimens to establish the identity of the person from whom the blood specimen taken from the eye glasses came, such as DNA. There was substantial evidence that the said eye glasses offered by the Prosecution were not the eye glasses of the deceased and that the deceased wore a different type of eye glasses. The Prosecution did not produce either blood specimen as to which it offered testimony regarding analysis and typing and which it used as evidence of ownership of the eye glasses for examination by the Petitioner. The Prosecution contended that all of the blood specimen removed from of the frame of the glasses was used in the testing that it performed and that the balance of the specimen removed from the body of the deceased was destroyed or disposed of.

(4). Additionally, the evidence showed that there was a blood residue on the lens of the eye glasses the Prosecution contended were being worn by the deceased at the time he was killed. The Prosecution did not produce this blood residue for examination and testing by the Petitioner.

(5). The Prosecution used the eye glasses, which it linked to the deceased by use of the analyses of

25

blood specimens to create an inference that the glasses were being worn by the deceased at the time he was killed, and the skull of the deceased as demonstrative evidence of its theory that the deceased was killed by a blow to the left temple by a blunt instrument by displaying to the jury a photograph of the skull of the deceased before it was destroyed or otherwise disposed of with the deformed eye glasses resting upon it in the manner that such eye glasses would ordinarily be worn and pointed out that the deformity in the left leg matched the location of the left temple injury the Prosecution contended was the fatal injury.

(6). An examination and analysis of the skull of the deceased and an examination and analysis of the blood specimens used by the Prosecution could have produced evidence favorable to the Petitioner in the defense of the charge against him. The Petitioner was deprived of this opportunity to develop favorable evidence by the action of the Prosecution in withholding and destroying or disposing of the skull and the blood specimens.

(7). Petitioner avers that the destruction or disposal of the said skull and the blood specimens was done in bad faith and amounted to a denial of due process of law in that the said specimens were destroyed or disposed of by the

Prosecution after a decision had been made to prosecute the Petitioner for homicide. Alternatively, Petitioner avers that the destruction and disposition of the said evidence denied him due process of law in violation of the Fourteenth Amendment to the Constitution of the United States in that it rendered his trial fundamentally unfair in denying him an opportunity to confront, challenge, and refute critical evidence against him.

(b). Petitioner has exhausted all State remedies as to Ground Three.

(c). Petitioner raised the issue of Ground Three on direct appeal of his conviction.

(d). (1). Petitioner raised the issue presented by Ground Three by a post-conviction petition under Rule 32 of the Alabama Rules of Criminal Procedure in the State trial court.

(2). The issue raised by Ground Three was raised by a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure. The petition was filed in the Circuit Court of Elmore County, Alabama at Wetumpka, Alabama. It was docketed as Case Number CC96-421.60. The Circuit Court of Elmore County, Alabama rendered a decision denying the said petition on September 23, 2005.

A copy of the Order of the Circuit Court of Elmore County, Alabama denying said petition is attached hereto as Exhibit 4.

(3). Petitioner did not receive an evidentiary hearing in the Circuit Court of Elmore County, Alabama on his petition for post-conviction relief.

(4). Petitioner appealed the denial of his petition for post-conviction relief.

(5). Petitioner raised the issue presented by Ground Three in the said appeal.

(6). Petitioner appealed to the Court of Criminal Appeals of Alabama in Montgomery, Alabama. The case was docketed in that Court as Case Number CR-05-0627. On April 21, 2006 the Court of Criminal Appeals of Alabama affirmed the order of the Circuit Court of Elmore County, Alabama in an unpublished memorandum opinion, a copy of which is attached hereto as Exhibit 5.

(7). Petitioner raised the issue presented by Ground Three in his appeal of the denial of his post-conviction petition to the Court of Criminal Appeals of Alabama.

(e). Petitioner sought to review the decision of the Court of Criminal Appeals of Alabama by filing a petition for

writ of certiorari in the Supreme Court of Alabama after having an application for re-hearing denied by the Court of Criminal Appeals of Alabama on May 12, 2006. On June 7, 2006 the Supreme Court of Alabama granted in part Petitioner's petition for writ of certiorari. A copy of the said order of June 7, 2006 is attached hereto as Exhibit 6. However, on September 15, 2006 the Supreme Court of Alabama quashed the writ of certiorari previously granted. A copy of the said order of September 15, 2006 is attached hereto as Exhibit 7.

**GROUND FOUR:** The conviction of the Petitioner was obtained following a trial that was rendered fundamentally unfair because of a denial of due process of law and a denial of rights guaranteed to the Petitioner by the Fourteenth Amendment to the Constitution of the United States by the failure of the Prosecution to disclose and produce to the Petitioner upon his request and the destruction and disposal of certain records or notes made by the medical examiner for the Alabama Department of Forensic Sciences at the time of his examination of the body of the deceased, from which examination the medical examiner concluded that the deceased met his death as the result of an accident.

(a). On February 13, 1992, the day after the death of the deceased, the medical examiner of the Alabama Department of Forensic Sciences examined the body of the deceased and concluded that the deceased was killed in an accident. At the time of this examination, as is required by Alabama law (See Alabama Code of 1975, §36-18-2), the medical examiner made a record of his investigation. The record was made by dictating notes which were electronically recorded and included his findings from his examination and the reasons for his conclusions. These notes or records were favorable to the Petitioner in the defense of the charge against him because they indicated an accidental death, not a homicide. Petitioner requested that the Prosecution produce the medical examiner's notes and records of the February 13, 1992 investigation. The said notes or records were not produced. The medical examiner testified that the electronically recorded notes were never transcribed and were destroyed. The Alabama Department of Forensic Sciences is required by statute to keep a record of such examinations (see Alabama Code of 1975, §36-18-2). The destruction of the said notes contrary to a statutory requirement constitutes bad faith on the part of the Prosecution in depriving the Petitioner of evidence favorable to his defense of charges against him and is

contrary to the due process rights guaranteed the Petitioner by the Fourteenth Amendment to the United States Constitution.

(b). Petitioner has exhausted his State remedies as to Ground Four.

(c). The issue raise by Ground Four was raised on the direct appeal.

(d). (1). Petitioner raised the issue presented by Ground Four in a post-conviction proceeding in the State trial court.

(2). Petitioner filed a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Elmore County, Alabama at Wetumpka, Alabama. The said case was docketed as Case Number CC96-421.60. The Circuit Court of Elmore County, Alabama rendered a decision denying the said petition on September 23, 2005. A copy of the order of the Circuit Court of Elmore County, Alabama denying said petition is attached hereto as Exhibit 4.

(3). Petitioner did not receive an evidentiary hearing of his petition for post-conviction relief.

(4). Petitioner appealed the denial of his petition for post-conviction relief.

(5). Petitioner raised the issue presented by Ground Four in the said appeal.

(6). Petitioner appealed to the Court of Criminal Appeals of Alabama in Montgomery, Alabama. The case was docketed in that Court as Case Number CR-05-0627. On April 21, 2006 the Court of Criminal Appeals of Alabama affirmed the order of the Circuit Court of Elmore County in an unpublished memorandum opinion, a copy of which is attached hereto as Exhibit 5.

(7). Petitioner raised the issue presented by Ground Four in his appeal of the denial of his post-conviction petition to the Court of Criminal Appeals.

(e). Petitioner sought to review the decision of the Court of Criminal Appeals of Alabama by filing a petition for writ of certiorari in the Supreme Court of Alabama after having an application for rehearing denied by the Court of Criminals of Alabama on May 12, 2006. On June 7, 2006 the Supreme Court of Alabama granted in part Petitioner's petition for writ of certiorari. A copy of the said order of June 7, 2006 is attached hereto as Exhibit 6. However, on September 15, 2006 the Supreme Court of Alabama quashed the writ of certiorari previously granted. A copy of the said order of September 15, 2006 is attached hereto as Exhibit 7.

**GROUND FIVE:** Petitioner was denied due process of law and his trial and conviction were rendered fundamentally unfair, contrary to rights guaranteed the Petitioner by the Sixth and Fourteenth Amendments to the United States Constitution, when the trial judge refused to suspend Petitioner's trial, which was at the stage where all the evidence had been presented and closing arguments were scheduled to begin the next day, to allow Petitioner's lead counsel to arrange for and attend the funeral of his father who had died in the interval between the completion of testimony and the commencement of closing arguments at Petitioner's trial.

(a). The father of Petitioner's lead counsel died on the day on which testimony in Petitioner's trial was completed and prior to the time that closing arguments would have ordinarily followed on the next day. Petitioner's counsel requested a delay in closing argument to allow him to make arrangements for and attend his father's funeral, citing the fact that the impact of this tragedy rendered him incapable of adequately and properly continuing his representation of Petitioner until after arrangements were made for and the funeral of his father was completed, a two day delay in the completion of the trial. The trial court denied this request and required Petitioner's counsel to

proceed with closing arguments on the day before the funeral of his father. The effect of this refusal was to deny Petitioner the right to the effective services of counsel of his choosing in representing him in the defense of the charges against him.

(b). Petitioner has exhausted his State remedies as to Ground Five.

(c). The issue raised by Ground Five was raised on the direct appeal of Petitioner's conviction.

(d). (1). Petitioner raised the issue presented by Ground Five in a post-conviction proceeding in the State trial court.

(2). Petitioner filed a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Elmore County, Alabama at Wetumpka, Alabama. The said case was docketed as Case Number CC96-421.60. The Circuit Court of Elmore County, Alabama rendered a decision denying the said petition on September 23, 2005. A copy of the order of the Circuit Court of Elmore County, Alabama denying said petition is attached hereto as Exhibit 4.

(3). Petitioner did not receive an evidentiary hearing of his petition for post-conviction relief.

34

(4). Petitioner appealed the denial of his petition for post-conviction relief.

(5). Petitioner raised the issue presented by Ground Five in the said appeal.

(6). Petitioner appealed to the Court of Criminal Appeals of Alabama in Montgomery, Alabama. The case was docketed in that Court as Case Number CR-05-0627. On April 21, 2006 the Court of Criminal Appeals of Alabama affirmed the order of the Circuit Court of Elmore County, Alabama in an unpublished memorandum opinion, a copy of which is attached hereto as Exhibit 5.

(7). Petitioner raised the issue presented by Ground Five in his appeal of the denial of his post-conviction petition to the Court of Criminal Appeals.

(e). Petitioner sought to review the decision of the Court of Criminal Appeals of Alabama by filing a petition for writ of certiorari in the Supreme Court of Alabama after having an application for rehearing denied by the Court of Criminals of Alabama on May 12, 2006. On June 7, 2006 the Supreme Court of Alabama granted in part Petitioner's petition for writ of certiorari. A copy of the said order of June 7, 2006 is attached hereto as Exhibit 6. However, on September 15, 2006 the Supreme Court of Alabama quashed the writ of

35

certiorari previously granted. A copy of the said order of September 15, 2006 is attached hereto as Exhibit 7.

**GROUND SIX**: Petitioner was denied due process of law and the prosecution of him was rendered fundamentally unfair and violated rights guaranteed to him by the Fourteenth Amendment to the Constitution of the United States because of undue delay, to the prejudice of the Petitioner, in the initiation of the prosecution against him which accorded an advantage to the Prosecution in the trial of the case against Petitioner.

(a). The event on which the prosecution of Petitioner was based, the death of the deceased, occurred on February 12, 1992. The indictment against the Petitioner was returned on October 4, 1996. The investigation by the Prosecution of the death of the deceased began on February 12, 1992 and was completed no later than November 1992. Most of the investigation, including the medical examiner's conclusions that the death of the deceased was a homicide and not an accident and was caused by blunt instrument trauma and not a bulldozer, was completed by April 1992. All of the evidence introduced against the Petitioner at trial was known to the Prosecution by no later than November 1992. The Petitioner was prejudiced by the delay in several respects:

36

(1). In the interim between November 1992 and the time of Petitioner's indictment in October 1996 three persons, namely Barry Worth, Reuben Jarrell and Orender Jarrell, who could have offered testimony favorable to the Petitioner at trial, died.

(2). Before the return of the indictment the bulldozer which the Prosecution first determined had accidently run over and killed the deceased and on which the Prosecution conducted tests and experiments which were offered as evidence at Petitioner's trial, was disposed of and no longer available to the Petitioner for examination and analysis as to defects or other conditions which could have explained the occurrence resulting in the death of the deceased as being accidental and which could have rebutted the evidence regarding tests and experiments presented by the Prosecution at Petitioner's trial. Further, by the time the indictment was returned in October 1996 the location at which the deceased met his death, and at which the Prosecution conducted tests and experiments soon after February 1992 with the bulldozer found at the said location, had been changed and was no longer available to the Petitioner in the same condition in which it existed on February 12, 1992 and in which it existed at the time the Prosecution conducted the

37

tests and experiments it offered evidence of at trial. At Petitioner's trial the trial court rejected evidence offered by the Petitioner conducted by a bulldozer expert using a different bulldozer of the same model which was conducted at a different location because the bulldozer was not the same as the bulldozer found at the location where the deceased was killed and because the area and terrain where the Petitioner's test and experiments were conducted were different from those existing at the time and place where the deceased was killed. Had the indictment been returned earlier and the Petitioner put on notice that he was being prosecuted, Petitioner's experts could have conducted a test and experiment using the same bulldozer and at the same undisturbed location as that used by the Prosecution in its tests and experiments.

(3). Before the return of the indictment the Prosecution disposed of blood samples it had used in tests and analyses and as to which it offered testimony at Petitioner's trial (as hereinabove described in Ground Three of this petition), thereby depriving the Petitioner of the opportunity to have testing and analyses conducted on these blood samples to rebut the testimony presented by the Prosecution with respect to such samples and to rebut the inferences the Prosecution argued based on this evidence.

(4). Before the return of the indictment the Prosecution disposed of the skull of the deceased and other tissue which the medical examiner had examined and which were the subject of prosecution testimony (as hereinabove described in Ground Three of this petition), thereby depriving the Petitioner of the opportunity to have the said skull and other tissue examined and analyzed in order to rebut the evidence the Prosecution presented and the inferences the Prosecution argued from it.

(5). Before the return of the indictment the Prosecution's medical examiner destroyed and disposed of portions of his initial notes and records of findings made on the examination of the body of the deceased (as hereinabove described in Ground Four of this petition) and thereby deprived the Petitioner of the opportunity to have these notes and records of these findings available for use as evidence at the trial of this case to rebut the evidence offered by the Prosecution against him.

(6). The delay in the initiation of the prosecution prevented the discovery by the Petitioner of critical evidence for his defense, the newly discovered evidence described below in Ground Seven of this petition, and allowed the memory of the custodian of it to fade and render

it unavailable for use at Petitioner's trial. Had this prosecution been initiated earlier the possessor of this evidence would have recalled the fact of her possession of it and would have revealed its existence to the Petitioner in time for its use at the trial of this case.

(7). The delay of the initiation of the prosecution against the Petitioner was to gain an advantage for the Prosecution. The said delay deprived the Petitioner of due process rights guaranteed by the Fourteenth Amendment to the United States Constitution

(b). Petitioner has exhausted his State remedies as to Ground Six.

(c). The issue raise by Ground Six was raised on the direct appeal of Petitioner's conviction.

(d). (1). Petitioner raised the issue presented by Ground Six in a post-conviction proceeding in the State trial court.

(2). Petitioner filed a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Elmore County, Alabama at Wetumpka, Alabama. The said case was docketed as Case Number CC96-421.60. The Circuit Court of Elmore County, Alabama rendered a decision denying the said petition on

September 23, 2005. A copy of the order of the Circuit Court of Elmore County, Alabama denying said petition is attached hereto as Exhibit 4.

(3). Petitioner did not receive an evidentiary hearing of his petition for post-conviction relief.

(4). Petitioner appealed the denial of his petition for post-conviction relief.

(5). Petitioner raised the issue presented by Ground Six in the said appeal.

(6). Petitioner appealed to the Court of Criminal Appeals of Alabama in Montgomery, Alabama. The case was docketed in that Court as Case Number CR-05-0627. On April 21, 2006 the Court of Criminal Appeals of Alabama affirmed the order of the Circuit Court of Elmore County, Alabama in an unpublished memorandum opinion, a copy of which is attached hereto as Exhibit 5.

(7). Petitioner raised the issue presented by Ground Six in his appeal of the denial of his post-conviction petition to the Court of Criminal Appeals.

(e). Petitioner sought to review the decision of the Court of Criminal Appeals of Alabama by filing a petition for writ of certiorari in the Supreme Court of Alabama after having an application for rehearing denied by the Court of

41

Criminals of Alabama on May 12, 2006. On June 7, 2006 the Supreme Court of Alabama granted in part Petitioner's petition for writ of certiorari. A copy of the said order of June 7, 2006 is attached hereto as Exhibit 6. However, on September 15, 2006 the Supreme Court of Alabama quashed the writ of certiorari previously granted. A copy of the said order of September 15, 2006 is attached hereto as Exhibit 7.

**GROUND SEVEN**: The conviction of the Petitioner is fundamentally unfair and is a denial of due process of law and rights guaranteed to the Petitioner by the Fourteenth Amendment to the Constitution of the United States in that Petitioner has been prevented from presenting newly discovered evidence material to the defense of the charge against him, which was discovered after his trial and conviction. This newly discovered evidence, if presented at trial, would have disproved the prosecution evidence against Petitioner and established his innocence. The said newly discovered evidence is so compelling in its impact upon the innocence of the Petitioner that it is fundamentally unfair and a violation of Petitioner's due process rights to allow his conviction to stand in the absence of the trier of fact considering this evidence.

(a). The newly discovered evidence and its significance to this case are as follows:

(1). The evidence against Petitioner at trial was not strong and was entirely circumstantial. No direct evidence showed that Petitioner committed a crime.

(2). The newly discovered evidence is a pair of eye glasses and an eye glasses case that belonged to Robert Landers, Sr., the deceased, which were given to Lenita Jarrell Landers, the wife of the deceased, by Sheriff Bill Franklin, the Sheriff of Elmore County, Alabama, on the night of February 12, 1992 at the location where the body of the deceased was found. These eye glasses and eye glasses case are presently in the possession of Lenita Jarrell Landers and have been in her possession since February 12, 1992, and their condition is unchanged from the condition they were in when given to her by Sheriff Franklin on February 12, 1992.

(3). Neither the Petitioner nor his attorneys had knowledge of the existence of the said eye glasses and the said eye glasses case, or of the unknowing possession of them by Lenita Jarrell Landers, at the time of Petitioner's trial in April and May 1997, over five years after the glasses were given to Mrs. Landers, and neither was informed of the existence of the said glasses and case until well after the

43

completion of Petitioner's trial and his conviction and sentence and the ruling on his post-trial motion under Rule 24 of the Alabama Rules of Criminal Procedure.

(4). Attached to this petition as Exhibit 8 is the affidavit of Lenita Jarrell Landers, dated May 6, 2005, which sets out the facts and circumstances surrounding her acquisition and possession of the said newly discovered evidence.

(5). Neither the Petitioner nor his attorneys could have discovered the said evidence at an earlier time because the existence and location of the said newly discovered evidence could have been known only to Lenita Jarrell Landers, who did not disclose it to Petitioner or his attorneys until after the ruling on Petitioner's post-trial motions and who, for a valid and legitimate reasons, had no recall of the existence and location of the said evidence until immediately before she disclosed the existence of the same after Petitioner's conviction and sentence and after his post-trial motion was denied.

(5). The significance of this evidence to the guilt or innocence of the Petitioner arises from the following:

44

(A). At Petitioner's trial the Prosecution contended that the deceased, Robert Landers, Sr., died on February 12, 1992 as a result of homicide rather than an accident. The medical examiner first determined that the deceased was accidentally killed by the crushing impact of being run over by a track of a crawler tractor (bulldozer). Later the Prosecution contended the death was a homicide and that the deceased met his death after receiving a blow by a blunt instrument on the left temple before he was run over by the bulldozer under whose track his body was found. The Prosecution theory, as outlined by the Prosecuting Attorney in opening statement and closing argument, was that the deceased was struck on the left temple by a blunt instrument and killed and then placed on the ground and run over by the bulldozer.

(B). The Prosecution sought to prove this theory of the manner in which the deceased met his death solely by the opinion testimony of Dr. James Lauridson, a medical examiner employed by the Department of Forensic Sciences. Dr. Lauridson described an injury to the left temple of the deceased. He testified that in his opinion this injury was produced by a blunt instrument which struck the temple with substantial force and caused his death. The Prosecution produced no evidence of the existence of a blunt

45

instrument that was connected to an injury on the body of the deceased. Dr. Lauridson testified that he observed injuries to the left temple that were substantially "vertical" fractures whereas the other fractures to the deceased's skull were "horizontal". In Dr. Lauridson's opinion this difference was deemed significant and confirmatory of his opinion and theory that the deceased was struck on the temple with a blunt instrument before he was run over by the bulldozer.

(C). Critical to the Prosecution theory as presented by Dr. Lauridson's opinions was a pair of eye glasses the Prosecution presented as evidence at Petitioner's trial. The Prosecution presented these eye glasses through the testimony of Sheriff Bill Franklin, the Sheriff of Elmore County and one of the first law enforcement officers on the scene after the deceased's body was found on the evening of February 12, 1992. Sheriff Franklin testified that he found no eye glasses at the scene on the night of February 12, 1992. Franklin testified that the eye glasses which were received in evidence were found at the scene on the next day, February 13, 1992, and that they were observed only after the bulldozer which was found resting on the deceased's body was moved on February 13, 1992. To support his opinions about the manner in which the deceased met his death Dr. Lauridson relied

46

heavily on the eye glasses Sheriff Franklin identified.  Dr.
Lauridson described an experiment he performed with the eye
glasses Sheriff Franklin had identified.  He testified that he
reconstructed the shattered bones of the deceased's skull and
placed the eye glasses on the skull.  Dr. Lauridson testified
that the left leg of these eye glasses was bent, a fact that
is observable from looking at them.  Dr. Lauridson opined that
the deformity in the left leg of the glasses matched the
injury on deceased's left temple that he had described.  From
his conclusion that the bent leg of the glasses matched the
wound on the temple, Dr. Lauridson opined that these glasses
established factually his theory that the deceased was struck
with a blunt instrument at this spot on the temple.  In the
most dramatic and forceful part of his testimony Dr. Lauridson
supported his conclusion with a photograph of his experiment
with the eye glasses with the bent leg resting upon the
deceased's reconstructed skull in the manner in which the eye
glasses would generally rest if worn by the deceased.  Dr.
Lauridson emphasized that these eye glasses proved the theory
of a blow to deceased's left temple by a blunt instrument
administered by some individual before the deceased was run
over by the bulldozer.

(D). Dr. Lauridson's prosecution theory could be valid only if these particular glasses were the eye glasses of the deceased and he was wearing them at the time he was struck. The eye glasses which Dr. Lauridson related to the theoretical critical injury to the left temple he described in his opinion testimony did not have an undisputed or credible predicate as being the deceased's glasses or being glasses related to his injury. No witness testified that the deceased was wearing these glasses on February 12, 1992. These glasses, by the Prosecution's testimony, were not found and were not retrieved from the location where the deceased's body was found until February 13, 1992, the next day after the body was discovered. In the interval between the time deceased's body was found on February 12, 1992 and the discovery of these glasses the scene had not been secured and many persons had been in the area and had walked over the scene where the deceased's body was found.

(E). The eye glasses offered into evidence by the Prosecution were identified by only one witness, whose credibility was seriously challenged, as being the eye glasses of the deceased and no witness testified these were the eye glasses he wore on February 12, 1992. They were not shown by any optometrical evidence to have lenses prescribed for the

48

deceased. These eye glasses had rather thick plastic frames. The eye glasses ordinarily worn by the deceased, according to the testimony of several witnesses, and as verified by several photographs, were wire frame glasses identical to the newly discovered evidence.

(F). The Prosecution's effort to connect the eye glasses it offered in evidence to the deceased was by testimony that there was blood on these eye glasses and that an analysis of this blood only by the ABO grouping analysis showed that the blood on the said eye glasses was Type O blood and that the deceased had Type O blood. This conclusion is a total non sequitur. It does not prove a connection between the deceased and these glasses. Merely showing that the blood type of the blood found on the glasses was Type O does not prove it was the deceased's blood. As is general knowledge, Type O is the most common blood type, so the Prosecution evidence does not exclude the possibility that it was the blood of approximately half the population. No further or more definitive analysis, such as DNA, was made of this blood specimen recovered from the glasses. The Prosecution used all of this blood specimen, or disposed of any unused portion of it, and no opportunity was afforded the Petitioner to have the blood stain on the said eye glasses analyzed by a more

definitive method to determine if it was in fact the blood of the deceased.

(G). The newly discovered evidence shows that the eye glasses which were the crux of the Prosecution's theory were not eye glasses of the deceased or eye glasses he was wearing at the time of his death. The newly discovered evidence totally undermines the Prosecution's theory for its case against the Petitioner.

(6). After the conclusion of the Petitioner's trial the Petitioner learned there was concrete and conclusive evidence that the eye glasses used by the Prosecution at his trial to prove the Prosecution theory were not the eye glasses of the deceased when he later learned that the real eye glasses of the deceased, which had been given to the wife of the deceased at the location where his body was found on the evening of his death, were in the possession of the deceased's wife, Lenita Jarrell Landers.

(7). The fact that these eye glasses, the newly discovered evidence, were in the possession of Mrs. Landers was not known by the Petitioner or Petitioner's counsel at the time of his trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, of the Alabama Rules of Criminal Procedure and could not have been discovered by any

50

of those times through the exercise of reasonable diligence.

(8).    This newly discovered evidence (the eye glasses now in the possession of Mrs. Landers) are not merely cumulative to other facts that were known and do not amount to mere impeachment evidence.

(9).    If this evidence had been known, i.e., if these eye glasses had been available for use as evidence at the time of Petitioner's trial, the results of the trial would have been different, in that:

(A).    This evidence establishes that the eye glasses placed in evidence by the Prosecution were not eye glasses worn by the deceased on February 12, 1992 and that the use of this evidence to support the Prosecution theory, and an inference that the deceased was struck on the left temple by a blunt instrument prior to being run over by the bulldozer, was a use of false evidence and provided a false basis for any inference the jury could draw.    The newly discovered evidence refutes this critical portion of the Prosecution theory by tangible physical evidence.

(B).    This newly discovered evidence is consistent with the report and testimony of Deputy Townsend, one of the first law enforcement officers to the scene where deceased's body was discovered.    Deputy Townsend filed a

report in which he stated that eye glasses were observed by him near the body of the deceased on the night of February 12, 1992. He identified this report in his trial testimony and testified that he did not retrieve the glasses. Deputy Townsend testified at trial that he was not sure about his observations on the night of February 12, 1992 and that after talking to Sheriff Franklin he thought he may have seen only a glasses case near the body. The testimony and report of Deputy Townsend, which is now corroborated by the newly discovered evidence, contradicts the testimony of Sheriff Franklin and other officers that no eye glasses or eye glasses case were observed or retrieved from the scene on Friday 12, 1992.

(C). This newly discovered evidence further contradicts the testimony of Prosecution witness Sheriff Franklin that no eye glasses were found or retrieved at the scene, near the body of deceased, on the night of February 12, 1992 and before there was opportunity for the scene to be disturbed.

(D). The Prosecution's supporting evidence for its prosecution theory - that the deceased was struck on the left temple with a blunt instrument which bent the leg of the glasses he was wearing at the time - is thoroughly refuted

52

by the newly discovered evidence.

(10). The newly discovered evidence establishes that Petitioner is innocent of the crime for which he was convicted. To allow Petitioner's conviction to stand without the opportunity for offering this newly discovered evidence in his defense is a violation of Petitioner's due process rights. and renders his conviction fundamentally unfair.

(b). Petitioner has exhausted his State remedies as to Ground Seven.

(c). (1). This issue was not raised on direct appeal from the judgment of conviction.

(2). This issue was not raised on direct appeal because the existence of this evidence was not known at that time.

(d). (1). Petitioner raised the issue presented by Ground Seven in a post-conviction proceeding in the State trial court.

(2). Petitioner filed a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Elmore County, Alabama at Wetumpka, Alabama. The said case was docketed as Case Number CC96-421.60. The Circuit Court of Elmore County, Alabama rendered a decision denying the said petition on

53

September 23, 2005. A copy of the order of the Circuit Court of Elmore County, Alabama denying said petition is attached hereto as Exhibit 4.

(3). Petitioner did not receive an evidentiary hearing of his petition for post-conviction relief.

(4). Petitioner appealed the denial of his petition for post-conviction relief.

(5). Petitioner raised the issue presented by Ground Seven in the said appeal.

(6). Petitioner appealed to the Court of Criminal Appeals of Alabama in Montgomery, Alabama. The case was docketed in that Court as Case Number CR-05-0627. On April 21, 2006 the Court of Criminal Appeals of Alabama affirmed the order of the Circuit Court of Elmore County, Alabama in an unpublished memorandum opinion, a copy of which is attached hereto as Exhibit 5.

(7). Petitioner raised the issue presented by Ground Seven in his appeal of the denial of his post-conviction petition to the Court of Criminal Appeals of Alabama.

(e). Petitioner sought to review the decision of the Court of Criminal Appeals of Alabama by filing a petition for writ of certiorari in the Supreme Court of Alabama after

having an application for rehearing denied by the Court of Criminals of Alabama on May 12, 2006. On June 7, 2006 the Supreme Court of Alabama granted in part Petitioner's petition for writ of certiorari. A copy of said order of June 7, 2006 is attached to this petition as Exhibit 6. However, on September 15, 2006 the Supreme Court of Alabama quashed the writ of certiorari previously granted. A copy of said order of September 15, 2006 is attached to this petition as Exhibit 7.

**GROUND EIGHT:** Petitioner was denied due process of law and equal protection of the laws and the conviction of him and his confinement under the said conviction was rendered fundamentally unfair and in violation of rights guaranteed to the Petitioner by the Fourteenth Amendment to the United States Constitution in that the State court which tried and convicted the Petitioner did not have jurisdiction to try and convict him because the allegations of the indictment against Petitioner did not confer subject-matter jurisdiction under Alabama law upon the trial court and deprived the said trial court of subject-matter jurisdiction to try and convict the Petitioner on the evidence that was presented against him at trial and his trial and conviction were extra-jurisdictional

and his conviction is void and his confinement under it unauthorized.

(a). The indictment returned against the Petitioner by the Grand Jury alleged:

> The Grand Jury of said County charge that before the finding of this Indictment, MARK SAMUEL LANDERS whose true name is to the Grand Jury unknown, otherwise as stated, did, intentionally cause the death of Robert R. Landers, Sr., by running over and crushing him with a bulldozer, for a pecuniary or other valuable consideration, to-wit: the proceeds of a life insurance policy on Robert R. Landers, Sr., in violation of Section 12A-5-40(a)(7), Code of Alabama, 1975, against the peace and dignity of the State of Alabama.

The proof offered by the Prosecution in support of the said indictment was that the death of the decedent was caused by "blunt trauma as a result of being struck on the left side of the head" by a blunt instrument.

Under Alabama law the allegations of an indictment are the source of subject-matter jurisdiction to try a criminal case. Under the indictment returned in this case the State trial court had no subject-matter jurisdiction to try and convict the Defendant for causing the death of the deceased by striking him on the left side of the head with a blunt instrument. Therefore, in the absence of subject-matter jurisdiction for Petitioner's trial and conviction his conviction was coram non judice and void and his confinement

under it is a denial of due process of law and equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.

(b). Petitioner has exhausted his State remedies as to Ground Eight.

(c). (1). Petitioner did not raise this issue on direct appeal from the judgment of conviction.

(2). This issue was not raised by direct appeal, but under Alabama law a jurisdictional issue may be raised at any time in any proceeding.

(d). (1). Petitioner raised the issue presented by Ground Eight in a post-conviction proceeding in the State trial court.

(2). Petitioner filed a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Elmore County, Alabama at Wetumpka, Alabama. The said case was docketed as Case Number CC96-421.60. The Circuit Court of Elmore County, Alabama rendered a decision denying the said petition on September 23, 2005. A copy of the order of the Circuit Court of Elmore County, Alabama denying said petition is attached hereto as Exhibit 4.

(3).  Petitioner did not receive an evidentiary hearing of his petition for post-conviction relief.

(4).  Petitioner appealed the denial of his petition for post-conviction relief.

(5).  Petitioner raised the issue presented by Ground Eight in the said appeal.

(6).   Petitioner appealed to the Court of Criminal Appeals of Alabama in Montgomery, Alabama.  The case was docketed in that Court as Case Number CR-05-0627.  On April 21, 2006 the Court of Criminal Appeals of Alabama affirmed the order of the Circuit Court of Elmore County, Alabama in an unpublished memorandum opinion, a copy of which is attached hereto as Exhibit 5.

(7).  Petitioner raised the issue presented by Ground Eight in his appeal of the denial of his post-conviction petition to the Court of Criminal Appeals of Alabama.

(e).  Petitioner sought to review the decision of the Court of Criminal Appeals of Alabama by filing a petition for writ of certiorari in the Supreme Court of Alabama after having an application for rehearing denied by the Court of Criminals of Alabama on May 12, 2006.  On June 7, 2006 the Supreme Court of Alabama granted in part Petitioner's petition

for writ of certiorari. A copy of the said order of June 7, 2006 is attached to this petition as Exhibit 6. However, on September 15, 2006 the Supreme Court of Alabama quashed the writ of certiorari previously granted. A copy of the said order of September 15, 2006 is attached to this petition as Exhibit 7.

13. (a). All of the grounds raised in this petition have been presented to the Supreme Court of Alabama, the highest State court having jurisdiction.

(b). All grounds in this petition have been previously presented to a State court. No ground of this petition has been previously presented to a Federal court.

14. No petition, application, or motion has been filed in any Federal court regarding the conviction challenged in this petition.

15. Petitioner has no petition or appeal now pending in any court, either State of Federal, challenging the judgment he challenges in this petition.

16. The name and address of the attorneys who represented Petitioner in the following stages of the judgment being challenged by this petition are as follows:

(a). Petitioner had no preliminary hearing.

(b). At arraignment and plea Petitioner was represented by William N. Clark, 940 Financial Center, Birmingham, Alabama.

(c). At trial Petitioner was represented by William N. Clark and Maxwell H. Pulliam, 940 Financial Center, Birmingham, Alabama.

(d). At sentencing Petitioner was represented by William N. Clark and Maxwell H. Pulliam, 940 Financial Center, Birmingham, Alabama.

(e). On appeal Petitioner was represented by William N. Clark, Maxwell H. Pulliam, Ronald J. Gault, and Gerald L. Miller, 940 Financial Center, Birmingham, Alabama.

(f). In post-conviction proceedings in the State trial court Petitioner was represented by William N. Clark and William H. Mills, 940 Financial Center, Birmingham, Alabama.

(g). On appeal from the adverse rulings in the post-conviction proceeding the Petitioner was represented by William N. Clark and William H. Mills, 940 Financial Center, Birmingham, Alabama.

17. Petitioner has no future sentence to serve after completing the sentence for the judgment being challenged by this petition.

18. Petitioner's judgment of conviction became final over one year ago, but within one year from the date on which his conviction became final, June 18, 2004, Petitioner filed, on May 31, 2005, a petition for post-judgment relief in the Circuit Court of Elmore County, Alabama and that said petition, or the appeal of the ruling of the said Circuit Court on it, remained pending in State court until September 15, 2006, when the Supreme Court of Alabama, as aforesaid, denied certiorari. Under Section 2244(d)(2) of Title 28, United States Code, the time during which the said State post-conviction relief petition was pending in State court is not counted toward the period of limitation for the filing of this petition, so this petition is timely.

WHEREFORE, Petitioner prays that the Court grant relief by entering an order vacating the judgment and sentence imposed upon him by the Circuit Court of Elmore County, Alabama and any other relief to which the Petitioner may be entitled.

William H. Mills
ASB-9841-M75W

and

61

William N. Clark
ASB-1260-C54W
REDDEN, MILLS & CLARK
940 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481 - Fax

Attorneys for Petitioner

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29 day of September, 2006.

Petitioner - Mark Samuel Landers

62

FILED
2006 Sep-29  PM 04:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 1

# COURT OF CRIMINAL APPEALS
### STATE OF ALABAMA
JUDICIAL BUILDING, 300 DEXTER AVENUE
P.O. BOX 301555
MONTGOMERY, AL 36104-1555



RELEASED

DEC 15 2000

CLERK
ALA COURT CRIMINAL APPEALS

FRANCIS ALLEN LONG, SR.
Presiding Judge
H. WARD McMILLAN
SUE BELL COBB
PAMELA W. BASCHAB
JAMES H. FRY
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334)242-4590

## MEMORANDUM

CR-97-0194                                    Elmore Circuit Court No. CC-96-421

Mark Samuel Landers v. State

LONG, Presiding Judge.

AFFIRMED. Mark Samuel Landers was convicted of murder made capital because it was committed for pecuniary gain or other valuable consideration. See § 13A-5-40(a)(7), Ala. Code 1975. The jury, by a vote of 12-0, recommended that Landers be sentenced to life imprisonment without the possibility of parole. The trial court accepted the jury's recommendation and sentenced Landers to life without parole.

### I.

Landers contends that the evidence was insufficient to sustain his conviction.

The evidence adduced at trial tended to show the following. On February 12, 1992, at 8:45 p.m., Connie Johnson, a dispatcher with the Elmore County Sheriff's Department, received a call from a man who identified himself as Landers. According to Johnson, Landers told her that he needed help because "there was a bulldozer on his daddy." (R. 996.) Landers gave Johnson directions to Cliff Side Road in Titus in Elmore County, and Johnson then dispatched several officers to the scene and notified the coroner.

Elmore County Chief Investigator Byron Martin testified that he arrived at the scene on Cliff Side Road at approximately 9:00 p.m. on February 12, 1992. Elmore County Deputy Sheriff Willie Townsend was already present and speaking with Landers. According to Martin, it was cloudy outside when he arrived, but it was not raining; Martin stated that it began raining at approximately 10:00 p.m. that evening. At the scene, there was a white dumptruck and a "low boy" flatbed trailer off the side of the road. The truck's lights were on, the engine was running, and the driver's side door was open. Near the right rear of the flatbed trailer, said Martin, a bulldozer was backed against an embankment of trees and brush, with the front of the bulldozer facing the right rear of the trailer; the blade of the bulldozer was pointed down. The body of a man later identified as Robert Richard Landers, Sr. (the appellant's father), was pinned underneath the right rear track of the bulldozer, with the track partially up on the side of his head. On top of the left track of the bulldozer and on some leaves in front of the bulldozer near the blade, according to Martin, was a substance that appeared to be blood; however, Martin did not collect any samples of this substance. Martin testified that there were no marks from the bulldozer's tracks anywhere on the ground behind the flatbed trailer or around the bulldozer. The only wheelmarks present

EXHIBIT 1

at the scene, he said, were those made by the wheels of the truck and the flatbed trailer. Martin stated that he found a single chain and a piece of pipe on the bed of the trailer, but that after searching the area, he was unable to find any "chain binders," which typically are used to tie down heavy equipment for transport.

Elmore County Sheriff Bill Franklin arrived at the scene on Cliff Side Road approximately 10 minutes after Investigator Martin. Sheriff Franklin testified that it was drizzling rain when he arrived. He stated that as soon as he stepped out of his vehicle at the scene, Landers approached him with his hand extended and told him that they had a "mutual friend," Ken Edwards. According to Sheriff Franklin, Landers then told him that he had told his father not to "play" on the bulldozer, but that his father had had an accident and was lying under the bulldozer. Sheriff Franklin testified that Landers was the first person at the scene to use the word "accident" and that Landers was not crying or upset when he was speaking with the Sheriff. Sheriff Franklin stated that when he asked Landers where the "bucking tongs" for tying down large pieces of machinery were located, Landers replied that he did not know.

Between 10:00 and 10:30 p.m. that night, Phil Holland, a forensic investigator with the Alabama Department of Forensic Sciences, arrived at the scene to take custody of the victim's body. Holland testified that when he first arrived, he noticed that the bulldozer was in reverse gear and that its ignition switch was in the on position. A wrecker was used to lift the bulldozer while Holland removed the victim's body from under the bulldozer's track. Holland placed the body in a body bag and transported it to the forensic laboratory. Holland stated that before he left the scene, Investigator Martin informed him that Landers had spoken with Deputy Townsend and had told the deputy that he had left his father in the area earlier in the afternoon, that the bulldozer was loaded on the flatbed trailer when he left, and that his father had tried to unload the bulldozer after he left but had fallen off and been accidentally run over.

The following day, Thursday, February 13, 1992, Sheriff Franklin and Investigator Martin returned to the scene on Cliff Side Road with John and David Strickland, friends of Sheriff Franklin and owners of Strickland Brothers Construction Company. At the direction of Sheriff Franklin, John Strickland started the bulldozer, which was still in the position it had been found in the night before (i.e., backed against an embankment of trees and brush), and attempted to back it over the embankment and into the woods just behind. According to Sheriff Franklin, the bulldozer's engine died when John Strickland attempted to do this. Sheriff Franklin stated that, at the scene, David Strickland pointed out a pair of eyeglasses near the bulldozer's left track. Sheriff Franklin collected the glasses and later turned them over to Investigator Martin.

Investigator Martin testified that on Thursday, February 13, he searched the area surrounding the scene and, on a nearby dirt road, found bulldozer tracks and several indentations in the ground that appeared to have been made by a ramp used to load and unload a bulldozer from a trailer.

On Friday, February 14, 1992, the Elmore County Sheriff's Department contacted the Alabama Bureau of Investigation ("ABI") and requested assistance in investigating the death of Robert Richard Landers, Sr. ABI Agents William Rhegness and Anthony Burton responded to the call and went to the scene on Friday afternoon with Investigator Martin and Sheriff Franklin. No equipment remained at the scene at that time. Agent Rhegness testified that the first thing he noticed at the scene was the absence of bulldozer trackmarks in the area where, he had been told, the truck, trailer, and bulldozer were found. Agent Rhegness, however, testified that he saw (just as Investigator Martin had seen the day before) what appeared to be bulldozer trackmarks and several deep indentations on a nearby dirt road. Like Investigator Martin, Agent Rhegness also believed that the indentations had been made from a ramp that would normally be used to load and unload a tracked vehicle from a trailer.

On Saturday, February 15, 1992, Agents Rhegness and Burton, Investigator Martin, and Sheriff Franklin returned to the scene on Cliff Side Road yet again and conducted an experiment with the bulldozer. Local residents William Harmon Ponder and John Brown were asked to assist. Ponder testified

-2-

that, before the experiment, he went to the residence of Barry Worth, another local resident, to retrieve the truck, trailer and bulldozer that had been found at the scene. Ponder stated that the truck and trailer were stuck in a ditch near the Worth residence and that John Brown had to back the bulldozer off the trailer and then use it to push the truck and trailer out of the ditch. Brown then drove the bulldozer back onto the trailer, and Ponder drove the truck, trailer, and bulldozer to the scene on Cliff Side Road for the experiment. Ponder testified that he and Brown attempted to find chain binders to tie down the bulldozer for the 3/4 mile drive to the scene, but that they were unable to find any on the truck or trailer.

At the scene with the equipment, Ponder attempted to place the truck and trailer into the same position they had been found on February 12, 1992. Ponder testified that he looked at photographs of the scene from February 12 and that there was also paint on the ground to aid him in the placement. Once the truck and trailer were in place, Investigator Martin placed the pipe and chain he had seen on the trailer in approximately the same position he had seen them in on February 12. John Brown then backed the bulldozer off the trailer and, in the process, ran over the pipe and chain. Agent Rhegness testified that because the trailer's bed was made of wood, the chain and pipe left indentations in the trailer bed when they backed over by the bulldozer. Agent Rhegness stated that there were no indentations in the trailer bed before this occurred. Ponder testified that Brown had to raise the blade of the bulldozer approximately two feet in order to back the bulldozer down the ramp without the blade's hitting the edge of the trailer.

According to Ponder, during the experiment, Brown attempted to back the bulldozer down the ramp and turn it so that it would back into the nearby embankment of trees and brush, where it had been found earlier. However, Ponder said, this attempt failed because the bulldozer could not turn that sharply without "eating up" the ramps. Testimony showed that the ramps were in good condition before the experiment began.

Brown subsequently maneuvered the bulldozer so as to place it in the same position it was found on February 12. Evidence showed that this maneuvering tore up the ground.

In March 1992, Thomas Owen Goodney, a forensic engineer and the design engineer for the John Deere 450-E bulldozer -- the same model of bulldozer as Landers's -- was asked by the John Deere Company to investigate the death of Robert Richard Landers, Sr. Goodney, who had retired from the full-time employ of John Deere several years earlier but had continued to work as a consultant, testified that he spoke with ABI Agent Burton about the investigation, looked at photographs taken of the scene on February 12, 1992, and on subsequent occasions, and inspected Landers's bulldozer. According to Goodney, the bulldozer in question was in "very good shape" and had no mechanical problems when he inspected it. On April 6, 1992, Goodney accompanied Landers, Landers's mother, Cleveland Swicord (Landers's cousin by marriage), Investigator Martin, and Agents Rhegness and Burton to the scene on Cliff Side Road and attempted to reconstruct the events of February 12. After placing the truck and trailer in the position they were found in on February 12, Swicord backed the bulldozer off the trailer. Goodney then took photographs of the trackmarks left in the dirt by the bulldozer. According to Goodney, the bulldozer could not have been backed off the trailer and into the position in which it was found on February 12 without leaving trackmarks similar to those created during the reconstruction, even though no such trackmarks were present at the scene on February 12. In addition, Goodney testified that the bulldozer, which had been found with its blade down, could not have been backed off the trailer with the blade in the down position without tearing up the ramps and leaving "backblading" marks in the dirt, none of which were found at the scene on February 12. Given the condition of the ramps at the scene on February 12, Goodney opined that the blade on the bulldozer must have been up when the bulldozer was backed off the trailer, and that only after the bulldozer was backed onto the ground, was the blade put back down. Testimony showed that the only way to put the blade down on the John Deere 450-E bulldozer was by manually pulling a lever on the bulldozer.

-3-

Dr. James Lauridson, the state medical examiner, testified that on Thursday, February 13, 1992, he performed an external examination of the body of Robert Richard Landers, Sr. Dr. Lauridson testified that he observed severe crushing injuries and abrasions to the entire left side of the victim's body, including the left leg, left abdomen, left chest, neck and face; those injuries, he said, were horizontally oriented and exhibited very little hemorrhaging. According to Dr. Lauridson, the injuries were consistent with being run over by a bulldozer; the horizontal nature of the injuries were consistent with the horizontal "cleats" on the track of a bulldozer. Dr. Lauridson also discovered a vertically oriented laceration on the victim's left temple with a significant amount of blood in the tissue surrounding it. Dr. Lauridson testified that based on his observations of the victim's external injuries and on the information he had received from Phil Holland regarding the circumstances surrounding the victim's death (which were based in significant part on Landers's statement to Deputy Townsend at the scene), he did not perform a full autopsy and he initially reported the death as accidental. However, within a few days, said Dr. Lauridson, after he met with ABI Agents Rhegness and Burton and learned more details about the scene, he determined that there were enough suspicious circumstances to warrant a full autopsy.

The body of Robert Richard Landers, Sr., was exhumed, and a full autopsy was performed on March 3, 1992. After performing the autopsy, spending several months "reapproximating" the bones of the victim's skull, and collecting information regarding the case from the investigators, Dr. Lauridson determined that the manner of death was a homicide.

In his testimony, Dr. Lauridson explained that he found several vertically oriented fractures in the left temple area of the victim's skull associated with the vertical laceration in the same area that were inconsistent with the horizontally oriented fractures and abrasions on the victim caused by the bulldozer track and inconsistent with being run over by a bulldozer. Dr. Lauridson stated that the vertically oriented fractures were depressed inward and localized in a single area, while the horizontal injuries on the skull were "crushing fractures" consistent with pressure from the horizontal "cleats" on the track of a bulldozer. Dr. Lauridson stated that the vertical fractures and laceration were most likely caused by a "blunt impact," either from the head being by another object or from the head hitting against another object, i.e., from a fall. Dr. Lauridson testified that the tissue surrounding the vertically oriented injuries was filled with blood, while the tissue surrounding all but one of the horizontal injuries on the rest of the victim's body showed very little hemorrhaging. (The injury to the victim's left leg, he said, also showed hemorrhaging, but less than the vertical injuries to the skull.) Dr. Lauridson stated that the presence of hemorrhaging in the vertical fractures of the skull and the paucity of hemorrhaging in the horizontal injuries indicated that the victim was still alive at the time the vertical injury was inflicted, and that the victim's circulation had lowered or "nearly stopped" by the time the other injuries were inflicted.

Dr. Lauridson put forward two theories as to why the victim's circulation had stopped by the time the horizontal injuries were inflicted. First, Dr. Lauridson stated that the blunt force causing the vertical injuries to the victim's skull could have killed the victim, thus stopping circulation, before the bulldozer crushed him. Second, Dr. Lauridson stated that the bulldozer could have crushed the victim's heart, causing circulation to stop, thus preventing any hemorrhaging in the injuries higher than the heart. Dr. Lauridson testified that, under either theory, the vertically oriented fractures to the left temple must have been inflicted before the victim was run over by the bulldozer.

Katherine K. McGeehan, a forensic serologist with the Alabama Department of Forensic Sciences, testified that she examined a pair of eyeglasses -- State's Exhibit 10, which, she said, she received from ABI Agent Burton -- for the presence of blood. According to McGeehan, she discovered Type O blood on the glasses, the same bloodtype as the victim's. McGeehan did not perform any DNA testing on the blood. The State presented evidence that the eyeglasses in State's Exhibit 10 were the victim's glasses.

The State's theory of the case was that in the months preceding his father's death, Landers was in serious financial trouble and that Landers murdered his father in order to collect the proceeds from a life insurance policy that Lander's had taken out on his father. The State introduced evidence that an

-4-

insurance policy in the amount of $1,000,000 was taken out on the victim's life on August 1, 1991, barely six months before his death. Donald M. Hyde, the director of claims for the Mutual Life Insurance Company of New York ("MONY"), the company that issued the policy, testified that Landers was the owner of the life insurance policy, that Landers was required to pay premiums on the policy of some $3,000 per month, and that Landers was the sole beneficiary of the policy. As the sole beneficiary, Landers stood to collect $1,000,000 in the event of his father's death. Because Landers, and not his father, was the owner of the policy, the proceeds would not go into his father's estate and would not be subject to estate taxes.

Records from MONY revealed that Landers filed a claim for the $1,000,000 on April 6, 1992. Pursuant to a standard contestability clause allowing MONY to challenge the payment of any life insurance proceeds when the death of the insured occurs within two years of purchase of the policy, MONY contested payment of the proceeds to Landers in federal district court. MONY's challenge was unsuccessful, however, and Landers ultimately collected the proceeds from the policy.

The State also introduced into evidence the financial records of Landers's construction company showing that between September 1991 and February 1992, the majority of Landers's business loans were anywhere from 30 days to 90 days past due, and that during that period, his construction company's bank account was overdrawn on a regular basis. Testimony showed that at the time of his father's death, Landers was embroiled in several contract disputes with customers of his construction company. One of these disputes, with Ricki D. Dobbs, a resident of Montgomery who had contracted with Landers to build a house, was later (after the death of Landers's father) settled, and Landers paid Dobbs some $200,000 out of the $1,000,000 life insurance proceeds he had received.

The State also presented evidence, in the form of a certified copy of the promissory note filed with the Secretary of State, that Landers had borrowed $100,000 from his father and had executed a note payable in that amount in March 1988. However, Don White, a loan officer with SouthTrust Bank, which held Landers's line of credit for his business and had floated two loans totalling $272,000 to Landers in 1989, testified that the financial statement Landers had submitted to SouthTrust Bank to secure the line of credit and the loans had not included any reference to the $100,000 loan Landers had received from his father. White also testified that on February 24, 1992, only 12 days after the death of Landers's father, Landers submitted a revised financial statement to Southtrust in which he listed the $1,000,000 from the life insurance policy as a receivable asset.

The State introduced telephone records relating to Landers's cellular telephone. (Testimony showed that Landers's kept the cellular telephone in his pickup truck.) The telephone records revealed that at 4:14 p.m. on the day of his father's death (February 12, 1992), Landers telephoned Southtrust Bank, and that at 4:23 p.m. that same day, Landers telephoned the Montgomery office of MONY, the company holding the life insurance policy on his father. The telephone records showed that no telephone call was made to "911" on the night of February 12, 1992.

The State also presented evidence that, in 1981, while he was working as a property damage adjustor for AllState Insurance Company, Landers had filed false insurance claims. Walter Maule, AllState's corporate director of security in 1981, testified that he investigated Landers while Landers was an employee of the company and that Landers had confessed to committing several thefts during his employment. According to Maule, Landers confessed that he had filed a repair order for his cousin Bambi Pilgrim in relation to an automobile accident that was some $400 in excess of the actual cost of the repairs. Landers also admitted to Maule that, in relation to the same automobile accident, he had filed a fictitious supplemental repair order in which he claimed that he had missed additional damage in the amount of $720 in the original report, when there was, in fact, no additional damage. Landers also told Maule that he had "coached and abetted" his cousin Bambi in filing another false claim for some $1,900. Finally, Maule said, Landers told him that he had induced another customer of the company to sign the back of a blank draft by promising her that the money would go toward her insurance claim when, in fact,

-5-

Landers filled the draft out to a furniture store to pay for furniture he had purchased for himself. Landers was fired from AllState for these thefts.

The State further presented evidence of three statements Landers made on different occasions to different people regarding the events of February 12, 1992. First, on Saturday, February 15, 1992, Landers gave a statement to law enforcement officials at the Elmore County Sheriff's Department. In that statement, which was admitted into evidence without objection, Landers stated the following:

"My name is Mark Samuel Landers. I am 35 years old, and I reside at 3336 Old Pike Road in Pike Road, Alabama. I am a self-employed general contractor.

"Near the end of 1991, my lake cabin burned down. It was located off Tiger Point Road which turns toward the water off Elmore County Road 9 in the Titus Community. My father, Robert Richard Landers, and I met on Wednesday, 2-12-92, in Montgomery to take some equipment to the lake lot -- some was already there -- and continue grading the remains of the burned cabin off the site. My father left his car at Dr. George's house at 6001 Greystone in Montgomery, and we had breakfast at Denny's Restaurant near the Eastern Bypass and Monticello Drive.

"We reached the lake lot at around 10:30 a.m. or 11:00 a.m. We worked a while -- sometimes my dad would drive the backhoe (which was already up there) and I would drive the bulldozer and sometimes the other way around. We both drove both pieces of equipment that day. The backhoe had been at the site for about a week and the dozer had been there for as long as two weeks. We took a break around lunch and took my pick-up truck up to Powell's store to get a snack and a coke. We came back and worked 3 or 4 more hours and my dad pulled the dump truck up the hill leading from our lot to Tiger Point Road and hooked it to the flat-bed trailer on which we normally carry the dozer. The trailer had been backed up into the woods approximately 25 to 100 yards from the main road off our entrance road. My father got the trailer straight on the road, [and] I drove the dozer up on the trailer. My father pulled the trailer and dozer on up onto Tiger Point Road and off to one side enough to let me get my pick-up truck past. I got in my pick-up truck and drove up to where my father was parked. I pulled up beside him and talked. I told my father I would tie the trailer down. I got a 'wrecker chain' out of my truck that we usually use to tie the trailer to the dozer by hooking one end on the accessory hitch behind the dozer and the other end to a shackle on the trailer. My father told me he'd tie it down and said he knew I had somewhere I had to go, that he'd take care of it. I recall the motor was running in the dump truck. I left between 3:30 and 4:00 p.m. I drove to two job sites in Halcyon Lakes in Montgomery. No crews were there at the time, I just needed to inspect the work. I then went to the YMCA on Carter Hill Road to pick up my son at a basketball game.

"I got home between 6:15 p.m. and 6:30 p.m. and my mom called from home at approximately 6:30 p.m. asking where my father was. I told her that when we left the lake lot, he was behind me. My mother called me from the Shell station at Monticello Road and the Eastern Bypass at around 7:00 p.m. She asked me to pick her up, that my father may have had truck trouble. I picked up my mother and we went by Dr. George's house and saw my father's buick still parked there. I drove to my father's friend Gerri's house on Highway 231 near Wetumpka and didn't find him there, so we drove on up toward the lake lot in case he had truck trouble. We got to the entrance road to the lake

lot and I saw my father's dump truck with the trailer still hooked to it. It was in the same place it was when I left earlier. I got out and saw the dozer had been backed off the trailer. I walked around the dozer and saw my father's body under the right-hand track of the dozer. I panicked and went to my truck and called my wife on my car phone.

"The dozer had been recently reworked and was in good shape. I don't see how it could have backed itself off the trailer and ran over my father. The interior light of the dump truck was on and the motor was still running. The dozer was not running."

(C. 1599-1602.) The State presented evidence that "Gerri," the friend of Robert Richard Landers, Sr., at whose house Landers claimed to have looked for his father on the way to the lake, was Gerri Waites, with whom the victim had been having an affair for approximately one year before his death.

Thomas Goodney testified that during the reconstruction he participated in on April 6, 1992, Landers made several statements to him about the events of February 12, 1992. Landers account to Goodney of what happened on the day of his father's death was essentially the same account he gave to law enforcement in his statement of February 15, 1992, except that Landers told Goodney that just before he left the site on the afternoon of February 12, he saw two local residents, Kay and Richard Green, drive by on Cliff Side Road. Landers had not told police that he had seen the Greens drive by.

The State called both Kay and Richard Greene to testify at Landers's trial. Both Greens testified that they had travelled to Birmingham on February 12, 1992, to take Richard Green's mother to the doctor. On their way home, both said, they drove down Cliff Side Road, which, both agreed, had been backbladed in preparation for paving. Kay Green stated that they drove down Cliff Side Road sometime between 4:00 and 5:00 p.m. on February 12; Richard Greene remembered only that it was late in the afternoon. Kay Green also testified that she remembered seeing a dump truck, a trailer, and a bulldozer pulled off the side of the road; Richard Green remembered seeing a truck and trailer, but could not recall seeing a bulldozer. According to Kay Greene, the bulldozer was backed into some "woods" near the trailer (unlike Landers's account to Goodney that the bulldozer was on the trailer just before he left the site which was when he also said that he saw the Greens drive by). In addition, Kay Green stated that she saw three men standing near the bulldozer and that when she waved to them as she passed by, they turned their heads away. Kay Green stated that none of the three men she saw was Landers.

The State also introduced into evidence a deposition that Landers gave on November 5, 1992, in relation to the proceedings in the federal district court regarding the proceeds from the life insurance policy. In the deposition, which was read into the record but was not given to the jury during deliberations, Landers's account of the events of February 12, 1992, was essentially the same as his two previous accounts. As he had told Goodney, Landers stated in the deposition that he had seen Kay and Richard Green drive by on Cliff Side Road just before he left his father that afternoon. Landers stated that he left his father at 3:30 p.m., arrived at a job site in Montgomery at 4:00 p.m. and briefly checked the work that had been done that day, and then arrived at his son's basketball game at the YMCA at 4:30 p.m. Landers also stated that he made some calls with his cellular telephone while travelling that afternoon, but that he could not remember whom he had called. Landers further stated in the deposition that when he and his mother drove toward the lake looking for his father and stopped at the home of Gerri Waites (the woman with whom the victim was having an affair), his mother, Lenita Landers, told him that she knew about the affair and had for a long time. When questioned about the insurance policy on his father's life, Landers stated that he purchased the policy at the request of his father; according to Landers, his insurance agent, Jeffrey Chapman, approached him about the policy after he had spoken with his father and Chapman told him that it would be better for estate tax purposes if he, rather than his father, owned the policy. Also in the deposition, Landers denied that he was fired from AllState Insurance Company in 1981; he stated that he left AllState for a better job opportunity at Progressive Insurance Company.

Landers also denied that he had ever filed or participated in filing a false or fraudulent claim with any insurance company.

Ricki Dobbs testified that his son played basketball with Landers's son and that he was present at the basketball game on February 12, 1992. In contrast to Landers's statement in his deposition that he arrived at his son's basketball game at 4:30 p.m., Dobbs testified that Landers did not arrive at the game until well after 5:30 p.m.

Finally, the State presented the testimony of Victoria Landers Goolsby, Landers's sister. Goolsby stated that the week after the death of her father, she spoke with Agents Rhegness and Burton of the ABI and agreed to help them in the investigation into her father's death. As the investigation progressed and Landers became a suspect, Goolsby became a confidential informant for the ABI and attempted to obtain evidence against Landers. As part of the investigation, Goolsby was instructed by the ABI to tell people, including Landers, that she was having an affair with ABI Agent Rhegness. Agent Rhegness confirmed that part of the investigation included Goolsby telling people that she was having an affair with him; Agent Rhegness testified that this idea came from a member of the behavioral sciences unit of the FBI. Both Agent Rhegness and Goolsby denied that they were actually having an affair. In addition, although both Agent Rhegness and Goolsby testified that Agent Rhegness visited Goolsby at her apartment in Vieux Carre on several occasions to discuss the investigation, both denied that Agent Rhegness ever visited Goolsby at her home on Wares Ferry Road. Goolsby's status as a confidential informant continued for several years during the investigation, but Goolsby was unable to obtain any evidence against Landers.

Goolsby further testified about an incident that occurred shortly before her father's death. According to Goolsby, on February 6, 1992, at approximately 4:00 p.m., she was at her father's home preparing for a birthday party for her son when her father and Landers came home from Landers's lake lot. According to Goolsby, upon entering the house, her father stated to Landers, "You came as close as you will ever come to putting me six feet under the ground today." (R. 1812.) Goolsby stated that she asked her father what had happened and that her father told her that Landers had almost run over him with the bulldozer and nearly killed him. Goolsby stated that her father was upset, pale, and "visibly shaken" while he was recounting the events. (R. 1812.) Goolsby further testified that her father repeatedly told Landers that he had almost killed him, and that he should get "a goddamn foreman" because he was never going to help Landers at the lake lot again. (R. 1813.) Goolsby stated that Landers only laughed and shrugged his shoulders in response to his father's words.

Goolsby testified that she learned of her father's death on February 12, 1992, at approximately 11:45 p.m., when her mother, her sister, Lisa Blue, and Landers came to her home and told her. According to Goolsby, although her sister was extremely upset and crying hysterically, neither her mother nor Landers showed any emotion at all. Goolsby also testified that on February 14, 1992, just after the family had returned to her mother's home following the visitation service for her father, Landers approached her and told her to stay out of the business regarding the life insurance policy on her father and to let him (Landers) handle all the details. Goolsby stated that later that same afternoon, she heard Landers give her sister, Lisa Blue, the same warning.

Landers testified on his own behalf at trial. He denied killing his father on February 12, 1992, and denied that he had tried previously to run his father over with a bulldozer on February 6, 1992. Landers stated that sometime around 1989 or 1990, his sister, Victoria Landers Goolsby, worked for his construction business as a bookkeeper. According to Landers, while working for him, Goolsby forged several checks totalling some $27,000. Although he didn't press charges, Landers said, he took Goolsby to the bank and forced her to admit to stealing the money. Landers stated that his other sister, Lisa Blue, later told him that Goolsby had threatened to get even with him for the event. Goolsby denied that she stole $27,000 from Landers; she said that she took the money out of Landers's business account because he owed her the money and had not payed her back.

Landers also testified about two conversations that he had had with Goolsby after their father's death. Landers stated that sometime during the summer of 1992, Goolsby invited him to her apartment to talk. There, Landers said, Goolsby offered to provide him with an alibi for the day of their father's death. (Goolsby denied ever offering to provide Landers with an alibi.) Landers said that he told Goolsby that he didn't need an alibi because he had done nothing wrong. Landers also stated that on another occasion that summer, Goolsby told him that she hated their father and was glad that he had died because he had raped her when she was 10 years old. During this conversation, Landers said, Goolsby told him that she and Agent Rhegness were having an affair. During her testimony, Goolsby denied telling Landers that her father had raped her, but also stated that it was possible she had said it on directions from the ABI.

Landers also testified about the events of February 12, 1992. His account at trial was substantially the same as his previous accounts. However, at trial, Landers revised his previous statements that he had seen Kay and Richard Green drive by just before he left the site on February 12. At trial, Landers testified that just before he left his father on February 12, he saw a gray Lincoln travelling away from the lake. According to Landers, he thought the gray Lincoln was owned by Richard and Kay Green, and thus, when questioned about the events of February 12, 1992, he had said on several occasions that he had seen the Greens drive by just before he left his father. However, Landers said, after hearing the Greens testify during his trial that they were driving a Cadillac (not a Lincoln) toward the lake (not away from the lake), he realized that it was not the Greens he had seen just before he left his father, and that it must have been someone else.

Finally, Landers testified that the telephone calls to Southtrust Bank and MONY on the day of his father's death were made because Gene Eaves, executive vice president of Southtrust, and Jeff Chapman, his insurance agent at MONY, had telephoned him earlier in the day and he was merely returning their calls.

Landers's mother, Lenita Landers, also testified on Landers's behalf. According to Mrs. Landers, when she and Landers discovered her husband's body under the bulldozer, she attempted to use Landers's cellular phone to call 911, but could not get through. Mrs. Landers stated that she later learned that, at that time in 1992, AllTell, the company through which Landers had his cellular service, did not provide 911 service for cellular telephones. Mrs. Landers testified that when she could not dial 911, she telephoned Landers's wife, Susan, and asked her to telephone 911 for help. According to Mrs. Landers, it took a long time for help to arrive, and while she and Landers were waiting, they decided to drive down the road to attempt to obtain help on their own. When they were down the road, Mrs. Landers said, they saw headlights behind them near the scene, so they turned around and went back. Mrs. Lander stated that when they got back to the scene, there were several cars and a number of people at the scene, including spectators. According to Mrs. Landers, the scene was not secured and both the police officers and spectators were walking all around the scene.

Mrs. Landers further testified (in contrast to Investigator Martin's testimony) that it had rained the entire evening of February 12, 1992, from the time she and Landers left Montgomery to look for her husband until after they had left the scene later that night. Mrs. Landers also stated that after her husband's body had been removed from the scene, Sheriff Bill Franklin approached her and told her that it was an "unfortunate accident" and asked her if she wanted her husband's wallet, ring, and eyeglasses. According to Mrs. Landers, she took the wallet and ring, but told Sheriff Franklin that he could keep the glasses since they were prescription glasses and of no use to her.

Sheriff Franklin denied telling Mrs. Landers that her husband's death was an accident, or offering her her husband's wallet, ring, or glasses. As noted above, Sheriff Franklin testified that the victim's glasses were not discovered until the following day.

Landers's sister, Lisa Blue, also testified on Landers's behalf. Blue testified that she learned of her father's death on February 12, 1992, when Landers and her mother came to her home to inform her;

Blue stated that both her mother and Landers were very upset and crying when they told her. Blue also testified that Goolsby did not get along well with Landers, particularly after she had worked for his construction business and had, according to Blue, stolen some $27,000 from the business. Blue stated that following that incident, Goolsby told her that she was going to get even with Landers "one way or another" because he had "embarrassed her and ruined her reputation." (R. 2091.) Goolsby denied making this statement. Blue also testified that Goolsby told her that she had Agent Rhegness of the ABI "wrapped around her fingers" and that she "could get him to do anything she wanted him to do." (R. 2094.) Goolsby denied making this statement as well. Blue further testified that she saw Agent Rhegness several times at Goolsby's apartment in Vieux Carre and at Goolsby's home on Wares Ferry Road. As noted above, both Goolsby and Agent Rhegness denied that Rhegness had ever been to Goolsby's home on Wares Ferry Road. Blue also testified that while watching Goolsby from outside her apartment, she saw Agent Rhegness and Goolsby in Goolsby's bedroom kissing.

Finally, Blue testified about an incident on February 6, 1992, between her father and Landers, the same incident that Goolsby testified about. In contrast to Goolsby's testimony that her father had told her that Landers had almost run over him with a bulldozer, Blue said that on February 7, 1992, the day after the incident, her father told her that it was Landers who had been hit by the bulldozer and injured. Blue stated that she saw Landers the day following the incident, on February 7, 1992, and noticed a large knot on his head. Goolsby denied seeing any knot on Landers's head on February 6, 1992, after the alleged incident.

Landers also called Gerald Carroll, service manager for Tractor Equipment Company, and Alan Smith, a service technician for Tractor Equipment Company, to testify. Both Carroll and Smith testified that in May of 1992, they serviced a John Deere 450-E bulldozer owned by Landers, the bulldozer at issue in this case. Alan Smith testified that after he and another mechanic had rebuilt the engine on the bulldozer, they took the bulldozer outside to test it and that it "jumped into" reverse and "took off" backwards. (R. 2021.) Smith immediately reported this occurrence to Carroll, and subsequently Carroll attempted to get the bulldozer to jump into gear on its own, but was unsuccessful. Smith testified that other than the bulldozer jumping into reverse, everything on the bulldozer appeared to be in "good working order." (R. 2022.)

Gerald Whitehouse, a consulting engineer certified as an expert in mechanical engineering by the trial court, testified that the 450-E John Deere bulldozer, like the one in this case, has no safety mechanism to stop movement if the operator of the bulldozer leaves the operator's seat. According to Whitehouse, if such a bulldozer were travelling in reverse and the operator left the operator's seat, the bulldozer would continue to travel in reverse until it hit something or the engine stalled. Whitehouse also testified that if a man with the same measurements as the victim were to step onto the right track of a 450-E bulldozer while it is travelling in reverse, his feet would be pulled backwards toward the rear of the bulldozer, his body would fall forward onto the track, and his body would then be pulled backwards and under the track. Whitehouse also testified that State's Exhibit 27-F, a photograph of the operator's floorboard on the bulldozer at issue in this case, showed a black substance on the floorboard that appeared to be hydraulic fluid. According to Whitehouse, the location of the hydraulic fluid was near the fitting or valve on the hydraulic tank that controls the blade of the bulldozer. Whitehouse testified that, if this hydraulic fluid came from the hydraulic valve controlling the blade, it would be impossible to keep the blade in an "up" position for any length of time and that the blade, even if initially left in an "up" position, would gradually go down on its own. On cross-examination, Whitehouse agreed with the State's expert, Thomas Goodney, that a bulldozer backed off a trailer such as the one found at the scene of the crime, would leave trackmarks in the dirt.

Ken Edwards, Landers's second cousin, testified that between 3:30 and 4:30 p.m. on February 12, 1992, the day of the victim's death, he saw Landers at a construction site on Halcyon Boulevard in

Montgomery. According to Edwards, Landers stopped at the site briefly, told Edwards that he had to pick his son up at a basketball game at the YMCA, and then left.

Suzanne Driggers testified that on February 12, 1992, she was working at a Chevron station on Highway 231 near Wetumpka and that she remembered seeing Landers and his father come into the store around lunchtime and purchase snacks and drinks. Driggers testified that she remembered that Robert Richard Landers, Sr., was wearing khaki pants, a hunting vest, and metal-frame glasses.

Jeffrey Chapman, the insurance agent who sold the $1,000,000 life insurance policy on the victim's life to Landers, testified that he was the person who initiated the sale of the insurance to Landers. According to Chapman, he spoke with Landers several times over the course of a year in an attempt to get Landers to take out an insurance policy on his father and that it wasn't until August of 1991 that Landers agreed and got the victim to come to his office on August 1, 1991 to fill out the application. Chapman's testimony contradicted Landers's own statement in the deposition in which Landers stated that it was his father's idea to purchase the insurance, not Chapman's. On cross-examination, Chapman stated that he did not remember speaking with Landers on the day of the victim's death.

Landers also called Deputy Willie George Townsend, the first officer to arrive at the scene on February 12, 1992, to testify. Deputy Townsend testified that when he arrived at the scene, he noticed a glass case near the victim's head. In response to questioning by Landers's counsel, he stated that he remembered being interviewed by Gerald Shockley of the ABI on March 13, 1997, and that he remembered telling Shockley that he believed he had seen eyeglasses, not an eyeglass case, near the victim's head. Deputy Townsend further stated that, after the interview with Shockley, he spoke with Sheriff Bill Franklin and then realized that he had seen an eyeglass case rather than eyeglasses.

Finally, Landers called several witnesses to testify that they had seen Landers's father operate bulldozers and other heavy equipment and that he was not a very good operator. Several other witnesses testified that Landers had a good reputation in the community for peaceableness and non-violence.

> ""'In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So. 2d 871 (Ala.Crim.App.), cert. denied, 368 So. 2d 877 (Ala. 1979); Scruggs v. State, 359 So. 2d 836, 842 (Ala.Crim.App.), cert. denied, 359 So. 2d 843 (Ala. 1978).

> ""'In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So. 2d 428 (Ala.Crim.App. 1976); Edson v. State, 53 Ala.App. 460, 301 So. 2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala.App. 4, 325 So. 2d 520, cert. denied, 295 Ala. [398], 325 So. 2d 531 [(1976)].

> ""'Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So. 2d 96 (Ala.Crim.App. [1976]). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness,

the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So. 2d 821 (1969); Morton v. State, 338 So. 2d 423 (Ala.Crim.App. 1976).

"'Freeman v. State, 505 So. 2d 1079 (Ala.Crim.App. 1986), quoting, Johnson v. State, 378 So. 2d 1164, 1169 (Ala.Crim.App. 1979), writ quashed by Ex parte Johnson, 378 So. 2d 1173 (Ala. 1979).'"

Anderson v. State, 542 So. 2d 292, 295-96 (Ala.Crim.App. 1987), writ quashed, 542 So. 2d 307 (Ala.), cert. denied, 493 U.S. 836, 110 S.Ct. 116, 107 L.Ed.2d 77 (1989), quoted in Bankhead v. State, 585 So. 2d 97, 104 (Ala.Crim.App. 1989), aff'd in part, remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala.Crim.App. 1992), rev'd on other grounds, 625 So. 2d 1146 (Ala. 1993), and quoted with approval in Pilley v. State, [Ms. CR-96-1781, August 14, 1998] ___ So. 2d ___, ___ (Ala.Crim.App. 1998), rev'd on other grounds, [Ms. 1980132, January 28, 2000] ___ So. 2d ___ (Ala. 2000).

"'"[C]ircumstantial evidence alone can support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty."'" Smith v. State, 727 So. 2d 147, 172 (Ala.Crim.App. 1998), aff'd, 727 So. 2d 173 (Ala.), cert. denied, ___ U.S. ___, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999), quoting White v. State, 546 So. 2d 1014, 1017 (Ala.Crim.App. 1989), quoting in turn, White v. State, 294 Ala. 265, 314 So. 2d 857 (Ala.), cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). "'"Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused."'" Neal v. State, 731 So. 2d 609, 619 (Ala.Crim.App. 1997), aff'd, 731 So. 2d 621 (Ala.), cert. denied, 527 U.S. 1027, 119 S.Ct. 2377, 144 L.Ed.2d 780 (1999), quoting White, 546 So. 2d at 1017, quoting in turn, Cochran v. State, 500 So. 2d 1161, 1177 (Ala.Crim.App. 1984), aff'd in part, rev'd on other grounds, 500 So. 2d 1179 (Ala. 1985), aff'd on return to remand, 500 So. 2d 1188 (Ala.Crim.App.), aff'd, 500 So. 2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987)(citations omitted). "[I]n reviewing a conviction based on circumstantial evidence, this court must view the evidence in the light most favorable to the prosecution. 'The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.'" Id., quoting White, 546 So. 2d at 1016. "Whether the circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis but that of the defendant's guilt is a question for the jury and not the court." Cumbo v. State, 368 So. 2d 871, 875 (Ala.Crim.App. 1978), cert. denied, 368 So. 2d 877 (Ala. 1979). "The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is to examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged." Dolvin v. State, 391 So. 2d 133, 138 (Ala. 1980), quoting Cumbo, 368 So. 2d at 874, quoting in turn, Odom v. United States, 377 F.2d 853, 855 (5th Cir. 1967)(emphasis added). Moreover, "[t]he weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury." Smith v. State, 698 So. 2d 189, 214 (Ala.Crim.App. 1996), aff'd, 698 So. 2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).

In challenging the sufficiency of the evidence to sustain his conviction, Landers first argues that the State failed to prove that the victim died as the result of the criminal agency of another. Specifically, he contends that the State's evidence "did not exclude the reasonable hypothesis that Robert Landers's death was an accident." (Landers's brief to this court, p. 133.)

The State presented evidence that there was a vertical laceration and vertical fractures on the victim's left temple that were inconsistent with the other horizontal injuries to the victim. Dr. Lauridson testified that the vertical injuries to the left temple were consistent with a blunt force, not with the horizontal "cleats" of a bulldozer track. Based on these medical findings and other information he received from the investigation, Dr. Lauridson concluded that the victim's death was a homicide. This evidence, alone, was sufficient for a jury to conclude that the victim's death was the result of the criminal agency of another and not an accident.

However, the State also presented other circumstantial evidence tending to support this conclusion. The State presented evidence that the victim's eyeglasses and a substance that appeared to be blood were found near the left track of the bulldozer, but that the victim's body was discovered under the right track of the bulldozer; that there were no bulldozer trackmarks or backblading marks at the scene whatsoever; and that if the bulldozer had been backed off the trailer, it would have left at least some evidence of trackmarks (or, if the blade was down, backblading marks) in the dirt. Testimony showed that the bulldozer could not have been backed off the trailer into the position in which it was found (at approximately a right angle to the trailer) without tearing up the ramp, but that the ramp was in good condition when the victim was found, and that the chain and pipe found on the trailer could not have been in the position investigators found them in at the scene (on the trailer) when the bulldozer was backed off the trailer, because a subsequent reenactment of the incident revealed that backing the bulldozer over the chain and pipe resulted in indentations in the wooden trailer bed and there were no indentations in the trailer bed before the reenactment. The jury could have reasonably concluded from this evidence that Robert Richard Landers, Sr., did not accidentally fall off the bulldozer and get pulled under the right track and crushed, but that someone else was present at the time he was crushed, that the person present placed the chain and pipe on the trailer only after the bulldozer was off the trailer and the victim was dead, and that person covered up the trackmarks made by the bulldozer at the scene. The State presented sufficient evidence from which the jury could have by fair inference concluded that the victim died as a result of a homicide and not an accident.

Landers contends that, even if there was sufficient evidence that the victim's death was a homicide, the evidence was still insufficient to sustain his conviction because, he says, the State failed to connect him to the crime. Specifically, Landers contends that "there must be more than the mere fact that [he] was the beneficiary of an insurance policy" to sustain a conviction for capital murder and that "[t]here is absolutely no evidence of any association between [him] and any injury to his father." (Landers's brief to this court, p. 126.) We disagree.

Although the State's case against Landers was entirely circumstantial, and each piece of evidence, standing alone, was insufficient, when the various items of evidence pointing to Landers as the perpetrator of this crime are viewed in conjunction with each other, a jury could reasonably have concluded that the evidence excluded every reasonable hypothesis except that of Landers's guilt.

The State presented evidence that Kay and Richard Green drove by the scene on February 12 between 4:00 and 5:00 p.m. and that the bulldozer was already backed into some "woods" at that time. When found by investigators, the bulldozer was backed against an embankment of trees and brush and was on top of the victim. The jury could reasonably have concluded that the victim had already been killed and that the bulldozer was in the position in which it was found by investigators when the Greens drove by. While Kay Green testified that she saw three men at the scene, none of which, she said, was Landers, Landers himself stated, on at least two different occasions, that he was present at the scene when the Greens drove by, thus placing himself at the scene of the crime. In addition, Ricki Dobbs testified that Landers did not arrive at the YMCA in Montgomery until after 5:30 p.m., thus contradicting Landers's claim that he left the scene at 3:30 p.m. and arrived at the YMCA at 4:30 p.m. The jury could reasonably have concluded from this evidence that Landers was present at the time his father was crushed by the bulldozer. Although we realize that Landers recanted his statements about seeing the Greens on

-13-

February 12 at trial, his trial testimony created nothing more than a conflict in the evidence for the jury to resolve. Obviously the jury resolved that conflict adversely to Landers, and we will not disturb that finding on appeal.

The State also presented evidence that Landers's construction company was having financial difficulties; that he was embroiled in a contract dispute that resulted in his having to pay some $200,000 to a dissatisfied customer of his company; that a $100,000 loan from his father was overdue; and that he had purchased a life insurance policy in the amount of $1,000,000 on his father barely six months before his father's death of which he was the sole beneficiary. Although Landers stated in his deposition that he purchased the insurance policy only at the request of his father, he then presented conflicting testimony at his trial (from his insurance agent, Jeffrey Chapman) that it was his insurance agent who initiated the policy, not his father. The State also introduced telephone records of Landers's cellular telephone showing that Landers telephoned both the bank that held the line of credit for his company and his insurance agent at approximately 4:15 p.m. on the day of his father's death. Evidence also showed that Landers filed a revised financial statement with his bank only 12 days after his father's death, in which he listed the $1,000,000 from the life insurance policy as a receivable asset. Evidence showed that Landers had previously filed false insurance claims while working for AllState Insurance Company in order to obtain money for himself and family members, and that later, during his deposition, he lied about being fired from AllState for those false claims. The jury could have reasonably concluded that Landers was, and always had been, motivated by greed, and killed his father simply to get money. The State also presented evidence that Landers had, only six days before his father's death, almost run over his father with the same bulldozer, thus raising the reasonable inference that Landers had attempted to kill his father once before, but failed in the attempt.

> "'While not alone sufficient to justify a conviction, motive may strengthen circumstantial evidence. The fact that the deceased was last seen in the presence of the accused is also a circumstance to consider.... A false explanation given by the accused of any suspicious fact or circumstance tending to connect him [or her] with the offense is admissible in evidence against him [or her].... The jury may properly consider conflicting statements as indicating a consciousness of guilt.'"

Bankston v. State, 620 So. 2d 115, 119 (Ala.Crim.App. 1992), quoting Cumbo, supra, at 876.

Here, the State showed that the victim's death was the result of a homicide; that Landers had a motive to kill his father; that Landers was the last person to see the victim alive and was present at the time his father was killed; that Landers lied about his whereabouts on the afternoon of his father's murder; and that Landers had attempted to kill his father once before and failed.

> "'"The true test of the sufficiency of circumstantial evidence to justify a conviction is whether the circumstances as proved produce a moral conviction to the exclusion of every reasonable doubt. It is not necessary for the circumstances to be 'such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused.' Bland v. State, 75 Ala. 574; Banks v. State, 72 Ala. 522; Matthews v. State, 55 Ala. 65." Mitchell v. State, 114 Ala. 1, 6, 22 So. 71, 72 (1897).'"

Cumbo, supra, at 875. Moreover,

> "'"'[w]hether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the

defendant's guilt is a question for the jury and not the court.' Our function is not to be factfinders, however tempting that may sometimes be. We must not substitute ourselves for jurors, nor play their role in the criminal process. Jury verdicts should not be disturbed unless they are not based upon evidence sufficient to meet the test set out above.'"'

Parker v. State, 589 So. 2d 773, 776 (Ala.Crim.App. 1991), quoting Linzy v. State, 455 So. 2d 260, 262 (Ala.Crim.App. 1984). (Citations omitted; emphasis in Parker.)

Considering the evidence in the light most favorable to the State, accepting as true all evidence introduced by the State, and allowing all legitimate inferences in favor of the State, we hold that there was sufficient evidence from which the jury could have, by fair inference, reasonably concluded that the State's case, albeit circumstantial, excluded every reasonable hypothesis except that of Landers's guilt. Accordingly, the trial court properly submitted the case to the jury for consideration.

II.

Landers contends that the trial court erred in denying his pretrial motion to dismiss the indictment or, in the alternative, to suppress certain evidence, because, he says, he was denied due process by the State's four-year delay in indicting him and the resulting loss or destruction of several pieces of evidence.

A.

First, Landers contends that the trial court should have suppressed the testimony of the medical examiner, Dr. James Lauridson, regarding the vertical fractures on the victim's left temple, which Dr. Lauridson stated were the result of a blunt force, and Dr. Lauridson's final autopsy report in which Dr. Lauridson concluded that the victim's death was a homicide. According to Landers, both the victim's skull and Dr. Lauridson's initial report prepared after the examination conducted on February 13, 1992, were destroyed by Dr. Lauridson, thus preventing him from conducting his own tests on the victim's skull and from "fully convey[ing]" to the jury the discrepancy between Dr. Lauridson's conclusion in his initial report that the victim's death was accidental and his subsequent conclusion after a full autopsy that the victim's death was a homicide. (Landers's brief to this court, p. 150.)

In Ex parte Gingo, 605 So. 2d 1237 (Ala. 1992), cert. denied, 506 U.S. 1049, 113 S.Ct. 967, 122 L.Ed.2d 123 (1993), the Alabama Supreme Court enunciated the standard regarding the loss or destruction of evidence by the State:

"'[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' Youngblood [v. Arizona], 488 U.S. [51,] 58, 109 S.Ct. [333,] 337, [102 L.Ed.2d 281 (1988)]. 'The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' Youngblood, 488 U.S. at 57 (footnote), 109 S.Ct. at 337 (footnote), citing Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

"Although to show bad faith, for the purpose of showing a due process violation, the defendant must show that the State had knowledge of the exculpatory value of the destroyed evidence, 'there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.' Youngblood, 488 U.S. at 67, 109 S.Ct. at 342 (Stevens, J., concurring in the result)."

-15-

605 So. 2d at 1240-41. See also <u>Griffin v. State</u>, [Ms. CR-97-1026, December 10, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999), rev'd on other grounds, [Ms. 1991354, August 18, 2000] ___ So. 2d ___ (Ala. 2000); and <u>May v. State</u>, 710 So. 2d 1362 (Ala.Crim.App. 1997).

Contrary to Landers's contention in his brief to this court, neither this court nor the Alabama Supreme Court has rejected the bad faith requirement set out by the United States Supreme Court in <u>Youngblood v. Arizona</u>, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Rather, the Alabama Supreme Court has recognized that, in addition to those cases involving bad faith on the part of the State, there may be cases in which a defendant cannot be denied due process by the loss or destruction of evidence even when the culpability of the State cannot be proven: if the evidence is so critical to the defense that its loss renders the defendant's trial fundamentally unfair. Here, Landers has not even alleged, much less proven, that the State acted in bad faith in destroying the evidence in question; therefore, we must determine whether the victim's skull and Dr. Lauridson's initial written report were so critical to Landers's defense that their destruction rendered his criminal trial fundamentally unfair.

The record reflects that the victim's skull was destroyed by the Department of Forensic Sciences sometime after Dr. Lauridson finished reapproximating the bones; Dr. Lauridson could not remember whether the skull was destroyed before or after Landers was indicted in 1996. Dr. Lauridson stated, however, that although that portion of the skull exhibiting the horizontal crushing fractures caused by the bulldozer was destroyed, he retained the portion of the victim's left temple reflecting the vertical fractures which he determined to be caused by a blunt force. We note that there is nothing in the record indicating that Landers ever requested to examine the portion of the skull that was retained.

Nevertheless, Landers claims that the destruction of the portion of the victim's skull exhibiting the horizontal crushing fractures prevented him from having the entire skull examined to determine whether Dr. Lauridson's observation that there were, in fact, two distinct types of fractures, horizontal and vertical, was "accurate." (Landers's brief to this court, p. 143.) According to Landers, Dr. Lauridson's identification of two different types of fractures in the victim's skull was a "pivotal component" of the State's case (Landers's brief to this court, p. 144), necessary to prove that the victim's death was a homicide, and that therefore, the victim's skull was "clearly material" to his defense. (Landers's brief to this court, p. 145.) We disagree.

The record reflects that Dr. Lauridson took several photographs of the victim's skull, all of which were introduced into evidence without objection by Landers, and all of which were available to Landers for analysis before trial. These photographs clearly show two different types of fractures on the victim's skull, some horizontal and some vertical. As noted above, that portion of the skull containing the vertical fractures which Dr. Lauridson opined were consistent with a blunt force was also available to Landers for analysis before trial. Landers offers only unfocused speculation that Dr. Lauridson's observation of two different types of fractures, an observation supported by the numerous photographs of the victim's skull, may have been inaccurate and that that portion of the victim's skull that was destroyed may have been exculpatory. Such speculation is simply not sufficient to show a due process violation.

Moreover, in addition to the horizontal and vertical fractures of the victim's skull discovered after the full autopsy on March 3, 1992, Dr. Lauridson testified that he observed during his <u>first</u> external examination of the victim on February 12, 1992, a vertical laceration to the victim's left temple that was inconsistent with the numerous horizontal abrasions over the remainder of the victim's body that were caused by the bulldozer. As the State correctly points out in its brief to this court, evidence of this inconsistent laceration was sufficient, without evidence of the inconsistent fractures, to raise an inference that the victim suffered from a blow to the head before being run over by the bulldozer, and therefore, to support the State's theory that the victim's death was a homicide. Although the victim's skull was an important piece of the State's case, it was not the only piece tending to show that the victim's death was a homicide, and the State's case was supported, as noted in Part I of this opinion, by ample other circumstantial evidence.

According to Landers, however, the victim's skull would have supported his defense that the victim's death was an accident by refuting Dr. Lauridson's findings that there were two different types of fractures, only the horizontal ones consistent with being crushed by a bulldozer, and by refuting the inference that the vertical injuries were caused by a blow to the head. However, as Landers correctly, and continuously, points out in his brief to this court, he elicited on cross-examination testimony from Dr. Lauridson that the blunt-force injury to the victim's left temple could have been the result of a homicide or an accident, and that an autopsy alone cannot determine whether an injury was inflicted intentionally, i.e., was the result of a homicide, or accidentally, but that additional information from investigators is necessary to make that determination. Dr. Lauridson further stated on cross-examination that his determination in this case that the victim's death was a homicide was based not only on the autopsy and the differing fractures he discovered but also on additional information he received from investigators. Landers impressed upon the jury the fact that the victim's skull was destroyed before he had the opportunity to examine it, that Dr. Lauridson's conclusion that the victim's death was a homicide was not based solely on the injuries to the victim, but also on other information obtained during the investigation, that the investigation into the victim's death was not as thorough as it could have been and that mistakes were made during the investigation, and even suggested to the jury that the destruction of the skull by Dr. Lauridson resulted in the loss of important, and possibly exculpatory, evidence for the defense.

Under these circumstances, we simply cannot say that that portion of the victim's skull exhibiting the horizontal crushing fractures was so critical to Landers's defense that its destruction rendered his trial fundamentally unfair. The trial court did not err in denying Landers's motion to suppress evidence of the vertical injuries to the victim's left temple.

As to the destruction of Dr. Lauridson's initial report, the record reflects that a written copy of Dr. Lauridson's initial conclusion that the victim's death was an accident, made just after his first examination of the victim on February 13, 1992, was destroyed by Dr. Lauridson and no backup computer disk of that written conclusion was retained. Dr. Lauridson testified that his initial conclusion that the victim's death was accidental, originally written in his initial report, was deleted after he conducted a full autopsy of the victim on March 3, 1992, and replaced with the results from the full autopsy and his final conclusion that the victim's death was a homicide. Dr. Lauridson stated that his observations and findings from his initial examination were retained and included in his final report, but that, in lieu of writing a new report after the full autopsy, he merely deleted his initial conclusion that the death was an accident and extended the initial report to include his findings and conclusion from the autopsy. As a result, pages one and two of Dr. Lauridson's autopsy report are the findings and observations from the first external examination on February 13, 1992, and the remainder of the report are the findings and observations from the full autopsy on March 3, 1992, and Dr. Lauridson's final conclusion that the victim's death was a homicide.

Landers claims that the written version of Dr. Lauridson's initial conclusion that the victim's death was accidental was necessary to "fully convey" the discrepancy between that conclusion and Dr. Lauridson's subsequent conclusion that the victim's death was the result of a homicide. (Landers's brief to this court, p. 150.) We disagree.

The record reflects that there was ample evidence, mainly through Dr. Lauridson's own testimony, that Dr. Lauridson initially concluded that the victim's death was accidental and the jury was well aware of that fact. There could be no more persuasive evidence to "fully convey" Dr. Lauridson's conflicting conclusions than Dr. Lauridson's own testimony that he initially concluded that the victim's death was accidental and then subsequently changed that opinion to conclude that the victim's death was the result of a homicide. As noted above, Landers elicited testimony from Dr. Lauridson that his final conclusion was based not only on the autopsy, but also on information he had received from investigators, and Landers showed that the investigation into the victim's death, the results of which were considered by Dr. Lauridson in forming his opinion, was not conducted as thoroughly as possible and that numerous

-17-

mistakes were made by investigators during that investigation. In addition, Landers introduced into evidence, without objection, the notes Dr. Lauridson made during his initial exam which included his initial conclusion that the death was accidental. Clearly then, the typewritten version of Dr. Lauridson's initial conclusion was merely cumulative of other evidence introduced by Landers regarding Dr. Lauridson's initial conclusion and was not so critical to his defense that its loss rendered his trial fundamentally unfair. The trial court did not err in denying Landers's motion to suppress Dr. Lauridson's final autopsy report.

B.

Landers contends that the trial court should have suppressed the testimony of Investigator Byron Martin regarding the substance, which he believed was blood, that he saw on the left track of the bulldozer and on leaves in front of the bulldozer near the blade when he first arrived at the scene on February 12, 1992. Landers maintains that the State's failure to collect a sample of the substance and analyze it to determine whether it was, in fact, blood, and if so, whose blood it was, violated his due process rights because it prevented him from having access to potentially exculpatory evidence. According to Landers, the failure to collect evidence in the first place is the equivalent of the failure to preserve evidence after it has been collected. We disagree.

There is a fundamental distinction between the failure to preserve evidence after it has been seized and the failure to collect evidence in the first instance when investigating a crime scene. It is one thing to challenge the State's negligent or intentional loss or destruction of evidence in its possession, but quite another to challenge the manner of investigation itself. Although due process requires that the State preserve potentially exculpatory evidence that has been seized, see Arizona v. Youngblood, supra, and to disclose such evidence to the defense, see Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), there is no corresponding due process requirement that the State collect certain evidence. To create such a due process requirement would unduly burden police officers and force them to gather up every scintilla of evidence regardless of its apparent value, or even its connection to the crime, in order to avoid running the risk of denying a defendant due process. The police cannot be expected to "'gather and collect everything which, with fortuitous foresight, might prove useful to the defense,'" because to do so would "'cast upon the prosecution the burden of preserving what may only be termed "potential" evidence.'" People v. Bradley, 159 Cal.App.3d 399, 406, 205 Cal.Rptr 485, 489 (Cal.App. 1984)(citations omitted).

In Arizona v. Youngblood, supra, the United States Supreme Court stated:

> "If the [lower] court meant ... that the Due Process Clause is violated when the police fail to use a particular investigatory tool, we strongly disagree. The situation here is no different than a prosecution for drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests."

488 U.S. at 58-59, 109 S.Ct. at 338. Other jurisdictions have similarly recognized the difference between the failure to collect evidence and the failure to preserve evidence already collected. See, e.g., State v. Latham, [1998 WL 191162, April 22, 1998] ___ P.2d ___ (Alaska.App. 1998)(the State has no constitutional duty to utilize any particular investigative tool); State v. Steffes, 500 N.W.2d 608 (N.D. 1993)(the police generally have no duty to collect evidence for the defense); State v. Stepter, 794 S.W.2d 649 (Mo. 1990)(the State does not have a duty to gather and present all evidence conceivably germane to the case); State v. Heth, 750 P.2d 103 (Mont. 1988)(the police have no affirmative duty to search for evidence favorable to the defendant); State v. Rivera, 733 P.2d 1090 (Ariz. 1987)(the State has no

-18-

affirmative duty to seek out and collect potentially exculpatory evidence for the defendant to use in his defense); People v. Moore, 701 P.2d 1249 (Colo.Ct.App.), cert. denied, 706 P.2d 802 (Colo. 1985)(the failure to investigate does not constitute suppression of evidence and the defendant does not have the right to compel the State to search out and collect potentially exculpatory evidence on his behalf); State v. Smith, 370 N.W.2d 827 (Wis.Ct.App. 1985), rev'd on other grounds, 388 N.W.2d 601 (Wis. 1986)(a defendant's right to due process does not require the State to collect all evidence which might turn out to be exculpatory); State v. Judge, 675 P.2d 219 (Wash. 1984)(police are only required or required to preserve evidence which actually comes into their possession; they are not required to investigate or search for exculpatory evidence at a crime scene, conduct tests, or pursue every angle on a case); Bradley, supra (officers have no duty to collect evidence at the scene of a crime); State v. Wells, 645 P.2d 371 (Idaho.Ct.App. 1982)(the State need not collect evidence for the defendant); People v. Baber, 187 N.W.2d 508 (Mich.App. 1971)(it is not the duty of the police to exhaust all scientific means available in collecting evidence at the scene of a crime). But see Daniels v. State, 956 P.2d 111 (Nev. 1998)(adopting a two-part materiality/culpability test for determining whether the failure to collect evidence results in the denial of due process); Collins v. Commonwealth, 951 S.W.2d 569 (Kent. 1997)(applying the bad-faith requirement of Arizona v. Youngblood to the State's failure to collect evidence); State v. Ware, 881 P.2d 679 (N.M. 1994)(adopting a two-part materiality/culpability test in determining whether the State's failure to collect evidence results in the denial of due process).

Here, Landers was free to, and in fact did, argue to the jury that the substance Martin saw at the scene may not have been the victim's blood and may not even have been blood at all. The question whether the substance was blood and, if so, whether it was the victim's blood was a question for the jury. Although there is no doubt that here, as in many investigations, the officers wish, in hindsight, that they had conducted a more thorough and detailed investigation, an inadequate investigation alone does not rise to the level of a due process violation. "To require that in every case the State must, in its investigation of a crime, leave no stone unturned would shift the line of fairness between the rights of an accused and the rights of society totally to one side." Wells, supra at 373. Accordingly, the trial court did not err in denying Landers's motion to suppress the testimony of Investigator Martin.

C.

Landers also contends that the trial court should have suppressed the testimony of Catherine McGeehan that there was blood on the victim's eyeglasses and that the blood was the same blood type, Type O, as that of the victim. Landers argues that because the sample of blood on the glasses was used up during the testing procedure and because McGeehan destroyed the vial of the victim's blood that she had received from Dr. Lauridson and to which she compared the blood on the glasses, he was unable to perform his own tests on the blood to refute McGeehan's finding, and therefore, was denied due process.

The record reflects that Landers did not include this claim in his motion to dismiss/motion to suppress, he did not argue this claim at the hearing on that motion, and he did not object to McGeehan's testimony regarding the blood on the victim's glasses or her determination that it was the same blood type as the victim on the grounds that the blood evidence had been destroyed.[1] "'An issue which has been raised for the first time on appeal is not subject to appellate review, because it has not been properly preserved and presented.'" Butler v. State, [Ms. CR-99-0189, April 28, 2000] ___ So. 2d ___, ___ (Ala.Crim.App. 2000), quoting Pate v. State, 601 So. 2d 210, 213 (Ala.Crim.App. 1992).

---

[1]Landers only objection to McGeehan's testimony was on the ground that the State failed to prove the chain of custody of the glasses.

D.

Finally, Landers contends that trial court should have dismissed the indictment against him based on the four-year preindictment delay. According to Landers, the State intentionally delayed indicting him until 1996, some four years after his father died and after Dr. Lauridson had determined the death to be a homicide, thus depriving him of his right to due process.

> "The United States Supreme Court has stated that the 'Due Process Clause had a limited role to play' in protecting against the prejudice caused by a preindictment delay. United States v. Lovasco, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977), quoted in State v. Prince, 581 So. 2d 874, 877 (Ala.Crim.App. 1991). 'A defendant is charged with a heavier burden of proof in showing a preindictment delay due process violation than in showing a denial of his speedy trial rights.' Stoner v. State, 418 So. 2d 171, 180 (Ala.Crim.App.), cert. denied, 418 So. 2d 184 (Ala. 1982), cert. denied, 459 U.S. 1128, 103 S.Ct. 764, 74 L.Ed.2d 978 (1983). 'In order to establish a due process violation due to preindictment delay, a defendant must show "(1) that the delay caused actual prejudice to the conduct of his defense, and (2) that the delay was the product of deliberate action by the government designed to gain a tactical advantage." United States v. Lindstrom, 698 F.2d 1154, 1157-58 (11th Cir. 1983).' Prince, 581 So. 2d at 878. A defendant seeking to establish the first prong necessary to show a due process violation from the delay 'must show "actual prejudice, not the mere possibility of prejudice, and that the delay caused substantial prejudice to [the defendant's] rights to a fair trial."' Id., quoting Stoner, 418 So. 2d at 180. 'Passage of time per se is not a constitutional violation.' Stoner, 418 So. 2d at 180, quoting Lovasco, supra."

R.D.H. v. State, [Ms. CR-94-2239, July 3, 1997] ___ So. 2d ___, ___ (Ala.Crim.App. 1997).

The only allegation of prejudice in this case is the loss or destruction of several pieces of evidence. However, as we have already determined that that evidence was not so critical to Landers's defense that its loss rendered his trial fundamentally unfair, it is clear that Landers has failed to show actual prejudice.

Likewise, Landers has failed to show that the delay in indicting him was deliberate on the part of the State in order to gain a tactical advantage. Landers claims that the State's use of Landers's deposition from the civil case against MONY regarding the insurance proceeds at his trial shows that the State deliberately delayed indicting him in order to gain "access to evidence and testimony which it would otherwise have been unable to obtain." (Landers's brief to this court, p. 155.) However, the mere use of evidence obtained during the delay is not sufficient to show the State's malicious intent.

Moreover, "prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe the accused is guilty," and "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." United States v. Lovasco, 431 U.S. 783, 790-91, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977). Although there is little in the record explaining the reason for the delay, it is clear from the record that the investigation into the victim's death did not end when Dr. Lauridson determined the manner of death, but continued not only for the four years leading up to the indictment, but also through the trial. The case against Landers was entirely circumstantial and we simply will not fault prosecutors for delaying indictments until they are satisfied that they have sufficient evidence to establish the accused's guilt beyond a reasonable doubt. Accordingly, the trial court did not err in denying Landers's motion to dismiss the indictment.

## III.

Landers contends that the trial court erred in denying his challenges for cause as to five prospective jurors. He maintains that jurors C.A., C.E., J.M., W.M., and C.P. should have been removed for cause because, he says, voir dire examination revealed that all five were "heavily influenced by media accounts" of the case and unable to render a fair verdict. (Landers's brief to this court, p. 157.)

> "To justify a challenge for cause, there must be a proper statutory ground or
> '"some matter which imports absolute bias or favor, and leaves nothing to the discretion
> of the trial court."' Clark v. State, 621 So. 2d 309, 321 (Ala.Crim.App. 1992)(quoting
> Nettles v. State, 435 So. 2d 146, 149 (Ala.Crim.App. 1983)). This Court has held that
> 'once a juror indicates initially that he or she is biased or prejudiced or has deep-seated
> impressions' about a case, the juror should be removed for cause. Knop v. McCain, 561
> So. 2d 229, 234 (Ala. 1989). The test to be applied in determining whether a juror
> should be removed for cause is whether the juror can eliminate the influence of his
> previous feelings and render a verdict according to the evidence and the law. Ex parte
> Taylor, 666 So. 2d 73, 82 (Ala. 1995). A juror 'need not be excused merely because [the
> juror] knows something of the case to be tried or because [the juror] has formed some
> opinions regarding it.' Kinder v. State, 515 So. 2d 55, 61 (Ala.Crim.App. 1986). Even
> in cases where a potential juror has expressed some preconceived opinion as to the guilt
> of the accused, the juror is sufficiently impartial if he or she can set aside that opinion
> and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to
> justify disqualification, a juror '"must have more than a bias, or fixed opinion, as to the
> guilt or innocence of the accused"'; '"[s]uch opinion must be so fixed ... that it would bias
> the verdict a juror would be required to render."' Oryang v. State, 642 So. 2d 979, 987
> (Ala.Crim.App. 1993) (quoting Siebert v. State, 562 So. 2d 586, 595 (Ala.Crim.App.
> 1989))."

Ex parte Davis, 718 So. 2d 1166, 1171-72 (Ala. 1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).

> "'"The test to be applied is can the juror eliminate the
> influence of his scruples and render a verdict according to the
> evidence. Ordinarily a juror is not disqualified where it appears
> that he is willing to follow the instructions of law given by the
> trial court and is able to decide the case impartially according to
> the evidence notwithstanding his scruples. The determination of
> this question is based on the juror's answers and demeanor and
> is within the sound discretion of the trial judge. Tidmore [v.
> City of Birmingham, 356 So. 2d 231 (Ala.Crim.App. 1977), cert.
> denied, 356 So. 2d 234 (Ala. 1978)]. A juror is incompetent
> whose answers show that he would follow his own views
> regardless of the instructions of the court. Watwood v. State,
> 389 So. 2d 549, 550 (Ala.Crim.App.), cert. denied, 389 So. 2d
> 552 (Ala. 1980).

> "'Barbee v. State, 395 So. 2d 1128, 1130-31 (Ala.Crim.App. 1981)....

> > "'"Thus, where a juror states that he has opinions but that he would try the case fairly and impartially according to the law and the evidence and that he would not allow his opinion to influence his decision, it is not error for a trial judge to deny a challenge for cause. Howard v. State, 420 So. 2d 828, 831 (Ala.Crim.App. 1982). 'A juror who brings his thoughts out into the open in response to voir dire questions may be be the one who later "bends over backwards" to be fair....' Clark v. State, 443 So. 2d 1287, 1289 (Ala.Crim.App. 1983)." "Mahan v. State, 508 So. 2d 1180 (Ala.Crim.App. 1986).'"

> "Kinder v. State, 515 So. 2d 55, 60-61 (Ala.Crim.App. 1986)."

Harris v. State, 632 So. 2d 503, 520-21 (Ala.Crim.App. 1992), aff'd, 632 So. 2d 543 (Ala. 1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).

Although the record reflects that C.A., C.E., J.M., W.M., and C.P. had all read or heard something about the case through the media, each of these jurors indicated during voir dire either that they had not formed any opinions as to Landers's guilt or that they could set aside whatever opinions they had formed and render a verdict based solely on the evidence presented and the law as instructed by the trial court.

Juror C.A. stated that although the facts surrounding the case that had been reported in the media sounded "plausible," he had not formed any "conclusion" nor even "thought about" Landers's guilt or innocence based on the media accounts of the case he had been exposed to and that he could set aside whatever details of the case he had read or heard and render a decision solely on the evidence presented during the trial. In his brief to this court, Landers contends that juror C.A. expressed the opinion that "the guy probably did it and they would nail him." (Landers's brief to this court, p. 158.) This is a distortion of the record. In truth, C.A. stated that he did not form the opinion that Landers was guilty and that, in fact, he "really hadn't thought about it." (R.665.)

Juror C.E. stated that although the facts presented in the media accounts of the case made it look as if Landers was guilty, she knew that not everything in the media is true; that she had not formed "an opinion one way or the other" based on the media accounts of the case; and that she would be able to disregard anything she had read or heard and render a verdict based solely on the evidence presented at trial and the law as instructed by the trial court.

Juror J.M. stated that although he had formed the opinion based on media accounts of the case that "the defense would have a stretch to go" (R. 722), he realized that that opinion was based on facts from the media that may be wrong and that he would "be willing to listen to the facts [presented at trial] and make a determination from those." (R. 721-22) He then stated that he presumed Landers was innocent and that although the media accounts had raised some questions in his mind about the crime, he did not have the opinion that Landers was guilty. Finally, he stated that he would be able to put aside what he had read or heard and base his verdict solely on the evidence presented during trial and the law as instructed by the court.

Juror W.M. stated that he could set aside whatever he had read or heard in the media and render a fair verdict based solely on the evidence presented at trial and that his exposure to media accounts of the case would have no bearing on his decision if he were to be a juror.

Finally, juror C.P. stated that he had not formed any opinion as to Landers's guilt based on media accounts of the case and that he would be able to set aside whatever he had heard or read and render a verdict based solely on the evidence presented at trial and the law as instructed by the trial court.

"[A] defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case," Neal v. State, 731 So. 2d 609, 613 (Ala.Crim.App. 1997), aff'd, 731 So. 2d 621 (Ala.), cert. denied, 527 U.S. 1027, 119 S.Ct. 2377, 144 L.Ed.2d 780 (1999), and as long as the "juror in question can and will base his decision on the evidence alone ... a trial judge's refusal to grant a motion to strike for cause is not error." Perryman v. State, 558 So. 2d 972, 977 (Ala.Crim.App. 1989).

Landers also contends, however, that jurors C.A., C.E. and C.P. should have been removed for cause because they each indicated during voir dire that not only had they read or heard about the present case in the media, but they had also read or heard that Landers was also suspected or had been accused of being involved in the death of his grandmother, a subject that the trial court had ruled was inadmissible during the present trial. Landers maintains that "knowledge of this inadmissible information ... certainly raises the probability of prejudice" and that therefore, jurors C.A., C.E., and C.P. should have automatically been removed for cause. (Landers's brief to this court, p. 157.) As noted above, jurors C.A., C.E., and C.P. all stated during voir dire that they could set aside what they had read or heard and render a verdict based solely on the evidence presented at trial and the law as instructed by the trial court. Although each had heard that Landers had been implicated in the death of his grandmother, a juror's knowledge of other crimes or convictions of the defendant that are inadmissible is not, alone, sufficient to justify a challenge for cause. See, e.g., Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). There is simply no indication that the exposure of these jurors to media stories concerning Landers's alleged involvement in the death of his grandmother caused any of them to form a deep-seated and fixed opinion as to Landers's guilt regarding the death of his father so as to render them unable to reach a fair verdict. Accordingly, we find that the trial court did not err in denying Landers's challenges for cause as to C.A., C.E., J.M., W.M., and C.P.

IV.

Landers contends that the trial court erred in denying his motion for a change of venue.

Before trial, Landers filed a motion for a change of venue on the ground that the pretrial publicity surrounding the case was so extensive and prejudicial as to preclude him from receiving a fair trial in Elmore County. In addition, Landers claimed that because some of the publicity included references to the death of Landers's grandmother, which, as noted above, had been ruled to be inadmissible at the trial for the death of his father, his jury pool would be tainted with inadmissible and prejudicial information. At the hearing on the motion, Landers referred to several newspaper articles from the Wetumpka Herald and Montgomery Advertiser to support his claim; however, those articles were not introduced into evidence and are not included in the record on appeal. The trial court deferred ruling on the motion until the voir dire examination was completed. Following the voir dire examination, Landers renewed his motion, arguing that because 51 percent of the venire had indicated that they had read or heard something about the case from the news media, including an article that had been published the day before jury selection began, he was entitled to a change of venue. In support of his renewed motion, Landers referred to an article from the Wetumpka Herald in which Sheriff Bill Franklin was reported as saying that there was more publicity surrounding Landers's case than any other he had seen in his career. Again, however, that article was never introduced into evidence nor is it included in the record on appeal. The trial court denied Landers's motion, stating:

"At this time, the law does not require that we attempt to select a jury from people who have been living in a cave somewhere for five to ten years. The law does require that people who are potential jurors, if they have knowledge of the case, that they be able to affirm to the Court that they can set aside that knowledge and base this decision on the evidence and on the law.

-23-

"There quite honestly were less people than I expected that have heard or read something with regard to this case.

"There has been no showing based on the examination of the jurors and the individual examination of the jurors in this Court's continuous inquiry to the jury whether there is any one who has any additional response, that any pretrial publicity has so affected the jury pool as to cause prejudice to the defendant."

(R. 911-12.) The trial court's findings are supported by the record.

"'The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.'

"Nelson v. State, 440 So. 2d 1130, 1132 (Ala.Crim.App. 1983). See also Trahan v. State, 450 So. 2d 1102 (Ala.Crim.App. 1984). An appellant must prove a 'gross abuse of discretion' before the trial court's ruling on a motion for change of venue will be reversed on appeal. Anderson v. State, 443 So. 2d 1364 (Ala.Crim.App. 1983)."

Hunt v. State, 642 So. 2d 999, 1042 (Ala.Crim.App. 1993), aff'd, 642 So. 2d 1060 (Ala. 1994).

In Oryang v. State, 642 So. 2d 979 (Ala.Crim.App. 1993), we stated:

"'[A] change of venue must be granted only when it can be shown that the pretrial publicity has so 'pervasively saturated' the community as to make the 'court proceedings nothing more than a "hollow formality,"' Hart v. State, 612 So. 2d 520, 526-27 (Ala.Crim.App.), affirmed, 612 So. 2d 536 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), citing Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In order to show community saturation, the appellant must show more than the fact 'that a case generates even widespread publicity.' Thompson v. State, 581 So. 2d 1216, 1233 (Ala.Crim.App. 1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). '"Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So. 2d 844 [1945]."' Thompson v. State, supra at 1233, quoting McLaren v. State, 353 So. 2d 24, 31 (Ala.Crim.App.), cert. denied, 353 So. 2d 35 (Ala. 1977). Furthermore, in order for a defendant to show [actual] prejudice, the '"proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So. 2d 1296, 1299 (Ala.Crim.App. 1978).' Ex parte Grayson, 479 So. 2d 76, 80 (Ala. 1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)."

642 So. 2d at 983.

Here, Landers has failed to prove either that the community was so "pervasively saturated" with such prejudicial publicity as to make it impossible to select an impartial jury or that any of the jurors who decided the case were actually prejudiced against him as a result of the publicity. Although we acknowledge that this case received publicity in Elmore County, "publicity" and "prejudice" are not synonymous. "'"The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).'" Siebert v. State, 562 So. 2d 586, 589 (Ala.Crim.App. 1989), aff'd, 562 So. 2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990), quoting Fortenberry v. State, 545 So. 2d 129 (Ala.Crim.App. 1988), aff'd, 545 So. 2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990). The jury venire in this case was extensively and thoroughly examined in an individual, sequestered setting regarding each prospective juror's knowledge about the case. While 31 out of 60 prospective jurors were aware of the case and some of the details, 30 of those jurors unequivocally stated that they could set aside what they had read or heard and render a verdict based solely on the evidence presented at trial; and the single juror who indicated that he had a fixed opinion that Landers was guilty and would be unable to set aside that opinion was properly removed for cause. In addition, only four prospective jurors indicated that they had read or heard anything regarding the death of Landers's grandmother -- one of which was the juror mentioned above that was removed for cause and the other three of which indicated that they could set aside what they had read or heard and render a verdict based solely on the evidence presented during the trial. "Nothing in the record indicates that those jurors who served [on Landers's jury] did not return a verdict based solely on the evidence presented at trial." Ex parte Travis, [Ms. 1970815, March 31, 2000] ___ So. 2d ___, ___ (Ala. 2000).

Accordingly, we find that the trial court did not abuse its discretion in denying Landers's motion for a change of venue.

V.

Landers contends that the trial court erred in admitting evidence of collateral conduct which was, he says, irrelevant to any issue in the case and unduly prejudicial. Specifically, Landers complains about the following:

1. Evidence that Landers was the owner and sole beneficiary of a $1,000,000 life insurance policy on his father that was purchased barely six months before his father's death.

2. Evidence that Landers was experiencing financial difficulties at the time of his father's death, that Landers's loans were past due, that his bank account was overdrawn on a regular basis, and that there was pending litigation against his construction company.

3. Evidence of numerous property damage claims filed by Landers with his insurance carrier between 1988 and 1992.

4. Evidence of fraudulent insurance claims filed by Landers while working for AllState in 1980 as a claims adjustor.

5. Evidence of Landers's educational background, his degree in criminal justice and his attendance at law school for one semester and his employment history of working in the insurance field for both AllState and Progressive.

"On the trial for the alleged commission of a particular crime, evidence of the accused's having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused's conformity therewith. This is a general exclusionary rule which prevents the introduction of prior acts or crimes for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question....

"....

"The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show the defendant's bad character and conformity therewith on the occasion of the now-charged crime. If the defendant's commission of another crime or misdeed is relevant for some other material purpose in the case then it may be admitted."

C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (5th ed. 1996)(footnotes omitted). Rule 404(b), Ala.R.Evid., provides that evidence of collateral conduct may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident." In determining whether the proposed evidence is admissible under one of the exceptions to the exclusionary rule, the question is whether the evidence is "'material and logically relevant'" to an issue in the case. Bradley v. State, 577 So. 2d 541, 547-48 (Ala.Crim.App. 1990), quoting Snead v. State, 243 Ala. 23, 24, 8 So. 2d 269, 270 (1942). See also Gamble v. State, [Ms. CR-97-0698, February 4, 2000] ___ So. 2d ___ (Ala.Crim.App. 2000); Perkins v. State, [Ms. CR-93-1931, November 19, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999). Rule 401, Ala.R.Evid., defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "The appellate courts of Alabama have sanctioned a liberal test of relevancy under which evidence is admissible if it has any probative value, however slight, upon a matter in the case." C. Gamble, McElroy's Alabama Evidence, § 21.01(1) (5th ed. 1996). "'All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner.'" Nicks v. State, 521 So. 2d 1018, 1026 (Ala.Crim.App. 1987), aff'd, 521 So. 2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), quoting Underhill, Criminal Evidence § 154 (3d ed. 1923). "'The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge.'" Akin v. State, 698 So. 2d 228, 234 (Ala.Crim.App. 1996), cert. denied, 698 So. 2d 238 (Ala. 1997), quoting Blanco v. State, 515 So. 2d 115, 120 (Ala.Crim.App. 1987).

The evidence of the life insurance policy on the victim's life, of which Landers was the sole beneficiary, was properly admitted into evidence because it was an element of the crime. Landers was charged with murder made capital because it was committed for pecuniary gain. See § 13A-5-40(a)(7), Ala. Code 1975. Specifically, the indictment reads as follows:

"The Grand Jury of said County charge that before the finding of this Indictment, Mark Samuel Landers, whose true name is to the Grand Jury unknown, otherwise than as stated, did intentionally cause the death of Robert R. Landers, Sr., by running over and crushing him with a bulldozer, for a pecuniary or other valuable consideration, to-wit: the proceeds of a life insurance policy on Robert R. Landers, Sr., in violation of Section 13A-5-40(a)(7), Code of Alabama, 1975, against the peace and dignity of the State of Alabama."

(C. 9.) Because the life insurance policy was an element of the crime that the State was required to prove beyond a reasonable doubt, it was properly admitted.

Likewise, we find that evidence of Landers's financial condition, of pending litigation against Landers's construction company, and of the numerous insurance claims filed by Landers (both legitimate and fraudulent), were properly admitted as evidence of Landers's motive. Contrary to Landers's contention, "evidence tending to establish motive is always admissible." Jordan v. State, 629 So. 2d 738, 741 (Ala.Crim.App. 1993), cert. denied, 511 U.S. 1112, 114 S.Ct. 2112, 128 L.Ed.2d 671 (1994). "'It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.'" Bradley, 577 So. 2d at 549, quoting Bowden v. State, 538 So. 2d 1226, 1235 (Ala. 1988)(emphasis in Bowden). "'Even slight evidence to show a motive for doing the act in a criminal case is not to be excluded, but should be left to the consideration of the jury.'" Siler v. State, 705 So. 2d 552, 556-557 (Ala.Crim.App. 1997), quoting Kelley v. State, 409 So. 2d 909, 914 (Ala.Crim.App. 1981). "'"Where the proffered evidence has a tendency, even though slight, to enlighten the jury as to the culpability of the defendant, then it is relevant and properly admissible."'" Boyd v. State, 715 So. 2d 825, 838-39 (Ala.Crim.App. 1997), aff'd, 715 So. 2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998), quoting Donahoo v. State, 505 So. 2d 1067, 1071 (Ala.Crim.App. 1986), quoting, in turn, Waters v. State, 357 So. 2d 368, 371 (Ala.Crim.App.), cert. denied, 357 So. 2d 373 (Ala. 1978).

> "'In cases where, as here, the evidence is circumstantial, a wide range of testimony is admissible to show the motive of defendant for committing the crime charged. Turner v. State, 224 Ala 5, 140 So. 447; Harden v. State, 211 Ala. 656, 101 So. 442.
>
> "'In a case where the evidence is circumstantial, evidence of motive becomes of great importance. Harden v. State, supra; Hardy v. State, 51 Ala.App. 489, 286 So. 2d 899. When circumstances point to the guilt of an accused, evidence of his motivation, even though weak, is admissible. In McClendon v. State, 243 Ala. 218, 8 So. 2d 883, the Supreme Court said:
>
>> "'"When it is shown that a crime has been committed and the circumstances point to the accused as the guilty agent, then proof of a motive to commit the offense, though weak and inconclusive evidence, is nevertheless admissible."'"

"Chambliss v. State, 373 So. 2d 1185, 1207-08 (Ala.Crim.App.), cert. denied, 373 So. 2d 1211 (Ala. 1979). See also Knotts v. State, 686 So. 2d 486 (Ala.Crim.App. 1995)."

Boyd, 715 So. 2d at 839.

Here, Landers's financial difficulties and the pending litigation against his construction company were clearly admissible to show his motive in killing his father, i.e., to collect the life insurance proceeds. This evidence tended to show that Landers needed the life insurance proceeds in order to ease his financial difficulties and in anticipation of the litigation against him. See, e.g., Mills v. State, 408 So. 2d 187 (Ala.Crim.App. 1981)(appellant's financial difficulties tended to show his motive for burning his house). In addition, evidence of the numerous insurance claims -- both the legitimate claims filed by Landers as

an insured and the fraudulent claims filed by Landers while working as a claims adjustor -- also tended to shed light on Landers's motive for killing his father. While not direct evidence of motive, it was circumstantial evidence of motive that tended to show Landers's attitude toward insurance proceeds. The jury could have inferred from this evidence that Landers tended to view insurance proceeds, in whatever form, as a source of income, and, combined with his financial difficulties, this evidence was highly relevant to show Landers's motive to kill his father in order to collect $1,000,000. See, e.g., Robinson v. State, 528 So. 2d 343 (Ala.Crim.App. 1986)(evidence that appellant previously "faked" a burglary of her home was properly admitted, in conjunction with appellant's financial difficulties, as relevant to show her motive in "faking" present burglary and killing her husband to obtain inheritance); Fountain v. State, 681 S.W.2d 858 (Tex.Ct.App. 1984)(evidence that appellant had filed previous insurance claims was properly admitted as relevant to show appellant's motive in killing his step-son where the appellant was the sole beneficiary of a life insurance policy on his step-son).

Finally, we find that evidence of Landers's educational background (including his 1978 degree in criminal justice and his attendance of law school for a short period of time in the 1980's) and his employment history in the insurance industry was properly admitted. During the hearing on Landers's motion in limine to prevent introduction of this evidence, the State argued that it was admissible to show that Landers had "knowledge of the system and how to stage an accident, plan a murder," and that Landers was "knowledgeable of how to file false claims and stage accidents and stage claims to collect insurance proceeds." (R. 313-14.) According to the State, Landers's degree in criminal justice showed that he had knowledge of the criminal justice system and of the burdens of proof in a criminal case and his employment in the insurance industry showed that he had knowledge of how to file false claims and manipulate the industry to obtain insurance proceeds. The trial court, in its written order, stated only that this evidence "may be admitted in order to demonstrate the knowledge of the defendant." (C. 223.) Although we do not believe that criminal justice majors are taught how to "plan a murder" or that employees of insurance companies are taught how to "file false claims," we do find that the evidence was relevant in showing the jury Landers's background and history and thereby demonstrating that it was not inconceivable that Landers could plan and carry out the murder of his father in order to collect the insurance proceeds and obtain relief from his financial difficulties. Although Landers contends that the trial court, in admitting this evidence, improperly "permitted the State to stack conjecture upon conjecture in an attempt to transform innocuous background information into some sinister plan which Mr. Landers waited approximately 20 years to carry out" (Landers's brief to this court, p. 168-69), Landers has failed to show how he was prejudiced by the admission of this evidence. The State, just as the defense, is permitted to argue reasonable inferences from the evidence, and "casting ... evidence in the most sinister light imaginable" is the prosecutor's job; such is not improper. (Landers's brief to this court, p. 171.) As Landers clearly concedes, this evidence was innocuous and unremarkable and Landers had the opportunity, and in fact did, argue to the jury that the State's inferences from this evidence were incorrect.

For these reasons, Landers's claim that the trial court improperly admitted evidence of collateral conduct is meritless.

VI.

Landers contends that the trial court erred in allowing the testimony of his sister, Victoria Landers Goolsby, regarding an incident that occurred on February 6, 1992, six days before his father's death, because, he says, the testimony was inadmissible hearsay that did not fit into any exception to the hearsay rule. Landers complains about the following testimony by Goolsby:

> "On February the 6th, 1992, when my father, Robert Richard Landers, Sr., arrived
> at the house, the first thing he said was, 'You came as close as you will ever come to

putting me six feet under the ground today.' I said, 'Okay. What happened? Tell me what happened.'

"We walked into the house in the kitchen which is where the rest of the conversation took place. My father began to tell me the event that had just occurred with my brother present at the lake house on the lot where he was.

"My father said that Mark had almost run over him with a bulldozer and killed him. My father was visibly shooken [sic]. He was white as he could be. And he was so upset and he was cussing. And about five minutes after he had been there and was telling me the story my brother walked in, Mark Landers walked in. Mark walked in and my father told Mark he better get him, quote, a god damn foreman. He would never help him do another thing. That he would never go back to that lake again. And just on and on with this same type language to my brother.

"My brother, Mark, laughed and shrugged his shoulders. And my father said, 'You almost killed me. You almost ran over me with a bulldozer. I will never help you do another god damn thing. I mean it, get you a god damn foreman. I will never go back to that lake again."

(R. 1812-13.)

Goolsby's testimony was properly admitted under two exceptions to the hearsay rule: to show the victim's state of mind, i.e., his fear of Landers, and as an excited utterance.

A statement of the declarant's then existing state of mind or emotions such as love, hatred or fear has historically been admissible as an exception to the hearsay rule. See Rule 803(3), Ala.R.Evid.; C. Gamble, McElroy's Alabama Evidence, § 261.03(5) (5th ed. 1996). See also Ex parte Dunaway, 746 So. 2d 1042 (Ala. 1999), cert. denied, ___ U.S. ___, 120 S.Ct. 1724, 146 L.Ed.2d 645 (2000)(victim's statement in the weeks preceding her murder that the appellant had threatened her and that she was afraid of the appellant was admissible to show the victim's state of mind); Ex parte Whisenhant, 555 So. 2d 235 (Ala. 1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 767 (1990)(victim's statement in days preceding her murder that she was afraid for her life was admissible to show the victim's state of mind); Moore v. State, 697 So. 2d 800 (Ala.Crim.App. 1996)(victim's statement in the hours preceding her murder that she was afraid the appellant would hurt her was admissible to show the victim's state of mind); Jackson v. State, 629 So. 2d 748 (Ala.Crim.App. 1993)(victim's statement to witnesses just prior to her death that the appellant had threatened her and that they should call the police if they saw the appellant was admissible to show the victim's fear). Furthermore:

"a person's statement concerning a startling occurrence made while perceiving the occurrence, or soon after perception thereof, and while the declarant is under the stress of a nervous excitement created by such perception, is admissible as tending to prove the truth of the matter asserted. A statement of this kind is frequently referred to as a spontaneous exclamation or excited utterance and is an exception to the hearsay evidence rule.

"....

"[R]ule [803, Ala.R.Evid.] sets out three conditions which must be met for admission of the statement. There must be a startling event or condition, the statement must relate to the circumstances of the occurrence and the statement must be made before time has elapsed sufficient for the declarant to fabricate. The statement must be the apparently spontaneous product of that occurrence operating upon the visual, auditory, or other perceptive sense of the speaker. The declaration must be instinctive rather than deliberative. In short, it must be the reflex product of the immediate sensual impressions, unaided by retrospective mental action. Whether a statement qualifies as an excited utterance is a preliminary and discretionary question for the trial court."

C. Gamble, McElroy's Alabama Evidence, § 265.01(1) at 1281 (5th ed. 1996)(footnotes omitted). "The question of whether the statement is spontaneous in a given case is to be decided upon the facts and circumstances of that case, and such determination is a question for the trial court." Berryhill v. State, 726 So. 2d 297, 301 (Ala.Crim.App. 1998), quoting O'Cain v. State, 586 So. 2d 34, 38 (Ala.Crim.App. 1991). Moreover, strict contemporaneousness between the startling occurrence and the statement is not required; the critical factor is whether the declarant was still under the influence of the emotions arising from the event. C. Gamble, McElroy's Alabama Evidence, § 265.01(2) (5th ed. 1996).

Here, Goolsby testified that her father was upset, visibly shaken, and pale when he made the statements; clearly, the victim was under the stress of nervous excitement and fear caused by almost being killed by his own son. Accordingly, the trial court did not err in allowing Goolsby's testimony regarding the events of February 6, 1992.

VII.

Landers contends that the trial court erred in "precluding evidence of defendant's experiment and in allowing evidence of the State's reconstruction." (Landers's brief to this court, p. 174.)

A.

First, Landers contends that the trial court erred in precluding his expert, Dr. Gerald Whitehouse, from testifying about an out-of-court experiment he conducted with a bulldozer and a "dummy" the week before trial. Prior to Dr. Whitehouse's testimony, the court held a hearing to determine the admissibility of Dr. Whitehouse's experiment. At that hearing, Landers's counsel made the following offer of proof:

"May it please the Court. Your Honor, the defense plans to call as a witness Dr. Gerald Whitehouse who is a retired professor from Louisiana State University.

"Since his retirement he has been a consulting sitting engineer for various manufacturers and dealers of heavy equipment.

"Dr. Whitehouse performed an examination of a John Deere Model 450-E bulldozer (the same model used in this case) sometime in April.

"It is my recollection it has been within the last couple of weeks in April outside of Birmingham in Gardendale the dozer in question was owned by the Alabama Forestry Commission. This dozer that is at issue in this case, the 450-E, is no longer manufactured by John Deere.

"Counsel and Dr. Whitehouse undertook to find a 450-E for the purpose of having him examine it.

"Through a couple of Deere dealers we were able to track back some service records and found that the Department of Conservation owned some Deere 450 models. Dr. Whitehouse traveled to Birmingham and to its suburb Gardendale and made an inspection of this bulldozer. He operated the bulldozer. He watched it while it was operated by an employee of the Department of Conservation.

"Part of his day was spent conducting an experiment. The experiment consisted of the construction of a dummy, for lack of a better word, and how that dummy might react to certain actions by the bulldozer. Particularly he placed the dummy on the right-hand side track of the bulldozer while it was moving rearward in reverse gear. And he observed the reaction of the dummy to the tracks on the bulldozer. He made some photographs of the bulldozer and the dummy, and I have the photographs with me today.

"His testimony would be offered about the operation of a Deere 450-E bulldozer and about the results of his experiment.

"He also visited the scene of the accident here in the Wetumpka area and has reviewed documents provided to him by counsel for the defendant.

"Documents, statements, transcripts of prior court proceedings, photographs, and we would like to call him as a witness and allow him to testify about the operation of the 450-E what it does under certain conditions.

"One condition being if no operator is in the vehicle does it continue to go? The other being what he did relative to this experiment. What he observed his dummy do when he placed him on the track.

"And I have a total of six photographs that I would expect to use in Dr. Whitehouse's testimony."

(R. 2031-34.) The State objected to the experiment on the grounds that it was not substantially similar to the crime scene because the bulldozer used in the experiment, although the same model as the one used to kill the victim, was not the same bulldozer and had been modified by the Department of Conservation; because there was no evidence that the terrain during the experiment was the same as the crime scene; and because there was no evidence that the "dummy" used in the experiment was substantially similar in height, weight, and measurements of the victim. The trial court agreed, stating:

"Based on the offer of proof further, the Court finds that the experiment is not substantially similar to where it would be admissible. The areas and the terrain are different. There is no, you know, I looked at the photographs. I don't know about the weight of the dummy or whatever, but it doesn't appear to me that it would be substantially similar to somebody in height, weight, and mass as the victim in this case.

"I don't know that the machine itself is substantially similar; however, assuming that Dr. Whitehouse is qualified to give testimony with regard to bulldozers, I feel like that he would probably be able to point out the difference as to operation of the dozer. And I would allow him to do that. There are differences that I noted in looking at it that have been mentioned. One I refer to is a safety cage that is around the cab with bars

going toward the front of the dozer which it is my understanding, and I'm not a pulpwooder either, provides protection to the operator when you are working in the woods and you have the possibility of trees and things like that falling on you.

"There is also an alteration to the blade itself. There is an extension above the blade that appears to me to be made of steel. And there is a chain that is also wrapped around that extension. But any rate, those are differences that I have noted.

"To the -- as I'm saying, to the extent that Dr. Whitehouse can be qualified, the Court would allow him to testify as to the operation of a John Deere 450-E dozer and its characteristics.

"It has been noted that Dr. Whitehouse has also visited the scene and reviewed documents and photographs provided by defense counsel which I'm sure almost everything that they have, if not everything they have, that is available to us on the scene. And provided that a foundation can be laid, I'm sure the Court will allow him to testify under those regards.

"If the witness is qualified, the Court may also be inclined to allow him to testify, you know, as to what happens when an object is sitting on top of the tracks and the machine moves.

"You know, I'm making a lot of assumptions here because I don't know Dr. Whitehouse and I don't know his qualifications. Assuming he is qualified I'm sure I would allow such testimony.

"But I will not allow the photographs and I will not allow the experiment. Okay."

(R. 2043-46.)[2]

"The party offering in evidence the results of an experiment must surmount the hurdle presented by the test of 'substantial similarity.' It has been held that evidence of an experiment, conducted out of court and having probative value on a matter in issue, is admissible if the conditions of the experiment were substantially similar to the conditions existing at the time of the occurrence involved in the litigation. Whether this condition of similarity has been met is a question left largely to the discretion of the trial judge."

C. Gamble, McElroy's Alabama Evidence, § 81.01(2) (5th ed. 1996)(footnotes omitted). "The exercise of the trial judge's discretion in the admission or exclusion of an experiment will not be reversed on appeal unless such discretion has been grossly abused." C. Gamble, McElroy's Alabama Evidence, §

---

[2]The trial court also found that defense counsel had violated discovery rules by failing to provide the State with the results of the experiment before trial; however, because we find that the exclusion of the experiment was proper on other grounds, we need not address this issue.

81.01(3) (5th ed. 1996). The conditions of the experiment and those surrounding the occurrence that is the subject of the trial must be substantially similar, but need not be identical. "[O]nly where the conditions are dissimilar in an essential particular should the evidence of an experiment be rejected." C. Gamble, McElroy's Alabama Evidence, § 81.01(4) (5th ed. 1996)(footnote omitted). The burden is on the party offering evidence of the experiment to show substantial similarity in conditions.

Here, Landers failed to show a substantial similarity in the conditions, and therefore, we cannot say that the trial court abused its discretion in preventing Dr. Whitehouse from testifying about the experiment. The experiment was conducted somewhere in Gardendale, the exact location unknown, not at the scene of the crime, and Landers failed to offer anything to show what the terrain was at the location of the experiment, much less that the terrain was substantially similar to the terrain on Cliff Side Road. The bulldozer used in the experiment, although the same model as the bulldozer at issue in this case, had been modified by the Department of Conservation and was not substantially similar, other than in model number, as the bulldozer used to kill the victim. In addition, Landers failed to show that the "dummy" used by Dr. Whitehouse was substantially similar in height, weight or mass as the victim. Clearly, Landers failed in his burden of showing substantially similar conditions. See, e.g., White v. State, 546 So. 2d 1014 (Ala.Crim.App. 1989). Moreover, we point out that Dr. Whitehouse was permitted to testify to the primary opinion for which the experiment was conducted and for which he was called to testify -- he testified regarding what would happen if an object, such as a human being, was placed on the tracks of a bulldozer while it was in motion. See, e.g., Gilley v. State, 367 So. 2d 597 (Ala.Crim.App. 1978), cert. denied, 367 So. 2d 600 (Ala. 1979).

Accordingly, we find that the trial court did not abuse its discretion in preventing evidence of Dr. Whitehouse's experiment.

B.

Second, Landers contends that the trial court erred in allowing the State to introduce into evidence State's Exhibits 11-A through 11-R, photographs of what Landers terms a "reconstruction" that was conducted by law enforcement officials at the scene of the crime on Saturday, February 15, 1992. Landers maintains that the photographs were inadmissible because, he says, the State failed to lay the proper predicate for their admission. Specifically, Landers contends that the State failed to present testimony showing that the "reconstructed" scene was the same as the crime scene as it was found on Wednesday, February 12, 1992.

During the testimony of ABI Agent Rhegness, the State attempted to introduce State's Exhibits 11-A through 11-R. The following then occurred:

"[Landers's counsel]: If it please the Court, we would object on the ground that counsel has stated that he is offering these as a part of a reconstruction.

"And we would object on the grounds or to demonstrate that they would be reconstruction. There has been no predicate laid that the circumstances, the area was the same as it was at the time of the accident. There has been no predicate laid showing that this gentleman is an experienced ABI agent that he has experience in reconstructing accident scenes or attempting to reconstruct an accident scene to create a circumstance.

"It is supposed to be as it was and in fact there is no evidence what may have happened. And at this stage for him to attempt to testify as to a reconstruction would tend to be misleading and confusing. And whatever relevance would be outweighed by that tendency to mislead and confuse what was seen may have been the way it was done -

"[The Court]: Just a second. Any response?

"[Prosecutor]: Judge, I think we have already covered this previously. There has been testimony of Mr. Ponder who was out there testified what they did. I think Mr. Rhegness testified yesterday as to what they did. And the photographs speak for themselves. And he says they fairly and accurately depict the event that occurred on Saturday morning.

"[Landers's counsel]: <u>I didn't object to what they did. But he is now representing this as a reconstruction. I object to his representing that this is a reconstruction. It could be misleading and confusing.</u>

"[The Court]: I think in reviewing the testimony yesterday of what they did, I think other than understanding there may be some debate over the use of the word reconstruction, the Court would sustain to the effect that it is a reconstruction.

"However, the Court, as I have up to this point, would allow Mr. Rhegness to testify and tell us what was done on that Saturday. And let me just look at the photographs again, Greg, and make sure I know which ones we are talking about.

"Other than the exclusion of the word 'reconstruction' the Court will admit State's Exhibits 11-A through R and allow Mr. Rhegness an opportunity to show the jury and explain to them what they depict."

(R. 1280-82.) (Emphasis added.)

Clearly, Landers's only objection at trial was to the characterization of the photographs and the events they depicted as a "reconstruction." That objection was sustained by the trial court and the photographs, although introduced into evidence, were not characterized as depicting a reconstruction, but merely as an experiment conducted by law enforcement officers to aid them in their investigation. Thus, Landers's claim on appeal that the photographs were improperly admitted as depicting a reconstruction without the proper predicate is clearly meritless.

Moreover, because the photographs were not offered as depicting a "reconstruction," it is clear that they were properly authenticated by Agent Rhegness. Although to properly authenticate photographs of a "reconstruction" of a crime scene, someone who was present at the crime scene must testify that the reconstruction was the same as the crime scene (which, as Landers correctly points out, Agent Rhegness was unable to do because he did not see the crime scene on Wednesday, February 12, 1992), see C. Gamble, McElroy's Alabama Evidence, § 123.04 (5th ed. 1996), to authenticate photographs of an experiment, there need only be testimony from a witness to the experiment that the photographs accurately depict what occurred during the experiment, see C. Gamble, McElroy's Alabama Evidence, § 123.03(3) (5th ed. 1996). Here, Agent Rhegness was present during the experiment on Saturday, February 15, 1992, and thus, his testimony that the photographs accurately depicted what occurred that day was sufficient to authenticate the photographs.

Furthermore, we find that even if there was error in the admission of the photographs (which we do not believe there was), the error was harmless. The photographs were merely cumulative to the testimony of two witnesses, Agent Rhegness and William Ponder, describing in detail the experiment that occurred on Saturday, February 15, 1992, testimony to which Landers did not object. See, e.g., Wilkerson v. State, 686 So. 2d 1266 (Ala.Crim.App. 1996).

-34-

Accordingly, the trial court did not err in admitting into evidence State's Exhibits 11-A through 11-R.

## VIII.

Landers contends that the trial court erred in denying his motion to continue closing arguments in the case, scheduled to begin on Thursday, May 8, 1997, to the following Monday due to the death of defense counsel's father.

The record reflects that on Wednesday, May 7, 1997, just before the last defense witness was to testify, Landers's lead defense counsel, Bill Clark, received a message that his father, who had been suffering from Parkinson's disease, had taken a turn for the worse. The record reflects that the trial court had received a message earlier in the day for Mr. Clark to telephone his wife. Not knowing the reason for the message, the trial court waited until the next recess to inform Mr. Clark of the message. The record reflects that after giving the message to Mr. Clark, and apparently after Mr. Clark had telephoned his wife and learned of his father's condition, an off-the-record bench conference was held. Although the conversation that took place during that conference is not in the record, the trial court stated during the hearing on Landers's motion for a new trial that it, defense counsel, and the prosecutor decided during the bench conference to finish the testimony of the last witness and then to allow the jury to go home and Mr. Clark to go to Birmingham to be with his father.

The next thing in the record is a statement by the trial court the following morning to the jury:

"This morning we have had -- well, we didn't have something come up this morning, we had something come up last night. So we are not going to be able to finish today.

"Yesterday afternoon, I don't know if y'all remember, but somewhere right at four o'clock when Mr. Clark and Mr. Valeska [the prosecutor] came up and we were having one of our bench conferences, I handed Mr. Clark a note. And his wife had called to tell him that his daddy was in real, real bad shape.

"So anyway, when we left here last night, Mr. Clark headed on back to Birmingham to check on his dad, and so when he got there he had died. So I was on the phone last night with Mr. Clark and Mr. Valeska and everybody else trying to figure out what to do and he, you know, told me he didn't feel like he would be in any condition to come down this morning and do closing which makes perfect sense to me. I know I wouldn't either, but he said that he would be back tomorrow morning.

"He has got to get funeral arrangements made and all of that today. So what we will do is you guys have got the day off and we will come back in the morning I hope and like we had planned today and go on into closing argument and try to get the case to you.

"My goal is by midday or lunchtime somewhere around in there y'all will have the case. That's what I'm hoping.

"So any way that's where we are. I hate it but we don't have any control over it. That's where we are, y'all."

-35-

(R. 2298-99.) The following day, Friday, the trial resumed with closing arguments. There was no mention of any further continuance, nor is there any written or oral request for a continuance contained in the record.

However, in his motion for a new trial, and on appeal, Landers claims that during the telephone conversation with the trial court on Wednesday night, Mr. Clark requested that the case be continued until the following Monday, but that the trial court refused, telling Mr. Clark that he had to give closing arguments either on Thursday, Friday, or Saturday because the judge was scheduled to preside over a case in another county, Baldwin County, as a special judge on Monday. According to Landers, Mr. Clark chose to give closing arguments on Friday only because he had no choice -- his father's funeral was scheduled for Saturday and he was not up to giving arguments the next day, Thursday. Other than defense counsel's allegations, however, there is nothing in the record to support Landers's claim that a continuance was ever requested, much less denied by the trial court. In fact, at the hearing on his motion for a new trial, after Mr. Clark summarized the allegations, the trial court stated the following:

> "I do disagree with some of the allegations that you have in there. But everybody has their own version, and I have mine because I was sitting right here. And I'm prepared to state whenever the time is what happened. I don't agree with your position."

(R. Supp. 32.) In addition, the prosecutor stated "I don't remember it like that." (R. Supp. 33.) Unfortunately, the trial court never elaborated, either at the hearing or in its order denying Landers's motion for a new trial, on which allegations made by Mr. Clark it disagreed with. And, as noted above, there is nothing in the record supporting Landers's claim in his motion for a new trial and on appeal that Mr. Clark requested a continuance. Because there is nothing in the record to suggest that a continuance was, in fact, requested, much less that the request was denied, there is, technically, nothing for this court to review. However, given the unique circumstances underlying this claim, we will, arguendo, accept Landers's allegations in this regard as true and address the merits of his claim.

Landers contends that the trial court's denial of his motion to continue closing arguments denied him due process, his right to a fair trial, and his right to effective assistance of counsel. Landers claims that his counsel was "not emotionally fit to prepare properly for the argument or to argue the case" (Landers's brief to this court, p. 181), and that the trial court's statements to the jury regarding the death of counsel's father may have prejudiced the jury against him because they "left the jury with the impression that counsel voluntarily chose to return to court on Friday." (Landers's brief to this court, p. 185.) Under the circumstances, however, we conclude that the trial court's actions were reasonable.

The record reflects that the judge was obligated to be in Baldwin County to preside over a case as a special judge on the following Monday. In fact, the case was continued for over a week after the guilt phase of the trial for the judge to fulfill his obligations in Baldwin County; after the jury returned its verdict on Friday, May 9, 1997, the sentencing phase of Landers's trial was postponed until Monday, May 19, 1997. This is not a situation where the court could alter its own docket in order to accommodate the needs of defense counsel; rather, the court would have had to alter the docket of another circuit court. In addition, as the State correctly points out in its brief to this court, delaying closing arguments for some five days increased the danger of the jury being tainted by media accounts of the case. Many of the issues Landers raises on appeal involve the media coverage of the case; he has consistently maintained that the extensive media coverage warranted a change of venue, tainted the jury pool, and denied him a fair trial. Although we have concluded that Landers was not denied a fair trial due to media coverage, we nevertheless recognize the inherent danger that would have presented in delaying the trial some five days after the evidence had been presented but before closing arguments and jury deliberations, given the media coverage of the case.

Furthermore, the record reflects that Landers was represented throughout his trial by two attorneys, Mr. Clark and Mr. Maxwell Pulliam. Although Mr. Clark was lead counsel, there is simply no evidence that cocounsel, Mr. Pulliam, was not fully competent and prepared to give closing statements. Mr. Pulliam was present throughout the trial, questioned several witnesses, and argued motions. Although Landers contends that Mr. Pulliam "did not have sufficient trial experience" to make closing arguments (Landers's brief to this court, p. 180), he concedes in his brief to this court that Mr. Clark, "in retrospect, upon denial of the request to adjourn to Monday, should not have appeared and [should have] left it to cocounsel to argue the case" (Landers's brief to this court, pp. 182-83), and that Mr. Clark presented arguments only because he was "torn by a sense of duty to a client" and "chose to attempt to do his best for his client under the most trying of circumstances." (Landers's brief to this court, p. 183.)

> "This court in Adkins v. State, 600 So. 2d 1054, 1061 (Ala.Crim.App. 1990), remanded, 600 So. 2d 1067 (Ala.), on remand, 600 So. 2d 1072 (Ala.Crim.App. 1992), on return to remand, 639 So. 2d 515 (Ala.Crim.App. 1993), aff'd, 639 So. 2d 522 (1994), stated the following:
>
>> "'Several factors to be evaluated when considering the propriety of a continuance are the length of the continuance, the inconvenience to witnesses, counsel, and the court, and whether the "defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel." United States v. Burton, 189 U.S.App.D.C. 327, 584 F.2d 485, 490-91 (D.C. Cir. 1978), cert. denied, 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979).
>>
>> "'The decision to grant or deny a motion for continuance will not be reversed unless the trial judge has abused his discretion. See Canada v. State, 421 So. 2d 140 (Ala.Crim.App.1982); Jenkins v. State, 384 So. 2d 1135 (Ala.Crim.App. 1979); cert. denied, 384 So. 2d 1141 (Ala. 1980).
>>
>> "'In Jenkins, supra, this court faced a similar issue where a continuance was requested because co-counsel could not participate in the trial due to a death in his family. In that case we noted that "there was no showing that the appellant could not be adequately represented by the remaining attorney." This court also stated that the remaining counsel adequately represented the appellant at trial.'"

Grimsley v. State, 678 So. 2d 1197, 1203 (Ala.Crim.App. 1996).

Here, the majority of the guilt phase of Landers's trial was completed; closing arguments were all that was left. Although closing arguments are an important part of a trial, we simply do not believe that Landers "could not [have been] adequately represented by [Mr. Pulliam]." Jenkins v. State, 384 So. 2d 1135, 1139 (Ala.Crim.App. 1979), cert. denied, 384 So. 2d 1141 (Ala. 1980).

Landers also contends that the denial of his request for a continuance may have prejudiced the jury against him. Landers speculates that the jury may have seen Mr. Clark making closing arguments just two days after the death of Mr. Clark's father as callous and uncaring and translated that into a prejudice against him. However, "[s]peculative allegations regarding the possible existence of juror prejudice are

-37-

insufficient to show that the trial court abused its discretion." Mack v. State, 736 So. 2d 664, 672 (Ala.Crim.App. 1998), aff'd, 736 So. 2d 681 (Ala.), cert. denied, ___ U.S. ___, 120 S.Ct. 502, 145 L.Ed.2d 388 (1999). Landers failed to present any evidence at the hearing on his motion for a new trial that the jury was actually prejudiced against him because of the unfortunate circumstances faced by his defense counsel.

Further, Landers appears to raise a claim of ineffective assistance of counsel. As noted above, Landers maintains that Mr. Clark was not "emotionally fit" to argue the case and that therefore he was denied his right "to a fully effective defense." (Landers's brief to this court, p. 185.) In its order denying this claim in Landers's motion for a new trial, the trial court specifically found that "defense counsel was not ineffective" during closing arguments. (C. 698.) We have read Mr. Clark's closing argument and agree with the trial court's assessment.

Accordingly, under the circumstances presented here, we find that the trial court did not abuse its discretion in denying Landers's motion for a continuance.

## IX.

Landers contends that the trial court erred in refusing to give five of his requested jury instructions.

The record reflects that Landers submitted 43 written requested instructions, all of which were marked as "refused" by the trial court. (C. 448-91.) Following the trial court's oral charge, Landers objected to the court's failure to give his requested instructions as follows:

> "And with regard to the defendant's requested charges. We do respectfully object to the failure of the Court to give certain requested charges that were requested in writing and timely submitted to the Court which although the Court did give in part certain of these charges we submit that these are correct statements of the law and were not fully covered in the Court's oral charge.

> "Defendant's requested instruction numbers 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 23, 26, 27, 28, 30, 32, 34, 35, 36, 37, 40."

(R. 2450.)

> "Under Rule 14, A.R.Cr.P.Temp. (now Rule 21.2, A.R.Cr.P.), to preserve alleged error in the refusal of requested charges, a defendant must not only object in a timely manner, he must 'state with particularity the grounds of [his] objection.' Matkins v. State, 497 So. 2d 201, 203 (Ala. 1986)(emphasis omitted). An objection which merely asserts that refused charges are correct or accurate statements of law does not meet this requirement. Connolly v. State, 539 So. 2d 436, 438 (Ala.Crim.App. 1988); Bogan v. State, 529 So. 2d 1029, 1031 (Ala.Crim.App. 1988). Cf. Ex parte Washington, 448 So. 2d 404, 406 (Ala. 1984)(in order to preserve alleged error in the trial court's oral charge, an 'objection must be specific enough to point out the alleged error so as to allow the judge to correct [that] error'); Petite v. State, 520 So. 2d 207, 213 (Ala.Crim.App. 1987) (same)."

Jones v. State, 591 So. 2d 569, 573 (Ala.Crim.App. 1991). See also Greenhill v. State, 746 So. 2d 1064 (Ala.Crim.App. 1999); Knight v. State, 710 So. 2d 511 (Ala.Crim.App. 1997); Sanders v. State, 683 So. 2d 14 (Ala.Crim.App. 1996); Hardeman v. State, 651 So. 2d 59 (Ala.Crim.App. 1994); Morrison v. State, 601 So. 2d 165 (Ala.Crim.App. 1992); and Hagood v. State, 588 So. 2d 526 (Ala.Crim.App. 1991), cert.

denied, <u>Martin v. Alabama</u>, 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). Accordingly, this issue is not preserved for review.

X.

Landers contends that the trial court erred in instructing the jury that it could use evidence of Landers's collateral acts only for showing motive, plan or knowledge. (See Part V of this opinion, addressing the admissibility of the collateral acts.) Landers maintains that the trial court's charge in this regard improperly "highlighted" the evidence as evidence of "other wrongful acts" and thereby "suggest[ed] to the jury that there was somehow some wrongful conduct connected with this information." (Landers's brief to this court, p. 189.)

The record reflects that during its oral charge, the trial court instructed the jury as follows:

"There has been evidence and testimony with regard to certain acts of the defendant, Mark Landers. And I know at least on two occasions during the trial I told you that that evidence could only be considered for a limited purpose. And this is the overview of that type evidence.

"The law says that evidence of other wrongs or acts is not admissible to prove the character of a person in order to show action and conformity therewith. It may however be admissible for other purposes.

"The defendant is on trial only on the charge or charges that I have submitted to you.

"The State presented evidence regarding the defendant's educational background, his employment history, litigation pending against his company at the time of the alleged incident, the defendant's company's financial condition at the time of the alleged incident, and the defendant's history of insurance claims.

"This evidence is to be and may be considered by you only for what bearing, if any, it may have as to preparation, plan, knowledge, and motive and for no other purpose.

"Motive is defined as a feeling, passion, impulse, wish, or the like in a person that impels or inclines a person to do or not to do a particular act. It is different from intent. Motive is why a person wants to do a particular act."

(R. 2434-35.) Following the completion of the court's oral charge, Landers made the following objection:

"We would further object to that portion of the Court's oral charge in which it instructed the jury about other alleged wrongs or acts. Listing education, employment history, litigation, the defendant's financial situation, and certain insurance claims.

"We objected in advance, asked the Court not to give that charge for that reason and do object at this time because we submit that his education background is not evidence of any alleged wrong or act [and] does not even properly come under the scope of Rule 404(b). The same would be true as employment history with the exception of that portion of his employment history that is related to the termination at one of the insurance companies.

"Same thing is true with regard to litigation. The fact that he had been sued we submit does not constitute any wrong or act that would come within the scope of 404(b) as it was proven. And the same also with regard to his financial situation and then the list of insurance claims that was submitted is simply a list of claims that were paid. There was not one iota of evidence that there was anything wrong about it.

"Of course we submitted there is no relevance, but certainly by highlighting them as evidence as other wrongful acts it tends to cause the jury to believe that perhaps there was something wrong with it. And we do respectfully object to that portion of the Court's oral charge."

(R. 2448-50.) As the trial court noted in its charge, a virtually identical instruction had already been given to the jury during the trial. The record reflects that Landers did not object to the previous instruction. Because Landers failed to object the first time the trial court instructed the jury as to the limited purpose of Landers's collateral acts, he waived any claim of error in this regard.

Moreover, even if this issue were not waived, we would still decide it adversely to Landers. Evidence of Landers's educational background, his employment history, his history of insurance claims, and his financial condition at the time of the crime were admitted under Rule 404(b), Ala.R.Evid., for a limited purpose. As the State correctly points out in its brief to this court, the trial court's limiting instructions ensured that the jury did not use this evidence improperly, i.e., as evidence of bad character. The court's instructions did not highlight the evidence nor suggest to the jury that Landers's collateral conduct was in any way wrong or bad. In addition, Landers had the opportunity, and in fact did, argue to the jury that this conduct was not wrongful. Given the wealth of evidence regarding Landers's collateral conduct leading up to his father's murder, we find that the trial court's instructions were proper.

### XI.

Landers contends that the trial court erred in denying his motion for a new trial. In his motion, Landers raised some 44 grounds for relief. Of those 44 grounds, 18 have been addressed elsewhere in this opinion, 21 have not been pursued by Landers on appeal and thus are deemed to be waived, and 5 will be addressed below.

Initially, we note that "[t]here exists a presumption of correctness surrounding a trial court's overruling of a motion for a new trial." Dossey v. State, 489 So. 2d 662, 666 (Ala.Crim.App. 1986). "'"The ruling of the trial judge denying a motion for new trial will not be disturbed in the absence of a showing of abuse of discretion, and this Court will indulge every presumption in favor of the correctness of his ruling."'" Woodson v. State, [Ms. CR-99-0960, August 25, 2000] ___ So. 2d ___, ___ (Ala.Crim.App. 2000), quoting Reynolds v. City of Birmingham, 723, So. 2d 822, 824 (Ala.Crim.App. 1998), quoting, in turn, Hall v. State, 348 So. 2d 870, 875 (Ala.Crim.App.), cert. denied, 348 So. 2d 875 (Ala. 1977), cert. denied, 434 U.S. 1021, 98 S.Ct. 745, 54 L.Ed.2d 768 (1978). "'At a hearing on a motion for a new trial, the defendant has the burden of proving the allegations of his motion to the satisfaction of the trial court.'" Dawson v. State, 710 So. 2d 472, 475 (Ala. 1997), quoting Miles v. State, 624 So. 2d 700, 703 (Ala.Crim.App. 1993). "[S]tatements made by counsel during a hearing on a motion for new trial cannot be considered evidence in support of the motion." Arnold v. State, 601 So. 2d 145, 154 (Ala.Crim.App. 1992), citing Vance v. City of Hoover, 565 So. 2d 1251, 1254 (Ala.Crim.App. 1990). Moreover, "[t]here is no error in a trial court's denial of a motion for new trial where no evidence is offered in support of that motion." Arnold, 601 So. 2d at 154, citing Tucker v. State, 454 So. 2d 541, 547-48 (Ala.Crim.App. 1983), rev'd on other grounds, 454 So. 2d 552 (Ala. 1984).

A.

First, Landers contends that the trial court erred in denying his motion for a new trial on the ground of juror misconduct. In his motion, Landers alleged:

"The death of Robert R. Landers, Sr. occurred in 1992 and, over four years later, defendant was indicted. Mr. Landers's death and the investigation received extensive publicity. In early 1997, this Court ordered the exhumation of defendant's grandmother, who had died in 1991 as the result of an accident, for the purpose of determining whether to charge the defendant with her death as well. That exhumation also received extensive publicity. The Court later ruled that no evidence of the grandmother's death could be admitted. However, since the conclusion of the trial, a juror has stated that during the course of the trial she had a conversation with another person, possibly another juror, in which the person asked whether defendant was being tried for the death of his grandmother or his father. This conversation was not reported to the Court and counsel as required by the Court's instructions to the jury, which was a clear violation of the juror's duty. This knowledge and the failure to disclose it acted to deny defendant his right to due process and to a fair and impartial trial in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally."

(C. 536-37.)

At the hearing on his motion, Landers offered no evidence, other than defense counsel's allegations, to support this claim. Landers's counsel claimed at the hearing that he had attempted to subpoena the juror who allegedly had this conversation, but that the juror had not been served. In lieu of the juror's testimony, Landers offered the testimony of Ned Hersman, an investigator hired by Landers after his trial to interview the jurors. The State objected to Hersman's testimony on the ground that it would be hearsay. The trial court sustained the State's objection.[3] Nevertheless, the trial court allowed Landers to make an offer of proof of what the juror's testimony would be if she were present to testify. According to Landers's counsel, the juror would have testified that during a recess during the trial, "she heard some person that she is not sure, could have been a juror, said this to her or this in substance, 'Was this a trial about his grandmother or about his father.'" (R.Supp. 25.)

In its order denying Landers's motion for a new trial, the trial court stated the following regarding this claim:

"In ground #34, the defendant claims that a juror was improperly influenced by an alleged conversation between a certain juror and another person, possibly another juror, about whether the defendant was being tried for the death of his grandmother or his father. There was no competent evidence offered by the defense to support this allegation. Further, the jurors were instructed many, many times regarding not discussing the case and the Court was assured by the jury many, many times that they had followed the Court's instructions. Further, as stated with regard to ground #10 above, having observed the jury throughout the trial, the Court is of the opinion that the verdict was not affected by nor the result of any improper consideration of extraneous matters."

---

[3]Landers does not challenge the trial court's ruling on the State's hearsay objection.

(C. 697.) The trial court's ruling was correct. As noted above, a trial court does not err in denying a motion for a new trial when no evidence is offered in support thereof. Because Landers failed to offer any evidence to support this claim, other than defense counsel's allegations, denial of this claim was proper.

B.

Landers contends that the trial court erred in denying his motion for a new trial on the ground of prosecutorial misconduct. Landers maintains that the prosecutor's closing argument was "highly prejudicial, inflammatory, and designed to cause the jury to disregard defense counsel's argument for improper reasons," and he cites to several comments by the prosecutor that he says were improper. (Landers's brief to this court, p. 194.) Landers concedes that he raised this claim of prosecutorial misconduct for the first time in his motion for a new trial and that he did not object to any of the comments by the prosecutor that he now complains of on appeal.

It is well settled that "[t]he grounds urged on a motion for a new trial must ordinarily be preserved at trial by timely and adequate objections," and that "improper argument of counsel is not a valid ground for a motion for a new trial or subject to review on appeal unless there is a timely and specific objection by counsel or a motion to exclude, an adverse ruling thereon by the trial court, or a refusal of the trial court to make a ruling, and an objection thereto." Trawick v. State, 431 So. 2d 574, 578-79 (Ala.Crim.App. 1983). "'[A] new trial will not be granted for matters pertaining to rulings, evidence, or occurrences at a trial, including erroneous conduct on the part of the court, counsel, or jury, unless timely and sufficient objections, requests, motions, or exceptions have been made and taken.'" Williams v. State, 710 So. 2d 1276, 1293 (Ala.Crim.App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), quoting Fuller v. State, 365 So. 2d 1010, 1012 (Ala.Crim.App. 1978), cert. denied, 365 So. 2d 1013 (Ala. 1979), quoting, in turn, 24 C.J.S. Criminal Law § 1428 (1961). Because Landers did not object to any of the prosecutor's comments that he now complains about on appeal, this issue is not preserved for review.

Nevertheless, Landers claims that this Court should reach the merits of this claim because, he says, the death of defense counsel's father two days before closing arguments rendered his counsel "not fully functional" and thus, counsel could not be expected to make a timely objection. (Landers's brief to this court, p. 194.) However, as we noted in Part VIII of this opinion, Landers was represented by two attorneys; although lead defense counsel was recovering from the loss of his father, co-counsel was not suffering from a traumatic event and could easily have objected to the prosecutor's comments if he believed those comments were, in fact, improper. Thus, we are unpersuaded by Landers's argument that the rules of preservation should not apply in his case.

C.

Landers contends that the trial court erred in denying his motion for a new trial on the ground that the court improperly allowed Landers's half-brother, Robert Richard Landers, Jr., to sit at the prosecution table during the trial. In his motion, Landers alleged:

"The Court erred in allowing Rick Landers, Jr., to sit at counsel table in that defendant's father was the victim, defendant denied killing his father and was supported by his mother and one sister in his immediate family, while Rick Landers, a half-brother, and Vicky Goolsby, his sister, opposed Mark Landers. Under the circumstances, by allowing Rick Landers to sit at counsel table he was made to appear to have more credibility or veracity than he otherwise would have been entitled. His presence at counsel table and his comments concerning defendant's counsel (an issue Landers does not pursue on appeal) all were in violation of the 5th, 6th and 14th Amendments to the

-42-

Constitution of the United States, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally."

(C. 540.) On appeal, Landers contends that in allowing Rick Landers to sit at the prosecution table, the trial court violated § 15-14-56(a), Ala. Code 1975, by overriding "the wishes of a majority of Robert Landers's family" who, Landers said, did not want Rick Landers as the family representative. (Landers's brief to this court, p. 196.) He also contends that Rick Landers sitting at the prosecution table allowed the State "to confuse the jury and to drive a wedge in the jury's minds between those members of Mark Landers's family who were for him and those who were against him." (Landers's brief to this court, p. 197.)

Clearly, the argument Landers raised in his motion for a new trial is not the same argument that Landers now makes on appeal. "The statement of specific grounds of objection waives all grounds not specified and the trial court will not be put in error on grounds not assigned at trial." Jackson v. State, 593 So. 2d 167, 171 (Ala.Crim.App. 1991). "A defendant is bound by the grounds of objection he stated at trial and may not expand those grounds on appeal." Cole v. State, 548 So. 2d 1093, 1096-97 (Ala.Crim.App. 1989).

Moreover, although it appears from the record that Landers objected when the State requested that both Rick Landers and Victoria Goolsby be exempted from "the rule," his objection and the grounds therefor are not included in the record. The record reflects that after the trial court invoked "the rule" and ordered all witnesses out of the courtroom, the following occurred:

"[Prosecutor]: Judge, we would like to make an exception for one of our investigators, Jerry Shockley, from the Attorney General's Office. And we have a couple of family members that we would like present in the courtroom. I know it would probably be too many people here at the table for both but we could alternate. And those family members are Robert Landers, Jr. and Victoria Landers Goolsby.

"[The Court]: Does defense have any objection to the exception of those three people?

"[Landers's counsel]: Yes, Your Honor, we do.

"[The Court]: If both Mr. Landers and Ms. Goolsby are going to testify, I think I could properly except one of them from the rule as being a representative of the family. I hate to make y'all pick.

"[Prosecutor]: May we approach?

"[The Court]: Yes, one at the time.

(Bench conference, off record.)

"[The Court]: The Court will -- defendant's objections are noted for the purpose of the record. The Court will allow Investigator Shockley and also Robert Landers, Jr., also known as Rick, to be excepted from the rule."

(R. 925-27.)

-43-

"[W]here the appellant fails to include pertinent portions of the proceedings in the record on appeal, this court may not presume a fact not shown by the record and make it a ground for reversal." Carden v. State, 621 So. 2d 342, 345 (Ala.Crim.App. 1992). "It is the appellant's duty to provide this court with a complete record on appeal, and we will not predicate error on a silent record." Gamble v. State, [Ms. CR-97-0698, February 4, 2000] ___ So. 2d ___, ___ (Ala.Crim.App. 2000). Moreover, "[i]f counsel makes objections and secures rulings 'off the record,' this court cannot consider those rulings." Jefferson v. State, 449 So. 2d 1280, 1282 (Ala.Crim.App. 1984).

Accordingly, this claim was not properly preserved for review.

### D.

Landers contends that the trial court erred in denying his motion for a new trial on the ground that the jury's guilt-phase verdict was a compromise verdict. In his motion, Landers alleged that "[t]he jury verdict was an impermissible and unlawful compromise verdict wherein certain jurors who were not convinced beyond a reasonable doubt of defendant's guilt, voted for guilty in exchange for an agreement that the jury would unanimously recommend life without parole." (C. 528.)

At the hearing on his motion, Landers presented no evidence, other than defense counsel's allegations, to support this claim. As noted previously, Landers's counsel claimed that he had subpoenaed one of the jurors to testify, but that the juror was not served. In lieu of that juror's testimony, Landers's counsel offered the testimony of his investigator, Ned Hersman. The trial court sustained the State's objection to the investigator's testimony. Landers's counsel then proffered that if the investigator were allowed to testify, he would testify as follows:

> "That during the course of [interviewing the juror in question] she was asked whether the sentence came down quickly because of an understanding that some of the jurors had voted for guilt and weren't firm about it. And she said, 'You are about right.'

> "And then after some further discussion about whether some of the jurors had reluctantly agreed to vote for guilt and there were some who were strong for guilt, that there had been some discussion about -- the question was asked had there been some discussion about that those wavering jurors if they voted for guilty would then a sentence be that it be life? To which she responded again, 'You are about right.'"

(R.Supp. 28-29.) As noted above, statements by counsel at a hearing on a motion for a new trial cannot be considered as evidence to support the motion and there is no error in the denial of a motion for a new trial that is unsupported by any evidence. Landers presented no evidence to support this claim.

Moreover, we note that the trial court properly ruled that neither Investigator Hersman nor the juror in question, if she had been present at the hearing, were competent to testify as to this issue.

> "After a case has been submitted to the jury, it generally has been considered that their deliberations in the jury room are not subject to review. Consequently, there has long existed in Alabama a general rule that a jury's verdict is not subject to impeachment by the testimony of the jurors, at least as to matters which transpired during the deliberations. This exclusionary rule continues, although in an expanded form, in the following Alabama Rule of Evidence:

> "'Rule 606. Competency of Juror as Witness

> "'....

-44-

"'(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. Nothing herein precludes a juror from testifying in support of a verdict or indictment.'

"Rule 606(b) constitutes a broad principle of exclusion. It applies in any proceeding in which the validity of a verdict or criminal indictment is challenged. This usually arises when the disappointed litigant files a motion for new trial and attaches one or more juror affidavits in support. No juror is competent to thus or otherwise testify (1) to any matter or statement occurring during the jury's deliberations, (2) to the effect of anything upon the mind or emotion of any juror, or (3) to the mental processes of the juror whose testimony, affidavit or statement is being offered. Such evidence is excluded whether it comes in the form of juror testimony, juror affidavit, through the testimony of some third party relating a statement by a juror or any other evidence, whether oral or in writing, concerning a matter about which the juror himself could not testify.

"The impact of this rule is to regularly exclude juror testimony to such matters of alleged wrongdoing as misunderstanding of instructions, misunderstanding of the law, speculation upon such matters as the wealth of a party, one juror's intimidating or threatening another, arriving at the verdict by quotient, considering the accused's failure to take the stand as evidence of guilt, or the failure to discuss the evidence during deliberations."

C. Gamble, McElroy's Alabama Evidence, § 94.06(1) (5th ed. 1996)(footnotes omitted). See also Adair v. State, 641 So. 2d 309 (Ala.Crim.App. 1993)(trial court properly excluded juror's affidavit that she voted for a guilty verdict when she did not believe the accused was guilty because she felt pressured to reach a verdict as soon as possible based on her vacation plans); and Walker v. State, 519 So. 2d 598 (Ala.Crim.App. 1987)(trial court properly prevented defense counsel from questioning juror-witness as to whether the trial court had, through any comments or actions, expressed its opinion that the accused was guilty and whether the juror was influenced by those comments or actions of the trial court).

Accordingly, this claim was properly denied by the trial court.

E.

Finally, Landers contends that the cumulative effect of all the errors allegedly committed in the trial of his case violated his rights to due process and to a fair trial. However, when "no single instance of alleged error [has been found to be] reversible error, we will not consider the cumulative effect to be any greater." Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So. 2d ___, ___ (Ala.Crim.App. 1998), aff'd in pertinent part, rev'd on other grounds, [Ms. 1980810, July 21, 2000] ___

So. 2d ___ (Ala. 2000), citing <u>Boyd v. State</u>, 715 So. 2d 825, 851 (Ala.Crim.App. 1997), aff'd, 715 So. 2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998). See also <u>Woods v. State</u>, [Ms. CR-97-0027, December 10, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999); <u>Bryant v. State</u>, [Ms. CR-98-0023, November 19, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999); <u>Whitehead v. State</u>, [Ms. CR-95-2129, August 27, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999), aff'd, [Ms. 1990177, June 30, 2000] ___ So. 2d ___ (Ala. 2000); <u>Melson v. State</u>, [Ms. CR-95-1681, March 26, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999), aff'd, [Ms. 1981463, August 4, 2000] ___ So. 2d ___ (Ala. 2000).

Based on the foregoing, the judgment of the trial court is affirmed.

McMillan, Cobb, and Fry, JJ., concur; Baschab, J., recuses herself.

# EXHIBIT 2

IN THE SUPREME COURT OF ALABAMA
August 30, 2001

1001070

Ex parte Mark Samuel Landers.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS (In re:  Mark Samuel Landers v. State of Alabama) (Elmore Cir.Ct.No.: CC-96-421) (Low'r.App.Ct.No.: CR-97-0194)

ORDER

IT IS ORDERED that the petition for writ of certiorari to the Court of Criminal Appeals is granted.  See Rule 39(h) and (i), Alabama Rules of Appellate Procedure, for instructions regarding the filing of additional briefs and oral argument.

**PLEASE USE THE ABOVE CASE NUMBER ON ALL FILINGS IN CONNECTION WITH THIS CASE.**

PER CURIAM - Moore, C.J., and Houston, See, Lyons, Johnstone, Harwood, and Woodall, JJ., concur.

Brown and Stuart, JJ., dissent.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appears(s) of record in said Court.

Witness my hand this 30th day of August, 2001

Robert G. Esdale, Sr.
Clerk, Supreme Court of Alabama

EXHIBIT 2

# EXHIBIT 3

# IN THE SUPREME COURT OF ALABAMA



June 18, 2004

**1001070**

Ex parte Mark Samuel Landers. PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS (In re: Mark Samuel Landers v. State of Alabama) (Elmore Circuit Court: CC-96-421; Criminal Appeals : CR-97-0194).

## CERTIFICATE OF JUDGMENT

### Writ Quashed

WHEREAS, on August 30, 2001, a writ of certiorari to the Court of Criminal Appeals was granted by this Court, and the cause was set down for submission pursuant to Rule 39, Alabama Rules of Appellate Procedure.

WHEREUPON, come the parties and the petition for writ of certiorari being submitted and duly examined and understood by the Court, it is considered by the Court that the writ heretofore issued should be quashed and that the petition should be denied.

IT IS, THEREORE, CONSIDERED AND ORDERED that the writ of certiorari heretofore issued to the Court of Criminal Appeals be, and the same is hereby, quashed, and the petition for writ of certiorari be, and the same is hereby, denied.

COST TAXED TO PETITIONER.

**Writ Quashed. No Opinion.**

JOHNSTONE, J. - Houston, See, Lyons, Brown, Harwood, Woodall, and STuart, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this _18th_ day of _June,_ _2004_

Clerk, Supreme Court of Alabama

EXHIBIT 3

# EXHIBIT 4

# IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

**MARK SAMUEL LANDERS,**

    **Petitioner,**

**vs.**

**STATE OF ALABAMA,**

    **Respondent.**

CASE NO. CC-96-421.60

FILED

SEP 2 3 2005

LARRY DOZIER
CIRCUIT CLERK, ELMORE COUNTY

## ORDER DENYING RULE 32 PETITION

This case is back before this Court on Landers' Rule 32 Petition and the State's

Motion to Dismiss.

The Petitioner appeared with counsel, William Mills and Bill Clark, on August

30, 2005 for a hearing on the State's Motion to Dismiss. The State was represented by

Assistant Attorney Generals Stephanie Morman, Don Valeska, and Greg Biggs. The

undersigned is the same judge who handled all pre-trial motions, the trial of this case as

well as sentencing, and post-trial motions.

Rule 32.7(d) Ala.R.Crim.P. provides: "If the court determines that the petition is

not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue

of fact or law exists which would entitle the petitioner to relief under this rule and that no

purpose would be served by any further proceedings, the court may either dismiss the

petition or grant leave to file an amended petition."

After reviewing the pleadings, considering the arguments of counsel, reflecting

upon the pre-trial, trial and post-trial proceedings, and reviewing the opinion of the Court

of Criminal Appeals affirming the Petitioner's conviction, this Court finds that an

evidentiary hearing is not necessary in this case as the Petitioner's claims are precluded

and that he is not otherwise entitled to relief.

EXHIBIT 4

The Court makes the following findings with regard to each of the Petitioner's claims:

1.	Petitioner claims that he was denied due process because the State failed to turn over blood specimens taken from the frame of his father's eye glasses. This claim is precluded from review pursuant to Rule 32.2(a)(3) and (a)(5) because it could have been raised at pre-trial, trial, or on appeal.

2.	Petitioner claims that he was denied due process because the State failed to turn over blood specimens taken from the "upper portion of the eye glass lens". This claim is precluded from review pursuant to Rule 32.2(a)(3) and (a)(5) because he was aware of the existence of such evidence and the issue could have been raised at pre-trial, trial, or on appeal.

3.	Petitioner claims that he was denied due process because the State failed to disclose medical examiner's notes, which were referred to as the "first autopsy report" at trial. This claim is precluded from review pursuant to Rule 32.2(a)(4) because it was raised and addressed on appeal.

4.	Petitioner claims that he was denied due process because the trial court refused to postpone closing argument until after the funeral of his lead counsel's father. This claim is precluded from review pursuant to Rule 32.2(a)(2) and (a)(4) because it was raised at trial, by post-trial motion, and was addressed on appeal.

Further, this claim is without merit. Mr. Clark telephoned this Court on the evening of May 7, 1997 and informed it that his father had

2

died. All evidence in this case had been presented to the jury. After discussion with and on the request of Mr. Clark, the Court recessed the trial on May 8, 1997 so that funeral arrangements could be made. Closing arguments were made, the jury was charged, and a verdict was returned in the guilt phase of this case on May 9, 1997.

5.        Petitioner claims that he was denied due process and that his trial was unfair because the State delayed the indictment. This claim is precluded from review pursuant to Rule 32.2(a)(2) and (a)(4) because it was raised in his Motion for New Trial and was raised and addressed on appeal.

6.        Petitioner claims that he was denied due process because the State "failed to disclose and correct false evidence" (a) from Vickie Goolsby regarding alleged molestation by her father and the denial of a relationship with ABI Agent William Rhegness and (b) from William Rhegness that he did not have an affair with Ms. Goolsby and did not visit her home. This claim is precluded from review pursuant to Rule 32.6(b) because there is no factual basis for the assertion that any molestation occurred and a bare assertion will not support relief. It is further precluded pursuant to Rule 32.2(a)(2) and (a)(3) because either it was raised or could have been raised at trial.

7.        Petitioner claims that he has "newly discovered" evidence in the form of eye glasses which were allegedly in the possession of his mother and not discovered until some time after the trial which requires that his conviction be vacated. This claim is without merit.

3

Rule 32.1(e) requires that the facts either not be known by petitioner or his counsel at trial, at sentencing or in time to file a post-trial motion and that they could not have been discovered by any of those times through the exercise of due diligence; that the facts are not merely cumulative to other facts that were known; that these facts do not merely amount to impeachment evidence; that if the facts had been known at the time of trial or of sentencing, the result probably would have been different; and that the facts establish that the petitioner is innocent or should not have received the sentence that he received.

If this evidence was so crucial to the defense, there is no reason why it was not discovered. This is particularly true since the Petitioner's mother appeared at the trial and appeared to be very supportive of the Petitioner. Further, plenty of time passed from the date that the Petitioner killed his father until trial such that any such glasses should have been discovered. Additionally, this evidence amounts to impeachment evidence, at best.

Therefore, this purported evidence does not rise to the level required for "newly discovered" evidence.

In the alternative, this claim is precluded from review pursuant to Rule 32.2(a)(3) in that the issue dealing with the eye glasses could have been raised at trial.

8.     Petitioner claims that he is innocent and that his "newly discovered" evidence establishes such. The Petitioner's alleged evidence does not rise to "newly discovered" evidence and therefore this claim is

4

precluded from review pursuant to Rule 32.2(a)(2) and (a)(4) in that it was raised at trial and was raised on appeal.

9.   Petitioner claims that there was a fatal variance between the indictment and the proof offered at trial, thereby entitling him to relief. This claim is precluded from review pursuant to Rule 32.2(a)(3) in that it could have been raised at trial. Further, this claim is precluded because it does not show a "variance" that, if it exists at all, is "jurisdictional". Hence, it is precluded under Rule 32.2(a)(5) in that it could have been raised on appeal.

10.   Finally, Petitioner claims that the evidence presented at trial was insufficient to support his conviction. This claim is precluded from review pursuant to Rule 32.2(a)(2) and (a)(4) in that it was raised at trial and raised and addressed on appeal.

Based upon the reasons set forth above, this Court finds that no purpose would be served by any further proceedings and it is therefore ORDERED, ADJUDGED and DECREED that the Petitioner's Petition for relief pursuant to Rule 32 Ala.R.Crim.P. is DENIED.

DONE and ORDERED this 23rd day of September, 2005.

JOHN B. BUSH
Circuit Judge

5

# EXHIBIT 5

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**

**RELEASED**

APR 21 2006

CLERK
ALA COURT CRIMINAL APPEALS

**H.W."BUCKY" McMILLAN**
Presiding Judge
**SUE BELL COBB**
**PAMELA W. BASCHAB**
**GREG SHAW**
**A. KELLI WISE**
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-05-0287                    Elmore Circuit Court 96-421.60

Mark Samuel Landers v. State

McMILLAN, Judge.

The appellant appeals from the trial court's order summarily dismissing his Rule 32 petition for post-conviction relief.

The appellant's underlying conviction was for capital murder, a violation of § 13A-5-40(a)(7), Ala. Code 1975. He was sentenced to life imprisonment without parole. His

1

EXHIBIT 5

conviction was affirmed on direct appeal and became final when

our Supreme Court quashed the writ of certiorari on June 18,

2004.

In his petition, the appellant raises the following

grounds for relief:

1. The State failed to turn over blood specimens taken
from the frame of his father's eyeglasses, in violation of
Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d
215 (1963), and general due process rights.

2. The State failed to turn over blood specimens taken
from the "upper portion of the [eyeglass] lens," in violation
of Brady, as well as his due process rights.

3. The State failed to disclose the medical examiner's
notes, which were referred to at trial as the "first autopsy
report," in violation of Brady, as well as his due process
rights.

4. He was denied due process rights when the trial court
refused to postpone closing arguments until after the funeral
of his lead counsel's father.

5. He was denied due process of law and his trial was
unfair because the State delayed his indictment.

6. He was denied due process and his trial was unfair
because the State "failed to disclose and correct false
evidence" (i) from Vickie Goolsby regarding the alleged
molestation by her father and the denial of her relationship
with ABI Agent William Rhegness and (ii) from William Rhegness
that he did not have an affair with Ms. Goolsby and did not
visit her home.

7. He was in possession of "newly discovered" evidence in
the form of eyeglasses in the possession of his mother,
allegedly given to her by Sheriff Franklin on February 12,
1992, and "unknown" to the defense until "well after the
completion of Landers's trial and his conviction and

2

sentence", which established his "innocence".

8. His due process and constitutional rights were violated when the charge in his indictment, that he killed his father by crushing him with a bulldozer, varied from the evidence presented at trial that his father was struck in the head.

9. The evidence presented at trial was insufficient to support his capital murder conviction.

An examination of the record reveals that the appellant's claims 1 and 2 were precluded from review because they could have been, but were not, raised at trial or on appeal. Rule 32.2(a)(3) and (5), Ala. R. Crim. P. The appellant's claims 3, 4, and 5, were precluded from review because that were raised and addressed on appeal. Rule 32.2(a)(4), Ala. R. Crim. P. In its motion to dismiss, the State arguued that the appellant's claim 6 was precluded from review because it could have been, but was not, raised at trial. Rule 32.2(a)(3), Ala. R. Crim. P. Additionally, the State argued that the claim was insufficiently pleaded, pursuant to Rule 32.3, Ala. R. Crim. P. This Court need not address the argument, however, because it was not raised on appeal. The appellant's claim 7(a) did not satisfy the "newly discovered evidence" test, and therefore, lacked merit. The appellant's claim 7(b) was precluded because the issue of the appellant's father's eyeglasses was raised at trial and could have been

3

investigated at that time. Rule 32.2(a)(3), Ala. R. Crim. P. The appellant's claim 7(c) that the evidence established his "innocence", was precluded because the issue was raised at trial and on appeal. Rule 32.2(a)(2) and (4), Ala. R. Crim. P. The appellant's claim 8 could have been, but was not, raised at trial. Rule 32.2(a)(3), Ala. R. Crim. P. Claim 9 was precluded from review because it was raised and addressed on appeal. Rule 32.2(a)(4), Ala. R. Crim. P.

Because all of the claims raised by the appellant were procedurally precluded from review, the trial court was correct in summarily dismissing the Rule 32 petition. Rule 32. 7(d), Ala. R. Crim. P.

The judgment of the trial court is affirmed.

AFFIRMED.

Cobb, Shaw, and Wise, JJ., concur. Baschab, J., recuses herself.

# EXHIBIT 6



# IN THE SUPREME COURT OF ALABAMA

June 7, 2006

## 1051169

Ex parte Mark Samuel Landers. PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS (In re: Mark Samuel Landers v. State of Alabama) (Elmore Circuit Court: CC96-421.60; Criminal Appeals : CR-05-0287).

### ORDER

IT IS ORDERED that the petition for writ of certiorari to the Court of Criminal Appeals is granted as to the issues of 1) whether the alleged variance between the indictment and proof at trial deprived the trial court of jurisdiction; and 2) whether, in responding to Landers's Rule 32 petition, the State was required to plead specific Rule 32 preclusion provisions.

IT IS FURTHER ORDERED that the petition for writ of certiorari to the Court of Criminal appeals is denied as to all other grounds.

See Rule 39(g)(1) – (3), Alabama Rules of Appellate Procedure, as amended effective June 1, 2005, for instructions regarding the filing of briefs.  The petitioner may file a brief within 14 days from the date of this order.  Thereafter, the respondent may file a brief in accordance with subsection (g)(2) of Rule 39.  If the petitioner or the respondent chooses not to file a brief, that party must file a waiver of the right to file the brief within the time the brief is due under the appellate rules.  See Rule 39(g)(1) and (2).

See Rule 39(h) with regard to oral argument.

PER CURIAM -Nabers, C.J., and Lyons, Woodall, Smith, and Bolin, JJ., concur.  Parker, J., recuses.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this __7th__ day of ___June___ ___2006___

# ORDER Cont.

cc:
William N. Clark, Attorney
William H. Mills, Attorney
Hon. Troy R. King, Attorney General
Hon. Stephanie N. Morman, Asst. Attorney General

# EXHIBIT 7

# IN THE SUPREME COURT OF ALABAMA



September 15, 2006

**1051169**

Ex parte Mark Samuel Landers. PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: Mark Samuel Landers v. State of Alabama)  (Elmore Circuit Court: CC96-421.60; Criminal Appeals : CR-05-0287).

## CERTIFICATE OF JUDGMENT

## Writ Quashed

WHEREAS, on September 15, 2006, a writ of certiorari to the Court of Criminal Appeals was granted by this Court, and the cause was set down for submission pursuant to Rule 39, Alabama Rules of Appellate Procedure.

WHEREUPON, come the parties and the petition for writ of certiorari being submitted and duly examined and understood by the Court, it is considered by the Court that the writ heretofore issued should be quashed and that the petition should be denied.

IT IS, THEREORE, CONSIDERED AND ORDERED that the writ of certiorari heretofore issued to the Court of Criminal Appeals be, and the same is hereby, quashed, and the petition for writ of certiorari be, and the same is hereby, denied.

COST TAXED TO PETITIONER.

LYONS, J. - Nabers, C.J., and Woodall, Smith, and Bolin, JJ., concur. Parker, J., recuses.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this _15th_ day of _September, 2006_

*Robert G. Esdale Sr.*

Clerk, Supreme Court of Alabama

EXHIBIT 7

# EXHIBIT 8

STATE OF ALABAMA   )
                   )
_____COUNTY )

## **AFFIDAVIT OF LENITA JARRELL LANDERS**

Before me, the undersigned authority in and for said County and said State personally appeared Lenita Jarrell Landers, who is known to me, and who by me first duly sworn deposes and says as follows:

My name is Lenita Jarrell Landers. I live at 3660 Narrow Lane Road, Montgomery, Alabama. I have lived at this address since October 1, 1971.

Robert Landers, Sr., and I were married in 1955. We lived together as husband and wife until his death on February 12, 1992. Mark Samuel Landers is a child born of this marriage.

I testified as a witness at the trial of Mark Samuel Landers in Elmore County, Alabama in May 1997 in which Mark Landers was charged with killing his father. My testimony at that trial was correct according to my best recollection and belief at the time I testified. However, as will be explained below, subsequent events and the discovery of certain tangible evidence have proven that portions of my testimony at that trial was some what incomplete and inaccurate and incorrect in certain respects and that the testimony of certain witnesses for the State was incorrect.

On the night on which my husband died I went to the location where his body was found. His sudden death was a frightful and shocking occurrence. Because of the stress of this tragic event I know that my mental focus as to details of what occurred while at the scene are not complete and my unaided memory of these details

was not complete at the time of the trial. The fact that it was dark at the time and raining added to the stressful situation and the general confusion and the inability to focus on and recall details.

Some of the details of the events of that evening, however, remain vivid in my memory forever in spite of efforts to try to forget them because of the sadness associated with them. Some of the details of what happened that evening never completely registered with or made a readily recallable impression on my memory because of the normal preoccupation, and something like a numbness, that such a sad and tragic event causes. I have, and have at all times following that night had, a definite and clear recollection of Sheriff Franklin coming to the car or truck near the scene in which I was sitting to be out of the rain and expressing his condolences to me about the death of my husband. I considered this to be a noble and respectful act on his part, and this, I am sure, caused it to register in my consciousness and memory. I have a definite recollection that at the time he expressed his condolences Sheriff Franklin also asked me if I would like to have my husband's rings, wallet and glasses. I recall replying that I would like to have the rings and wallet (or billfold) and that the glasses (which I understood or believed were likely broken) would be of no concern. At that time Sheriff Franklin handed some items to me through the window of the vehicle. The items were separate and not in a container such as a bag or envelope. I took them without closely examining them at the time and put them in the pocket of the coat I was wearing. Because of

a refreshed recollection, brought about by the events set out below, I now remember and know that what Sheriff Franklin handed to me through the window of the vehicle on February 12, 1992 was 2 rings belonging to my husband, my husband's wallet, and my husband's glasses case with his wire rimmed glasses inside it.

I next looked at the articles Sheriff Franklin gave me sometime later that night after I arrived at my home. I recall taking all of the articles Sheriff Franklin handed me from the coat pocket and putting them in the drawer of a dresser where rarely used clothing items were kept. I do not recall ever looking in that drawer again after the night of my husband's death until sometime either shortly before or during Mark's trial. I do not recall being asked about my husband's glasses or about having or knowing where they were at any time before or during the trial. Had I been asked about the glasses before actually seeing them again in the dresser drawer and recognizing them I would not have been able to recall or been able to inform anyone of their existence or whereabouts because I had tried to, and had succeeded, in blocking out of my memory many of the details of the night of February 12, 1992, including the fact that Sheriff Franklin had given me certain items that night, including the glasses.

I testified at Mark's trial, which was over five years after February 12, 1992, that sometime after the tractor was moved off my husband's body Sheriff Franklin came to where I was seated in a motor vehicle out of the rain and spoke to me. I testified that he expressed his condolences and that he inquired if I wanted my husband's wallet and rings and glasses. I testified that I told

him that I would take the rings and wallet but that the broken glasses were of no use. I testified that Sheriff Franklin gave me the wallet and the rings, which he did. I further testified that Sheriff Franklin did not show me the glasses he referred to and I do not recall that he did actually show me glasses in the sense of exhibiting them to me. I was not asked at the trial if Sheriff Franklin actually gave me the glasses he mentioned or if I actually received the glasses he mentioned from him at that time. I did not think or reflect any further about the glasses at the time of the trial. At that time I had not seen the glasses or the glasses case since February 12, 1992. I believed I had accurately answered the questions asked me. The main focus of the questions asked me at the trial related to the billfold and its contents, especially the driver's license.

I had not thought about or been asked about glasses during the over 5 years between my husband's death and the trial. I knew at the time I testified at the trial that Sheriff Franklin had handed some objects to me through the open window of the motor vehicle. I also knew and recalled at that time that he had handed me my husband's rings and wallet because I had recently found these items and had brought them to court. At that time I had not found the glasses and my memory was not refreshed by looking at them as my memory was refreshed about the rings and wallet. Also, my memory of the details of the night of February 12, 1992 was now clouded by the passage of over 5 years since the event.

Sometime either shortly before or during the trial Mark's lawyer asked me if I could locate photographs of my husband. I was

specifically asked if I could find a driver's license, which would have a photograph of him. At that time I reasoned that my husband's driers's license should be in his wallet. The location of his wallet was unknown to me when I was asked to look for his driver's license abut I began searching for it. I went to the particular dresser, and for the first time that I can recall after placing the items Sheriff Franklin had given me in that drawer, opened the drawer to look for the wallet. I saw the wallet and saw two rings lying on top of it. Upon seeing the wallet and rings my memory was refreshed that the wallet and the rings were items Sheriff Franklin had given me on the night of February 12, 1992. I did not look beyond the wallet and did not see anything else at that time that reminded me of the tragic night. I removed the rings and the wallet from the dresser and looked into the wallet for a driver's license. I located the driver's license and turned it over to Mark's lawyer, along with the wallet and the rings. I made no further search of the dresser drawer at that time because my purpose in looking into it was to find the wallet, which I readily found because it was on top and was not obscured by any of the drawer's other contents.

The rings and the wallet and the wallet's contents, including the driver's license, were presented and identified during my testimony at the trial. I do not recall that I was asked any questions about them other than the fact that they were given to me by Sheriff Franklin on the night my husband died. Following my testimony at the trial the wallet and rings were returned to me. I took them home and for some period of time they remained in the

bag I carried them in to court.

About 30 days more or less after Mark was sentenced I decided to return the wallet and rings to the dresser drawer where they had been placed by me on the night my husband met his death. When I opened this dresser drawer, for the second time in over 5 years, I saw an article I recognized which was partially obscured by cloth items in the dresser drawer. It was in a location that placed it underneath the wallet I had removed in my earlier search for my husband's driver's license. It was partially, but not completely, obscured by other items that were in the drawer because it was between these items.

The item I recognized was the glasses case my husband regularly carried with him and used to hold his glasses when he was not wearing them. I opened the glasses case and found a pair of wire rimmed glasses with bent frames. These were the glasses my husband regularly wore and used in the period immediately before his death and are the glasses he was wearing in several photographs which were introduced at the trial. The glasses case had what appeared to be mud or mud stains on it.

At that time, upon seeing the glasses case and glasses, I recalled for the first time since February 12, 1992 that Sheriff Franklin actually handed me my husband's glasses case with the glasses in it at the same time he handed me the wallet and the rings. I now recall that I placed all of these items into the dresser drawer at the same time. I never looked at them again following that night when I placed them in the drawer. I never told anyone about receiving the glasses case with the glasses. No

one had access to the dresser where the glasses, wallet and rings were stored other than myself. I know that Mark Landers never saw this glasses case or these glasses after I placed them in this drawer and was never told the glasses were there.

The death of my husband was a very sudden and a very tragic and distressing occurrence. The trial of Mark Landers occurred over five years after his death. I am sure that in this interval of time I attempted to erase from my mind and memory the details of that sad and tragic night and I am sure I succeeded to some extent in doing so. Only the sight of the glasses case in the dresser drawer at the time I went to replace the wallet and rings regenerated in my memory the long forgotten occurrence where Sheriff Franklin gave me the items at the scene of my husband's death, including the glasses case and glasses, and my placing them in the dresser drawer and out of sight so as not to be reminded of that sad and tragic occasion.

Lenita Jarrell Landers

Sworn to and subscribed before me this the 6th day of May, 2005.

Notary Public