IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2007 JAN 26  A II: 50

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| Mark Samuel LANDERS, | ) | |
|     Petitioner, | ) | |
| | ) | |
| v. | ) | 2:06-CV-975-MEF |
| | ) | |
| Ralph HOOKS, et. al., | ) | |
|     Respondents. | ) | |

## RESPONDENTS' ANSWER

Come now the Respondents in the above-styled cause, by and through the Attorney General for the State of Alabama, and, in response to this Honorable Court's order to show cause why a writ of habeas corpus should not be granted, state as follows:

1. Mark Landers challenges his May 9, 1997 murder conviction entered in the Circuit Court of Elmore County, Alabama and his corresponding sentence of life imprisonment without the possibility of parole.  Landers attacks his conviction on eight grounds:

    a. His due process and constitutional rights were violated because his indictment did not provide "notice of the conduct and occurrence the Prosecution intended to prove, and did prove against him, at trial" (Petition pp. 15-17);

b.  The evidence presented at trial was insufficient to support his capital murder conviction (Petition, pp. 19-20);

c.  The State failed to turn over and "willfully and in bad faith destroyed or disposed of" before trial:

　　1) his father's skull;

　　2) "a blood specimen taken from the frame of a pair of eye glasses";

　　3) "a blood specimen from the lens of a pair of eye glasses"; and,

　　4) "a blood specimen taken from the body of the deceased" (Petition, pp. 22-23)

d.  The State failed to disclose the medical examiner's notes (Petition, pp. 29-31);

e.  His constitutional rights were violated when the trial court denied his request for a continuance so that lead counsel could attend his father's funeral (Petition, pp. 33-34);

f.  He was denied due process of law and his trial was unfair because the State delayed his indictment (Petition, pp. 36-40);

g. He is in possession of "newly discovered evidence" in the form of eyeglasses in the possession of his mother, allegedly given to her by Sheriff Franklin on February 12, 1992, and "unknown" to the defense until "well after the completion of Landers's trial and his conviction and sentence" which establishes his "innocence" (Petition, pp. 42-53); and,

h. The trial court lacked "subject-matter jurisdiction" to try him because a variance existed between the charge in his indictment and the proof offered at trial (Petition, pp. 55-57).

2. The Respondents acknowledge that Landers is presently incarcerated in a state facility pursuant to this conviction, but deny that Landers is in custody in violation of the laws or constitution of the United States. His jury verdict and corresponding sentence are valid and constitutional.

3. As detailed in the procedural history and argument following, Landers's petition is due to be dismissed with prejudice because: 1) several of his claims do not invoke this Court's jurisdiction; 2) some of his claims were not exhausted in the state courts; and, 3)

3

his claims were ruled precluded from state post-conviction review and are procedurally defaulted.

## PROCEDURAL HISTORY

### A. Landers's trial and direct appeal

4. Landers was convicted on May 9, 1997 for the murder of his father, made capital because it was committed for pecuniary gain or other valuable consideration under Section 13A-5-40(a)(7) of the Alabama Code (1994). (Ex. A, C. 98) On July 1, 1997, Elmore County Circuit Court Judge John Bush accepted the jury's recommended sentence and ordered Landers imprisoned for a term of life without the possibility of parole. (Ex. A, C. 98) Landers filed a motion seeking a new trial and argued, in addition to those grounds raised on appeal, that the trial court erred by "denying the defense Motion to Suppress and in overruling Defendant's objection to the introduction into evidence the eyeglasses which allegedly belonged to the Defendant's father" on grounds of a break in the chain of custody, the lack of predicate, and the lack of "scientific tests" to support conclusions drawn from the evidence. (Ex. A, C. 91)

5. Landers appealed and argued, among other claims: 1) The evidence was insufficient to sustain his conviction (Ex. A, C. 98-112); the trial court erred by denying his motion to dismiss the indictment based on the State's four-year delay before indictment (Ex. A, C. 117); 3) the trial court should have suppressed testimony from Dr. James Lauridson involving the vertical fractures on Landers's father's left temple because of the destruction of his father's skull and Dr. Lauridson's initial autopsy report (Ex. A, C. 112-16); 4) the court should have suppressed testimony from Catherine McGeehan involving blood on Landers's father's eyeglasses and that the blood matched the blood type of his father because the sample of blood discovered on the eyeglasses was expended during testing and because the vial of blood received from Dr. Lauridson to cross-type was destroyed (Ex. A, C. 116); and, 5) the court erred by refusing to continue closing arguments (Ex. A, C. 132-35).

6. The Alabama Court of Criminal Appeals rejected each of Landers's arguments in a 46-page unpublished decision released on December 15, 2000. (Ex. A, C. 98-143) Landers filed an

application for rehearing, which the appellate court overruled without opinion on March 2, 2001. (Ex. B)

7.  Landers sought review in a state petition for a writ of certiorari, which the Supreme Court of Alabama initially granted on August 30, 2001. Upon review of the parties' briefs, however, the court quashed the writ on June 18, 2004. (Ex. C) The Certificate of Judgment issued the same day. (Ex. D)

**B. State post-conviction petition**

8.  On May 31, 2005, Landers filed a state post-conviction petition in the Elmore County Circuit Court challenging his murder conviction. (Ex. A, C. 2, 4) He raised seven grounds for relief in his petition. First, he argued that the State failed to turn over blood specimens taken from the frame of his father's eyeglasses, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and general due process rights. (Ex. A, C. 9-15) Second, he complained that the State failed to turn over blood specimens taken from the "upper portion of the [eyeglass] lens[,]" in violation of *Brady*, as well as his due process rights. (Ex. A, C. 15-17) Third, he alleged that the State failed to disclose the medical examiner's notes - which were referred to at trial as the "first autopsy report" - in violation of

6

*Brady*, as well as his due process rights. (Ex. A, C. 17-19) Fourth, Landers contended that he was denied his due process rights when the trial court refused to postpone closing arguments until after the funeral of his lead counsel's father. (Ex. A, C. 19-20) Fifth, he asserted that he was denied due process of law and that his trial was unfair because the State delayed his indictment. (Ex. A, C. 20-24) As his sixth ground for relief, Landers claimed he was denied due process and his trial was unfair because the State "failed to disclose and correct false evidence" (i) from Vickie Goolsby regarding alleged molestation by her father and the denial of a relationship with ABI Agent William Rhegness and (ii) from William Rhegness that he did not have an affair with Ms. Goolsby and did not visit her home. (Ex. A, C. 24-25) In his seventh claim, Landers alleged that he was in possession of "newly discovered" evidence in the form of eyeglasses in the possession of his mother, allegedly given to her by Sheriff Franklin on February 12, 1992, and "unknown" to the defense until "well after the completion of Landers's trial and his conviction and sentence", which established his "innocence". (Ex. A, C. 25-33, 37-43)

7

9. On June 10, 2005, Landers filed an amendment to his petition, in which he raised two additional claims for relief. First, he argued that his due process and constitutional rights were violated when the charge in his indictment – that he killed his father by crushing him with a bulldozer – varied from the evidence presented at trial that his father was struck in the head. (Ex. A, C. 52-54) As his final ground for relief, Landers contended that the evidence presented at trial was insufficient to support his capital murder conviction. (Ex. A, C. 54)

10. The State filed a Motion to Dismiss the petition on July 12, 2005. (Ex. A, C. 2, 56) In its motion, the State argued: 1) Landers's claims 1 and 2 were precluded under Rules 32.2(a)(3) and (a)(5) (Ex. A, C. 60-61); 2) Landers's claims 3 through 5 were precluded from review under Rule 32.2(a)(4) (Ex. A, C. 62-68); 3) Landers's claim 6 was precluded under Rule 32.2(a)(3) and insufficiently pleaded (Ex. A, C. 68-70); 4) Landers's claim 7: (a) did not satisfy the "newly discovered evidence" test and, for that reason, lacked merit; (b) was precluded under Rule 32.2(a)(3) because the issue of Landers's father's eyeglasses was raised at trial and could have been explored at that point; and, (c) was precluded to the extent

that Landers claimed the evidence established his "innocence," because that was discussed at trial and on appeal (Ex. A, C. 70-73); 5) Landers's claim 8 was precluded from review under Rule 32.2(a)(3) (Ex. A, C. 73-76); and, 6) Landers's claim 9 was precluded from review under Rule 32.2(a)(4) (Ex. A, C. 76-77). Because Landers's various claims were precluded and lacked merit, the State requested the trial court summarily deny the petition. (Ex. A, C. 78)

11. Following a brief hearing on August 30, 2005 consisting of the parties' legal arguments (Ex. A, C. 2, 144; R. 2-19), Judge Bush denied Landers post-conviction relief. In a thorough written order filed on September 23, 2005, the judge ruled that Landers's various claims were precluded from review and did not warrant relief. (Ex. A, C. 2, 167-71)

12. Landers appealed, raising ten claims for review. The issues relevant to this habeas petition included arguments that: 1) The trial court erred by summarily dismissing his newly discovered evidence claim; 2) "the failure of the indictment to inform [him] of the conduct he was called on to defend at trial den[ied] him due process rights"; 3) "the allegations of the indictment in [his]

murder prosecution charging [him] with specific conduct which caused the death" of his father "limit[ed] the subject-matter jurisdiction of the trial court"; 4) the delay in his prosecution amounted to a "denial of due process"; 5) the circuit court should have postponed closing arguments for lead counsel to attend his father's funeral; 6) "the destruction by the State, and its failure to produce, body fluids and tissue specimens from" his father's body amounted to a "denial of due process"; 7) "the destruction" and "failure to produce[] notes of a post-mortem examination made by the medical examiner" amounted to a "denial of due process"; and, 8) he was "denied due process by being convicted when no evidence connected him with the offense with which he was charged[.]"  (Ex. E, pp. 24-63, 65-70)

13. The Alabama Court of Criminal Appeals affirmed the denial of post-conviction relief in an unpublished opinion released on April 21, 2006.  (Ex. F)  In its decision, the court ruled that all of Landers's arguments were precluded under Rule 32.2 of the Alabama Rules of Criminal Procedure.  Specifically, the court found that:

a. Landers's complaint about the State's failure to turn over blood specimens from the frame of his father's eyeglasses was precluded under Rules 32.2(a)(3) and (a)(5) (Ex. F, pp. 2, 3);

b. Landers's allegation that the State failed to turn over blood specimens from the "upper portion of the [eyeglass] lens," was precluded under Rules 32.2(a)(3) and (a)(5) (Ex. F, pp. 2, 3);

c. Landers's argument that the State failed to "disclose the medical examiner's notes, which were referred to at trial as the "first autopsy report," was precluded under Rule 32.2(a)(4) (Ex. F, pp. 2, 3);

d. Landers's claim that he was "denied due process of law and his trial was unfair because the State delayed his indictment" was precluded under Rule 32.2(a)(4) (Ex. F, pp. 2, 3);

e. Landers's allegation that he possessed "'newly discovered' evidence in the form of eyeglasses in the possession of his mother":
    (1) "did not satisfy the 'newly discovered evidence' test, and therefore, lacked merit";
    (2) was "precluded [under Rule 32.2(a)(3)] because the issue of [his] father's eyeglasses was raised at trial and could have been investigated at that time" (Ex. F, pp. 2-4); and,
    (3) to the degree that it asserted the evidence established his innocence "was precluded because the issue was raised at trial and on appeal" under "Rule[s] 32.2(a)(2) and (4)" (Ex. R, pp. 2-4);

f. Landers's assertion that his "due process and constitutional rights were violated when the charge in his indictment, that he killed his father by crushing him with a bulldozer, varied from the evidence presented at trial that his father was struck in the head" was precluded under Rule 32.2(a)(3) (Ex. F, pp. 3-4); and,

g. Landers's attack on the sufficiency of the evidence was precluded from review under Rule 32.2(a)(4) (Ex. F, pp. 3-4).

11

14. Landers filed an application for rehearing in the Alabama Court of Criminal Appeals in which – as relevant to this proceeding – he challenged: 1) the court's failure to consider his "subject matter jurisdiction" argument (Ex. G, Application, p. 1; Brief In Support of Application, pp. 3-6); 2) rejection of his "newly discovered evidence" argument (Ex. G, Application, p. 1; Brief In Support of Application, pp. 9-13); 3) rejection of his argument that his indictment did not provide sufficient "notice" (Ex. G, Application, p. 2; Brief In Support of Application, p. 13); and, 4) treating as precluded his issues about the delay in indictment and the sufficiency of the evidence when "prior State court adjudications" of the claims "were in conflict with or unreasonable applications of established Federal law or were unreasonable determinations of fact based on the evidence presented" (Ex. G, Application, p. 2; Brief In Support of Application, pp. 13-14)  The Alabama Court of Criminal Appeals overruled the application without opinion on May 12, 2006.  (Ex. H)

15. On May 19, 2006, Landers filed a petition for a writ of certiorari in the Supreme Court of Alabama, raising ten grounds for relief.  (Ex. I)  He argued – relevant to this proceeding – that:

a. The Court of Criminal Appeals's decision that his indictment vested the trial court with subject-matter jurisdiction conflicted with previous state caselaw on the subject (Ex. I, pp. 2-4);

b. The court's conclusion that his attack on his indictment could have been raised at trial conflicted with prior state court decisions (Ex. I, pp. 4-5);

c. The court's dismissal of his newly discovered evidence argument without an evidentiary hearing conflicted with prior state court decisions (Ex. I, pp. 8-10);

d. His allegation that the indictment did not confer sufficient notice of the charge against him conflicted with prior Supreme Court and state caselaw (Ex. I, pp. 10-12);

e. His court's rejection of his pre-indictment delay argument conflicted with a previous Supreme Court decision (Ex. I, pp. 12);

f. His argument related to the failure to produce, and destruction of, the medical examiner's notes conflicted with a previous Supreme Court decision (Ex. I, p. 14); and,

g. The court's rejection of his sufficiency argument conflicted with previous Supreme Court decisions (Ex. I, pp. 14-15).

16. On June 7, 2006, the Supreme Court of Alabama granted Landers's petition on two issues – only one of which is relevant to the present proceeding. The court directed the parties to brief "whether the alleged variance between the indictment and proof at trial deprived the trial court of jurisdiction[.]" (Ex. J)

17. The State filed its brief, arguing – relevant to the issues here – that Landers's "variance" argument did not warrant relief because: 1)

his indictment did not affect the trial court's subject-matter
jurisdiction; 2) no variance existed between the indictment and
evidence introduced at trial; and, 3) the claim was not
"jurisdictional" and was precluded from review.  (Ex. K, pp. 10-
19)

18. On September 15, 2006, the Supreme Court of Alabama quashed
the writ of certiorari.  (Ex. L)

### E. Federal habeas corpus petition

19. Landers filed the present – his first – habeas corpus petition
challenging his murder conviction on September 29, 2006.


# ARGUMENT

### A. Jurisdiction: Landers has not invoked this Court's jurisdiction to conduct a habeas corpus review of issue g. involving newly discovered evidence or issues a. and h. involving the validity of his indictment.

20. 28 U.S.C. § 2254(a) stipulates that this Court's habeas corpus
jurisdiction is solely invoked for those claims in which the
petitioner establishes that he is "in custody in violation of the
Constitution or laws or treaties of the United States." *E.g., Estelle
v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review,

14

a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

### Issue g.

21. Landers's Issue g. – in which he asserts that he is entitled to relief based on "newly discovered evidence" – does not refer to or otherwise properly discuss an issue of constitutional magnitude. As the United States Supreme Court held in *Herrera v. Collins*, 506 U.S. 390, 400-05, 113 S. Ct. 853, 860-63 (1993), a claim of newly discovered evidence does not present a ground for habeas relief absent an independent constitutional violation.

22. Landers asserts that newly discovered evidence – eyeglasses in his mother's possession long before trial but purportedly forgotten and not disclosed to defense counsel until after trial and sentencing – warrants relief from his murder conviction. As ruled by the state courts, his "evidence" did not qualify for treatment as "newly discovered evidence" under Rule 32.1(e) of the Alabama Rules of Criminal Procedure and, as a result, was precluded under Rule 32.2 of the Alabama Rules of Criminal Procedure from post-conviction review. (Ex. A, 169-70; Ex. F, pp. 3-4) Moreover, his argument does not warrant examination here because there is no independent

15

constitutional violation to invoke this Court's jurisdiction to review the claim. *See Herrera*, 506 U.S. at 400-05, 113 S. Ct. at 860-63.

**Issues a. & h.**

23. The Eleventh Circuit has held that "[t]he sufficiency of a state indictment is an issue on federal habeas corpus only if the indictment was so deficient that the convicting court was deprived of jurisdiction." *Heath v. Jones*, 863 F.2d 815, 821 (11th Cir. 1989); *DeBenedictis v. Wainwright*, 674 F.2d 841, 842 (11th Cir. 1982). The determination of the extent – if any exists – of the deficiency rests with the state courts. *See Tuck v. Bullard*, No. Civ.A. 203CV850DWO, 2005 WL 1138810, at *1 (M.D. Ala. Apr. 27, 2005).

> "[J]urisdiction to try an offense includes jurisdiction to determine whether the offense is properly charged." Murphy v. Beto, 416 F.2d 98, 100 (5th Cir. 1969). Therefore, "[w]hen it appears . . . that the sufficiency of the indictment was squarely presented to the highest court of the state on appeal, and that court held that the trial court had jurisdiction over the case, the issue is foreclosed to a federal habeas court." Id.

*Hunt v. Tucker*, 875 F. Supp. 1487, 1522 (N.D. Ala. 1995), *aff'd*, 93 F.3d 735 (11th Cir. 1996); *e.g.*, *Tuck*, 2005 WL 1138810, at *1.

16

24. Landers's "notice" and "subject matter jurisdiction" challenges to his indictment were "squarely presented" to the Court of Criminal Appeals and the Supreme Court of Alabama. In its unpublished opinion, the Court of Criminal Appeals rejected Landers's arguments and found them precluded from review. (Ex. F, p. 3) The state supreme court, in turn, considered Landers's "subject-matter" argument and rejected it, ultimately quashing the writ of certiorari. (Ex. J; Ex. L) That decision comports with its rulings that the omission of an element of a crime from an indictment does not affect the trial court's jurisdiction to adjudicate a case, *see Ex parte Seymour*, No. 1050597, 2006 WL 1793747 (Ala. June 30, 2006), and that evidence introduced to prove a crime beyond those facts listed in the indictment does not create a "variance" and does not affect the trial court's jurisdiction, *see Ex parte Robey*, 920 So. 2d 1069, 1072-74 (Ala. 2004). (*See* Ex. K, pp. 10-19)

25. Because the indictment was not fatally defective, the Court of Criminal Appeals correctly determined that the claim did not call into question the jurisdiction of the trial court and was, therefore, precluded from post-conviction review. *See Heath*, 863 F.2d at 821 (ruling that, because the indictment "incorporated the elements

of . . . armed robbery . . . [t]he indictment was not fatally defective . . . and the state trial court was not deprived of jurisdiction"); *DeBenedictis*, 674 F.2d at 843 ("reject[ing]" the petitioner's challenge to the sufficiency of his state indictment where the charging instrument "adequately incorporate[d] the elements of [the petitioner's] grand larceny" crime). "Consequently, to the extent that [Landers] challenges matters of state law, this Court is foreclosed from reviewing his contention." *Tuck*, 2005 WL 1138810, at *1; *see also Hunt*, 875 F. Supp. at 1487 (citing from *Murphy*, 416 F.2d at 100); *Hayes v. State*, 566 F. Supp. 108, 113 (S.D. Ala. 1983) (concluding that petitioner's base assertion that his indictment was faulty was "frivolous" where the charging instrument "complied with the requirements of <u>Ala. Code</u> § 15-8-150(72) (1982) and the petitioner fail[ed] to allege any federal right related in any way to the indictment").

18

**B. Exhaustion and procedural default: Landers has not exhausted claims c., d. or e. for purposes of habeas corpus review.**

**1. Landers's three claims are not exhausted.**

26. 28 U.S.C. § 2254(b)(1)(A) requires that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – the applicant has exhausted the remedies available in the courts of the State[.]"  Correspondingly, 28 U.S.C. § 2254(c) states that a petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, . . . by any available procedure, the question presented."  In speaking to the issue, the Supreme Court has ruled that, based on principles of comity,

> [b]efore a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court.  In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).

27. As explained in *Boerckel*, a prisoner must exhaust all avenues of state discretionary review to obtain federal review of a claim.  In this case, Landers did not complete one full round of discretionary

19

review of claims c., d., or e. in his state post-conviction proceedings.

### Issue c.

28. Issue c. is broken into subparts; each subpart is not exhausted, although – as explained in the paragraphs that follow – for different reasons.

a) In Issue c.1., Landers contends that the State failed to turn over his father's skull in violation of constitutional and due process rights. This issue was not raised in his state post-conviction proceeding.

On direct appeal, Landers sought suppression of testimony based on partial destruction of the skull, but did not attack the State directly about the condition of the skull. There, Landers argued that the trial court should have suppressed testimony from the medical examiner, Dr. James Lauridson, about fractures on Landers's father's left temple on the basis that the skull was destroyed by Dr. Lauridson and that the destruction of the portion of his father's skull exhibiting the crushing fractures from the bulldozer undercut his defense that the death was an accident. (Ex. A, C. 112-14) The Alabama Court of Criminal Appeals ruled that

the arguments lacked merit because: 1) the portion of the skull related to the fractures was retained by Dr. Lauridson; 2) Landers never requested examination of the skull; 3) photographs were taken of the entire skull, all of which were available for analysis before trial, and were introduced into evidence without objection; 4) Landers was able to elicit during Dr. Lauridson's cross-examination that the blunt force trauma to the left temple could have been the "result of a homicide or an accident"; and, 5) as a result, the court "simply [could not] say that that portion of [Landers's father's] skull exhibiting the horizontal crushing fractures was so critical to Landers's defense that its destruction rendered his trial fundamentally unfair" and, therefore, the "trial court did not err in denying Landers's motion to suppress[.]" (Ex. A, C. 112-14)  He sought review of the claim in his application for rehearing and in his petition for a writ of certiorari filed in the Supreme Court of Alabama.

Because Landers never presented to the state courts the question raised here – namely, whether the State engaged in wrongdoing related to the destruction of the skull – it is not exhausted for purposes of habeas litigation.

21

b) In Issue c.2., Landers argues that the State failed to turn over the blood specimen from the frame of his father's eyeglasses. This issue was raised in Landers's Rule 32 petition (Ex. A, C. 8-15) and ruled precluded by the state circuit court (Ex. A, C. 168). On appeal, the Alabama Court of Criminal Appeals held that the issue was precluded from review under Rules 32.2(a)(3) and (a)(5) of the Alabama Rules of Criminal Procedure because the issue could have been raised at trial and on appeal. (Ex. F, p. 3) Landers did not further challenge the ruling that the issue was precluded in either his application for rehearing or in his petition for a writ of certiorari filed in the Supreme Court of Alabama. (*See* Ex. G; Ex. I)

Because Landers did not invoke one full round of review of the issue in the state courts, the claim is not exhausted for this Court's consideration.

c) In Issue c.3, Landers asserts that the State failed to turn over the blood specimen from the lens of his father's eyeglasses. Like Issue c.2, Issue c.3 was raised in Landers's Rule 32 petition (Ex. A, C. 15-17) and ruled precluded by the state circuit court (Ex. A, C. 168). On appeal, the Alabama Court of Criminal

22

Appeals ruled that the issue was precluded from review under Rules 32.2(a)(3) and (a)(5). (Ex. F, p. 3)  Landers did not further challenge the finding that the issue was precluded in either his application for rehearing or in his petition for a writ of certiorari filed in the Supreme Court of Alabama. (*See* Ex. G; Ex. I)

Again, because Landers did not invoke one full round of review of the issue in the state courts, the claim is not exhausted for examination in a habeas proceeding.

d) In Issue c.4, Landers argues that the State failed to turn over the blood specimen from his father's body.  Like Issue c.1, this issue was not raised in Landers's state post-conviction proceeding and was not directly presented to the court on direct appeal.

On direct appeal, Landers challenged the trial court's refusal to suppress testimony from Catherine McGeehan that "there was blood on the victim's eyeglasses and that the blood was the same blood type" as his father because Ms. McGeehan "destroyed the vial of the victim's blood that she had received from Dr. Lauridson" and "he was unable to perform his own tests on the blood to refute McGeehan's finding and, therefore, was denied due

23

process." The Alabama Court of Criminal Appeals held that the issue was not preserved for appellate review because it was not listed as a ground for relief in his motion to suppress or argued at the motion hearing, and because Landers did not object to Ms. McGeehan's testimony "on the grounds that the blood evidence had been destroyed." (Ex. A, C. 116) Landers did not pursue the claim in his application for rehearing or petition for a writ of certiorari in the Supreme Court of Alabama.

Like with Issue c.1, because Landers never presented to the state courts the question raised here – whether the State engaged in wrongdoing related to the destruction of blood drawn from his father's body – it is not exhausted for purposes of habeas litigation.

### Issue d.

29. In Issue d., Landers complains that the State failed to turn over the medical examiner's notes, which were referred to at trial as the "first autopsy report." He raised this claim in his Rule 32 petition (Ex. A, C. 17-19), and the circuit court ruled that the claim was precluded under Rule 32.2(a)(4) (Ex. A, C. 168). Landers appealed the denial of relief and the Alabama Court of Criminal Appeals affirmed that the claim was precluded under Rule

32.2(a)(4). (Ex. F, p. 3)  Landers did not mention this argument in his application for rehearing, but did raise it in his petition for a writ of certiorari filed in the Supreme Court of Alabama. (*See* Ex. G, Ex. I, p. 14)  The court did not explicitly state that the issue was precluded because it was not raised in the application for rehearing, but it did not grant the writ on this ground. (*See* Ex. J)

30. Because Landers did not invoke one full round of state discretionary review of the claim, it is not exhausted for purposes of examination in this habeas proceeding.

**Issue e.**

31. Finally, as to Issue e., Landers alleges that the trial court erred by denying his request for a continuance for lead counsel to attend his father's funeral.  Landers raised this claim in his Rule 32 petition (Ex. A, C. 19-20), and the circuit court ruled that the claim was precluded under Rule 32.2(a)(4). (Ex. A, C. 168-69)  Landers raised the ground on appeal (Ex. E, pp. 63-65), but it was not addressed by the Alabama Court of Criminal Appeals (*see* Ex. F). He did not contest the appellate court's failure to rule on the issue in his application for rehearing (*see* Ex. G) and did not raise the

issue as a ground for certiorari review in the Supreme Court of Alabama (*see* Ex. I).

32. Once again, because Landers did not invoke one full round of discretionary review in the state courts, it is not exhausted for this Court's consideration.

33. Although Landers did not exhaust these claims in state court, it would be futile for him to return there in an attempt to satisfy that procedural requirement because the issues would be ruled precluded from review. His various arguments would be precluded as successive, *see* Ala. R. Crim. P. 32.2(b) and (possibly) time-barred, *see* Ala. R. Crim. P. 32.2(c). In addition, all the claims would be barred – at this point – either as raised at trial or on direct appeal, *see* Ala. R. Crim. P. 32.2(a)(3), (a)(5), or as raised in a previous collateral proceeding, *see* Ala. R. Crim. P. 32.2(a)(4).

### 2. Landers's claims c., d., and e. are procedurally defaulted.

34. Because Landers did not exhaust his claims c., d., and e. and cannot return to state court for further review of the arguments, the exhaustion and preclusion rules coalesce into a procedural default of his claims. *See McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005) ("It is well established that when a petitioner has failed

to exhaust his claim by failing to fairly present it to the state courts and the state court remedy is no longer available, the failure . . . constitutes a procedural bar."); *see also Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) ("if the Petitioner failed to exhaust state remedies and the court to which Petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred[,] . . . there is a procedural default for purposes of federal habeas").

35. To overcome the procedural default, Landers must allege and prove cause to excuse, and prejudice resulting from, the default of his claims or establish that habeas corpus review would correct a miscarriage of justice. *See Herring v. Secretary, Dept. of Corr.*, 397 F.3d 1338, 1343 (11th Cir. 2005) (citing from *Bailey v. Nagle*, 172 F.3d 1299, 1302 (11th Cir. 1999), which, in turn, cites to *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). Landers has offered no excuse to this Court; therefore, his claims c., d., and e. are defaulted for purposes of habeas review.

27

**C. Preclusion and procedural default: The state courts ruled Landers's claims were precluded from review under Rule 32.2 of the Alabama Rules of Criminal Procedure and are procedurally defaulted.**

**1. Landers's remaining issues were ruled precluded from post-conviction review by the state courts.**

36. The state courts found that all of Landers's issues were precluded from review. As explained in the paragraphs that follow, his various arguments either could have been or were raised at trial and on appeal and, for that reason, were precluded under Rule 32.2 of the Alabama Rules of Criminal Procedure. Because they were disposed of on independent and adequate state grounds, they are not subject to this Court's consideration.

**Issue a.**

37. Landers argued in his Rule 32 petition that his indictment did not provide sufficient notice of the charge against him because a variance existed between the information in the indictment – that he killed his father by crushing him with a bulldozer – and evidence introduced at trial that his father died as the result of being struck in the head. (Ex. A, C. 52-54) In its response, the State explained that Landers's notice argument was precluded from review unless he was able to prove that the alleged "variance" was

28

jurisdictional, which it was not. (Ex. A, C. 73-76) The state circuit court ruled that Landers's Issue a. – that his indictment did not provide notice – was precluded under Rules 32.2(a)(3) and (a)(5) of the Alabama Rules of Criminal Procedure. (Ex. A, C. 171)

38. On appeal, Landers separated his challenge to his indictment into two claims: 1) that he was deprived of "notice" of the charge against him; and 2) that the "variance" between the indictment and evidence deprived the trial court of "subject-matter jurisdiction" to adjudicate his case. The Alabama Court of Criminal Appeals did not treat the claims separately and instead addressed the argument as whether Landers's "due process and constitutional rights were violated when the charge in his indictment, that he killed his father by crushing him with a bulldozer, varied from the evidence presented at trial that his father was struck in the head." (Ex. F, p. 2) That court ruled the issue precluded under Rule 32.2(a)(3) because it "could have been, but was not, raised at trial." (Ex. F, p. 3)

39. Landers continued to treat the issues separately in his petition for a writ of certiorari filed in the Supreme Court of Alabama. The

29

court granted the writ as to the "jurisdictional" issue, but later quashed the writ. Therefore, the state courts' final ruling on the issue is that Landers's attack on his indictment is precluded from review under Rule 32.2(a)(3).

40. "Federal constitutional claims defaulted in the state proceedings are procedurally barred at federal habeas review if there existed 'adequate and independent state grounds' for the bar." *Holladay v. Haley*, 209 F.3d 1243, 1254 n.9 (11th Cir. 2000), *cert. denied*, 531 U.S. 1017 (2000); *see Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002) (this Court cannot "consider on federal habeas corpus review a claim that was not adequately presented to the state court in compliance with the state's procedural requirements").

41. The state courts adjudged Landers's attack on his indictment precluded under Rule 32.2(a)(3) of the Alabama Rules of Criminal Procedure. This rule has been recognized as an "adequate and independent state ground" to bar federal review. *See Brownlee*, 306 F.3d at 1065-66 (ruling that defendant's ineffective assistance argument was procedurally defaulted where the state courts adjudged the claim precluded from review under Rules 32.2(a)(3)

30

and 32.2(a)(5) of the Alabama Rules of Criminal Procedure).

Therefore, the claim is defaulted for purposes of habeas litigation.

### Issue b.

42. Landers requested in his state post-conviction proceeding that the state courts reconsider the sufficiency of the evidence underlying his conviction. The courts ruled the claim was precluded because Landers had already litigated the issue on direct appeal.

43. On direct appeal, the Alabama Court of Criminal Appeals held that Landers's attack on the sufficiency of the evidence lacked merit.

### I.

Landers contends that the evidence was insufficient to sustain his conviction.

. . .

Here, the State showed that the victim's death was the result of a homicide; that Landers had a motive to kill his father; that Landers was the last person to see the victim alive and was present at the time his father was killed; that Landers lied about his whereabouts on the afternoon of his father's murder; and that Landers had attempted to kill his father once before and failed.

. . .

Considering the evidence in the light most favorable to the State, accepting as true all evidence introduced by the State, and allowing all legitimate inferences in favor of the State, we hold that there was sufficient evidence from which the jury could have, by fair inference, reasonably

31

concluded that the State's case, albeit circumstantial, excluded every reasonable hypothesis except that of Landers's guilt. Accordingly, the trial court properly submitted the case to the jury for consideration.

(Ex. A, C. 98-112)

44. Because the issue was addressed on direct appeal, both the trial court and the appellate courts found that Landers's post-conviction attack on the sufficiency of the evidence was precluded under Rule 32.2(a)(4) of the Alabama Rules of Criminal Procedure. (Ex. A, C. 171; Ex. F, p. 3) The state courts disposed of Landers's argument on an independent and adequate state ground. *Cf. Kennedy v. Hopper*, 156 F.3d 1143, 1147 (11th Cir. 1998) (noting that Rule 32.2(a)(4) would be an appropriate state law ground on which to deny relief of an issue already addressed on direct appeal), *cert. denied*, 526 U.S. 1075, 119 S. Ct. 1475 (1999). Therefore, the issue is procedurally defaulted.

**Issue f.**

45. Landers asked the state courts sitting in post-conviction review to reconsider his claim that the State unduly delayed indicting him. The courts ruled the claim precluded because it had already been addressed on direct appeal.

32

46. On direct appeal, the Alabama Court of Criminal Appeals rejected

Landers's argument on the merits.  It held:

### II. D.

Finally, Landers contends that [the] trial court should have dismissed the indictment against him based on the four-year preindictment delay.  According to Landers, the State intentionally delayed indicting him until 1996, some four years after his father died and after Dr. Lauridson had determined the death to be a homicide, thus depriving him of his right to due process.

. . .

The only allegation of prejudice in this case is the loss or destruction of several pieces of evidence. However, as we have already determined that that evidence was not so critical to Landers's defense that its loss rendered his trial fundamentally unfair, it is clear that Landers has failed to show actual prejudice.

Likewise, Landers has failed to show that the delay in indicting him was deliberate on the part of the State in order to gain a tactical advantage.  Landers claims that the State's use of Landers's deposition from the case against MONY regarding the insurance proceedings at his trial shows that the State deliberately delayed indicting him in order to gain "access to evidence and testimony which it would otherwise have been unable to obtain."  (Landers's brief to this C ourt, p. 155 .)  H owever, the m ere u se of evidence obtained during the delay is not sufficient to show the State's malicious intent.

Moreover, "prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe the accused is guilty," and "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt."  United States

33

v. Lovasco, 431 U.S. 783, 790-91, 97 S.Ct. 2044, 2049, 52
L.Ed.2d 752 (1977). Although there is little in the record
explaining the r eason f or the d elay, i t is c lear f rom t he
record that the investigation into the victim's death did not
end when Dr. Lauridson determined the manner of death,
but continued not only for the four years leading up to the
indictment, but also through the trial. The case against
Landers was entirely circumstantial and we simply will
not f ault p rosecutors f or delaying ind ictments un til t hey
are satisfied that they have sufficient evidence to establish
the accused's guilt beyond a reasonable doubt.
Accordingly, the trial court did not err in denying
Landers's motion to dismiss the indictment.

(Ex. A, C. 117)

47. Because the state courts had already considered this issue on direct

appeal, both the trial court and the appellate courts found that

Landers's post-conviction attack on the sufficiency of the evidence

was precluded under Rule 32.2(a)(4) of the Alabama Rules of

Criminal Procedure. (Ex. A, C. 169; Ex. F, p. 3) The state courts

disposed of Landers's argument on an independent and adequate

state ground. *Cf. Hopper*, 156 F.3d at 1147. Therefore, it is

procedurally defaulted for purposes of this habeas proceeding.

**Issue g.**

48. Landers argued in his Rule 32 petition that he was in possession of

"newly discovered evidence" – his father's eyeglasses –

purportedly discovered by his mother after Landers's trial. He

34

supported the claim – as he does here – with an affidavit executed
by his mother in which she asserted that she was given the
eyeglasses by law enforcement shortly after Landers's father's
body was discovered, that she placed the eyeglasses in a chest
drawer and that, although she accessed the drawer "shortly before
or during [Landers's] trial[,]" she did not see or otherwise recall
the presence of the eyeglasses to bring them to the attention of the
trial court and jury.  He further asserted – like he does here – that
the eyeglasses established his "innocence."

49. In response, the State first argued that Landers did not satisfy the
"newly discovered evidence" test laid out in Rule 32.1(e) of the
Alabama Rules of Criminal Procedure.  The State further argued
that conflicting evidence was introduced at trial about what time
Landers's father's glasses were discovered and, based on the state
of the evidence at that time, the defense could have developed the
issue at trial and, therefore, Landers's argument was precluded
under Rule 32.2(a)(3) of the Alabama Rules of Criminal
Procedure.  (Ex. A, C. 70-72)  Finally, the State treated Landers's
assertion of "innocence" as a separate claim and argued that it was

precluded from review under Rules 32.2(a)(2) and (a)(4) of the
Alabama Rules of Criminal Procedure.  (Ex. A, C. 72-73)

50. The trial court held: 1) that Landers's "purported evidence [did]
not rise to the level required for 'newly discovered' evidence"
because the defense had not established they acted with due
diligence and because the "evidence amount[ed] to impeachment
evidence, at best"; 2) the argument was precluded under Rule
32.2(a)(3) because "the issue dealing with the eyeglasses could
have been raised at trial"; and, 3) his assertion of "innocence" was
litigated previously and was precluded under Rules 32.2(a)(2) and
(a)(4).  (Ex. A, C. 169-71)  The appellate courts agreed.  (Ex. F, p.
3)

51. The state courts' findings that Landers's argument could have been
pursued at trial (Rule 32.2(a)(3)) and that his assertion of
innocence was already litigated on appeal (Rule 32.2(a)(4))
constitute independent and adequate state procedural grounds to
deny relief. *See Brownlee*, 306 F.3d at 1065-66. *Cf. Hopper*, 156
F.3d at 1147.  Therefore, his claim is procedurally defaulted.

**Issue h.**

52. Landers contends that he is entitled to relief because the trial court

    lacked "subject matter jurisdiction" to adjudicate his case. As

    explained in the paragraphs related to Issue a., Landers separated

    the challenge made to his indictment in his Rule 32 petition into

    two claims on appeal – "notice" and "jurisdiction." The Alabama

    Court of Criminal Appeals did not rule on the separate arguments,

    but instead disposed of Landers's attack on his indictment as

    precluded under Rule 32.2(a)(3) because it could have been raised

    at trial. (Ex. F, p. 3)

53. Landers presented both issues to the Supreme Court of Alabama in

    his petition for a writ of certiorari. That court granted the petition,

    in part, on the issue of "whether the alleged variance between the

    indictment and proof at trial deprived the trial court of

    jurisdiction[.]" (Ex. J) After the issue was briefed by Landers and

    the State, the court quashed the writ. (Ex. L)

54. Accordingly, the state courts' final ruling on the "jurisdictional"

    issue is that Landers's attack on his indictment is precluded from

    review under Rule 32.2(a)(3). Because that rule constitutes an

    independent and adequate state ground to bar further review,

37

Landers's issue is procedurally defaulted. *See Brownlee*, 306 F.3d at 1065-66.

> **2. Because these remaining claims were adjudged precluded on independent and adequate state grounds, Landers's claims are procedurally defaulted.**

55. Once adjudged procedurally defaulted, the petitioner must show cause and prejudice or a fundamental miscarriage of justice to overcome the default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) ("We therefore require a prisoner to demonstrate cause for his state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim."); *Brownlee*, 306 F.3d at 1065; *Holladay*, 209 F.3d at 1254.

56. Landers has not provided this Court with any reason to excuse the procedural default of his Issues a., b., f., g., or h. Accordingly, they are defaulted for purposes of habeas corpus review.

38

### D. Statute of limitation: Landers's petition is not time-barred.

57. 28 U.S.C. § 2244(d) applies a one-year statute of limitation to an

application for a writ of habeas corpus to an individual

incarcerated pursuant to a state court judgment.

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of-
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or,
>> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

58. The legislation enacting the one-year statute of limitation

applicable to federal habeas corpus petitions became effective on

April 24, 1996.  *See Carey v. Saffold*, 536 U.S. 214, 217 (2002)

39

(noting the effective date of the federal limitation period); *Drew v. Department of Corr.*, 297 F.3d 1278, 1282 (11th Cir. 2002) (same). In cases where the conviction is obtained following the one-year period, the defendant has one year from the date on which his conviction becomes final to mount a federal challenge. *See* § 2244(d)(2)(A).

59. Landers's capital murder conviction became final when the Supreme Court of Alabama quashed his petition for a writ of certiorari on June 18, 2004. (Ex. C)  Because Landers pursued relief to the state supreme court, he was then accorded 90 days, or until Thursday, September 16, 2004, to seek review of his conviction in the United States Supreme Court. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002).

60. Landers failed to take such action, so the federal period of limitation began running on September 17, 2004 and ran for 256 days – until May 31, 2005 – when he filed a state post-conviction petition in the Elmore County Circuit Court. (Ex. A, C. 2, 4)  His state post-conviction proceedings concluded on September 15, 2006, when the Supreme Court of Alabama quashed the writ of certiorari. (Ex. L)

61. The one-year period resumed running on September 16, 2006, and ran for an additional 13 days, until Landers filed his habeas corpus petition in this Court on September 29, 2006.

62. Therefore, 269 days have elapsed until the federal statute of limitation. Because Landers appears to have presented his claims within one year of "the date on which [his] judgment became final by the . . . expiration of the time for seeking review," § 2244(d)(1)(A), his petition is timely filed.

### E. Remaining defenses

63. If this Court finds that Landers's claims are not procedurally defaulted, the Respondents respectfully request that this Court permit them to file a Supplemental Answer addressing any other applicable defense – including a more expansive discussion of Landers's procedural default of his claims.

## CONCLUSION

For the foregoing reasons, the Respondents respectfully request this

Court deny and dismiss Landers's habeas corpus petition with prejudice.


Respectfully submitted,
Troy King
*Attorney General*
By:


Stephanie N. Morman (MOR105)
*Deputy Solicitor General*

42

## EXHIBITS

Exhibit A          Transcript of Landers's state post-conviction
                   proceeding

Exhibit B          Alabama Court of Criminal Appeals's March 2,
                   2001 order overruling Landers's application for
                   rehearing filed on direct appeal of his conviction

Exhibit C          Supreme Court of Alabama's June 18, 2004 order
                   quashing the writ of certiorari issued on direct
                   appeal of Landers's conviction

Exhibit D          Certificate of Judgment on direct appeal of
                   Landers's conviction

Exhibit E          Landers's brief filed in the Alabama Court of
                   Criminal Appeals after the denial of his Rule 32
                   petition

Exhibit F          Alabama Court of Criminal Appeals's April 21,
                   2006 unpublished opinion affirming the denial of
                   Rule 32 relief

Exhibit G          Landers's application for rehearing filed after the
                   denial of Rule 32 relief

Exhibit H          Alabama Court of Criminal Appeals's May 12,
                   2006 order overruling the application for rehearing
                   after the denial of Rule 32 relief

Exhibit I          Landers's petition for a writ of certiorari filed in
                   the Supreme Court of Alabama after the denial of
                   Rule 32 relief

Exhibit J          Supreme Court of Alabama's June 7, 2006 order
                   granting Landers's petition on two grounds

43

Exhibit K          State's merits brief filed in response to the
                   issuance of the writ by the Supreme Court of
                   Alabama

Exhibit L          Supreme Court of Alabama's September 15, 2006
                   order quashing the writ of certiorari

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>26th</u> day of January, 2007, I served a copy of the foregoing (excluding Exhibits) on Counsel for the Petitioner, by placing said copy in the United States mail, first class, postage prepaid, and addressed as follows:

>William H. Mills
>William N. Clark
>Redden, Mills & Clark
>940 Financial Center
>505 North 20th Street
>Birmingham, Alabama  35203

Stephanie N. Morman (MOR105)
*Deputy Solicitor General*

ADDRESS OF COUNSEL
Office of the Attorney General
Alabama State House
11 South Union
Montgomery, AL  36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848
E-Mail: smorman@ago.state.al.us

225384/104072-001

COPY
Vol 1 of 2

COURT OF CRIMINAL APPEALS NO. _CR 05-0287_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF ___ELMORE___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC 1996-421.60___

CIRCUIT JUDGE ___HON. JOHN B. BUSH___

Type of Conviction / Order Appealed From: __RULE 32 PETITION__

Sentence Imposed: _____CASE DISMISSED_____

Defendant Indigent: ☐ YES ☒ NO

__MARK SAMUEL LANDERS__

__HON. WILLIAM N. CLARK__  **NAME OF APPELLANT**
(Appellant's Attorney)                    (Telephone No.)
__940 THE FINANCIAL CENTER, 505 20th STREET NORTH__
(Address)
__BIRMINGHAM, AL  35203__
(City)            (State)            (Zip Code)

### V.

__STATE OF ALABAMA__

**NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



EXHIBIT
A

# INDEX

ORGANIZATION OF COURTS...................................................................01

CASE ACTION SUMMARY...................................................................02

PETITION FOR POST-CONVICTION RELIEF.............................................04

MOTION FOR REASSIGNMENT OR FOR TRANSFER OF PROCEEDINGS.........44

MOTION TO ALLOW TAKING OF DEPOSITIONS AND OTHER DISCOVERY....46

ORDER ON MOTION.......................................................................48

MOTION FOR LEAVE TO AMEND.........................................................49

AMENDMENT TO PETITION FOR POST-CONVICTION RELIEF....................52

STATE'S MOTION TO DISMISS............................................................56

ORDER SETTING HEARING................................................................144

PETITIONER'S MEMORANDUM IN OPPOSITION TO STATE'S MOTION TO DISMISS...................................................................................145

ORDER DENYING RULE 32 PETITION....................................................167

NOTICE OF APPEAL.......................................................................172

DESIGNATION OF RECORD ON APPEAL.................................................174

COURT OF CRIMINAL APPEALS DOCKETING STATEMENT......................177

REPORTER'S TRANSCRIPT ORDER – CRIMINAL......................................179

CERTIFICATE OF FILING..................................................................180

NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS...181

COURT REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS.....1 THRU 19

COURT REPORTER'S CERTIFICATE OF COMPLETION............................20

CERTIFICATE OF COMPLETION OF RECORD ON APPEAL BY TRIAL CLERK

## APPEAL TO THE COURT OF CRIMINAL APPEALS OF ALABAMA

AT A REGULAR, ADJOURNED OR SPECIAL SESSION OF THE CIRCUIT

COURT OF ELMORE COUNTY, ALABAMA, CRIMINAL DIVISION, AT WHICH

TIME THE OFFICERS AUTHORIZED BY LAW TO SERVE WERE SERVING, THE

FOLLOWING PROCEEDINGS WERE HAD IN THE CASE STYLES:


MARK SAMUEL LANDERS
**APPELLANT**:

**IN THE CIRCUIT COURT OF
ELMORE COUNTY ALABAMA**
CASE NO: CC 1996-421.60

VS


STATE OF ALABAMA
**APPELLEE**:


### APPEARANCES

**FOR THE APPELLANT:**

HON. WILLIAM N. CLARK
940 THE FINANCIAL CENTER
505 20TH STREET NORTH
BIRMINGHAM, AL 35203


**FOR THE APPELLEE:**

HON. TROY KING
ATTORNEY GENERAL
11 SOUTH UNION STREET
MONTGOMERY, AL 36130


**CIRCUIT JUDGE:**

HON. JOHN B. BUSH
8955 US 231 RM 232
WETUMPKA, AL 36092


**COURT REPORTER:**

DUB HARRIS
8955 US 231 RM 232
WETUMPKA, AL 36092

```
ACRO372                ALABAMA JUDICIAL INFORMATION SYSTEM        CASE: CC 1996 000421.60
O  : SUS                       CASE ACTION SUMMARY
P  :   1                       CIRCUIT   CRIMINAL                 RUN DATE: 06/20/2005
IN THE CIRCUIT COURT OF   ELMORE
                                                                          JUDGE: JBB
STATE  OF  ALABAMA                    VS       LANDERS MARK SAMUEL
                                               ELMORE COUNTY JAIL
CASE: CC 1996 000421.60
                                               WETUMPKA, AL  36092 0000
DOB: 03/03/1956         SEX: M  RACE: W  HT: 0 00  WT: 000   HR:      EYES:
SSN: 929096421  ALIAS NAMES:
CHARGE01: RULE 32-FELONY       CODE01: RULE  LIT: RULE 32-FELONY TYP: F #: 001
OFFENSE DATE:                          AGENCY/OFFICER: 0290000
DATE WAR/CAP ISS:                      DATE ARRESTED:
DATE   INDICTED: 10/04/1996            DATE   FILED: 05/31/2005
DATE  RELEASED:                        DATE HEARING:
BOND     AMOUNT:          $.00              SURETIES:
DATE 1:             DESC:               TIME: 0000
DATE 2:             DESC:               TIME: 0000
TRACKING NOS:                   /                     /
   DEF/ATY: CLARK WILLIAM N              TYPE: R
            940 THE FINANCIAL CENTER                           TYPE:
            505 20TH STREET NORTH
            BIRMINGHAM    AL 35203
                                                     00000
PROSECUTOR: KIDD MICHAEL L

TH CSE:   000000000000 CHK/TICKET NO:
COURT REPORTER:                  SID NO:      000000000      GRAND JURY: 1
DEF STATUS: PRISON              DEMAND:
A                                                            OPER: SUS
         ACTIONS,  JUDGEMENTS,  AND  NOTES
```

| | |
|---|---|
| 5-31-05 | Petition for Post-Conviction Relief |
| 5-31-05 | Motion for Reassignment or for Transfer of Proceedings |
| 5-31-05 | Motion to Allow taking of Depositions and other Discovery |
| 6-7-05 | Order on Motion C. DA, Wm Mills & Wm N. Clark |
| 6-10-05 | Motion for Leave to Amend |
| 6-10-05 | Amendment to Petition for Post-Conviction Relief |
| 7-12-05 | State's Motion to (Dismiss)/Procedural History |
| 7-13-05 | Order setting hearing for 8-30-05 @ 1:30 pm. C.DA, DOC, Wm Mills, Wm Clar. |
| 8/19/05 | Petitioner's Memorandum in Opposition to State's motion to Dismiss |
| 8/30/05 | Conseguent Reg for Hear State's Mot to Dismiss Rule 32 petn. Taken under Advisement |
| 9/23/05 | Order Denying Rule 32 Petition C.DA, W. Mills, S. Clark, CAG, S. Norman, D. Valeska C |
| 11/3/05 | Notice of Appeal. C. CCA, AG, DA, D. Harris, Wm Clark |
| 11/3/05 | Designation of record on Appeal C CCA, AG, DA, D. Harris W. N Clark |
| 11/3/05 | Docketing Statement C. CCA, AG, DA, D. Harris, Wm Clark |

ACRO369  A L A B A M A    J U D I C I A L    I N F O R M A T I O N    C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 1996 000421.60
JUDGE ID:  JBB

---

STATE  OF  ALABAMA                    VS    LANDERS MARK SAMUEL

---

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|
| 11/3/05 | Court Reporters transcript c. CCA, AG, DA, D. Harris, Wm Clark |
| 11/3/05 | Certificate of filing c. CCA, AG, DA, D. Harris, Wm Clark |

3

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

MARK SAMUEL LANDERS,

Inmate Number: AIS #193732
Place of Confinement: St.Clair
    Correctional Facility,
    Springville, Alabama
County of Conviction: Elmore

    Petitioner

VS.

STATE OF ALABAMA,

    Respondent

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

2005 MAY 31  PM 2 31

LARRY DOZIER
CIRCUIT CLERK ELMORE COUNTY

CASE NO.: CC96-421

## PETITION FOR POST-CONVICTION RELIEF

COMES NOW the Petitioner, Mark Samuel Landers, pursuant to Rule 32 of the Alabama Rules of Criminal Procedure, and petitions the Court to vacate the conviction and sentence imposed upon him in Case Number CC-96-421 in the Circuit Court of Elmore County, Alabama and to dismiss or order a new trial on the indictment returned against him in the said case, and for such other, further, different or general relief as may be appropriate.  In support of this petition the Petitioner avers as follows:

1.    The judgment of conviction which this petition attacks was entered in the Circuit Court of Elmore County, Alabama in Wetumpka, Alabama in Case Number CC-96-421 in said court.

2.    The date of the judgment of conviction was July 1, 1997.

3.    The Petitioner's sentence was life imprisonment.

4.    The offense with which the Petitioner was charged was capital murder.

-1-

4

5.    The Petitioner entered a plea of not guilty.

6.    The Petitioner was tried by a jury.

7.    The Petitioner testified at the trial.

8.    The Petitioner appealed from the judgment of conviction.

9.    A-(1).    Petitioner appealed to the Court of Criminal Appeals of Alabama.

(2).    The Court of Criminal Appeals of Alabama affirmed the judgment of conviction.

(3).    The Court of Criminal Appeals affirmed Petitioner's conviction on December 15, 2000.    The Court of Criminal Appeals of Alabama overruled Petitioner's application for rehearing on March 2, 2001.

B-(1).    Petitioner timely filed a petition for writ of certiorari to the Court of Criminal Appeals of Alabama in the Supreme Court of Alabama.

(2).    The Supreme Court of Alabama granted Petitioner's petition for writ of certiorari and on August 30, 2001 issued a writ of certiorari to the Court of Criminal Appeals of Alabama.    On June 18, 2004 the Supreme Court of Alabama entered an order quashing the said writ of certiorari previously issued and denying the said petition for writ of certiorari.    On June 18, 2004 the Court of Criminal Appeals of Alabama entered a certificate of affirmance of his said judgment of conviction.

(3).    The Supreme Court of Alabama denied Petitioner's petition for writ of certiorari to the Court of Criminal Appeals of Alabama on June 18, 2004.

-2-

5

10. Other than the direct appeal from the judgment of conviction and sentence and the petition for writ of certiorari to the Supreme Court of Alabama, as described above, Petitioner has filed no other petitions, applications, or motions with respect to this judgment in any court, State or Federal.

11. Except for the appeal, as described above, Petitioner has filed no other proceedings attacking the said judgment other than a motion under Rule 24 of the Alabama Rules of Criminal Procedure in the trial court prior to the said appeal.

12. Petitioner avers that the said judgment of conviction entered against him should be set aside for each of the reasons set out below.

## Background

To facilitate an understanding of the grounds of this petition Petitioner includes the following background statement:

The Petitioner was convicted of capital murder by a jury verdict returned on May 9, 1997 and he was adjudicated guilty and sentenced to life imprisonment without parole on July 1, 1997. The indictment on which he was tried charged him with the murder of Robert Landers, Sr. The deceased and alleged victim was the Petitioner's father.

No witnesses testified to observing the occurrence in which the deceased was killed. The evidence against the Petitioner was entirely circumstantial. The core of the prosecution evidence was opinion testimony from a medical examiner employed by the Alabama Department of Forensic Sciences, Dr. James Lauridson.

Certain facts surrounding the death of the deceased are undisputed. On the evening of February 12, 1992 the body of the deceased was found in rural Elmore County. The body was partially underneath one of the tracks of a crawler tractor with which the deceased had been working at this location earlier in the day. The body had sustained extensive crushing injuries and obviously had been run over by the tractor which was resting on the body.

Law enforcement officers investigated at the scene where deceased's body was found on the evening of February 12, 1992. The tractor was moved to permit the removal of the deceased's body. The body was turned over to the medical examiner on the next day, February 13, 1992. On that date the medical examiner conducted an examination of the body but did not perform an autopsy. From the examination of the body on that date the medical examiner concluded that the deceased had been killed by accident when he was run over by the tractor. The investigating law enforcement officers reached the same conclusion.

On March 3, 1992 the body of the deceased was exhumed from its burial site and brought again to Dr. Lauridson for examination. On this occasion Dr. Lauridson performed an autopsy and other examinations of the body. Later, by a report dated March 13, 1992, Dr. Lauridson concluded the deceased died as a result of a homicide.

The Petitioner was indicted and charged with capital murder on October 4, 1996, over four and one half years after the deceased was killed.

The theory of the prosecution advanced at trial was that the deceased was struck by a blunt instrument on the left temple and either killed outright or disabled by the blow and that the perpetrator subsequently ran over his body with the tractor under which his body was found. The State had no direct evidence to prove this theory and its case against the Petitioner was based entirely on circumstantial evidence. The State produced no evidence of a "blunt instrument that was connected by any evidence, such as blood, body tissue, finger prints or otherwise, to an injury inflicted on the deceased. The testimony supporting the State's theory was the opinion testimony of Dr. Lauridson, the medical examiner, and the opinion testimony of a technician employed by the Alabama Department of Forensic Sciences.

Petitioner plead not guilty. His trial commenced on April 28, 1997. He was found guilty on May 9, 1997 and was sentenced to life imprisonment on July 1, 1997. Petitioner appealed his conviction to the Court of Criminal Appeals of Alabama which affirmed his conviction with a memorandum and without a formal opinion, on December 15, 2000. After denial of an application for rehearing in the Court of Criminal Appeals the Petitioner filed a petition for writ of certiorari in the Supreme Court of Alabama. The petition for writ of certiorari was granted by the Supreme Court on August 30, 2001. On June 18, 2004 the Supreme Court quashed the writ of certiorari it had previously granted and affirmed Petitioner's conviction without an opinion.

<u>Grounds of Petition</u>

<u>A.</u>

The Sixth and Fourteenth Amendments Constitution of the United States or Article 1, Section 6 of the 1901 Constitution of the State of Alabama require a new trial because:

(1). The conviction of the Petitioner was obtained following the unconstitutional failure of the prosecution to disclose to the Petitioner evidence favorable to the Petitioner which the Petitioner had specifically requested the State to produce.  The facts on which this ground is based are as follows:

(a). Critical to the State's case against the Petitioner in this circumstantial evidence case was proof that a certain pair of eye glasses, which were introduced into evidence as State's Exhibit 10, were the eye glasses of the deceased and were being worn by him at the time he was killed.

(b). The primary circumstantial evidence offered by the State in the prosecution of the Petitioner was the opinion testimony of Dr. James Lauridson, the medical examiner employed by the State Department of Forensic Sciences.  The said eye glasses (State's Exhibit 10) are an essential element in Dr. Lauridson's testimony.

(c). Dr. Lauridson testified that he examined the body of the deceased on February 13, 1992 and performed an autopsy on the body on March 3, 1992 following its exhumation after burial. Dr. Lauridson testified that from his examination of the body of the deceased on February 13, 1992 he concluded the deceased died as

a result of an accident.  However, Dr. Lauridson testified, after the autopsy on March 3, 1992 he changed his opinion and concluded that in his opinion the deceased died as a result of a homicide. Dr. Lauridson testified that the latter opinion was based on the following conclusions which he reached and as to which he testified to as expert opinions at trial:

i.   The skull of the deceased had a fracture in the left temple area that was "vertical" as contrasted to other fractures of the skull which were "horizontal".

ii.   The described injury to the left temple area of the deceased's skull occurred earlier than the other fracture injuries to the skull and was caused by a blunt instrument force different from the forces of which caused the other fractures of the skull.

iii.  The conclusion that the left temple injury on the skull of the deceased was caused by a blunt force different from the forces which caused the other injuries to the deceased's skull was explained by Dr. Lauridson in his opinion testimony by his assumption that at the time the injury to the left temple occurred the deceased was wearing a certain pair of eye glasses which were introduced at Petitioner's trial as State's Exhibit 10. These eye glasses had been provided to Dr. Lauridson by investigating officers with the statement that they were eye glasses found at the scene where the deceased's body was found and that they were eye glasses belonging to the deceased.  These eye glasses had a bent or deformed left leg.  Dr. Lauridson concluded

-7-10

that this bend or deformity in the left leg of the eye glasses was at a location matching the left temple injury location on the skull if it be assumed that the eye glasses were being worn by the deceased when struck with a blunt object on the left temple.

iv.  Dr. Lauridson illustrated his opinion of the connection between the deformity in the left leg of the eye glasses and the left temple injury on deceased's skull by placing these eye glasses on the deceased's reconstructed skull and photographing the glasses in this position.  In his testimony Dr. Lauridson pointed out to the jury the alignment of the deformity in the left leg of the eye glasses with the left temple injury.  This demonstration was a very forceful demonstration in support of the State's theory that the deceased was struck on the left temple with a blunt instrument before he was run over by the track of the tractor.

(d).  This testimony and this demonstration by Dr. Lauridson was stressed by the prosecution in opening statement and closing argument as proof of the fact that the deceased was killed in a homicide and not in an accident.  The State, in effect, argued that these eye glasses (State's Exhibit 10) proved the prosecution's case.

(e).  Whether the eye glasses referred to by Dr. Lauridson in his testimony and used by him in his demonstration were the eye glasses of the deceased was a highly contested issue at Petitioner's trial.  No witness testified that the deceased was wearing these eye glasses on the day of his death.  Most witnesses

testified the deceased wore wire rimmed glasses, and not the glasses the State placed in evidence and which Dr. Lauridson used in his demonstration (State's Exhibit 10).

(f). The State undertook to prove the eye glasses referred to by Dr. Lauridson in his testimony and used by him in his demonstration were the eye glasses of the deceased by a tenuous link based on the testimony of an employee of the State Department of Forensic Sciences, Katherine McGeehan. Ms. McGeehan testified:

i.    That she found a blood stain on the lower right side of the eye frame of the glasses (State's Exhibit 10) which she removed for testing.

ii.   That she tested this blood stain by what is generally known as the ABO analysis.  The conclusion of her analysis was that the blood stain taken from the frame of the said eye glasses was Type O blood.  No other or more sophisticated testing of the blood stain, such as DNA testing, was performed by the State to demonstrate that this blood stain was the blood of the deceased.

iii. That she was provided with a vial of blood which she was informed was a blood sample taken from the body of the deceased.

iv.  A similar ABO analysis of the blood from this vial showed that it was Type O blood.  No other or more sophisticated testing of this blood specimen from this vial, such as DNA testing, was performed by the State.

(g). Ms. McGeehan testified that all of the blood

specimen taken by her from the said eye glasses frame was used in the test that she performed on the said blood specimen and that no portion of the blood specimen remained for testing by the Petitioner.

(h). The Petitioner requested the State to produce blood from the specimens it had tested for testing by the Petitioner. The State responded to this request by stating

i.   That all of the blood specimen taken from the frame of the said eye glasses was used in the test it performed and none of that blood specimen remained for production to the Petitioner for testing by the Petitioner.

ii.  That the remainder of the vial of blood taken from the body of the deceased and not used in the test was disposed of by the State and was not available for production to the Petitioner for testing.

(i). A specimen such as that described by the State's evidence that was taken from the frame of the said eye glasses would have yielded enough blood for preservation and testing by the Petitioner. The vial described by Ms. McGeehan contained a sufficient quantity of blood to allow the retention of a sample for testing by the Petitioner.

(j).   The evidence to be derived from analysis and testing of the blood specimens was of critical significance in the trial of this case. The State's prosecution theory required that it prove that the eye glasses from which the said blood sample was taken were the eye glasses of the deceased and that he was wearing

-10-73

them at the time he met his death.  The State's evidence regarding the results of its analysis of the blood specimen taken from the said glasses and from the body of the deceased was the sole evidence having facial probative value connecting this pair of glasses with the deceased.  A connection of this pair of glasses to the deceased was critical to the State's prosecution theory that the deceased received a blow to the temple area by a blunt instrument because this theory was primarily illustrated by the bent leg of the said glasses at a place allegedly corresponding to the site of the temple injury on the deceased's skull.  If the said eye glasses were not in fact the eye glasses of the deceased, a fact that could have been shown by a more sophisticated analysis of the blood stain removed from them, then the State's prosecution theory is totally unsupported by evidence and fails as an hypothesis on which the jury could have predicated the Petitioner's guilt.

(k).  An examination and analysis of the said blood stain or specimen could yield conclusive evidence favorable to the Petitioner and contradictory to the State's contention that the eye glasses identified as State's Exhibit 10 were the eye glasses of the deceased.  The Petitioner was deprived of this opportunity to develop favorable evidence by the actions of the State in withholding or destroying or disposing of the said blood stain and blood specimen which the Petitioner had specifically requested the State to produce.

(l).  Petitioner avers that the said destruction or

-114-

disposition of the said blood specimens, as aforesaid, was done in bad faith and amounted to a denial of due process of law to the Petitioner as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 1, Section 6 of the Alabama Constitution of 1901.

(m). Alternatively, Petitioner avers that the destruction and disposition of the said blood samples, as aforesaid denied him due process of law in violation of the Fourteenth Amendment to the Constitution of the United States and Article 1, Section 6 of the Alabama Constitution of 1901 in that it rendered his trial fundamentally unfair in denying him an opportunity to confront, challenge, and refute critical evidence against him.

(n). By reason of the destruction or disposition or withholding of the said evidence by the State, which the Petitioner had specifically requested be produced, the Petitioner was deprived of the opportunity to develop evidence reasonably calculated to assist in his defense and the State failed to provide and produce to the Petitioner, even though he had requested the same, evidence favorable to the Petitioner in this prosecution, in violation of principles announced by the Supreme Court of the United States in Brady vs. Maryland, 373 U.S. 83 (1963) and other cases.

(2). The conviction of the Petitioner was obtained by the unconstitutional failure of the prosecution to disclose and make available to the Petitioner for inspection and use as evidence in his defense evidence favorable to the Petitioner which the Petitioner had specifically requested the State to produce. The

facts of which this ground is based are as follows:

(a). Petitioner incorporates by reference and re-alleges the allegations of Part 12A(1), above.

(b). The said eye glasses identified at trial and received in evidence as State's Exhibit 10 had blood stains or residue of blood on them other than the blood stain on the lower right side of the eye frame described by Ms. McGeehan. These glasses also had blood stains on the upper portion of the lens which was of sufficient volume to permit testing. This fact is demonstrated by the photograph of the said eye glasses which was placed in evidence as State's Exhibit 23A.

(c). Though requested to produce evidence favorable to the Petitioner, including blood stains or specimens, the State did not produce the blood stains on the lens of the eye glasses which were State's Exhibit 10, which said blood stain or specimen was not used by the Department of Forensic Sciences technician in the test she performed.

(d). An examination and analysis of the said blood stain on the lens of the said glasses could yield conclusive evidence favorable to the Petitioner and contradictory to the State's testimony that the eye glasses identified as State's Exhibit 10 were the eye glasses of the deceased.

(e). Petitioner avers that the said withholding, destruction or disposition of the said blood specimen, as aforesaid, was done in bad faith and amounted to a denial of due process of law to the Petitioner as guaranteed by the Fourteenth

Amendment to the United States Constitution and Article 1, Section 6 of the Alabama Constitution of 1901.

(f). Alternatively, Petitioner avers that the destruction and disposition of the said blood sample, as aforesaid, denied him due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 1, Section 6 of the Alabama Constitution of 1901, in that it rendered his trial fundamentally unfair in denying him an opportunity to confront, challenge, and refute critical evidence against him.

(g). By reason of the destruction or disposition or withholding of the said evidence by the State the Petitioner was deprived of the opportunity to develop evidence reasonably calculated to assist in his defense and the State failed to provide and produce to the Petitioner, even though he had requested the same, evidence favorable to the Petitioner in this prosecution, in violation of principles announced by the Supreme Court of the United States in <u>Brady vs. Maryland</u>, 373 U.S. 83 (1963) and other cases.

(3). The conviction of the Petitioner was obtained by the unconstitutional failure of the prosecution to disclose and make available to the Petitioner for inspection and use as evidence in his defense evidence favorable to the Petitioner which the Petitioner had specifically requested the State to produce. The facts on which this ground is based are as follows:

(a). On February 13, 1992, the day after the death of the deceased, the medical examiner of the State Department of

-147-

Forensic Sciences, Dr. Lauridson, examined the body of the deceased. Following this examination of the body of the deceased Dr. Lauridson concluded that the deceased met his death as a result of an accident.

(b). At the time of this examination, as he was required by law to do (see Section 36-18-2, <u>Code of Alabama of 1975</u>, Dr. Lauridson made a record of his investigation. This record was made by Dr. Lauridson by dictating notes of his investigation which were electronically recorded setting out the findings of his examination and the reasons for his conclusions that the death of the deceased was the result of an accident. These dictated notes necessarily contained recitations favorable to the Petitioner in the subsequent prosecution against him because they necessarily contained information or observations supporting the conclusion that the death of the deceased was the result of an accident and not a homicide.

(c). Although requested to do so by the Petitioner, the State did not produce in any form the medical examiner's dictated notes of his February 13, 1992 investigation. The State's response to the Petitioner's request for production of these notes was that no such notes existed.

(d). The medical examiner testified that the notes of the investigation dictated by him on February 13, 1992 were destroyed by either the destruction of his electronically recorded dictation and/or by the deletion or erasure of his typed dictation from his secretary's computer before a printed copy of it was

produced.   The  failure  to  keep  such  notes  is  a  violation  of statutory  requirements  for  the  Department  of  Forensic  Sciences found in Section 36-18-2 of the <u>Code of Alabama of 1975</u>.

(e). By  destroying  the  said  notes,  contrary  to statute, the State acted in bad faith in depriving the Petitioner of evidence favorable to his defense of the charges against him in this case, contrary to due process rights guaranteed to him by the Fourteenth Amendment to the United States Constitution and Article 1, Section 6 of the Alabama Constitution of 1901.

(f). Due to the importance of the testimony of the medical examiner in the trial of this case, the destruction of the notes of the medical examiner rendered the trial of the Petitioner fundamentally unfair and deprived him of due process of law, and denied  rights  guaranteed  to  the  Petitioner  by  the  Fourteenth Amendment to the United States Constitution and Article 1, Section 6 of the Alabama Constitution of 1901.

(g). By reason of the destruction or disposition or withholding of the said evidence by the State the Petitioner was deprived  of  the  opportunity  to  develop  evidence  reasonably calculated to assist in his defense and the State failed to provide and produce to the Petitioner, even though he had requested the same, evidence favorable to the Petitioner in this prosecution, in violation  of  principles  announced  by  the  Supreme  Court  of  the United States in <u>Brady vs. Maryland</u>, 373 U.S. 83 (1963) and other cases.

(4). The Defendant was denied due process of law and his

trial was rendered  fundamentally unfair, contrary to rights guaranteed to the Petitioner by the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 6 of the Alabama Constitution of 1901, when the trial judge refused to postpone closing arguments in this case until after the funeral of the father of Defendant's counsel who had died in the interval between the completion of testimony at the said trial and the commencement of closing arguments.

(5). The Petitioner was denied due process of law and the prosecution of him was rendered fundamentally unfair because the State, to the prejudice of the Petitioner, unduly delayed the initiation of the prosecution against him for over 55 months after the occurrence of the event on which the prosecution was based and by reason of this delay gained an advantage in the said prosecution.   The facts on which this ground is based are as follows:

(a). Petitioner incorporates by reference and re-alleges each of the allegations of Part 12A(1), (2) and (3), above.

(b). The event on which this prosecution was based, the death of Robert Landers, Sr., occurred on February 12, 1992.

(c). The indictment against the Petitioner was returned on October 4, 1996.

(d). The investigation by the State of the Petitioner as the person possibly responsible for the death of the said deceased began soon after February 12, 1992 and was completed no later than November 1992, and most of its investigation was

-17<sub>20</sub>

completed by April 1992, and all of the evidence accumulated by the State and introduced as evidence against the Petitioner at the trial of his case was known to the State by November 1992.

(e). The Petitioner was prejudiced by the delay in the initiation of this prosecution in the following separate and several respects:

i.   In the interim between November 1992 and the time of Petitioner's indictment certain persons who could have offered testimony favorable to the Petitioner as witnesses at the trial of the charge against the Petitioner died, including the following:

Barry Worth

Reuben Jarrell

Orender Jarrell

ii.  Before the return of the indictment the crawler tractor which ran over the deceased, as to which the State conducted tests and experiments soon after February 12, 1992 and offered evidence of the results thereof at Petitioner's trial, had been disposed of and was no longer available to the Petitioner for examination and analysis as to defects or other conditions or tests and experiments which could have explained the occurrence which caused the death of the deceased as an accident and which would have rebutted the evidence regarding the tests and experiments presented by the State at Petitioner's trial. Further, by the time the indictment was returned in November 1996 the location at which the deceased met his death, and at which the State conducted tests

and experiments with the tractor involved in the death of the deceased which were received in evidence at Petitioner's trial, had changed and was no longer available to the petitioner in the same condition in which it existed on February 12, 1992 and at the time the State conducted its tests and experiments soon afer February 12, 1992. At Petitioner's trial he offered evidence of a test or experiment conducted by a defense expert using a different but similar crawler tractor of the same model as the tractor under which the body of the deceased was found, which was conducted at a different location after the indictment was returned. This evidence was ruled inadmissible by the trial court because the tractor was not the same or substantially similar to the tractor involved in the death of the deceased and because the area and terrain where the test or experiment was conducted were different. Had the indictment been returned earlier the Petitioner's expert could have conducted a test and experiment using the same tractor as the tractor under which deceased's body was found and at the same location.

iii. Before the return of the indictment the State disposed of blood samples it had used in tests or analyses (as hereinabove described in this petition), and as to which the State presented testimony at Petitioner's trial, thereby depriving the Petitioner of the opportunity to have testing and analyses conducted on the said blood samples to rebut the testimony presented by the State with respect to such samples and to rebut the inferences the State argued based on this evidence.

iv.  Before the return of the indictment the State disposed of the deceased's skull and other tissue which the State's medical examiner had examined and which was the subject of his testimony and thereby deprived the Petitioner of the opportunity to have the said skull and other tissue examined and analyzed in order to rebut the testimony of the medical examiner, and the inferences the State argued therefrom.

v.  Before the return of the said indictment the State's medical examiner destroyed or disposed of portions of his initial notes and records of findings made on the examination of the body of the deceased and thereby deprived the Petitioner of the opportunity to have the notes and records of these findings available for use as evidence at the trial of this case to rebut the testimony offered by the State against him.

vi.  The delay in the initiation of the prosecution prevented the discovery by the Petitioner of the newly discovered evidence which is described in Sub-part B of Part 12 or Paragraph 12, below, of this petition.  Had this prosecution been initiated earlier the possessor of this evidence would have recalled the fact of her possession of this evidence and would have revealed its existence to the Petitioner in time for its use at the trial of his case.

(f).  The State delayed the initiation of this prosecution against the Petitioner in order to gain an advantage in the prosecution against him and the State did, in fact, gain an advantage in the prosecution of the Petitioner by the said delay,

as is more fully described above in this petition, and thereby deprived the Petitioner of due process rights guaranteed by the Fourteenth Amendment to the United States Constitution and Article 1, Section 6 of the Alabama Constitution of 1901.

(6). The Petitioner was denied due process of law and the prosecution of him was rendered fundamentally unfair in violation of rights guaranteed to the Petition by the Fourteenth Amendment to the United States Constitution and Article 1, Section 6 of the Alabama Constitution of 1901, because the State failed to disclose and correct false evidence presented against him. The facts on which this ground is based are as follows:

(a). The State presented the testimony of Vickie Landers Goolsby who testified:

i. She did not tell the Petitioner that her father had molested her when she was 10 years old.

ii. She had no relationship with ABI Agent William Rhegness other than a professional relationship.

(b). The state presented the testimony of William Rhegness who testified:

i. He did not have an affair with State's witness Vickie Landers Goolsby.

ii. He did not go to the home of State's witness Vickie Landers Goolsby on Wares Ferry Road.

(c). The said testimony was false and was known by the State to be false.

(d). State witness Vickie Landers Goolsby, for reasons personal to her, conspired with the prosecution in an attempt to convict the Petitioner of the charge against him.

<u>B.</u>

Newly discovered material facts exist which require that Petitioner's conviction be vacated by the Court. The newly discovered material facts and their significance to this case are as follows:

(1). The newly discovered evidence is a pair of eye glasses and an eye glasses case that belonged to Robert Landers, Sr., the deceased, which were given to Lenita Jarrell Landers, the wife of the deceased, by Sheriff Bill Franklin, the Sheriff of Elmore County, Alabama, on the night of February 12, 1992 at the location where the body of the deceased was found. These eye glasses and eye glasses case are presently in the possession of Lenita Jarrell Landers and have been in her possession since February 12, 1992, and their condition is unchanged from the condition they were in when given to her by Sheriff Franklin on February 12, 1992.

(2). Neither the Petitioner nor his attorneys had knowledge of the existence of the said eye glasses and the said eye glasses case, or the unknowing possession of them by Lenita Jarrell Landers, at the time of Petitioner's trial and neither was informed of the existence of the said glasses and case until well after the completion of Petitioner's trial and his conviction and sentence

and the ruling on his post-trial motion under Rule 24 of the Alabama Rules of Criminal Procedure.

(3). Neither the Petitioner nor his attorneys could have discovered the said evidence at an earlier time because the existence and location of the said newly discovered evidence was known only to Lenita Jarrell Landers, who did not disclose it to Petitioner or his attorneys until after the ruling on Petitioner's post trial motions and who, for a valid and legitimate reasons, had no recall of the existence and location of the said evidence until immediately before she disclosed the existence of the same after Petitioner's conviction and sentence and after his post-trial motion was denied.

(4). The significance of this evidence to the guilt or innocence of the Petitioner arises from the following:

(a). At Petitioner's trial in the trial court the State contended that the deceased, Robert Landers, Sr., died on February 12, 1992 as a result of homicide rather than an accident. The medical examiner first determined that the deceased was accidentally killed by the crushing impact of being run over by a track of a crawler tractor.  Later the State contended the death was a homicide and that the deceased met his death after receiving a blow by a blunt instrument on the left temple before he was run over by the tractor under whose track his body was found.  The State's prosecution theory, as is more fully described above in this petition, was that the deceased was struck on the left temple by a blunt instrument and killed or rendered unconscious and then

placed on the ground and run over by the tractor.

(b). The State sought to prove this prosecution theory of the manner in which the deceased met his death solely by the opinion testimony of Dr. James Lauridson, a medical examiner employed by the Department of Forensic Sciences. Dr. Lauridson's testimony and its critical significance to the prosecution theory is set out in some detail in Sub-Part A, above, in this petition and those allegations are incorporated by reference in this paragraph. Dr. Lauridson described an injury to the left temple of the deceased. He testified that in his opinion this injury was produced by a blunt instrument which struck the temple with substantial force. The State produced no evidence of the existence of a blunt instrument that was connected to an injury on the body of the deceased. Dr. Lauridson testified that he observed injuries to the left temple that were substantially "vertical" fractures whereas the other fractures to the deceased's skull were "horizontal". In Dr. Lauridson's opinion this difference was deemed significant and confirmatory of his opinion and theory that the deceased was struck on the temple with a blunt instrument before he was run over by the tractor.

(c). Critical to the State's prosecution theory as presented by Dr. Lauridson's opinions was a pair of eye glasses with one lens missing that the State offered, and was admitted, into evidence as State's Exhibit 10. The State presented these eye glasses through the testimony of Sheriff Bill Franklin, the Sheriff of Elmore County and one of the first law enforcement officers on

the scene after the deceased's body was found on the evening of February 12, 1992. Sheriff Franklin testified that he found no eye glasses at the scene on the night of February 12, 1992. Franklin testified that these eye glasses (Exhibit 10) were found at the scene on the next day, February 13, 1992, and that they were observed only after the tractor which was found resting on the deceased's body was moved on February 13, 1992. To support his opinions about the manner in which the deceased met his death Dr. Lauridson relied heavily on the eye glasses (Exhibit 10) Sheriff Franklin identified. Dr. Lauridson described an experiment he performed with the eye glasses (State's Exhibit 10) Sheriff Franklin had identified. He testified that he reconstructed the shattered bones of the deceased's skull and placed on the skull the eye glasses (Exhibit 10), which he had been told were retrieved in the area where the deceased's body was found. Dr. Lauridson testified that the left leg of these eye glasses was bent, a fact that is observable from looking at them. Dr. Lauridson opined that the deformity in the left leg of the glasses matched the injury on deceased's left temple that he had described. From his conclusion that the bent leg of the glasses (State's Exhibit 10) matched the wound on the temple, Dr. Lauridson opined that these glasses (Exhibit 10) established factually his theory that the deceased was struck with a blunt instrument at this spot on the temple. In the most dramatic and forceful part of his testimony Dr. Lauridson supported his conclusion with a photograph of his experiment with the eye glasses with the bent leg resting upon the deceased's

reconstructed skull in the manner in which the eye glasses would generally rest if worn by the deceased. Dr. Lauridson emphasized that these eye glasses (State's Exhibit 10) proved the theory of a blow to deceased's left temple by a blunt instrument administered by some individual before the deceased was run over by the tractor.

(d). Dr. Lauridson's prosecution theory could be valid only if these particular glasses (Exhibit 10) were the eye glasses of the deceased and he was wearing them at the time he was struck. The eye glasses which Dr. Lauridson related to the theoretical critical injury to the left temple he described in his opinion testimony did not have an undisputed or credible predicate as being the deceased's glasses or being glasses related to his injury. No witness testified that the deceased was wearing these glasses on February 12, 1992. These glasses, by the State's testimony, were not found and were not retrieved from the location where the deceased's body was found until February 13, 1992, the next day after the body was discovered. In the interval between the time deceased's body was found on February 12, 1992 and the discovery of these glasses the scene had not been secured and many persons had been in the area and had walked over the scene where the deceased's body was found.

(e). The eye glasses offered into evidence by the State (State's Exhibit 10) were identified by only one witness, whose credibility was seriously challenged, as being the eye glasses of the deceased and no witness testified these were the eye glasses he wore on February 12, 1992. They were not shown by any

optometrical evidence to have lenses prescribed for the deceased. These eye glasses (State's Exhibit 10) had rather thick plastic frames. The eye glasses ordinarily worn by the deceased, according to the testimony of several witnesses, and as verified by several photographs, were wire frame glasses identical to the newly discovered evidence.

(f). The State's effort to connect the eye glasses it offered in evidence (State's Exhibit 10) to the deceased by testimony that there was blood on these eye glasses and that an analysis of this blood by the ABO grouping analysis showed that the blood on the said eye glasses was Type O blood and that the deceased had Type O blood is a total non sequitur. It does not prove a connection between the deceased and these glasses. Merely showing that the blood type of the blood found on the glasses was Type O does not prove it was the deceased's blood. Type O is the most common blood type, so the State's evidence does not exclude the possibility that it was the blood of approximately half the population. No further or more definitive analysis, such as DNA, was made of this blood specimen recovered from State's Exhibit 10. The State used all of this blood specimen, or disposed of any unused portion of it, and no opportunity was afforded the Petitioner to have the blood spot on the said eye glasses analyzed by a more definitive method to determine if it was in fact the blood of the deceased.

(g). The newly discovered evidence shows that the eye glasses which were the crux of the prosecution's theory (State's Exhibit 10) were not eye glasses of the deceased or eye glasses he was wearing at the time of his death.  The newly discovered evidence totally undermines the State's prosecution theory for its case against the Petitioner.

(5). After the conclusion of the Petitioner's trial the Petitioner learned there was concrete and conclusive evidence that the eye glasses used by the State at his trial (State's Exhibit 10) to prove the State's prosecution theory were not the eye glasses of the deceased when he later learned that the real eye glasses of the deceased, which had been given to the wife of the deceased at the location where his body was found on the evening of his death, were in the possession of the deceased's wife, Lenita Jarrell Landers.

(6). The fact that these eye glasses, the newly discovered evidence, were in the possession of Mrs. Landers was not known by the Petitioner nor Petitioner's counsel at the time of his trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, and could not have been discovered by any of those times through the exercise of reasonable diligence.

(7). This newly discovered evidence (the eye glasses now in the possession of Mrs. Landers) are not merely cumulative to other facts that were known and do not amount to mere impeachment evidence.

(8). If this evidence had been known, i.e., if these eye glasses had been available for use as evidence at the time of

-28-

Petitioner's trial, the results of the trial would probably have been different, in that:

(a). This evidence establishes that the eye glasses placed in evidence by the State (State's Exhibit 10) were not eye glasses worn by the deceased on February 12, 1992 and that the use of this evidence (State's Exhibit 10)to support the State's prosecution theory, and an inference that the deceased was struck on the left temple by a blunt instrument prior to being run over by the tractor, was a use of false evidence and provided a false basis for any inference the jury could draw. The newly discovered evidence refutes this critical portion of the State's prosecution theory by tangible physical evidence.

(b). This newly discovered evidence is consistent with the report and testimony of Deputy Townsend, one of the first law enforcement officers to the scene where deceased's body was discovered. Deputy Townsend filed a report in which he stated that eye glasses were observed by him near the body of the deceased on the night of February 12, 1992. He identified this report in his trial testimony and testified that he did not retrieve the glasses. Deputy Townsend testified at trial that he was not sure about his observations on the night of February 12, 1992 and that after talking to Sheriff Franklin he thought he may have seen only a glasses case near the body. The testimony and report of Deputy Townsend, which is now corroborated by the newly discovered evidence, contradicts the testimony of Sheriff Franklin and other officers that no eye glasses or eye glasses case were observed or

retrieved from the scene on Friday 12, 1992.

(c). This newly discovered evidence further contradicts the testimony of State's witness Sheriff Franklin that no eye glasses were found or retrieved at the scene, near the body of deceased, on the night of February 12, 1992 and before there was opportunity for the scene to be disturbed.

(d). The State's supporting evidence for its prosecution theory - that the deceased was struck on the left temple with a blunt instrument which bent the leg of the glasses he was wearing at the time - is thoroughly refuted by the newly discovered evidence.

(9). The newly discovered evidence establishes that Petitioner is innocent of the crime for which he was convicted. To allow Petitioner's conviction to stand without the opportunity for offering this newly discovered evidence in his defense is a violation of rights guaranteed to the Petitioner by the Sixth and Fourteenth Amendments to the United States Constitution and by Article 1, Section 6 of the Alabama Constitution of 1901.

(10). Petitioner submits in support of this ground for this petition the affidavit of Lenita Jarrell Landers, which is attached hereto as Exhibit 1 and incorporated by reference herein. Petitioner will present other evidence in support of this ground for this petition at the hearing of this petition, including the eye glasses and eye glasses case hereinabove referred to in this petition.

13.  Other than an appeal to the Alabama Court of Criminal Appeals and petition for writ of certiorari in the Supreme Court of Alabama, as previously stated, the Petitioner has filed no petition in State Court attacking his conviction or sentence.

14.  Petitioner has no petition or appeal now pending in any court, either State or Federal, as to the judgment under attack.

15.  The name and address of each attorney who represented Defendant at the following stages of the case that resulted in the judgment under attack were:

a.  At preliminary hearing - No preliminary hearing.

b.  At arraignment and plea - William N. Clark, 940 Financial Center, 505 20th Street North, Birmingham, Alabama.

c.  At trial - William N. Clark, 940 Financial Center, 505 20th Street North, Birmingham, Alabama.

d.  At sentencing - William N. Clark, 940 Financial Center, 505 20th Street North, Birmingham, Alabama.

e.  On appeal – William N. Clark, 940 Financial Center, 505 20th Street North, Birmingham, Alabama.

16.  Petitioner was sentenced on one count of one indictment.

17.  Petitioner has no future sentence to serve after the completion of the sentence imposed by the judgment under attack.

18.  This petition is being filed on ___*May 31*___, 2005.

WHEREFORE, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

DATED this _____ day of May 2005.


## PETITIONER'S VERIFICATION

I swear and affirm under penalty of perjury that the foregoing is true and correct. Executed on this the 27ᵗʰ day of May , 2005.

*Mark Samuel Landers*

Mark Samuel Landers
Petitioner


Sworn to and Subscribed before me this the 27ᵗʰ day of May , 2005.

Notary Public


William H. Mills
ASB-9841-M75W

and

William N. Clark
ASB-1260-C54W
REDDEN, MILLS & CLARK
940 The Financial Center
505 – 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX

Attorney for Petitioner
Mark Samuel Landers

-32-
35

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama and the District Attorney for the 19th Judicial Circuit of Alabama by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the  31st  day of May 2005.

Of Counsel for Petitioner


Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

STATE OF ALABAMA    )
                    )
_____COUNTY )

## AFFIDAVIT OF LENITA JARRELL LANDERS

Before me, the undersigned authority in and for said County and said State personally appeared Lenita Jarrell Landers, who is known to me, and who by me first duly sworn deposes and says as follows:

My name is Lenita Jarrell Landers. I live at 3660 Narrow Lane Road, Montgomery, Alabama. I have lived at this address since October 1, 1971.

Robert Landers, Sr., and I were married in 1955. We lived together as husband and wife until his death on February 12, 1992. Mark Samuel Landers is a child born of this marriage.

I testified as a witness at the trial of Mark Samuel Landers in Elmore County, Alabama in May 1997 in which Mark Landers was charged with killing his father. My testimony at that trial was correct according to my best recollection and belief at the time I testified. However, as will be explained below, subsequent events and the discovery of certain tangible evidence have proven that portions of my testimony at that trial was some what incomplete and inaccurate and incorrect in certain respects and that the testimony of certain witnesses for the State was incorrect.

On the night on which my husband died I went to the location where his body was found. His sudden death was a frightful and shocking occurrence. Because of the stress of this tragic event I know that my mental focus as to details of what occurred while at the scene are not complete and my unaided memory of these details

37

was not complete at the time of the trial.  The fact that it was dark at the time and raining added to the stressful situation and the general confusion and the inability to focus on and recall details.

Some of the details of the events of that evening, however, remain vivid in my memory forever in spite of efforts to try to forget them because of the sadness associated with them.  Some of the details of what happened that evening never completely registered with or made a readily recallable impression on my memory because of the normal preoccupation, and something like a numbness, that such a sad and tragic event causes.  I have, and have at all times following that night had, a definite and clear recollection of Sheriff Franklin coming to the car or truck near the scene in which I was sitting to be out of the rain and expressing his condolences to me about the death of my husband.  I considered this to be a noble and respectful act on his part, and this, I am sure, caused it to register in my consciousness and memory.  I have a definite recollection that at the time he expressed his condolences Sheriff Franklin also asked me if I would like to have my husband's rings, wallet and glasses.  I recall replying that I would like to have the rings and wallet (or billfold) and that the glasses (which I understood or believed were likely broken) would be of no concern.  At that time Sheriff Franklin handed some items to me through the window of the vehicle. The items were separate and not in a container such as a bag or envelope.  I took them without closely examining them at the time and put them in the pocket of the coat I was wearing.  Because of

a refreshed recollection, brought about by the events set out below, I now remember and know that what Sheriff Franklin handed to me through the window of the vehicle on February 12, 1992 was 2 rings belonging to my husband, my husband's wallet, and my husband's glasses case with his wire rimmed glasses inside it.

I next looked at the articles Sheriff Franklin gave me sometime later that night after I arrived at my home. I recall taking all of the articles Sheriff Franklin handed me from the coat pocket and putting them in the drawer of a dresser where rarely used clothing items were kept. I do not recall ever looking in that drawer again after the night of my husband's death until sometime either shortly before or during Mark's trial. I do not recall being asked about my husband's glasses or about having or knowing where they were at any time before or during the trial. Had I been asked about the glasses before actually seeing them again in the dresser drawer and recognizing them I would not have been able to recall or been able to inform anyone of their existence or whereabouts because I had tried to, and had succeeded, in blocking out of my memory many of the details of the night of February 12, 1992, including the fact that Sheriff Franklin had given me certain items that night, including the glasses.

I testified at Mark's trial, which was over five years after February 12, 1992, that sometime after the tractor was moved off my husband's body Sheriff Franklin came to where I was seated in a motor vehicle out of the rain and spoke to me. I testified that he expressed his condolences and that he inquired if I wanted my husband's wallet and rings and glasses. I testified that I told

him that I would take the rings and wallet but that the broken glasses were of no use. I testified that Sheriff Franklin gave me the wallet and the rings, which he did. I further testified that Sheriff Franklin did not show me the glasses he referred to and I do not recall that he did actually show me glasses in the sense of exhibiting them to me. I was not asked at the trial if Sheriff Franklin actually gave me the glasses he mentioned or if I actually received the glasses he mentioned from him at that time. I did not think or reflect any further about the glasses at the time of the trial. At that time I had not seen the glasses or the glasses case since February 12, 1992. I believed I had accurately answered the questions asked me. The main focus of the questions asked me at the trial related to the billfold and its contents, especially the driver's license.

I had not thought about or been asked about glasses during the over 5 years between my husband's death and the trial. I knew at the time I testified at the trial that Sheriff Franklin had handed some objects to me through the open window of the motor vehicle. I also knew and recalled at that time that he had handed me my husband's rings and wallet because I had recently found these items and had brought them to court. At that time I had not found the glasses and my memory was not refreshed by looking at them as my memory was refreshed about the rings and wallet. Also, my memory of the details of the night of February 12, 1992 was now clouded by the passage of over 5 years since the event.

Sometime either shortly before or during the trial Mark's lawyer asked me if I could locate photographs of my husband. I was

specifically asked if I could find a driver's license, which would have a photograph of him.   At that time I reasoned that my husband's driers's license should be in his wallet.  The location of his wallet was unknown to me when I was asked to look for his driver's license abut I began searching for it.  I went to the particular dresser, and for the first time that I can recall after placing the items Sheriff Franklin had given me in that drawer, opened the drawer to look for the wallet.  I saw the wallet and saw two rings lying on top of it.  Upon seeing the wallet and rings my memory was refreshed that the wallet and the rings were items Sheriff Franklin had given me on the night of February 12, 1992. I did not look beyond the wallet and did not see anything else at that time that reminded me of the tragic night.  I removed the rings and the wallet from the dresser and looked into the wallet for a driver's license.  I located the driver's license and turned it over to Mark's lawyer, along with the wallet and the rings.  I made no further search of the dresser drawer at that time because my purpose in looking into it was to find the wallet, which I readily found because it was on top and was not obscured by any of the drawer's other contents.

The rings and the wallet and the wallet's contents, including the driver's license, were presented and identified during my testimony at the trial.  I do not recall that I was asked any questions about them other than the fact that they were given to me by Sheriff Franklin on the night my husband died.  Following my testimony at the trial the wallet and rings were returned to me. I took them home and for some period of time they remained in the

41

bag I carried them in to court.

About 30 days more or less after Mark was sentenced I decided to return the wallet and rings to the dresser drawer where they had been placed by me on the night my husband met his death. When I opened this dresser drawer, for the second time in over 5 years, I saw an article I recognized which was partially obscured by cloth items in the dresser drawer. It was in a location that placed it underneath the wallet I had removed in my earlier search for my husband's driver's license. It was partially, but not completely, obscured by other items that were in the drawer because it was between these items.

The item I recognized was the glasses case my husband regularly carried with him and used to hold his glasses when he was not wearing them. I opened the glasses case and found a pair of wire rimmed glasses with bent frames. These were the glasses my husband regularly wore and used in the period immediately before his death and are the glasses he was wearing in several photographs which were introduced at the trial. The glasses case had what appeared to be mud or mud stains on it.

At that time, upon seeing the glasses case and glasses, I recalled for the first time since February 12, 1992 that Sheriff Franklin actually handed me my husband's glasses case with the glasses in it at the same time he handed me the wallet and the rings. I now recall that I placed all of these items into the dresser drawer at the same time. I never looked at them again following that night when I placed them in the drawer. I never told anyone about receiving the glasses case with the glasses. No

42

one had access to the dresser where the glasses, wallet and rings were stored other than myself. I know that Mark Landers never saw this glasses case or these glasses after I placed them in this drawer and was never told the glasses were there.

The death of my husband was a very sudden and a very tragic and distressing occurrence. The trial of Mark Landers occurred over five years after his death. I am sure that in this interval of time I attempted to erase from my mind and memory the details of that sad and tragic night and I am sure I succeeded to some extent in doing so. Only the sight of the glasses case in the dresser drawer at the time I went to replace the wallet and rings regenerated in my memory the long forgotten occurrence where Sheriff Franklin gave me the items at the scene of my husband's death, including the glasses case and glasses, and my placing them in the dresser drawer and out of sight so as not to be reminded of that sad and tragic occasion.

_Lenita Jarrell Landers_
Lenita Jarrell Landers

Sworn to and subscribed before me this the 6th day of May, 2005.

_____
Notary Public

43

FILED

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

2005 MAY 31 PM 2 31

LARRY DOZIER
CIRCUIT CLERK ELMORE COUNTY

MARK SAMUEL LANDERS,                    )
                                        )
Inmate Number: AIS #193732             )
Place of Confinement: St.Clair          )
      Correctional Facility,            )
      Springville, Alabama              )
County of Conviction: Elmore            )
                                        )
      Petitioner                        )
                                        )
VS.                                     )    CASE NO.: *CC96-421*
                                        )
STATE OF ALABAMA,                       )
                                        )
      Respondent                        )

## MOTION FOR REASSIGNMENT OR FOR TRANSFER OF PROCEEDING

COMES NOW the Petitioner, Mark Samuel Landers, pursuant to Rule 32.6(d) of the Alabama Rules of Criminal Procedure, and moves the Court to assign or transfer the proceeding based on the petition filed by Petitioner for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure from the judgment and sentence in Case Number CC-96-421 in the Circuit Court of Elmore County, Alabama to a different Judge from the Judge who sentenced the Petitioner in the said Case Number CC-96-421 in said Court. Petitioner avers that there is good grounds for the reassignment or transfer of this proceeding, as follows:

1.    A different Judge will be able to more objectively and judiciously hear and determine the issues raised by the petition filed by Petitioner for relief under Rule 32 of the Alabama Rules of Criminal Procedure.

2.    A different Judge would be more likely to be fair and impartial in a hearing and determination of this petition.

3.    This petition raises issues regarding the propriety of rulings of the Judge who sentenced the Petitioner in this said Case Number CC-96-421.


William H. Mills
ASB-9841-M75W
Attorney for Petitioner
Mark Samuel Landers
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX


## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama and the District Attorney for the 19th Judicial Circuit of Alabama by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the _3/st_ day of May 2005.


Of Counsel for Petitioner

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

IN THE CIRC T COURT OF ELMORE COUNTY, LABAMA

MARK SAMUEL LANDERS, )
)
Inmate Number: AIS #193732 )
Place of Confinement: St.Clair )
        Correctional Facility, )
        Springville, Alabama )
County of Conviction: Elmore )
)
        Petitioner )
)
VS. )
)
STATE OF ALABAMA, )
)
        Respondent )

FILED

2005 MAY 31 PM 2 31

LARRY DOZIER
CIRCUIT CLERK ELMORE COUNTY

CASE NO.: _CC96-421_

## MOTION TO ALLOW TAKING OF DEPOSITIONS AND OTHER DISCOVERY

COMES NOW the Petitioner, Mark Samuel Landers, pursuant to Rule 32.4 of the Alabama Rules of Criminal Procedure, and moves the Court to enter an order permitting the Petitioner to take oral depositions in this case for discovery and for use at trial and for other discovery, including compulsory production from the State or third parties of documents and tangible things for inspection by the Petitioner or his counsel.    In support of this motion the Petitioner avers:

1.    Certain witnesses whose testimony will be required at a hearing of the petition filed by the Petitioner reside outside the State of Alabama or may otherwise not be available as witnesses at a hearing of the said petition.

2.    Information critical to this petition is known to persons who will not voluntarily provide such information to the Petitioner or his counsel and depositions and compulsory process to compel the attendance of witnesses is necessary to obtain such information.

-1-

46

3.    Documents and tangible things pertinent to the issues of this petition are in the custody or control of parties who will not voluntarily disclose or reveal them to Petitioner or his counsel and he will be unable to discover or obtain such documents or tangible things without compulsory process.

4.    Depositions may be a more efficient method of presenting some of the testimony that will be presented in support of Petitioner's petition.

William H. Mills
ASB-9841-M75W
Attorney for Petitioner
Mark Samuel Landers
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX

### CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama and the District Attorney for the 19th Judicial Circuit of Alabama by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the 31st day of May 2005.

Of Counsel for Petitioner

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

-2-  47

# IN THE CIRCUIT COURT OF _Elmore_ COUNTY, ALABAMA

_Mark Samuel Landers_, )
_Petitioner_      Plaintiff )
                              )
                              )    Case No. _CC-96-421_
v.                            )
                              )
                              )    FILED
_State of Alabama_, )
_Respondent_      Defendant )    JUN - 7 2005
                              )
                                   LARRY DOZIER
                                   CIRCUIT CLERK ELMORE COUNTY

## ORDER ON MOTION

This matter is before the Court on the Motion of _Petitioner_

_for reassignment or for transfer of proceeding_

Upon consideration the Court finds that the Motion is ___not___ well taken. It is therefore ORDERED, ADJUDGED and DECREED that the Motion be and is hereby _____ ___DENIED___.

The _____ is allowed _____ days from this date in which to _____.

_____

DONE and ORDERED this ___7th___ day of ___June___, 20_05_.

___Geo. B. Best___
Circuit Judge — 19th Judicial Circuit

copies to:
    Plaintiff
    Defendant

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

MARK SAMUEL LANDERS,     )
                               )
Inmate Number: AIS #193732   )
Place of Confinement: St.Clair )
     Correctional Facility,     )
     Springville, Alabama      )
County of Conviction: Elmore  )

     Petitioner             )

VS.                         )  CASE NO.: CC 96-421

STATE OF ALABAMA,        )

     Respondent           )



FILED
JUN 10 2005
LARRY DOZIER
CIRCUIT CLERK, ELMORE COUNTY

## MOTION FOR LEAVE TO AMEND

COMES NOW the Petitioner, Mark Samuel Landers, and moves the Court for leave to amend the Petition for Post Conviction Relief heretofore filed in this cause by filing the proposed amendment attached hereto as Exhibit 1.

DATED this _____5th_____ day of June 2005.


_____
William H. Mills
ASB-9841-M75W


              and


_____
William N. Clark
ASB-1260-C54W
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX

Attorney for Petitioner
Mark Samuel Landers

49

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama and the District Attorney for the 19th Judicial Circuit of Alabama by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the ___5th___ day of June 2005.

Of Counsel for Petitioner


Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama and the District Attorney for the 19th Judicial Circuit of Alabama by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the _____ day of June 2005.

Of Counsel for Petitioner

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA



MARK SAMUEL LANDERS,                     )
                                         )
Inmate Number: AIS #193732               )
Place of Confinement: St.Clair           )
     Correctional Facility,              )
     Springville, Alabama                )
County of Conviction: Elmore             )
                                         )
     Petitioner                          )
                                         )
VS.                                      )    CASE NO.: *CC 96-421*
                                         )
STATE OF ALABAMA,                        )
                                         )
     Respondent                          )

FILED

JUN 10 2005

LARRY DOZIER)
CIRCUIT CLERK, ELMORE COUNTY

## AMENDMENT TO PETITION FOR POST-CONVICTION RELIEF

COMES NOW the Petitioner, Mark Samuel Landers, and amends his petition heretofore filed in this cause by adding to Part 12 (or Paragraph 12), Sub-part A, the following:

(7). The Petitioner was denied due process of law and the prosecution and conviction of him was rendered fundamentally unfair and in violation of rights guaranteed to the Petitioner by the Fifth Amendment, Sixth Amendment, and Fourteenth Amendment to the United States Constitution and Article 1, Section 6 of the Alabama Constitution of 1901 in that the Petitioner was not sufficiently apprised by the indictment returned against him of the charge the State intended to prove against him and could not have been prepared to meet the said charge and defend against it and was denied the right to be heard on the specific charge of which he was accused because the proof offered by the State in support of the charge made in the indictment against the Petitioner varied from

-1-

the allegations of the indictment.   The facts on which this ground

is based are as follows:

(a). The indictment returned against the Petitioner

by the Grand Jury alleged:

> The Grand Jury of said County charge that before the
> filing of this Indictment, MARK SAMUEL LANDERS whose true
> name is to the Grand Jury unknown, otherwise as stated,
> did, intentionally cause the death of Robert R. Landers,
> Sr., by running over and crushing him with a bulldozer,
> for a pecuniary or other valuable consideration, to-wit:
> the proceeds of a life insurance policy on Robert R.
> Landers, Sr., in violation of Section 12A-5-40(a)(7),
> Code of Alabama, 1975, against the peace and dignity of
> the State of Alabama.

(b). The proof offered by the State in support of

the said indictment was that the death of the decedent was caused

by "blunt trauma as a result of being struck on the left side of

the head" by a blunt instrument.

(c). By reason of the said variance between the

allegations of the indictment and the proof presented at trial the

Petitioner:

i.   was not apprised of and could not have

been sufficiently prepared to defend against the evidence presented

by the State as to the cause of death of the decedent and the

alleged conduct of the petitioner which caused the death of the

decedent;

ii.   was not given the opportunity to be heard

on the specific accusation made against him as to how he allegedly

caused the death of the decedent;

iii. the said variance between the allegations

of the indictment and the proof offered by the State was a fatal variance; and

   iv.   these irregularities denied the Petitioner his due process rights, as aforesaid.

   (8). The Petitioner was denied due process of law and the prosecution and conviction of him was rendered fundamentally unfair and in violation of rights guaranteed to the Petitioner by the Fourteenth Amendment to the United States Constitution and Article 1, Section 6 of the Alabama Constitution of 1901 in that the evidence presented against the Petitioner did not support a conclusion, beyond a reasonable doubt, that the Petitioner caused the death of the decedent, and, therefore, his conviction was without the constitutionally required evidentiary support.


William H. Mills
ASB-9841-M75W

   and


William N. Clark
ASB-1260-C54W
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX

Attorney for Petitioner
Mark Samuel Landers

-3-

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama and the District Attorney for the 19th Judicial Circuit of Alabama by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the ____ day of June 2005.

Of Counsel for Petitioner

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

-4-

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA



Mark Samuel LANDERS,　　　　　)
　　　Petitioner,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　) CC-96-421.60
　　　　　　　　　　　　　　　　　　)
STATE of Alabama,　　　　　　　　)
　　　Respondent.　　　　　　　　　)

FILED

JUL 1 2 2005

LARRY DOZIER
CIRCUIT CLERK, ELMORE COUNTY

## STATE'S MOTION TO DISMISS

Comes now the State, by and through the Attorney General for the State of Alabama, and responds to Landers's Rule 32 petition, as well as his June 10, 2005 amendment to the petition. As further explained in the Argument portion of this Motion, the State requests this Court summarily deny Landers's claims as precluded from review.

## PROCEDURAL HISTORY

### A. Conviction and Direct Appeal

1. Mark Landers (Landers) was convicted on May 9, 1997 of murdering his father; or, more specifically, convicted of murder made capital as committed for pecuniary gain or other valuable consideration under Section 13A-5-40(a)(7) of the Alabama Code (1994). On May 19, 1997, the jury recommended that Landers receive a sentence of life without parole, which Elmore County Circuit Court Judge John Bush accepted on July 1, 1997.

2. Landers filed a motion seeking a new trial and, argued, in addition to those grounds later argued on appeal, that the court erred by "denying the defense Motion to Suppress and in overruling Defendant's objection to the

introduction into evidence of the eyeglasses which allegedly belonged to the Defendant's father" on grounds of chain of custody, lack of predicate, and "no scientific tests" conducted to support conclusions drawn from the evidence. (C. 535[1])

3. Landers appealed his conviction and argued, among other claims: 1) The evidence was insufficient to sustain his conviction (Ex. B[2], pp. 1-15); 2) the trial court erred by denying his motion to dismiss the indictment based on the State's four-year delay before indictment (Ex. B, p. 20); 3) the trial court should have suppressed testimony from Dr. James Lauridson involving the vertical fractures on Landers's father's left temple because of the destruction of his father's skull and Dr. James Lauridson's initial autopsy report (Ex. B, pp. 15-18); 4) the court should have suppressed testimony from Catherine McGeehan involving blood on Landers's father's eyeglasses and that the blood matched the blood type of his father because the sample of blood discovered on the eyeglasses was expended during testing and because the vial of blood received from Dr. Lauridson to cross-type was destroyed (Ex. B, p. 19); and, 5) the court erred by refusing to continue closing arguments (Ex. B, pp. 35-38).

---

[1] The State references the clerk's record on appeal and has attached a copy of Landers's motion for a new trial as Exhibit A to this Motion to Dismiss.
[2] The State has attached a copy of the December 15, 2000 unpublished opinion by the Court of Criminal Appeals as Exhibit B to this Motion to Dismiss.

2

4. Landers's conviction became final when the Supreme Court of Alabama quashed the writ of certiorari on June 18, 2004.

B. Present Rule 32 petition

5. Landers filed the present, his first, Rule 32 petition, in this Court on May 31, 2005.  He filed an amendment to the petition on June 10, 2005.

## STATEMENT OF THE ISSUES RAISED IN THE PETITION

6. As the State understands Landers's petition and amendment, he asserts 10 grounds for relief.  Those include:

   a. The State failed to turn over blood specimens taken from the frame of his father's eyeglasses, in violation of Brady v. Maryland, 373 U.S. 83 (1963), and general due process rights (Petition, pp. 6-12);

   b. The State failed to t urn over blood specimens taken from the "upper portion of the [eyeglass] lens[,]" in violation of Brady, as well as Landers's due process rights (Petition, pp 12-14);

   c. The State failed to disclose the medical examiner's notes, which were referred to as the "first autopsy report" at trial, in violation of Brady, as well as Landers's due process rights (Petition, pp. 14-16);

   d. Landers was denied his due process rights when the trial court refused to postpone closing arguments until after the funeral of Landers's lead counsel (Petition, pp. 16-17);

3

e.  Landers was denied due process of law and his trial was unfair
because the State delayed indictment (Petition, pp. 17-21);

f.  He was denied due process and his trial was unfair because the State
"failed to disclose and correct false evidence" (i) from Vickie Goolsby
regarding alleged molestation by her father and the denial of a
relationship with ABI Agent William Rhegness and (ii) from William
Rhegness that he did not have an affair with Ms. Goolsby and did not
visit her home (Petition, pp. 21-22);

g.  Landers is in possession of "newly discovered" evidence in the form of
eyeglasses in possession of his mother, allegedly given to her by
Sheriff Franklin on February 12, 1992, and "unknown" to the defense
until "well after the completion of Landers's trial and his conviction
and sentence" (Petition, pp. 22-30; Exhibit 1);

h.  The "newly discovered evidence" establishes Landers's innocence
(Petition, p. 30);

i.  The charge in Landers's indictment, that he was killed by being
crushed by a bulldozer, allegedly varies from the evidence presented
at trial that his father was struck in the head (Amendment to Petition,
pp. 1-3); and,

j.  The evidence presented at trial was insufficient to support his
conviction (Amendment, p. 3).

4

7. As explained in the following paragraphs, Landers's claims are precluded from review because they either were or could have been raised at trial or on direct appeal.

## ARGUMENT

A. <u>Landers could have challenged the blood samples discovered on the frame of Landers's father's eyeglasses at trial or on appeal and, for that reason, the claim is precluded from review.</u>

8. Landers argues, as the first claim in his Rule 32 petition, that the State failed to disclose -- in violation of <u>Brady</u> -- blood sample evidence collected from the frame of his father's eyeglasses. (Petition, pp. 6-12) Facts from Landers's trial establish that this claim is precluded from review.

9. Rules 32.2(a)(3) and 32.2(a)(5) of the Alabama Rules of Criminal Procedure provide that a claim is precluded from review in post-conviction proceedings if the claim could have been raised at trial or on appeal. Landers was afforded the opportunity to question the samples before, during, and after trial and failed to do so, despite his decision to challenge other pieces of evidence. In fact, when Landers sought suppression of expert testimony based on the destruction of the blood on the glasses on direct apeal, the claim was ruled not preserved for appellate review. (Ex. B, p. 19)

10. The Court of Criminal Appeals has recognized that <u>Brady</u> claims can be raised during and post-trial and, for that reason, has ruled the claims precluded from review absent an assertion that the claim is based on newly-discovered evidence. <u>See</u> <u>Woods v. State</u>, CR-02-1959, 2004 WL 1909291,

5

at *9 (Ala. Crim. App. Aug. 27, 2004) (citing to <u>Williams v. State</u>, 782 So. 2d

811, 818 (Ala. Crim. App. 2000) for the proposition that "a *Brady* claim

raised in a Rule 32 petition is procedurally barred under Rule 32.2(a)(3) and

(a)(5) where the petitioner fails to assert that the claim was based on newly

discovered evidence"). Because Landers does not allege or establish that his

<u>Brady</u> claim relies on new evidence, the argument is precluded from review.

     B. <u>Because Landers could have objected to the absence of blood samples related to the "upper portion" of Landers's father's eyeglass "lens" at trial, the claim is precluded from review.</u>

11.   As his second ground for post-conviction relief, Landers contends that, in

violation of <u>Brady</u>, the State failed to turn over blood specimens taken from

the "upper portion" of his father's eyeglass "lens[.]" (Petition, pp 12-14)

This claim, like his first addressed above, is precluded from review.

12.   Landers admits in his petition that the blood sample he claims was

withheld was visible in the State's photograph that was admitted at trial.

(Petition, p. 13) Because the underlying information was available to

Landers at trial, he could (and should) have argued the <u>Brady</u> claim at trial

or in a post-trial motion. For that reason, Landers's claim that he was

deprived of the opportunity to obtain and test a blood sample from the

"upper portion" of his father's eyeglass lens is precluded under Rules

32.2(a)(3) and (a)(5). <u>See</u> <u>Woods</u>, 2004 WL 1909291, at *9.

6

C. Landers's argument that the State violated Brady by withholding the medical examiner's notes was litigated on direct appeal and is precluded from post-conviction review.

13.    As his third ground for post-conviction relief, Landers contends that the State, in violation of Brady, withheld the medical examiner's notes from his father's initial external autopsy.  (Petition, pp. 14-16)  It appears that Landers is attempting to relitigate the same (or an extremely similar) claim to one raised on direct appeal, which the Court of Criminal Appeals rejected. On direct appeal, Landers contended that the Supreme Court of Alabama had rejected a "bad faith" test to establish that the destruction of evidence constituted a due process violation; in his petition, however, Landers now claims that the State acted in bad faith.  Regardless of the test applied, because the underlying claim -- withholding of the notes -- has been litigated, Landers's claim is precluded from review.

14.    On direct appeal, the Court of Criminal Appeals ruled:

II. A.

First, Landers contends that the trial court should have suppressed the testimony of the medical examiner, Dr. James Lauridson, regarding . . . Dr. Lauridson's final autopsy report in which Dr. Lauridson concluded that the victim's death was a homicide.  According to Landers, . . . Dr. Lauridson's initial report prepared after the examination conducted on February 13, 1992, was destroyed by Dr. Lauridson, thus preventing him . . . from "fully convey[ing] to the jury the discrepancy between Dr. Lauridson's conclusion in his initial report that the victim's death was accidental and his subsequent conclusion after a full autopsy that the victim's death was a homicide.  (Landers's brief to this court, p. 150).

. . .

7

Contrary to Landers's contention in his brief to this court, neither this court nor the Alabama Supreme Court has rejected the bad faith requirement set out by the United States Supreme Court in <u>Youngblood v. Arizona</u>, 488 U.S. 51 . . . (1998). Rather, the Alabama Supreme Court has recognized that, in addition to those cases involving bad faith on the part of the State, there may be cases in which a defendant is denied due process by the loss or destruction of evidence even when the culpability of the State cannot be proven: if the evidence is so critical to the defense that its loss renders the defendant's trial fundamentally unfair. Here, Landers has not even alleged, much less proven, that the State acted in bad faith in destroying the evidence in question: therefore, we must determine whether . . . Dr. Lauridson's initial written report [was] so critical to Landers's defense that [its] destruction rendered his criminal trial fundamentally unfair.

. . .

The record reflects that there was ample evidence, mainly through Dr. Lauridson's own testimony, that Dr. Lauridson initially concluded that the victim's death was accidental and the jury was well aware of that fact. There could be no more persuasive evidence to "fully convey" Dr. Lauridson's conflicting conclusions than Dr. Lauridson's own testimony that he initially concluded that the victim's death was accidental and then subsequently changed that opinion to conclude that the victim's death was the result of a homicide. As noted above, Landers elicited testimony from Dr. Lauridson that his final conclusion was based not only on the autopsy, but also on information he had received from investigators, and Landers showed that the investigation into the victim's death, the results of which were considered by Dr. Lauridson in forming his opinion, was not conducted as thoroughly as possible and that numerous mistakes were made by investigators during that investigation. In addition, Landers introduced into evidence, without objection, the notes Dr. Lauridson made during his initial exam which included his initial conclusion that the death was accidental. Clearly then, the typewritten version of Dr. Lauridson's initial conclusion was merely cumulative of other evidence introduced by Landers regarding Dr. Lauridson's initial conclusion and was not so critical to his defense that its loss rendered his trial fundamentally unfair. The trial court did not err in denying Landers's motion to suppress Dr. Lauridson's final autopsy report.

(Ex. B, pp. 15-18)

8

15.    Rule 32.2(a)(4) of the Alabama Rules of Criminal Procedure precludes review of claims that were "raised or addressed on appeal[.]"  As shown above, the Court of Criminal Appeals squarely addressed the claim Landers asserts as a basis for post-conviction relief.  While he now asserts that the State's action was the product of "bad faith," it does not constitute "new evidence" that would remove his argument from preclusion.  <u>See</u> <u>Woods</u>, 2004 WL 1909291, at *9.  Accordingly, like his two previous claims, this fourth claim involving Dr. Lauridson's initial autopsy notes does not warrant post-conviction relief.

    D.  <u>Landers challenged the trial court's refusal to postpone closing arguments on direct appeal; therefore, he is precluded from repeating the argument as a ground for post-conviction relief.</u>

16.    Landers claims, as his fourth basis for post-conviction relief, that the trial court should have postponed closing arguments.  (Petition, pp. 16-17)  The record reflects that Landers argued this claim in his motion for a new trial (C. 529-31), as well as on direct appeal.  The Court of Criminal Appeals rejected Landers's claim:

<div align="center">VIII.</div>

Landers contends that the trial court erred in denying his motion to continue closing arguments in the case, scheduled to begin on Thursday, May 8, 1997, to the following Monday due to the death of defense counsel's father.

. . .

Landers contends that the trial court's denial of his motion to continue closing arguments denied him due process, his right to a fair trial, and his right to effective assistance of counsel.  Landers

<div align="center">64</div>

<div align="right">9</div>

claims that his counsel was "not emotionally fit to prepare properly for the argument or to argue the case" (Landers's brief to this court, p. 181), and that the trial court's statements to the jury regarding the death of counsel's father may have prejudiced the jury against him because they "left the jury with the impression that counsel voluntarily chose to return to court on Friday." (Landers's brief to this court, p. 185.)  Under the circumstances, however, we conclude that the trial court's actions were reasonable.

. . .

   The record reflects that the judge was obligated to be in Baldwin County to preside over a case as a special judge on the following Monday.  In fact, the case was continued for over a week after the guilt phase of the trial for the judge to fulfill his sentencing obligations in Baldwin County; after the jury returned its verdict on Friday, May 9, 1997, the sentencing phase of Landers's trial was postponed until Monday, May 19, 1997.  This is not a situation where the court could alter its own docket in order to accommodate the needs of defense counsel; rather the court would have had to alter the docket of another circuit court.  In addition, as the State correctly points out in its brief to this court, delaying closing arguments for some five days increased the danger of the jury being tainted by media accounts of the case. . . . Although we have concluded that Landers was not denied a fair trial due to media coverage, we nevertheless recognize the inherent danger that would have presented in delaying the trial some five days after the evidence had been presented but before closing arguments and jury deliberations, given the media coverage of the case.

   Furthermore, the record reflects that Landers was represented throughout his trial by two attorneys, Mr. Clark and Mr. Maxwell Pulliam.  Although Mr. Clark was lead counsel, there is simply no evidence that cocounsel, Mr. Pulliam, was not fully competent and prepared to give closing statements.  Mr. Pulliam was present throughout the trial, questioned several witnesses, and argued motions.  Although Landers contends that Mr. Pulliam "did not have sufficient trial experience" to make closing arguments (Landers's brief to this court, p. 180), he concedes in his brief to this court that Mr. Clark, "in retrospect upon denial of the request to adjourn to Monday, should not have appeared and [should have] left it to cocounsel to argue the case" (Landers's brief to this court, pp. 182-83), and that Mr. Clark presented arguments only because he was "torn by a sense of duty to a client" and

10

"chose to attempt to do his best for his client under the most trying of circumstances." (Landers's brief to this court, p. 183.)

. . .

Here, the majority of the guilt phase of Landers's trial was completed; closing arguments were all that was left. Although closing arguments are an important part of a trial, we simply do not believe that Landers "could not [have bee] adequately represented by [Mr. Pulliam]." <u>Jenkins v. State</u>, 384 So. 2d 1135, 1139 (Ala.Crim.App. 1979), cert. denied, 384 So. 2d 1141 (Ala. 1980).

. . .

Accordingly, under the circumstances presented here, we find that the trial court did not abuse its discretion in denying Landers's motion for a continuance.

(Ex. B, pp. 35-38)

17.    Considering that Landers "raised" the identical claim now asserted as a

basis for post-conviction relief and this Court, as well as the Court of

Criminal Appeals, has "addressed" the claim, the argument is precluded

from review under Rules 32.2(a)(2) and (a)(4) of the Alabama Rules of

Criminal Procedure.


E.    <u>Landers is precluded from relief on his "delay of prosecution"</u>
      <u>argument because the claim was addressed at trial and on appeal.</u>

18.    Landers contends, as his fifth ground for post-conviction relief, that he

was denied due process because the State "unduly delayed" his indictment.

(Petition, pp. 17-21) This is a repetition of a claim Landers asserted in his

motion for a new trial (C. 527), as well as on direct appeal.  It appears that

in his Rule 32 petition, Landers attempts to flesh out further evidence of

11

prejudice.  Notwithstanding his additional argument, the claim has already

been reviewed and is not subject to reconsideration in a post-conviction

proceeding.

19.    The Court of Criminal Appeals rejected Landers's claim:

<div align="center">II. D.</div>

Finally, Landers contends that [the] trial court should have dismissed the indictment against him based on the four-year preindictment delay.  According to Landers, the State intentionally delayed indicting him until 1996, some four years after his father died and after Dr. Lauridson had determined the death to be a homicide, thus depriving him of his right to due process.

. . .

The only allegation of prejudice in this case is the loss or destruction of several pieces of evidence.  However, as we have already determined that that evidence was not so critical to Landers's defense that its loss rendered his trial fundamentally unfair, it is clear that Landers has failed to show actual prejudice.
Likewise, Landers has failed to show that the delay in indicting him was deliberate on the part of the State in order to gain a tactical advantage.  Landers claims that the State's use of Landers's deposition from the case against MONY regarding the insurance proceedings at his trial shows that the State deliberately delayed indicting him in order to gain "access to evidence and testimony which it would otherwise have been unable to obtain." (Landers's brief to this Court, p. 155.)  However, the mere use of evidence obtained during the delay is not sufficient to show the State's malicious intent.
Moreover, "prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe the accused is guilty," and "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt."  United States v. Lovasco, 431 U.S. 783, 790-91 . . . (1977).  Although there is little in the record explaining the reason for the delay, it is clear from the record that the investigation into the victim's death did not end when Dr. Lauridson determined the manner of death, but continued not only for the four years leading up to the indictment, but also through the trial.  The case against Landers

was entirely circumstantial and we simply will not fault prosecutors for delaying indictments until they are satisfied that they have sufficient evidence to establish the accused's guilt beyond a reasonable doubt. Accordingly, the trial court did not err in denying Landers's motion to dismiss the indictment.

(Ex. B, p. 20)

20.   As shown above, both this Court and the appellate court have already reviewed the merits of Landers's claim and found it to lack merit. For that reason, under Rules 32.2(a)(2) and (a)(4), Landers is precluded from review of his fifth claim for post-conviction relief.


F.   Landers's challenge to testimony from Ms. Goolsby and Agent Rhegness should have been, and was, at least in part, developed at trial; for that reason, his claim is precluded from review.

21.   Landers complains, as his sixth ground for post-conviction relief, that his due process rights were violated because false evidence was presented at trial. First, Landers contends that Ms. Goolsby failed to divulge that "her father had molested her when she was 10 years old." (Petition, pp. 21-22) Landers provides absolutely no source for this information and fails to explain its relevance to his trial; logic would lead to the conclusion that, if actually abused, Ms. Goolsby would not have assisted the inquiry into her father's death. More importantly, Landers does not allege, other than a general claim of a violation of a constitutional right, how this information constituted "false evidence" or how the State (if it had any knowledge of this information or if it is true, which the State does not concede) had a duty to disclose this fact. For that reason, Landers has made only a "bare

13

allegation that a constitutional right has been violated," see Ala. R. Crim. P. 32.6(b), and is not entitled to relief from this Court.

22.   Second, Landers alleges that Ms. Goolsby and Agent Rhegness provided false information at trial regarding a "relationship" between them.  (Petition, p. 21)  As explained in the unpublished opinion of the Court of Criminal Appeals during Landers's direct appeal, Ms. Goolsby and Agent Rhegness merely concocted a story that they were having an affair.

> Finally, the State presented the testimony of Victoria Landers Goolsby, Landers's sister.  Goolsby stated that the week after the death of her father, she spoke with Agents Rhegness and Burton of the ABI and agreed to help them in the investigation into her father's death.  As the investigation progressed and Landers became a suspect, Goolsby became a confidential informant for the ABI and attempted to obtain evidence against Landers.  As part of the investigation, Goolsby was instructed by the ABI to tell people, including Landers, that she was having an affair with ABI Agent Rhegness.  Agent Rhegness confirmed that part of the investigation included Goolsby telling people that she was having an affair with him; Agent Rhegness testified that this idea came from a member of the behavioral sciences unit of the FBI.  Both Agent Rhegness and Goolsby denied that they were actually having an affair.  In addition, although both Agent Rhegness and Goolsby testified that Agent Rhegness visited Goolsby at her apartment in Vieux Carre on several occasions to discuss the investigation, both denied that Agent Rhegness ever visited Goolsby at her home on Wares Ferry Road.  Goolsby's status as a confidential informant continued for several years during the investigation, but Goolsby was unable to obtain any evidence against Landers.

(Ex. B, p. 8)

23.   These circumstances reveal that Landers was given the opportunity to and did, in fact, cross-examine both Ms. Goolsby and Agent Rhegness regarding this fabrication.  The fact that Landers was allowed to examine this topic at trial undermines his claim that he was unaware of and

14

deprived of the opportunity to develop his suspicions about a "relationship" at trial. To the extent that Landers did question Ms. Goolsby and Agent Rhegness regarding their "relationship," his claim is precluded from review under Rule 32.2(a)(2) of the Alabama Rules of Criminal Procedure. Likewise, because the nature of Ms. Goolsby's and Agent Rhegness's relationship was divulged at trial, he could have fully developed his present assertion that the two were having an affair. Because the claim could have been, but was not developed at trial, the argument is precluded from review under Rule 32.2(a)(3) of the Alabama Rules of Criminal Procedure.

G. <u>Landers's assertion of "newly discovered evidence" in the form of an affidavit from his mother regarding her discovery of his father's eyeglasses constitutes merely newly disclosed evidence and directly contradicts her testimony at trial.</u>

24.   Landers claims that he possesses "newly discovered evidence" in the form of eyeglasses that his mother discovered after his trial. (Petition, pp. 22-30) He supports his claim with an affidavit executed by his mother in which she asserts that she was given the eyeglasses by law enforcement shortly after Landers's father's body was discovered, that she placed the eyeglasses in a chest drawer, and that, although she accessed the drawer "shortly before or during [Landers's] trial[,]" she did not see or otherwise recall the presence of the eyeglasses to bring them to the attention of the trial court and the jury. (Affidavit of Lenita Jarrell Landers, pp. 2-7)

15

25.    This information from Ms. Landers does not equate to newly discovered evidence. The test governing newly discovered evidence requires that the facts that come to light could not have been discovered through a reasonably diligent investigation and that the facts amount to more than impeachment material. Ala. R. Crim. P. 32.1(e)(1), (e)(3). A thorough investigation by the defense should have discovered that Ms. Landers was given the eyeglasses. Cf. King v. State, 729 So. 2d 366, 367 (Ala. Crim. App. 1998) (recantation does not qualify as "newly discovered evidence"). Moreover, her testimony provides nothing more than information to impeach testimony from Investigator Martin and Sheriff Franklin, who testified that Landers's father's eyeglasses were not discovered until the day after Ms. Landers appeared at the scene. See Wilson v. State, 845 So. 2d 2, 4 (Ala. Crim. App. 2002) (rejecting "newly discovered evidence" claim when facts amounted to impeachment evidence). This information was contained in the opinion by the Court of Criminal Appeals.

> The following day (after discovery of Landers's father's body), Thursday, February 13, 1992, Sheriff Franklin and Investigator Martin returned to the scene on Cliff Side Road with John and David Strickland, friends of Sheriff Franklin and owners of Strickland Brothers Construction Company. . . . Sheriff Franklin stated that, at the scene, David Strickland pointed out a pair of eyeglasses near the bulldozer's left track. Sheriff Franklin collected the glasses and later turned them over to Investigator Martin.
>
> . . .
>
> Mrs. Landers further testified (in contrast to Investigator Martin's testimony) that it had rained the entire evening of February 12, 1992, from the time she and Landers left Montgomery to look for her husband until after they had left the

16

scene later that night. Mrs. Landers also stated that after her husband's body had been removed from the scene, Sheriff Bill Franklin approached her and told her that it was an "unfortunate accident" and asked if she wanted her husband's wallet, ring, and eyeglasses. According to Mrs. Landers, she took the wallet and ring, but told Sheriff Franklin that he could keep the glasses since they were prescription glasses and of no use to her.

Sheriff Franklin denied telling Mrs. Landers that her husband's death was an accident, or offering her her husband's wallet, ring, or glasses. As noted above, Sheriff Franklin testified that the victim's glasses were not discovered until the following day.

(Ex. B, pp. 2, 9) Considering these facts provided by Ms. Landers do not constitute "newly discovered evidence," he is not entitled to relief on this claim.

26.    It is also noteworthy that the issue of Landers's father's eyeglasses was in dispute at trial. Conflicting testimony was introduced regarding what time Landers's father's glasses were discovered. Based on the state of the evidence, the defense was given the opportunity to develop this conflict at trial (and likely discover the eyeglasses now offered by Ms. Landers). Accordingly, the issue underlying Landers's "newly discovered evidence" claim could have been (and to some degree) was raised at trial and is precluded from review under Rule 32.2(a)(3) of the Alabama Rules of Criminal Procedure.

H. Landers's allegation of "innocence" does not warrant state post-conviction relief.

27.    Landers next asserts, as his eighth argument for post-conviction relief, that his "newly discovered evidence" establishes that he is innocent.

17

(Petition, p. 30)  While "actual innocence" is a viable means to avoid a procedural bar in federal habeas corpus actions, it does not exist as an independent ground for state post-conviction relief.  <u>See</u> Ala. R. Crim. P. 32.1.  In addition, Landers challenged the validity of the evidence that supported his conviction at trial and on appeal (<u>see</u> Section J. below).  For that reason, his claim is precluded from review under Rules 32.2(a)(2) and 32.2(a)(4) of the Alabama Rules of Criminal Procedure.  <u>See</u> <u>Russell v. State</u>, 886 So. 2d 123, 124-25 (Ala. Crim. App. 2003); <u>Payne v. State</u>, 791 So. 2d 383, 390-91 (Ala. Crim. App. 1999).  For those reasons, Landers's claim does not warrant relief.


I.  <u>Landers's attack on the sufficiency of the indictment is not properly raised for the first time in a post-conviction petition.</u>

28.    Landers contends, as his ninth basis for post-conviction relief, that the indictment was insufficient to adequately advise him of the charge against him so that he could mount a defense and that a variance existed between the information listed in the charging instrument and the evidence introduced at trial.  (Petition, pp. 1-3)   He asserts that the indictment charged that his father died from being crushed by a bulldozer, but that the evidence showed his father died from a blow to his head.  This is a misconstruction of the evidence.

29.    As explained in the unpublished opinion of the Court of Criminal Appeals, the State established that Landers's father was initially

73

18

immobilized by being struck with a blunt instrument in the head, but ultimately died as a result of being crushed by a bulldozer.

Dr. James Lauridson, the state medical examiner, testified that on Thursday, February 13, 1992, he performed an external examination of the body of Robert Richard Landers, Sr. Dr. Lauridson testified that he observed severe crushing injuries and abrasions to the entire left side of the victim's body, including the left leg, left abdomen, left chest, neck and face; those injuries, he said were horizontally oriented and exhibited very little hemorrhaging. According to Dr. Lauridson, the injuries were consistent with being run over by a bulldozer; the horizontal nature of the injuries were consistent with the horizontal "cleats" on the track of a bulldozer.

. . .

In his testimony, Dr. Lauridson explained that he found several vertically oriented fractures in the left temple area of the victim's skull associated with the vertical laceration in the same area that were inconsistent with the horizontal oriented fractures and abrasions on the victim caused by the bulldozer track and inconsistent with being run over by a bulldozer. . . . Dr. Lauridson testified that the tissue surrounding the vertically oriented injuries was filled with blood, while the tissue surrounding all but one of the horizontal injuries on the rest of the victim's body showed very little hemorrhaging. (*The injury to the victim's left leg, he said also showed hemorrhaging, but less than the vertical injuries to the skull.*) Dr. Lauridson stated that the presence of hemorrhaging in the vertical fractures of the skull and the paucity of hemorrhaging in the horizontal injuries indicated that the victim was still alive at the time the vertical area was inflicted, and that the victim's circulation had lowered or "nearly stopped" by the time the other injuries were inflicted.

Dr. Lauridson put forward two theories as to why the victim's circulation had stopped by the time the horizontal injuries were inflicted. First, Dr. Lauridson stated that the blunt force causing the vertical injuries to the victim's skull could have killed the victim, thus stopping circulation, before the bulldozer crushed him. *Second, Dr. Lauridson stated that the bulldozer could have crushed the victim's heart, causing circulation to stop, thus preventing any hemorrhaging in the injuries higher than the heart.* Dr. Lauridson testified that, under either theory, the vertically oriented fractures to the left temple must have been inflicted <u>before</u> the victim was run over by the bulldozer.

19

(Ex. B, p. 4)

30.     First, Landers had the opportunity to, and should have raised this claim

at trial.  See Ala. R. Crim. P. 32.2(a)(3).  He was well aware of the charge

pending against him, mounted a significant defense to the charge lodged

against him, and was sufficiently apprised of the State's evidence at the time

he made his motions for judgment of acquittal, and particularly his motion

for a new trial.  See Ala. R. Crim. P. 13.5(c)(1) (permitting objections to the

indictment during the time permitted under Rule 15); Ala. R. Crim. P.

15.2(d) (mandating an objection "during the pendency of the proceeding").

Accordingly, unless Landers can show that this claim is "jurisdictional" in

nature, his ninth claim is precluded from review.

31.     The Supreme Court of Alabama previously addressed whether a

"variance" argument is "jurisdictional" to overcome the grounds of

preclusion.  Landers does not satisfy that test.  In Ex parte Robey, No.

1031442, 2004 WL 2757429, at *3-5 (Ala. 2004), the court rejected the

defendant's Rule 32 argument that a "variance" existed between his

indictment, which charged him with murder while intoxicated by alcohol,

and evidence that showed he was intoxicated with both alcohol and drugs.

Robey's indictment included all essential elements of the murder offense

and, for that reason, no "variance" existed to impacted the trial court's

authority to accept the jury's verdict.  Id., 2004 WL 2757429, at *4.

Additionally, the court noted that, even in recognition of a variance in

Hightower v. State, 443 So. 2d 1272 (Ala. 1983), Robey did not create a

20

"jurisdictional" claim to overcome a ground of preclusion. <u>Robey</u>, 2004 WL 2757429, at *5.

32.    The present case is akin to <u>Robey</u>. Landers alleges that a variance existed because he was indicted for killing his father by running over a bulldozer, but the State proved that his father died from a combination of being struck in the head and run over by a bulldozer. Like the evidence of drugs in addition to the charge of alcohol in <u>Robey</u>, the mere fact that the State showed that the combination of a blow to Landers's father's head and the bulldozer led to his death did not impact the validity of Landers's indictment or the trial court's authority to accept the jury's finding of guilt. Accordingly, Landers did not prove any "variance" existed and, for that reason, his claim, which he could have raised at trial, is precluded from review. <u>Cf. Ash v. State</u>, 843 So. 2d 213, 214-17 (Ala. 2002) (finding argument that trial court instruction created a "variance" was not "jurisdictional" and, for that reason, the claim was precluded under Rule 32.2(a)(5)).

   J.  <u>Landers's challenge to the sufficiency of the evidence is precluded from review because the argument was addressed on direct appeal.</u>

33.    Landers asks this Court, as his tenth and final ground for post-conviction relief, to reconsider the sufficiency of the evidence underlying his conviction. (Amendment to Petition, p. 3)  A reading of the unpublished opinion of the Court of Criminal Appeals reveals that it rejected the identical argument on direct appeal.

76

21

I.

Landers contends that the evidence was insufficient to sustain his conviction.

. . .

Here, the State showed that the victim's death was the result of a homicide; that Landers had a motive to kill his father; that Landers was the last person to see the victim alive and was present at the time his father was killed; that Landers lied about his whereabouts on the afternoon of his father's murder; and that Landers had attempted to kill his father once before and failed.

. . .

Considering the evidence in the light most favorable to the State, accepting as true all evidence introduced by the State, and allowing all legitimate inferences in favor of the State, we hold that there was sufficient evidence from which the jury could have, by fair inference, reasonably concluded that the State's case, albeit circumstantial, excluded every reasonable hypothesis except that of Landers's guilt. Accordingly, the trial court properly submitted the case to the jury for consideration.

(Ex. B, pp. 1, 14, 15)

34.    Rule 32.2(a)(4) prohibits relief for a post-conviction claim previously

adjudicated on appeal. Considering Landers's argument falls directly into

this ground of preclusion, Landers is not entitled to post-conviction relief.

See Sims v. State, 869 So. 2d 1181, 1184 n.3 (Ala. Crim. App. 2003) (finding

challenges to the sufficiency and weight of the evidence precluded where the

adequacy of the evidence was addressed on direct appeal); Slater v. State,

672 So. 2d 1312, 1313 (Ala. Crim. App. 1993) (affirming the trial court's

decision to dismiss a sufficiency claim under Rule 32.2(a)(4) where the

argument was addressed on direct appeal).

22

Considering that all of Landers's claims are precluded from review, and "no material issue of fact or law exists which would entitle [Landers] to relief under this rule and . . . no purpose would be served by any further proceedings," Ala. R. Crim. P. 32.7(d), the State respectfully requests this Court summarily deny Landers's petition.

Respectfully submitted,

Troy King
*Attorney General*

Donald G. Valeska
*Assistant Attorney General*
By:

Stephanie N. Morman(MOR105)
*Deputy Solicitor General*
Counsel of Record *

23

## CERTIFICATE OF SERVICE

I hereby certify that on this the 11th day of July, 2005, I served a copy of

the foregoing on Counsel for the Petitioner, by placing the same in the United

States mail, first class, postage prepaid, and addressed as follows:

William H. Mills
William N. Clark
Redden, Mills & Clark
940 The Financial Center
505 20th Street North
Birmingham, Alabama  35203

Stephanie N. Morman(MOR105)
*Deputy Solicitor General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7300; 242-7380 *

210753/MORMAN

24

0526

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

```
STATE OF ALABAMA,        )
                         )
          Plaintiff,     )
                         )
vs.                      )      CASE NO.: CC96-421
                         )
MARK SAMUEL LANDERS,     )
                         )
          Defendant.     )
```

## MOTION FOR JUDGMENT OF ACQUITTAL, MOTION IN ARREST OF JUDGMENT OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL

COMES NOW the Defendant, Mark Samuel Landers, and moves the Court to set aside the verdict, judgment of conviction and the sentence imposed in this case and to enter a judgment of acquittal in this cause; or in the alternative to arrest judgment; or, in the alternative, to grant to Defendant a new trial. As grounds for said motion, Defendant assigns the following grounds, separately and severally:

1.    The evidence is insufficient to convince a reasonable minded jury beyond a reasonable doubt that the Defendant intentionally caused the death of Robert R. Landers, Sr.

2.    The evidence is insufficient to convince a reasonable minded jury beyond a reasonable doubt that the Defendant caused the death of Robert R. Landers, Sr.

1



EXHIBIT

_A_

)                                    )

3.   The jury verdict was contrary to the law of the State of Alabama.

4.   The Court erred in refusing to set a reasonable bond for Defendant pending trial which refusal denied Defendant the right to due process, and to a fair and impartial trial in that the State waited almost five (5) years before obtaining an indictment against Defendant thus making it critically important that Defendant be free to assist in reviewing evidence, in locating potential witnesses and other potential evidence, and in attempting to generally assist counsel in preparation for trial, all in violationn of the 5th, 6th and 14th Amendments to the Constitutiton of the United States and Article 1, § 6 of the Constitution of Alabama of 1901, separately and severally.

5.   The evidence was insufficient to convince a reasonably minded jury beyond a reasonable doubt that Robert Landers' death was in fact a homicide rather than an accident.

6.   By inclusion of the aggravating circumstance in the capital offense  statute under which Defendant is charged, the legislature has attempted to bootstrap a non-capital offense into a capital offense, thus rendering the statute unconstitutional in violation of the 5th, 6th, and 14th Amendments to the Constitution of the United States , and Article 1, § 6 of the Constitution of Alabama of 1901, separately and severally.

2

0528

7.    The jury verdict was contrary to the evidence.

8.    The indictment does not charge an offense.

9.    The Court was without jurisdiction of the offense charged.

10.    The jury verdict was an impermissible and unlawful compromise verdict wherein certain jurors who were not convinced beyond a reasonable doubt of Defendant's guilt, voted for guilty in exchange for an agreement that the jury would unanimously recommend life without parole.

11.    The Court erred in overruling the defense motion for judgment of acquittal made at the conclusion of the State's case.

12.    The Court erred in denying Defendant's Motion to Dismiss.

13.    The Court erred in denying Defendant's Amended Motion to Dismiss.

14.    The Court erred in denying Defendant's Motion for Individual Voir Dire of all jurors. The denial of same denied Defendant Due Process, and the right to a fair and impartial trial, in violation of Article 1, § 6 of the Constitution of Alabama of

3

1901, and the 5th and 6th Amendments to the Constitution of the United States.

15. The Court erred in overruling the defense Motion For Judgement of Acquittal made at the conclusion of all the evidence.

16. The Court erred in denying Defendant's separate and several motions for mistrial.

17. The Court erred in denying Defendant's Motion for Production of Statements of Witnesses. The denial of same denied Defendant Due Process, and the right to a fair and impartial trial, in violation of Article 1, § 6 of the Constitution of Alabama of 1901, and the Fifth and Sixth Amendments to the Constitution of the United States, separately and severally.

18. The Court denied Defendant a fair and impartial trial by requiring that the final arguments be made on Thursday or Friday of the second week of trial following the death on Wednesday evening of principal defense counsel's father. Defense counsel's office called early in the afternoon on Wednesday in an effort to advise counsel that his wife had called to say that counsel's father, who had Parkinson's disease, had taken a turn for the worse. Counsel was not given the message by court personnel until there was a second call that counsel should come home. The evidence was concluded and Defendant's Motion for Judgment of Acquittal was heard before counsel was able to leave Wetumpka to return to

4

Birmingham to be with his father. Counsel's father died minutes before the time counsel arrived.

That evening, counsel delivered a message to the Court through the Court bailiff. The Court then telephoned defense counsel on Wednesday night. Counsel requested that the final arguments be delayed until Monday so that counsel could be with his mother and family in Birmingham, prepare for the funeral and attend the funeral which was to be held on Saturday in Birmingham. The trial judge stated that he had to hold court in Baldwin County on the following Monday and that arguments would have to be on Thursday or Friday. Counsel was physically and emotionally unable to argue the case on Thursday and requested that, between the two options, Friday would be better. The death of defense counsel's father was even more traumatic because Defendant was charged with killing his own father.

Principal defense counsel was thus compelled to argue the case under very personally demanding and emotional circumstances which may have had the effect of rendering counsel's argument ineffective. The prosecutor who argued the case for the State in fact argued that he was surprised at the defense argument and that he would have expected more from such an experienced lawyer, or words to that effect. Defense Counsel was further concerned that arguing the case before his father had been buried could have caused the jury to consider him to be callous and insensitive, and thus cause the jury to be prejudiced against Defendant.

5

A defendant in a capital murder case, and particularly one where the only evidence is circumstantial, has the right to a fair trial. In this case, the trial judge for reasons unstated, had not held court on the Friday of the first week of trial, but was unwilling to postpone the trial two workdays so Defendant's counsel could bury his father before being compelled to argue the case. The jury was not sequestered.

Defendant's principal counsel's co-counsel had never tried a major criminal or civil case and had only tried six jury trials. It would have denied Defendant a fair trial had he argued the case.

The trial judge's order was so prejudicial that it denied Defendant his right to due process and to a fair and impartial trial in violation of the 5th, 6th, and 14th Amendments to the Constitution of the United States, and in violation of Article 1, § 6 of the Constitution of Alabama of 1901, separately and severally.

19.  The Court erred in overruling objections made by defense counsel to questions propounded to State witnesses on direct examination in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article 1, § 6 of the Constitution of Alabama of 1901, separately and severally.

20.  The Court erred in sustaining objections made by counsel for the State to questions propounded by defense counsel on direct

6

0530

Birmingham to be with his father. Counsel's father died minutes before the time counsel arrived.

That evening, counsel delivered a message to the Court through the Court bailiff. The Court then telephoned defense counsel on Wednesday night. Counsel requested that the final arguments be delayed until Monday so that counsel could be with his mother and family in Birmingham, prepare for the funeral and attend the funeral which was to be held on Saturday in Birmingham. The trial judge stated that he had to hold court in Baldwin County on the following Monday and that arguments would have to be on Thursday or Friday. Counsel was physically and emotionally unable to argue the case on Thursday and requested that, between the two options, Friday would be better. The death of defense counsel's father was even more traumatic because Defendant was charged with killing his own father.

Principal defense counsel was thus compelled to argue the case under very personally demanding and emotional circumstances which may have had the effect of rendering counsel's argument ineffective. The prosecutor who argued the case for the State in fact argued that he was surprised at the defense argument and that he would have expected more from such an experienced lawyer, or words to that effect. Defense Counsel was further concerned that arguing the case before his father had been buried could have caused the jury to consider him to be callous and insensitive, and thus cause the jury to be prejudiced against Defendant.

5

86

0531

A defendant in a capital murder case, and particularly one where the only evidence is circumstantial, has the right to a fair trial. In this case, the trial judge for reasons unstated, had not held court on the Friday of the first week of trial, but was unwilling to postpone the trial two workdays so Defendant's counsel could bury his father before being compelled to argue the case. The jury was not sequestered.

Defendant's principal counsel's co-counsel had never tried a major criminal or civil case and had only tried six jury trials. It would have denied Defendant a fair trial had he argued the case.

The trial judge's order was so prejudicial that it denied Defendant his right to due process and to a fair and impartial trial in violation of the 5th, 6th, and 14th Amendments to the Constitution of the United States, and in violation of Article 1, § 6 of the Constitution of Alabama of 1901, separately and severally.

19.   The Court erred in overruling objections made by defense counsel to questions propounded to State witnesses on direct examination in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article 1, § 6 of the Constitution of Alabama of 1901, separately and severally.

20.   The Court erred in sustaining objections made by counsel for the State to questions propounded by defense counsel on direct

6

87

0532

examination of defense witnesses in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally.

21. The Court erred in overruling objections made by defense counsel to questions propounded by counsel for the State on cross-examination of defense witnesses in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally.

22. The Court erred in unduly limiting the direct examination by defense counsel of expert witness, Dr. Gerald Whitehouse, in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article I, § 6 of the Constitution of Alabama of 1901.

23. The Court erred in denying Defendant's requested Jury charges which were correct statements of law and were not covered by the Court's oral charge; i.e., 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, and 43.

24. The Court erred in instructing the jury as to lesser included offenses over objection of Defendant in that there was no basis in fact for such charges, Defendant having specifically

7

JUL 11 2005 14:13

PAGE.10

0533

...ed in any way in participating in the death of his father, and ...nature of the charge being such that if the jury believed ...fendant killed his father for pecuniary gain, his actions could ...y have been murder under Ala. Code, § 13A-6-2.  The giving of ...charges and the manner and form in which they were given had ...effect of suggesting to the jury that the Defendant was guilty ...one of the charges and that they were to select which one, all ...violation of the 5th, 6th and 14th Amendments to the ...stitution of the United States, and Article 1, § 6 of the ...stitution of Alabama of 1901, separately and severally.

25.  The Court erred in overruling or otherwise denying ...fendant's Objection to Sentencing, particularly, grounds # 3, 4, ...d 10 in violation of the 5th, 6th, 8th, and 14th Amendments to ...Constitution of the United States and Article 1, § 6 and 15 of ...Constitution of Alabama of 1901, separately and severally.

26.  The Court erred in overruling the defense motion in ...ine to preclude the State's use of any report, testimony or ...dence based upon its attempted "recreation" of the incident in ...lation of the 5th, 6th and 14th Amendments to the United States ...stitution, and Article I § 6 of the Constitution of Alabama of ..., separately and severally.

27.  The Court erred in denying the defense motion in limine ...preclude the State's introduction of evidence and in admitting ...evidence at trial regarding: Defendant's prior property ...urance claims with Allstate; Defendant's prior property

8

0534

insurance claims with State Farm; Defendant's employment history with Allstate Insurance Company and Progressive Casualty Insurance Company; Defendants's educational background and the fact that he attended graduate classes in business administration and criminal justice; and Defendant's brief attendance at Jones Law School in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally.

28. The Court's error in allowing such evidence as described in the preceding paragraph was rendered highly prejudicial by the Court's instructions over objection of Defendant that such evidence was admitted for the limited purpose of showing other wrongs to show pattern, motive, intent, scheme or design. While some of such evidence might have otherwise been admissible as mere background evidence, the manner in which the Court instructed the jury in what was clearly a case of circumstantial evidence had the effect of causing the jury to believe that the evidence somehow made Defendant appear more culpable and hence guilty, all of which denied Defendant his right to due process and to a fair and impartial trial in violation of Article 1, § 6 of the Constitution of Alabama of 1901, and the 5th, 6th and 14th Amendments to the Constitution of the United States, separately and severally.

29. The Court erred in denying the defense motion to suppress and in overruling Defendant's objections to the State's introduction of evidence regarding any alleged injury to the face or head of Robert R. Landers, Sr., or any alleged blood found on

9

0535

the track of the bulldozer, or any alleged blood found on leaves in front of the bulldozer in violation of the 4th, 5th, 6th and 14th Amendments to the United States Constitution, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally, in that there was no predicate laid whatsoever for such evidence, there had been no scientific tests done to reach or support such conclusions, and the State elected not to do any such tests despite their availability.

30. The Court erred in denying the defense Motion to Suppress and in overruling Defendant's objection to the introduction into evidence of the glasses which allegedly belonged to the Defendant's father in that there was no proper and complete chain of custody shown, there was no predicate laid for such evidence, and there were no scientific tests done to support such conclusions all in violation of the 4th, 5th, 6th, and 14th Amendements to the Constitution of the United States, and Article I, § 5 and 6 of the Constitution of Alabama of 1901, separately and severally.

31. The Court erred in denying the defense Motion to Dismiss, Amended Motion to Dismiss and Supplement to Amended Motion to Dismiss the indictment for misconduct on the part of the State of Alabama in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article 1, § 6 of the Constitution of Alabama of 1901, separately and severally.

32. The Court erred in denying the defense objections to the introduction of and the reading into evidence of Defendant's

10

0536

deposition which was taken in the civil matter, <u>Mutual Life Insurance of New York v. Mark S. Landers, et al.</u>, in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally.

33.    The Court erred in denying the defense motions for change of venue, which motions were made both before and after voir dire in violation of the 5th, 6th, and 14th Amendments to the United States Constitution, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally.

34.    The death of Robert R. Landers, Sr. occurred in 1992 and, over four years later, Defendant was indicted. Mr. Landers death and the investigation received extensive publicity. In early 1997, this Court ordered the exhumation of Defendant's grandmother, who had died in 1991 as the result of an accident, for the purpose of determining whether to charge Defendant with her death, as well. That exhumation also received extensive publicity. The Court later ruled that no evidence of the grandmother's death could be admitted. However, since the conclusion of the trial, a juror has stated that during the course of the trial she had a conversation with another person, possibly another juror, in which the person asked whether Defendant was being tried for the death of his grandmother or his father. This conversation was not reported to the Court and counsel as required by the Court's instructions to the jury, which was a clear violation of the juror's duty. This

11

0537

knowledge and the failure to disclose it acted to deny Defendant his right to due process and to a fair and impartial trial in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally.

35.   The Court erred in excusing ex mero moto without just cause, and over objection of Defendant a number of jurors who otherwise would have been in the panel of jurors from which the jury was selected.  Because of the vast publicity the case received and the number of jurors who had read or heard about the case, the excusal of these jurors unnecessarily narrowed the pool from which a fair minded jury could be selected and had the effect of denying Defendant due process, and the right to a fair trial in violation of the 5th, 6th, and 14th Amendments to the Constitution of the United States, and Article 1, § 6 of the Constitution of Alabama of 1901, separately and severally.

36.   The Court erred in striking those jurors who expressed some disagreement with the death penalty.

37.   The Court erred in granting the State's challenge for cause of those  certain jurors who expressed opposition to the death penalty.

38.   The Court erred in commenting in the presence of the jury that this is "a most unusual case"; and when Defendant objected, Court's subsequent comments combined with his original

12

JUL 11 2005 14:38

0538

statement were prejudicial to Defendant's right to due process and to a fair and impartial trial in violation of the 5th, 6th, and 14th Amendments to the Constitution of the United States and Article 1, § 6 of the Constitution of Alabama of 1901, separately and severally.

39. The prosecutor's closing argument was so highly prejudicial and improper as to constitute plain error in that the prosecutor falsely called Defendant a "con man", improperly and unfairly made personal attacks upon Defendant's counsel, and so inflamed the jury with his invective rhetoric that Defendant was denied his right to due process, and to a fair and impartial trial in violation of the 5th, 6th, and 14th Amendments to the Constitution of the United States, and Article 1, § 6 of the Constitution of Alabama of 1901, separately and severally.

40. The almost five year delay by the State in obtaining an indictment prejudiced this Defendant's right to due process and to a fair and impartial trial in that there was no new relevant evidence known at the time the case was presented to the Grand Jury in 1996 that had not been known by the State in 1992.

The delay greatly prejudiced Defendant in the preparation of his case in that it was to late to do certain critical scientific tests, e.g., to determine scientifically whether Bob Landers' injury to the head was from a blow or fall; the skull of Bob Landers on which the State based much of its argument had been destroyed by the State Medical Examiner; the bulldozer which was allegedly involved had been sold and was not available; the

13

0539

memories of potential crucial witnesses had "faded", e.g. Deputy Willie Townsend; the State made no effort to locate the three men which Mrs. Green testified she saw.

41. The testimony of Dr. Lauridson, the State medical examiner, was that based on his own autopsy examination and analysis the death of Robert Landers could have been either an accident or a homicide. The conclusion that the death was a homicide was based on information provided by State and County investigators. Said latter investigation was so unprofessional, unscientific, biased, and generally not in accordance with accepted law enforcement standards as to render Dr. Lauridson's ultimate conclusion null and void, and certainly not a proper basis on which to base a capital murder charge. This entire process was so defective as to violate Defendant's right to due process, and to a fair and impartial trial in violation of the 5th, 6th and 14th Amendments to the Constitution of the United States, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally.

42. The Court in his denial of Defendant's Motion for Mistrial committed prejudicial error in his statements to the Jury, and open expression, before the jury, of hostility to Defendant's counsel because he would not consent to the court reporter not being required to transcribe the reading of Mark Landers' deposition into evidence. The obvious disdain of the

14

court for Defendant's counsel was highly prejudicial to Defendant and had the effect of denying him due process and the right to a fair and impartial trial in violation of the 5th, 6th and 14th Amendments to the Constitution of the United States, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally.

43.  The Court erred in allowing Ric Landers, Jr. to sit at counsel table in that Defendant's father was the victim, Defendant denied killing his father and was supported by his mother and one sister in his immediate family, while Ric Landers, a half-brother, and Vicky Goolsby, his sister, opposed Mark Landers.  Under the circumstances, by allowing Ric Landers to sit at counsel table he was made to appear to have more credibility or veracity than he otherwise would have been entitled.  His presence at counsel table and his comments concerning Defendant's counsel all were in violation of the 5th, 6th, and 14th Amendments to the Constitution of the United States, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally.

44. All of the grounds previously stated separately, constitute grounds for the relief sought; and combined together cumulatively denied the Defendant due process and a fair and impartial trial in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article 1, § 6 of the Constitution of 1901, separately and severally.

15

0541

Defendant respectfully reserves the right to amend this motion upon having an opportunity to review the trial transcript, and further investigation into any newly discovered evidence.

<div align="right">
William N. Clark<br>
Attorney for Defendant<br>
Mark Samuel Landers
</div>

OF COUNSEL:

HEDDEN, MILLS & CLARK
North 20th Street, Suite 940
Birmingham, Alabama  35203
(205) 322-0457

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon Donald Valeska, Deputy Attorney General, by mailing to him a copy of the same in the United States Mail, properly addressed and with sufficient prepaid postage affixed thereto, this the 31st day of ____July____, 1997.

<div align="right">
Of Counsel
</div>

Donald Valeska
Deputy Attorney General
State of Alabama
State House
Union Street
Birmingham, Alabama  36130

16

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA
JUDICIAL BUILDING, 300 DEXTER AVENUE
### P.O. BOX 301555
### MONTGOMERY, AL 36104-1555



FRANCIS ALLEN LONG, SR.
Presiding Judge
H. WARD McMILLAN
SUE BELL COBB
PAMELA W. BASCHAB
JAMES H. FRY
Judges

RELEASED

DEC 15 2000

CLERK
ALA COURT CRIMINAL APPEALS

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334)242-4590

MEMORANDUM

CR-97-0194

Elmore Circuit Court No. CC-96-421

Mark Samuel Landers v. State

LONG, Presiding Judge.

AFFIRMED. Mark Samuel Landers was convicted of murder made capital because it was committed for pecuniary gain or other valuable consideration. See § 13A-5-40(a)(7), Ala. Code 1975. The jury, by a vote of 12-0, recommended that Landers be sentenced to life imprisonment without the possibility of parole. The trial court accepted the jury's recommendation and sentenced Landers to life without parole.

I.

Landers contends that the evidence was insufficient to sustain his conviction.

The evidence adduced at trial tended to show the following. On February 12, 1992, at 8:45 p.m., Connie Johnson, a dispatcher with the Elmore County Sheriff's Department, received a call from a man who identified himself as Landers. According to Johnson, Landers told her that he needed help because "there was a bulldozer on his daddy." (R. 996.) Landers gave Johnson directions to Cliff Side Road in Titus in Elmore County, and Johnson then dispatched several officers to the scene and notified the coroner.

Elmore County Chief Investigator Byron Martin testified that he arrived at the scene on Cliff Side Road at approximately 9:00 p.m. on February 12, 1992. Elmore County Deputy Sheriff Willie Townsend was already present and speaking with Landers. According to Martin, it was cloudy outside when he arrived, but it was not raining; Martin stated that it began raining at approximately 10:00 p.m. that evening. At the scene, there was a white dumptruck and a "low boy" flatbed trailer off the side of the road. The truck's lights were on, the engine was running, and the driver's side door was open. Near the right rear of the flatbed trailer, said Martin, a bulldozer was backed against an embankment of trees and brush, with the front of the bulldozer facing the right rear of the trailer; the blade of the bulldozer was pointed down. The body of a man later identified as Robert Richard Landers, Sr. (the appellant's father), was pinned underneath the right rear track of the bulldozer, with the track partially up on the side of his head. On top of the left track of the bulldozer and on some leaves in front of the bulldozer near the blade, according to Martin, was a substance that appeared to be blood; however, Martin did not collect any samples of this substance. Martin testified that there were no marks from the bulldozer's tracks anywhere on the ground behind the flatbed trailer or around the bulldozer. The only wheelmarks present



EXHIBIT
B

at the scene, he said, were those made by the wheels of the truck and the flatbed trailer. Martin stated that he found a single chain and a piece of pipe on the bed of the trailer, but that after searching the area, he was unable to find any "chain binders," which typically are used to tie down heavy equipment for transport.

Elmore County Sheriff Bill Franklin arrived at the scene on Cliff Side Road approximately 10 minutes after Investigator Martin. Sheriff Franklin testified that it was drizzling rain when he arrived. He stated that as soon as he stepped out of his vehicle at the scene, Landers approached him with his hand extended and told him that they had a "mutual friend," Ken Edwards. According to Sheriff Franklin, Landers then told him that he had told his father not to "play" on the bulldozer, but that his father had had an accident and was lying under the bulldozer. Sheriff Franklin testified that Landers was the first person at the scene to use the word "accident" and that Landers was not crying or upset when he was speaking with the Sheriff. Sheriff Franklin stated that when he asked Landers where the "bucking tongs" for tying down large pieces of machinery were located, Landers replied that he did not know.

Between 10:00 and 10:30 p.m. that night, Phil Holland, a forensic investigator with the Alabama Department of Forensic Sciences, arrived at the scene to take custody of the victim's body. Holland testified that when he first arrived, he noticed that the bulldozer was in reverse gear and that its ignition switch was in the on position. A wrecker was used to lift the bulldozer while Holland removed the victim's body from under the bulldozer's track. Holland placed the body in a body bag and transported it to the forensic laboratory. Holland stated that before he left the scene, Investigator Martin informed him that Landers had spoken with Deputy Townsend and had told the deputy that he had left his father in the area earlier in the afternoon, that the bulldozer was loaded on the flatbed trailer when he left, and that his father had tried to unload the bulldozer after he left but had fallen off and been accidentally run over.

The following day, Thursday, February 13, 1992, Sheriff Franklin and Investigator Martin returned to the scene on Cliff Side Road with John and David Strickland, friends of Sheriff Franklin and owners of Strickland Brothers Construction Company. At the direction of Sheriff Franklin, John Strickland started the bulldozer, which was still in the position it had been found in the night before (i.e., backed against an embankment of trees and brush), and attempted to back it over the embankment and into the woods just behind. According to Sheriff Franklin, the bulldozer's engine died when John Strickland attempted to do this. Sheriff Franklin stated that, at the scene, David Strickland pointed out a pair of eyeglasses near the bulldozer's left track. Sheriff Franklin collected the glasses and later turned them over to Investigator Martin.

Investigator Martin testified that on Thursday, February 13, he searched the area surrounding the scene and, on a nearby dirt road, found bulldozer tracks and several indentations in the ground that appeared to have been made by a ramp used to load and unload a bulldozer from a trailer.

On Friday, February 14, 1992, the Elmore County Sheriff's Department contacted the Alabama Bureau of Investigation ("ABI") and requested assistance in investigating the death of Robert Richard Landers, Sr. ABI Agents William Rhegness and Anthony Burton responded to the call and went to the scene on Friday afternoon with Investigator Martin and Sheriff Franklin. No equipment remained at the scene at that time. Agent Rhegness testified that the first thing he noticed at the scene was the absence of bulldozer trackmarks in the area where, he had been told, the truck, trailer, and bulldozer were found. Agent Rhegness, however, testified that he saw (just as Investigator Martin had seen the day before) what appeared to be bulldozer trackmarks and several deep indentations on a nearby dirt road. Like Investigator Martin, Agent Rhegness also believed that the indentations had been made from a ramp that would normally be used to load and unload a tracked vehicle from a trailer.

On Saturday, February 15, 1992, Agents Rhegness and Burton, Investigator Martin, and Sheriff Franklin returned to the scene on Cliff Side Road yet again and conducted an experiment with the bulldozer. Local residents William Harmon Ponder and John Brown were asked to assist. Ponder testified

- 2 -

that, before the experiment, he went to the residence of Barry Worth, another local resident, to retrieve the truck, trailer and bulldozer that had been found at the scene. Ponder stated that the truck and trailer were stuck in a ditch near the Worth residence and that John Brown had to back the bulldozer off the trailer and then use it to push the truck and trailer out of the ditch. Brown then drove the bulldozer back onto the trailer, and Ponder drove the truck, trailer, and bulldozer to the scene on Cliff Side Road for the experiment. Ponder testified that he and Brown attempted to find chain binders to tie down the bulldozer for the 3/4 mile drive to the scene, but that they were unable to find any on the truck or trailer.

At the scene with the equipment, Ponder attempted to place the truck and trailer into the same position they had been found on February 12, 1992. Ponder testified that he looked at photographs of the scene from February 12 and that there was also paint on the ground to aid him in the placement. Once the truck and trailer were in place, Investigator Martin placed the pipe and chain he had seen on the trailer in approximately the same position he had seen them in on February 12. John Brown then backed the bulldozer off the trailer and, in the process, ran over the pipe and chain. Agent Rhegness testified that because the trailer's bed was made of wood, the chain and pipe left indentations in the trailer bed when they backed over by the bulldozer. Agent Rhegness stated that there were no indentations in the trailer bed before this occurred. Ponder testified that Brown had to raise the blade of the bulldozer approximately two feet in order to back the bulldozer down the ramp without the blade's hitting the edge of the trailer.

According to Ponder, during the experiment, Brown attempted to back the bulldozer down the ramp and turn it so that it would back into the nearby embankment of trees and brush, where it had been found earlier. However, Ponder said, this attempt failed because the bulldozer could not turn that sharply without "eating up" the ramps. Testimony showed that the ramps were in good condition before the experiment began.

Brown subsequently maneuvered the bulldozer so as to place it in the same position it was found on February 12. Evidence showed that this maneuvering tore up the ground.

In March 1992, Thomas Owen Goodney, a forensic engineer and the design engineer for the John Deere 450-E bulldozer -- the same model of bulldozer as Landers's -- was asked by the John Deere Company to investigate the death of Robert Richard Landers, Sr. Goodney, who had retired from the full-time employ of John Deere several years earlier but had continued to work as a consultant, testified that he spoke with ABI Agent Burton about the investigation, looked at photographs taken of the scene on February 12, 1992, and on subsequent occasions, and inspected Landers's bulldozer. According to Goodney, the bulldozer in question was in "very good shape" and had no mechanical problems when he inspected it. On April 6, 1992, Goodney accompanied Landers, Landers's mother, Cleveland Swicord (Landers's cousin by marriage), Investigator Martin, and Agents Rhegness and Burton to the scene on Cliff Side Road and attempted to reconstruct the events of February 12. After placing the truck and trailer in the position they were found in on February 12, Swicord backed the bulldozer off the trailer. Goodney then took photographs of the trackmarks left in the dirt by the bulldozer. According to Goodney, the bulldozer could not have been backed off the trailer and into the position in which it was found on February 12 without leaving trackmarks similar to those created during the reconstruction, even though no such trackmarks were present at the scene on February 12. In addition, Goodney testified that the bulldozer, which had been found with its blade down, could not have been backed off the trailer with the blade in the down position without tearing up the ramps and leaving "backblading" marks in the dirt, none of which were found at the scene on February 12. Given the condition of the ramps at the scene on February 12, Goodney opined that the blade on the bulldozer must have been up when the bulldozer was backed off the trailer, and that only after the bulldozer was backed onto the ground, was the blade put back down. Testimony showed that the only way to put the blade down on the John Deere 450-E bulldozer was by manually pulling a lever on the bulldozer.

-3-

Dr. James Lauridson, the state medical examiner, testified that on Thursday, February 13, 1992, he performed an external examination of the body of Robert Richard Landers, Sr. Dr. Lauridson testified that he observed severe crushing injuries and abrasions to the entire left side of the victim's body, including the left leg, left abdomen, left chest, neck and face; those injuries, he said, were horizontally oriented and exhibited very little hemorrhaging. According to Dr. Lauridson, the injuries were consistent with being run over by a bulldozer; the horizontal nature of the injuries were consistent with the horizontal "cleats" on the track of a bulldozer. Dr. Lauridson also discovered a vertically oriented laceration on the victim's left temple with a significant amount of blood in the tissue surrounding it. Dr. Lauridson testified that based on his observations of the victim's external injuries and on the information he had received from Phil Holland regarding the circumstances surrounding the victim's death (which were based in significant part on Landers's statement to Deputy Townsend at the scene), he did not perform a full autopsy and he initially reported the death as accidental. However, within a few days, said Dr. Lauridson, after he met with ABI Agents Rhegness and Burton and learned more details about the scene, he determined that there were enough suspicious circumstances to warrant a full autopsy.

The body of Robert Richard Landers, Sr., was exhumed, and a full autopsy was performed on March 3, 1992. After performing the autopsy, spending several months "reapproximating" the bones of the victim's skull, and collecting information regarding the case from the investigators, Dr. Lauridson determined that the manner of death was a homicide.

In his testimony, Dr. Lauridson explained that he found several vertically oriented fractures in the left temple area of the victim's skull associated with the vertical laceration in the same area that were inconsistent with the horizontally oriented fractures and abrasions on the victim caused by the bulldozer track and inconsistent with being run over by a bulldozer. Dr. Lauridson stated that the vertically oriented fractures were depressed inward and localized in a single area, while the horizontal injuries on the skull were "crushing fractures" consistent with pressure from the horizontal "cleats" on the track of a bulldozer. Dr. Lauridson stated that the vertical fractures and laceration were most likely caused by a "blunt impact," either from the head being by another object or from the head hitting against another object, i.e., from a fall. Dr. Lauridson testified that the tissue surrounding the vertically oriented injuries was filled with blood, while the tissue surrounding all but one of the horizontal injuries on the rest of the victim's body showed very little hemorrhaging. (The injury to the victim's left leg, he said, also showed hemorrhaging, but less than the vertical injuries to the skull.) Dr. Lauridson stated that the presence of hemorrhaging in the vertical fractures of the skull and the paucity of hemorrhaging in the horizontal injuries indicated that the victim was still alive at the time the vertical injury was inflicted, and that the victim's circulation had lowered or "nearly stopped" by the time the other injuries were inflicted.

Dr. Lauridson put forward two theories as to why the victim's circulation had stopped by the time the horizontal injuries were inflicted. First, Dr. Lauridson stated that the blunt force causing the vertical injuries to the victim's skull could have killed the victim, thus stopping circulation, before the bulldozer crushed him. Second, Dr. Lauridson stated that the bulldozer could have crushed the victim's heart, causing circulation to stop, thus preventing any hemorrhaging in the injuries higher than the heart. Dr. Lauridson testified that, under either theory, the vertically oriented fractures to the left temple must have been inflicted before the victim was run over by the bulldozer.

Katherine K. McGeehan, a forensic serologist with the Alabama Department of Forensic Sciences, testified that she examined a pair of eyeglasses -- State's Exhibit 10, which, she said, she received from ABI Agent Burton -- for the presence of blood. According to McGeehan, she discovered Type O blood on the glasses, the same bloodtype as the victim's. McGeehan did not perform any DNA testing on the blood. The State presented evidence that the eyeglasses in State's Exhibit 10 were the victim's glasses.

The State's theory of the case was that in the months preceding his father's death, Landers was in serious financial trouble and that Landers murdered his father in order to collect the proceeds from a life insurance policy that Lander's had taken out on his father. The State introduced evidence that an

-4-

insurance policy in the amount of $1,000,000 was taken out on the victim's life on August 1, 1991, barely six months before his death. Donald M. Hyde, the director of claims for the Mutual Life Insurance Company of New York ("MONY"), the company that issued the policy, testified that Landers was the owner of the life insurance policy, that Landers was required to pay premiums on the policy of some $3,000 per month, and that Landers was the sole beneficiary of the policy. As the sole beneficiary, Landers stood to collect $1,000,000 in the event of his father's death. Because Landers, and not his father, was the owner of the policy, the proceeds would not go into his father's estate and would not be subject to estate taxes.

Records from MONY revealed that Landers filed a claim for the $1,000,000 on April 6, 1992. Pursuant to a standard contestability clause allowing MONY to challenge the payment of any life insurance proceeds when the death of the insured occurs within two years of purchase of the policy, MONY contested payment of the proceeds to Landers in federal district court. MONY's challenge was unsuccessful, however, and Landers ultimately collected the proceeds from the policy.

The State also introduced into evidence the financial records of Landers's construction company showing that between September 1991 and February 1992, the majority of Landers's business loans were anywhere from 30 days to 90 days past due, and that during that period, his construction company's bank account was overdrawn on a regular basis. Testimony showed that at the time of his father's death, Landers was embroiled in several contract disputes with customers of his construction company. One of these disputes, with Ricki D. Dobbs, a resident of Montgomery who had contracted with Landers to build a house, was later (after the death of Landers's father) settled, and Landers paid Dobbs some $200,000 out of the $1,000,000 life insurance proceeds he had received.

The State also presented evidence, in the form of a certified copy of the promissory note filed with the Secretary of State, that Landers had borrowed $100,000 from his father and had executed a note payable in that amount in March 1988. However, Don White, a loan officer with SouthTrust Bank, which held Landers's line of credit for his business and had floated two loans totalling $272,000 to Landers in 1989, testified that the financial statement Landers had submitted to SouthTrust Bank to secure the line of credit and the loans had not included any reference to the $100,000 loan Landers had received from his father. White also testified that on February 24, 1992, only 12 days after the death of Landers's father, Landers submitted a revised financial statement to Southtrust in which he listed the $1,000,000 from the life insurance policy as a receivable asset.

The State introduced telephone records relating to Landers's cellular telephone. (Testimony showed that Landers's kept the cellular telephone in his pickup truck.) The telephone records revealed that at 4:14 p.m. on the day of his father's death (February 12, 1992), Landers telephoned Southtrust Bank, and that at 4:23 p.m. that same day, Landers telephoned the Montgomery office of MONY, the company holding the life insurance policy on his father. The telephone records showed that no telephone call was made to "911" on the night of February 12, 1992.

The State also presented evidence that, in 1981, while he was working as a property damage adjustor for AllState Insurance Company, Landers had filed false insurance claims. Walter Maule, AllState's corporate director of security in 1981, testified that he investigated Landers while Landers was an employee of the company and that Landers had confessed to committing several thefts during his employment. According to Maule, Landers confessed that he had filed a repair order for his cousin Bambi Pilgrim in relation to an automobile accident that was some $400 in excess of the actual cost of the repairs. Landers also admitted to Maule that, in relation to the same automobile accident, he had filed a fictitious supplemental repair order in which he claimed that he had missed additional damage in the amount of $720 in the original report, when there was, in fact, no additional damage. Landers also told Maule that he had "coached and abetted" his cousin Bambi in filing another false claim for some $1,900. Finally, Maule said, Landers told him that he had induced another customer of the company to sign the back of a blank draft by promising her that the money would go toward her insurance claim when, in fact,

-5-

Landers filled the draft out to a furniture store to pay for furniture he had purchased for himself. Landers was fired from AllState for these thefts.

The State further presented evidence of three statements Landers made on different occasions to different people regarding the events of February 12, 1992. First, on Saturday, February 15, 1992, Landers gave a statement to law enforcement officials at the Elmore County Sheriff's Department. In that statement, which was admitted into evidence without objection, Landers stated the following:

"My name is Mark Samuel Landers. I am 35 years old, and I reside at 3336 Old Pike Road in Pike Road, Alabama. I am a self-employed general contractor.

"Near the end of 1991, my lake cabin burned down. It was located off Tiger Point Road which turns toward the water off Elmore County Road 9 in the Titus Community. My father, Robert Richard Landers, and I met on Wednesday, 2-12-92, in Montgomery to take some equipment to the lake lot -- some was already there -- and continue grading the remains of the burned cabin off the site. My father left his car at Dr. George's house at 6001 Greystone in Montgomery, and we had breakfast at Denny's Restaurant near the Eastern Bypass and Monticello Drive.

"We reached the lake lot at around 10:30 a.m. or 11:00 a.m. We worked a while -- sometimes my dad would drive the backhoe (which was already up there) and I would drive the bulldozer and sometimes the other way around. We both drove both pieces of equipment that day. The backhoe had been at the site for about a week and the dozer had been there for as long as two weeks. We took a break around lunch and took my pick-up truck up to Powell's store to get a snack and a coke. We came back and worked 3 or 4 more hours and my dad pulled the dump truck up the hill leading from our lot to Tiger Point Road and hooked it to the flat-bed trailer on which we normally carry the dozer. The trailer had been backed up into the woods approximately 25 to 100 yards from the main road off our entrance road. My father got the trailer straight on the road, [and] I drove the dozer up on the trailer. My father pulled the trailer and dozer on up onto Tiger Point Road and off to one side enough to let me get my pick-up truck past. I got in my pick-up truck and drove up to where my father was parked. I pulled up beside him and talked. I told my father I would tie the dozer down. I got a 'wrecker chain' out of my truck that we usually use to tie the trailer to the dozer by hooking one end on the accessory hitch behind the dozer and the other end to a shackle on the trailer. My father told me he'd tie it down and said he knew I had somewhere I had to go, that he'd take care of it. I recall the motor was running in the dump truck. I left between 3:30 and 4:00 p.m. I drove to two job sites in Halcyon Lakes in Montgomery. No crews were there at the time, I just needed to inspect the work. I then went to the YMCA on Carter Hill Road to pick up my son at a basketball game.

"I got home between 6:15 p.m. and 6:30 p.m. and my mom called from home at approximately 6:30 p.m. asking where my father was. I told her that when we left the lake lot, he was behind me. My mother called me from the Shell station at Monticello Road and the Eastern Bypass at around 7:00 p.m. She asked me to pick her up, that my father may have had truck trouble. I picked up my mother and we went by Dr. George's house and saw my father's buick still parked there. I drove to my father's friend Gerri's house on Highway 231 near Wetumpka and didn't find him there, so we drove on up toward the lake lot in case he had truck trouble. We got to the entrance road to the lake

-6-

lot and I saw my father's dump truck with the trailer still hooked to it. It was in the same place it was when I left earlier. I got out and saw the dozer had been backed off the trailer. I walked around the dozer and saw my father's body under the right-hand track of the dozer. I panicked and went to my truck and called my wife on my car phone.

"The dozer had been recently reworked and was in good shape. I don't see how it could have backed itself off the trailer and ran over my father. The interior light of the dump truck was on and the motor was still running. The dozer was not running."

(C. 1599-1602.) The State presented evidence that "Gerri," the friend of Robert Richard Landers, Sr., at whose house Landers claimed to have looked for his father on the way to the lake, was Gerri Waites, with whom the victim had been having an affair for approximately one year before his death.

Thomas Goodney testified that during the reconstruction he participated in on April 6, 1992, Landers made several statements to him about the events of February 12, 1992. Landers account to Goodney of what happened on the day of his father's death was essentially the same account he gave to law enforcement in his statement of February 15, 1992, except that Landers told Goodney that just before he left the site on the afternoon of February 12, he saw two local residents, Kay and Richard Green, drive by on Cliff Side Road. Landers had not told police that he had seen the Greens drive by.

The State called both Kay and Richard Greene to testify at Landers's trial. Both Greens testified that they had travelled to Birmingham on February 12, 1992, to take Richard Green's mother to the doctor. On their way home, both said, they drove down Cliff Side Road, which, both agreed, had been backbladed in preparation for paving. Kay Green stated that they drove down Cliff Side Road sometime between 4:00 and 5:00 p.m. on February 12; Richard Greene remembered only that it was late in the afternoon. Kay Green also testified that she remembered seeing a dump truck, a trailer, and a bulldozer pulled off the side of the road; Richard Green remembered seeing a truck and trailer, but could not recall seeing a bulldozer. According to Kay Greene, the bulldozer was backed into some "woods" near the trailer (unlike Landers's account to Goodney that the bulldozer was on the trailer just before he left the site which was when he also said that he saw the Greens drive by). In addition, Kay Green stated that she saw three men standing near the bulldozer and that when she waved to them as she passed by, they turned their heads away. Kay Green stated that none of the three men she saw was Landers.

The State also introduced into evidence a deposition that Landers gave on November 5, 1992, in relation to the proceedings in the federal district court regarding the proceeds from the life insurance policy. In the deposition, which was read into the record but was not given to the jury during deliberations, Landers's account of the events of February 12, 1992, was essentially the same as his two previous accounts. As he had told Goodney, Landers stated in the deposition that he had seen Kay and Richard Green drive by on Cliff Side Road just before he left his father that afternoon. Landers stated that he left his father at 3:30 p.m., arrived at a job site in Montgomery at 4:00 p.m. and briefly checked the work that had been done that day, and then arrived at his son's basketball game at the YMCA at 4:30 p.m. Landers also stated that he made some calls with his cellular telephone while travelling that afternoon, but that he could not remember whom he had called. Landers further stated in the deposition that when he and his mother drove toward the lake looking for his father and stopped at the home of Gerri Waites (the woman with whom the victim was having an affair), his mother, Lenita Landers, told him that she knew about the affair and had for a long time. When questioned about the insurance policy on his father's life, Landers stated that he purchased the policy at the request of his father; according to Landers, his insurance agent, Jeffrey Chapman, approached him about the policy after he had spoken with his father and Chapman told him that it would be better for estate tax purposes if he, rather than his father, owned the policy. Also in the deposition, Landers denied that he was fired from AllState Insurance Company in 1981; he stated that he left AllState for a better job opportunity at Progressive Insurance Company.

-7-

Landers also denied that he had ever filed or participated in filing a false or fraudulent claim with any insurance company.

Ricki Dobbs testified that his son played basketball with Landers's son and that he was present at the basketball game on February 12, 1992. In contrast to Landers's statement in his deposition that he arrived at his son's basketball game at 4:30 p.m., Dobbs testified that Landers did not arrive at the game until well after 5:30 p.m.

Finally, the State presented the testimony of Victoria Landers Goolsby, Landers's sister. Goolsby stated that the week after the death of her father, she spoke with Agents Rhegness and Burton of the ABI and agreed to help them in the investigation into her father's death. As the investigation progressed and Landers became a suspect, Goolsby became a confidential informant for the ABI and attempted to obtain evidence against Landers. As part of the investigation, Goolsby was instructed by the ABI to tell people, including Landers, that she was having an affair with ABI Agent Rhegness. Agent Rhegness confirmed that part of the investigation included Goolsby telling people that she was having an affair with him; Agent Rhegness testified that this idea came from a member of the behavioral sciences unit of the FBI. Both Agent Rhegness and Goolsby denied that they were actually having an affair. In addition, although both Agent Rhegness and Goolsby testified that Agent Rhegness visited Goolsby at her apartment in Vieux Carre on several occasions to discuss the investigation, both denied that Agent Rhegness ever visited Goolsby at her home on Wares Ferry Road. Goolsby's status as a confidential informant continued for several years during the investigation, but Goolsby was unable to obtain any evidence against Landers.

Goolsby further testified about an incident that occurred shortly before her father's death. According to Goolsby, on February 6, 1992, at approximately 4:00 p.m., she was at her father's home preparing for a birthday party for her son when her father and Landers came home from Landers's lake lot. According to Goolsby, upon entering the house, her father stated to Landers, "You came as close as you will ever come to putting me six feet under the ground today." (R. 1812.) Goolsby stated that she asked her father what had happened and that her father told her that Landers had almost run over him with the bulldozer and nearly killed him. Goolsby stated that her father was upset, pale, and "visibly shaken" while he was recounting the events. (R. 1812.) Goolsby further testified that her father repeatedly told Landers that he had almost killed him, and that he should get "a goddamn foreman" because he was never going to help Landers at the lake lot again. (R. 1813.) Goolsby stated that Landers only laughed and shrugged his shoulders in response to his father's words.

Goolsby testified that she learned of her father's death on February 12, 1992, at approximately 11:45 p.m., when her mother, her sister, Lisa Blue, and Landers came to her home and told her. According to Goolsby, although her sister was extremely upset and crying hysterically, neither her mother nor Landers showed any emotion at all. Goolsby also testified that on February 14, 1992, just after the family had returned to her mother's home following the visitation service for her father, Landers approached her and told her to stay out of the business regarding the life insurance policy on her father and to let him (Landers) handle all the details. Goolsby stated that later that same afternoon, she heard Landers give her sister, Lisa Blue, the same warning.

Landers testified on his own behalf at trial. He denied killing his father on February 12, 1992, and denied that he had tried previously to run his father over with a bulldozer on February 6, 1992. Landers stated that sometime around 1989 or 1990, his sister, Victoria Landers Goolsby, worked for his construction business as a bookkeeper. According to Landers, while working for him, Goolsby forged several checks totalling some $27,000. Although he didn't press charges, Landers said, he took Goolsby to the bank and forced her to admit to stealing the money. Landers stated that his other sister, Lisa Blue, later told him that Goolsby had threatened to get even with him for the event. Goolsby denied that she stole $27,000 from Landers; she said that she took the money out of Landers's business account because he owed her the money and had not payed her back.

-8-

Landers also testified about two conversations that he had had with Goolsby after their father's death. Landers stated that sometime during the summer of 1992, Goolsby invited him to her apartment to talk. There, Landers said, Goolsby offered to provide him with an alibi for the day of their father's death. (Goolsby denied ever offering to provide Landers with an alibi.) Landers said that he told Goolsby that he didn't need an alibi because he had done nothing wrong. Landers also stated that on another occasion that summer, Goolsby told him that she hated their father and was glad that he had died because he had raped her when she was 10 years old. During this conversation, Landers said, Goolsby told him that she and Agent Rhegness were having an affair. During her testimony, Goolsby denied telling Landers that her father had raped her, but also stated that it was possible she had said it on directions from the ABI.

Landers also testified about the events of February 12, 1992. His account at trial was substantially the same as his previous accounts. However, at trial, Landers revised his previous statements that he had seen Kay and Richard Green drive by just before he left the site on February 12. At trial, Landers testified that just before he left his father on February 12, he saw a gray Lincoln travelling away from the lake. According to Landers, he thought the gray Lincoln was owned by Richard and Kay Green, and thus, when questioned about the events of February 12, 1992, he had said on several occasions that he had seen the Greens drive by just before he left his father. However, Landers said, after hearing the Greens testify during his trial that they were driving a Cadillac (not a Lincoln) toward the lake (not away from the lake), he realized that it was not the Greens he had seen just before he left his father, and that it must have been someone else.

Finally, Landers testified that the telephone calls to Southtrust Bank and MONY on the day of his father's death were made because Gene Eaves, executive vice president of Southtrust, and Jeff Chapman, his insurance agent at MONY, had telephoned him earlier in the day and he was merely returning their calls.

Landers's mother, Lenita Landers, also testified on Landers's behalf. According to Mrs. Landers, when she and Landers discovered her husband's body under the bulldozer, she attempted to use Landers's cellular phone to call 911, but could not get through. Mrs. Landers stated that she later learned that, at that time in 1992, AllTell, the company through which Landers had his cellular service, did not provide 911 service for cellular telephones. Mrs. Landers testified that when she could not dial 911, she telephoned Landers's wife, Susan, and asked her to telephone 911 for help. According to Mrs. Landers, it took a long time for help to arrive, and while she and Landers were waiting, they decided to drive down the road to attempt to obtain help on their own. When they were down the road, Mrs. Landers said, they saw headlights behind them near the scene, so they turned around and went back. Mrs. Lander stated that when they got back to the scene, there were several cars and a number of people at the scene, including spectators. According to Mrs. Landers, the scene was not secured and both the police officers and spectators were walking all around the scene.

Mrs. Landers further testified (in contrast to Investigator Martin's testimony) that it had rained the entire evening of February 12, 1992, from the time she and Landers left Montgomery to look for her husband until after they had left the scene later that night. Mrs. Landers also stated that after her husband's body had been removed from the scene, Sheriff Bill Franklin approached her and told her that it was an "unfortunate accident" and asked her if she wanted her husband's wallet, ring, and eyeglasses. According to Mrs. Landers, she took the wallet and ring, but told Sheriff Franklin that he could keep the glasses since they were prescription glasses and of no use to her.

Sheriff Franklin denied telling Mrs. Landers that her husband's death was an accident, or offering her her husband's wallet, ring, or glasses. As noted above, Sheriff Franklin testified that the victim's glasses were not discovered until the following day.

Landers's sister, Lisa Blue, also testified on Landers's behalf. Blue testified that she learned of her father's death on February 12, 1992, when Landers and her mother came to her home to inform her;

– 9 –

Blue stated that both her mother and Landers were very upset and crying when they told her. Blue also testified that Goolsby did not get along well with Landers, particularly after she had worked for his construction business and had, according to Blue, stolen some $27,000 from the business. Blue stated that following that incident, Goolsby told her that she was going to get even with Landers "one way or another" because he had "embarrassed her and ruined her reputation." (R. 2091.) Goolsby denied making this statement. Blue also testified that Goolsby told her that she had Agent Rhegness of the ABI "wrapped around her fingers" and that she "could get him to do anything she wanted him to do." (R. 2094.) Goolsby denied making this statement as well. Blue further testified that she saw Agent Rhegness several times at Goolsby's apartment in Vieux Carre and at Goolsby's home on Wares Ferry Road. As noted above, both Goolsby and Agent Rhegness denied that Rhegness had ever been to Goolsby's home on Wares Ferry Road. Blue also testified that while watching Goolsby from outside her apartment, she saw Agent Rhegness and Goolsby in Goolsby's bedroom kissing.

Finally, Blue testified about an incident on February 6, 1992, between her father and Landers, the same incident that Goolsby testified about. In contrast to Goolsby's testimony that her father had told her that Landers had almost run over him with a bulldozer, Blue said that on February 7, 1992, the day after the incident, her father told her that it was Landers who had been hit by the bulldozer and injured. Blue stated that she saw Landers the day following the incident, on February 7, 1992, and noticed a large knot on his head. Goolsby denied seeing any knot on Landers's head on February 6, 1992, after the alleged incident.

Landers also called Gerald Carroll, service manager for Tractor Equipment Company, and Alan Smith, a service technician for Tractor Equipment Company, to testify. Both Carroll and Smith testified that in May of 1992, they serviced a John Deere 450-E bulldozer owned by Landers, the bulldozer at issue in this case. Alan Smith testified that after he and another mechanic had rebuilt the engine on the bulldozer, they took the bulldozer outside to test it and that it "jumped into" reverse and "took off" backwards. (R. 2021.) Smith immediately reported this occurrence to Carroll, and subsequently Carroll attempted to get the bulldozer to jump into gear on its own, but was unsuccessful. Smith testified that other than the bulldozer jumping into reverse, everything on the bulldozer appeared to be in "good working order." (R. 2022.)

Gerald Whitehouse, a consulting engineer certified as an expert in mechanical engineering by the trial court, testified that the 450-E John Deere bulldozer, like the one in this case, has no safety mechanism to stop movement if the operator of the bulldozer leaves the operator's seat. According to Whitehouse, if such a bulldozer were travelling in reverse and the operator left the operator's seat, the bulldozer would continue to travel in reverse until it hit something or the engine stalled. Whitehouse also testified that if a man with the same measurements as the victim were to step onto the right track of a 450-E bulldozer while it is travelling in reverse, his feet would be pulled backwards toward the rear of the bulldozer, his body would fall forward onto the track, and his body would then be pulled backwards and under the track. Whitehouse also testified that State's Exhibit 27-F, a photograph of the operator's floorboard on the bulldozer at issue in this case, showed a black substance on the floorboard that appeared to be hydraulic fluid. According to Whitehouse, the location of the hydraulic fluid was near the fitting or valve on the hydraulic tank that controls the blade of the bulldozer. Whitehouse testified that, if this hydraulic fluid came from the hydraulic valve controlling the blade, it would be impossible to keep the blade in an "up" position for any length of time and that the blade, even if initially left in an "up" position, would gradually go down on its own. On cross-examination, Whitehouse agreed with the State's expert, Thomas Goodney, that a bulldozer backed off a trailer such as the one found at the scene of the crime, would leave trackmarks in the dirt.

Ken Edwards, Landers's second cousin, testified that between 3:30 and 4:30 p.m. on February 12, 1992, the day of the victim's death, he saw Landers at a construction site on Halcyon Boulevard in

-10-

Montgomery. According to Edwards, Landers stopped at the site briefly, told Edwards that he had to pick his son up at a basketball game at the YMCA, and then left.

Suzanne Driggers testified that on February 12, 1992, she was working at a Chevron station on Highway 231 near Wetumpka and that she remembered seeing Landers and his father come into the store around lunchtime and purchase snacks and drinks. Driggers testified that she remembered that Robert Richard Landers, Sr., was wearing khaki pants, a hunting vest, and metal-frame glasses.

Jeffrey Chapman, the insurance agent who sold the $1,000,000 life insurance policy on the victim's life to Landers, testified that he was the person who initiated the sale of the insurance to Landers. According to Chapman, he spoke with Landers several times over the course of a year in an attempt to get Landers to take out an insurance policy on his father and that it wasn't until August of 1991 that Landers agreed and got the victim to come to his office on August 1, 1991 to fill out the application. Chapman's testimony contradicted Landers's own statement in the deposition in which Landers stated that it was his father's idea to purchase the insurance, not Chapman's. On cross-examination, Chapman stated that he did not remember speaking with Landers on the day of the victim's death.

Landers also called Deputy Willie George Townsend, the first officer to arrive at the scene on February 12, 1992, to testify. Deputy Townsend testified that when he arrived at the scene, he noticed a glass case near the victim's head. In response to questioning by Landers's counsel, he stated that he remembered being interviewed by Gerald Shockley of the ABI on March 13, 1997, and that he remembered telling Shockley that he believed he had seen eyeglasses, not an eyeglass case, near the victim's head. Deputy Townsend further stated that, after the interview with Shockley, he spoke with Sheriff Bill Franklin and then realized that he had seen an eyeglass case rather than eyeglasses.

Finally, Landers called several witnesses to testify that they had seen Landers's father operate bulldozers and other heavy equipment and that he was not a very good operator. Several other witnesses testified that Landers had a good reputation in the community for peaceableness and non-violence.

   """In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So. 2d 871 (Ala.Crim.App.), cert. denied, 368 So. 2d 877 (Ala. 1979); Scruggs v. State, 359 So. 2d 836, 842 (Ala.Crim.App.), cert. denied, 359 So. 2d 843 (Ala. 1978).

   """In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So. 2d 428 (Ala.Crim.App. 1976); Edson v. State, 53 Ala.App. 460, 301 So. 2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala.App. 4, 325 So. 2d 520, cert. denied, 295 Ala. [398], 325 So. 2d 531 [(1976)].

   """Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So. 2d 96 (Ala.Crim.App. [1976]). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness,

-11-

the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So. 2d 821 (1969); Morton v. State, 338 So. 2d 423 (Ala.Crim.App. 1976).

"'Freeman v. State, 505 So. 2d 1079 (Ala.Crim.App. 1986), quoting, Johnson v. State, 378 So. 2d 1164, 1169 (Ala.Crim.App. 1979), writ quashed by Ex parte Johnson, 378 So. 2d 1173 (Ala. 1979).'"

Anderson v. State, 542 So. 2d 292, 295-96 (Ala.Crim.App. 1987), writ quashed, 542 So. 2d 307 (Ala.), cert. denied, 493 U.S. 836, 110 S.Ct. 116, 107 L.Ed.2d 77 (Ala.), quoted in Bankhead v. State, 585 So. 2d 97, 104 (Ala.Crim.App. 1989), aff'd on return to remand, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala.Crim.App. 1992), rev'd on other grounds, 625 So. 2d 1146 (Ala. 1993), and quoted with approval in Pilley v. State, [Ms. CR-96-1781, August 14, 1998] ___ So. 2d ___, ___ (Ala.Crim.App. 1998), rev'd on other grounds, [Ms. 1980132, January 28, 2000] ___ So. 2d ___ (Ala. 2000).

"'"[C]ircumstantial evidence alone can support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty."'" Smith v. State, 727 So. 2d 147, 172 (Ala.Crim.App. 1998), aff'd, 727 So. 2d 173 (Ala.), cert. denied, ___ U.S. ___, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999), quoting White v. State, 546 So. 2d 1014, 1017 (Ala.Crim.App. 1989), quoting in turn, White v. State, 294 Ala. 265, 314 So. 2d 857 (Ala.), cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). "'"Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused."'" Neal v. State, 731 So. 2d 609, 619 (Ala.Crim.App. 1997), aff'd, 731 So. 2d 621 (Ala.), cert. denied, 527 U.S. 1027, 119 S.Ct. 2377, 144 L.Ed.2d 780 (1999), quoting White, 546 So. 2d at 1017, quoting in turn, Cochran v. State, 500 So. 2d 1161, 1177 (Ala.Crim.App. 1984), aff'd in part, rev'd on other grounds, 500 So. 2d 1179 (Ala. 1985), aff'd on return to remand, 500 So. 2d 1188 (Ala.Crim.App.), aff'd, 500 So. 2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987)(citations omitted). "[I]n reviewing a conviction based on circumstantial evidence, this court must view the evidence in the light most favorable to the prosecution. 'The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.'" Id., quoting White, 546 So. 2d at 1016. "Whether the circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis but that of the defendant's guilt is a question for the jury and not the court." Cumbo v. State, 368 So. 2d 871, 875 (Ala.Crim.App. 1978), cert. denied, 368 So. 2d 877 (Ala. 1979). "The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is to examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged." Dolvin v. State, 391 So. 2d 133, 138 (Ala. 1980), quoting Cumbo, 368 So. 2d at 874, quoting in turn, Odom v. United States, 377 F.2d 853, 855 (5th Cir. 1967)(emphasis added). Moreover, "[t]he weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury." Smith v. State, 698 So. 2d 189, 214 (Ala.Crim.App. 1996), aff'd, 698 So. 2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).

In challenging the sufficiency of the evidence to sustain his conviction, Landers first argues that the State failed to prove that the victim died as the result of the criminal agency of another. Specifically, he contends that the State's evidence "did not exclude the reasonable hypothesis that Robert Landers's death was an accident." (Landers's brief to this court, p. 133.)

-12-

The State presented evidence that there was a vertical laceration and vertical fractures on the victim's left temple that were inconsistent with the other horizontal injuries to the victim. Dr. Lauridson testified that the vertical injuries to the left temple were consistent with a blunt force, not with the horizontal "cleats" of a bulldozer track. Based on these medical findings and other information he received from the investigation, Dr. Lauridson concluded that the victim's death was a homicide. This evidence, alone, was sufficient for a jury to conclude that the victim's death was the result of the criminal agency of another and not an accident.

However, the State also presented other circumstantial evidence tending to support this conclusion. The State presented evidence that the victim's eyeglasses and a substance that appeared to be blood were found near the *left* track of the bulldozer, but that the victim's body was discovered under the *right* track of the bulldozer; that there were no bulldozer trackmarks or backblading marks at the scene whatsoever; and that if the bulldozer had been backed off the trailer, it would have left at least some evidence of trackmarks (or, if the blade was down, backblading marks) in the dirt. Testimony showed that the bulldozer could not have been backed off the trailer into the position in which it was found (at approximately a right angle to the trailer) without tearing up the ramp, but that the ramp was in good condition when the victim was found, and that the chain and pipe found on the trailer could not have been in the position investigators found them in at the scene (on the trailer) when the bulldozer was backed off the trailer, because a subsequent reenactment of the incident revealed that backing the bulldozer over the chain and pipe resulted in indentations in the wooden trailer bed and there were no indentations in the trailer bed before the reenactment. The jury could have reasonably concluded from this evidence that Robert Richard Landers, Sr., did not accidentally fall off the bulldozer and get pulled under the right track and crushed, but that someone else was present at the time he was crushed, that the person present placed the chain and pipe on the trailer only *after* the bulldozer was off the trailer and the victim was dead, and that person covered up the trackmarks made by the bulldozer at the scene. The State presented sufficient evidence from which the jury could have by fair inference concluded that the victim died as a result of a homicide and not an accident.

Landers contends that, even if there was sufficient evidence that the victim's death was a homicide, the evidence was still insufficient to sustain his conviction because, he says, the State failed to connect him to the crime. Specifically, Landers contends that "there must be more than the mere fact that [he] was the beneficiary of an insurance policy" to sustain a conviction for capital murder and that "[t]here is absolutely no evidence of any association between [him] and any injury to his father." (Landers's brief to this court, p. 126.) We disagree.

Although the State's case against Landers was entirely circumstantial, and each piece of evidence, standing alone, was insufficient, when the various items of evidence pointing to Landers as the perpetrator of this crime are viewed in conjunction with each other, a jury could reasonably have concluded that the evidence excluded every reasonable hypothesis except that of Landers's guilt.

The State presented evidence that Kay and Richard Green drove by the scene on February 12 between 4:00 and 5:00 p.m. and that the bulldozer was already backed into some "woods" at that time. When found by investigators, the bulldozer was backed against an embankment of trees and brush and was on top of the victim. The jury could reasonably have concluded that the victim had already been killed and that the bulldozer was in the position in which it was found by investigators when the Greens drove by. While Kay Green testified that she saw three men at the scene, none of which, she said, was Landers, Landers himself stated, on at least two different occasions, that he was present at the scene when the Greens drove by, thus placing himself at the scene of the crime. In addition, Ricki Dobbs testified that Landers did not arrive at the YMCA in Montgomery until after 5:30 p.m., thus contradicting Landers's claim that he left the scene at 3:30 p.m. and arrived at the YMCA at 4:30 p.m. The jury could reasonably have concluded from this evidence that Landers was present at the time his father was crushed by the bulldozer. Although we realize that Landers recanted his statements about seeing the Greens on

-13-

February 12 at trial, his trial testimony created nothing more than a conflict in the evidence for the jury to resolve. Obviously the jury resolved that conflict adversely to Landers, and we will not disturb that finding on appeal.

The State also presented evidence that Landers's construction company was having financial difficulties; that he was embroiled in a contract dispute that resulted in his having to pay some $200,000 to a dissatisfied customer of his company; that a $100,000 loan from his father was overdue; and that he had purchased a life insurance policy in the amount of $1,000,000 on his father barely six months before his father's death of which he was the sole beneficiary. Although Landers stated in his deposition that he purchased the insurance policy only at the request of his father, he then presented conflicting testimony at his trial (from his insurance agent, Jeffrey Chapman) that it was his insurance agent who initiated the policy, not his father. The State also introduced telephone records of Landers's cellular telephone showing that Landers telephoned both the bank that held the line of credit for his company and his insurance agent at approximately 4:15 p.m. on the day of his father's death. Evidence also showed that Landers filed a revised financial statement with his bank only 12 days after his father's death, in which he listed the $1,000,000 from the life insurance policy as a receivable asset. Evidence showed that Landers had previously filed false insurance claims while working for AllState Insurance Company in order to obtain money for himself and family members, and that later, during his deposition, he lied about being fired from AllState for those false claims. The jury could have reasonably concluded that Landers was, and always had been, motivated by greed, and killed his father simply to get money. The State also presented evidence that Landers had, only six days before his father's death, almost run over his father with the same bulldozer, thus raising the reasonable inference that Landers had attempted to kill his father once before, but failed in the attempt.

> "'While not alone sufficient to justify a conviction, motive may strengthen circumstantial evidence. The fact that the deceased was last seen in the presence of the accused is also a circumstance to consider.... A false explanation given by the accused of any suspicious fact or circumstance tending to connect him [or her] with the offense is admissible in evidence against him [or her].... The jury may properly consider conflicting statements as indicating a consciousness of guilt.'"

Bankston v. State, 620 So. 2d 115, 119 (Ala.Crim.App. 1992), quoting Cumbo, supra, at 876.

Here, the State showed that the victim's death was the result of a homicide; that Landers had a motive to kill his father; that Landers was the last person to see the victim alive and was present at the time his father was killed; that Landers lied about his whereabouts on the afternoon of his father's murder; and that Landers had attempted to kill his father once before and failed.

> "'"The true test of the sufficiency of circumstantial evidence to justify a conviction is whether the circumstances as proved produce a moral conviction to the exclusion of every reasonable doubt. It is not necessary for the circumstances to be 'such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused.' Bland v. State, 75 Ala. 574; Banks v. State, 72 Ala. 522; Matthews v. State, 55 Ala. 65." Mitchell v. State, 114 Ala. 1, 6, 22 So. 71, 72 (1897).'"

Cumbo, supra, at 875. Moreover,

> "'"[w]hether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the

-14-

defendant's guilt is a question for the jury and not the court.' Our function is not to be factfinders, however tempting that may sometimes be. We must not substitute ourselves for jurors, nor play their role in the criminal process. Jury verdicts should not be disturbed unless they are not based upon evidence sufficient to meet the test set out above.'"

Parker v. State, 589 So. 2d 773, 776 (Ala.Crim.App. 1991), quoting Linzy v. State, 455 So. 2d 260, 262 (Ala.Crim.App. 1984). (Citations omitted; emphasis in Parker.)

Considering the evidence in the light most favorable to the State, accepting as true all evidence introduced by the State, and allowing all legitimate inferences in favor of the State, we hold that there was sufficient evidence from which the jury could have, by fair inference, reasonably concluded that the State's case, albeit circumstantial, excluded every reasonable hypothesis except that of Landers's guilt. Accordingly, the trial court properly submitted the case to the jury for consideration.

II.

Landers contends that the trial court erred in denying his pretrial motion to dismiss the indictment or, in the alternative, to suppress certain evidence, because, he says, he was denied due process by the State's four-year delay in indicting him and the resulting loss or destruction of several pieces of evidence.

A.

First, Landers contends that the trial court should have suppressed the testimony of the medical examiner, Dr. James Lauridson, regarding the vertical fractures on the victim's left temple, which Dr. Lauridson stated were the result of a blunt force, and Dr. Lauridson's final autopsy report in which Dr. Lauridson concluded that the victim's death was a homicide. According to Landers, both the victim's skull and Dr. Lauridson's initial report prepared after the examination conducted on February 13, 1992, were destroyed by Dr. Lauridson, thus preventing him from conducting his own tests on the victim's skull and from "fully convey[ing]" to the jury the discrepancy between Dr. Lauridson's conclusion in his initial report that the victim's death was accidental and his subsequent conclusion after a full autopsy that the victim's death was a homicide. (Landers's brief to this court, p. 150.)

In Ex parte Gingo, 605 So. 2d 1237 (Ala. 1992), cert. denied, 506 U.S. 1049, 113 S.Ct. 967, 122 L.Ed.2d 123 (1993), the Alabama Supreme Court enunciated the standard regarding the loss or destruction of evidence by the State:

"'[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' Youngblood [v. Arizona], 488 U.S. [51,] 58, 109 S.Ct. [333,] 337, [102 L.Ed.2d 281 (1988)]. 'The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' Youngblood, 488 U.S. at 57 (footnote), 109 S.Ct. at 337 (footnote), citing Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

"Although to show bad faith, for the purpose of showing a due process violation, the defendant must show that the State had knowledge of the exculpatory value of the destroyed evidence, 'there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.' Youngblood, 488 U.S. at 67, 109 S.Ct. at 342 (Stevens, J., concurring in the result)."

-15-

605 So. 2d at 1240-41. See also Griffin v. State, [Ms. CR-97-1026, December 10, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999), rev'd on other grounds, [Ms. 1991354, August 18, 2000] ___ So. 2d ___ 2000); and May v. State, 710 So. 2d 1362 (Ala.Crim.App. 1997).

Contrary to Landers's contention in his brief to this court, neither this court nor the Alabama Supreme Court has rejected the bad faith requirement set out by the United States Supreme Court in Youngblood v. Arizona, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Rather, the Alabama Supreme Court has recognized that, in addition to those cases involving bad faith on the part of the State, there may be cases in which a defendant is denied due process by the loss or destruction of evidence even when the culpability of the State cannot be proven: if the evidence is so critical to the defense that its loss renders the defendant's trial fundamentally unfair. Here, Landers has not even alleged, much less proven, that the State acted in bad faith in destroying the evidence in question; therefore, we must determine whether the victim's skull and Dr. Lauridson's initial written report were so critical to Landers's defense that their destruction rendered his criminal trial fundamentally unfair.

The record reflects that the victim's skull was destroyed by the Department of Forensic Sciences sometime after Dr. Lauridson finished reapproximating the bones; Dr. Lauridson could not remember whether the skull was destroyed before or after Landers was indicted in 1996. Dr. Lauridson testified, however, that although that portion of the skull exhibiting the horizontal crushing fractures caused by the bulldozer was destroyed, he retained the portion of the victim's left temple reflecting the vertical fractures which he determined to be caused by a blunt force. We note that there is nothing in the record indicating that Landers ever requested to examine the portion of the skull that was retained.

Nevertheless, Landers claims that the destruction of the portion of the victim's skull exhibiting the horizontal crushing fractures prevented him from having the entire skull examined to determine whether Dr. Lauridson's observation that there were, in fact, two distinct types of fractures, horizontal and vertical, was "accurate." (Landers's brief to this court, p. 143.) According to Landers, Dr. Lauridson's identification of two different types of fractures in the victim's skull was a "pivotal component" of the State's case (Landers's brief to this court, p. 144), necessary to prove that the victim's death was a homicide, and that therefore, the victim's skull was "clearly material" to his defense. (Landers's brief to this court, p. 145.) We disagree.

The record reflects that Dr. Lauridson took several photographs of the victim's skull, all of which were introduced into evidence without objection by Landers, and all of which were available to Landers for analysis before trial. These photographs clearly show two different types of fractures on the victim's skull, some horizontal and some vertical. As noted above, that portion of the skull containing the vertical fractures which Dr. Lauridson opined were consistent with a blunt force was also available to Landers for analysis before trial. Landers offers only unfocused speculation that Dr. Lauridson's observation of two different types of fractures, an observation supported by the numerous photographs of the victim's skull, may have been inaccurate and that that portion of the victim's skull that was destroyed may have been exculpatory. Such speculation is simply not sufficient to show a due process violation.

Moreover, in addition to the horizontal and vertical fractures of the victim's skull discovered after the full autopsy on March 3, 1992, Dr. Lauridson testified that he observed during his first external examination of the victim on February 12, 1992, a vertical laceration to the victim's left temple that was inconsistent with the numerous horizontal abrasions over the remainder of the victim's body that were caused by the bulldozer. As the State correctly points out in its brief to this court, evidence of this inconsistent laceration was sufficient, without evidence of the inconsistent fractures, to raise an inference that the victim suffered from a blow to the head before being run over by the bulldozer, and therefore, to support the State's theory that the victim's death was a homicide. Although the victim's skull was an important piece of the State's case, it was not the only piece tending to show that the victim's death was a homicide, and the State's case was supported, as noted in Part I of this opinion, by ample other circumstantial evidence.

-16-

According to Landers, however, the victim's skull would have supported his defense that the victim's death was an accident by refuting Dr. Lauridson's findings that there were two different types of fractures, only the horizontal ones consistent with being crushed by a bulldozer, and by refuting the inference that the vertical injuries were caused by a blow to the head. However, as Landers correctly, and continuously, points out in his brief to this court, he elicited on cross-examination testimony from Dr. Lauridson that the blunt-force injury to the victim's left temple could have been the result of a homicide or an accident, and that an autopsy alone cannot determine whether an injury was inflicted intentionally, i.e., was the result of a homicide, or accidentally, but that additional information from investigators is necessary to make that determination.  Dr. Lauridson further stated on cross-examination that his determination in this case that the victim's death was a homicide was based not only on the autopsy and the differing fractures he discovered but also on additional information he received from investigators. Landers impressed upon the jury the fact that the victim's skull was destroyed before he had the opportunity to examine it, that Dr. Lauridson's conclusion that the victim's death was a homicide was not based solely on the injuries to the victim, but also on other information obtained during the investigation, that the investigation into the victim's death was not as thorough as it could have been and that mistakes were made during the investigation, and even suggested to the jury that the destruction of the skull by Dr. Lauridson resulted in the loss of important, and possibly exculpatory, evidence for the defense.

Under these circumstances, we simply cannot say that that portion of the victim's skull exhibiting the horizontal crushing fractures was so critical to Landers's defense that its destruction rendered his trial fundamentally unfair.  The trial court did not err in denying Landers's motion to suppress evidence of the vertical injuries to the victim's left temple.

As to the destruction of Dr. Lauridson's initial report, the record reflects that a written copy of Dr. Lauridson's initial conclusion that the victim's death was an accident, made just after his first examination of the victim on February 13, 1992, was destroyed by Dr. Lauridson and no backup computer disk of that written conclusion was retained.  Dr. Lauridson testified that his initial conclusion that the victim's death was accidental, originally written in his initial report, was deleted after he conducted a full autopsy of the victim on March 3, 1992, and replaced with the results from the full autopsy and his final conclusion that the victim's death was a homicide. Dr. Lauridson stated that his observations and findings from his initial examination were retained and included in his final report, but that, in lieu of writing a new report after the full autopsy, he merely deleted his initial conclusion that the death was an accident and extended the initial report to include his findings and conclusion from the autopsy. As a result, pages one and two of Dr. Lauridson's autopsy report are the findings and observations from the first external examination on February 13, 1992, and the remainder of the report are the findings and observations from the full autopsy on March 3, 1992, and Dr. Lauridson's final conclusion that the victim's death was a homicide.

Landers claims that the written version of Dr. Lauridson's initial conclusion that the victim's death was accidental was necessary to "fully convey" the discrepancy between that conclusion and Dr. Lauridson's subsequent conclusion that the victim's death was the result of a homicide. (Landers's brief to this court, p. 150.) We disagree.

The record reflects that there was ample evidence, mainly through Dr. Lauridson's own testimony, that Dr. Lauridson initially concluded that the victim's death was accidental and the jury was well aware of that fact. There could be no more persuasive evidence to "fully convey" Dr. Lauridson's conflicting conclusions than Dr. Lauridson's own testimony that he initially concluded that the victim's death was accidental and then subsequently changed that opinion to conclude that the victim's death was the result of a homicide. As noted above, Landers elicited testimony from Dr. Lauridson that his final conclusion was based not only on the autopsy, but also on information he had received from investigators, and Landers showed that the investigation into the victim's death, the results of which were considered by Dr. Lauridson in forming his opinion, was not conducted as thoroughly as possible and that numerous

-17-

mistakes were made by investigators during that investigation. In addition, Landers introduced into evidence, without objection, the notes Dr. Lauridson made during his initial exam which included his initial conclusion that the death was accidental. Clearly then, the typewritten version of Dr. Lauridson's initial conclusion was merely cumulative of other evidence introduced by Landers regarding Dr. Lauridson's initial conclusion and was not so critical to his defense that its loss rendered his trial fundamentally unfair. The trial court did not err in denying Landers's motion to suppress Dr. Lauridson's final autopsy report.

B.

Landers contends that the trial court should have suppressed the testimony of Investigator Byron Martin regarding the substance, which he believed was blood, that he saw on the left track of the bulldozer and on leaves in front of the bulldozer near the blade when he first arrived at the scene on February 12, 1992. Landers maintains that the State's failure to collect a sample of the substance and analyze it to determine whether it was, in fact, blood, and if so, whose blood it was, violated his due process rights because it prevented him from having access to potentially exculpatory evidence. According to Landers, the failure to collect evidence in the first place is the equivalent of the failure to preserve evidence after it has been collected. We disagree.

There is a fundamental distinction between the failure to preserve evidence after it has been seized and the failure to collect evidence in the first instance when investigating a crime scene. It is one thing to challenge the State's negligent or intentional loss or destruction of evidence in its possession, but quite another to challenge the manner of investigation itself. Although due process requires that the State preserve potentially exculpatory evidence that has been seized, see Arizona v. Youngblood, supra, and to disclose such evidence to the defense, see Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), there is no corresponding due process requirement that the State collect certain evidence. To create such a due process requirement would unduly burden police officers and force them to gather up every scintilla of evidence regardless of its apparent value, or even its connection to the crime, in order to avoid running the risk of denying a defendant due process. The police cannot be expected to "'gather and collect everything which, with fortuitous foresight, might prove useful to the defense,'" because to do so would "'cast upon the prosecution the burden of preserving what may only be termed "potential" evidence.'" People v. Bradley, 159 Cal.App.3d 399, 406, 205 Cal.Rptr 485, 489 (Cal.App. 1984)(citations omitted).

In Arizona v. Youngblood, supra, the United States Supreme Court stated:

"If the [lower] court meant ... that the Due Process Clause is violated when the police fail to use a particular investigatory tool, we strongly disagree. The situation here is no different than a prosecution for drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests."

488 U.S. at 58-59, 109 S.Ct. at 338. Other jurisdictions have similarly recognized the difference between the failure to collect evidence and the failure to preserve evidence already collected. See, e.g., State v. Latham, [1998 WL 191162, April 22, 1998] ___ P.2d ___ (Alaska.App. 1998)(the State has no constitutional duty to utilize any particular investigative tool); State v. Steffes, 500 N.W.2d 608 (N.D. 1993)(the police generally have no duty to collect evidence for the defense); State v. Stepter, 794 S.W.2d 649 (Mo. 1990)(the State does not have a duty to gather and present all evidence conceivably germane to the case); State v. Heth, 750 P.2d 103 (Mont. 1988)(the police have no affirmative duty to search for evidence favorable to the defendant); State v. Rivera, 733 P.2d 1090 (Ariz. 1987)(the State has no

-18-

affirmative duty to seek out and collect potentially exculpatory evidence for the defendant to use in his defense); People v. Moore, 701 P.2d 1249 (Colo.Ct.App.), cert. denied, 706 P.2d 802 (Colo. 1985)(the failure to investigate does not constitute suppression of evidence and the defendant does not have the right to compel the State to search out and collect potentially exculpatory evidence on his behalf); State v. Smith, 370 N.W.2d 827 (Wis.Ct.App. 1985), rev'd on other grounds, 388 N.W.2d 601 (Wis. 1986)(a defendant's right to due process does not require the State to collect all evidence which might turn out to be exculpatory); State v. Judge, 675 P.2d 219 (Wash. 1984)(police are only required to preserve evidence which actually comes into their possession; they are not required to investigate or search for exculpatory evidence at a crime scene, conduct tests, or pursue every angle on a case); Bradley, supra (officers have no duty to collect evidence at the scene of a crime); State v. Wells, 645 P.2d 371 (Idaho.Ct.App. 1982)(the State need not collect evidence for the defendant); People v. Baber, 187 N.W.2d 508 (Mich.App. 1971)(it is not the duty of the police to exhaust all scientific means available in collecting evidence at the scene of a crime). But see Daniels v. State, 956 P.2d 111 (Nev. 1998)(adopting a two-part materiality/culpability test for determining whether the failure to collect evidence results in the denial of due process); Collins v. Commonwealth, 951 S.W.2d 569 (Kent. 1997)(applying the bad-faith requirement of Arizona v. Youngblood to the State's failure to collect evidence); State v. Ware, 881 P.2d 679 (N.M. 1994)(adopting a two-part materiality/culpability test in determining whether the State's failure to collect evidence results in the denial of due process).

Here, Landers was free to, and in fact did, argue to the jury that the substance Martin saw at the scene may not have been the victim's blood and may not even have been blood at all. The question whether the substance was blood and, if so, whether it was the victim's blood was a question for the jury. Although there is no doubt that here, as in many investigations, the officers wish, in hindsight, that they had conducted a more thorough and detailed investigation, an inadequate investigation alone does not rise to the level of a due process violation. "To require that in every case the State must, in its investigation of a crime, leave no stone unturned would shift the line of fairness between the rights of an accused and the rights of society totally to one side." Wells, supra at 373. Accordingly, the trial court did not err in denying Landers's motion to suppress the testimony of Investigator Martin.

### C.

Landers also contends that the trial court should have suppressed the testimony of Catherine McGeehan that there was blood on the victim's eyeglasses and that the blood was the same blood type, Type O, as that of the victim. Landers argues that because the sample of blood on the glasses was used up during the testing procedure and because McGeehan destroyed the vial of the victim's blood that she had received from Dr. Lauridson and to which she compared the blood on the glasses, he was unable to perform his own tests on the blood to refute McGeehan's finding, and therefore, was denied due process.

The record reflects that Landers did not include this claim in his motion to dismiss/motion to suppress, he did not argue this claim at the hearing on that motion, and he did not object to McGeehan's testimony regarding the blood on the victim's glasses or her determination that it was the same blood type as the victim on the grounds that the blood evidence had been destroyed.[1] "'An issue which has been raised for the first time on appeal is not subject to appellate review, because it has not been properly preserved and presented.'" Butler v. State, [Ms. CR-99-0189, April 28, 2000] ___ So. 2d ___, ___ (Ala.Crim.App. 2000), quoting Pate v. State, 601 So. 2d 210, 213 (Ala.Crim.App. 1992).

---

[1] Landers only objection to McGeehan's testimony was on the ground that the State failed to prove the chain of custody of the glasses.

-19-

### D.

Finally, Landers contends that trial court should have dismissed the indictment against him based on the four-year preindictment delay. According to Landers, the State intentionally delayed indicting him until 1996, some four years after his father died and after Dr. Lauridson had determined the death to be a homicide, thus depriving him of his right to due process.

"The United States Supreme Court has stated that the 'Due Process Clause had a limited role to play' in protecting against the prejudice caused by a preindictment delay. <u>United States v. Lovasco</u>, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977), quoted in <u>State v. Prince</u>, 581 So. 2d 874, 877 (Ala.Crim.App. 1991). 'A defendant is charged with a heavier burden of proof in showing a preindictment delay due process violation than in showing a denial of his speedy trial rights.' <u>Stoner v. State</u>, 418 So. 2d 171, 180 (Ala.Crim.App.), cert. denied, 418 So. 2d 184 (Ala. 1982), cert. denied, 459 U.S. 1128, 103 S.Ct. 764, 74 L.Ed.2d 978 (1983). 'In order to establish a due process violation due to preindictment delay, a defendant must show "(1) that the delay caused actual prejudice to the conduct of his defense, and (2) that the delay was the product of deliberate action by the government designed to gain a tactical advantage." <u>United States v. Lindstrom</u>, 698 F.2d 1154, 1157-58 (11th Cir. 1983).' <u>Prince</u>, 581 So. 2d at 878. A defendant seeking to establish the first prong necessary to show a due process violation from the delay 'must show "actual prejudice, not the mere possibility of prejudice, and that the delay caused substantial prejudice to [the defendant's] rights to a fair trial."' <u>Id.</u>, quoting <u>Stoner</u>, 418 So. 2d at 180. 'Passage of time per se is not a constitutional violation.' <u>Stoner</u>, 418 So. 2d at 180, quoting <u>Lovasco</u>, supra."

<u>R.D.H. v. State</u>, [Ms. CR-94-2239, July 3, 1997] ___ So. 2d ___, ___ (Ala.Crim.App. 1997).

The only allegation of prejudice in this case is the loss or destruction of several pieces of evidence. However, as we have already determined that that evidence was not so critical to Landers's defense that its loss rendered his trial fundamentally unfair, it is clear that Landers has failed to show actual prejudice.

Likewise, Landers has failed to show that the delay in indicting him was deliberate on the part of the State in order to gain a tactical advantage. Landers claims that the State's use of Landers's deposition from the civil case against MONY regarding the insurance proceeds at his trial shows that the State deliberately delayed indicting him in order to gain "access to evidence and testimony which it would otherwise have been unable to obtain." (Landers's brief to this court, p. 155.) However, the mere use of evidence obtained during the delay is not sufficient to show the State's malicious intent.

Moreover, "prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe the accused is guilty," and "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." <u>United States v. Lovasco</u>, 431 U.S. 783, 790-91, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977). Although there is little in the record explaining the reason for the delay, it is clear from the record that the investigation into the victim's death did not end when Dr. Lauridson determined the manner of death, but continued not only for the four years leading up to the indictment, but also through the trial. The case against Landers was entirely circumstantial and we simply will not fault prosecutors for delaying indictments until they are satisfied that they have sufficient evidence to establish the accused's guilt beyond a reasonable doubt. Accordingly, the trial court did not err in denying Landers's motion to dismiss the indictment.

-20-

III.

Landers contends that the trial court erred in denying his challenges for cause as to five prospective jurors. He maintains that jurors C.A., C.E., J.M., W.M., and C.P. should have been removed for cause because, he says, voir dire examination revealed that all five were "heavily influenced by media accounts" of the case and unable to render a fair verdict. (Landers's brief to this court, p. 157.)

"To justify a challenge for cause, there must be a proper statutory ground or '"some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court."' Clark v. State, 621 So. 2d 309, 321 (Ala.Crim.App. 1992)(quoting Nettles v. State, 435 So. 2d 146, 149 (Ala.Crim.App. 1983)). This Court has held that 'once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions' about a case, the juror should be removed for cause. Knop v. McCain, 561 So. 2d 229, 234 (Ala. 1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So. 2d 73, 82 (Ala. 1995). A juror 'need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.' Kinder v. State, 515 So. 2d 55, 61 (Ala.Crim.App. 1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror '"must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused"'; '"[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render."' Oryang v. State, 642 So. 2d 979, 987 (Ala.Crim.App. 1993) (quoting Siebert v. State, 562 So. 2d 586, 595 (Ala.Crim.App. 1989))."

Ex parte Davis, 718 So. 2d 1166, 1171-72 (Ala. 1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).

"'"The test to be applied is can the juror eliminate the influence of his scruples and render a verdict according to the evidence. Ordinarily a juror is not disqualified where it appears that he is willing to follow the instructions of law given by the trial court and is able to decide the case impartially according to the evidence notwithstanding his scruples. The determination of this question is based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Tidmore [v. City of Birmingham, 356 So. 2d 231 (Ala.Crim.App. 1977), cert. denied, 356 So. 2d 234 (Ala. 1978)]. A juror is incompetent whose answers show that he would follow his own views regardless of the instructions of the court. Watwood v. State, 389 So. 2d 549, 550 (Ala.Crim.App.), cert. denied, 389 So. 2d 552 (Ala. 1980).

"'Barbee v. State, 395 So. 2d 1128, 1130-31 (Ala.Crim.App. 1981)....

-21-

> "'"Thus, where a juror states that he has opinions but that he would try the case fairly and impartially according to the law and the evidence and that he would not allow his opinion to influence his decision, it is not error for a trial judge to deny a challenge for cause. <u>Howard v. State</u>, 420 So. 2d 828, 831 (Ala.Crim.App. 1982). 'A juror who brings his thoughts out into the open in response to voir dire questions may be the one who later "bends over backwards" to be fair....' <u>Clark v. State</u>, 443 So. 2d 1287, 1289 (Ala.Crim.App. 1983)." "<u>Mahan v. State</u>, 508 So. 2d 1180 (Ala.Crim.App. 1986)."'

"<u>Kinder v. State</u>, 515 So. 2d 55, 60-61 (Ala.Crim.App. 1986)."

<u>Harris v. State</u>, 632 So. 2d 503, 520-21 (Ala.Crim.App. 1992), aff'd, 632 So. 2d 543 (Ala. 1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).

Although the record reflects that C.A., C.E., J.M., W.M., and C.P. had all read or heard something about the case through the media, each of these jurors indicated during voir dire either that they had not formed any opinions as to Landers's guilt or that they could set aside whatever opinions they had formed and render a verdict based solely on the evidence presented and the law as instructed by the trial court.

Juror C.A. stated that although the facts surrounding the case that had been reported in the media sounded "plausible," he had not formed any "conclusion" nor even "thought about" Landers's guilt or innocence based on the media accounts of the case he had been exposed to and that he could set aside whatever details of the case he had read or heard and render a decision solely on the evidence presented during the trial. In his brief to this court, Landers contends that juror C.A. expressed the opinion that "the guy probably did it and they would nail him." (Landers's brief to this court, p. 158.) This is a distortion of the record. In truth, C.A. stated that he did <u>not</u> form the opinion that Landers was guilty and that, in fact, he "really hadn't thought about it." (R.665.)

Juror C.E. stated that although the facts presented in the media accounts of the case made it look as if Landers was guilty, she knew that not everything in the media is true; that she had not formed "an opinion one way or the other" based on the media accounts of the case; and that she would be able to disregard anything she had read or heard and render a verdict based solely on the evidence presented at trial and the law as instructed by the trial court.

Juror J.M. stated that although he had formed the opinion based on media accounts of the case that "the defense would have a stretch to go" (R. 722), he realized that that opinion was based on facts from the media that may be wrong and that he would "be willing to listen to the facts [presented at trial] and make a determination from those." (R. 721-22) He then stated that he presumed Landers was innocent and that although the media accounts had raised some questions in his mind about the crime, he did not have the opinion that Landers was guilty. Finally, he stated that he would be able to put aside what he had read or heard and base his verdict solely on the evidence presented during trial and the law as instructed by the court.

Juror W.M. stated that he could set aside whatever he had read or heard in the media and render a fair verdict based solely on the evidence presented at trial and that his exposure to media accounts of the case would have no bearing on his decision if he were to be a juror.

Finally, juror C.P. stated that he had not formed any opinion as to Landers's guilt based on media accounts of the case and that he would be able to set aside whatever he had heard or read and render a verdict based solely on the evidence presented at trial and the law as instructed by the trial court.

-22-

"[A] defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case," Neal v. State, 731 So. 2d 609, 613 (Ala.Crim.App. 1997), aff'd, 731 So. 2d 621 (Ala.), cert. denied, 527 U.S. 1027, 119 S.Ct. 2377, 144 L.Ed.2d 780 (1999), and as long as the "juror in question can and will base his decision on the evidence alone ... a trial judge's refusal to grant a motion to strike for cause is not error." Perryman v. State, 558 So. 2d 972, 977 (Ala.Crim.App. 1989).

Landers also contends, however, that jurors C.A., C.E. and C.P. should have been removed for cause because they each indicated during voir dire that not only had they read or heard about the present case in the media, but they had also read or heard that Landers was also suspected or had been accused of being involved in the death of his grandmother, a subject that the trial court had ruled was inadmissible during the present trial. Landers maintains that "knowledge of this inadmissible information ... certainly raises the probability of prejudice" and that therefore, jurors C.A., C.E., and C.P. should have automatically been removed for cause. (Landers's brief to this court, p. 157.) As noted above, jurors C.A., C.E., and C.P. all stated during voir dire that they could set aside what they had read or heard and render a verdict based solely on the evidence presented at trial and the law as instructed by the trial court. Although each had heard that Landers had been implicated in the death of his grandmother, a juror's knowledge of other crimes or convictions of the defendant that are inadmissible is not, alone, sufficient to justify a challenge for cause. See, e.g., Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). There is simply no indication that the exposure of these jurors to media stories concerning Landers's alleged involvement in the death of his grandmother caused any of them to form a deep-seated and fixed opinion as to Landers's guilt regarding the death of his father so as to render them unable to reach a fair verdict. Accordingly, we find that the trial court did not err in denying Landers's challenges for cause as to C.A., C.E., J.M., W.M., and C.P.

IV.

Landers contends that the trial court erred in denying his motion for a change of venue.

Before trial, Landers filed a motion for a change of venue on the ground that the pretrial publicity surrounding the case was so extensive and prejudicial as to preclude him from receiving a fair trial in Elmore County. In addition, Landers claimed that because some of the publicity included references to the death of Landers's grandmother, which, as noted above, had been ruled to be inadmissible at the trial for the death of his father, his jury pool would be tainted with inadmissible and prejudicial information. At the hearing on the motion, Landers referred to several newspaper articles from the Wetumpka Herald and Montgomery Advertiser to support his claim; however, those articles were not introduced into evidence and are not included in the record on appeal. The trial court deferred ruling on the motion until the voir dire examination was completed. Following the voir dire examination, Landers renewed his motion, arguing that because 51 percent of the venire had indicated that they had read or heard something about the case from the news media, including an article that had been published the day before jury selection began, he was entitled to a change of venue. In support of his renewed motion, Landers referred to an article from the Wetumpka Herald in which Sheriff Bill Franklin was reported as saying that there was more publicity surrounding Landers's case than any other he had seen in his career. Again, however, that article was never introduced into evidence nor is it included in the record on appeal. The trial court denied Landers's motion, stating:

"At this time, the law does not require that we attempt to select a jury from people who have been living in a cave somewhere for five to ten years. The law does require that people who are potential jurors, if they have knowledge of the case, that they be able to affirm to the Court that they can set aside that knowledge and base this decision on the evidence and on the law.

- 23 -

"There quite honestly were less people than I expected that have heard or read something with regard to this case.

"There has been no showing based on the examination of the jurors and the individual examination of the jurors in this Court's continuous inquiry to the jury whether there is any one who has any additional response, that any pretrial publicity has so affected the jury pool as to cause prejudice to the defendant."

(R. 911-12.)  The trial court's findings are supported by the record.

"'The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.'

"Nelson v. State, 440 So. 2d 1130, 1132 (Ala.Crim.App. 1983).  See also Trahan v. State, 450 So. 2d 1102 (Ala.Crim.App. 1984).  An appellant must prove a 'gross abuse of discretion' before the trial court's ruling on a motion for change of venue will be reversed on appeal.  Anderson v. State, 443 So. 2d 1364 (Ala.Crim.App. 1983)."

Hunt v. State, 642 So. 2d 999, 1042 (Ala.Crim.App. 1993), aff'd, 642 So. 2d 1060 (Ala. 1994).

In Oryang v. State, 642 So. 2d 979 (Ala.Crim.App. 1993), we stated:

"'[A] change of venue must be granted only when it can be shown that the pretrial publicity has so 'pervasively saturated' the community as to make the 'court proceedings nothing more than a "hollow formality,"' Hart v. State, 612 So. 2d 520, 526-27 (Ala.Crim.App.), affirmed, 612 So. 2d 536 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), citing Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), or when actual prejudice can be demonstrated.  The burden of showing this saturation of the community or actual prejudice lies with the appellant.  Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).  In order to show community saturation, the appellant must show more than the fact 'that a case generates even widespread publicity.'  Thompson v. State, 581 So. 2d 1216, 1233 (Ala.Crim.App. 1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).  '"Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible.  Patton v. State, 246 Ala. 639, 21 So. 2d 844 [1945]."'  Thompson v. State, supra at 1233, quoting McLaren v. State, 353 So. 2d 24, 31 (Ala.Crim.App.), cert. denied, 353 So. 2d 35 (Ala. 1977).  Furthermore, in order for a defendant to show [actual] prejudice, the '"proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So. 2d 1296, 1299 (Ala.Crim.App. 1978).'  Ex parte Grayson, 479 So. 2d 76, 80 (Ala. 1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)."

-24-

642 So. 2d at 983.

Here, Landers has failed to prove either that the community was so "pervasively saturated" with such prejudicial publicity as to make it impossible to select an impartial jury or that any of the jurors who decided the case were actually prejudiced against him as a result of the publicity. Although we acknowledge that this case received publicity in Elmore County, "publicity" and "prejudice" are not synonymous. "'"The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).'" Siebert v. State, 562 So. 2d 586, 589 (Ala.Crim.App. 1989), aff'd, 562 So. 2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990), quoting Fortenberry v. State, 545 So. 2d 129 (Ala.Crim.App. 1988), aff'd, 545 So. 2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990). The jury venire in this case was extensively and thoroughly examined in an individual, sequestered setting regarding each prospective juror's knowledge about the case. While 31 out of 60 prospective jurors were aware of the case and some of the details, 30 of those jurors unequivocally stated that they could set aside what they had read or heard and render a verdict based solely on the evidence presented at trial; and the single juror who indicated that he had a fixed opinion that Landers was guilty and would be unable to set aside that opinion was properly removed for cause. In addition, only four prospective jurors indicated that they had read or heard anything regarding the death of Landers's grandmother -- one of which was the juror mentioned above that was removed for cause and the other three of which indicated that they could set aside what they had read or heard and render a verdict based solely on the evidence presented during the trial. "Nothing in the record indicates that those jurors who served [on Landers's jury] did not return a verdict based solely on the evidence presented at trial." Ex parte Travis, [Ms. 1970815, March 31, 2000] ___ So. 2d ___, ___ (Ala. 2000).

Accordingly, we find that the trial court did not abuse its discretion in denying Landers's motion for a change of venue.

## V.

Landers contends that the trial court erred in admitting evidence of collateral conduct which was, he says, irrelevant to any issue in the case and unduly prejudicial. Specifically, Landers complains about the following:

1. Evidence that Landers was the owner and sole beneficiary of a $1,000,000 life insurance policy on his father that was purchased barely six months before his father's death.

2. Evidence that Landers was experiencing financial difficulties at the time of his father's death, that Landers's loans were past due, that his bank account was overdrawn on a regular basis, and that there was pending litigation against his construction company.

3. Evidence of numerous property damage claims filed by Landers with his insurance carrier between 1988 and 1992.

4. Evidence of fraudulent insurance claims filed by Landers while working for AllState in 1980 as a claims adjustor.

5. Evidence of Landers's educational background, his degree in criminal justice and his attendance at law school for one semester and his employment history of working in the insurance field for both AllState and Progressive.

-25-

"On the trial for the alleged commission of a particular crime, evidence of the accused's having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused's conformity therewith. This is a general exclusionary rule which prevents the introduction of prior acts or crimes for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question....

"....

"The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show the defendant's bad character and conformity therewith on the occasion of the now-charged crime. If the defendant's commission of another crime or misdeed is relevant for some other material purpose in the case then it may be admitted."

C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (5th ed. 1996)(footnotes omitted). Rule 404(b), Ala.R.Evid., provides that evidence of collateral conduct may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident." In determining whether the proposed evidence is admissible under one of the exceptions to the exclusionary rule, the question is whether the evidence is "'material and logically relevant'" to an issue in the case. Bradley v. State, 577 So. 2d 541, 547-48 (Ala.Crim.App. 1990), quoting Snead v. State, 243 Ala. 23, 24, 8 So. 2d 269, 270 (1942). See also Gamble v. State, [Ms. CR-97-0698, February 4, 2000] ___ So. 2d ___ (Ala.Crim.App. 2000); Perkins v. State, [Ms. CR-93-1931, November 19, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999). Rule 401, Ala.R.Evid., defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "The appellate courts of Alabama have sanctioned a liberal test of relevancy under which evidence is admissible if it has any probative value, however slight, upon a matter in the case." C. Gamble, McElroy's Alabama Evidence, § 21.01(1) (5th ed. 1996). "'All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner.'" Nicks v. State, 521 So. 2d 1018, 1026 (Ala.Crim.App. 1987), aff'd, 521 So. 2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), quoting Underhill, Criminal Evidence § 154 (3d ed. 1923). "'The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge.'" Akin v. State, 698 So. 2d 228, 234 (Ala.Crim.App. 1996), cert. denied, 698 So. 2d 238 (Ala. 1997), quoting Blanco v. State, 515 So. 2d 115, 120 (Ala.Crim.App. 1987).

The evidence of the life insurance policy on the victim's life, of which Landers was the sole beneficiary, was properly admitted into evidence because it was an element of the crime. Landers was charged with murder made capital because it was committed for pecuniary gain. See § 13A-5-40(a)(7), Ala. Code 1975. Specifically, the indictment reads as follows:

"The Grand Jury of said County charge that before the finding of this Indictment, Mark Samuel Landers, whose true name is to the Grand Jury unknown, otherwise than as stated, did intentionally cause the death of Robert R. Landers, Sr., by running over and crushing him with a bulldozer, for a pecuniary or other valuable consideration, to-wit: the proceeds of a life insurance policy on Robert R. Landers, Sr., in violation of Section 13A-5-40(a)(7), Code of Alabama, 1975, against the peace and dignity of the State of Alabama."

-26-

(C. 9.) Because the life insurance policy was an element of the crime that the State was required to prove beyond a reasonable doubt, it was properly admitted.

Likewise, we find that evidence of Landers's financial condition, of pending litigation against Landers's construction company, and of the numerous insurance claims filed by Landers (both legitimate and fraudulent), were properly admitted as evidence of Landers's motive. Contrary to Landers's contention, "evidence tending to establish motive is always admissible." Jordan v. State, 629 So. 2d 738, 741 (Ala.Crim.App. 1993), cert. denied, 511 U.S. 1112, 114 S.Ct. 2112, 128 L.Ed.2d 671 (1994). "'It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.'" Bradley, 577 So. 2d at 549, quoting Bowden v. State, 538 So. 2d 1226, 1235 (Ala. 1988)(emphasis in Bowden). "'Even slight evidence to show a motive for doing the act in a criminal case is not to be excluded, but should be left to the consideration of the jury.'" Siler v. State, 705 So. 2d 552, 556-557 (Ala.Crim.App. 1997), quoting Kelley v. State, 409 So. 2d 909, 914 (Ala.Crim.App. 1981). "'"Where the proffered evidence has a tendency, even though slight, to enlighten the jury as to the culpability of the defendant, then it is relevant and properly admissible."'" Boyd v. State, 715 So. 2d 825, 838-39 (Ala.Crim.App. 1997), aff'd, 715 So. 2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998), quoting Donahoo v. State, 505 So. 2d 1067, 1071 (Ala.Crim.App. 1986), quoting, in turn, Waters v. State, 357 So. 2d 368, 371 (Ala.Crim.App.), cert. denied, 357 So. 2d 373 (Ala. 1978).

> "'In cases where, as here, the evidence is circumstantial, a wide range of testimony is admissible to show the motive of defendant for committing the crime charged. Turner v. State, 224 Ala 5, 140 So. 447; Harden v. State, 211 Ala. 656, 101 So. 442.'
>
> "'In a case where the evidence is circumstantial, evidence of motive becomes of great importance. Harden v. State, supra; Hardy v. State, 51 Ala.App. 489, 286 So. 2d 899. When circumstances point to the guilt of an accused, evidence of his motivation, even though weak, is admissible. In McClendon v. State, 243 Ala. 218, 8 So. 2d 883, the Supreme Court said:
>
>> "'"'When it is shown that a crime has been committed and the circumstances point to the accused as the guilty agent, then proof of a motive to commit the offense, though weak and inconclusive evidence, is nevertheless admissible.'"'
>
> "Chambliss v. State, 373 So. 2d 1185, 1207-08 (Ala.Crim.App.), cert. denied, 373 So. 2d 1211 (Ala. 1979). See also Knotts v. State, 686 So. 2d 486 (Ala.Crim.App. 1995)."

Boyd, 715 So. 2d at 839.

Here, Landers's financial difficulties and the pending litigation against his construction company were clearly admissible to show his motive in killing his father, i.e., to collect the life insurance proceeds. This evidence tended to show that Landers needed the life insurance proceeds in order to ease his financial difficulties and in anticipation of the litigation against him. See, e.g., Mills v. State, 408 So. 2d 187 (Ala.Crim.App. 1981)(appellant's financial difficulties tended to show his motive for burning his house). In addition, evidence of the numerous insurance claims -- both the legitimate claims filed by Landers as

-27-

an insured and the fraudulent claims filed by Landers while working as a claims adjustor -- also tended to shed light on Landers's motive for killing his father. While not direct evidence of motive, it was circumstantial evidence of motive that tended to show Landers's attitude toward insurance proceeds. The jury could have inferred from this evidence that Landers tended to view insurance proceeds, in whatever form, as a source of income, and, combined with his financial difficulties, this evidence was highly relevant to show Landers's motive to kill his father in order to collect $1,000,000. See, e.g., Robinson v. State, 528 So. 2d 343 (Ala.Crim.App. 1986)(evidence that appellant previously "faked" a burglary of her home was properly admitted, in conjunction with appellant's financial difficulties, as relevant to show her motive in "faking" present burglary and killing her husband to obtain inheritance); Fountain v. State, 681 S.W.2d 858 (Tex.Ct.App. 1984)(evidence that appellant had filed previous insurance claims was properly admitted as relevant to show appellant's motive in killing his step-son where the appellant was the sole beneficiary of a life insurance policy on his step-son).

Finally, we find that evidence of Landers's educational background (including his 1978 degree in criminal justice and his attendance of law school for a short period of time in the 1980's) and his employment history in the insurance industry was properly admitted. During the hearing on Landers's motion in limine to prevent introduction of this evidence, the State argued that it was admissible to show that Landers had "knowledge of the system and how to stage an accident, plan a murder," and that Landers was "knowledgeable of how to file false claims and stage accidents and stage claims to collect insurance proceeds." (R. 313-14.) According to the State, Landers's degree in criminal justice showed that he had knowledge of the criminal justice system and of the burdens of proof in a criminal case and his employment in the insurance industry showed that he had knowledge of how to file false claims and manipulate the industry to obtain insurance proceeds. The trial court, in its written order, stated only that this evidence "may be admitted in order to demonstrate the knowledge of the defendant." (C. 223.) Although we do not believe that criminal justice majors are taught how to "plan a murder" or that employees of insurance companies are taught how to "file false claims," we do find that the evidence was relevant in showing the jury Landers's background and history and thereby demonstrating that it was not inconceivable that Landers could plan and carry out the murder of his father in order to collect the insurance proceeds and obtain relief from his financial difficulties. Although Landers contends that the trial court, in admitting this evidence, improperly "permitted the State to stack conjecture upon conjecture in an attempt to transform innocuous background information into some sinister plan which Mr. Landers waited approximately 20 years to carry out" (Landers's brief to this court, p. 168-69), Landers has failed to show how he was prejudiced by the admission of this evidence. The State, just as the defense, is permitted to argue reasonable inferences from the evidence, and "casting ... evidence in the most sinister light imaginable" is the prosecutor's job; such is not improper. (Landers's brief to this court, p. 171.) As Landers clearly concedes, this evidence was innocuous and unremarkable and Landers had the opportunity, and in fact did, argue to the jury that the State's inferences from this evidence were incorrect.

For these reasons, Landers's claim that the trial court improperly admitted evidence of collateral conduct is meritless.

## VI.

Landers contends that the trial court erred in allowing the testimony of his sister, Victoria Landers Goolsby, regarding an incident that occurred on February 6, 1992, six days before his father's death, because, he says, the testimony was inadmissible hearsay that did not fit into any exception to the hearsay rule. Landers complains about the following testimony by Goolsby:

"On February the 6th, 1992, when my father, Robert Richard Landers, Sr., arrived at the house, the first thing he said was, 'You came as close as you will ever come to

-28-

putting me six feet under the ground today.' I said, 'Okay. What happened? Tell me what happened.'

"We walked into the house in the kitchen which is where the rest of the conversation took place. My father began to tell me the event that had just occurred with my brother present at the lake house on the lot where he was.

"My father said that Mark had almost run over him with a bulldozer and killed him. My father was visibly shooken [sic]. He was white as he could be. And he was so upset and he was cussing. And about five minutes after he had been there and was telling me the story my brother walked in, Mark Landers walked in. Mark walked in and my father told Mark he better get him, quote, a god damn foreman. He would never help him do another thing. That he would never go back to that lake again. And just on and on with this same type language to my brother.

"My brother, Mark, laughed and shrugged his shoulders. And my father said, 'You almost killed me. You almost ran over me with a bulldozer. I will never help you do another god damn thing. I mean it, get you a god damn foreman. I will never go back to that lake again."

(R. 1812-13.)

Goolsby's testimony was properly admitted under two exceptions to the hearsay rule: to show the victim's state of mind, i.e., his fear of Landers, and as an excited utterance.

A statement of the declarant's then existing state of mind or emotions such as love, hatred or fear has historically been admissible as an exception to the hearsay rule. See Rule 803(3), Ala.R.Evid.; C. Gamble, McElroy's Alabama Evidence, § 261.03(5) (5th ed. 1996). See also Ex parte Dunaway, 746 So. 2d 1042 (Ala. 1999), cert. denied, ___ U.S. ___, 120 S.Ct. 1724, 146 L.Ed.2d 645 (2000)(victim's statement in the weeks preceding her murder that the appellant had threatened her and that she was afraid of the appellant was admissible to show the victim's state of mind); Ex parte Whisenhant, 555 So. 2d 235 (Ala. 1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 767 (1990)(victim's statement in days preceding her murder that she was afraid for her life was admissible to show the victim's state of mind); Moore v. State, 697 So. 2d 800 (Ala.Crim.App. 1996)(victim's statement in the hours preceding her murder that she was afraid the appellant would hurt her was admissible to show the victim's state of mind); Jackson v. State, 629 So. 2d 748 (Ala.Crim.App. 1993)(victim's statement to witnesses just prior to her death that the appellant had threatened her and that they should call the police if they saw the appellant was admissible to show the victim's fear). Furthermore:

"a person's statement concerning a startling occurrence made while perceiving the occurrence, or soon after perception thereof, and while the declarant is under the stress of a nervous excitement created by such perception, is admissible as tending to prove the truth of the matter asserted. A statement of this kind is frequently referred to as a spontaneous exclamation or excited utterance and is an exception to the hearsay evidence rule.

"....

-29-

"[R]ule [803, Ala.R.Evid.] sets out three conditions which must be met for admission of the statement. There must be a startling event or condition, the statement must relate to the circumstances of the occurrence and the statement must be made before time has elapsed sufficient for the declarant to fabricate. The statement must be the apparently spontaneous product of that occurrence operating upon the visual, auditory, or other perceptive sense of the speaker. The declaration must be instinctive rather than deliberative. In short, it must be the reflex product of the immediate sensual impressions, unaided by retrospective mental action. Whether a statement qualifies as an excited utterance is a preliminary and discretionary question for the trial court."

C. Gamble, McElroy's Alabama Evidence, § 265.01(1) at 1281 (5th ed. 1996)(footnotes omitted). "The question of whether the statement is spontaneous in a given case is to be decided upon the facts and circumstances of that case, and such determination is a question for the trial court." Berryhill v. State, 726 So. 2d 297, 301 (Ala.Crim.App. 1998), quoting O'Cain v. State, 586 So. 2d 34, 38 (Ala.Crim.App. 1991). Moreover, strict contemporaneousness between the startling occurrence and the statement is not required; the critical factor is whether the declarant was still under the influence of the emotions arising from the event. C. Gamble, McElroy's Alabama Evidence, § 265.01(2) (5th ed. 1996).

Here, Goolsby testified that her father was upset, visibly shaken, and pale when he made the statements; clearly, the victim was under the stress of nervous excitement and fear caused by almost being killed by his own son. Accordingly, the trial court did not err in allowing Goolsby's testimony regarding the events of February 6, 1992.

### VII.

Landers contends that the trial court erred in "precluding evidence of defendant's experiment and in allowing evidence of the State's reconstruction." (Landers's brief to this court, p. 174.)

### A.

First, Landers contends that the trial court erred in precluding his expert, Dr. Gerald Whitehouse, from testifying about an out-of-court experiment he conducted with a bulldozer and a "dummy" the week before trial. Prior to Dr. Whitehouse's testimony, the court held a hearing to determine the admissibility of Dr. Whitehouse's experiment. At that hearing, Landers's counsel made the following offer of proof:

"May it please the Court. Your Honor, the defense plans to call as a witness Dr. Gerald Whitehouse who is a retired professor from Louisiana State University.

"Since his retirement he has been a consulting sitting engineer for various manufacturers and dealers of heavy equipment.

"Dr. Whitehouse performed an examination of a John Deere Model 450-E bulldozer (the same model used in this case) sometime in April.

"It is my recollection it has been within the last couple of weeks in April outside of Birmingham in Gardendale the dozer in question was owned by the Alabama Forestry Commission. This dozer that is at issue in this case, the 450-E, is no longer manufactured by John Deere.

"Counsel and Dr. Whitehouse undertook to find a 450-E for the purpose of having him examine it.

-30-

"Through a couple of Deere dealers we were able to track back some service records and found that the Department of Conservation owned some Deere 450 models. Dr. Whitehouse traveled to Birmingham and to its suburb Gardendale and made an inspection of this bulldozer. He operated the bulldozer. He watched it while it was operated by an employee of the Department of Conservation.

"Part of his day was spent conducting an experiment. The experiment consisted of the construction of a dummy, for lack of a better word, and how that dummy might react to certain actions by the bulldozer. Particularly he placed the dummy on the right-hand side track of the bulldozer while it was moving rearward in reverse gear. And he observed the reaction of the dummy to the tracks on the bulldozer. He made some photographs of the bulldozer and the dummy, and I have the photographs with me today.

"His testimony would be offered about the operation of a Deere 450-E bulldozer and about the results of his experiment.

"He also visited the scene of the accident here in the Wetumpka area and has reviewed documents provided to him by counsel for the defendant.

"Documents, statements, transcripts of prior court proceedings, photographs, and we would like to call him as a witness and allow him to testify about the operation of the 450-E what it does under certain conditions.

"One condition being if no operator is in the vehicle does it continue to go? The other being what he did relative to this experiment. What he observed his dummy do when he placed him on the track.

"And I have a total of six photographs that I would expect to use in Dr. Whitehouse's testimony."

(R. 2031-34.) The State objected to the experiment on the grounds that it was not substantially similar to the crime scene because the bulldozer used in the experiment, although the same model as the one used to kill the victim, was not the same bulldozer and had been modified by the Department of Conservation; because there was no evidence that the terrain during the experiment was the same as the crime scene; and because there was no evidence that the "dummy" used in the experiment was substantially similar in height, weight, and measurements of the victim. The trial court agreed, stating:

"Based on the offer of proof further, the Court finds that the experiment is not substantially similar to where it would be admissible. The areas and the terrain are different. There is no, you know, I looked at the photographs. I don't know about the weight of the dummy or whatever, but it doesn't appear to me that it would be substantially similar to somebody in height, weight, and mass as the victim in this case.

"I don't know that the machine itself is substantially similar; however, assuming that Dr. Whitehouse is qualified to give testimony with regard to bulldozers, I feel like that he would probably be able to point out the difference as to operation of the dozer. And I would allow him to do that. There are differences that I noted in looking at it that have been mentioned. One I refer to is a safety cage that is around the cab with bars

-31-

going toward the front of the dozer which it is my understanding, and I'm not a pulpwooder either, provides protection to the operator when you are working in the woods and you have the possibility of trees and things like that falling on you.

"There is also an alteration to the blade itself. There is an extension above the blade that appears to me to be made of steel. And there is a chain that is also wrapped around that extension. But any rate, those are differences that I have noted.

"To the -- as I'm saying, to the extent that Dr. Whitehouse can be qualified, the Court would allow him to testify as to the operation of a John Deere 450-E dozer and its characteristics.

"It has been noted that Dr. Whitehouse has also visited the scene and reviewed documents and photographs provided by defense counsel which I'm sure almost everything that they have, if not everything they have, that is available to us on the scene. And provided that a foundation can be laid, I'm sure the Court will allow him to testify under those regards.

"If the witness is qualified, the Court may also be inclined to allow him to testify, you know, as to what happens when an object is sitting on top of the tracks and the machine moves.

"You know, I'm making a lot of assumptions here because I don't know Dr. Whitehouse and I don't know his qualifications. Assuming he is qualified I'm sure I would allow such testimony.

"But I will not allow the photographs and I will not allow the experiment. Okay."

(R. 2043-46.)[2]

"The party offering in evidence the results of an experiment must surmount the hurdle presented by the test of 'substantial similarity.' It has been held that evidence of an experiment, conducted out of court and having probative value on a matter in issue, is admissible if the conditions of the experiment were substantially similar to the conditions existing at the time of the occurrence involved in the litigation. Whether this condition of similarity has been met is a question left largely to the discretion of the trial judge."

C. Gamble, McElroy's Alabama Evidence, § 81.01(2) (5th ed. 1996)(footnotes omitted). "The exercise of the trial judge's discretion in the admission or exclusion of an experiment will not be reversed on appeal unless such discretion has been grossly abused." C. Gamble, McElroy's Alabama Evidence, §

---

[2] The trial court also found that defense counsel had violated discovery rules by failing to provide the State with the results of the experiment before trial; however, because we find that the exclusion of the experiment was proper on other grounds, we need not address this issue.

-32-

81.01(3) (5th ed. 1996). The conditions of the experiment and those surrounding the occurrence that is the subject of the trial must be substantially similar, but need not be identical. "[O]nly where the conditions are dissimilar in an essential particular should the evidence of an experiment be rejected." C. Gamble, McElroy's Alabama Evidence, § 81.01(4) (5th ed. 1996)(footnote omitted). The burden is on the party offering evidence of the experiment to show substantial similarity in conditions.

Here, Landers failed to show a substantial similarity in the conditions, and therefore, we cannot say that the trial court abused its discretion in preventing Dr. Whitehouse from testifying about the experiment. The experiment was conducted somewhere in Gardendale, the exact location unknown, not at the scene of the crime, and Landers failed to offer anything to show what the terrain was at the location of the experiment, much less that the terrain was substantially similar to the terrain on Cliff Side Road. The bulldozer used in the experiment, although the same model as the bulldozer at issue in this case, had been modified by the Department of Conservation and was not substantially similar, other than in model number, as the bulldozer used to kill the victim. In addition, Landers failed to show that the "dummy" used by Dr. Whitehouse was substantially similar in height, weight or mass as the victim. Clearly, Landers failed in his burden of showing substantially similar conditions. See, e.g., White v. State, 546 So. 2d 1014 (Ala.Crim.App. 1989). Moreover, we point out that Dr. Whitehouse was permitted to testify to the primary opinion for which the experiment was conducted and for which he was called to testify -- he testified regarding what would happen if an object, such as a human being, was placed on the tracks of a bulldozer while it was in motion. See, e.g., Gilley v. State, 367 So. 2d 597 (Ala.Crim.App. 1978), cert. denied, 367 So. 2d 600 (Ala. 1979).

Accordingly, we find that the trial court did not abuse its discretion in preventing evidence of Dr. Whitehouse's experiment.

B.

Second, Landers contends that the trial court erred in allowing the State to introduce into evidence State's Exhibits 11-A through 11-R, photographs of what Landers terms a "reconstruction" that was conducted by law enforcement officials at the scene of the crime on Saturday, February 15, 1992. Landers maintains that the photographs were inadmissible because, he says, the State failed to lay the proper predicate for their admission. Specifically, Landers contends that the State failed to present testimony showing that the "reconstructed" scene was the same as the crime scene as it was found on Wednesday, February 12, 1992.

During the testimony of ABI Agent Rhegness, the State attempted to introduce State's Exhibits 11-A through 11-R. The following then occurred:

"[Landers's counsel]: If it please the Court, we would object on the ground that counsel has stated that he is offering these as a part of a reconstruction.

"And we would object on the grounds or to demonstrate that they would be reconstruction. There has been no predicate laid that the circumstances, the area was the same as it was at the time of the accident. There has been no predicate laid showing that this gentleman is an experienced ABI agent that he has experience in reconstructing accident scenes or attempting to reconstruct an accident scene to create a circumstance.

"It is supposed to be as it was and in fact there is no evidence what may have happened. And at this stage for him to attempt to testify as to a reconstruction would tend to be misleading and confusing. And whatever relevance would be outweighed by that tendency to mislead and confuse what was seen may have been the way it was done -

-33-

"[The Court]:  Just a second.  Any response?

"[Prosecutor]:  Judge, I think we have already covered this previously.  There has been testimony of Mr. Ponder who was out there testified what they did.  I think Mr. Rhegness testified yesterday as to what they did.  And the photographs speak for themselves.  And he says they fairly and accurately depict the event that occurred on Saturday morning.

"[Landers's counsel]:  I didn't object to what they did.  But he is now representing this as a reconstruction.  I object to his representing that this is a reconstruction.  It could be misleading and confusing.

"[The Court]:  I think in reviewing the testimony yesterday of what they did, I think other than understanding there may be some debate over the use of the word reconstruction, the Court would sustain to the effect that it is a reconstruction.

"However, the Court, as I have up to this point, would allow Mr. Rhegness to testify and tell us what was done on that Saturday.  And let me just look at the photographs again, Greg, and make sure I know which ones we are talking about.

"Other than the exclusion of the word 'reconstruction' the Court will admit State's Exhibits 11-A through R and allow Mr. Rhegness an opportunity to show the jury and explain to them what they depict."

(R. 1280-82.)  (Emphasis added.)

Clearly, Landers's only objection at trial was to the characterization of the photographs and the events they depicted as a "reconstruction."  That objection was sustained by the trial court and the photographs, although introduced into evidence, were not characterized as depicting a reconstruction, but merely as an experiment conducted by law enforcement officers to aid them in their investigation.  Thus, Landers's claim on appeal that the photographs were improperly admitted as depicting a reconstruction without the proper predicate is clearly meritless.

Moreover, because the photographs were not offered as depicting a "reconstruction," it is clear that they were properly authenticated by Agent Rhegness.  Although to properly authenticate photographs of a "reconstruction" of a crime scene, someone who was present at the crime scene must testify that the reconstruction was the same as the crime scene (which, as Landers correctly points out, Agent Rhegness was unable to do because he did not see the crime scene on Wednesday, February 12, 1992), see C. Gamble, McElroy's Alabama Evidence, § 123.04 (5th ed. 1996), to authenticate photographs of an experiment, there need only be testimony from a witness to the experiment that the photographs accurately depict what occurred during the experiment, see C. Gamble, McElroy's Alabama Evidence, § 123.03(3) (5th ed. 1996).  Here, Agent Rhegness was present during the experiment on Saturday, February 15, 1992, and thus, his testimony that the photographs accurately depicted what occurred that day was sufficient to authenticate the photographs.

Furthermore, we find that even if there was error in the admission of the photographs (which we do not believe there was), the error was harmless.  The photographs were merely cumulative to the testimony of two witnesses, Agent Rhegness and William Ponder, describing in detail the experiment that occurred on Saturday, February 15, 1992, testimony to which Landers did not object.  See, e.g., Wilkerson v. State, 686 So. 2d 1266 (Ala.Crim.App. 1996).

<center>-34-</center>

Accordingly, the trial court did not err in admitting into evidence State's Exhibits 11-A through 11-R.

## VIII.

Landers contends that the trial court erred in denying his motion to continue closing arguments in the case, scheduled to begin on Thursday, May 8, 1997, to the following Monday due to the death of defense counsel's father.

The record reflects that on Wednesday, May 7, 1997, just before the last defense witness was to testify, Landers's lead defense counsel, Bill Clark, received a message that his father, who had been suffering from Parkinson's disease, had taken a turn for the worse. The record reflects that the trial court had received a message earlier in the day for Mr. Clark to telephone his wife. Not knowing the reason for the message, the trial court waited until the next recess to inform Mr. Clark of the message. The record reflects that after giving the message to Mr. Clark, and apparently after Mr. Clark had telephoned his wife and learned of his father's condition, an off-the-record bench conference was held. Although the conversation that took place during that conference is not in the record, the trial court stated during the hearing on Landers's motion for a new trial that it, defense counsel, and the prosecutor decided during the bench conference to finish the testimony of the last witness and then to allow the jury to go home and Mr. Clark to go to Birmingham to be with his father.

The next thing in the record is a statement by the trial court the following morning to the jury:

"This morning we have had -- well, we didn't have something come up this morning, we had something come up last night. So we are not going to be able to finish today.

"Yesterday afternoon, I don't know if y'all remember, but somewhere right at four o'clock when Mr. Clark and Mr. Valeska [the prosecutor] came up and we were having one of our bench conferences, I handed Mr. Clark a note. And his wife had called to tell him that his daddy was in real, real bad shape.

"So anyway, when we left here last night, Mr. Clark headed on back to Birmingham to check on his dad, and so when he got there he had died. So I was on the phone last night with Mr. Clark and Mr. Valeska and everybody else trying to figure out what to do and he, you know, told me he didn't feel like he would be in any condition to come down this morning and do closing which makes perfect sense to me. I know I wouldn't either, but he said that he would be back tomorrow morning.

"He has got to get funeral arrangements made and all of that today. So what we will do is you guys have got the day off and we will come back in the morning I hope and like we had planned today and go on into closing argument and try to get the case to you.

"My goal is by midday or lunchtime somewhere around in there y'all will have the case. That's what I'm hoping.

"So any way that's where we are. I hate it but we don't have any control over it. That's where we are, y'all."

-35-

(R. 2298-99.)  The following day, Friday, the trial resumed with closing arguments.  There was no mention of any further continuance, nor is there any written or oral request for a continuance contained in the record.

However, in his motion for a new trial, and on appeal, Landers claims that during the telephone conversation with the trial court on Wednesday night, Mr. Clark requested that the case be continued until the following Monday, but that the trial court refused, telling Mr. Clark that he had to give closing arguments either on Thursday, Friday, or Saturday because the judge was scheduled to preside over a case in another county, Baldwin County, as a special judge on Monday.  According to Landers, Mr. Clark chose to give closing arguments on Friday only because he had no choice -- his father's funeral was scheduled for Saturday and he was not up to giving arguments the next day, Thursday.  Other than defense counsel's allegations, however, there is nothing in the record to support Landers's claim that a continuance was ever requested, much less denied by the trial court.  In fact, at the hearing on his motion for a new trial, after Mr. Clark summarized the allegations, the trial court stated the following:

> "I do disagree with some of the allegations that you have in there.  But everybody has their own version, and I have mine because I was sitting right here.  And I'm prepared to state whenever the time is what happened.  I don't agree with your position."

(R. Supp. 32.)  In addition, the prosecutor stated "I don't remember it like that."  (R. Supp. 33.)  Unfortunately, the trial court never elaborated, either at the hearing or in its order denying Landers's motion for a new trial, on which allegations made by Mr. Clark it disagreed with.  And, as noted above, there is nothing in the record supporting Landers's claim in his motion for a new trial and on appeal that Mr. Clark requested a continuance.  Because there is nothing in the record to suggest that a continuance was, in fact, requested, much less that the request was denied, there is, technically, nothing for this court to review.  However, given the unique circumstances underlying this claim, we will, arguendo, accept Landers's allegations in this regard as true and address the merits of his claim.

Landers contends that the trial court's denial of his motion to continue closing arguments denied him due process, his right to a fair trial, and his right to effective assistance of counsel.  Landers claims that his counsel was "not emotionally fit to prepare properly for the argument or to argue the case" (Landers's brief to this court, p. 181), and that the trial court's statements to the jury regarding the death of counsel's father may have prejudiced the jury against him because they "left the jury with the impression that counsel voluntarily chose to return to court on Friday."  (Landers's brief to this court, p. 185.)  Under the circumstances, however, we conclude that the trial court's actions were reasonable.

The record reflects that the judge was obligated to be in Baldwin County to preside over a case as a special judge on the following Monday.  In fact, the case was continued for over a week after the guilt phase of the trial for the judge to fulfill his obligations in Baldwin County; after the jury returned its verdict on Friday, May 9, 1997, the sentencing phase of Landers's trial was postponed until Monday, May 19, 1997.  This is not a situation where the court could alter its own docket in order to accommodate the needs of defense counsel; rather, the court would have had to alter the docket of another circuit court.  In addition, as the State correctly points out in its brief to this court, delaying closing arguments for some five days increased the danger of the jury being tainted by media accounts of the case.  Many of the issues Landers raises on appeal involve the media coverage of the case; he has consistently maintained that the extensive media coverage warranted a change of venue, tainted the jury pool, and denied him a fair trial.  Although we have concluded that Landers was not denied a fair trial due to media coverage, we nevertheless recognize the inherent danger that would have presented in delaying the trial some five days after the evidence had been presented but before closing arguments and jury deliberations, given the media coverage of the case.

-36-

Furthermore, the record reflects that Landers was represented throughout his trial by two attorneys, Mr. Clark and Mr. Maxwell Pulliam. Although Mr. Clark was lead counsel, there is simply no evidence that cocounsel, Mr. Pulliam, was not fully competent and prepared to give closing statements. Mr. Pulliam was present throughout the trial, questioned several witnesses, and argued motions. Although Landers contends that Mr. Pulliam "did not have sufficient trial experience" to make closing arguments (Landers's brief to this court, p. 180), he concedes in his brief to this court that Mr. Clark, "in retrospect, upon denial of the request to adjourn to Monday, should not have appeared and [should have] left it to cocounsel to argue the case" (Landers's brief to this court, pp. 182-83), and that Mr. Clark presented arguments only because he was "torn by a sense of duty to a client" and "chose to attempt to do his best for his client under the most trying of circumstances." (Landers's brief to this court, p. 183.)

"This court in Adkins v. State, 600 So. 2d 1054, 1061 (Ala.Crim.App. 1990), remanded, 600 So. 2d 1067 (Ala.), on remand, 600 So. 2d 1072 (Ala.Crim.App. 1992), on return to remand, 639 So. 2d 515 (Ala.Crim.App. 1993), aff'd, 639 So. 2d 522 (1994), stated the following:

"'Several factors to be evaluated when considering the propriety of a continuance are the length of the continuance, the inconvenience to witnesses, counsel, and the court, and whether the "defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel." United States v. Burton, 189 U.S.App.D.C. 327, 584 F.2d 485, 490-91 (D.C. Cir. 1978), cert. denied, 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979).

"'The decision to grant or deny a motion for continuance will not be reversed unless the trial judge has abused his discretion. See Canada v. State, 421 So. 2d 140 (Ala.Crim.App.1982); Jenkins v. State, 384 So. 2d 1135 (Ala.Crim.App. 1979); cert. denied, 384 So. 2d 1141 (Ala. 1980).

"'In Jenkins, supra, this court faced a similar issue where a continuance was requested because co-counsel could not participate in the trial due to a death in his family. In that case we noted that "there was no showing that the appellant could not be adequately represented by the remaining attorney." This court also stated that the remaining counsel adequately represented the appellant at trial.'"

Grimsley v. State, 678 So. 2d 1197, 1203 (Ala.Crim.App. 1996).

Here, the majority of the guilt phase of Landers's trial was completed; closing arguments were all that was left. Although closing arguments are an important part of a trial, we simply do not believe that Landers "could not [have been] adequately represented by [Mr. Pulliam]." Jenkins v. State, 384 So. 2d 1135, 1139 (Ala.Crim.App. 1979), cert. denied, 384 So. 2d 1141 (Ala. 1980).

Landers also contends that the denial of his request for a continuance may have prejudiced the jury against him. Landers speculates that the jury may have seen Mr. Clark making closing arguments just two days after the death of Mr. Clark's father as callous and uncaring and translated that into a prejudice against him. However, "[s]peculative allegations regarding the possible existence of juror prejudice are

-37-

insufficient to show that the trial court abused its discretion." Mack v. State, 736 So. 2d 664, 672 (Ala.Crim.App. 1998), aff'd, 736 So. 2d 681 (Ala.), cert. denied, ___ U.S. ___, 120 S.Ct. 502, 145 L.Ed.2d 388 (1999). Landers failed to present any evidence at the hearing on his motion for a new trial that the jury was actually prejudiced against him because of the unfortunate circumstances faced by his defense counsel.

Further, Landers appears to raise a claim of ineffective assistance of counsel. As noted above, Landers maintains that Mr. Clark was not "emotionally fit" to argue the case and that therefore he was denied his right "to a fully effective defense." (Landers's brief to this court, p. 185.) In its order denying this claim in Landers's motion for a new trial, the trial court specifically found that "defense counsel was not ineffective" during closing arguments. (C. 698.) We have read Mr. Clark's closing argument and agree with the trial court's assessment.

Accordingly, under the circumstances presented here, we find that the trial court did not abuse its discretion in denying Landers's motion for a continuance.

## IX.

Landers contends that the trial court erred in refusing to give five of his requested jury instructions.

The record reflects that Landers submitted 43 written requested instructions, all of which were marked as "refused" by the trial court. (C. 448-91.) Following the trial court's oral charge, Landers objected to the court's failure to give his requested instructions as follows:

> "And with regard to the defendant's requested charges. We do respectfully object to the failure of the Court to give certain requested charges that were requested in writing and timely submitted to the Court which although the Court did give in part certain of these charges we submit that these are correct statements of the law and were not fully covered in the Court's oral charge.
>
> "Defendant's requested instruction numbers 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 23, 26, 27, 28, 30, 32, 34, 35, 36, 37, 40."

(R. 2450.)

> "Under Rule 14, A.R.Cr.P.Temp. (now Rule 21.2, A.R.Cr.P.), to preserve alleged error in the refusal of requested charges, a defendant must not only object in a timely manner, he must 'state with particularity the grounds of [his] objection.' Matkins v. State, 497 So. 2d 201, 203 (Ala. 1986)(emphasis omitted). An objection which merely asserts that refused charges are correct or accurate statements of law does not meet this requirement. Connolly v. State, 539 So. 2d 436, 438 (Ala.Crim.App. 1988); Bogan v. State, 529 So. 2d 1029, 1031 (Ala.Crim.App. 1988). Cf. Ex parte Washington, 448 So. 2d 404, 406 (Ala. 1984)(in order to preserve alleged error in the trial court's oral charge, an 'objection must be specific enough to point out the alleged error so as to allow the judge to correct [that] error'); Petite v. State, 520 So. 2d 207, 213 (Ala.Crim.App. 1987) (same)."

Jones v. State, 591 So. 2d 569, 573 (Ala.Crim.App. 1991). See also Greenhill v. State, 746 So. 2d 1064 (Ala.Crim.App. 1999); Knight v. State, 710 So. 2d 511 (Ala.Crim.App. 1997); Sanders v. State, 683 So. 2d 14 (Ala.Crim.App. 1996); Hardeman v. State, 651 So. 2d 59 (Ala.Crim.App. 1994); Morrison v. State, 601 So. 2d 165 (Ala.Crim.App. 1992); and Hagood v. State, 588 So. 2d 526 (Ala.Crim.App. 1991), cert.

-38-

denied, <u>Martin v. Alabama</u>, 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). Accordingly, this issue is not preserved for review.

<p style="text-align:center">X.</p>

Landers contends that the trial court erred in instructing the jury that it could use evidence of Landers's collateral acts only for showing motive, plan or knowledge. (See Part V of this opinion, addressing the admissibility of the collateral acts.) Landers maintains that the trial court's charge in this regard improperly "highlighted" the evidence as evidence of "other wrongful acts" and thereby "suggest[ed] to the jury that there was somehow some wrongful conduct connected with this information." (Landers's brief to this court, p. 189.)

The record reflects that during its oral charge, the trial court instructed the jury as follows:

> "There has been evidence and testimony with regard to certain acts of the defendant, Mark Landers. And I know at least on two occasions during the trial I told you that that evidence could only be considered for a limited purpose. And this is the overview of that type evidence.

> "The law says that evidence of other wrongs or acts is not admissible to prove the character of a person in order to show action and conformity therewith. It may however be admissible for other purposes.

> "The defendant is on trial only on the charge or charges that I have submitted to you.

> "The State presented evidence regarding the defendant's educational background, his employment history, litigation pending against his company at the time of the alleged incident, the defendant's company's financial condition at the time of the alleged incident, and the defendant's history of insurance claims.

> "This evidence is to be and may be considered by you only for what bearing, if any, it may have as to preparation, plan, knowledge, and motive and for no other purpose.

> "Motive is defined as a feeling, passion, impulse, wish, or the like in a person that impels or inclines a person to do or not to do a particular act. It is different from intent. Motive is why a person wants to do a particular act."

(R. 2434-35.) Following the completion of the court's oral charge, Landers made the following objection:

> "We would further object to that portion of the Court's oral charge in which it instructed the jury about other alleged wrongs or acts. Listing education, employment history, litigation, the defendant's financial situation, and certain insurance claims.

> "We objected in advance, asked the Court not to give that charge for that reason and do object at this time because we submit that his education background is not evidence of any alleged wrong or act [and] does not even properly come under the scope of Rule 404(b). The same would be true as employment history with the exception of that portion of his employment history that is related to the termination at one of the insurance companies.

<p style="text-align:center">-39-</p>

"Same thing is true with regard to litigation. The fact that he had been sued we submit does not constitute any wrong or act that would come within the scope of 404(b) as it was proven. And the same also with regard to his financial situation and then the list of insurance claims that was submitted is simply a list of claims that were paid. There was not one iota of evidence that there was anything wrong about it.

"Of course we submitted there is no relevance, but certainly by highlighting them as evidence as other wrongful acts it tends to cause the jury to believe that perhaps there was something wrong with it. And we do respectfully object to that portion of the Court's oral charge."

(R. 2448-50.) As the trial court noted in its charge, a virtually identical instruction had already been given to the jury during the trial. The record reflects that Landers did not object to the previous instruction. Because Landers failed to object the first time the trial court instructed the jury as to the limited purpose of Landers's collateral acts, he waived any claim of error in this regard.

Moreover, even if this issue were not waived, we would still decide it adversely to Landers. Evidence of Landers's educational background, his employment history, his history of insurance claims, and his financial condition at the time of the crime were admitted under Rule 404(b), Ala.R.Evid., for a limited purpose. As the State correctly points out in its brief to this court, the trial court's limiting instructions ensured that the jury did not use this evidence improperly, i.e., as evidence of bad character. The court's instructions did not highlight the evidence nor suggest to the jury that Landers's collateral conduct was in any way wrong or bad. In addition, Landers had the opportunity, and in fact did, argue to the jury that this conduct was not wrongful. Given the wealth of evidence regarding Landers's collateral conduct leading up to his father's murder, we find that the trial court's instructions were proper.

## XI.

Landers contends that the trial court erred in denying his motion for a new trial. In his motion, Landers raised some 44 grounds for relief. Of those 44 grounds, 18 have been addressed elsewhere in this opinion, 21 have not been pursued by Landers on appeal and thus are deemed to be waived, and 5 will be addressed below.

Initially, we note that "[t]here exists a presumption of correctness surrounding a trial court's overruling of a motion for a new trial." Dossey v. State, 489 So. 2d 662, 666 (Ala.Crim.App. 1986). "'"The ruling of the trial judge denying a motion for new trial will not be disturbed in the absence of a showing of abuse of discretion, and this Court will indulge every presumption in favor of the correctness of his ruling."'" Woodson v. State, [Ms. CR-99-0960, August 25, 2000] ___ So. 2d ___, ___ (Ala.Crim.App. 2000), quoting Reynolds v. City of Birmingham, 723, So. 2d 822, 824 (Ala.Crim.App. 1998), quoting, in turn, Hall v. State, 348 So. 2d 870, 875 (Ala.Crim.App.), cert. denied, 348 So. 2d 875 (Ala. 1977), cert. denied, 434 U.S. 1021, 98 S.Ct. 745, 54 L.Ed.2d 768 (1978). "'At a hearing on a motion for a new trial, the defendant has the burden of proving the allegations of his motion to the satisfaction of the trial court.'" Dawson v. State, 710 So. 2d 472, 475 (Ala. 1997), quoting Miles v. State, 624 So. 2d 700, 703 (Ala.Crim.App. 1993). "[S]tatements made by counsel during a hearing on a motion for new trial cannot be considered evidence in support of the motion." Arnold v. State, 601 So. 2d 145, 154 (Ala.Crim.App. 1992), citing Vance v. City of Hoover, 565 So. 2d 1251, 1254 (Ala.Crim.App. 1990). Moreover, "[t]here is no error in a trial court's denial of a motion for new trial where no evidence is offered in support of that motion." Arnold, 601 So. 2d at 154, citing Tucker v. State, 454 So. 2d 541, 547-48 (Ala.Crim.App. 1983), rev'd on other grounds, 454 So. 2d 552 (Ala. 1984).

-40-

## A.

First, Landers contends that the trial court erred in denying his motion for a new trial on the ground of juror misconduct. In his motion, Landers alleged:

> "The death of Robert R. Landers, Sr. occurred in 1992 and, over four years later, defendant was indicted. Mr. Landers's death and the investigation received extensive publicity. In early 1997, this Court ordered the exhumation of defendant's grandmother, who had died in 1991 as the result of an accident, for the purpose of determining whether to charge the defendant with her death as well. That exhumation also received extensive publicity. The Court later ruled that no evidence of the grandmother's death could be admitted. However, since the conclusion of the trial, a juror has stated that during the course of the trial she had a conversation with another person, possibly another juror, in which the person asked whether defendant was being tried for the death of his grandmother or his father. This conversation was not reported to the Court and counsel as required by the Court's instructions to the jury, which was a clear violation of the juror's duty. This knowledge and the failure to disclose it acted to deny defendant his right to due process and to a fair and impartial trial in violation of the 5th, 6th and 14th Amendments to the United States Constitution, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally."

(C. 536-37.)

At the hearing on his motion, Landers offered no evidence, other than defense counsel's allegations, to support this claim. Landers's counsel claimed at the hearing that he had attempted to subpoena the juror who allegedly had this conversation, but that the juror had not been served. In lieu of the juror's testimony, Landers offered the testimony of Ned Hersman, an investigator hired by Landers after his trial to interview the jurors. The State objected to Hersman's testimony on the ground that it would be hearsay. The trial court sustained the State's objection.[3] Nevertheless, the trial court allowed Landers to make an offer of proof of what the juror's testimony would be if she were present to testify. According to Landers's counsel, the juror would have testified that during a recess during the trial, "she heard some person that she is not sure, could have been a juror, said this to her or this in substance, 'Was this a trial about his grandmother or about his father.'" (R.Supp. 25.)

In its order denying Landers's motion for a new trial, the trial court stated the following regarding this claim:

> "In ground #34, the defendant claims that a juror was improperly influenced by an alleged conversation between a certain juror and another person, possibly another juror, about whether the defendant was being tried for the death of his grandmother or his father. There was no competent evidence offered by the defense to support this allegation. Further, the jurors were instructed many, many times regarding not discussing the case and the Court was assured by the jury many, many times that they had followed the Court's instructions. Further, as stated with regard to ground #10 above, having observed the jury throughout the trial, the Court is of the opinion that the verdict was not affected by nor the result of any improper consideration of extraneous matters."

---

[3]Landers does not challenge the trial court's ruling on the State's hearsay objection.

-41-

(C. 697.) The trial court's ruling was correct. As noted above, a trial court does not err in denying a motion for a new trial when no evidence is offered in support thereof. Because Landers failed to offer any evidence to support this claim, other than defense counsel's allegations, denial of this claim was proper.

### B.

Landers contends that the trial court erred in denying his motion for a new trial on the ground of prosecutorial misconduct. Landers maintains that the prosecutor's closing argument was "highly prejudicial, inflammatory, and designed to cause the jury to disregard defense counsel's argument for improper reasons," and he cites to several comments by the prosecutor that he says were improper. (Landers's brief to this court, p. 194.) Landers concedes that he raised this claim of prosecutorial misconduct for the first time in his motion for a new trial and that he did not object to any of the comments by the prosecutor that he now complains of on appeal.

It is well settled that "[t]he grounds urged on a motion for a new trial must ordinarily be preserved at trial by timely and adequate objections," and that "improper argument of counsel is not a valid ground for a motion for a new trial or subject to review on appeal unless there is a timely and specific objection by counsel or a motion to exclude, an adverse ruling thereon by the trial court, or a refusal of the trial court to make a ruling, and an objection thereto.'" Trawick v. State, 431 So. 2d 574, 578-79 (Ala.Crim.App. 1983). "'[A] new trial will not be granted for matters pertaining to rulings, evidence, or occurrences at a trial, including erroneous conduct on the part of the court, counsel, or jury, unless timely and sufficient objections, requests, motions, or exceptions have been made and taken.'" Williams v. State, 710 So. 2d 1276, 1293 (Ala.Crim.App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), quoting Fuller v. State, 365 So. 2d 1010, 1012 (Ala.Crim.App. 1978), cert. denied, 365 So. 2d 1013 (Ala. 1979), quoting, in turn, 24 C.J.S. Criminal Law § 1428 (1961). Because Landers did not object to any of the prosecutor's comments that he now complains about on appeal, this issue is not preserved for review.

Nevertheless, Landers claims that this Court should reach the merits of this claim because, he says, the death of defense counsel's father two days before closing arguments rendered his counsel "not fully functional" and thus, counsel could not be expected to make a timely objection. (Landers's brief to this court, p. 194.) However, as we noted in Part VIII of this opinion, Landers was represented by two attorneys; although lead defense counsel was recovering from the loss of his father, co-counsel was not suffering from a traumatic event and could easily have objected to the prosecutor's comments if he believed those comments were, in fact, improper. Thus, we are unpersuaded by Landers's argument that the rules of preservation should not apply in his case.

### C.

Landers contends that the trial court erred in denying his motion for a new trial on the ground that the court improperly allowed Landers's half-brother, Robert Richard Landers, Jr., to sit at the prosecution table during the trial. In his motion, Landers alleged:

"The Court erred in allowing Rick Landers, Jr., to sit at counsel table in that defendant's father was the victim, defendant denied killing his father and was supported by his mother and one sister in his immediate family, while Rick Landers, a half-brother, and Vicky Goolsby, his sister, opposed Mark Landers. Under the circumstances, by allowing Rick Landers to sit at counsel table he was made to appear to have more credibility or veracity than he otherwise would have been entitled. His presence at counsel table and his comments concerning defendant's counsel (an issue Landers does not pursue on appeal) all were in violation of the 5th, 6th and 14th Amendments to the

-42-

139

Constitution of the United States, and Article I, § 6 of the Constitution of Alabama of 1901, separately and severally."

(C. 540.) On appeal, Landers contends that in allowing Rick Landers to sit at the prosecution table, the trial court violated § 15-14-56(a), Ala. Code 1975, by overriding "the wishes of a majority of Robert Landers's family" who, Landers said, did not want Rick Landers as the family representative. (Landers's brief to this court, p. 196.) He also contends that Rick Landers sitting at the prosecution table allowed the State "to confuse the jury and to drive a wedge in the jury's minds between those members of Mark Landers's family who were for him and those who were against him." (Landers's brief to this court, p. 197.)

Clearly, the argument Landers raised in his motion for a new trial is not the same argument that Landers now makes on appeal. "The statement of specific grounds of objection waives all grounds not specified and the trial court will not be put in error on grounds not assigned at trial." Jackson v. State, 593 So. 2d 167, 171 (Ala.Crim.App. 1991). "A defendant is bound by the grounds of objection he stated at trial and may not expand those grounds on appeal." Cole v. State, 548 So. 2d 1093, 1096-97 (Ala.Crim.App. 1989).

Moreover, although it appears from the record that Landers objected when the State requested that both Rick Landers and Victoria Goolsby be exempted from "the rule," his objection and the grounds therefor are not included in the record. The record reflects that after the trial court invoked "the rule" and ordered all witnesses out of the courtroom, the following occurred:

"[Prosecutor]: Judge, we would like to make an exception for one of our investigators, Jerry Shockley, from the Attorney General's Office. And we have a couple of family members that we would like present in the courtroom. I know it would probably be too many people here at the table for both but we could alternate. And those family members are Robert Landers, Jr. and Victoria Landers Goolsby.

"[The Court]: Does defense have any objection to the exception of those three people?

"[Landers's counsel]: Yes, Your Honor, we do.

"[The Court]: If both Mr. Landers and Ms. Goolsby are going to testify, I think I could properly except one of them from the rule as being a representative of the family. I hate to make y'all pick.

"[Prosecutor]: May we approach?

"[The Court]: Yes, one at the time.

(Bench conference, off record.)

"[The Court]: The Court will – defendant's objections are noted for the purpose of the record. The Court will allow Investigator Shockley and also Robert Landers, Jr., also known as Rick, to be excepted from the rule."

(R. 925-27.)

-43-

"[W]here the appellant fails to include pertinent portions of the proceedings in the record on appeal, this court may not presume a fact not shown by the record and make it a ground for reversal." Carden v. State, 621 So. 2d 342, 345 (Ala.Crim.App. 1992). "It is the appellant's duty to provide this court with a complete record on appeal, and we will not predicate error on a silent record." Gamble v. State, [Ms. CR-97-0698, February 4, 2000] ___ So. 2d ___, ___ (Ala.Crim.App. 2000). Moreover, "[i]f counsel makes objections and secures rulings 'off the record,' this court cannot consider those rulings." Jefferson v. State, 449 So. 2d 1280, 1282 (Ala.Crim.App. 1984).

Accordingly, this claim was not properly preserved for review.

### D.

Landers contends that the trial court erred in denying his motion for a new trial on the ground that the jury's guilt-phase verdict was a compromise verdict. In his motion, Landers alleged that "[t]he jury verdict was an impermissible and unlawful compromise verdict wherein certain jurors who were not convinced beyond a reasonable doubt of defendant's guilt, voted for guilty in exchange for an agreement that the jury would unanimously recommend life without parole." (C. 528.)

At the hearing on his motion, Landers presented no evidence, other than defense counsel's allegations, to support this claim. As noted previously, Landers's counsel claimed that he had subpoenaed one of the jurors to testify, but that the juror was not served. In lieu of that juror's testimony, Landers's counsel offered the testimony of his investigator, Ned Hersman. The trial court sustained the State's objection to the investigator's testimony. Landers's counsel then proffered that if the investigator were allowed to testify, he would testify as follows:

"That during the course of [interviewing the juror in question] she was asked whether the sentence came down quickly because of an understanding that some of the jurors had voted for guilt and weren't firm about it. And she said, 'You are about right.'

"And then after some further discussion about whether some of the jurors had reluctantly agreed to vote for guilt and there were some who were strong for guilt, there there had been some discussion about — the question was asked had there been some discussion about that those wavering jurors if they voted for guilty would then a sentence be that it be life? To which she responded again, 'You are about right.'"

(R.Supp. 28-29.) As noted above, statements by counsel at a hearing on a motion for a new trial cannot be considered as evidence to support the motion and there is no error in the denial of a motion for a new trial that is unsupported by any evidence. Landers presented no evidence to support this claim.

Moreover, we note that the trial court properly ruled that neither Investigator Hersman nor the juror in question, if she had been present at the hearing, were competent to testify as to this issue.

"After a case has been submitted to the jury, it generally has been considered that their deliberations in the jury room are not subject to review. Consequently, there has long existed in Alabama a general rule that a jury's verdict is not subject to impeachment by the testimony of the jurors, at least as to matters which transpired during the deliberations. This exclusionary rule continues, although in an expanded form, in the following Alabama Rule of Evidence:

"'Rule 606. Competency of Juror as Witness

"'....

-44-

"'(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. Nothing herein precludes a juror from testifying in support of a verdict or indictment.'

"Rule 606(b) constitutes a broad principle of exclusion. It applies in any proceeding in which the validity of a verdict or criminal indictment is challenged. This usually arises when the disappointed litigant files a motion for new trial and attaches one or more juror affidavits in support. No juror is competent to thus or otherwise testify (1) to any matter or statement occurring during the jury's deliberations, (2) to the effect of anything upon the mind or emotion of any juror, or (3) to the mental processes of the juror whose testimony, affidavit or statement is being offered. Such evidence is excluded whether it comes in the form of juror testimony, juror affidavit, through the testimony of some third party relating a statement by a juror or any other evidence, whether oral or in writing, concerning a matter about which the juror himself could not testify.

"The impact of this rule is to regularly exclude juror testimony to such matters of alleged wrongdoing as misunderstanding of instructions, misunderstanding of the law, speculation upon such matters as the wealth of a party, one juror's intimidating or threatening another, arriving at the verdict by quotient, considering the accused's failure to take the stand as evidence of guilt, or the failure to discuss the evidence during deliberations."

C. Gamble, McElroy's Alabama Evidence, § 94.06(1) (5th ed. 1996)(footnotes omitted). See also Adair v. State, 641 So. 2d 309 (Ala.Crim.App. 1993)(trial court properly excluded juror's affidavit that she voted for a guilty verdict when she did not believe the accused was guilty because she felt pressured to reach a verdict as soon as possible based on her vacation plans); and Walker v. State, 519 So. 2d 598 (Ala.Crim.App. 1987)(trial court properly prevented defense counsel from questioning juror-witness as to whether the trial court had, through any comments or actions, expressed its opinion that the accused was guilty and whether the juror was influenced by those comments or actions of the trial court).

Accordingly, this claim was properly denied by the trial court.

E.

Finally, Landers contends that the cumulative effect of all the errors allegedly committed in the trial of his case violated his rights to due process and to a fair trial. However, when "no single instance of alleged error [has been found to be] reversible error, we will not consider the cumulative effect to be any greater." Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So. 2d ___, ___ (Ala.Crim.App. 1998), aff'd in pertinent part, rev'd on other grounds, [Ms. 1980810, July 21, 2000] ___

-45-

So. 2d ___ (Ala. 2000), citing <u>Boyd v. State</u>, 715 So. 2d 825, 851 (Ala.Crim.App. 1997), aff'd, 715 So. 2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998). See also <u>Woods v. State</u>, [Ms. CR-97-0027, December 10, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999); <u>Bryant v. State</u>, [Ms. CR-98-0023, November 19, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999); <u>Whitehead v. State</u>, [Ms. CR-95-2129, August 27, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999), aff'd, [Ms. 1990177, June 30, 2000] ___ So. 2d ___ (Ala. 2000); <u>Melson v. State</u>, [Ms. CR-95-1681, March 26, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999), aff'd, [Ms. 1981463, August 4, 2000] ___ So. 2d ___ (Ala. 2000).

Based on the foregoing, the judgment of the trial court is affirmed.

McMillan, Cobb, and Fry, JJ., concur; Baschab, J., recuses herself.

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

MARK SAMUEL LANDERS,

    Petitioner,

vs.

STATE OF ALABAMA,

    Respondent.

CASE NO. CC-96-42

```
┌─────────────────────────────┐
│          FILED              │
│   ┌─────────────────┐       │
│   │   JUL 1 3 2005  │       │
│   └─────────────────┘       │
│         LARRY DOZIER        │
│ CIRCUIT CLERK, ELMORE COUNTY│
└─────────────────────────────┘
```

## ORDER SETTING HEARING

It is hereby ORDERED, ADJUDGED and DECREED that the above-styled cause is hereby set for hearing on State's Motion to Dismiss on the 30th day of August, 2005 at 1:30 p.m.

The Circuit Clerk shall make arrangements to have the Defendant transported from the Department of Corrections to appear for hearing.

DONE and ORDERED this 13th day of July, 2005.

_____
JOHN B. BUSH
Circuit Judge

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

MARK SAMUEL LANDERS,                )
                                    )
Inmate Number: AIS #193732          )
Place of Confinement: St.Clair      )
     Correctional Facility,         )
     Springville, Alabama           )
County of Conviction: Elmore        )
                                    )
     Petitioner                     )
                                    )
VS.                                 )      CASE NO.:_ 96-421.60
                                    )
STATE OF ALABAMA,                   )
                                    )
     Respondent                     )



## PETITIONER'S MEMORANDUM IN OPPOSITION TO STATE'S MOTION TO DISMISS

The Petitioner, Mark Samuel Landers, submits this memorandum in opposition to the motion to dismiss the petition filed by the State in this case. This memorandum will discuss why the State's motion is not well taken as a whole and as to each ground of the petition.

### Petition Generally

A mere cursory reading of the State's motion will reveal that the motion in its entirety is not well taken. This proceeding is at the pleading stage. The State's motion obviously confuses the function of pleading and the function of evidence, and the distinction between them, in a proceeding under Rule 32 of the Alabama Rules of Criminal Procedure. See Ex Parte Lucas, 865 So.2d 418, 420-21 (Ala. 2002); Ex Parte Walker, 800 So.2d 135, 138 (Ala. 2000)("If a Rule 32 petition contains allegations that, if true, would entitle the petitioner to relief, the trial court must hold

an evidentiary hearing."); Ex parte Land, 775 So.2d 847, 852 (Ala. 2000); Johnson vs. State, 835 So.2d 1077, 1080 (Ala.Crim.App. 2001) (". . . the initial pleading stage, a stage at which the petitioner has only a burden to plead."). At the present stage of this proceeding the allegations of the petition are construed as being true. See Parker vs. State, 719 So.2d 259, 260 (Ala.Crim.App. 1997); Henderson vs. State, 586 So.2d 21, 109, 1010 (Ala.Crim.App. 1991).

The State's motion asserts the same ground - preclusion - as to all of the grounds of the petition (See Paragraph 7, Page 5 of State's motion). This terse allegation in a motion to dismiss ignores the requirements of Rule 32.3 and its interpretation by the appellate courts. Rule 32.3 clearly requires:

> The state shall have the burden of pleading any ground of preclusion . . . A.R.Crim.P. 32.3.

This rule, or its predecessor in the Temporary Rules, has been consistently construed by the Supreme Court and the Court of Criminal Appeals to place the burden upon the State of pleading in detail the facts claimed to foreclose a remedy and giving a petitioner the notice he needs to present evidence and formulate arguments to disprove the existence of a ground for preclusion. See Ex Parte Rice, 565 So.2d 606, 608 (Ala. 1990) ("The State is required to plead the ground or grounds of preclusion that it believes apply to the petitioner's case, thereby giving the petitioner the notice he needs to attempt to formulate arguments and present evidence to 'disprove' [the] existence [of those

grounds]. . . "); <u>Nicks vs. State</u>, 783 So.2d 895, 914 (Ala.Crim.App. 1999); <u>Alvis vs. State</u>, 762 So.2d 380, 381 (Ala.Crim.App. 1999); <u>Marshall vs. State</u>, 720 So.2d 960, 961 (Ala.Crim.App. 1996); <u>Snipes vs. State</u>, 571 So.2d 398 (Ala.Crim.App. 1990). This requirement surely contemplates an answer with factual allegations. Preclusion cannot be decided on the basis of a mere assertion in a motion. Clearly, adjudication of preclusion can only be based upon evidence after a hearing. Meritorious claims alleged in a Rule 32 petition warrant an evidentiary hearing. See <u>Walker vs. State</u>, <u>supra</u>; <u>Alvis vs. State</u>, 762 So.2d 380, 381 (Ala.Crim.App. 1999).

Based on the plain language of Rule 32.3 and the decision of the Supreme Court in <u>Ex Parte Rice</u> and the decisions of the Court of Criminal Appeals that have followed <u>Ex Parte Rice</u>, to grant the State's motion would deny the Petitioner's constitutional right to due process of law. The State's motion and its argument "ignores the obvious purpose behind the assignment of the burdens of pleading and proof" in Rule 32.3. See <u>Ex Parte Rice</u>, <u>supra</u> at 608. The State's motion to dismiss is due to be denied and the State required to file an answer to the petition to frame the issues on which an evidentiary hearing can be conducted in this matter.

## Grounds of Petition

Although probably superfluous for the purposes of the present motion to dismiss, Petitioner will briefly discuss each of the grounds of the petition and point out reasons the State's motion is not well taken as to particular grounds.

It seems appropriate at the outset to bring to the Court's attention and discuss certain overarching principles and precedents which refute the State's claim of preclusion as it relates to most of the issues raised by the present petition.    The primary contention made by the State is that certain issues raised by the petition in this case have been considered and ruled on by State trial and appellate courts and that for this reason these issues are precluded from review in this proceeding.    This argument is specious, misinformed, and misdirected.    It overlooks several established legal propositions and obvious facts.

The threshold flaw in the State's argument is that it ignores or overlooks the fact that most, if not all, of the issues raised by the present petition are issues of Federal constitutional rights.    The first ground stated in Rule 32.1 as a basis for post-conviction relief is that the Constitution of the United States "requires a new trial, a new sentence proceeding or other relief".    See A.R.Crim.P. 32.1(a).    Rights under the United States Constitution, including rights which invalidate criminal convictions and resulting imprisonment and mandate relief under Rule 32.1, are, of course, defined by Federal law and Federal courts.    State courts, including this Court, are obligated to apply

-4-

and enforce those Federal constitutional rights which Federal law and Federal courts have declared. See <u>Henry vs. City of Rock Hill</u>, 376 U.S. 776, 777 (1964).

Because it is Federal law and Federal courts which declare and define Federal constitutional rights not all State court decisions on such issues have preclusive effect. Some do not. To have preclusive effect a State court decision on such constitutional issues: (1) must not be contrary to established Federal law and must not unreasonably apply established Federal law as determined by the United States Supreme Court and (2) must not be based on an unreasonable determination of facts in the light of the evidence presented. See 28 U.S.C. §2254; <u>Williams vs. Taylor</u>, 529 U.S. 362, 375, 379, 385-86, 387, 389 (2000). The State court decisions the State's motion argues have preclusive effect in this case all offend this guiding principle of constitutional law. For this reason these State court rulings do not have preclusive effect and do not foreclose granting relief in this proceeding where relief is required by the United States Constitution.

<u>Ground 12A (1)</u>

This ground of the petition concerns the State's failure to produce upon Petitioner's request the blood samples the State tested and used the test results as evidence linking a pair of glasses it introduced in evidence to the deceased and the circumstances of his death. After testing these blood samples the State destroyed them and produced nothing for the Petitioner to test. This ground raises the issue of the State's failure to

comply with a Federal due process constitutional obligation that is related to the due process obligation defined in Brady vs. Maryland, 373 U.S. 83 (1963) and its progeny. It differs from a pure Brady violation in that it involves a failure to produce evidence for inspection because it has been destroyed or disposed of by the prosecution thereby making the exculpatory or mitigating effect of the unproduced evidence difficult or impossible to ascertain. However, there is no doubt that the United States Supreme Court has declared that a defendant has a due process right not to be deprived of access to such evidence for use in his defense by misconduct of the prosecution in destroying it and that a defendant is denied a constitutionally protected right by such misconduct of the prosecution in destroying such evidence. See Arizona vs. Youngblood, 488 U.S. 51, 55 (1988); see also Ex Parte Ginko, 605 So.2d 1237, 1241 (Ala. 1992). This right of a defendant is clearly established Federal law determined by the United States Supreme Court. As such a Federal constitutional right defined by Federal law State courts are obligated to apply and enforce it. See Henry vs. City of Rock Hill, 376 U.S. 776, 777 (1964). This obligation exists in this proceeding.

As raised by the petition, the due process right involved in this case is somewhat special. It involves a destruction of evidence and a deprivation of the constitutional right a defendant "had" to have access to and utilize the destroyed evidence in his defense. The loss to the defendant is irretrievable. It cannot be remedied by a new trial after the prosecution has complied with its

constitutional obligation to produce evidence. A concurring opinion in Arizona vs. Youngblood, supra, and the decision of the Supreme Court of Alabama in Ex parte Ginko, 605 So.2d 1237, 1241 (Ala. 1992), recognize that such a denial of access to evidence can be sufficient in and of itself, without regard for prosecution misconduct or bad faith, to render a trial fundamentally unfair and a denial of due process.

The blood test evidence the State presented was critical to its prosecution theory for this case. To prove the "blow to the temple" theory it needed the eye glasses it offered as evidence and could not use the eye glasses unless it could prove they were the eye glasses of the deceased or were otherwise connected to the deceased. All the credible testimony of witnesses who knew the deceased and knew the type of eye glasses he wore testified that his eye glasses were of a different type and that the glasses which were State's Exhibit 10 were not his glasses. To overcome this evidence the State needed a connection between these glasses and the deceased. The only connection was the results of the blood tests from the blood samples the State destroyed. Without these blood tests the State's case was simply non-existent. The sole connection was the blood test results. The State denied and deprived the Petitioner of the opportunity to confront and refute this evidence by conclusively and irretrievably denying him the opportunity to have the same samples tested to determine if the State's test were valid and if there was a connection between the critical eye glasses and the deceased. These blood samples were the linchpin of the State's case. Without the blood test evidence

the State had no case.

One of the grounds for a petition for relief under Rule 32 is that the Constitution of the United States "requires" relief. See A.R.Crim.P. 32.1(a). The Constitution of the United States requires relief for the bad faith destruction of evidence or for the destruction of evidence that renders a defendant's trial fundamentally unfair as determined by Federal law. See Arizona vs. Youngblood, supra.

For this due process issue to be precluded in this case it would be necessary either that the Petitioner have waived this issue by not raising it at trial and on appeal or, if raised, that it was acceptably decided by the State courts. As discussed above, a decision by State courts that precludes further review of an issue involving Federal constitutional law must: (1) not be contrary to established Federal law and not unreasonably apply established Federal law and (2) not be based on an unreasonable determination of facts in the light of the evidence presented. See 28 U.S.C. §2254; Williams v. Taylor, 529 U.S. 362, 375, 379, 385-86, 387, 389 (2000).

Here, the issue of the failure of the State to produce previously destroyed evidentiary material was raised in the trial court and then in the appellate courts, so there is no waiver for failure to raise the issue. The questions which remain undecided, and which are raised by the present petition, are whether there has been a full development of the facts relating to the action which the State took in destroying the evidence and/or whether the

decisions by the State courts in deciding whether the State's action in destroying evidence was constitutionally permissible was contrary to or unreasonably applied applicable Federal law or were based on an unreasonable determination of facts. Those questions, cannot, of course, be decided on this motion to dismiss and can only be decided after an evidentiary hearing. An evidentiary hearing will establish that the prior decisions of the State courts were contrary to and were an unreasonable application of established Federal law or were based on an unreasonable determination of facts in light of the evidence presented.

If the prior decisions of the State courts on this issue are contrary to or unreasonably applied established Federal law or were based on an unreasonable determination of facts the United States Constitution requires relief for the Petitioner. See Williams vs. Taylor, supra. This is a claim for relief (mandated by Rule 32.1[a]) which cannot be precluded if not previously waived (which it has not been).

Clearly, the State's motion as to this ground must be denied.

Ground 12A (2)

This ground of the petition raises a similar due process issue as Ground 12A (1), above. Rather than repeat that discussion, this memorandum adopts that discussion for this ground with a few additional comments.

This ground concerns the State's failure to produce and apparent destruction of another blood sample it had in its possession but did not produce and as to which it did not offer

evidence of testing or test results.  The State's evidence showed that the eye glasses it introduced in evidence as the eye glasses of the deceased at one time had another blood spot on them other than the blood spot the Department of Forensic Sciences technician testified she analyzed.  This fact is apparent from a photograph of the glasses, State's Exhibit 23A, which was presumably taken shortly after the State took possession of these glasses.  What would an analysis of this blood spot reveal?  We will never know. The State, in utter disregard of the Petitioner's rights, as discussed above, has destroyed it.

This issue has not been precluded by waiver of by an acceptable determination of it under the standards discussed above.

### Ground 12A (3)

This ground of the petition raises a similar due process issue as Ground 12A (1), above.  Rather than repeat that discussion, this memorandum adopts that discussion for this ground with a few additional comments.

This ground concerns the State's destruction of and failure to produce the notes of the investigation by the medical examiner which concluded that the death of the deceased was accidental and not a homicide.  The destroyed notes were the notes of the facts and observations which led to this conclusion.  These facts and observations are obviously favorable to the Petitioner and are clearly Brady material.  The admissions by the medical examiner that he first concluded the death was accidental (but later changed his mind) does not detract from the importance of these notes -

notes of actual observations on which the conclusion of accident was based and which the jury could see and read - to the defense of this case where the evidence against the petitioner was entirely circumstantial and there was a highly contested issue of whether the deceased was killed in an accident or a homicide.

There has been no decisions on this issue that is acceptable under Federal constitutional standards that precludes this issue from decision in this proceeding.

### Ground 12A (4)

This ground of the petition concerns the refusal of the trial court to delay closing arguments in this case. The prior decisions of the trial court and the Court of Criminal Appeals on this issue are simply factually wrong. The Court of Criminal Appeals memorandum recites:

> The record reflects that the judge was obligated to be in Baldwin County to preside over a case as a special judge on the following Monday.

This is wrong, as is apparent from the order attached as Exhibit 1 to this memorandum. The trial judge had no assignment to preside over a particular case as a special judge in Baldwin County on May 12, 1997. Rather, his assignment was a mere general assignment to serve as "an additional judge to perform duties in the 28th Judicial Circuit, Circuit Court of Baldwin County" during the week of May 12, 1997. Contrary to the memorandum opinion's suggestion, the trial judge had no compelling reason to be in Baldwin County on May 12, 1997 that outweighed the rights of the Petitioner to fair

representation and a fair trial in this case. As an "additional" Circuit Judge, he obviously had discretionary authority to schedule his docket in the Circuit Court of Baldwin County just as he had the discretionary authority to schedule his docket in the Circuit Court of Elmore County. See ALA. CONST., Amend 328, §§ 6.01, 6.04(b) (1901); ALA. CODE §§ 12-11-1, 12-11-4 (1975). He clearly had the authority to delay presiding over any case in the Circuit Court of Baldwin County under his assignment as an "additional judge" until he completed this case in the Circuit Court of Elmore County. Had he delayed the closing arguments from Friday to Monday, he would have delayed his docket in Baldwin County by only one day.

The conclusion that the trial judge was powerless to re-schedule closing arguments in this case to accommodate one of life's most tragic, doleful, and distressing occurrences in the life of Petitioner's lead counsel was simply decided wrong. It is a conclusion based on an unreasonable determination of facts in the light of the evidence presented because no facts support the conclusion that the trial judge was powerless to delay closing arguments. Such an unwarranted conclusion of fact does not have preclusive effect. See 28 U.S.C. §2254.

This wrong decision by the trial court and the appellate courts warrants correction of this grievous error in this proceeding.

## Ground 12A (5)

This ground of the petition concerns the inordinate delay in initiating this prosecution against the Petitioner. It is a violation of a defendant's Federal constitutional rights to delay without justification the initiation of a prosecution where the delay gives the prosecution a tactical advantage and prejudices the defendant because this violates the fundamental conception of justice which lies at the base of our civil and political institutions and which defines the community's sense of fair play and decency. See United States vs. Lavasco, 431 U.S. 783, 790 (1977). This is established Federal constitutional law determined by the United States Supreme Court. The trial court and the Court of Criminal Appeals simply reached the wrong conclusion - an unreasonable determination based on evidence that was presented and that will be presented - about the delay and the effect of the delay on the Petitioner. The delay did prejudice the Petitioner, as the petition alleges in detail and as evidence will clearly demonstrate.

The assertion in the December 15, 2000 memorandum from the Court of Criminal Appeals that the investigation of the charges against the Petitioner continued through the trial is simply wrong. It is based on an unreasonable determination of facts in the light of the evidence presented and is contrary to and involves an unreasonable application of established Federal law. See 28 U.S.C. §2254; Williams vs. Taylor, supra. All the evidence presented at trial against the Petitioner was available to the State no later

-13-

157

than November 1992, and most of it was available earlier than that date.

Evidence will clearly demonstrate prejudice to the Petitioner resulting from the delay of this prosecution for over four years. There can be no preclusion of this claim because the prior decisions and determinations of the trial and appellate courts are based on an unacceptable determination of facts bearing on a Federal constitutional right and are contrary to or unreasonably apply established Federal law. The United States Constitution requires relief in such circumstances. <u>Williams vs. Taylor</u>, <u>supra</u>.

### Ground 12A (6)

This ground of the petition concerns false and misleading testimony presented by the State which was knowingly presented and which was not corrected or withdrawn.  The presentation of such evidence, without correction, the United States Supreme Court has decided, infringes the Federal constitutional right to due process. See <u>Napue vs. Illinois</u>, 360 U.S. 264 (1959).  Therefore, this is clearly established Federal law declared by the United Sates Supreme Court.

It was not possible to fully present the facts relating to this issue at trial, or on post trial motion, or on appeal because the facts were not fully developed at the time.  There could be no preclusion of this issue, because there has been no determination of it, and certainly no determination that is not contrary to Federal law, or which does not unreasonably apply Federal law, or which is not based on an unreasonable determination of facts.

## Ground 12A (7)

This ground of the petition concerns the difference in the allegations of the indictment and the evidence presented by the State to support the indictment and to convict the Petitioner of the offense which is the basis for his present incarceration. While this is what is generally termed a variance, it is more than a mere technical error in the pleading. It is a violation of the basic constitutional principle that no person may be convicted of an offense different from the specific offense of which he is accused, a basic due process right under the United States Constitution. See <u>Dunn vs. United States</u>, 442 U.S. 100, 106 (1979); <u>Stirone vs. United States</u>, 361 U.S. 212, 217 (1960). This is established Federal law determined by the United States Supreme Court.

The indictment in this case specifically charges that the Defendant killed the deceased "by running over and crushing him with a bull dozer" (Appeal Transcript 9). The jury was instructed that the State must prove that the Petitioner caused the death of the deceased "by the means that are charged in the indictment" (Appeal Transcript 2421, 2422, 2423, 2425, 2426). This instruction, which is technically correct, surely required that in order to convict the Petitioner the jury must find from testimony that the death of the deceased was the result of being run over by a bull dozer.

The State's evidence as to cause of death was the testimony of the medical examiner. The medical examiner testified at trial that

-15-

the deceased was killed by being struck on the left side of the head by a blunt instrument (Appeal Transcript 1941). This is obviously not proof of the offense charged in the indictment.

The State may argue that the medical examiner also testified, after stating unequivocally that in this opinion the deceased was killed by a blow to the side of the head, that:

> ... and possibly as a result of being run over by the bull dozer. I can't exclude that Mr. Landers was not still alive when he was run over. (Appeal Transcript 1941-42) (Emphasis added)

The State may argue that this testimony is evidence showing the cause of death to be the same as alleged in the indictment. Such an argument would be unsound and meritless. The testimony quoted above is only a statement of a possibility - nothing more than mere conjecture, supposition or guess - that the deceased was killed by being run over by a bull dozer. Such testimony is insufficient proof that the cause of death was being run over by a bull dozer. A mere possibility or conjecture, supposition, or guess as to the cause of death is not sufficient proof of cause of death in a homicide prosecution. See Gantt vs. State, 356 So.2d 707, 711 (Ala.Crim.App. 1978), cert. Denied 356 So.2d 712 (Ala. 1978); James vs. State, 339 So.2d 1047, 1052 (Ala.Crim.App. 1976); cert. Denied 339 So.2d 1052 (Ala. 1976); Welch vs. State, 45 Ala.App. 635, 636, 235 So.2d 906 (1970); Hardison vs. State, 30 Ala.App. 40, 200 So. 635 (1941). Therefore, the above cited testimony of the medical examiner, as a matter of law, does not prove the deceased met his death in the manner alleged in the indictment and does not alter

the obvious conclusion that the only evidence of cause of death was a blow to the side of the head.

The difference in the allegations of the indictment and the testimony at trial leaves the Petitioner convicted of an offense different from the one described in the indictment. Petitioner was not given an opportunity to be heard on and defend against the accusations made by the State's evidence and on which he was convicted - an obvious Federal due process violation which is correctable in this Rule 32 proceeding.  See A.R.Crim.P. 32.1(a).

### Ground 12A (8)

This ground asserts insufficiency of the evidence but it is more than a technical issue.  It is an issue of whether a person may be constitutionally convicted of a particular charged crime where there is no evidence connecting that person with the particular charged crime.  To convict a person of a certain crime where no evidence connects that person with the commission of that crime is a conviction totally devoid of evidentiary support and violates due process rights guaranteed by the United States Constitution.  See Bunkley vs. Florida, 538 U.S. 835, 840 (2003); Garner vs. Louisiana, 368 U.S. 157, 164 (1961); Thompson vs Louisville, 362 U.S. 199, 206 (1960).  This is established Federal constitutional law determined by the United States Supreme Court.

An objective review of the evidence in this case, Petitioner submits, does not show a connection between the Petitioner and the death of the deceased.  While Petitioner recognizes that the trial court and the appellate courts have held the evidence in this case

to be sufficient to sustain a conviction, those rulings do not bar the relief Petitioner seeks on this Federal constitutional ground by the present petition. For the prior rulings to bar relief on this ground of this petition, since it is based on established Federal constitutional law declared by the United States Supreme Court (as is discussed above in more detail in this memorandum), the State court rulings must not be contrary to and must not unreasonably apply established Federal law and must not be based on an unreasonable determination of facts in the light of the evidence presented. All previous rulings on the issue of whether the Petitioner committed a crime fail these tests. For that reason these rulings do not bar an examination of this issue in this proceeding.

### Ground 12B (1)

It is difficult to see how the State can argue a newly discovered evidence ground for Rule 32 relief can be summarily dismissed as being precluded. Only by the presentation of the newly discovered evidence to a court and its judicial consideration of it in the light of other evidence can there be a determination by a court of whether newly discovered evidence warrants relief in a Rule 32 proceeding.

The newly discovered evidence described in this ground of the petition is highly important evidence for this case. Its importance cannot be overstated. The theory of the prosecution was that the deceased was killed by a blow to his left temple from a blunt instrument. The State offered as proof of this theory the

testimony of the medical examiner and a pair of glasses (a different pair of glasses from the newly discovered evidence) which the medical examiner used as his "Rosetta Stone", contending they were conclusive evidence of guilt. The State's contention was that this pair of glasses was worn by the deceased at the time he was struck on the left temple by a blunt instrument and killed, and that a deformity in one of the legs of these glasses was the key to its theory because it matched the temple injury and explained the fatal temple injury.  The State stressed this theory in opening statement, presentation of evidence, and closing argument.  If the glasses the State offered in evidence as the key evidence which proved its theory were not the deceased's glasses and were not the glasses the deceased was wearing when killed, and if the newly discovered evidence are the deceased's glasses and the glasses the deceased was wearing at the time which were retrieved by law enforcement officers at the scene and turned over to his widow, then the State's case is comprehensively refuted.  The deceased obviously was not wearing two pairs of glasses.  If the glasses (the newly discovered evidence) which the Petitioner will offer are, in fact, the glasses of the deceased then Petitioner should be entitled to offer these glasses as evidence to disprove this salient element of the State's theory of prosecution.

The newly discovered evidence is not evidence the Petitioner could have discovered earlier.  These glasses were not in his possession at the time of the trial or at any time prior thereto. The prosecution of the Petitioner did not take place until over

-19-

four years after the death of the deceased, which gave ample and sufficient time for memories to fade and items to become lost. Further, it must be recalled that the Petitioner was incarcerated from the time of his arrest shortly after his indictment and has not been at large since that time and has not had the opportunity or ability to search for or to freely inquire about items such as these glasses.

Obviously, the Petitioner is not precluded from presenting evidence in support of this ground of his petition.

## Conclusion

For the reasons discussed, the State's motion to dismiss should be denied and this case scheduled for evidentiary hearing after the State files its answer to the petition.

Respectfully submitted,

William H. Mills
ASB-9841-M75W

and

William N. Clark
ASB-1260-C54W
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX

Attorney for Petitioner
Mark Samuel Landers

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama and the District Attorney for the 19th Judicial Circuit of Alabama by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the _18th_ day of August 2005.

Of Counsel for Petitioner

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130


Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

BALDWIN COUNTY
FILED

APR 25 1997

JACKIE N. CALHOUN
CIRCUIT COURT CLERK

### IN THE SUPREME COURT OF ALABAMA
### ORDER

TO THE HONORABLE JOHN B. BUSH, CIRCUIT JUDGE, 19TH JUDICIAL CIRCUIT, WETUMPKA, ALABAMA.

THERE BEING A NEED for an additional judge to perform duties in the 28th Judicial Circuit, Circuit Court of Baldwin County, therefore, I, Perry O. Hooper, Sr., Chief Justice of the Supreme Court of Alabama, do assign the Honorable John B. Bush, a circuit judge residing in Wetumpka, Alabama, for temporary service in the 28th Judicial Circuit, Circuit Court of Baldwin County, effective the week of May 12, 1997, to handle any and all types of jury court cases that he may be called upon to handle by the presiding circuit judge of the 28th Judicial Circuit.

THIS ASSIGNMENT IS MADE pursuant to the authority contained in the provisions of Section 6.10 of Constitutional Amendment No. 328, Constitution of Alabama 1901, as amended, and the authority of this assignment for Judge Bush is as full and complete as if Judge Bush were a regular circuit judge of the above-referenced court. Travel expenses as provided by §§ 36-7-20 and 36-7-22, Code of Alabama 1975, will be reimbursed to Judge Bush during his assignment duties.

IT IS FURTHER DIRECTED that this order be spread upon the minutes of the above-referenced Court.

ORDERED at chambers this the 14th day of April, 1997.

PERRY O. HOOPER, SR.
Chief Justice

c:   Chief Justice Perry O. Hooper, Sr.
     Honorable Robert G. Esdale, Clerk of Supreme Court
     Honorable Charles C. Partin, Presiding Circuit Judge
     Honorable Jacquelyn L. Stuart, Circuit Judge
     Honorable Jacqueline N. Calhoun, Circuit Clerk
     AOC

22-13



IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

MARK SAMUEL LANDERS,

      Petitioner,

vs.

STATE OF ALABAMA,

      Respondent.

CASE NO. CC-96-421.60

FILED
SEP 23 2005
LARRY DOZIER
CIRCUIT CLERK, ELMORE COUNTY

### ORDER DENYING RULE 32 PETITION

This case is back before this Court on Landers' Rule 32 Petition and the State's Motion to Dismiss.

The Petitioner appeared with counsel, William Mills and Bill Clark, on August 30, 2005 for a hearing on the State's Motion to Dismiss. The State was represented by Assistant Attorney Generals Stephanie Morman, Don Valeska, and Greg Biggs. The undersigned is the same judge who handled all pre-trial motions, the trial of this case as well as sentencing, and post-trial motions.

Rule 32.7(d) Ala.R.Crim.P. provides: "If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition."

After reviewing the pleadings, considering the arguments of counsel, reflecting upon the pre-trial, trial and post-trial proceedings, and reviewing the opinion of the Court of Criminal Appeals affirming the Petitioner's conviction, this Court finds that an evidentiary hearing is not necessary in this case as the Petitioner's claims are precluded and that he is not otherwise entitled to relief.

The Court makes the following findings with regard to each of the Petitioner's claims:

1.    Petitioner claims that he was denied due process because the State failed to turn over blood specimens taken from the frame of his father's eye glasses. This claim is precluded from review pursuant to Rule 32.2(a)(3) and (a)(5) because it could have been raised at pre-trial, trial, or on appeal.

2.    Petitioner claims that he was denied due process because the State failed to turn over blood specimens taken from the "upper portion of the eye glass lens". This claim is precluded from review pursuant to Rule 32.2(a)(3) and (a)(5) because he was aware of the existence of such evidence and the issue could have been raised at pre-trial, trial, or on appeal.

3.    Petitioner claims that he was denied due process because the State failed to disclose medical examiner's notes, which were referred to as the "first autopsy report" at trial. This claim is precluded from review pursuant to Rule 32.2(a)(4) because it was raised and addressed on appeal.

4.    Petitioner claims that he was denied due process because the trial court refused to postpone closing argument until after the funeral of his lead counsel's father. This claim is precluded from review pursuant to Rule 32.2(a)(2) and (a)(4) because it was raised at trial, by post-trial motion, and was addressed on appeal.

Further, this claim is without merit. Mr. Clark telephoned this Court on the evening of May 7, 1997 and informed it that his father had

2

died. All evidence in this case had been presented to the jury. After discussion with and on the request of Mr. Clark, the Court recessed the trial on May 8, 1997 so that funeral arrangements could be made. Closing arguments were made, the jury was charged, and a verdict was returned in the guilt phase of this case on May 9, 1997.

5.          Petitioner claims that he was denied due process and that his trial was unfair because the State delayed the indictment. This claim is precluded from review pursuant to Rule 32.2(a)(2) and (a)(4) because it was raised in his Motion for New Trial and was raised and addressed on appeal.

6.          Petitioner claims that he was denied due process because the State "failed to disclose and correct false evidence" (a) from Vickie Goolsby regarding alleged molestation by her father and the denial of a relationship with ABI Agent William Rhegness and (b) from William Rhegness that he did not have an affair with Ms. Goolsby and did not visit her home. This claim is precluded from review pursuant to Rule 32.6(b) because there is no factual basis for the assertion that any molestation occurred and a bare assertion will not support relief. It is further precluded pursuant to Rule 32.2(a)(2) and (a)(3) because either it was raised or could have been raised at trial.

7.          Petitioner claims that he has "newly discovered" evidence in the form of eye glasses which were allegedly in the possession of his mother and not discovered until some time after the trial which requires that his conviction be vacated. This claim is without merit.

Rule 32.1(e) requires that the facts either not be known by petitioner or his counsel at trial, at sentencing or in time to file a post-trial motion and that they could not have been discovered by any of those times through the exercise of due diligence; that the facts are not merely cumulative to other facts that were known; that these facts do not merely amount to impeachment evidence; that if the facts had been known at the time of trial or of sentencing, the result probably would have been different; and that the facts establish that the petitioner is innocent or should not have received the sentence that he received.

If this evidence was so crucial to the defense, there is no reason why it was not discovered. This is particularly true since the Petitioner's mother appeared at the trial and appeared to be very supportive of the Petitioner. Further, plenty of time passed from the date that the Petitioner killed his father until trial such that any such glasses should have been discovered. Additionally, this evidence amounts to impeachment evidence, at best.

Therefore, this purported evidence does not rise to the level required for "newly discovered" evidence.

In the alternative, this claim is precluded from review pursuant to Rule 32.2(a)(3) in that the issue dealing with the eye glasses could have been raised at trial.

8.    Petitioner claims that he is innocent and that his "newly discovered" evidence establishes such. The Petitioner's alleged evidence does not rise to "newly discovered" evidence and therefore this claim is

precluded from review pursuant to Rule 32.2(a)(2) and (a)(4) in that it was raised at trial and was raised on appeal.

9.          Petitioner claims that there was a fatal variance between the indictment and the proof offered at trial, thereby entitling him to relief. This claim is precluded from review pursuant to Rule 32.2(a)(3) in that it could have been raised at trial.  Further, this claim is precluded because it does not show a "variance" that, if it exists at all, is "jurisdictional". Hence, it is precluded under Rule 32.2(a)(5) in that it could have been raised on appeal.

10.          Finally, Petitioner claims that the evidence presented at trial was insufficient to support his conviction.  This claim is precluded from review pursuant to Rule 32.2(a)(2) and (a)(4) in that it was raised at trial and raised and addressed on appeal.

Based upon the reasons set forth above, this Court finds that no purpose would be served by any further proceedings and it is therefore ORDERED, ADJUDGED and DECREED that the Petitioner's Petition for relief pursuant to Rule 32 Ala.R.Crim.P. is DENIED.

DONE and ORDERED this 23ʳᵈ day of September, 2005.

JOHN B. BUSH
Circuit Judge

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

MARK SAMUEL LANDERS,     )
                             )

      Petitioner       )

VS.                     )  CASE NO.: CC96-421.60

STATE OF ALABAMA,       )

      Respondent      )

FILED

2005 NOV 3 PM 2 09

LARRY DOZIER
CIRCUIT CLERK ELMORE COUNTY

## NOTICE OF APPEAL

Pursuant to Rule 32.10(a) of the Alabama Rules of Criminal Procedure and Rule 3(a) of the Alabama Rules of Appellate Procedure, Mark Samuel Landers, the Petitioner in this proceeding, hereby gives notice of appeal to the Court of Criminal Appeals of Alabama from the order entered in this proceeding on September 23, 2005 denying his petition filed pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.

William H. Mills
ASB-9841-M75W
Attorney for Appellant
Mark Samuel Landers
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama and the District Attorney for the 19th Judicial Circuit of Alabama by delivering or mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the ___3rd___ day of ___November___ 2005.

_William H. Wiley, Jr. SWR_
Of Counsel for Petitioner

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

MARK SAMUEL LANDERS,                )
                                    )
                                    )
        Appellant                   )                    FILED
                                    )
VS.                                 )        2005 NOV 3 PM 2 10
                                    )       CASE NO.: CC96-421.60
                                    )              LARRY DOZIER
STATE OF ALABAMA,                   )Appeal to the Court of Criminal
                                    )Appeals of Alabama
        Appellee                    )


## DESIGNATION OF RECORD ON APPEAL

1.    Appellant requests the Clerk to include the following materials in the Clerk's record:

a.    Petition for Post-Conviction Relief filed May 31, 2005.

b.    Motion for Leave to Amend Petition for Post-Conviction Relief filed June 10, 2005.

c.    Amendment to Petition for Post-Conviction Relief filed June 10, 2005.

d.    Motion to Allow Taking of Deposition and other Discovery filed May 31, 2005.

e.    Amendment to Motion to Allow Taking of Deposition and other Discovery filed September 8, 2005.

f.    Motion for Re-assignment or for Transfer of Proceeding filed May 31, 2005.

g.    State's Motion to Dismiss filed on or about July 11, 2005.

h.    Petitioner's Memorandum in Opposition to State's Motion to Dismiss filed on August 19, 2005.

i.    Order denying Petition for Re-assignment or for Transfer

-1-

174

of Proceeding entered June 7, 2005.

j.    Order setting hearing entered July 13, 2005.

k.    Order Denying Rule 32 Petition entered September 23, 2005.

l.    The entire appeal record in Case Number CC-96-421 (Court of Criminal Appeals, Case Number CR-97-0194 and Supreme Court Case Number 1001070).    This record is essential to a review of the issues to be raised by this appeal because the order appealed from, the order entered September 23, 2005, recites that the same judge who entered this order presided at "all pre-trial motions, the trial of this case as well as sentencing, and post-trial motions" and further recites that the said order was entered after "reflecting upon the pre-trial, trial and post-trial proceedings, and reviewing the opinion of the Court of Criminal Appeals affirming the Petitioner's [Appellant's] conviction".

2.    Appellant designates as the Court Reporter's transcript the entire transcript of the proceedings of the hearing conducted in this matter on August 30, 2005.    Appellant has submitted a purchase order for a transcript of these proceedings and will pay or make satisfactory arrangements with the court reporter for the payment of the charges for this transcript.

William H. Mills
ASB-9841-M75W
Attorney for Appellant
Mark Samuel Landers
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama and the District Attorney for the 19th Judicial Circuit of Alabama by delivering or mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the _3rd_ day of _November_ 2005.

_____
Of Counsel for Petitioner

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

State of Alabama
Unified Judicial System

Form ARAP-26 (front)    8/91

**COURT OF CRIMINAL APPEALS
DOCKETING STATEMENT** FILED

Criminal Appeal Number

_____ - _____

## A. GENERAL INFORMATION:

2005 NOV 3 PM 2 10

LARRY DOZIER

CLERK ELMORE COUNTY

[✓] CIRCUIT COURT  [ ] DISTRICT COURT  [ ] JUVENILE COURT OF _____ ELMORE _____ COUNTY

_____ Mark Samuel Landers _____, Appellant

v. [✓] STATE OF ALABAMA    [ ] MUNICIPALITY OF _____

| Case Number    CC96-421.60 | Date of Complaint or indictment    May 31, 2005 | Date of Judgment / Sentence / Order    September 23, 2005 |
|---|---|---|
| Number of Days of Trial / Hearing    1/10 Days | Date of Notice of Appeal    October _____, 2005    Oral: | Written:    Yes |

Indigent Status Requested: [ ] Yes [✓] No      Indigent Status Granted: [ ] Yes [✓] No

## B. REPRESENTATION:

Is Attorney Appointed or Retained?  [ ] Appointed  [✓] Retained    If no attorney, will appellant represent self?  [ ] Yes [ ] No

Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)

William H. Mills, Redden, Mills & Clark

| Telephone Number    205-322-0457 |
|---|

| Address    940 The Financial Ctr., 505 N. 20th St. | City    Birmingham' | State    AL | Zip Code    35203 |
|---|---|---|---|

## C. CO-DEFENDANTS: List each CO-DEFENDANT and the co-defendant's case number:

| Co-defendant    n/a | Case Number |
|---|---|
| Co-defendant | Case Number |
| Co-defendant | Case Number |

## D. TYPE OF APPEAL : Please check the applicable block

1 [ ] State Conviction
2 [✓] Post-Conviction Remedy
3 [ ] Probation Revocation

4 [ ] Pretrial Order
5 [ ] Contempt Adjudication
6 [ ] Municipal Conviction

7 [ ] Juvenile Transfer Order
8 [ ] Juvenile Delinquency
9 [ ] Habeas Corpus Petition

10 [ ] Other (Specify)

_____
_____

## E. UNDERLYING CONVICTION / CHARGE: Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal.  Also include the applicable section of the code of Alabama for State convictions.

1 [✓] Capital Offense - §  13A-5-40(7)
2 [ ] Homicide - § _____
3 [ ] Assault - § _____
4 [ ] Kidnapping / Unlawful Imprisonment § _____
5 [ ] Drug Possession- § _____

6 [ ] Trafficking in Drugs -§ _____
7 [ ] Theft - § _____
8 [ ] Damage or intrusion to Property - § _____
9 [ ] Escape -§ _____
10 [ ] Weapons / Firearms - § _____

11 [ ] Fraudulent Practices - § _____
12 [ ] Offense Against Family - § _____
13 [ ] Traffic – DUI - § _____
14 [ ] Traffic – Other - § _____
15 [ ] Miscellaneous (Specify) :
_____ - § _____

## F. DEATH PENALTY:

Does this appeal involve a case where the death penalty has been imposed?    [ ] Yes [✓] No

## G. TRANSCRIPT:

1. Will the record on appeal have a reporter's transcript?  [✓] Yes [ ] No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _(Date)_____
3. If the answer to question"1" is "No":
   (a) will a stipulation of facts be filed with the circuit clerk?  [ ] Yes [ ] No
   (b) will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  [ ] Yes [ ] No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a)  or 3(b).

177

| From ARAP-26 (back) | 8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT |
|---|---|---|

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP))

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case

This is an appeal from the denial of a petition filed under Rule 32 of the Alabama Rules of Criminal Procedure seeking to vacate a captail murder conviction. The Rule 32 Petition raises several issues of deprivation of constitutional rights and asserts newly discovered evidence as a ground for vacating Appellant's conviction.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. (Attach additional pages if necessary)

1. Whether the Constitution of the United States or the Constitution of the State of Alabama require that the Appellant's conviction be vacated because:

   a. The State failed to disclose evidence favorable to the Petitioner.

   b. The State destroyed evidence that may have been favorable to the Petitioner.

   c. The withholding of evidence and the destruction of evidence by the State rendered the Appellant's trial fundamentally unfair.

   d. The State unduly delayed the initiation of the prosecution against the Appellant thereby prejudicing his defense against the charge made against him.

   e. The State presented knowingly false testimony.

   f. The Defendant was tried on a charge different from teh charge made in the indictment.

   g. The State's evidence did not prove an offense committed by the Appellant.

2. Whether newly discovered evidence mandates a vacation of teh Appellant's conviction.

**K. SIGNATURE:**

10/31/05
Date

_signature_ William H. Mills
Signature of Attorney / Party Filing this Form

178

| State of Alabama Unified Judicial System<br><br>Form ARAP-1C     8/91 | REPORTER'S TRANSCRIPT ORDER – CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R.App.P) | Criminal Appeal Number<br>FILED |
|---|---|---|

2005 NOV 3 PM 2 12

**TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.**

[✓] CIRCUIT COURT [ ] DISTRICT COURT [ ] JUVENILE COURT OF _____ ELMORE DOZIER _____ COUNTY
CIRCUIT CLERK ELMORE COUNTY

Mark Samuel Landers _____ , Appellant

v. [✓] STATE OF ALABAMA [ ] MUNICIPALITY OF _____

| Case Number     CC96-421.60 | Date of Judgment / Sentence / Order     September 23, 2005 |
|---|---|
| Date of Notice of Appeal<br>Oral:          Written: | October     , 2005<br>X | Indigent Status Granted:<br>[ ] Yes  [✓] No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE / DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

| Signature | Date | Print or Type Name |
|---|---|---|

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

**MARK PROCEEDINGS REQUESTED:**                                                                                              **COURT REPORTER(S)**

A. [✓] **TRIAL PROCEEDINGS** – Although this designation will include the judgment and sentence          _____
proceedings, a transcript of the organization of the jury and arguments of counsel must be          _____
designated separately.          _____

B. [ ] **ORGANIZATION OF THE JURY** – This designation will include voir dire examination and          _____
challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded          _____
unless the trial judge so directs. (See Rule 19.4, ARCrP.)          _____

C. [ ] **ARGUMENTS OF COUNSEL** – Note that in noncapital cases the arguments of counsel will not          _____
be recorded unless the trial judge so directs. (See Rule 19.4, ArCrP.)          _____

**IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):**

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D.  All Proceedigns Conducted | August 30, 2005 | Dub Harris |
| E. | | |
| F. | | |
| G. | | |

**IMPORTANT NOTICE :** The court reporter who reported the  proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN  GIVEN  PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

| Signature | November 3, 2005 | William H. Mills |
|---|---|---|
| | Date | Print or Type Name |

**DISTRIBUTION :** Original filed with Clerk of Trial Court and copies mailed to : (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) theAttorney General or the municipal prosecutor in lieu  of the District Attorney and the Attorney General if the appeal is from a municipal conviction,  and  (4) to each Court Reporter who reported proceedings designated for inclusion in the  reporter's transcript.

179

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

| | |
|---|---|
| MARK SAMUEL LANDERS, | ) |
| | ) |
| | ) |
| Appellant | ) |
| | ) |
| VS. | ) |
| | ) |
| STATE OF ALABAMA, | ) |
| | ) |
| Appellee | ) |

FILED

CASE NO. CC96-421.60

Appeal to the Court of Criminal
Appeals of Alabama

2003 NOV 3 PM 2 11

LARRY DOZIER
CIRCUIT CLERK ELMORE COUNTY

## CERTIFICATE OF FILING

I certify that I have this date filed with the Clerk of the trial court the original and 5 copies of a notice of appeal (along with $100.00 docketing fee), and such other instruments as have been completed and included herewith.  A true copy of each of these items will be served by the Clerk of the trial court on each of the following:

1).  Clerk of appellate court (the $100 docket fee shall be transmitted with this filing).

2).  Court Reporter.

3).  Counsel for Appellee.

Name:  Troy King, Attorney General, State of Alabama, State Capitol Building, 600 Dexter Avenue, Montgomery, Alabama 36130, and

Name:  Randall V. Houston, District Attorney, Elmore County, P.O. Box 700, Wetumpka, Alabama 36092.

William H. Mills
ASB-9841-M75W
Attorney for Appellant
Mark Samuel Landers
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX

ACR371                       ALABAMA JUDICIAL DATA CENTER
              NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                            BY THE TRIAL COURT CLERK
                     IN THE CIRCUIT COURT  OF  ELMORE COUNTY
STATE OF ALABAMA VS LANDERS MARK SAMUEL           JUDGE: JOHN B. BUSH

APPEAL DATE: 11/03/2005

INDIGENCY STATUS:
   GRANTED INDIGENCY STATUS AT TRIAL COURT:
   APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:        _____ YES   X   NO
   INDIGENT STATUS REVOKED ON APPEAL:                    _____ YES   X   NO
   INDIGENT STATUS GRANTED ON APPEAL:                    _____ YES   X   NO

DEATH PENALTY: NO

APPEAL TYPE: RULE 32 PETITION

THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E. RULE 32 PETITION,
WRIT OF HABEAS CORPUS, ETC) OR FROM ANY OTHER ISSUED BY THE TRIAL JUDGE.

CO/CASE NUMBER: 29/CC 1996 000421.60

ORDER ENTERED(DATE): 09232005 PETITION: X DISMISSED ___ DENIED ___ GRANTED

POST-JUDGMENT MOTIONS FILED:        DT FILED      DT DENIED      CON BY AGREE
   _____ MOTION FOR NEW TRIAL
   _____ MOTION FOR JUDG. OF ACQUIT    _____       _____        _____
   _____ MOTION TO W/D GUILTY PLEA     _____       _____        _____
   _____ MOTION FOR ATTY TO W/DRAW     _____       _____        _____
   _____ OTHER                         _____       _____        _____

COURT REPORTER(S):
ADDRESS:                             HARRIS, W. H. JR.
                                     C/O HON. CHARLES PRICE
                                     MONTGOMERY      ,  AL  36104

APPELLATE COUNSEL #1:
ADDRESS:                             CLARK WILLIAM N
                                     940 THE FINANCIAL CENTER
                                     505 20TH STREET NORTH
PHONE NUMBER:                        BIRMINGHAM      ,  AL  35203
                                     205-322-0457

APPELLATE COUNSEL #2:
ADDRESS:                             _____
                                     _____
                                     _____
PHONE NUMBER:                        _____

APPELLANT (PRO SE):
ADDRESS:                             LANDERS MARK SAMUEL
                                     ELMORE COUNTY JAIL
                                     WETUMPKA       ,  AL  360920000
AIS #:                               000193732

APPELLEE (IF CITY APPEAL):
ADDRESS:                             _____
                                     _____
                                     _____
                                     _____

I CERTIFY THAT THE INFORMATION PROVIDED
ABOVE IS ACCURATE TO THE BEST OF MY                       OPERATOR: SUS
KNOWLEDGE AND I HAVE SERVED A COPY OF               PREPARED: 11/10/2005
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS  10  DAY OF  Nov.  2005
                                                   CIRCUIT COURT CLERK

1

```
 1              IN THE CIRCUIT COURT

 2            OF ELMORE COUNTY, ALABAMA

 3   STATE OF ALABAMA,

 4              Petitioner,

 5   VS.                    X      CC-96-421-B

 6   MARK S. LANDERS,

 7              Defendant.

 8   _____/

 9

10            RULE 32 PETITION HEARING

11

12      The above-styled cause came on to be heard

13      before the Hon. John B. Bush, Circuit Judge

14      for the 19th Judicial Circuit of Alabama

15      commencing on August 30, 2005, at the Elmore

16      County Courthouse, Wetumpka, Alabama.

17            A P P E A R A N C E S

18              FOR THE STATE:

19    Hon. Stephanie Norman; Hon. Greg Biggs;

20              Hon. Don Valeska.

21          FOR THE DEFENDANT:

22    Hon. Bill Clark; Hon. William Mills.

23

24   COURT REPORTER FOR THESE PROCEEDINGS:   DUB HARRIS

25
```

2

```
 1                    PROCEEDINGS

 2          BY THE COURT:  All right, Dub, this is

 3    case number CC-96-421, State of Alabama versus

 4    Mark Landers.  Mr. Landers is here today with

 5    his lawyers Mr. Bill Clark and Mr. William

 6    Mills.

 7          Also present on behalf of the state is

 8    Stephanie Norman, Don Valeska, and pulling him

 9    out of retirement, looks like, Greg Biggs.

10          Mr. Landers filed a Rule 32 petition with

11    this court.  The state responded to that

12    petition with a motion to dismiss, and Mr.

13    Landers has responded to that motion to

14    dismiss.

15          As a general rule -- as a matter of fact,

16    I think this is the first time in history.  I

17    rarely ever set a hearing on motion to dismiss

18    on a Rule 32 petition, but since this is a

19    capital case that has gone up and this court

20    has been affirmed previous to it, so I figured

21    it was appropriate to set a hearing on the

22    motion to dismiss to allow counsel for the

23    state and counsel for the defendant -- for

24    petitioner, to address the issues raised in

25    the motion to dismiss, and see where we go
```

3

1    next after that one.

2          So I think what I will do, give the state

3    of Alabama the floor and we'll kind of go

4    through, and I will hear from folks.

5          BY MS. NORMAN:  Thank you.  I would like

6    to say I don't know where the response is, but

7    I haven't received the response from my motion

8    to dismiss.

9          BY THE COURT:  Now, that's not good, is

10   it?

11         BY MS. NORMAN:  If you could hand me a

12   copy, I would be happy to look over it.

13         BY THE COURT:  I can hand you one of

14   mine.

15         BY MS. NORMAN:  Thank you, Your Honor.

16   Would you like me just to respond to the

17   initial claims, then while they're responding,

18   I can look over the response?

19         BY THE COURT:  Yeah, that sounds good.

20         BY MS. NORMAN:  Their first claim is

21   found on page six of the petition.  They

22   assert they are entitled to a new trial

23   because they were denied access to blood found

24   on the lens of the victim's eyeglasses.  This

25   issue was dealt with at trial and on appeal,

4

1          or could have been dealt with on appeal.

2          There was a lot of litigation and discussion,

3          I'm sure you recall the discussions about

4          that, Your Honor, during trial about the

5          validity of the glasses and the taking of the

6          blood evidence from them and things like that.

7          For that reason, the state claims the argument

8          is precluded because it could have or should

9          have been raised at trial, and/or on appeal --

10         would you like me to repeat the authority I

11         cited in my motion to dismiss?

12                BY THE COURT:  No, that's fine, unless

13         you've got anything additional to add?

14                BY MS. NORMAN:  No, sir, not for that

15         argument.

16                BY THE COURT:  Okay.

17                BY MS. NORMAN:  Now, as to claim B, it is

18         similar to claim A in that they are saying

19         there was not access to blood stains on the

20         upper portion of the lens as well.  And again,

21         this claim could have been raised at trial or

22         on appeal.

23                They assert that an examination and

24         analysis of the blood could yield conclusive

25         evidence favorable to the petitioner, and

5

1    contradictory to state's evidence, identifying

2    the eyeglasses as being those of the deceased.

3        That's kind of conclusory allegations,

4    and again I haven't had a chance to look at

5    their response in case they said anything

6    about that.

7        And I would point out to the court there

8    was testimony from several witnesses that

9    identified the eyeglasses introduced at trial

10    as being those of the victim.  So their

11    assertion that our only link between the

12    victim and the eyeglasses is the blood

13    evidence is simply wrong.  There was testimony

14    from three different witnesses, Richard

15    Landers, Victoria Goolsby, then of course

16    Sheriff Franklin, explained that the

17    eyeglasses was found on the day after the body

18    was found, the victim's body.  And the son, I

19    believe his name is Richard Landers, actually

20    introduced photographs showing the victim in

21    the particular eyeglasses that were introduced

22    at trial, as well.

23        Claim C is found on page 14 of the

24    petition --

25        THE COURT:  With regard to that the state

6

1    claims that's precluded, in that it was raised

2    or could have been raised at trial, on

3    subsequent appeal, is that where you are on

4    that one?

5         BY MS. NORMAN:  Yes, Your Honor.  And for

6    that, I cite the Woods case as well.

7         BY THE COURT:  Okay.

8         BY MS. NORMAN:  Claim C is found on page

9    14 of the petition, and in this third claim,

10   they assert that they were entitled to

11   preliminary notes under Brady, and they were

12   the dictated notes that Doctor Lauridson made.

13   It was the initial autopsy that he performed,

14   just the visual autopsy that he performed, and

15   this was actually raised at trial, and

16   litigated at trial, and also addressed on

17   direct appeal.  And for that reason, this

18   claim is precluded under 32 point two A four.

19        BY THE COURT:  Okay.

20        BY MS. NORMAN:  And their fourth claim,

21   they assert that he was denied due process of

22   law because the closing argument should have

23   been postponed.  This claim, like the previous

24   claim, was litigated at trial, and raised and

25   and addressed on direct appeal, so it's also

7

1     precluded under 32 point two A four.

2          Then the fifth claim, found on page 17 of

3     the petition, he complains about pretrial

4     delay.  This claim, like the two previous

5     claims, was addressed by this court, and also

6     addressed by the Court of Criminal Appeals on

7     direct appeal, and that is precluded under

8     Rule 32 point two A four as well.

9          BY THE COURT:  All right.

10         BY MS. NORMAN:  Okay.  The next claim

11    involves the testimony from Mrs. Goolsby and

12    Detective Rhegness, found on page 21 of the

13    petition.  All of these matters were discussed

14    and brought up at trial, and had opportunity

15    for cross examination and did in fact cross

16    examine Miss Goolsby, as well as the Detective

17    about -- the nature of the relationship, if

18    one existed and this is peripherally discussed

19    by the Court of Criminal Appeals as well in

20    their opinion, so this is precluded as well.

21         The next claim is found on page 22 of the

22    petition that involves newly discovered

23    material, facts, regarding Lanita Landers,

24    involving discovery of a new pair of

25    eyeglasses.  I think I pointed out to the

8

1   court that they don't qualify as newly

2   discovered evidence.  She alleges in her

3   affidavit that in fact she was in the

4   particular drawer where she claims the

5   eyeglasses were located during trial, before

6   trial.  Seems to me due diligence by counsel

7   regarding this matter could have led to

8   discovery.

9        In addition, they don't establish

10  innocence, which is an element of newly

11  discovered facts.  And also the testimony is

12  simply contradictory to that of the sheriff

13  and to others at trial, who said that the

14  eyeglasses were not found until the following

15  day, and she claims the eyeglasses that were

16  in her possession were given to her at the

17  time the victim's body was found.  So that

18  would be a credibility determination.  That

19  would rest in your judgement.

20       The next claim is found on page 30 of the

21  petition and involves a claim of actual

22  innocence.  He doesn't -- he asserts that this

23  newly discovered evidence somehow establishes

24  that he's innocent, but doesn't explain it.

25  And this discovery of these glasses just

9

1      doesn't establish innocence.  There's a

2      significant amount of evidence that ties him

3      to the crime, and also ties the eyeglasses to

4      the victim, and to the other evidence

5      introduced in the case.

6           The next claim is actually raised in the

7      amendment to the petition, it involves a

8      variance between the indictment and the trial.

9      As I explained in my motion to dismiss, it

10     doesn't actually constitute a variance.  It's

11     not jurisdictional.  It could have been raised

12     at trial and/or on appeal, and it is precluded

13     under 32 point two A three.

14          Your Honor, I believe one last claim,

15     sufficiency of the evidence, raised on page

16     three of the amendment.  That claim was

17     litigated at trial, as well as on appeal.

18     It's precluded under 32 point two A four.

19          BY THE COURT:  Anything else right now?

20     Or do you want to wait until you hear from the

21     other side?

22          BY MS. NORMAN:  May I just respond, Your

23     Honor?

24          BY THE COURT:  All right.

25          BY MR. CLARK:  If it please the court, I

10

1    think the state in their argument here, as

2    well as in the brief that they filed, haven't

3    recognized what stage this proceeding is in,

4    and what burden Rule 32 point three places on

5    the state.  This is a motion to dismiss, this

6    is a pleading.  It's not a place where facts

7    are established.  And I think the state is

8    making the same error here that they made in

9    the case that we cite in our memorandum, ex

10   parte Rice, that clearly holds that the state

11   has the obligation to plead preclusion, and

12   these are the only things the state has raised

13   in their motion, to plead preclusion, and to

14   afford the opportunity for a hearing where

15   proof can be offered and received by the

16   court, to determine if there is grounds for

17   preclusion.

18       The state's only allegation of preclusion

19   is a conclusionary allegation, as I read their

20   petition, that says the issues that are raised

21   are precluded.  That's exactly what the state

22   did in ex parte Rice, where the Supreme Court

23   reversed a trial court order that had

24   dismissed the petition and sent it back for a

25   hearing, and for the filing of an answer that

1    would more fully set out what it is the state

2    claims is preclusion, and would give an

3    opportunity to rebut by evidence what it is,

4    that the state simply hasn't done that in this

5    case, and we would submit that the motion

6    ought to be denied just for that reason, and

7    for that reason alone.

8         As the Supreme Court pointed out in the

9    ex parte Rice case, it would indeed be a

10   denial of due process that a petitioner is

11   entitled to in a Rule 32 proceeding, if such a

12   motion could be granted at this stage of the

13   proceeding.

14        So for that reason alone, the state's

15   motion we would submit would be due to be

16   denied.

17        The second general flaw in the state's

18   argument that I'm going into the particulars,

19   is that the state has ignored the essence in

20   the first grounds of relief stated in Rule 32,

21   and that is, that a petitioner is entitled to

22   relief under the United States Constitution.

23   I think all of the grounds that we have raised

24   in this petition, with the exception of the

25   newly discovered evidence ground, are rights

12

1    based on the United States Constitution.  The
2    fact that a state court may have decided an
3    issue previously is not the whole answer to
4    the question of whether there's a right to
5    relief under the United States Constitution.
6    In order for a state court ruling to be, or to
7    have preclusive effect, of course it must
8    satisfy the standard that the federal statutes
9    and the U. S. Supreme Court cases have set out
10   for, and that is that it not be contrary to
11   established federal law as determined by the
12   United States Supreme Court, or that it not be
13   an unreasonable appication of established
14   federal law as declared by the United States
15   Supreme Court, or that it not be an
16   unreasonable determination of facts, based on
17   the evidence that was presented.
18        Those issues, we would submit, can't be
19   reached and decided on a motion to dismiss,
20   that those issues can only be determined after
21   there's been a evidentiary hearing that Rule
22   32 contemplates, Rule 32 three, after the
23   state has pled the facts which it contends
24   constitutes preclusion.
25        So, for those two reasons, those two

13

1    general reasons, we would submit that the

2    state's motion based on preclusion could not

3    have -- could not have validity and would be

4    due to be denied at this stage or at this

5    proceeding.

6         The newly discovered evidence ground is

7    slightly different, in that it raises an issue

8    that was really at the heart of the evidence

9    in the trial of this case.  This was a

10   strictly circumstantial evidence case, which

11   makes any evidence critical, and which makes

12   even the slightest evidence that might refute

13   the state's burden of proof in the charge that

14   it made, significant.  Certainly the

15   eyeglasses were a key part of the state's

16   evidence in this case.  Without those

17   eyeglasses that they put in evidence, and

18   without the connection of those eyeglasses

19   with the defendant, through the blood analysis

20   that they offered, the state would have been

21   missing one of the key elements of their case,

22   and I think they argued those eyeglasses, from

23   opening statement to closing argument, that

24   this is critical and this is important.

25        Now, the newly discovered evidence would

14

1      refute that, and if these were the eyeglasses,

2      I don't think the state is going to contend

3      that a person was wearing two pairs of

4      eyeglasses, if these were the eyeglasses that

5      the decedent had in his possession, or was

6      wearing on that occasion, rather than the

7      eyeglasses that the state put in evidence and

8      that they put so much stress on in the

9      prosecution, that certainly is material

10     evidence that would have a bearing on the

11     outcome of this case, or could have been a

12     bearing on the outcome of this case.

13         So, certainly that is newly discovered

14     evidence by any definition, and particularly

15     in a circumstantial evidence case, and that of

16     course would not be subject to any argument of

17     preclusion as the state cites as its only

18     ground for motion to dismiss.

19         So, as to the other grounds of this

20     petition, there has been no appeal -- no

21     definitive appellate decision.  The decision

22     by the Court of Criminal Appeals was by a

23     memorandum, which the rule says can't be

24     cited.  It's not authoritative, and as far as

25     being a definitive ruling on any of these

1    issues, could not be considered under rule --
2    I guess it's 45, of the Alabama Rules of
3    Appellate Procedure.
4         So, certainly there must be an
5    evidentiary hearing to determine if any of
6    those rulings are what I will call acceptable
7    rulings under the federal standards, or
8    deprivation of constitutional rights under the
9    United States Constitution.
10        So, for each of those reasons, we would
11   submit that preconclusion, as raised by a
12   motion to dismiss, is certainly inappropriate
13   in this case.
14        BY THE COURT:  Okay.  Anything further?
15        BY MS. NORMAN:  Yes, Your Honor.  With
16   all due respect to opposing counsel, in fact
17   Rule 32 point one of the Rules of Criminal
18   Procedure sets out plainly that the grounds on
19   which you can receive relief are plainly
20   subject to the rules of preclusion.  I think
21   that is actually in the opening paragraph of
22   Rule 32 point one.  So any of his claims, even
23   though they are constitutional in nature, or
24   at least alleged as such, they are subject to
25   the rules of preclusion.

1          He quotes ex parte Rice, I apologize,

2      Your Honor, I don't have a copy with me, but

3      if memory serves me correctly, I think what

4      occurred in that case was that the state

5      alleged grounds of preclusion in the

6      alternative, and it was nearly impossible to

7      determine on what basis the state was actually

8      alleging the claim was precluded.  I think

9      they asserted that the claims were precluded

10     by 32 point two A two, A three, A four, A

11     five, and at that point, the defendant could

12     not determine what ground of preclusion was

13     actually applicable to the particular grounds.

14     And in this case, they have not done that.  I

15     specified which grounds of preclusion applied,

16     and to the degree that I might have alleged in

17     the alternative, I've tried to set out the

18     facts that would explain why I've alleged them

19     in the alternative.

20          Also, there's no need for an evidentiary

21     hearing under Rule 32 point seven D of the

22     Rules of Criminal Procedure.  You can

23     summarily deny a petition if the claims are

24     precluded, or do not warrant postconviction

25     rulings.

17

1           Also, a petition is a place in which a
2      petitioner must allege facts.  That is clear
3      from Rule 32 point three and 32 point six B.
4      That requires the petitionor set out all the
5      factual basis for his grounds.
6           In response -- quick response to his
7      motion to dismiss, and I just kind of glanced
8      over that quickly.  First of all, he asserts
9      that the blood, and I think he alleges this in
10     the petition as well, that the blood is the
11     only link that we make between the glasses and
12     the victim.  And as I stated earlier, there's
13     actually testimony from Mrs. Victoria Goolsby
14     as well as Richard Landers.  And in addition
15     Richard Landers had a photograph that was
16     introduced at trial showing his father in the
17     particular eyeglasses that were introduced
18     during the State's case.  And he appears to
19     reargue the sufficiency of the evidence, and
20     as I said, that was litigated in this court,
21     as well as on direct appeal, and it is
22     therefore precluded.  And under McWilliams
23     versus State, and Your Honor, I apologize, I'm
24     not sure I quoted this in my response, but
25     it's found at 897 So.2d, 437, and I do have a

18

1    copy of the opinion that I would have to

2    retrieve, but found at pages 449 and 450.  The

3    Court of Criminal Appeals establishes that

4    Rule 32 point two A four of the Rules of

5    Criminal Procedure, specifically provides that

6    when an issue has been addressed on direct

7    appeal, it cannot be relitigated in a Rule 32

8    proceeding.  So, the rules do simply prohibit

9    relitigation of claims that have already been

10   addressed on direct appeal.

11        BY THE COURT:  Okay.  Anything else?

12        BY MR. CLARK:  For the court's

13   convenience, I have a copy of the Rice opinion

14   here.

15        BY THE COURT:  Thank you.

16        BY MS. NORMAN:  Your Honor, there was one

17   other thing I wanted to mention.  They talk

18   about the importance of the eyeglasses, and

19   linking the defendant to the crime, and I

20   believe the eyeglasses were primarily used to

21   show the manner of death, or the method in

22   which he was actually murdered, not so much to

23   identify.

24        BY MR. BIGGS:  And that was only one

25   piece of evidence.  There was a wealth of

19

1   other evidence; the accident scene, the

2   forensics of the skull, forensics of the

3   flesh.  He was the last one to see Mr. Landers

4   alive, the first one to find the body.  The

5   motive evidence.  Phone calls.  The deposition

6   in the civil case where he actually puts

7   himself at a time where neighbors went by the

8   scene and the bulldozer was already off the

9   trailer in the position it was found on top of

10  the victim.  It's just one piece of evidence

11  that the jury weighed.

12       BY THE COURT:  All right, I'll go back

13  through it, and I will get an order on the

14  motion to dismiss when I can get it done.  And

15  if I deny the motion to dismiss, I will set an

16  evidentiary hearing.  And that's what I will

17  do.

18

19                 (Court adjourned)

20

21

22

23

24

25

0094
VOL 20F2

COURT OF CRIMINAL APPEALS NO. CR 05- 0287

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

CIRCUIT COURT NO.    CC 1996-421.60

CIRCUIT JUDGE    HON. JOHN B. BUSH

Type of Conviction / Order Appealed From:    RULE 32 PETITION

Sentence Imposed:    CASE DISMISSED

Defendant Indigent:    ☐ YES    ☒ NO

MARK SAMUEL LANDERS

HON. WILLIAM N. CLARK                                          **NAME OF APPELLANT**
(Appellant's Attorney)                    (Telephone No.)
940 THE FINANCIAL CENTER, 505 20th STREET NORTH
(Address)
BIRMINGHAM, AL   35203
(City)              (State)              (Zip Code)

V.

STATE OF ALABAMA

(State represented by Attorney General)                        **NAME OF APPELLEE**

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

(For Court of Criminal Appeals Use Only)

EXHIBIT
A

PENGAD-Bayonne,N.J.

20

```
 1                    C E R T I F I C A T E

 2

 3   STATE OF ALABAMA,

 4   COUNTY OF ELMORE

 5

 6              I, DUB HARRIS, Special Roving Court

 7   Reporter of the 19th Judicial Circuit for the State

 8   of Alabama, do hereby certify as follows:

 9              THAT I reported in shorthand the

10   foregoing proceedings in the foregoing styled

11   Cause at the time and place stated heretofore;

12              THAT I later reduced my shorthand notes

13   to computer-aided transcription, and the foregoing

14   pages contain a full, true and correct transcript

15   of the proceedings and testimony as herein set

16   out;

17              THAT I am neither of kin nor of counsel

18   to the parties to said cause, nor in any manner

19   interested in the results thereof.

20              DONE this 1st day of December, 2005.

21

22              _____

23              DUB HARRIS, REPORTER

24

25
```

| State of Alabama<br>Unified Judicial System<br>Form ARAP-14          11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number |
|---|---|---|

| TO: THE CLERK OF<br>    THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL:    NOVEMBER 3, 2005 |
|---|---|

APPELLANT

MARK SAMUEL LANDERS

v.   STATE OF ALABAMA

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) ( __1__ volumes of 200 pages each and one volume of __1__ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

Dated this ___2___ day of ___DECEMBER___, 2005

_____
Circuit Clerk

Larry Dozier

ELMORE COUNTY

# COURT OF CRIMINAL APPEALS

### STATE OF ALABAMA
### JUDICIAL BUILDING, 300 DEXTER AVENUE
### P.O. BOX 301555
### MONTGOMERY, AL 36130-1555

H. W. "Bucky" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
FAX (334) 242-4689

Hon. Larry Dozier, Circuit Clerk
Hon. Thomas Parker, IV, Asst. Atty. Gen.
Hon. William N. Clark, Attorney
Hon. Maxwell H. Pulliam, Jr., Attorney

RE:  CR-97-0194
Mark Samuel Landers v. State of Alabama (Appeal from
Elmore Circuit Court: CC96-421).

Dear Sir or Madam:

You are hereby notified that on March 2nd, 2001 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for rehearing overruled.

Lane W. Mann
Clerk
Court of Criminal Appeals

LWM/ lk



# IN THE SUPREME COURT OF ALABAMA



June 18, 2004

**1001070**

Ex parte Mark Samuel Landers.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: Mark Samuel Landers v. State of Alabama)  (Elmore Circuit Court: CC-96-421; Criminal Appeals : CR-97-0194).

## CERTIFICATE OF JUDGMENT

### Writ Quashed

WHEREAS, on August 30, 2001, a writ of certiorari to the Court of Criminal Appeals was granted by this Court, and the cause was set down for submission pursuant to Rule 39, Alabama Rules of Appellate Procedure.

WHEREUPON, come the parties and the petition for writ of certiorari being submitted and duly examined and understood by the Court, it is considered by the Court that the writ heretofore issued should be quashed and that the petition should be denied.

IT IS, THEREORE, CONSIDERED AND ORDERED that the writ of certiorari heretofore issued to the Court of Criminal Appeals be, and the same is hereby, quashed, and the petition for writ of certiorari be, and the same is hereby, denied.

COST TAXED TO PETITIONER.

**Writ Quashed. No Opinion.**

JOHNSTONE, J. - Houston, See, Lyons, Brown, Harwood, Woodall, and STuart, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this _18th_ day of ___June,___ ___2004___

*Robert G Esdale Sr.*

Clerk, Supreme Court of Alabama



EXHIBIT

C

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
# THE ALABAMA COURT OF CRIMINAL APPEALS

**CR-97-0194**

Mark Samuel Landers v. State of Alabama  (Appeal from Elmore  Circuit Court: CC96-421).

## CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on December 15th 2000:

### Affirmed by Memorandum

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure, it is hereby certified that the aforesaid judgment is final.

Upon this affirmance, it is further ordered and adjudged that the $100.00 docket fee prescribed in Rule 35(b) of the Alabama Rules of Appellate Procedure,  along with the cost accruing in the Court below, are hereby taxed as costs against the appellant for which execution may issue.

Witness. Lane W. Mann, Clerk
Court of Criminal Appeals, on this
the 18th day of June, 2004.

*Lane W. Mann*

**Clerk**
**Court of Criminal Appeals**
**State of Alabama**

cc: Hon. John B. Bush, Circuit Judge
Hon. Larry Dozier, Circuit Clerk
William N. Clark, Attorney
Maxwell H. Pulliam, Jr., Attorney
Thomas Parker, IV, Asst. Atty. Gen.



Case Number: CR-05-0627

COURT OF CRIMINAL APPEALS OF ALABAMA

MARK SAMUEL LANDERS

APPELLANT

VS.

STATE OF ALABAMA

APPELLEE

Appealed from the Circuit Court of Elmore County, Alabama
Case Number: CC-96-421.60

## BRIEF OF APPELLANT

William H. Mills
William N. Clark
REDDEN, MILLS & CLARK
940 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 322-0457
Attorneys for Appellant

Oral Argument Requested



## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is requested. Appellant believes oral argument will serve a useful purpose in this case in providing a complete presentation of the important issues raised by this appeal, most of which are constitutional issues, some of which are novel applications of settled law, and all of which are of substantial importance.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . i

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . iv-x

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . 4

STATEMENT OF THE STANDARD OF REVIEW . . . . . . . . . . 15

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 20

        Issue 1   . . . . . . . . . . . . . . . . . . . 20
        Issue 2   . . . . . . . . . . . . . . . . . . . 22
        Issue 3   . . . . . . . . . . . . . . . . . . . 24
        Issue 4   . . . . . . . . . . . . . . . . . . . 42
        Issue 5   . . . . . . . . . . . . . . . . . . . 44
        Issue 6   . . . . . . . . . . . . . . . . . . . 61
        Issue 7   . . . . . . . . . . . . . . . . . . . 63
        Issue 8   . . . . . . . . . . . . . . . . . . . 65
        Issue 9   . . . . . . . . . . . . . . . . . . . 68
        Issue 10  . . . . . . . . . . . . . . . . . . . 69

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 70

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . 71

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . .

## STATEMENT OF JURISDICTION

Jurisdiction of this appeal is based on Rule 32.10(a) of the Alabama Rules of Criminal Procedure.  The order appealed from in this case, which denied Appellant's petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure, was entered by the trial court on September 23, 2005.  Appellant filed notice of appeal on November 3, 2005.

## TABLE OF AUTHORITIES

Alvis v. State, 762 So.2d 380, 381 (Ala.Crim.App. 1999) . 21

Arizona v. Youngblood, 488 U.S. 51, 58 (1988) . . . . . . 66

Ashworth v. Alabama Great Southern R.Co., 211 Ala.
      20, 99 So. 191, 195 (1924) . . . . . . . . . . . . . 35

Bay Lines, Inc. v. Stoughton Trailers, Inc., 838 So.2d
      1013, 1017 (Ala.2002) . . . . . . . . . . . . . . . 15

Branzburg v. Hayes, 408 U.S. 665, 687 (1972) . . . . 47, 48

Bunkley v. Florida, 538 U.S. 835, 840 (200) . . . . . . . 69

Burgess v. State, 44 Ala. 190, 192-93 (1870)   51, 52, 58,59

Calloway v. State, 473 So.2d 601, 603
      (Ala.Crim.App. 1985) . . . . . . . . . . . . . . 31, 67

Carr v. State, 28 Ala. App. 466, 468, 187
      So. 252, 254 (1939) . . . . . . . . . . . . . . . . 67

Cooper v. Watts, 280 Ala. 236, 191 So.2d 519,
      522 (1966) . . . . . . . . . . . . . . . . . . . . 20

Cox v. Mobile & Girard Railroad Co., 44 Ala. 611,
      615-16 (1870) . . . . . . . . . . . . . . . . . 36, 39

Davis v. State, 245 Ala. 589, 18 So.2d 282, 284 (1944) . 37

Doe v. Finnegan, 202 Ala. 17, 79 So. 355 (1918) . . . . . 38

Dunn v. United States, 442 U.S. 100, 106 (1979) . . . . . 42

Early v. Packer, 537 U.S. 3, 10-11 (2002) . . . . . . . . 24

Ex Parte Citizens Bank, 879 So.2d 535, 538,
      540 (Ala. 2003) . . . . . . . . . . . . . . . . . . 46

Ex Parte Cole, 842 So.2d 605, 607
      (Ala. 2002) . . . . . . . . . . . . . . . 50, 55, 56, 58

Ex Parte Floyd, 457 So.2d 961, 962 (Ala. 1984) . . . 20, 53

Ex Parte Gonzalez, 686 So.2d 204, 206 (Ala. 1996) . . . . 49

Ex Parte Hightower, 443 So.2d 1272, 1273
    (Ala. 1983) . . . . . . . . . . . . . . . . . . . 50, 52

Ex Parte James, 780 So.2d 693, 696 (Ala. 2000) . . . . . 46

Ex Parte Key, 890 So.2d 1056, 1059 (Ala. 2003) . . . . . 15

Ex Parte Land, 775 So.2d 847, 852 (Ala. 2000) . . . . . . 33

Ex Parte Rice, 565 So.2d 606, 608 (Ala. 1990) . . 20, 21, 34

Ex Parte State, 899 So.2d 1025, 1033, 1034 (Ala. 2004) . 55

Ex Parte Verzone, 868 So.2d 399, 402-03
    (Ala. 2003) . . . . . . . . . . . . . . . . . . . 53, 61

Ex Parte Walker, 800 So.2d 135, 138 (Ala. 2000) . . . . . 33

Ex Parte Washington, 448 So.2d 404, 407
    (Ala. 1984) . . . . . . . . . . . . . . . . . . . 50, 53

Ex Parte Weeks, 611 So.2d 259, 261 (Ala. 1992) . . . . . 20

Farris v. State, 890 So.2d 188, 192
    (Ala.Crim.App. 2003) . . . . . . . . . . . . . . 39, 41

Ferguson v. State, 565 So.2d 1172, 1173
    (Ala.Crim.App. 1990) . . . . . . . . . . . . . . . 60

Floyd v. State, 659 So.2d 961, 965
    (Ala.Crim.App. 1994) . . . . . . . . . . . . . . 20, 53

Formby v. State, 750 So.2d 581, 586 (Ala.Crim.App.
    1997) . . . . . . . . . . . . . . . . . . . . . . . 51

Fries v. Acme White Lead & Color Works, 201 Ala.
    613, 79 So. 45, 47 (1918) . . . . . . . . . . . 36, 37

Gaines v. State, 146 Ala. 16, 41 So. 865 (1906) . . . . . 54

Gamble v. State, 758 So.2d 1125, 1126-27
    (Ala.Crim.App. 1999) . . . . . . . . . . . . . . . . 53

Gantt v. State, 356 So.2d 707, 711 (Ala.Crim.App.
     1978), cert. denied 356 So.2d 712 (Ala. 1978) . 46, 57

Garner v. Louisiana, 368 U.S. 157, 164 (1961) . . . . . . 69

Gayden v. State, 262 Ala. 468, 80 So.2d 501, 502,
     503, 507 (1955) . . . . . . . . . . . . 45, 53, 54

Hardison v. State, 30 Ala. App. 40, 200 635, 636
     (1941) . . . . . . . . . . . . . . . . . . 46

Harper v. Brown, Stagner, Richardson, Inc., 873 So.2d
     220, 223 (Ala. 2003) . . . . . . . . . . . . . . 15

Harvey v. City of Oneonta, 715 So.2d 779, 781
     (Ala. 1983) . . . . . . . . . . . . . . . . 46

Howard v. State, 420 So.2d 828 (Ala.Crim.App.
     1982) . . . . . . . . . . . . . . . . . . 53, 54

Irvin v. Dowd, 359 U.S. 394, 404 (1959) . . . . . . . . 23

James v. State, 339 So.2d 1047, 1052 (Ala.Crim.App.
     1976), cert. denied 339 So.2d 1052 (Ala. 1976) . . . 46

Johnson v. Johnson, 702 So.2d 161, 162-63
     (Ala.Civ.App. 1997) . . . . . . . . . . . . 36, 37

Johnson v. State, 835 So.2d 1077, 1080
     (Ala.Crim.App. 2001) . . . . . . . . . . . . . 33

Kolmetz v. State, 623 So.2d 453, 454
     (Ala.Crim.App. 1993) . . . . . . . . . . . . 20, 33

Marshall v. State, 720 So.2d 960, 961
     (Ala.Crim.App. 1996) . . . . . . . . . . . . . 21

Mason v. Slate, 259 Ala. 438, 66 So.2d 557, 559 (1953) . 51

McCormack Bros. Motor Co. v. Arnold, 223 Ala. 504,
     137 So. 288, 289-90 (1931) . . . . . . . . . . . 39

McMann v. Richardson, 397 U.S. 759, 771 (1980) . . . . . 65

Moore v. John Hancock Life Ins. Co., 876 So.2d 443,
     448 (Ala. 2003) . . . . . . . . . . . . . . . 46

Morris v. State, 733 So.2d 912, 913
    (Ala.Crim.App. 1998) . . . . . . . . . . . . . . . . 60

Nelson v. State, 28 Ala.App. 207, 182 So. 85,
    86 (1938) . . . . . . . . . . . . . . . . . . . 35, 38

Nelson v. State, 50 Ala.App. 285, 286, 289 278 So.2d
    734, (1973) . . . . . . . . . . . . . . . . . . 53, 54

Nicks v. State, 783 So.2d 895, 914 (Ala.Crim.App.1999) . 21

Ohme v. Bisimanis, 222 Ala. 262, 132 So. 161,
    162 (1931) . . . . . . . . . . . . . . . . . . 36, 37

Pacifico v. Jackson, 562 So.2d 174, 177 (Ala. 1990) . . . 35

Parker v. State, 719 So.2d 259, 260
    (Ala.Crim.App. 1997) . . . . . . . . . . . 33, 34, 35

Pendleton v. State, 57 Ala.App. 452, 453, 329 So.2d
    140 (1975) . . . . . . . . . . . . . . . . 45, 53, 54

Ragland v. State, 883 So.2d 730, 731
    (Ala.Crim.App. 2003) . . . . . . . . . . . . . . . 15

Reynolds v. City of Birmingham, 29 Ala.App. 505,
    198 So. 360, 362 (1940) . . . . . . . . . 35, 38, 39

Rice v. State, 682 So.2d 484
    (Ala.Crim.App. 1995) . . . . . . . . 20, 21, 33, 34, 35

Rogers v. Richmond, 365 U.S. 534, 544-45 (1961) . . . 23, 52

Russell v. United States, 369 U.S. 749, 766,
    770-71 (1962) . . . . . . . . . . . . . . . . 49, 52

Scanland v. State, 473 So.2d 1182, 1185
    (Ala.Crim.App. 1985) . . . . . . . . . . . . . . . 25

Shelton v. State, 217 Ala. 465, 117 So. 8, 9
    (1928) . . . . . . . . . . . . . . . . . . . 25, 27

Shepherd v. Southern Railway Co., 288 Ala. 50, 60-61,
    256 So.2d 883 (1970) . . . . . . . . . . . . . . . 39

Singleton v. State, 33 Ala.App. 536, 35 So.2d 375,
     378 (1948) . . . . . . . . . . . . . . . . . . . 46

Sparks v. State, 24 Ala.App. 585, 139 So.
     300, 301 (1932) . . . . . . . . . . . . . . . 35, 37

State v. Freeman, 605 So.2d 1258, 1259
     (Ala.Crim.App. 1992) . . . . . . . . . . . . . . 41

Stephens v. Pate, 221 Ala. 200, 128 So. 176 (1930) . 36, 37

Stirone v. United States, 361 U.S. 212,
     217 (1960) . . . . . . . . . . . . . . 42, 43, 49, 51

Strange v. Gregerson's Foods, Inc., 608 So.2d 721,
     722 (Ala. 1992) . . . . . . . . . . . . . . . 36, 39

Strickland v. Washington, 466 U.S. 668, 686 (1984) . . . 65

T.B.II v. State, 819 So.2d 108, 110 (Ala.Crim.App. 2001)  20

Thompson v. Louisville, 362 U.S. 199, 206 (1960) . . . . 69

Thorn v. State, 39 Ala.App. 227, 98 So.2d 859, 860 (1957),
     cert. denied 266 Ala. 689, 98 So.2d 860 (1957) . . . 50

United States v. Lovasco, 431 U.S. 783, 790 (1977) . . . 63

United States v. Russell, supra at 766, 770 . . . . . 49, 52

United States v. Sells Engineering, Inc., 463 U.S.
     418, 423 (1983) . . . . . . . . . . . . . . . . . 47

United States v. Williams, 504 U.S. 36, 47 (1992) . . . . 48

Waldrep v. Southern Railway Co., 266 Ala. 652, 98
     So.2d 614, 617 (1957) . . . . . . . . . . . . . . 36

Watson v. Adams, 187 Ala. 490, 65 So. 528, 532 (1914) . . 67

Welch v. State, 45 Ala. App. 657, 658-59, 235 So.2d
     906 (1970) . . . . . . . . . . . . . . . . . . . 46

Williams v. Taylor, 529 U.S. 362, 375, 379, 385-86,
     387, 389 (2000) . . . . . . . . . . . . . . 21, 24, 67

-viii-

<u>Williams v. Birmingham Water Works Co.</u>, 230 Ala. 428,
    162 So. 95, 96 (1935) . . . . . . . . . . . . . 36, 37

<u>Wood v. Georgia</u>, 370 U.S. 375, 390 (1962) . . . . . . . 48


U.S. CONST. Amend. 5 . . . . . . . . . . . . . . . 47

U.S. CONST. Amend 6 . . . . . . . . . . . 3, 42, 47, 52

U.S. CONST. Amend. 14 . . . . . . . . . . 3, 23, 42, 52

U.S. CONST. Art.VI . . . . . . . . . . . . . . . . 24

28 U.S.C. §2254 . . . . . . . . . . . 21, 24, 63, 65, 67

ALA. CONST. §6 (1901) . . . . . . . . . . . . . . 47

ALA. CONST. §8 (1901) . . . . . . . . . . . . 47, 48, 50

ALA. CONST. Amend. 328, §6.01 (1901) . . . . . . . . 64

ALA. CONST. Amend. 328, §6.04(b) (1901) . . . . . . . 64

ALA. CODE §12-11-1 (1975) . . . . . . . . . . . . 64

ALA. CODE §12-11-4 (1975) . . . . . . . . . . . . 64

ALA. CODE §15-8-1 (1975) . . . . . . . . . 48, 50, 58

ALA. CODE §15-8-2 (1975) . . . . . . . . . . . . 48,50

ALA. CODE §15-8-90 (1975) . . . . . . . . . . . . 61

ALA. CODE §15-8-91 (1975) . . . . . . . . . . . . 61

ALA. CODE §36-18-2 (1975) . . . . . . . . . . . . 68

A.R.Crim.P. 12.3(d)(i) . . . . . . . . . . . . . . 50

A.R.Crim.P. 13.5 . . . . . . . . . . . . . . . . 60

A.R.Crim.P. 32 . . . iii, 1, 2, 3, 15, 20, 22, 23, 24, 25,
. . . . . . . . . . . . . . . 33, 36, 44, 61, 63, 65, 67

A.R.Crim.P. 32.1 . . . . . . . . . . . . . . 23, 26, 69

A.R.Crim.P. 32.1(a) . . . . . . . . . . . . . 15, 24, 35, 70

A.R.Crim.P. 32.1(d) . . . . . . . . . . . . . . . 16, 26

A.R.Crim.P. 32.3 . . . . . . . . . . . . . . . . . 21, 22

A.R.Crim.P. 32.3(a)(3) . . . . . . . . . . . . . . . . 60

A.R.Crim.P. 32.10(a) . . . . . . . . . . . . . . . . . iii

## STATEMENT OF THE CASE

On May 31, 2005 Appellant (hereinafter "Landers") filed a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure from a judgment of conviction for capital murder and a life sentence entered on July 1, 1997(C 4-43). The conviction was affirmed by this Court on December 15, 2000 and re-hearing was denied on March 2, 2001 (Case Number CR-97-0194). Landers timely petitioned for certiorari in the Supreme Court, which was granted on August 30, 2001, but which was quashed on June 18, 2004 (Supreme Court Case Number 1001070).

On June 10, 2005 Landers filed a motion for leave to amend his petition and a proposed amendment asserting additional grounds for relief (C 49-55). The motion was not expressly ruled on by the trial court; however, the State's responsive motion (C 56-163) acknowledged and responded to the amendment, the amendment was argued at the hearing of the State's motion (R 1-19), and the trial court's order ruled on the grounds contained in the proposed amendment (C 171).

Landers filed with his petition a motion for reassignment or transfer to another judge (C 44-45) and a motion to allow discovery (C 46-47). The trial court denied the motion for reassignment on June 7, 2005 (C 48).

1

On July 12, 2005 the State filed a motion to dismiss the petition as amended (C 56-143). The State's motion was set for argument (C 144). On August 19, 2005 Landers filed an opposition to the State's motion (C 145-66). Following oral argument on August 30, 2005 (R.1-19) the trial court entered an order on September 23, 2005 denying Landers' petition (C 167-71). Landers filed notice of appeal on November 3, 2005 (C 172).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The issues presented for review by this appeal are:

Issue 1 - Did dismissing Appellant's Rule 32 petition without an evidentiary hearing infringe his due process rights?

Issue 2 - Does a prior State court adjudication of a claim for relief in a Rule 32 petition based on a right guaranteed by the U.S. Constitution preclude that claim if the prior State court adjudication was in conflict with, or was an unreasonable application of, clearly established Federal law as determined by the U.S. Supreme Court or was based on an unreasonable determination of facts in light of the evidence presented?

Issue 3 - Did the trial court improperly deny without a hearing the ground of Appellant's Rule 32 petition which asserted newly discovered evidence?

Issue 4 - Did the failure of the indictment to inform Appellant of the conduct he was called on to defend against at trial deny him due process rights guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution?

Issue 5 - Did the allegations of the indictment in this murder prosecution charging Appellant with specific conduct which caused the death of the deceased limit the subject-matter jurisdiction of the trial court, or limit its authority to exercise its jurisdiction, to the specific conduct alleged in the indictment and render void for lack of subject-matter jurisdiction a conviction based on proof of different specific conduct, not alleged in the indictment, as causing the death of the deceased?

Issue 6 - Was the dismissal of the ground of Appellant's Rule 32 petition asserting delay in instituting a prosecution against him a denial of due process?

Issue 7 - Was the refusal to delay closing arguments at Appellant's trial a due process denial as an unreasonable determination of facts in the light of the evidence presented?

3

Issue 8 - Was the destruction by the State, and its failure to produce, body fluids and tissue specimens from the victim's body a denial of due process guaranteed by the U.S. Constitution?

Issue 9 - Was the destruction by the State, and its failure to produce, notes of a post-mortem examination made by the medical examiner a denial of due process guaranteed by the U.S. Constitution?

Issue 10 - Was the Appellant denied due process by being convicted when no evidence connected him with the offense with which he was charged?

## STATEMENT OF THE FACTS

The trial court conducted no evidentiary hearing (C 167; R 1-19). The facts for purposes of this appeal are those alleged in Landers' petition and the judicially noticed facts appearing in the appeal record of the underlying case (See this Court's order of December 28, 2005).[1]

---

[1] Reference to the prior appeal record (CC-96-421, CR-97-0194, and 1001070) will be by "XC" followed by a page number for reference to the Clerk's Record portion and "XR" followed by a page number for reference to the Reporter's Transcript portion of that record. Reference to the Court's December 15, 2000 Memorandum will be by "12/15/00 Memo.".

4

Landers was indicted for capital murder on October 4, 1996 (XC 9-10). The only *quo modo* of the offense alleged was:

...by running over and crushing him with a bulldozer. (XC 9).

This indictment was never amended.

Bond was denied pending trial and Landers was incarcerated at all tines after his indictment (XC 16-19).

The victim's body was found near a construction site on the evening of February 12, 1992 (XR 1010-12). The body was lying partially under the right track of a bulldozer (XR 1012). One of the first officers at the scene saw an eye glasses case near the victim's head as he lay under the bulldozer (XR 2201, 2202, 2203). He did not retrieve the case (XR 2202).

On the night of February 12, 1992, at the scene where the victim's body was found, Elmore County Sheriff Franklin handed to Lenita Landers, the victim's wife, two rings, a wallet, and a glasses case containing a pair of glasses, all of which belonged to the victim (C 25, 38). Mrs. Landers placed these items in her coat pocket. (C 38). When she arrived home later that night she placed these items, including the glasses case, in a rarely used dresser drawer (C 39). She did not look in this drawer again for over five years, and forgot about the items she had placed there (C 39). She was never asked about

5

the glasses (C 39).  Had she been asked about the glasses at the time of Landers' trial she would have been unable, due to loss of memory, to recall their existence or location (C 39).

Sometime shortly before or during Landers' trial Mrs. Landers was asked to locate photographs of her husband (C 40). She reasoned that his drivers license should have a photograph and should be in his wallet (C 41).  She searched for a wallet and located the wallet the Sheriff had given her on February 12, 1992 in the drawer where she had placed it that night (C 41).  The wallet was not obscured by other contents of the drawer (C 41). She removed the wallet and found a drivers license in it (C 41).   She took the wallet to Landers' trial (C 41).  Thirty days or more after Landers was sentenced, Mrs. Landers decided to put the wallet back into the drawer from which she had taken it (C 42).  When she opened the drawer she saw for the first time since she placed it there on February 12, 1992 the glasses case the Sheriff had given her on that date (C 42). She recognized the case as the case in which her husband regularly carried his glasses (C 42).  At that time she opened the case and found a pair of wire rimmed glasses, the glasses her husband regularly wore and used in the period immediately preceding his death (C 42).  Upon seeing these glasses on this occasion Mrs. Landers recalled for the first

6

time since February 12, 1992 that the Sheriff had handed her these glasses and other items on that night (C 42).

Mrs. Landers never told anyone about these glasses (C 42). Only she had access to the drawer where they were stored (C 43). Landers never saw and was never told about the glasses until he was told about them shortly before the filing of the present petition (C 22, 43). The condition of the glasses and case is unchanged from the time they were given to Mrs. Landers by the Sheriff on February 12, 1992 (C 22). Neither Landers nor his attorneys knew of the existence of the glasses until well after the completion of Landers' trial and post trial motions (C 25-26). Neither Landers nor his attorneys could have discovered the glasses at an earlier time because the only person with any knowledge of their existence and whereabouts, Mrs. Landers, did not disclose their existence or whereabouts to anyone (C 26). Mrs. Landers did not discover them herself until she accidentally did so shortly before Landers' petition was filed (C 26).

On the evening of February 12, 1992 a large crowd - including spectators - gathered at the scene where the body was found (XR 1172, 1191, 1192). The bulldozer was picked up by a wrecker to allow removal of the body (XR 1076). A truck and trailer that were near the bulldozer were moved (XR 1079,

1147). Between the evening of February 12, 1992 (when the body was discovered) and February 13, 1992 (when State's Exhibit 10 was discovered) the scene was not secured (XR 1068).

On February 13, 1992 investigators returned to the scene and moved the bulldozer; and at that time saw a pair of glasses on the ground where the left track of the bulldozer had been (XR 1106-10). These glasses were identified at trial as State's Exhibit 10 (hereafter "Ex.10") (XR 1011).

At trial the State introduced Ex. 10, eye glasses with thick plastic rims and a deformed left leg, into evidence (XR 1852). State's Exhibits 23-A and 23-B are photographs of Ex. 10 (XR 1928; XC 1063-66). Ex. 10 was turned over to the Department of Forensic Sciences after retrieval at the scene (XR 1927). A blood stain on the frame was typed by a technician in the Department (XR 1431-33). This technician also did an ABO blood test on a blood specimen taken from the victim's body (XR 1433). The blood type of both was Type O (XR 1434). Based on this blood typing the medical examiner assumed Ex. 10 was the victim's glasses and used the glasses in explaining his theory of how the victim was killed and the cause of death (XR 1927-28, 1940-41).

The medical examiner testified that the cause of death was being struck on the left temple with a blunt instrument (XR

1941). He explained this conclusion by describing two distinct sets of injuries on the victim's body (XR 1901-02). One set was to the left temple where something blunt struck the head with sufficient force to break the skull and depress the skull bones down into the brain (XR 1901, 1910, 1919-21, 1922). The temple injury occurred before the victim was run over by the bulldozer (XR 1922-24). The bulldozer did not cause the fractures to the left temple (XR 1922). The crushing injuries to the body, including to the skull, produced little bleeding, an indication the victim was dead when run over by the bulldozer (XR 1904, 1910, 1921, 1923, 1929-40).

The medical examiner used the glasses (Ex. 10) to illustrate and support his theory that the victim was killed by a blow to the temple before he was run over by the bulldozer (XR 1926-40). He reconstructed the victim's skull from bone fragments and placed Ex. 10 on the reapproximated skull (XR 1917). In his opinion, a deformity in the left leg of Ex. 10 matched the temple injury and showed the victim was struck in the temple (XR 1927, 1940-41; XC 1115-20).

In opening statement the State emphasized that a blow to the left temple killed the victim. The prosecutor stated that the victim was struck in the temple and was then dragged around and run over by the bulldozer as a means of concealing

9

the blow to the head (XR 938, 946-47). The prosecutor emphasized the importance of the glasses in this theory, and their connection to the victim, by pointing out that the blood on the glasses was the same type as the victim's (XR 944). The prosecutor referred to the fact that when the glasses (Ex. 10) were placed on the victim's reconstructed skull a deformity in the left leg coincided with the temple injury (XR 947). In closing argument the State reiterated the blow to the head theory (XR 287-89). The prosecutor again stressed the fact that Ex. 10 confirmed the theory by showing the point where the victim was struck on the head (XR 239). The prosecutor again pointed to the blood on Ex. 10, and the typing of it, as proof that Ex 10 was the victim's glasses and was proof of the blow to the head theory (XR 2390, 2400, 2406).

There was testimony at the trial that Ex. 10 was not the victim's glasses. The victim's glasses were described as wire rimmed, not plastic rimmed, glasses (XR 2080, 2168-71). Photographs showed the victim wearing wire rimmed glasses (XC 1635-39). The proffered newly discovered evidence is the victim's wire rimmed glasses (C 42).

Landers made several pretrial requests or filed motions seeking discovery or disclosure (XC 28, 32, 62, 161). His

10

requests included "tangible objects", "any other things ... which are intended for use by the State ... as evidence at trial", "objects or other tangible things which are relevant to this cause or are material to Defendant's defense", and "exculpatory evidence" (XC 33, 34). One of his motions showed the State had not produced a portion of a February 13, 1992 report of a post-mortem examination, tissue blocks and glass slides used in a post-mortem examination, and other materials relating to a post-mortem examination (XC 261-62). Landers also filed a motion to dismiss the indictment for failure to produce blood samples (XC 266-70).

The State responded to the discovery requests by producing sundry materials which are described in its responses to discovery (XC 42-51, 65-66, 73-83, 135-50, 231-33). The responses do not list glasses, blood or tissue specimens, or February 13, 1992 post-mortem notes. The State produced no glasses, blood or tissue specimens (C.13,14-15, 16, 17) or the dictated notes of the findings from the February 13, 1992 post-mortem examination (C 18).

The testimony of the Forensic Sciences Department medical examiner and a technician were a major part of the State's case (XR 1428-37, 1890-1997). The medical examiner testified that a blood specimen was drawn from the victim's body on

11

February 13, 1992 (XR 1908) and transmitted to the technician (XR 1943). The medical examiner testified he examined the glasses identified as Ex. 10 and used them in his examination of the victim's body (XR 1927-28). He described the victim's skull and the injuries to it and stated he reconstructed the skull from bone fragments (XR 1923-24, 1926-27). He illustrated his testimony by photographs (XR 1929-41;C 1068-1120). Except for a small portion, the victim's skull was not retained (XR 1966). It was disposed of at some undetermined time, possibly after Landers' indictment (XR 1966).

The medical examiner dictated a report of his February 13, 1992 examination of the victim's body onto a recording device (XR 1951). The dictation was not transcribed and has been destroyed (XR 1951).

A Forensic Sciences technician testified that blood taken from Ex. 10 and a vial of blood given to her by the medical examiner were analyzed by the ABO method (XR 1432-34). The blood from the glasses was used up in the testing and the vial of blood obtained from the medical examiner was destroyed (XR 1437).

A deposition of Landers taken in a civil case on November 5, 1992 was used as evidence by the State (XR 1481-1659; XC 1459-1546). The medical examiner's work on this case, the

12

primary foundation for the prosecution, was completed within three months after March 3, 1992 (XR 1952).

The bulldozer under which the victim's body was found was examined and used by the State in experiments conducted soon after February 12, 1992 (C 21; XC 1043-46, 1184-90, 1283-91, 1351-98).  Because the bulldozer was no longer available after Landers' indictment he had no opportunity to conduct experiments with it and had no opportunity to conduct experiments at the unaltered scene (C 21-22).  The trial court rejected experiments offered by Landers at trial, which were conducted after indictment in October 1996, because they were not conducted with the same bulldozer and the area where they were conducted was different from the area where the victim's body was found (XR 2043-46).

In the interim between November 1992, when the State completed the collection of the evidence it used at trial, and the indictment in October 1996, three persons (Barry Worth, Rubin Jarrell, and Orender Jarrell) who could have offered testimony favorable to Landers died (C 21).  Had the prosecution against Landers been instituted earlier: (1) the bulldozer, the subject of tests and experiments by the State, would have been available to Landers for tests and experiments (C 21-22); (2) the State would not have destroyed the blood

13

and tissue specimens it destroyed before trial (C 22-23); (3) the notes of the medical examiner's original examination would not have been destroyed (C 23); and (4) the newly discovered evidence would have been remembered, found, and available for use as evidence at trial (C 23).

On the evening of May 7, 1997 the father of Landers' lead counsel died (XC 2298). The funeral was scheduled for Saturday, May 10, 1997. The trial judge refused to postpone closing arguments until after the funeral and scheduled them for May 9, 1997 (XR 2300, 2307). The State contended, and the memorandum of this Court entered with its December 15, 2000 decision finds, "the record reflects that the Judge was obligated to be in Baldwin County to preside over a case as a special judge on the following Monday" (See 12-15-00 Memo. p.36). This conclusion is incorrect; the trial judge was only assigned as an "additional judge" in Baldwin County for the week beginning May 12, 1997 (C 166).

At trial the State offered no testimony from a witness who observed Landers at the time the victim was killed, or who saw Landers in possession of any blunt instrument that the State claimed killed the victim, or who heard Landers conspire with any other person to kill the victim (XR 1-2291).

14

## STATEMENT OF THE STANDARD OF REVIEW

The standard of review in this case is de novo as to all issues. The order appealed from was an order entered on Appellee's motion to dismiss Appellant's petition. It was entered on the pleadings without an evidentiary hearing. Review of such an order presents only legal questions; so review is de novo with no presumption in favor of the ruling of the trial court. See Ex Parte Key, 890 So.2d 1056, 1059 (Ala. 2003); Harper v. Brown, Stagner, Richardson, Inc., 873 So.2d 220, 223 (Ala. 2003); Bay Lines, Inc. v. Stoughton Trailers, Inc., 838 So.2d 1013, 1017 (Ala. 2002); Ragland v. State, 883 So.2d 730, 731 (Ala.Crim.App. 2003).

## SUMMARY OF THE ARGUMENT

Issue 1 - A Rule 32 petitioner is entitled to an evidentiary hearing if the petition shows on its face a basis for relief. Dismissal of a facially adequate petition without a hearing violates the right to due process. Landers' petition showed several bases for relief and its dismissal without a hearing denied due process.

Issue 2 - Rule 32.1(a) of the Alabama Rules of Criminal Procedure authorizes relief from a conviction where required by the U.S. Constitution. A prior State court adjudication on a Federal constitutional issue does not preclude relief if the

15

State adjudication was in conflict with, or was an unreasonable application of, established Federal law as declared by the U.S. Supreme Court or if it was an unreasonable determination of facts in light of the evidence presented. All the State adjudications relied on by the State as precluding relief were either in conflict with or unreasonable applications of U.S. Supreme Court precedents or were unreasonable determinations of fact in light of the evidence presented and do not support preclusion.

Issue 3 - Critical to the State's case - including proof of the corpus delecti - was proof that a certain pair of glasses were the victim's glasses. The newly discovered evidence proffered by Landers, a different pair of glasses, disproves this critical element of the State's case. It is tangible evidence contradicting the most important single item of evidence in this case and is not merely impeachment or cumulative evidence. The newly discovered evidence was not and could not have been discovered earlier. It was voluntarily disclosed to Landers by a third party shortly before the petition was filed. The proffered evidence meets all of the Rule 32.1(d) requirements and the dismissal of this ground was erroneous.

16

Issue 4 - To comply with the due process requirements of the U.S. Constitution an indictment must give notice of the nature and cause of the accusation on which an accused is to be tried.  The present indictment informed Landers of one *quo modo* of the alleged offense - crushing the victim with a bulldozer.  The State's proof showed another, vastly different *quo modo* - striking the victim on the temple with a blunt instrument.  Due process does not permit the trial and conviction of an accused of an offense so vastly different from the one described in the indictment.

Issue 5 - An established principle of Alabama law is that the words of an indictment describing specific conduct of the accused create the jurisdiction for and limit the jurisdiction of a court to try and convict an accused to the specific conduct described in the indictment.  A court lacks jurisdiction to try and convict a defendant based on proven conduct different from the conduct alleged in the indictment. A conviction based on proven conduct different from the conduct alleged in an indictment is extra-jurisdictional and void.  The present indictment charged Landers with killing the victim by crushing him with a bulldozer.  The proof at trial showed the victim was killed by being struck on the temple with a blunt instrument.  The trial court had no jurisdiction

17

to try Landers for killing the victim by striking him with a blunt instrument.  Therefore, Landers' conviction was beyond the jurisdiction of the trial court and is void.

Issue 6 - The indictment against Landers was returned nearly four years after the State had collected all the evidence used at trial.  The State showed no justification for this lengthy delay.  This delay deprived Landers of the opportunity the State had to test and experiment with a bulldozer at the unaltered scene of the alleged crime, of blood and tissue specimens the State destroyed in the interim, of evidence the victim's widow lost, of notes of a post-mortem examination the medical examiner destroyed, and of the testimony of three witnesses who died.  The delay gave the State a tactical advantage and prejudiced Landers.  Such a delay is a denial of due process.

Issue 7 - For no valid reason, the trial court refused to delay closing arguments until after the funeral of the father of Landers' lead counsel, who died on the day before closing arguments were to commence. The putative reason for the refusal, an imperative assignment to preside over a case as a special judge in another circuit, is shown by Court records to be non-existent. The refusal to delay closing argument was based on an unreasonable determination in view of the true

18

evidence and denied Landers the right to the benefit of effective counsel and due process at closing argument.

Issue 8 - With knowledge that the results of tests on blood and tissue specimens were a critical part of the evidence against Landers, the State destroyed these specimens and denied Landers an opportunity to have them analyzed. Such a destruction with knowledge of the critical nature of test results amounts to bad faith. Depriving Landers of potentially beneficial evidence is a denial of due process under established U.S. Supreme Court precedents.

Issue 9 - The State destroyed dictated notes of the first post-mortem examination of the victim's body. The medical examiner admitted that after this examination he concluded the victim's death was accidental. The notes setting out the reasons for this conclusion would have been tangible evidence favorable to Landers. He was denied this evidence due to the misprision of the State. This was a denial of due process.

Issue 10 - It is a denial of due process guaranteed by the U.S. Constitution to convict a person of a crime where no evidence connects that person with the crime. This principle was violated in this case because no evidence connected Landers with killing the victim.

19

## ARGUMENT

The order appealed from granted a motion to dismiss (C 167-71). It was entered without an evidentiary hearing. On this appeal the allegations of the petition must be taken as true. See Ex Parte Floyd 457 So.2d 961, 962 (Ala. 1984); Kolmetz v. State, 623 So.2d 453, 454 (Ala.Crim.App. 1993).

**Issue 1** - Did dismissing Appellant's Rule 32 petition without an evidentiary hearing infringe his due process rights?

Landers' petition was dismissed at the pleading stage on a finding that an evidentiary hearing was "not necessary" and that the "claims are precluded" (C 167). This summary dismissal is a denial of due process and is erroneous on its face.

A Rule 32 petitioner is entitled to due process. Ex Parte Rice, 565 So.2d 606, 608 (Ala. 1990). Due process means fair play; it includes an opportunity to present evidence in support of claims asserted and a reasonable opportunity to controvert an adversary's claims. See Ex Parte Weeks, 611 So.2d 259, 261 (Ala. 1992); Cooper v. Watts, 280 Ala. 236, 191 So.2d 519, 522 (1966); T.B.II v. State, 819 So.2d 108, 110 (Ala.Crim.App. 2001).

Rule 32 not only requires general due process. It spells out specific due process requirements. See Ex Parte Rice,

20

<u>supra</u>. Where the State asserts preclusion as a bar, as in this case, Rule 32.3 plainly says the State has the "burden of pleading any ground of preclusion".  This "burden" provision requires the State to plead in detail the facts it claims foreclose a remedy and give the petitioner the notice needed to present evidence and formulate arguments to disprove preclusion.  See <u>Ex Parte Rice</u>, <u>supra</u>; <u>Nicks v. State</u>, 783 So.2d 895, 914 (Ala.Crim.App.1999); <u>Alvis v. State</u>, 762 So.2d 380, 381 (Ala.Crim.App. 1999); <u>Marshall v. State</u>, 720 So.2d 960, 961 (Ala.Crim.App. 1996).

The State's motion was largely conclusionary.  It did not allege specific facts barring the several claims raised in the petition.  Particularly, it did not carry its burden by alleging facts indicating that the prior adjudications it relied on as barring Landers' claims met Federal standards, i.e., they were not in conflict with, or were not unreasonable applications of, settled Federal law as determined by the U.S. Supreme Court or did not involve unreasonable determinations of fact in light of the evidence presented.  See 28 U.S.C. §2254; <u>Williams v. Taylor</u>, 529 U.S. 362, 375, 379, 385-86, 387, 399 (2000).  As will be discussed in more detail under Issue 2, to preclude a Federal constitutional claim for relief based on a prior State court adjudication it is necessary that

21

the State adjudication meet these standards.

Rule 32.3 surely means the State must do more than merely assert preclusion. It also is an admonition against summary dismissal. It surely means a trial court must give the petitioner an opportunity to controvert whatever the State alleges. An opportunity to controvert contemplates a hearing, not a summary dismissal. Rule 32.3 obviously creates a presumption in favor of an evidentiary hearing and against a summary dismissal. The trial court's order was contrary to this presumption. It denied an opportunity to controvert. It was a denial of due process and is due to be vacated on this ground alone before considering the details of the specific grounds raised by the petition.

**Issue 2** - Does a prior State court adjudication of a claim for relief in a Rule 32 petition based on a right guaranteed by the U.S. Constitution preclude that claim if the prior State court adjudication was in conflict with, or was an unreasonable application of, clearly established Federal law as determined by the U.S. Supreme Court or was based on an unreasonable determination of facts in light of the evidence presented?

The order summarily denying Landers' petition makes a blanket assertion that "Petitioner's claims are precluded" (C 167). Later the order concludes that specific claims are precluded because they were raised and decided in the trial court or by this Court (C 168-71). In fact, all of Landers'

22

claims were raised in the trial court and/or on appeal except for the newly discovered evidence claim (Ground 7) and the claim based on a jurisdictional defect (Ground 9).

An adjudication by a State court is not, however, the final word on whether relief in a Rule 32 proceeding is precluded. The first circumstance stated in Rule 32.1 authorizing relief is:

> (a) The constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

The U.S. Constitution establishes many standards which govern State trials. By virtue of the Fourteenth Amendment, a departure from Federal constitutional standards vitiates a State trial and any conviction rendered in it. See Rogers v. Richmond, 365 U.S. 534, 544-45 (1961). It is the obligation of State courts, equally with Federal courts, to guard, enforce and protect rights granted or secured by the U.S. Constitution. See Irvin v. Dowd, 359 U.S. 394, 404 (1959).

In spite of an adjudication by a State court on an issue involving Federal constitutional rights, the U.S. Constitution affords relief from a State conviction if the State court adjudication concerning a Federal right was in conflict with or was an unreasonable application of clearly established Federal law as determined by the U.S. Supreme Court or was a

23

decision based on an unreasonable determination of facts in light of the evidence presented. See 28 U.S.C. §2254; Williams v. Taylor, 529 U.S. 362, 375, 379, 385-86, 387, 389 (2000); Early v. Packer, 537 U.S. 3, 10-11 (2002). Therefore, not all State court adjudications can have preclusive effect. To hold otherwise would make State courts, not Federal courts, the final arbiter of Federal rights, which is not the rule. See U.S. CONST. Art.VI. To have preclusive effect a State court ruling must not offend Federal constitutional standards, and if it does, there remains an unprecluded right to relief under Rule 32.1(a).

The trial court's order overlooks or ignores this principle in its blanket holding that Landers' claims were precluded by prior State adjudications. Each of the State adjudications relied on by the State as supporting its position on Issues 4, 6, 7, 8, 9, and 10 below offend Federal constitutional standards. Consequently, it was error to summarily deny Landers' petition on the basis of preclusion.

**Issue 3** - Did the trial court improperly deny without a hearing the ground of Appellant's Rule 32 petition which asserted newly discovered evidence?

To reach first base - and establish the corpus delecti - in this murder prosecution it was necessary for the State to prove the victim's death was the result of a criminal agency

24

and not an accident. See, e.g., <u>Shelton v. State</u>, 217 Ala. 465, 117 So. 8, 9 (1928); <u>Scanland v. State</u>, 473 So.2d 1182, 1185 (Ala.Crim.App. 1985). Unquestionably, the most critical evidence presented to prove a corpus delecti - that criminal agency, not an accident, caused the victim's death - was Ex. 10, a pair of plastic framed glasses. If these glasses were the victim's glasses, and were being worn by him at the time he was killed, the State's case (in this totally circumstantial evidence case) was arguably tenable. If these glasses were not the victim's glasses the State's case was not even arguably tenable and effectively evaporates from lack of proof of a corpus delecti.

The newly discovered evidence - the victim's true glasses - proves Ex. 10 was not the victim's glasses. It totally undermines the prosecution theory. The newly discovered evidence is critical evidence the jury did not see, but which, if justice is to be served, the jury should see.

A Rule 32 petition based on newly discovered evidence should be granted if the evidence posited as newly discovered evidence meets the following criteria:

1.  The evidence was not known to the petitioner or counsel at trial or in time to be included in a post-trial proceeding and could not have been discovered by the exercise

of reasonable diligence.

    2.   The evidence is not merely cumulative.

    3.   The evidence is not merely impeachment evidence.

    4.   If the evidence had been known earlier the results probably would have been different.

    5.   The facts establish that the petitioner is innocent. See A.R.Crim.P. 32.1(d).[2]  The glasses described in Landers' petition meet all Rule 32.1 criteria.

The trial court summarily rejected, without a hearing, Landers' newly discovered evidence claim giving these reasons:

    1.   The claim "is without merit" (C 169).

    2.   A lack of due diligence (C 170).

    3.   The evidence is impeachment evidence (C 170).

    4.   Relief is precluded because the issue could have been or was raised at trial and on appeal (C 170, 171). These reasons are demonstrably erroneous.

To properly consider this ground of Landers' petition it is necessary to fully understand: (1) the prosecution theory in this case, (2) the evidence the State presented to support its theory, including proof of corpus delicti, and (3) the role and significance of Ex. 10, a pair of eye glasses, in the State's presentation and the absolute necessity to prove Ex.

---

[2] The State's motion raises only numbers 1, 2, and 3 and does not question numbers 4 and 5.

10 was the victim's glasses to support the prosecution theory. Also significant is the fact that the State's case was entirely circumstantial (See 12/15/00 Memo., p.13).

It is undisputed that the victim's body was found under a bulldozer. However, at trial the State contended that being run over by the bulldozer, which had the appearance of being accidental (and which was the initial conclusion), was not how the victim was killed. Rather, to counter the apparent accident - and to prove the corpus delecti (See Shelton v. State, supra [must show death not accidental to prove corpus delecti]) - the State contended (contrary to the indictment) the victim was killed by being struck in the left temple by a blunt instrument and that his dead body was later run over by the bulldozer as a cover up.

This left temple injury theory was the only theory the State advocated in its opening statement (XR 938, 946-47) and closing argument (XR 2318, 2387, 2388-89, 2400, 2406) and was the only theory it presented evidence to support. All of the evidence supporting this theory was testimony from the medical examiner, Dr. Lauridson. Dr. Lauridson testified at great length, illustrating much of it with photographs, that there were two separate sets of injuries on the victim. One was an injury to the left temple, accompanied by considerable

27

bleeding (XR 1901-03, 1910, 1919-20, 1921, 1922, 1923-24, 1929-40). The second set of injuries were crushing injuries - with little or no bleeding (XR 1904, 1910, 1921, 1922). Dr. Lauridson opined: (1) the temple injury was not caused by the bulldozer (XR 1910, 1921, 1922); (2) the temple injury was the result of being struck at that point by something blunt (XR 1901, 1922);

(3) the temple injury was caused by being struck with force sufficient to break the skull and push bone down into the brain (XR 1922); (4) the temple injury occurred at a different time, and earlier, than the bulldozer's crushing injuries (XR 1922, 1923-24); and (5) the left temple injury caused the victim's death (XR 1941).

Critical to proving the temple injury theory was Ex. 10, a pair of glasses with a questionable background the State contended were the victim's glasses (XR 1852). Several facts deprecate the contention these glasses were the victim's glasses. These glasses were not found until the next morning after the body was found and were on the opposite side of the bulldozer from where the body was found (XR 1106, 1108, 1110-11). In the interim between the discovery of the body and the discovery of these glasses: (1) the scene was left unsecured overnight (XR 1068); (2) the bulldozer was picked up by a

28

wrecker to allow removal of the body (XR 1076); (3) a truck and trailer had been removed from the scene (XR 1079, 1147); and (4) many persons had been at and walked over the scene (XR 1172, 1191, 1192).

The critical nature of Ex. 10 to the State's theory is illustrated by opening statement where the prosecutor referred to the glasses several times. He said: (1) the glasses were found on the opposite side of the bulldozer from the body (XR 943); (2) blood found on the glasses was the same type as the victim's blood (XR 944); (3) the legs of the glasses were bent and the deformity in one of the legs, when the glasses were placed on the victim's reconstructed skull, coincided with the visible indication of the injury to the left temple (XR 947).

Much of Dr. Lauridson's testimony was devoted to Ex. 10 and to his hypothesis that the glasses proved his theory. Approximately eleven transcript pages of his testimony concern his photographs of the reconstructed skull, his description of the temple injury, and his explanation of the correlation between the glasses and the temple injury (XR 1929-40; XC 1063-66, 1115-20). In a very dramatic presentation Dr. Lauridson explained how, after re-approximating the victim's skull, he placed the glasses (Ex. 10) on the reconstructed skull and found, which he pointed out in photographs, that the

29

deformity in the left leg of the glasses matched the location of the left temple injury on the skull (XR 1917, 1927, 1928, 1940-41). He opined that the deformity in the "victim's glasses" confirmed the separate temple injury theory. This testimony has significance - and tends to prove the corpus delecti - only if Ex. 10 is the victim's glasses. If Ex 10 was not the victim's glasses Dr. Lauridson's temple injury theory testimony is meaningless.

To prove Ex. 10, in spite of its tenuous and questionable background, was the victim's glasses the State presented the testimony of a forensic technician. She testified she found blood on the right side of the frame of Ex. 10 (XR 1431, 1432-33). She did an ABO grouping test of this blood and determined it was Type O (XR 1432-33). She testified she received a vial of the victim's blood and determined it was also Type O (XR 1434). The technician did not perform a more definitive test, such as DNA, on the blood specimens (XR 1437, 1438). The test performed provided no confirmation that the two blood specimens were from the same person.

In opening statement the prosecutor stressed the evidence tending to show Ex. 10 was the victim's glasses. He said the coincidence of blood types was proof these glasses were the victim's glasses (XR 944). In closing argument the prosecutor

30

reiterated the importance of this blood type coincidence as proof that Ex. 10 was the victim's glasses (XR 2390). He referred again to the glasses, to the importance of the blood found on the glasses, and to the fact that the deformity in the glasses when placed on the reconstructed skull (as illustrated by photographs) coincided with the location of the left temple injury (XR 2389, 2390)

There was testimony at trial that Ex. 10 was not the victim's glasses (XR 2080, 2168-71). There was testimony that the victim regularly wore wire framed glasses, not plastic framed glasses like Ex. 10 (C 42; XR 2080, 2168-71). Other evidence, including photographs, showed the victim's glasses were wire framed (XC 1635-39).

The importance of whether Ex. 10 was the victim's glasses cannot be overstated. Unless Ex. 10 is the victim's glasses the State's case is devoid of its most tangible evidentiary element. Its chain of circumstantial evidence is missing an essential link. See Calloway v. State, 473 So.2d 601, 603 (Ala.Crim.App. 1985) (circumstantial evidence is no stronger than its weakest link). It has no tangible evidence to support totally circumstantial proof of the criminal agency element of the corpus delecti and is left with a mere theory as to how the deceased met his death. Without Ex. 10 and the

31

evidence based on Ex. 10 the State's case would have failed as a matter of law.  If Ex. 10 had been challenged at trial by the newly discovered evidence, glasses with no deformed leg to match the temple injury site described by Dr. Lauridson, the jury, especially in view of Ex. 10's questionable predicate, could easily have rejected the State's theory and found a reasonable doubt of the corpus delecti in an all circumstantial case.

At trial Landers had no tangible evidence to refute the State's contention that Ex. 10 was the victim's glasses, a contention which was the foundation of the corpus delecti. The proffered glasses is such tangible evidence.  They are glasses with no bent leg and no blood stains.  Oral testimony that Ex. 10 was not the victim's glasses is not the same quality evidence with the same impact and persuasive effect as tangible evidence which a jury can see and feel in refuting the State's contention.  Consequently, the glasses proffered are not merely cumulative.  In a circumstantial evidence case tangible evidence, such as the newly discovered glasses, is highly material evidence which should be presented to and considered by the jury in deciding guilt or innocence.

As previously noted, the trial court assigned four reasons for rejecting Landers' newly discovered evidence

32

claim: a general assertion of lack of merit, the evidence could have been discovered earlier (lack of diligence), the evidence is impeachment evidence, and the evidence was presented at trial and on appeal and is precluded. A brief discussion will illustrate the error of each assigned reason.

<u>General ("Without Merit") Ground</u>

At the pleading stage - where this case was when dismissed - a Rule 32 petitioner only has a burden to plead. See <u>Johnson v. State</u>, 835 So.2d 1077, 1080 (Ala. Crim.App. 2001). If a petition shows on its face a valid ground for relief its allegations cannot be disregarded and must be taken as true. See <u>Parker v. State</u>, 719 So.2d 259, 260 (Ala.Crim.App. 1997); <u>Rice v. State</u>, 682 So.2d 484 (Ala.Crim.App. 1995); <u>Kolmetz v. State</u>, 623 So.2d 453, 454 (Ala.Crim.App. 1993). If a petition shows a ground for relief the petitioner is entitled to an evidentiary hearing. See <u>Ex Parte Walker</u>, 800 So.2d 135, 138 (Ala. 2000); <u>Ex Parte Land</u>, 775 So.2d 847, 852 (Ala. 2000); <u>Johnson v. State</u>, <u>supra</u> at 1079-80.

The trial court dismissed Landers' petition without an evidentiary hearing on the newly discovered glasses. It had only the allegations of the petition, which it was bound to credit, which showed valid newly discovered evidence. See

33

Parker v. State, supra.  This issue had not, of course, (contrary to a later recitation in the trial court's order) been presented at trial or on appeal.  This issue could not have been raised at trial because it was not, according to the petition, known at that time.  The trial court had no knowledge derived from the trial that enabled it to make a factual determination of this issue without a hearing.  No justification exists for the trial court to make a general determination that the newly discovered evidence ground was "without merit".  A dismissal for this unspecific reason is, on its face, surely a denial of due process.  See Ex Parte Rice, 565 So.2d 606, 608 (Ala. 1990).

### Lack of Diligence

To deny Landers' petition without a hearing based on a conclusion the newly discovered evidence could have been discovered earlier is a classic example of denial of due process.  It is obvious that whether this evidence was discovered, or could have been discovered, earlier is a fact issue.  The trial court did not hear the evidence necessary to decide that fact issue. It was bound to accept the allegations of the petition (see Parker v. State, supra) which show valid newly discovered evidence.  A resolution of this fact issue without evidence surely denies basic due process.

34

Since the newly discovered evidence issue must be resolved at this stage from the allegations of the petition it is pertinent to take notice of several facts from the petition which indicate no lack of diligence in discovering this evidence. See Parker v. State and Rice v. State, both supra). First, the existence of the glasses was not known to Landers or his counsel until shortly before the petition was filed (C 25-26), so earlier discovery or an unexcused reason for non-discovery cannot be presumed.

Second, evidence does not lose its standing as newly discovered evidence because it was known or should have been known by others at the time of trial. Newly discovered evidence must exist at the time of trial. See Pacifico v. Jackson, 562 So.2d 174, 177 (Ala. 1990) (involving newly discovered evidence in a civil case, which follows the same standards as Rule 32.1[a]). If evidence exists at the time of trial someone obviously knows about it. Reports of decisions are replete with examples of proper newly discovered evidence that was known to others, but not to the party, at the time of trial. See, e.g., Ashworth v. Alabama Great Southern R.Co., 211 Ala. 20, 99 So. 191, 195 (1924); Reynolds v. City of Birmingham, 29 Ala.App. 505, 198 So. 360, 362 (1940); Sparks v. State, 24 Ala.App. 585, 139 So. 300, 301 (1932); Nelson v.

35

State, 28 Ala.App. 207, 182 So. 85, 86 (1938); Stephens v. Pate, 221 Ala. 200, 128 So. 176 (1930); Williams v. Birmingham Water Works Co., 230 Ala. 428, 162 So. 95, 96 (1935); Cox v. Mobile & Girard Railroad Co., 44 Ala. 611, 615-16 (1870); Strange v. Gregerson's Foods, Inc., 608 So.2d 721 722 (Ala. 1992); Johnson v. Johnson, 702 So.2d 161, 162-63 (Ala.Civ.App. 1997); Ohme v. Bisimanis, 222 Ala. 262, 132 So. 161 (1931); Fries v. Acme White Lead & Color Works, 201 Ala. 613, 70 So. 45, 47 (1918).  Knowledge of others as to the existence of the glasses cannot be attributed to Landers.

Third, newly discovered evidence warranting relief from a judgment can be evidence that was accidentally discovered by a party after trial or which was voluntarily disclosed to the party by a third person after trial.  See Fries v. Acme White Lead & Color Works, 201 Ala. 613, 79 So. 45, 47 (1918); Ohme v. Bisimanis, 222 Ala. 262, 132 So. 161, 162 (1931); Stephens v. Pate, 221 Ala. 200, 128 So. 176 (1930); Waldrep v. Southern Railway Co., 266 Ala. 652, 98 So.2d 614, 617 (1957).  The other pair of glasses was disclosed to Landers by a third person after his trial and affirmance on appeal (C 25-26) and qualify as proper newly discovered evidence under the cited authorities.

36

Further, Landers was not accused of a crime until October 4, 1996 (XC 9). His trial started in April 1997. During the interim he was in jail and could not freely confer with his mother or browse through her house in search of evidence (XC 16-19). Due diligence is a relative term and must be resolved in view of the circumstances of each case. See <u>Davis v. State</u>, 245 Ala. 589, 18 So.2d 282, 284 (1944). It does not require that every possibility be considered and exhausted. See <u>Johnson v. Johnson</u>, 707 So.2d 161, 162-65 (Ala.Civ.App. 1997). Landers' incarceration from the time he was charged until his trial acquits him of negligence in not procuring evidence. See <u>Sparks v. State</u>, 24 Ala.App. 585, 139 So. 300, 301 (1932).

The newly discovered evidence has been in the possession of Lenita Landers, not Landers. The failure of Mrs. Landers to locate and disclose this evidence to Landers cannot be charged against him. See <u>Davis v. State</u>, <u>Williams v. Birmingham Water Works Co.</u>, <u>Stephens v. Pate</u>, <u>Ohme v. Bisimanis</u>, <u>Fries v. Acme White Lead & Color Works</u>, all <u>supra</u>.

The failure of Mrs. Landers to find and disclose this evidence at an earlier time is understandable in view of the long delay in initiating this prosecution and other circumstances (C 39-43). The death of the victim occurred

February 12, 1992. Until the indictment in October 1996 there was no reason for Landers to search for evidence to establish his innocence. The fact that in five years a person of Mrs. Landers advanced years could forget or lose an item such as these glasses is understandable. Even if Mrs. Landers was negligent, Landers cannot be charged with her negligence or faulty recollection.

One other aspect of this case is significant on the issue of newly discovered evidence. It is related to a due process issue discussed under Issues 4 and 5 - the indictment's failure to give notice of the offense charged. The indictment charged the victim was killed by being run over by a bulldozer. This was the only notice the indictment gave Landers of the *quo modo*. The indictment does not mention the temple injury theory. A party cannot be held to be negligent in not discovering evidence to refute evidence he has no reason to believe will be offered against him. See <u>Doe v. Finnegan</u>, 202 Ala. 17, 79 So. 355 (1918); <u>Nelson v. State</u>, 28 Ala. App. 207, 182 So. 85, 86 (1938) (defendant learned State's contention at trial); <u>Reynolds v. City of Birmingham</u>, 29 Ala. App. 505, 198 So. 360, 362 (1940) (alibi defense not disclosed until trial). Had the indictment advised Landers of the *quo modo* the State intended to prove there would be more

38

substance to the lack of diligence argument.  The failure to give notice of the real quo modo theory cannot be held against Landers on the due diligence issue.

### Impeachment and Cumulative Evidence

Denial of the newly discovered evidence ground because it shows impeachment or cumulative evidence is patent error. Impeachment evidence is evidence which only seeks to discredit the veracity of a witness.  See Farris v. State, 890 So.2d 188, 192 (Ala.Crim.App. 2003); see also, Shepherd v. Southern Railway Co., 288 Ala. 50, 60-61, 256 So.2d 883 (1970); Reynolds v. City of Birmingham, 29 Ala.App. 505, 198 So. 360, 362 (1940) (evidence which tends to obliterate or destroy evidence supporting a verdict is more than impeachment evidence); Strange v. Gregerson's Foods, Inc., 608 So.2d 721, 722 (Ala. 1992).   Evidence disputing the observations, recollections, opinions, or conclusions of other testimony is contradictory evidence, not impeachment evidence.  See Farris v. State, supra. See also, Reynolds v. City of Birmingham, supra; Cox v. Mobile & Girard Railroad Co., 44 Ala. 611, 615-16 (1870); McCormack Bros. Motor Co. v. Arnold, 223 Ala. 504, 137 So. 288, 289-90 (1931).

Here the proffered evidence contradicts or disputes key prosecution evidence in several respects:

1.    It squarely disputes and contradicts the evidence that Ex. 10 was the victim's glasses.

2.    It disputes the questionable background evidence connecting Ex. 10 to the victim (because Ex. 10 was found the next day after body was found, area unsecured overnight, many persons in area, glasses case seen by officer at different location on previous night, etc.).

3.    It disputes the crucial foundation for the criminal agency element of the corpus delecti by showing that the victim's real glasses were not deformed at a location supporting the temple injury theory described by the medical examiner.

4.    It renders irrelevant the evidence that the inconclusive ABO testing of blood from Ex. 10 was proof that Ex. 10 was related to the victim's death.

5.    It undermines and refutes Dr. Lauridson's opinion and the prosecutor's argument that photographs of the reconstructed skull with Ex. 10 resting on it confirm the temple injury theory, the criminal agency element of the corpus delecti for this case.

40

Therefore, the newly discovered evidence represents substantive evidence disputing the observations, recollections, opinions and conclusions of the State's evidence and is not merely impeachment evidence. See <u>Farris v. State</u>, <u>supra</u>. It is not cumulative because Landers had no tangible evidence of the quality and character of this evidence to offer at trial proving that Exhibit 10 was not the victim's glasses. The conclusion that the newly discovered evidence is merely impeachment or cumulative is clearly wrong.

<p align="center"><u>Preclusion</u></p>

Newly discovered evidence as a ground for post-conviction relief is not usually precluded - for obvious reasons. See <u>State v. Freeman</u>, 605 So.2d 1258, 1259 (Ala.Crim.App. 1992). Rationally, it would appear that newly discovered evidence could be precluded only if presented and properly ruled on at post-judgment motion or appeal or if it was not raised earlier because of lack of diligence. As discussed, the newly discovered evidence Landers offers has not been previously considered and the failure to present it earlier is not due to lack of diligence under the circumstances of this case. The newly discovered evidence was voluntarily disclosed to Landers by a third person after trial and appeal. Preclusion cannot justify summarily denying this ground of the petition.

<p align="center">41</p>

**Issue 4** - Did the failure of the indictment to inform Appellant of the conduct he was called on to defend against at trial deny him due process rights guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution?

The Sixth Amendment to the U.S. Constitution requires that an indictment inform a defendant of the "nature and cause of the accusation". Section 6 of the Alabama Constitution has an identical guarantee. It is established Federal law that convicting a person of an offense different from the specific offense described in an indictment is a violation of this Sixth Amendment due process right. See <u>Dunn v. United States</u>, 442 U.S. 100, 106 (1979); <u>Stirone v. United States</u>, 361 U.S. 212, 217 (1960). Scrutiny will show this due process right was unquestionably violated in this case.

This case was begun by an indictment which charged that Landers killed the victim "by running over and crushing him with a bulldozer" (XR 9). The command of the notice requirement of the Sixth Amendment is that Landers could be tried and convicted under this indictment only for killing the victim by the conduct or actions specified in the indictment. The trial court even recognized this due process requirement (on its face, at least) in instructing the jury that the State must prove that Landers caused the death of the victim "by the means that are charged in the indictment" (XR 2421-26).

42

However, in the course of the trial due process and reality became separated.

The State's evidence proved an offense of a different nature and of a different cause from the offense described by the indictment. In fact, the State's evidence was calculated to and did disprove what was alleged in the indictment as the quo modo of the offense. The State's evidence was unequivocal that the victim was killed by being struck on the left temple by a blunt instrument, not by being run over by a bulldozer (XR 1941). This obviously is not proof of the offense described in the indictment.

This difference in the indictment and the evidence leaves Landers convicted of an offense different from what the grand jury charged and the indictment described. He was not informed by the indictment and given an opportunity to be heard on and defend against the evidence on which he was convicted. We must assume the grand jury either: (1) never heard evidence of the temple injury theory or (2) did not believe the temple injury theory. In either event, the grand jury did not, charge Landers with the temple injury theory and give him notice to defend against it. Consequently, Landers was tried and convicted for conduct the grand jury never charged, a clear due process violation. See <u>Stirone v. U.S.</u>, <u>supra</u>.

43

The U.S. Constitution requires relief from this conviction and Rule 32 provides the vehicle for that remedy. The trial court committed error in summarily denying relief on this ground.

> **Issue 5** - Did the allegations of the indictment in this murder prosecution charging Appellant with specific conduct which caused the death of the deceased limit the subject-matter jurisdiction of the trial court, or limit its authority to exercise its jurisdiction, to the specific conduct alleged in the indictment and render void for lack of subject-matter jurisdiction a conviction based on proof of different specific conduct, not alleged in the indictment, as causing the death of the deceased?

The difference in the allegations of the indictment as to how the victim was killed and the evidence presented at trial as to how the victim was killed creates more than the notice due process denial discussed under Issue 4. This difference also operates - founded on some of the same principles - to deny jurisdiction for the trial court to have entered the judgment it entered. This conclusion is based on established principles and precedents of Alabama law that the words of an indictment returned by a grand jury create and limit the jurisdiction of a court to try, convict, and sentence an accused. Because of this limitation the authority of the trial court to convict Landers on the evidence presented at his trial was foreclosed.

The indictment in this case plainly alleges Landers caused the death of the victim by:

> ... running over and crushing him with a bulldozer...

(XC 9). This is the allegation of the means or *quo modo* of the offense, an essential allegation of a homicide indictment. See Gayden v. State, 262 Ala. 468, 80 So.2d 501, 502, 507 (1955); Pendleton v. State, 57 Ala.App. 452, 453, 329 So.2d 140 (1975). It is the only quo modo allegation in the indictment. The testimony presented by the State at trial as to how the victim was killed was:

> Q....[D]o you have an opinion within a reasonable degree of medical certainty as to the cause of death of Mr. Robert Landers, Sr.?
>
> A. Yes. Mr. Landers died as a result of multiple blunt trauma.
>
> Q. Okay. As a result of what?
>
> A. As a result of being struck in the left side of the head... (XR 1941).[3]

---

[3] The State may contend the medical examiner also testified that the cause of death was from being crushed by a bulldozer. This is a specious argument. The medical examiner stated unequivocally that the cause of death was a blow to the side of the head (XR 1941). Following this unequivocal statement the medical examiner, as somewhat of an apology, added the equivocal statement: "...and possibly as a result of being run over by the bulldozer. I can't exclude that Mr. Landers was not still alive when he was run over.". (XR 1941-42). The quoted apologetic testimony is only a statement of a possibility, and nothing more. Such testimony is insufficient proof that the cause of death was being run over by a bulldozer because a mere possibility or conjecture,

45

Subject-matter jurisdiction is a pre-requisite for every valid judgment. Ex Parte Citizens Bank, 879 So.2d 535, 538, 540 (Ala. 2003); Harvey v. City of Oneonta, 715 So.2d 779, 781 (Ala. 1983). Without subject matter jurisdiction a judgment is void. See Moore v. John Hancock Life Ins. Co., 876 So.2d 443, 448 (Ala. 2003); Ex Parte James, 780 So.2d 693, 696 (Ala. 2000). This case presents a text book example of lack of subject-matter jurisdiction or lack of authority to exercise jurisdiction - because the words of the indictment do not create the jurisdiction necessary to try and convict Landers on the basis of the evidence presented at trial.

The absence of subject-matter jurisdiction is clearly shown by this analysis:

---

supposition, or guess is not sufficient proof of cause of death in a homicide prosecution. See Gantt v. State, 356 So.2d 707, 711 (Ala.Crim.App. 1978), cert. denied 356 So.2d 712 (Ala. 1978); James v. State, 339 So.2d 1047, 1052 (Ala.Crim.App. 1976), cert. denied 339 So.2d 1052 (Ala. 1976); Welch v. State, 45 Ala. App. 657, 658-59, 235 So.2d 906 (1970); Hardison v. State, 30 Ala. App. 40, 200 635, 636 (1941). A jury would not have been authorized to convict for killing the victim by crushing with a bulldozer on this equivocal testimony and Landers would have been entitled to a judgment of acquittal of a charge of causing death by running over with bulldozer. It is, of course, axiomatic that a person cannot kill a person who is already dead, which was the situation when the body here was run over by the bulldozer according to the State's evidence. See Singleton v. State, 33 Ala.App. 536, 35 So.2d 375, 378 (1948). Therefore, the quoted testimony, as a matter of law, does not prove that the victim met his death in the manner alleged in the indictment and does not alter the obvious conclusion that the only substantive evidence of cause of death was a blow to the side of the head.

46

1.   A consideration of the unique role and function of a grand jury in our system of jurisprudence.

2.   A consideration of the constitutional role and requirements of an indictment.

3.   A consideration of the jurisdiction-creating and jurisdiction-limiting effect of an indictment.

4.   An application of these principles to this case, which demonstrates that Landers' conviction is outside the jurisdiction created by the indictment in this case.

The undeniable facts are:

(a) The words of the indictment charged Landers with causing the death of the victim by specific conduct; but

(b) the evidence presented at trial did not prove this specific conduct; rather it proved other specific conduct not alleged in the indictment caused the victim's death.

<u>Grand Jury Role and Function in Criminal Prosecutions</u>

The grand jury has a revered, almost sacred, status in our jurisprudence. It has a long history in the common law of England and of this country. See <u>Branzburg v. Hayes</u>, 408 U.S. 665, 687 (1972). It is an institution embedded in both the Alabama Constitution and the U.S. Constitution. See ALA. CONST. §§ 6, 8 (1901); U.S. CONST. Amends. 5, 6; <u>United States v. Sells Engineering, Inc.</u>, 463 U.S. 418, 423 (1983)

47

("...enshrined in the Constitution").  In Alabama a grand jury is the only entity (except for special circumstances not relevant here) with the power to charge a person of murder. See ALA. CONST. §8 (1901); ALA. CODE §§ 15-8-1, 15-8-2 (1975).

The requirement that only grand jury action may charge a person of a felony is not a hollow formality.  As the U.S. Supreme Court said in <u>Branzburg v. Hayes</u>, <u>supra</u>:

> The adoption of the grand jury "in our Constitution as the <u>sole</u> method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice".  (Emphasis added)

This statement echoes the regard Alabama law places on the grand jury because the grand jury requirements are practically the same under Alabama law and Federal law.

The U.S. Supreme Court has often eloquently explained the role a grand jury and an indictment play in system:

(1) In <u>Wood v. Georgia</u>, 370 U.S. 375, 390 (1962):

> Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.

(2) In <u>United States v. Williams</u>, 504 U.S. 36, 47 (1992):

> In fact the whole theory of its [grand jury] function is that it belongs to no branch of the institutional Government, serving as a kind of

48

buffer or referee between the Government and the people.

(3) In <u>Stirone v. United States</u>, 361 U.S. 212, 218 (1960):

> The very purpose of the requirement that a man be indicted by a grand jury is <u>to limit his jeopardy to offenses charged by a group of his fellow citizens</u> acting independently of either prosecuting attorney or judge. (Emphasis added)

(4) In <u>Russell v. United States</u>, 369 U.S. 749, 766, 770-71 (1962) (in discussing why amendments to indictments are not permitted):

> If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says 'no person shall be held to answer', may be frittered away until its value is almost destroyed...
>                          * * *
> Any other doctrine would place the rights of the citizens, which were intended to be protected by the constitutional provision, at the mercy or control of the court or prosecuting attorney...

These same precepts are found in Alabama decisions. See, e.g., <u>Ex Parte Gonzalez</u>, 686 So.2d 204, 206 (Ala. 1996) ("an institution separate from the courts"; a "buffer between the government and the people").

49

From the cited and other authorities it is clear that a person may not be tried and convicted of a felony unless this independent body - the grand jury - has heard evidence and determined that a particular crime has probably been committed and that the accused probably committed it.  This procedure requires a final step by the grand jury - the return of a written indictment in which the grand jury describes in words the offense and the role of the accused in it which gives the accused notice of the charge he must be prepared to defend against.  See Ex Parte Cole, 842 So.2d 605, 607 (Ala. 2002); Ex Parte Washington, 448 So.2d 404, 407 (Ala. 1984); Ex Parte Hightower, 443 So.2d 1272, 1273 (Ala. 1983).  A grand jury speaks only by its written indictment; it is there that it sets out in words the offense it has considered and heard evidence on and describes in words the specific accusation it makes.  See ALA. CODE §15-8-1 (1975); Thorn v. State, 39 Ala.App. 227, 98 So.2d 859, 860 (1957), cert. denied 266 Ala. 689, 98 So.2d 860 (1957).  For this reason the importance of the words used by a grand jury in its indictment has been repeatedly stressed by Alabama appellate courts.

Only a grand jury can take the action which exposes a defendant to jeopardy.  See ALA. CONST. §8; ALA. CODE §§15-8-1 and 15-8-2 (1975); A.R.Crim.P. 12.3(d)(i).  In exposing a

50

defendant to jeopardy a grand jury specifies the nature of and limits the charge a defendant must face at trial. See <u>Mason v. Slate</u>, 259 Ala. 438, 66 So.2d 557, 559 (1953); <u>Formby v. State</u>, 750 So.2d 581, 586 (Ala.Crim.App. 1997). As the Alabama Supreme Court so pointedly said over a century ago in <u>Burgess v. State</u>, 44 Ala. 190, 192-93 (1870) in defining the role and office of a grand jury and the content of an indictment it returns:

> [The accusation] should be so set forth as <u>to leave no doubt concerning its nature and its limits, and leave it impossible for the accuser to vary it during the course of the hearing.</u> (Emphasis added)

To try and to convict a defendant for conduct different from the conduct a grand jury specifies in its indictment is a violation of the principle that a grand jury - and only a grand jury - decides and describes the offense for which a defendant may be placed in jeopardy and tried and convicted. To depart from this principle is to subject an accused to jeopardy for an offense a group of fellow citizens - a grand jury - never intended that the accused be tried for. See <u>Stirone v. United States</u>, <u>supra</u> at 218. To allow the prosecution to go beyond the conduct the grand jury indictment has specified violates the imperative concept of the role and function of the grand jury. To permit going beyond the words of an indictment is to allow a prosecutor and a trial court a

51

free hand and a blank check to vary an accusation and to
describe the nature and limits of an accusation and create
charges and obtain convictions based on conduct a grand jury
never described in its indictment and never even considered.
See <u>United States v. Russell</u>, supra at 766, 770; <u>Burgess v.
State</u>, <u>supra</u>.  A prosecution and conviction for an offense of
a different nature from the offense described by the grand
jury in its indictment has no standing as a proper juridical
event in our system of jurisprudence.

<u>Constitutional Basis and Purpose of an Indictment</u>

It is a basic right of one accused by an indictment to be
informed by the indictment - by the grand jury's words used in
the indictment - of the charge to be defended against and the
conduct which the grand jury has found makes the accused
guilty of that charge.  The Sixth and Fourteenth Amendments to
the U.S. Constitution and Sections 6 and 8 of the Alabama
Constitution require an indictment to "specify the conduct
sought to be condemned".  <u>Ex Parte Hightower</u>, 443 So.2d 1272,
1273 (Ala. 1983); See also, <u>Rogers v. Richmond</u>, 365 U.S. 534,
544-45 (1961).

As a corollary to this requirement, it is fundamental
that an accused is only required to meet the charge made and
defend against the conduct described in an indictment and need

52

not defend against a distinct charge or different conduct not included in the indictment and charged by the grand jury. See Ex Parte Washington, 448 So.2d 404, 407 (Ala. 1984); Floyd v. State, 659 So.2d 961, 965 (Ala.Crim.App. 1994); See also, Ex Parte Verzone, 868 So.2d 399, 402-03 (Ala. 2003). For that reason Alabama cases consistently hold that a court does not have jurisdiction of a charge based on, and cannot try, convict, or sentence a defendant for, conduct different from the conduct alleged by a grand jury in its indictment. See Ex Parte Washington, 448 So.2d 404, 407 (Ala. 1984); Gamble v. State, 758 So.2d 1125, 1126-27 (Ala.Crim.App. 1999).

As an aside, we parenthetically mention as a related issue the per se effect of the failure of an indictment in a homicide case to allege the *quo modo* or means by which a charged homicide was accomplished. The better reasoned decisions of this Court have held that an allegation of the *quo modo* is an essential and indispensable allegation of a homicide indictment. See, e.g., Pendleton v. State, 57 Ala.App. 452, 453, 329 So.2d 140 (1975); Nelson v. State, 50 Ala.App. 285, 286, 289, 278 So.2d 734, (1973); See also, Gayden v. State, 262 Ala. 468, 80 So.2d 501, 502, 503, 507 (1955). However, in Howard v. State, 420 So.2d 828 (Ala.Crim.App. 1982), the opinion rejects the reasoning of the

Pendleton and Nelson cases, which hold a homicide indictment is void if it does not set out the *quo modo*, and follows (and says it is bound by) Gaines v. State, 146 Ala. 16, 41 So. 865 (1906). In addition to being philosophically incorrect, we submit that the Howard case ignores the more recent Supreme Court decision in Gayden v. State, supra, which clearly requires a quo modo allegation by holding that an indictment must allege "the acts which constitute" the defendant's alleged guilt and identify the "transaction" on which the charge is based and which supports a conviction. 80 So.2d at 502, 503. While the reasoning of the Pendleton, Nelson, and Gayden cases are somewhat related to the present issue, the real issue here is different. Consequently, we do not need to further discuss the error of the Howard case.

As we see from the present indictment, the *quo modo* was alleged (XC 9). On its face the indictment appears sufficient. Rather than a facial flaw in the language of the indictment, which is confrontable by pre-trial motions, the jurisdictional flaw in this case is not confrontable pre-trial and is devious and deceptive. What occurred in this case amounts to a trap. It is an invitation to prosecutorial deception. The indictment gave notice of a *quo modo;* but did not give notice of the actual *quo modo* the prosecution intended to and did rely on at

trial.  What occurred here is an invidious due process flaw that not only fails to give notice of the intended *quo modo* but also affirmatively deceives the accused as to what conduct he must be prepared to defend against.  This real and obvious danger to a fair trial underscores the rationale for the strict jurisdiction - limiting role an indictment has under the authorities cited above and to be cited below in this brief.

### The Allegations of an Indictment Create, Define, Determine and Limit the Subject-Matter Jurisdiction of a Court

The allegations of an indictment create, define, determine and circumscribe the subject-matter jurisdiction of a court to try, convict, and sentence a defendant.  This principle was clearly stated in <u>Ex Parte Cole</u>, 842 So.2d 605, 607 (Ala. 2002):

> A valid indictment or complaint, giving the accused notice of the criminal charge against him, is <u>the source of the subject - matter jurisdiction</u> to try a contested criminal case.  (Emphasis added)

The principle was reaffirmed in <u>Ex Parte State</u>, 899 So.2d 1025, 1033, 1034 (Ala. 2004).  The <u>Cole</u>, <u>Ex Parte State</u> and numerous other decisions firmly establish as Alabama law the principle that the words of an indictment describing the conduct of the accused establish the boundaries of the subject-matter jurisdiction of a trial court.

The reason for such a jurisdiction-limiting role for the conduct describing allegations of an indictment are easily understood in the context of the unique role of a grand jury in our system and the perils to the constitutional rights of an accused from any other standard, as discussed above. The Cole et al. cases are not new law. Rather, they are precedent-following statements and applications of the time honored role and function of a grand jury and an indictment in our jurisprudence.

In this case the words of the indictment were the only source of the trial court's subject-matter jurisdiction to try and convict Landers. See Ex Parte Cole, supra. The words of the indictment created the trial court's jurisdiction. The words of the indictment defined, determined, and limited the trial court's subject-matter jurisdiction. The indictment alleged specific *quo modo* conduct - that Landers killed the victim "by running over and crushing him with a bulldozer" (XC 9). The quoted words set out the only *quo modo* conduct Landers was accused of by the grand jury. Further, these words were the only notice to Landers of the *quo modo* he needed to prepare to defend against. These words were the grand jury's only findings regarding *quo modo* conduct. The grand jury obviously never heard evidence of the temple injury

56

theory - or it did not believe it.  We know this because it is not described in the indictment.  The words used in the indictment limited the jurisdiction to try Landers to the stated *quo modo*, "running over and crushing him with a bulldozer".  By this indictment the grand jury did not confer subject- matter jurisdiction on the trial court to try, convict, and sentence Landers for causing the death of the victim by striking him on the temple with a blunt instrument. This is entirely different conduct from the *quo modo* described by the grand jury in its indictment.

At trial the State went to great effort and lengths to disprove the indictment and to show the victim was not killed by the *quo modo* alleged in the indictment.  It affirmatively proved the victim was killed by an entirely different mechanism and different conduct - by being struck on the left temple by a blunt instrument (XR 1941). There was no legally adequate proof that Landers killed the victim by running over him with a bulldozer. See <u>Gantt v. State</u>, 356 So.2d 707, 711 (Ala.Crim.App. 1978) and other cases cited in Footnote 3, above.

Under the cited authorities, the trial court's jurisdiction to try and convict Landers was limited to the *quo modo* the grand jury stated in its indictment - running over

and crushing with a bulldozer. The grand jury did not create jurisdiction by its indictment - the only source of the trial court's jurisdiction (See Ex Parte Cole, supra) - for a trial and conviction of Landers for causing the death of the victim by striking him on the temple with a blunt instrument.

We do not, of course, empirically know what evidence the grand jury heard and considered or what its conclusions were from the evidence it heard. We do not know if it heard the medical examiner and his theory of the separate temple injury by a blunt instrument. We do know however, what the grand jury did and did not do as evidenced by its indictment, its only voice. See ALA. CODE §15-8-1 (1975). From its indictment we know its *quo modo* accusation. Had the grand jury decided to accuse Landers of killing the victim by striking him in the temple with a blunt instrument we know it would have done so by writing words describing this conduct in its indictment, either as a separate count or as an alternative *quo modo*. It did not do so, and no entity is empowered to supply that omission. See Burgess v. State, supra. Its failure to do so, and its specification of a different, exclusive *quo modo*, limited the trial court's jurisdiction to the *quo modo* alleged and it foreclosed jurisdiction to try and convict for the *quo modo* proved at

58

trial.   Neither the trial court nor the prosecutor had the power to expand the jurisdiction the grand jury delimited. Landers' conviction transgressed the jurisdictional boundaries the grand jury established and is, for that reason, void.

For the reasons discussed, Landers' trial and conviction, and the sentence which followed, were extra-jurisdictional and void.   To hold otherwise would be:

1.   A disavowal of the sacred and unique role of the grand jury in our system and the principle that a felony prosecution can proceed only on the charge created and described by the words used by a grand jury in an indictment.

2.   A rejection of the right of an accused to be informed by an indictment of the nature and cause of the accusation and the charges to be defended against.

3.   A grant of authority to prosecutors to <u>ex parte</u> amend indictments and ambush defendants at trial and convict them on facts and theories not revealed by, and different from those expressly shown by, an indictment. See <u>Burgess v. State</u>, <u>supra</u>.

## Jurisdictional Defect Not Precluded

Since the difference between the conduct alleged in the indictment and the proof at trial creates a jurisdictional defect it is not subject to the State's preclusion argument.

A jurisdictional defect may be raised at any time and is not barred by preclusion for failure to raise it at an earlier time.  See A.R.Crim.P. 32.3(a)(3); Morris v. State, 733 So.2d 912, 913 (Ala.Crim.App. 1998); Ferguson v. State, 565 So.2d 1172, 1173 (Ala.Crim.App. 1990).

The State obviously forfeited several opportunities it had to avoid this jurisdictional defect.  The State surely knew of the medical examiner's temple injury theory testimony before indictment because his investigation was completed (and his conclusions reached) in 1992, four years before indictment (XR 1952).  In October 1996 the State, if it presented the medical examiner's conclusions to the grand jury, could have asked the grand jury to conform its indictment to the medical examiner's theory if the grand jury agreed with it.  (Perhaps the grand jury disagreed with the medical examiner's theory).  Even after the limiting indictment was returned, the State had options.  Before trial it could have dismissed the indictment and obtained another (assuming grand jury concurrence) specifying a *quo modo* consistent with its theory.

After the trial began with the present indictment the State still had options.  It could have moved for an amendment under Rule 13.5 of the Alabama Rules of Criminal Procedure. If amendment was denied, the State had yet another option.  At

60

any time before the jury retired it could have, under Sections 15-8-90 and 15-8-91 of the Code, dismissed the indictment and asked the court to order another indictment.  See Ex Parte Verzone, 868 So.2d 399, 402 (Ala. 2003).

The State did not avail itself of any of the opportunities it had to correct what became a jurisdictional flaw and resulted in a void judgment.  It cannot now complain that it has a void judgment which must be vacated in this Rule 32 proceeding.

> **Issue 6** - Was the dismissal of the ground of Appellant's Rule 32 petition asserting delay in instituting a prosecution against him a denial of due process?

The alleged homicide was on February 12, 1992. Indictment was on October 4, 1996 (XC 9).  In the almost 4 2/3 year interim several significant events occurred:

1.   The bulldozer which was at the scene of the alleged homicide and which possibly accidentally caused the victim's death, and which the State extensively examined and tested, was disposed of and no longer available to Landers for examination and testing to develop evidence to support a defense (C 21-22; XR 1184-90, 1283-91, 1351-98).

2.   The State destroyed blood and tissue specimens which it had examined and tested and thereby deprived Landers of the opportunity for examination and testing to disprove the

State's conclusions (C 10-15, 16-17; XR 1437, 1966).

3.   The victim's widow effectively lost the victim's true glasses - in a case where the victim's glasses played a key role in the State's theory of prosecution (C 28-30, 37-43).

4.   Three witnesses who could have offered testimony favorable to Landers died (C 21).

5.   The medical examiner destroyed notes made of his initial examination of the victim's body (C 17-19; XR 1951). Each of these seriously handicapped Landers' defense.

Landers was not charged until indicted and had no reason to prepare to defend a murder charge until October 1996.  The State showed no need to wait 4 years to obtain an indictment. The State had all the evidence it used  at trial by November 1992.   In November 1992 Landers gave a deposition in a civil case which was used as evidence (XR 1481-1659; XC 1459-1546). The medical examiner, the State's key witness, completed all of his work on this case by June 1992 (XR 1952).

Had Landers been indicted in November 1992, or soon thereafter, he would not have faced the obstacles he faced four years later.  The bulldozer would have been available. The scene of the alleged homicide would not have been altered. The witnesses would not have died.  The State would not have destroyed the blood and tissue specimens and the medical

examiner's notes.  Mrs. Landers would not have forgotten and effectively lost and made unavailable at trial the glasses she recently found and which are proffered as newly discovered evidence.  Clearly, delaying the prosecution until after this evidence became unavailable severely prejudiced the ability of Landers to defend the charge against him.

An unjustified delay in initiating a prosecution which gives the prosecution a tactical advantage and prejudices the ability of an accused to defend violates an accused's Federal constitutional right to due process.  See <u>United States v. Lovasco</u>, 431 U.S. 783, 790 (1977). This is established Federal law declared by the U.S. Supreme Court.  The trial court and this Court in its December 15, 2000 decision reached a wrong conclusion on the delay in prosecution issue – a conclusion which is in conflict with established Federal law and which was an unreasonable factual determination based on the evidence presented (See Issue 2).  Either error is a basis for relief in this Rule 32 proceeding.  See 28 U.S.C. §2254.

> **Issue 7** – Was the refusal to delay closing arguments at Appellant's trial a due process denial as an unreasonable determination of facts in the light of the evidence presented?

Circumstances more demanding of a delay in the proceedings in Landers' trial can be imagined than those presented late in the day on May 7, 1997.  The father of

Landers' lead counsel had died. The only portion of the two week trial remaining was closing argument and jury instructions. The trial court was asked, but refused, to delay the proceedings until after the funeral on May 10, 1997. The reason asserted by the trial judge, and the reason stated in this Court's December 15, 2000 memorandum, as justifying the denial of the delay was:

> The record reflects that the judge was obligated to be in Baldwin County to preside over a case as a special judge on the following Monday (12/15/00 Memo p.36).

This conclusion is simply wrong (C 166). While this Court obviously was not aware of this error at the time the memorandum was issued, we now know, and the trial judge knew at the time he denied the request, that his assignment to Baldwin County was merely a general assignment to serve as "an additional judge" during the week of May 12, 1997, and not a special assignment to preside over a case as a special judge (C 166). The trial judge had the discretion to complete this case in a fair, reasonable, and just fashion before embarking upon his general assignment in Baldwin County. See ALA. CONST. Amend. 328, §§6.01, 6.04(b) (1901); ALA. CODE §§ 12-11-1, 12-11-4 (1975). The callous action of refusing to delay closing arguments, and the action of this Court in affirming the refusal, is clearly an unreasonable determination of facts

in the light of the evidence. It was, under the circumstances, unquestionably a deprivation of the right to effective counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984); McMann v. Richardson, 397 U.S. 759, 771 (1980). As such it is a ground for relief in this Rule 32 proceeding (See Issue 2). See 28 U.S.C. §2254.

**Issue 8** - Was the destruction by the State, and its failure to produce, body fluids and tissue specimens from the victim's body a denial of due process guaranteed by the U.S. Constitution?

Although the State had possession of, and tested or analyzed and presented evidence at trial of the results of its post-mortem analyses of, the victim's blood and tissue it never produced such items for inspection or testing by Landers. These items were destroyed by the State (C 13-17, XC 42-51, 65-66, 73-83, 135-50, 231-33). The blood and tissue specimens were destroyed with knowledge that the results of the State's testing would be used in prosecuting Landers (XR 1437, 1952, 1966). Some were possibly destroyed after indictment (XR 1966-67). Landers specifically asked for "tangible objects" and "tangible things" the State intended to use at trial or which were relevant to the defense (XC 33, 34). He also requested tissue blocks, glass slides, and other materials relating to a post-mortem examination (XC 261-62, 266-70). The State did not show it had or followed a policy

or procedure relating to retention of such specimens. The destruction of this evidence under these circumstances shows bad faith on the part of the State.

It is established Federal law, declared by the U.S. Supreme Court, that a defendant may not be deprived of possibly favorable evidence by the prosecution's misconduct in destroying such evidence. See Arizona v. Youngblood, 488 U.S. 51, 58 (1988). When the State destroyed the blood and tissue samples it had tested and used to create evidence that Ex. 10 was the glasses of the victim and that these glasses demonstrated the State's theory of how the victim was killed, it forever foreclosed the opportunity for Landers to have these specimens analyzed to show that the glasses - the State's critical evidence - were not the victim's glasses. Without the ability to challenge this critical part of the State's case Landers was unquestionably prejudiced and denied due process.

The reasoning in this Court's December 15, 2000 memorandum that the State's destruction of this vital evidence did not offend a constitutional right of Landers is in conflict with the decision of the U.S. Supreme Court in Arizona v. Youngblood, supra. Since the 2000 decision is in conflict with the U.S. Supreme Court decision it is not

66

effective to preclude Landers from post- conviction relief under Rule 32 on this constitutional ground.  See 28 U.S.C. §2254; Williams v. Taylor, 529 U.S. 362, 375, 379, 385-86, 387, 389 (2000).

The conclusion of the December 2000 memorandum that the denial of this evidence was, in effect, error without injury does not withstand scrutiny.  As the memorandum notes, the evidence against Landers was all circumstantial. Circumstantial evidence, from its nature, is accepted only with great caution.  See Watson v. Adams, 187 Ala. 490, 65 So. 528, 532 (1914).  Where a prosecution is based on circumstantial evidence consisting of independent facts and circumstances it is like a chain which is no stronger than its weakest link.  See Calloway v. State, 473 So.2d 601, 603 (Ala.Crim.App. 1985); Carr v. State, 28 Ala. App. 466, 468, 187 So. 252, 254 (1939).  In a circumstantial evidence case each item of evidence is a  critical link.  The error without injury doctrine cannot eliminate the prejudice of this misconduct by the prosecution that affected critical evidence.

No evidentiary hearing was conducted where all facts relating to the State's destruction of this evidentiary material could be examined.  At a minimum, the dismissal of the grounds of the petition raising this issue should be

67

remanded for a hearing to determine if Landers' due process rights were violated by the destruction of evidence.

**Issue 9** - Was the destruction by the State, and its failure to produce, notes of a post-mortem examination made by the medical examiner a denial of due process guaranteed by the U.S. Constitution?

The State also destroyed a page from the report of the medical examiner containing findings supporting a conclusion that the victim's death was accidental (XR 1951). The December 15, 2000 memorandum glosses over this failure of the State to comply with its due process obligation by, in effect, applying the error without injury doctrine to this prosecution dereliction. This conclusion is patently erroneous. In this circumstantial evidence case every item of evidence was a critical link. Having the medical examiner's written words to contradict his trial testimony would have far more jury effect than his mere admission of a conclusion with no details of the facts which he found and recorded that were favorable to Landers. The destruction of this vital evidence cannot be error without injury.

As discussed under Issue 8, the destruction of this vital evidence showed bad faith under the circumstances. Further evidence of bad faith is the fact this was a record required by statute to be made and kept. See ALA. CODE §36-18-2 (1975). This was a known record of findings in a criminal

68

prosecution and was favorable to the defense. Depriving Landers of its use at trial was a violation of an established Federal constitutional right. The ruling of the trial court and of this Court are in conflict with the clearly established Federal authorities on this subject and do not serve as a basis for preclusion. Relief from Landers' conviction for this reason is mandated by the U.S. Constitution and Rule 32.1.

**Issue 10** - Was the Appellant denied due process by being convicted when no evidence connected him with the offense with which he was charged?

It is established Federal law, declared by the U.S. Supreme Court, that it is a violation of due process to convict an accused of an offense where no evidence presented at trial connects the accused with the charged offense. See Bunkley v. Florida, 538 U.S. 835, 840 (2003); Garner v. Louisiana, 368 U.S. 157, 164 (1961); Thompson v. Louisville, 362 U.S. 199, 206 (1960). The conviction of Landers in this case offends this principle. The prior decision of the trial court and this Court on appeal upholding the sufficiency of the evidence to support his conviction are contrary to this principle.

An objective review of the evidence in this case shows no connection between Landers and the death of the victim.

Without such an evidentiary connection Landers' conviction amounts to a denial of due process under the cited authorities and entitles him to relief under Rule 32.1(a).

<u>CONCLUSION</u>

For the several reasons discussed in this brief the trial court's order was erroneous. Appellant prays that the order be reversed and rendered because of the jurisdictional defect discussed under Issue 5, or alternatively, that this case be remanded with directions that an evidentiary hearing be conducted. Appellant further prays that in the event of remand the Court will direct that this proceeding be assigned to a different judge.

Respectfully submitted,

William H. Mills
ASB-9841-M75W

and

William N. Clark
ASB-1260-C54W
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX

Attorneys for Appellant
Mark Samuel Landers

70

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama, and the District Attorney for the 19th Judicial Circuit of Alabama, by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the _12TH_ day of January 2006.

_Of Counsel for Appellant_

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

71

Appendix A

## LIST OF ADVERSE RULINGS

Record Page Number                        Description

C 167-71                        Order denying Rule 32 petition

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**



RELEASED
APR 2 1 2006
CLERK
ALA COURT CRIMINAL APPEALS

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

**MEMORANDUM**

CR-05-0287                    Elmore Circuit Court 96-421.60

<u>Mark Samuel Landers v. State</u>

McMILLAN, Judge.

The appellant appeals from the trial court's order summarily dismissing his Rule 32 petition for post-conviction relief.

The appellant's underlying conviction was for capital murder, a violation of § 13A-5-40(a)(7), Ala. Code 1975. He was sentenced to life imprisonment without parole. His

1



EXHIBIT
F

conviction was affirmed on direct appeal and became final when our Supreme Court quashed the writ of certiorari on June 18, 2004.

In his petition, the appellant raises the following grounds for relief:

1. The State failed to turn over blood specimens taken from the frame of his father's eyeglasses, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and general due process rights.

2. The State failed to turn over blood specimens taken from the "upper portion of the [eyeglass] lens," in violation of <u>Brady</u>, as well as his due process rights.

3. The State failed to disclose the medical examiner's notes, which were referred to at trial as the "first autopsy report," in violation of <u>Brady</u>, as well as his due process rights.

4. He was denied due process rights when the trial court refused to postpone closing arguments until after the funeral of his lead counsel's father.

5. He was denied due process of law and his trial was unfair because the State delayed his indictment.

6. He was denied due process and his trial was unfair because the State "failed to disclose and correct false evidence" (i) from Vickie Goolsby regarding the alleged molestation by her father and the denial of her relationship with ABI Agent William Rhegness and (ii) from William Rhegness that he did not have an affair with Ms. Goolsby and did not visit her home.

7. He was in possession of "newly discovered" evidence in the form of eyeglasses in the possession of his mother, allegedly given to her by Sheriff Franklin on February 12, 1992, and "unknown" to the defense until "well after the completion of Landers's trial and his conviction and

2

sentence", which established his "innocence".

8. His due process and constitutional rights were violated when the charge in his indictment, that he killed his father by crushing him with a bulldozer, varied from the evidence presented at trial that his father was struck in the head.

9. The evidence presented at trial was insufficient to support his capital murder conviction.

An examination of the record reveals that the appellant's claims 1 and 2 were precluded from review because they could have been, but were not, raised at trial or on appeal. Rule 32.2(a)(3) and (5), Ala. R. Crim. P. The appellant's claims 3, 4, and 5, were precluded from review because that were raised and addressed on appeal. Rule 32.2(a)(4), Ala. R. Crim. P. In its motion to dismiss, the State argued that the appellant's claim 6 was precluded from review because it could have been, but was not, raised at trial. Rule 32.2(a)(3), Ala. R. Crim. P. Additionally, the State argued that the claim was insufficiently pleaded, pursuant to Rule 32.3, Ala. R. Crim. P. This Court need not address the argument, however, because it was not raised on appeal. The appellant's claim 7(a) did not satisfy the "newly discovered evidence" test, and therefore, lacked merit. The appellant's claim 7(b) was precluded because the issue of the appellant's father's eyeglasses was raised at trial and could have been

3

investigated at that time.  Rule 32.2(a)(3), Ala. R. Crim. P.
The appellant's claim 7(c) that the evidence established his
"innocence", was precluded because the issue was raised at
trial and on appeal.  Rule 32.2(a)(2) and (4), Ala. R. Crim.
P.  The appellant's claim 8 could have been, but was not,
raised at trial.  Rule 32.2(a)(3), Ala. R. Crim. P.  Claim 9
was precluded from review because it was raised and addressed
on appeal.  Rule 32.2(a)(4), Ala. R. Crim. P.

Because all of the claims raised by the appellant were
procedurally precluded from review, the trial court was
correct in summarily dismissing the Rule 32 petition.  Rule
32.7(d), Ala. R. Crim. P.

The judgment of the trial court is affirmed.

AFFIRMED.

Cobb, Shaw, and Wise, JJ., concur.  Baschab, J., recuses
herself.

4

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

Case Number - CR-05-0287


MARK SAMUEL LANDERS

Appellant

vs.

STATE OF ALABAMA

Appellee


Appeal from the Circuit Court of Elmore County, Alabama
Case Number CC-96-421.60


**<u>APPLICATION FOR REHEARING</u>**


William H. Mills
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama  35203
(205)  322-0457

Attorneys for Appellant



EXHIBIT
G
PENGAD-Bayonne,N.J.

**TO THE COURT OF CRIMINAL APPEALS OF ALABAMA:**

COMES NOW the Appellant and applies to the Court for a rehearing from the judgment entered on April 21, 2006. Appellant prays that the Court will withdraw and set aside its said judgment.

## I.

As grounds for this application for rehearing Appellant avers that the Court erred, separately and severally, in its April 21, 2006 judgment and memorandum as follows:

1.    In failing to consider and rule on the issue raised by the Appellant that the indictment in this case did not create subject-matter jurisdiction for a conviction of the Appellant on the evidence presented against him at trial.

2.    In concluding that a summary dismissal of Appellant's petition without a hearing was permissible under Rule 32.7(d) of the Alabama Rules of Criminal Procedure.

3.    In restricting the scope of relief mandated by 32.1(a) of the Alabama Rules of Criminal Procedure in cases based on rights guaranteed by the United States Constitution.

4.    In concluding that the Appellant did not make a prima facia showing in his petition of newly discovered evidence under Rule 32.1(e) of the Alabama Rules of Criminal Procedure.

-1-

5. In ignoring an obvious due process flaw in this prosecution – the failure of the indictment to give the Appellant notice of the offense he was actually called on to defend against, thereby depriving him of due process rights guaranteed by the United States Constitution.

6. In failing to consider and rule on several issues raised by the Appellant that prior State court adjudications did not preclude relief because the adjudications were in conflict with or unreasonable applications of established Federal law or were unreasonable determinations of fact based on the evidence presented.

## II.

The Appellant, being unsatisfied with the facts stated in the unpublished memorandum issued by the Court as the basis for its decision, submits the following as an appropriate statement of facts for this case:

The trial court conducted no evidentiary hearing (C 167; R 1-19). The facts for purposes of appellate review are those alleged in Landers' petition and the judicially noticed facts appearing in the appeal record of the underlying case (Case Number CR-97-0194) pursuant to the Court's order of December 29, 2005, which reads:

> Appellant's motion to supplement the record
> on appeal is denied. However, this Court

-2-

will take judicial notice of the records in
CR-97-0194.

Landers was indicted for the capital murder of Robert
Landers on October 4, 1996 for a homicide that allegedly
occurred on February 12, 1992 (XC 9-10).[1] The only *quo modo*
of the offense alleged in the indictment was:

> ...by running over and crushing him with a
> bulldozer. (XC 9).

This indictment was never amended.

Bond was denied pending trial and Landers has been
incarcerated at all tines after indictment (XC 16-19).

The victim's body was found near a construction site on
the evening of February 12, 1992 (XR 1010-12). The body was
lying partially under the right track of a bulldozer (XR
1012). One of the first officers at the scene saw an eye
glasses case near the victim's head as he lay under the right
track of the bulldozer (XR 2201, 2202, 2203). This officer
did not retrieve the case (XR 2202).

On the night of February 12, 1992, at the scene where the
victim's body was found, Elmore County Sheriff Franklin handed
to Lenita Landers, the victim's wife, two rings, a wallet, and

---

[1] Reference to the prior appeal record (CC-96-421, CR-
97-0194, and 1001070) will be by "XC" followed by a page
number for reference to the Clerk's Record portion and "XR"
followed by a page number for reference to the Reporter's
Transcript portion of that record. Reference to the Court's
December 15, 2000 Memorandum will be by "12/15/00 Memo.".

-3-

a glasses case containing a pair of glasses, all of which belonged to the victim (C 25, 38). Mrs. Landers placed these items in her coat pocket (C 38). When she arrived home later that night she placed these items, including the glasses case, in a rarely used dresser drawer (C 39). She did not look in this drawer again for over five years, and forgot about the items she had placed there (C 39). She was never asked about the glasses (C 39). Had she been asked about the glasses at the time of Landers' trial she would have been unable, due to passage of time and loss of memory, to recall their existence or location (C 39).

Sometime shortly before or during Landers' trial Mrs. Landers was asked to locate photographs of her husband (C 40). She reasoned that his drivers license should have a photograph and should be in his wallet (C 41). She searched for a wallet and located the wallet the Sheriff had given her on February 12, 1992 in the drawer where she had placed it that night (C 41). The wallet was not obscured by other contents of the drawer (C 41). She removed the wallet and found a drivers license in it (C 41). She took the wallet to Landers' trial (C 41). Thirty days or more after Landers was sentenced, Mrs. Landers decided to put the wallet back into the drawer from which she had taken it (C 42). When she opened the drawer she

saw for the first time since she placed it there on February
12, 1992 the glasses case the Sheriff had given her on that
date (C 42). She recognized the case as the case in which her
husband regularly carried his glasses (C 42). At that time
she opened the case and found a pair of wire rimmed glasses,
the glasses her husband regularly wore and used in the period
immediately preceding his death (C 42). Upon seeing these
glasses on this occasion Mrs. Landers recalled for the first
time since February 12, 1992 that the Sheriff had handed her
these wire rimmed glasses and other items on that night (C
42).

Mrs. Landers never told anyone about these glasses (C
42). Only she had access to the drawer where they were stored
(C 43). Neither Landers nor his counsel ever saw and neither
was ever told about the glasses until they were told about
them shortly before the filing of the present petition (C 22,
43). The condition of the wire rimmed glasses and case is
unchanged from the time they were given to Mrs. Landers by the
Sheriff on February 12, 1992 (C 22). Neither Landers nor his
attorneys knew of the existence of the  glasses until well
after the completion of Landers' trial and post-trial motions
(C 25-26). Neither Landers nor his attorneys could have
discovered the glasses at an earlier time because the only

person with any knowledge of their existence and whereabouts,
Mrs. Landers, did not disclose their existence or whereabouts
to anyone (C 26).  Mrs. Landers did not discover them herself
until she accidentally discovered them shortly before Landers'
petition was filed (C 26).

On the evening of February 12, 1992 a large crowd -
including spectators - gathered at the scene where the
victim's body was found (XR 1172, 1191, 1192). The bulldozer
was picked up by a wrecker to allow removal of the body (XR
1076).  A truck and trailer that were near the bulldozer were
moved (XR 1079, 1147). Between the evening of February 12,
1992 (when the body was discovered) and February 13, 1992
(when State's Exhibit 10, a pair of plastic rimmed glasses was
discovered) the scene was not secured (XR 1068).

On February 13, 1992 investigators returned to the scene
and moved the bulldozer; and at that time saw a pair of
plastic rimmed glasses on the ground where the left track of
the bulldozer had been (XR 1106-10).  These plastic rimmed
glasses were identified at trial as State's Exhibit 10
(hereafter "Ex.10") (XR 1011).

At trial the State introduced Ex. 10, eye glasses with
thick plastic rims and a deformed left leg, into evidence (XR
1852).  State's Exhibits 23-A and 23-B are photographs of

-6-

these glasses (XR 1928; XC 1063-66).  These glasses were
turned over to the Department of Forensic Sciences after
retrieval at the scene (XR 1927).  A blood stain on the frame
was tested for blood type by a technician in the Department
(XR 1431-33).  This technician also did an ABO blood test on
a blood specimen taken from the victim's body (XR 1433).  The
blood type of both was Type O (XR 1434).  Based on this blood
typing the medical examiner assumed Ex. 10 was the victim's
glasses and used the glasses in explaining his theory of how
the victim was killed and the cause of death (XR 1927-28,
1940-41).

The medical examiner testified that the cause of death
was being struck on the left temple with a blunt instrument(XR
1941). He explained this conclusion by describing two distinct
sets of injuries on the victim's body (XR 1901-02).  One set
was to the left temple where something blunt struck the head
with sufficient force to break the skull and depress the skull
bones down into the brain (XR 1901, 1910, 1919-21, 1922).  The
temple injury occurred before the victim was run over by the
bulldozer (XR 1922-24).  The bulldozer did not cause the
fractures to the left temple (XR 1922).  The crushing injuries
to the body, including to the skull, produced little bleeding,
an indication the victim was dead when run over by the

-7-

bulldozer (XR 1904, 1910, 1921, 1923, 1929-40).

The medical examiner used the plastic rimmed glasses (Ex. 10) to illustrate and support his theory that the victim was killed by a blow to the temple before he was run over by the bulldozer (XR 1926-40). He reconstructed the victim's skull from bone fragments and placed the plastic rimmed glassed on the reapproximated skull (XR 1917). In his opinion, a deformity in the left leg of the plastic rimmed glasses (Ex. 10) matched the temple injury and showed the victim was struck in the temple by a blunt instrument (XR 1927, 1940-41; XC 1115-20).

In opening statement the State emphasized that a blow to the left temple killed the victim. The prosecutor stated that the victim was struck in the temple and was then dragged around and run over by the bulldozer as a means of concealing the blow to the head (XR 938, 946-47). The prosecutor emphasized the importance of the plastic rimmed glasses in this theory, and their connection to the victim, by pointing out that the blood on the glasses was the same type as the victim's (XR 944). The prosecutor referred to the fact that when the plastic rimmed glasses (Ex. 10) were placed on the victim's reconstructed skull a deformity in the left leg coincided with the temple injury (XR 947). In closing

-8-

argument the State reiterated the blow to the head theory (XR 287-89). The prosecutor again stressed the fact that the plastic rimmed glassed (Ex. 10) confirmed the theory by showing the point where the victim was struck on the head (XR 239). The prosecutor again pointed to the blood on Ex. 10, and the typing of it, as proof that the plastic rimmed glasses were the victim's glasses and were proof of the blow to the head theory (XR 2390, 2400, 2406).

There was testimony at the trial that the plastic rimmed glasses (Ex. 10) were not the victim's glasses. The victim's glasses were described as wire rimmed, not plastic rimmed, glasses (XR 2080, 2168-71). Photographs showed the victim wearing wire rimmed glasses (XC 1635-39). The proffered newly discovered evidence is the victim's wire rimmed glasses which were not part of the evidence at trial (C 42).

Landers made several pretrial requests or filed motions seeking discovery or disclosure (XC 28, 32, 62, 161). His requests included "tangible objects", "any other things ... which are intended for use by the State ... as evidence at trial", "objects or other tangible things which are relevant to this cause or are material to Defendant's defense", and "exculpatory evidence" (XC 33, 34). One of his motions showed the State had not produced a portion of a February 13, 1992

-9-

report of a post-mortem examination, tissue blocks and glass slides used in a post-mortem examination, and other materials relating to a post-mortem examination (XC 261-62). Landers also filed a motion to dismiss the indictment for the State's failure to produce blood samples (XC 266-70).

The State responded to the discovery requests by producing sundry materials which are described in its responses to discovery (XC 42-51, 65-66, 73-83, 135-50, 231-33). The responses do not list glasses, blood or tissue specimens, or February 13, 1992 post-mortem notes. The State produced no glasses, blood or tissue specimens (C.13,14-15, 16, 17) or the dictated notes of the findings from the February 13, 1992 post-mortem examination (C 18).

The testimony of the Forensic Sciences Department medical examiner and a technician were a major part of the State's case (XR 1428-37, 1890-1997). The medical examiner testified that a blood specimen was drawn from the victim's body on February 13, 1992 (XR 1908) and transmitted to the technician (XR 1943). The medical examiner testified he examined the plastic rimmed glasses identified as Ex. 10 and used them in his examination of the victim's body (XR 1927-28). He described the victim's skull and the injuries to it and stated he reconstructed the skull from bone fragments (XR 1923-24,

-10-

1926-27). He illustrated his testimony by photographs (XR 1929-41;C 1068-1120). Except for a small portion, the victim's skull was not retained (XR 1966). It was disposed of at some undetermined time, possibly after Landers' indictment (XR 1966).

The medical examiner dictated a report of his February 13, 1992 examination of the victim's body onto a recording device (XR 1951). The dictation was not transcribed and has been destroyed (XR 1951).

A Forensic Sciences technician testified that blood taken from the plastic rimmed glasses (Ex. 10) and a vial of blood given to her by the medical examiner were analyzed by the ABO method (XR 1432-34). The blood from the glasses was used up in the testing and the vial of blood obtained from the medical examiner was destroyed (XR 1437).

The medical examiner's work on this case, the primary foundation for the prosecution, was completed within three months after March 3, 1992 (XR 1952). A deposition of Landers taken in a civil case on November 5, 1992 was used as evidence by the State (XR 1481-1659; XC 1459-1546).

The bulldozer under which the victim's body was found was examined and used by the State in experiments conducted soon after February 12, 1992 (C 21; XC 1043-46, 1184-90, 1283-91,

1351-98). Because the bulldozer was no longer available after Landers' indictment he had no opportunity to conduct experiments with it and had no opportunity to conduct experiments at the unaltered scene (C 21-22). The trial court rejected experiments offered by Landers at trial, which were conducted after indictment in October 1996, because they were not conducted with the same bulldozer and the area where they were conducted was different from the area where the victim's body was found (XR 2043-46).

In the interim between November 1992, when the State completed the collection of the evidence it used at trial, and the indictment in October 1996, three persons (Barry Worth, Rubin Jarrell, and Orender Jarrell) who could have offered testimony favorable to Landers died (C 21). Had the prosecution against Landers been instituted earlier: (1) the bulldozer, the subject of tests and experiments by the State, would have been available to Landers for tests and experiments (C 21-22); (2) the State would not have destroyed the blood and tissue specimens it destroyed before trial (C 22-23); (3) the notes of the medical examiner's original examination would not have been destroyed (C 23); and (4) the newly discovered evidence would have been remembered, found, and available for use as evidence at trial (C 23).

On the evening of May 7, 1997 the father of Landers' lead counsel died (XC 2298). The funeral was scheduled for Saturday, May 10, 1997. The trial judge refused to postpone closing arguments until after the funeral and scheduled them for May 9, 1997 (XR 2300, 2307). The State contended, and the memorandum of this Court entered with its December 15, 2000 decision finds, "the record reflects that the Judge was obligated to be in Baldwin County to preside over a case as a special judge on the following Monday" (See 12-15-00 Memo. p.36). This conclusion is incorrect; the trial judge was only assigned as an "additional judge" in Baldwin County for the week beginning May 12, 1997 (C 166).

At trial the State offered no testimony from a witness who observed Landers at the time the victim was killed, or who saw Landers in possession of any blunt instrument that the State claimed killed the victim, or who heard Landers conspire with any other person to kill the victim (XR 1-2291).

### III.

Appellant prays that the Court will withhold its certificate of affirmance during the pendency of this application.

-13-

<u>IV.</u>

Appellant submits a brief in support of this application for rehearing.

Respectfully submitted,

William H. Mills
ASB-9841-M75W

and

William N. Clark
ASB-1260-C54W
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX

Attorneys for Appellant

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama, and the District Attorney for the 19th Judicial Circuit of Alabama, by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the _2nd_ day of May 2006.

Of Counsel for Appellant

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

Case Number - CR-05-0287


MARK SAMUEL LANDERS

Appellant

vs.

STATE OF ALABAMA

Appellee


Appeal from the Circuit Court of Elmore County, Alabama
Case Number CC-96-421.60


BRIEF IN SUPPORT OF APPLICATION FOR REHEARING


William H. Mills
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama  35203
(205)  322-0457

Attorneys for Appellant

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

Case Number - CR-05-0287


MARK SAMUEL LANDERS

Appellant

vs.

STATE OF ALABAMA

Appellee


Appeal from the Circuit Court of Elmore County, Alabama
Case Number CC-96-421.60


**BRIEF IN SUPPORT OF APPLICATION FOR REHEARING**


William H. Mills
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama  35203
(205)  322-0457

Attorneys for Appellant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . i-iii

STATEMENT OF CASE . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED BY APPLICATION FOR REHEARING . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 3

    Ground 1 . . . . . . . . . . . . . . . . . . . . . 3

    Ground 2 . . . . . . . . . . . . . . . . . . . . . 6

    Ground 3 . . . . . . . . . . . . . . . . . . . . . 8

    Ground 4 . . . . . . . . . . . . . . . . . . . . . 9

    Ground 5 . . . . . . . . . . . . . . . . . . . . . 13

    Ground 6 . . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 14

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . 16

## TABLE OF AUTHORITIES

Baldwin County v. Palmtree Penthouses, Ltd., 831
    So.2d 603, 605 (Ala. 2002) . . . . . . . . . . . . 4

Branzburg v. Hayes, 408 U.S. 665, 687 (1972) . . . . . 5

Burgess v. State, 44 Ala. 190, 192-93 (1870) . . . . . 5

Cooper v. Watts, 280 Ala. 236, 191 So.2d 519,
    522 (1966) . . . . . . . . . . . . . . . . . . . . 7

Davis v. State, 245 Ala. 589, 18 So.2d 282, 284 (1944) . 12

Deas v. State, 844 So.2d 1286, 1288
(Ala.Crim.App. 2002) . . . . . . . . . . . . . . . . 4

i

Ex Parte Adams, 2005 WL 3506662 (Ala. 2005) . . . . . . .  8

Ex Parte Cole, 842 So.2d 605, 607 (Ala. 2002) . . . . . .  5

Ex Parte Dixon, 804 So.2d 1075, 1078 (Ala. 2000) . . . .  4

Ex Parte Gonzales, 686 U.S. 204, 206 (Ala. 1996) . . . .  5

Ex Parte Land, 775 So.2d 847, 852 (Ala. 2000) . . . . . . 11

Ex Parte Rice, 565 So.2d 606, 608 (Ala. 1990) . . . . . .  7

Ex Parte Smith, 438 So.2d 766, 768 (Ala. 1983) . . . . .  4

Ex Parte State, 899 So.2d 1025, 1033, 1034 (Ala. 2004) .  5

Ex Parte State, 922 So.2d 144 (Ala. 2005) . . . . . . . .  6

Ex Parte Walker, 800 So.2d 135, 138 (Ala. 2000) . . . . . 11

Ex Parte Weeks, 611 So.2d 259, 261 (Ala. 1992) . . . . .  7

Fincher v. State, 837 So.2d 876, 881
     (Ala.Crim.App. 2002) . . . . . . . . . . . . . . . .  4

Hamilton v. State, 828 So.2d 957, 959
     (Ala.Crim.App. 2002) . . . . . . . . . . . . . . . .  4

Hill v. Tucker, 889 So.2d 583, 586 (Ala.Civ.App. 2004) .  4

Johnson v. Johnson, 707 So.2d 161, 162-65
     (Ala.Civ.App. 1997) . . . . . . . . . . . . . . . . 12

Johnson v. State, 922 So.2d 137 (Ala.Crim.App. 2005),
     cert.denied . . . . . . . . . . . . . . . . . . . .  6

Mason v. State, 259 Ala. 438, 66 So.2d 557, 559 (1953) .  5

Pacifico v. Jackson, 562 So.2d 174, 177 (Ala. 1990) . . . 11

Parker v. State, 719 So.2d 259, 260 (Ala.Crim.App. 1997) 10

Rice v. State, 682 So.2d 484 (Ala.Crim.App. 1995) . . . . 10

<u>Russell v. United States</u>, 369 U.S. 749, 766, 770-71
    (1962) . . . . . . . . . . . . . . . . . . . . .   5

<u>T.B. II v. State</u>, 819  So.2d 108, 110
    (Ala.Crim.App. 2001) . . . . . . . . . . . . . .   7


U.S. CONST. Amend. 6 . . . . . . . . . . . . . . . .  13

U.S. CONST. Amend. 14 . . . . . . . . . . . . . . . .  13

28 U.S. Code §2254(d) . . . . . . . . . . . . . . . .   8

ALA. CONST. §6 (1901) . . . . . . . . . . . . . . . .  13

A.R.Crim.P. 32  . . . . . . . . . . .  1, 4, 6, 7, 8, 14, 15

A.R.Crim.P. 32.1(a) . . . . . . . . . . . . . . .  2, 8, 9

A.R.Crim.P. 32.1(a)(e) . . . . . . . . . . . . . . .  12

A.R.Crim.P. 32.1(e) . . . . . . . . . . . .  2, 10, 11, 13

A.R.Crim.P. 32.2  . . . . . . . . . . . . . . . . .  5, 7

A.R.Crim.P. 32.2(a)(3) . . . . . . . . . . . . . . .   4

A.R.Crim.P. 32.3  . . . . . . . . . . . . . . . . . .   7

A.R.Crim.P. 32.7(d) . . . . . . . . . . . . . . . . .   2

A.R.App.P. 40(g) . . . . . . . . . . . . . . . . . .   3

## STATEMENT OF THE CASE

On May 31, 2005 Appellant (hereinafter "Landers") filed a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure from a judgment of conviction for capital murder and a life sentence entered on July 1, 1997(C 4-43). The conviction was affirmed by this Court on December 15, 2000 and re-hearing was denied on March 2, 2001 (Case Number CR-97-0194). Landers timely petitioned for certiorari in the Supreme Court, which was granted on August 30, 2001, but which was quashed on June 18, 2004 (Supreme Court Case Number 1001070).

On June 10, 2005 Landers filed a motion for leave to amend his petition to assert additional grounds for relief (C 49-55). The motion was not expressly ruled on by the trial court; however, the State's response (C 56-163) acknowledged and answered the amendment, the amendment was argued at the hearing of the State's motion (R 1-19), and the trial court ruled on the grounds contained in the amendment (C 171).

On July 12, 2005 the State filed a motion to dismiss the petition as amended (C 56-143). The State's motion was set for argument (C 144). Landers filed an opposition to the State's motion (C 145-66). Following oral argument of the State's motion (R.1-19) the trial court denied Landers'

1

petition on September 23, 2005 (C 167-71). Landers filed notice of appeal on November 3, 2005 (C 172). On April 21, 2006 the judgment of the trial court was affirmed by memorandum.

## ISSUES PRESENTED BY APPLICATION FOR REHEARING

1. Did the Court err in failing to consider and rule on the issue raised by the Appellant that the indictment in this case did not create subject-matter jurisdiction for a conviction of the Appellant on the evidence presented against him at trial?

2. Did the Court err in concluding that a summary dismissal of Appellant's petition without a hearing was permissible under Rule 32.7(d) of the Alabama Rules of Criminal Procedure?

3. Did the Court err in restricting the scope of relief mandated by 32.1(a) of the Alabama Rules of Criminal Procedure in cases based on rights guaranteed by the U.S. Constitution?

4. Did the Court err in concluding that the Appellant did not make a prima facia showing in his petition of newly discovered evidence under Rule 32.1(e) of the Alabama Rules of Criminal Procedure?

5. Did the Court err in ignoring an obvious due process flaw in this prosecution - the failure of the indictment to

give the Appellant notice of the offense he was actually called on to defend against, thereby depriving him of due process rights guaranteed by the U.S. Constitution?

6.  Did the Court err in failing to consider and rule on several issues raised by the Appellant that prior State court adjudications did not preclude relief because the adjudications were in conflict with or unreasonable applications of established Federal law or were unreasonable determinations of fact based on the evidence presented?

## STATEMENT OF FACTS

A statement of facts is included in the application and is not included in this brief.  See A.R.App.P. 40(g).

## ARGUMENT

The Court's April 21, 2006 memorandum concludes the trial court was correct in dismissing Landers' petition without a hearing because "all of the claims... were procedurally precluded from review".  This conclusion is demonstratively wrong for several reasons.

## Ground 1 - Jurisdictional Defect

The most confounding error in the April 21, 2006 decision is its failure to recognize, deal with, discuss, and explicitly rule on the jurisdictional issue raised by the Appellant.  An obvious jurisdictional flaw is present in this

prosecution which inculcates relief from the conviction.

The only comment in the April 21, 2006 memorandum regarding the jurisdictional flaw is the terse comment that "claim 8 could have been, but was not, raised at trial". Presumably, the Court is saying that the jurisdictional claim was waived. This position is contrary to well established precedents that jurisdictional flaws cannot be waived. See Fincher v. State, 837 So.2d 876, 881 (Ala.Crim.App. 2002); Deas v. State, 844 So.2d 1286, 1288 (Ala.Crim.App. 2002). Such defects may be raised for the first time on appeal. See Ex Parte Dixon, 804 So.2d 1075, 1078 (Ala. 2000); Hamilton v. State, 828 So.2d 957, 959 (Ala.Crim.App. 2002). A court has the duty to notice jurisdictional defects ex mero motu or sua sponte. See Baldwin County v. Palmtree Penthouses, Ltd., 831 So.2d 603, 605 (Ala. 2002); Ex Parte Smith, 438 So.2d 766, 768 (Ala. 1983); Hill v. Tucker, 889 So.2d 583, 586 (Ala.Civ.App. 2004). Any jurisdictional defect in this case could not have been waived by failure to raise it. This Court was duty bound to notice it - which it has not done.

Moreover, Rule 32 specifically provides that the preclusion doctrine does not apply to jurisdictional claims. A.R.Crim.P. 32.2(a)(3). Therefore, Landers' lack of jurisdiction claim was not waived by failure to raise it

4

earlier, Rule 32.2 expressly prohibits its preclusion, and should be noticed and ruled on by this Court.

The genesis and the boundary of jurisdiction for a felony prosecution are the words of a grand jury indictment. The jurisdiction to try and convict a defendant of an offense does not extend beyond the offense described by the words of an indictment. See Ex Parte State, 899 So.2d 1025, 1033, 1034 (Ala. 2004); Ex Parte Cole, 842 So.2d 605, 607 (Ala. 2002); Burgess v. State, 44 Ala. 190, 192-93 (1870). The jurisdiction created by an indictment is limited to the conduct alleged in the indictment. See Ex Parte Cole, supra. To extend the authority of a court to try a defendant for conduct not specified in an indictment – as is discussed in more detail in the Appellant's brief – is a denigration of the role of the grand jury in our system and emasculates the adherence of our jurisprudence to the ideal of due process and the rule of law. See Branzburg v. Hayes, 408 U.S. 665, 687 (1972); Russell v. United States, 369 U.S. 749, 766, 770-71 (1962); Ex Parte Gonzales, 686 U.S. 204, 206 (Ala. 1996); Mason v. State, 259 Ala. 438, 66 So.2d 557, 559 (1953); Burgess v. State, 44 Ala. 190, 192-93 (1870).

This doctrine is not new and is not eroded by passage of time. See cases cited in Appellant's brief, including Burgess

5

v. State, supra, and see Johnson v. State, 922 So.2d 137
(Ala.Crim.App. 2005), cert.denied, Ex Parte State, 922 So.2d
144 (Ala. 2005).  It should be applied in this case and the
judgment held void because it was based on proof of conduct
not alleged in the indictment.  If this Court's affirmance of
the trial court on this issue is allowed to stand it amounts
to the grant of a license to every prosecutor to ambush every
defendant at trial by proving unalleged conduct as the basis
for a conviction.

### Ground 2 - Limited Basis for Summary Dismissal

An obvious generally pervasive flaw in the April 21, 2006
memorandum is lack of regard for the nature of a Rule 32
proceeding, the due process rights guaranteed a petitioner in
such a proceeding, and the precedents which have defined these
rights.  A reading of the April 21, 2006 memorandum - where
the Court concludes all claims, regardless of type or nature,
were "procedurally precluded" - would lead one to believe that
a Rule 32 proceeding was designed as a mere academic, futile
exercise and an illusory process which confers no rights to a
petitioner and where a petition can properly be summarily
denied at whim.  This is not the case.  Rule 32 establishes a
real and substantive judicial proceeding in which rights can
be  vindicated  after  judgment  which  were  denied  before

judgment. It is a proceeding in which a petitioner is entitled to due process of law. See Ex Parte Rice, 565 So.2d 606, 608 (Ala. 1990). It is a judicial proceeding in which due process means fair play and includes an opportunity to present evidence in support of claims asserted and an opportunity to controvert adversary claims. See Ex Parte Weeks, 611 So.2d 259, 261 (Ala. 1992); Cooper v. Watts, 280 Ala. 236, 191 So.2d 519, 522 (1966); T.B. II v. State, 819 So.2d 108, 110 (Ala.Crim.App. 2001).

Rule 32 does describe circumstances where relief is precluded. See A.R.Crim.P. 32.2. However, Rule 32.2 does not require a petitioner to preemptively negate preclusion. Rather, it places the burden on the State to plead a valid ground for preclusion and then gives a petitioner the opportunity to disprove the State's claim and makes the determination of the issue of preclusion dependent upon the proof. See A.R.Crim.P. 32.3. Where the determination of an issue is dependent upon proof an adversary hearing where evidence can be presented (and not a summary dismissal) is the obvious and certain precursor of a decision. It is doubtful that the State adequately plead grounds for preclusion for most of the issues raised in Landers' petition. However, even if preclusion was adequately plead, summary dismissal without

a hearing denied Landers his due process rights to present evidence to disprove the preclusion allegations. Such a summary dismissal is contrary to both the letter and spirit of Rule 32. Without an evidentiary hearing Rule 32 is transformed into something less than a judicial proceeding - a mere procedural apparition with no substance.

## Ground 3 - Scope of Relief Under Rule 32

The April 21, 2006 memorandum seems to assume that all issues which have been raised and decided by a State court are precluded as a ground for relief. Common sense, as well as Federal law, tells us this is not, and cannot be, the law. Rule 32.1(a) mandates relief where the "constitution of the United States...requires" it. The U.S. Constitution requires relief in some instances where a State court adjudication may have denied relief. Federal constitutional rights are, of course, decided by Federal law, not by State law. See Ex Parte Adams, 2005 WL 3506662 (Ala. 2005). Some State court adjudications do not deprive a State prisoner of a Federal constitutional right to release from confinement. Section 2254(d) of Title 28, U.S. Code, says that a State court adjudication is denied deference on the issue of Federal constitutional rights where the State court adjudication:

> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly

8

established Federal law as determined by the Supreme
Court of the United States; or (2) resulted in a
decision that was based on an unreasonable
determination of the facts in light of the evidence
presented in the State court proceeding. 28 U.S.C.
§2254(d).

Consequently, to preclude relief in this case by a State court

adjudication on the issues raised by Landers' petition the

State adjudication must meet the standards of Section 2254(d).

The State did not plead, or contend in argument, that the

adjudications it relied on met these standards. Without a

hearing there was no opportunity for proof on this issue.

Therefore, the summary dismissal of the issues involving prior

State court adjudications with no hearing to determine if

those adjudications met the Section 2254 standards was a

denial of due process and a denial of relief mandated by Rule

32.1(a). The blanket finding of preclusion by prior

adjudications in the April 21, 2006 decision is clearly

erroneous.

### Ground 4 - Newly Discovered Evidence

The discussion in the April 21, 2006 memorandum of the

newly discovered evidence ground is confusing. On pages 2-3

the memorandum identifies Ground 7 as the newly discovered

evidence ground. It follows, on pages 3-4, with references to

"appellant's claim 7(a)", "appellant's claim 7(b)", and

"appellant's claim 7(c)"., apparently treating each as a

9

separate ground for relief.  It is puzzling how these separate claims were identified and ruled on.

The newly discovered evidence proffered by the petition was one item - a pair of wire rimmed glasses.  These newly discovered wire rimmed glasses were proffered as substantive evidence contradicting  the State's evidence, and the theory of the prosecution that the victim was killed by a blow to the left temple rather than being run over by a bull dozer.  The State's evidence relied on a pair of plastic framed glasses with a deformed left leg, which the State contended coincided with the site of the left temple injury, to support its theory of the prosecution and the cause of the victim's death.

The assertion in the April 21, 2006 memorandum that "claim 7(a)" did not satisfy the newly discovered evidence test apparently means that the trial court correctly concluded, without a hearing, that the wire rimmed glasses were not newly discovered evidence within the meaning of Rule 32.1(e).  How the trial court could have reached this conclusion without an evidentiary hearing is not explained - for the obvious reason that it is not explainable.  When the trial court made this ruling it had only the allegations of the petition, which it was bound to take as true.  See Parker v. State, 719 So.2d 259, 260 (Ala.Crim.App. 1997); Rice v.

State, 682 So.2d 484 (Ala.Crim.App. 1995). The petition clearly shows newly discovered evidence within the meaning of Rule 32.1(e). The petition showed the newly discovered evidence was not known by Landers at the time of trial and post-judgment motions, could not have been discovered by him by reasonable diligence, was contradictory evidence and not merely impeaching, and would have shown Landers' innocence by disproving the corpus delicti. Under no perception of ordered and orderly jurisprudence - where due process is the rule - could this ground of the petition be summarily denied without a hearing. See Ex Parte Walker, 800 So.2d 135, 138 (Ala. 2000); Ex Parte Land, 775 So.2d 847, 852 (Ala. 2000).

The April 21, 2006 memorandum makes the following unintelligible assertion: "The appellant's claim 7(b) was precluded because the issue of appellant's father's eye glasses was raised at trial and could have been investigated at that time". If this is an assertion of non-diligence in discovering the wire rimmed glasses it is based on no evidence. If it is an assertion, as it seems to be, that if "investigated" all evidence will be revealed it is irrational. Newly discovered evidence must, of course, exist at the time of trial. See Pacifico v. Jackson, 562 So.2d 174, 177 (Ala. 1990). If every investigation were required to be perfect and

11

reveal all evidence there would be no need for a rule like Rule 32.1(a)(e) granting relief from a judgment based on newly discovered evidence. Diligence in investigating and discovering evidence is a relative term and must be resolved in view of the facts of each particular case. See <u>Davis v. State</u>, 245 Ala. 589, 18 So.2d 282, 284 (1944). There is no requirement that every possibility be considered and exhausted in order to make a post-judgment newly discovered evidence claim. See <u>Johnson v. Johnson</u>, 707 So.2d 161, 162-65 (Ala.Civ.App. 1997). Since the allegations of the petition were bound to be accepted as true, there is no basis in the record, or in the law, for denying the newly discovered evidence ground as precluded because of lack of diligence.

A third strange assertion in the April 21, 2006 memorandum is: "...claim 7(c)... was precluded because the issue was raised at trial and on appeal". This simply is a mistake. No issue was raised post-trial or on the appeal of newly discovered evidence in the form of wire rimmed glasses. No court has previously heard or ruled on this issue.

The petition clearly shows tangible evidence contradicting an important element of the State's case which was not available at the time of trial. This tangible evidence met all of the newly discovered evidence requirements

12

of Rule 32.1(e).  A denial of this ground of the petition without a hearing was manifestly erroneous.

### Ground 5 - Failure of Indictment to Give Notice

The U.S. Constitution, and the Alabama Constitution, require that an indictment give notice to a defendant of the offense that must be defended against.  See U.S. CONST. Amends. 6, 14; ALA. CONST. §6 (1901).  This requirement includes an allegation describing the allegedly criminal conduct.  As was discussed in Appellant's brief, the indictment in this case charged Landers with conduct different from the conduct proved at trial.  The indictment provided no notice of the conduct on which his conviction is based.  He stands convicted of conduct the grand jury never charged. This is an ambush - and a clear violation of Federal constitutional rights as declared by the U.S. Supreme Court. Any prior decision of this Court or the trial court sanctioning this due process denial does not meet the standards of Section 2254 and cannot preclude relief for this constitutional violation.  For that reason the April 21, 2006 decision is clearly erroneous.

### Ground 6 - Unwarranted Dismissal of Federal Law Claims

The April 21, 2006 memorandum concludes that the claims based on the destruction of and failure of the State to

13

produce tangible evidence, the failure to delay closing arguments because of the death of the father of Landers' counsel, the 4½ year delay in the indictment, and the absence of evidence connecting Landers with the commission of a crime were precluded because they were raised and addressed on appeal. Again, as was discussed above, the cited adjudications can preclude relief only if they conform to the standards of Section 2254.  As was discussed in the Appellant's brief, these rulings by the trial court and this Court conflict with established law declared by the U.S. Supreme Court, or are unreasonable applications of such law to the facts presented, or are unreasonable determinations of fact based on the evidence presented.  Therefore, these prior adjudications cannot justify the summary dismissal of these grounds for relief.

### Conclusion

This rehearing request places this Court in somewhat of a "fork of the road" position as to the significance of Rule 32.  The first fork - the fork taken by the April 21, 2006 decision - is: Rule 32 is a hollow exercise for the amusement of prosecutors because a petition can be denied at whim.  The other fork is: Rule 32 establishes real, substantive post-judgment rights for the rectification of pre-judgment errors.

14

Surely, no rational mind could conclude that Rule 32 was promulgated for no substantive and remedial purpose and that taking the first fork is proper. The errant departure of the April 21, 2006 decision should be corrected by granting this application for re-hearing.

Respectfully submitted,


_____
William H. Mills
ASB-9841-M75W


and


_____
William N. Clark
ASB-1260-C54W
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX
Attorneys for Appellant

15

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama, and the District Attorney for the 19th Judicial Circuit of Alabama, by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the _2nd_ day of May 2006.

_____
Of Counsel for Appellant

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

LAW OFFICES OF

# REDDEN, MILLS & CLARK

940 FINANCIAL CENTER

505 TWENTIETH STREET NORTH

## BIRMINGHAM, ALABAMA 35203

WILLIAM H. MILLS
WILLIAM N. CLARK
GERALD L. MILLER
STEPHEN W. SHAW
LAURA S GIBSON
KEITH E. BRASHIER

TELEPHONE (205) 322-0457
FACSIMILE (205) 322-8481

OF COUNSEL
L DREW REDDEN

May 2, 2006

<u>Certified Mail - Return Receipt Requested</u>

Mr. Lane Mann
Clerk, Court of Criminal Appeals
P.O. Box 301555
Montgomery, Alabama 36130

     Re: Mark Samuel Landers, Appellant VS.
        State of Alabama, Appellee
       Case Number: CR-05-0287

Dear Mr. Mann:


    Enclosed is an original and five copies of the Appellant's Application for Rehearing and Brief in Support of Application for Rehearing.

    Please return the enclosed extra copy to me stamped filed. I have enclosed a self-addressed envelope for this purpose.

    Thank you for your assistance in this matter.


          Very truly yours,

          William H. Mills


WHM/lan
Enclosure
cc: Troy King, Attorney General
    Randall V. Houston, District Attorney, Elmore County

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
 Clerk
Gerri Robinson
 Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

May 12, 2006

**CR-05-0287**

**Mark Samuel Landers v. State of Alabama  (Appeal from Elmore  Circuit Court: CC96-421.60)**

## <u>NOTICE</u>

You are hereby notified that on May 12, 2006 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

cc: Hon. Larry Dozier, Circuit Clerk
    William N. Clark, Attorney
    Stephanie N. Morman, Asst. Atty. Gen.



EXHIBIT
H

IN THE SUPREME COURT OF ALABAMA

Case Number _____

EX PARTE MARK SAMUEL LANDERS

Petitioner

IN RE:

Mark Samuel Landers, Appellant

vs.

State of Alabama, Appellee

Court of Criminal Appeals of Alabama
Case Number: CR-05-0287

Appealed from the Circuit Court of
Elmore County, Alabama
Case Number CC-96-421.60

**PETITION FOR WRIT OF CERTIORARI**
**TO THE COURT OF CRIMINAL APPEALS OF ALABAMA**

REDDEN, MILLS & CLARK
940 The Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 322-0457

Attorneys for Petitioner



**TO THE SUPREME COURT OF ALABAMA:**

Petitioner Mark Samuel Landers petitions the Court for a writ of certiorari to the Court of Criminal Appeals of Alabama, and in support thereof avers:

<u>I.</u>

The decision of the Court of Criminal Appeals which this petition seeks to review was rendered April 21, 2006 with an unpublished memorandum, a copy of which is attached as Exhibit A.  A timely filed application for rehearing was overruled on May 12, 2006 and a copy of the notice of this ruling is attached as Exhibit B.

<u>II.</u>

The appeal to the Court of Criminal Appeals was from an order of the Circuit Court of Elmore County which summarily denied, without an evidentiary hearing, Petitioner's post-conviction petition under A.R.Crim.P. 32 for relief from a capital murder conviction.

<u>III.</u>

As grounds for the issuance of the writ, Petitioner avers that the decision of the Court of Criminal Appeals is in conflict with prior decisions of the Supreme Court of the United States, the Supreme Court of Alabama, and the Alabama Court of Criminal Appeals.  Petitioner states that it is not

1

feasible to quote a part of the unpublished memorandum as demonstrative of the conflicts because facts, legal issues, and rationale are not discussed in it and no wording clearly shows the conflicts; therefore, A.R.App.P. 39(a)(1)(D)(2) applies. From its effect and results the said decision necessarily conflicts with the said prior decisions as follows:

A. The said decision erroneously decided that the indictment in this case, which charged Petitioner with killing the victim by "running over and crushing him with a bulldozer", created subject-matter jurisdiction to try and convict Petitioner for killing the victim by a different instrumentality and conduct - a blow to the side of the head with a blunt instrument.

1. The said decision necessarily decided that an indictment charging the commission of murder by one specific means and conduct creates subject-matter jurisdiction to try and convict the accused for committing murder by an entirely different means and conduct.

2. The said decision conflicts with:

a. Ex Parte Cole, 842 So.2d 605,607 (Ala. 2002), where this Court said:

> A valid indictment or complaint, giving the accused
> notice of the criminal charge against him, is the

2

source of the subject-matter jurisdiction to try a contested criminal case. (Citations omitted). Absent a valid indictment or complaint, a trial court would lack subject-matter jurisdiction to try, to convict, or to sentence a defendant in a contested criminal case.

b. <u>Burgess vs. State</u>, 44 Ala. 190, 192-93 (1870),

where this Court said:

And an indictment is an accusation in writing, presented by the grand jury of the county in which the crime has been committed, charging a person with an indictable offense.

This accusation constitutes the charge against the person alleged to be guilty of the crime on which the indictment is founded, and it should be "so set forth as to leave no doubt concerning its nature and its limits, and leave it impossible for the accuser to vary it in the course of the hearing."

c. <u>Mason vs. State</u>, 259 Ala. 438, 66 So.2d 557, 559

(1953), where this Court said:

Under our system of law when a defendant is charged in an indictment, he must be tried on that indictment. The purpose of the indictment is to limit and make specific the charges that the defendant will have to face on the trial.

d. <u>Gamble vs. State</u>, 758 So.2d 1125, 1126-27

(Ala.Crim.App.1999), where the Court of Criminal Appeals said:

While it is true that Gamble failed to object to the incorrect instruction at trial, we are required to reach this issue because it involves the question of jurisdiction. See *Ross v. State*, 529 So.2d 1074 (Ala.Cr.App.1988)("the [subject-matter] jurisdiction of the court, in felony cases, rests upon the utilization of a grand jury indictment or information").

e.  <u>Goetzman  vs.  State</u>,  844  So.2d  1289,  1291 (Ala.Crim.App. 2002) where the Court of Criminal Appeals said:

> However, Goetzman's second claim regarding the trial court's jurisdiction to accept his guilty plea to second-degree robbery when the indictment contained no facts to support such a conviction implicates the jurisdiction of the trial court.

B.  The  said  decision  erroneously  concluded  that Petitioner's lack of jurisdiction claim "could have been, but was not, raised at trial" and was "procedurally precluded from review" and was properly dismissed without a hearing.

1.  The  said  decision  necessarily  decided  that  a jurisdictional  claim  can  be  waived  and  is  precluded  from review in an A.R.Crim.P. 32 proceeding if not raised at trial.

2.  The said decision conflicts with:

a.  <u>Baldwin  County  vs.  Palmtree  Penthouses</u>,  831 So.2d 603, 605 (FN 4) (Ala. 2002), where this Court said:

> Furthermore, "'[s]ubject matter jurisdiction [cannot] be conferred by agreement nor can it be waived. Indeed, it is incumbent upon the court to notice [a lack of] subject matter jurisdiction *sua sponte.*' "

b.  <u>Ex Parte Smith</u>, 438 So.2d 766, 768 (Ala. 1983), where this Court said:

> Lack of subject matter jurisdiction may not be waived by the parties and it is the duty of an appellate court to consider lack of subject matter jurisdiction *ex mero motu.*

4

c. <u>Goetzman vs. State</u>, 844 So.2d 1289, 1291 (Ala.Crim.App. 2002) where the Court of Criminal Appeals said:

> Therefore, it [jurisdictional flaw] cannot be precluded.

d. <u>Gamble vs. State</u>, 758 So.2d 1125, 1126-27 (Ala.Crim.App.1999), where the Court of Criminal Appeals said:

> ...[W]e are required to reach this issue because it involves the question of jurisdiction. See *Ross v. State*, 529 So.2d 1074 (Ala.Cr.App.1988) ("the [subject-matter] jurisdiction of the court, in felony cases, rests upon the utilization of a grand jury indictment or information"); 1127 *McKinney v. State*, 549 So.2d 166, 168 (Ala.Cr.App.1989) ("[a] court's lack of subject-matter jurisdiction is fundamental, cannot be waived, and may be raised at any time").

C. The said decision erroneously sanctioned dismissal of an A.R.Crim.P. 32 petition which included a jurisdictional claim and a newly discovered evidence claim without a hearing based on a blanket assertion of preclusion.

1. The said decision necessarily decided that an A.R.Crim.P. 32 petition may be summarily dismissed without a hearing regardless of the claims and issues presented and with no consideration of the petitioner's due process rights.

2. The said decision conflicts with:

a. <u>Ex Parte Rice</u>, 565 So.2d 606, 608 (Ala. 1990), where this Court said:

> ...[T]he appellate courts of Alabama have extended the rights inherent in our concept of due process to

5

prisoners filing Rule 20 petitions. (Citations omitted).

\* \* \*

The State also argues that Rule 20.3 does not require it to plead a specific Rule 20.2 ground of preclusion. However, that argument ignores the obvious purpose behind the assignment of the burdens of pleading and proof in Rule 20.3. Under that Rule the State is required to plead the ground or grounds of preclusion that it believes apply to the petitioner's case, thereby giving the petitioner the notice he needs to attempt to formulate arguments and present evidence to "disprove [the] existence [of those grounds] by a preponderance of the evidence." Temp. Rule 20.3, Ala.R.Crim.P.

b. Ex Parte Weeks, 611 So.2d 259, 261 (Ala. 1992), where this Court said:

Procedural due process, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, § 6, of the Alabama Constitution of 1901, broadly speaking, contemplates the rudimentary requirements of fair play, which include ... information as to the claims of the opposing party, with reasonable opportunity to controvert them.

c. Alvis vs. State, 762 So.2d 380, 381 (Ala.Crim.App.1999), where the Court of Criminal Appeals said:

After conducting an evidentiary hearing on a Rule 32 petition, a trial court is required to make specific findings of fact relating to each material issue of fact presented. Rule 32.9(d), Ala.R.Crim.P. Furthermore, the petitioner is entitled to notice of the specific ground of preclusion upon which the circuit court relied in dismissing the petition. Ex parte Rice, 565 So.2d 606 (Ala.1990).

D. The said decision erroneously concluded that State court adjudications of Petitioner's Federal constitutional

claims automatically precluded the adjudicated claims as a basis for relief in a proceeding under A.R.Crim.P. 32.

1.   The said decision necessarily decided that all prior State adjudications of Federal constitutional rights are entitled to absolute deference in the determination of claims of Federal constitutional rights under A.R.Crim.P. 32.1(a).

2.   The said decision is in conflict with:

a.   <u>Williams vs. Taylor</u>, 529 U.S. 362, 412-13 (2000), where the U.S. Supreme Court said:

> In sum, §2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied-the state-court adjudication resulted in a decision that (1) "was contrary to ··· clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ··· clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

b.   <u>Miller-El vs. Cockrell</u>, 537 U.S. 322, 340 (2003), where the U.S. Supreme Court said:

7

A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system. Where 28 U.S.C. § 2254 applies, our habeas jurisprudence embodies this deference. Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2);

E.    The said decision erroneously sanctioned the dismissal without a hearing of a petition under A.R.Crim.P. 32.1(e) based on newly discovered evidence even though the petition showed on its face valid newly discovered evidence.

1.    The said decision necessarily decided that at the pleading stage of an A.R.Crim.P. 32 proceeding a court is not bound by the allegations of the petition and may make factual determinations and dismiss a petition without a hearing.

2.    The said decision conflicts with:

a.    Ex Parte Boatwright, 471 So.2d 1257, 1258 (Ala. 1985), where this Court said:

It is clear from the decisions of the Court of Criminal Appeals that an evidentiary hearing must be held on a coram nobis petition which is meritorious on its face, *i.e.,* one which contains matters and allegations (such as ineffective assistance of counsel) which, if true, entitle the petitioner to relief.

8

b.  <u>Johnson vs. State</u>, 835 So.2d 1077, 1079-80 (Ala.Crim.App.2001), where the Court of Criminal Appeals said:

Initially, it is important to distinguish between a petitioner's burden to plead and a petitioner's burden to prove.

"[A]t the pleading stage of Rule 32 proceedings, a Rule 32 petitioner does not have the burden of proving his claims by a preponderance of the evidence. Rather, at the pleading stage, a petitioner must only provide 'a clear and specific statement of the grounds upon which relief is sought.' Rule 32.6(b), Ala.R.Crim.P. Once a petitioner has met his burden of pleading so as to avoid summary disposition pursuant to Rule 32.7(d), Ala.R.Crim.P., he is then entitled to an opportunity to present evidence in order to satisfy his burden of proof." (Citations omitted). A claim may not be summarily dismissed because the petitioner failed to meet his burden of *proof* at the initial pleading stage, a stage at which the petitioner has only a burden to *plead*.

\* \* \*

Further, when a petition contains matters which, if true, would entitle the petitioner to relief, an evidentiary hearing must be held. *Ex parte Boatwright,* 471 So.2d 1257, 1258 (Ala.1985).".

c.  <u>Kolmetz vs. State</u>, 623 So.2d 453, 454 (Ala.Crim.App.1993), where the Court of Criminal Appeals said:

The [A.R.Crim.P. 32] petition is "meritorious on its face." . . . Consequently, those allegations must be accepted as true.

d.  <u>State vs. Freeman</u>, 605 So.2d 1258, 1259 (Ala.Crim.App.1992), where the Court of Criminal Appeals said:

Freeman's allegation concerning the juror constitutes newly discovered evidence, *State v. Gilbert,* 568 So.2d 876 (Ala.Cr.App.1990), and, therefore, it was not procedurally barred by Rule

9

32.2(a)(4) and (5).

F.    The said decision erroneously denied Petitioner's claim that he was denied basic due process guaranteed by the U.S. Constitution and the Alabama Constitution because the indictment did not charge the conduct and <u>quo modo</u> of the offense on which Petitioner's conviction was based.

1.    The said decision necessarily holds that a homicide defendant is not entitled to notice in the indictment of the conduct he is accused of and the <u>quo modo</u> of the charged offense that the prosecution will rely at trial and that he may be convicted on evidence of conduct and <u>quo modo</u> different from that alleged in the indictment.

2.    The said decision conflicts with:

a.    <u>Rogers vs. Richmond</u>, 365 U.S. 534, 544-45 (1961), where the U.S. Supreme Court said:

> A defendant has the right to be tried according to the substantive and procedural due process requirements of the Fourteenth Amendment.
>                    * * *
> To the extent that in the trial of Rogers evidence was allowed to go to the jury on the basis of standards that departed from constitutional requirements, to that extent he was unconstitutionally tried and the conviction was vitiated by error of constitutional dimension.

b.    <u>Dunn vs. United States</u>, 442 U.S. 100, 106 (1979), where the U.S. Supreme Court said:

> To uphold a conviction on a charge that was neither

alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused.

c. <u>Stirone vs. United States</u>, 361 U.S. 212, 217-18

(1960), where the U.S. Supreme Court said:

The *Bain* case, which has never been disapproved, stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him. (citations omitted)

* * *

While there was a variance in the sense of a variation between pleading and proof, that variation here destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury. Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error. (Citations omitted). The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge. Thus the basic protection the grand jury was designed to afford is defeated by a device or method which subjects the defendant to prosecution for interference with interstate commerce which the grand jury did not charge.

d. <u>Ex Parte Hightower</u>, 443 So.2d 1272, 1273, 1274

(1983), where this Court said:

An indictment must specify the conduct sought to be condemned so that the defendant may have an opportunity to prepare a defense if one is available.

* * *

The defendant is called upon to answer only the specific charge contained in the indictment. *Underwood v. State,* 33 Ala.App. 314, 33 So.2d 379 (1948). "No proposition of law is more fundamental

11

than the one requiring that the proof at trial must correspond with the material allegations of the indictment."

G.    The said decision erroneously denied Petitioner's claim that pre-indictment delay denied his due process rights.

1.    The said decision necessarily decided that pre-indictment delay by the State is never a deprivation of rights guaranteed by the U.S. Constitution.

2.    The said decision conflicts with:

a.    <u>United States vs. Lovasco</u>, 431 U.S. 783, 789 (1977), where the U.S. Supreme Court said:

> But we did acknowledge that the "statute of limitations does not fully define (defendants') rights with respect to the events occurring prior to indictment," 404 U.S., at 324, 92 S.Ct., at 465, and that the Due Process Clause has a limited role to play in protecting against oppressive delay.
> * * *
> ... [T]he due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.

H.    The said decision erroneously denied Petitioner's claim for relief based on the refusal of the trial court to grant a short delay in Petitioner's trial because of the death of the father of Petitioner's counsel.

1.    The said decision necessarily decided that whether to delay a trial is a matter of absolute discretion on the part of the trial judge and does not implicate rights guaranteed by the U.S. Constitution.

12

2.    The said decision conflicts with:

a.    <u>Ungar vs. Sarafite</u>, 376 U.S. 575, 589 (1964),

where the U.S. Supreme Court said:

> The matter of continuance is traditionally within
> the discretion of the trial judge, and it is not
> every denial of a request for more time that
> violates due process even if the party fails to
> offer evidence or is compelled to defend without
> counsel. (Citations omitted). Contrariwise, a myopic
> insistence upon expeditiousness in the face of a
> justifiable request for delay can render the right
> to defend with counsel an empty formality.
> (Citations omitted). There are no mechanical tests
> for deciding when a denial of a continuance is so
> arbitrary as to violate due process. The answer must
> be found in the circumstances present in every case,
> particularly in the reasons presented to the trial
> judge at the time the request is denied.

b.    <u>Morris vs. Slappy</u>, 461 U.S. 1, 11-12 (1983),

where  the U.S. Supreme Court said:

> ... [B]road discretion must be granted trial courts
> on matters of continuances; only an unreasoning and
> arbitrary "insistence upon expeditiousness in the
> face of a justifiable request for delay" violates
> the right to the assistance of counsel.

c.    <u>Crane vs. Kentucky</u>, 476 U.S. 683, 690 (1986),

where the U.S. Supreme Court said:

> Whether rooted directly in the Due Process Clause of
> the Fourteenth Amendment, (Citations omitted) or in
> the Compulsory Process or Confrontation clauses of
> the Sixth Amendment, (Citations omitted) the
> Constitution guarantees criminal defendants "a
> meaningful opportunity to present a complete
> defense." (Citations omitted). We break no new
> ground in observing that an essential component of
> procedural fairness is an opportunity to be heard.

I.   The said decision erroneously held that Petitioner had no right to relief in this A.R.Crim.P. 32 proceeding based on the State's failure to produce, and the bad faith destruction of, physical evidence and autopsy notes.

1.   The said decision necessarily decided that no constitutional right of a defendant is violated by bad faith destruction of physical evidence collected, examined, and analyzed by the State and notes reflecting findings of a post-mortem examination.

2.   The said decision conflicts with:

a.   <u>Arizona vs. Youngblood</u>, 488 U.S. 51, 58 (1988), where the U.S. Supreme Court said:

> We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.   .

J.   The said decision erroneously denied Petitioner's claim that he was denied due process by being convicted when no evidence connected him with the charged offense.

1.   The said decision necessarily holds that a defendant may be lawfully convicted when no evidence connects him with the offense charged.

2.   The said decision conflicts with:

a.   <u>Thompson vs. Louisville</u>, 362 U.S. 199, 206 (1960), where the U.S. Supreme Court said:

14

Just as 'Conviction upon a charge not made would be sheer denial of due process,' so is it a violation of due process to convict and punish a man without evidence of his guilt.

b. <u>Bunkley vs. Florida</u>, 538 U.S. 835, 840 (2003), where the U.S. Supreme Court said:

It has long been established by this Court that "the Due Process Clause ··· forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt."

IV.

In his application for rehearing to the Court of Criminal Appeals Petitioner included a statement of facts pursuant to A.R.App.P. 40(e), a copy of which is attached hereto as Exhibit C. Petitioner verifies, pursuant to A.R.App.P. 39(c)(5)(A)(ii), that Exhibit C is a verbatim copy of the statement of facts presented to the Court of Criminal Appeals.

Wherefore, Petitioner respectfully requests that after a preliminary examination the writ of certiorari be granted and that this Court proceed under its rules to review the matter complained of and reverse the judgment of the Court of Criminal Appeals.

Respectfully submitted,

Redden, Mills & Clark
940 Financial Center
505 North 20th Street
Birmingham, AL 35203
(205) 322-0457
(205) 322-8481 Fax

William H. Mills (ASB-9841-M75W)

William N. Clark (ASB-1260-C54W)
Attorneys for Petitioner

15

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama, and the District Attorney for the 19th Judicial Circuit of Alabama, by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the _18th_ day of May 2006.

Of Counsel for Petitioner
Redden, Mills & Clark
940 The Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481 - Fax

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

Lane Mann
Clerk, Court of Criminal Appeals
P.O. Box 301555
Montgomery, Alabama 36130

Notice: This unpublished memorandum should not be cited as precedent.  See Rule 54, Ala.R.App.P.  Rule 54(d),
states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or
briefs and shall not be used by any court within this state, except for the purpose of establishing the application
of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama

Judicial Building, 300 Dexter Avenue

P. O. Box 301555

Montgomery, AL 36130-1555



RELEASED

APR 2 1 2006

CLERK
ALA COURT CRIMINAL APPEALS

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

MEMORANDUM

CR-05-0287                    Elmore Circuit Court 96-421.60

Mark Samuel Landers v. State

McMILLAN, Judge.

The appellant appeals from the trial court's order summarily dismissing his Rule 32 petition for post-conviction relief.

The appellant's underlying conviction was for capital murder, a violation of § 13A-5-40(a)(7), Ala. Code 1975.  He was sentenced to life imprisonment without parole.  His

1

EXHIBIT A

conviction was affirmed on direct appeal and became final when

our Supreme Court quashed the writ of certiorari on June 18,

2004.

In his petition, the appellant raises the following

grounds for relief:

1. The State failed to turn over blood specimens taken
from the frame of his father's eyeglasses, in violation of
Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d
215 (1963), and general due process rights.

2. The State failed to turn over blood specimens taken
from the "upper portion of the [eyeglass] lens," in violation
of Brady, as well as his due process rights.

3. The State failed to disclose the medical examiner's
notes, which were referred to at trial as the "first autopsy
report," in violation of Brady, as well as his due process
rights.

4. He was denied due process rights when the trial court
refused to postpone closing arguments until after the funeral
of his lead counsel's father.

5. He was denied due process of law and his trial was
unfair because the State delayed his indictment.

6. He was denied due process and his trial was unfair
because the State "failed to disclose and correct false
evidence" (i) from Vickie Goolsby regarding the alleged
molestation by her father and the denial of her relationship
with ABI Agent William Rhegness and (ii) from William Rhegness
that he did not have an affair with Ms. Goolsby and did not
visit her home.

7. He was in possession of "newly discovered" evidence in
the form of eyeglasses in the possession of his mother,
allegedly given to her by Sheriff Franklin on February 12,
1992, and "unknown" to the defense until "well after the
completion of Landers's trial and his conviction and

2

sentence", which established his "innocence".

8. His due process and constitutional rights were violated when the charge in his indictment, that he killed his father by crushing him with a bulldozer, varied from the evidence presented at trial that his father was struck in the head.

9. The evidence presented at trial was insufficient to support his capital murder conviction.

An examination of the record reveals that the appellant's claims 1 and 2 were precluded from review because they could have been, but were not, raised at trial or on appeal. Rule 32.2(a)(3) and (5), Ala. R. Crim. P. The appellant's claims 3, 4, and 5, were precluded from review because that were raised and addressed on appeal. Rule 32.2(a)(4), Ala. R. Crim. P. In its motion to dismiss, the State arguued that the appellant's claim 6 was precluded from review because it could have been, but was not, raised at trial. Rule 32.2(a)(3), Ala. R. Crim. P. Additionally, the State argued that the claim was insufficiently pleaded, pursuant to Rule 32.3, Ala. R. Crim. P. This Court need not address the argument, however, because it was not raised on appeal. The appellant's claim 7(a) did not satisfy the "newly discovered evidence" test, and therefore, lacked merit. The appellant's claim 7(b) was precluded because the issue of the appellant's father's eyeglasses was raised at trial and could have been

3

investigated at that time.  Rule 32.2(a)(3), Ala. R. Crim. P.
The appellant's claim 7(c) that the evidence established his
"innocence", was precluded because the issue was raised at
trial and on appeal.  Rule 32.2(a)(2) and (4), Ala. R. Crim.
P.  The appellant's claim 8 could have been, but was not,
raised at trial.  Rule 32.2(a)(3), Ala. R. Crim. P.  Claim 9
was precluded from review because it was raised and addressed
on appeal.  Rule 32.2(a)(4), Ala. R. Crim. P.

Because all of the claims raised by the appellant were
procedurally precluded from review, the trial court was
correct in summarily dismissing the Rule 32 petition.  Rule
32. 7(d), Ala. R. Crim. P.

The judgment of the trial court is affirmed.

AFFIRMED.

Cobb, Shaw, and Wise, JJ., concur.  Baschab, J., recuses
herself.

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
  Clerk
Gerri Robinson
  Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

May 12, 2006

**CR-05-0287**

Mark Samuel Landers v. State of Alabama  (Appeal from Elmore  Circuit Court:
CC96-421.60)

## NOTICE

You are hereby notified that on May 12, 2006 the following action was taken in the
above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk
Court of Criminal Appeals**

cc: Hon. Larry Dozier, Circuit Clerk
    William N. Clark, Attorney
    Stephanie N. Morman, Asst. Atty. Gen.

EXHIBIT B

## II.

The Appellant, being unsatisfied with the facts stated in the unpublished memorandum issued by the Court as the basis for its decision, submits the following as an appropriate statement of facts for this case:

The trial court conducted no evidentiary hearing (C 167; R 1-19). The facts for purposes of appellate review are those alleged in Landers' petition and the judicially noticed facts appearing in the appeal record of the underlying case (Case Number CR-97-0194) pursuant to the Court's order of December 29, 2005, which reads:

> Appellant's motion to supplement the record on appeal is denied. However, this Court will take judicial notice of the records in CR-97-0194.

Landers was indicted for the capital murder of Robert Landers on October 4, 1996 for a homicide that allegedly occurred on February 12, 1992 (XC 9-10).[1] The only *quo modo* of the offense alleged in the indictment was:

> ...by running over and crushing him with a bulldozer. (XC 9).

---

[1] Reference to the prior appeal record (CC-96-421, CR-97-0194, and 1001070) will be by "XC" followed by a page number for reference to the Clerk's Record portion and "XR" followed by a page number for reference to the Reporter's Transcript portion of that record. Reference to the Court's December 15, 2000 Memorandum will be by "12/15/00 Memo.".

**EXHIBIT C**

1

This indictment was never amended.

Bond was denied pending trial and Landers has been incarcerated at all times after indictment (XC 16-19).

The victim's body was found near a construction site on the evening of February 12, 1992 (XR 1010-12).  The body was lying partially under the right track of a bulldozer (XR 1012).  One of the first officers at the scene saw an eye glasses case near the victim's head as he lay under the right track of the bulldozer (XR 2201, 2202, 2203).  This officer did not retrieve the case (XR 2202).

On the night of February 12, 1992, at the scene where the victim's body was found, Elmore County Sheriff Franklin handed to Lenita Landers, the victim's wife, two rings, a wallet, and a glasses case containing a pair of glasses, all of which belonged to the victim (C 25, 38).  Mrs. Landers placed these items in her coat pocket (C 38).  When she arrived home later that night she placed these items, including the glasses case, in a rarely used dresser drawer (C 39).  She did not look in this drawer again for over five years, and forgot about the items she had placed there (C 39).  She was never asked about the glasses (C 39).  Had she been asked about the glasses at the time of Landers' trial she would have been unable, due to passage of time and loss of memory, to recall their existence

2

or location (C 39).

Sometime shortly before or during Landers' trial Mrs. Landers was asked to locate photographs of her husband (C 40). She reasoned that his drivers license should have a photograph and should be in his wallet (C 41). She searched for a wallet and located the wallet the Sheriff had given her on February 12, 1992 in the drawer where she had placed it that night (C 41). The wallet was not obscured by other contents of the drawer (C 41). She removed the wallet and found a drivers license in it (C 41).  She took the wallet to Landers' trial (C 41).  Thirty days or more after Landers was sentenced, Mrs. Landers decided to put the wallet back into the drawer from which she had taken it (C 42).  When she opened the drawer she saw for the first time since she placed it there on February 12, 1992 the glasses case the Sheriff had given her on that date (C 42). She recognized the case as the case in which her husband regularly carried his glasses (C 42).  At that time she opened the case and found a pair of wire rimmed glasses, the glasses her husband regularly wore and used in the period immediately preceding his death (C 42).  Upon seeing these glasses on this occasion Mrs. Landers recalled for the first time since February 12, 1992 that the Sheriff had handed her these wire rimmed glasses and other items on that night (C

3

42).

Mrs. Landers never told anyone about these glasses (C 42). Only she had access to the drawer where they were stored (C 43). Neither Landers nor his counsel ever saw and neither was ever told about the glasses until they were told about them shortly before the filing of the present petition (C 22, 43). The condition of the wire rimmed glasses and case is unchanged from the time they were given to Mrs. Landers by the Sheriff on February 12, 1992 (C 22). Neither Landers nor his attorneys knew of the existence of the  glasses until well after the completion of Landers' trial and post-trial motions (C 25-26). Neither Landers nor his attorneys could have discovered the glasses at an earlier time because the only person with any knowledge of their existence and whereabouts, Mrs. Landers, did not disclose their existence or whereabouts to anyone (C 26). Mrs. Landers did not discover them herself until she accidentally discovered them shortly before Landers' petition was filed (C 26).

On the evening of February 12, 1992 a large crowd - including spectators - gathered at the scene where the victim's body was found (XR 1172, 1191, 1192). The bulldozer was picked up by a wrecker to allow removal of the body (XR 1076). A truck and trailer that were near the bulldozer were

moved (XR 1079, 1147). Between the evening of February 12, 1992 (when the body was discovered) and February 13, 1992 (when State's Exhibit 10, a pair of plastic rimmed glasses was discovered) the scene was not secured (XR 1068).

On February 13, 1992 investigators returned to the scene and moved the bulldozer; and at that time saw a pair of plastic rimmed glasses on the ground where the left track of the bulldozer had been (XR 1106-10). These plastic rimmed glasses were identified at trial as State's Exhibit 10 (hereafter "Ex.10") (XR 1011).

At trial the State introduced Ex. 10, eye glasses with thick plastic rims and a deformed left leg, into evidence (XR 1852). State's Exhibits 23-A and 23-B are photographs of these glasses (XR 1928; XC 1063-66). These glasses were turned over to the Department of Forensic Sciences after retrieval at the scene (XR 1927). A blood stain on the frame was tested for blood type by a technician in the Department (XR 1431-33). This technician also did an ABO blood test on a blood specimen taken from the victim's body (XR 1433). The blood type of both was Type O (XR 1434). Based on this blood typing the medical examiner assumed Ex. 10 was the victim's glasses and used the glasses in explaining his theory of how the victim was killed and the cause of death (XR 1927-28,

1940-41).

The medical examiner testified that the cause of death was being struck on the left temple with a blunt instrument (XR 1941). He explained this conclusion by describing two distinct sets of injuries on the victim's body (XR 1901-02). One set was to the left temple where something blunt struck the head with sufficient force to break the skull and depress the skull bones down into the brain (XR 1901, 1910, 1919-21, 1922). The temple injury occurred before the victim was run over by the bulldozer (XR 1922-24). The bulldozer did not cause the fractures to the left temple (XR 1922). The crushing injuries to the body, including to the skull, produced little bleeding, an indication the victim was dead when run over by the bulldozer (XR 1904, 1910, 1921, 1923, 1929-40).

The medical examiner used the plastic rimmed glasses (Ex. 10) to illustrate and support his theory that the victim was killed by a blow to the temple before he was run over by the bulldozer (XR 1926-40). He reconstructed the victim's skull from bone fragments and placed the plastic rimmed glassed on the reapproximated skull (XR 1917). In his opinion, a deformity in the left leg of the plastic rimmed glasses (Ex. 10) matched the temple injury and showed the victim was struck in the temple by a blunt instrument (XR 1927, 1940-41; XC

6

1115-20).

In opening statement the State emphasized that a blow to the left temple killed the victim. The prosecutor stated that the victim was struck in the temple and was then dragged around and run over by the bulldozer as a means of concealing the blow to the head (XR 938, 946-47). The prosecutor emphasized the importance of the plastic rimmed glasses in this theory, and their connection to the victim, by pointing out that the blood on the glasses was the same type as the victim's (XR 944). The prosecutor referred to the fact that when the plastic rimmed glasses (Ex. 10) were placed on the victim's reconstructed skull a deformity in the left leg coincided with the temple injury (XR 947). In closing argument the State reiterated the blow to the head theory (XR 287-89). The prosecutor again stressed the fact that the plastic rimmed glassed (Ex. 10) confirmed the theory by showing the point where the victim was struck on the head (XR 239). The prosecutor again pointed to the blood on Ex. 10, and the typing of it, as proof that the plastic rimmed glasses were the victim's glasses and were proof of the blow to the head theory (XR 2390, 2400, 2406).

There was testimony at the trial that the plastic rimmed glasses (Ex. 10) were not the victim's glasses. The victim's

7

glasses were described as wire rimmed, not plastic rimmed, glasses (XR 2080, 2168-71). Photographs showed the victim wearing wire rimmed glasses (XC 1635-39). The proffered newly discovered evidence is the victim's wire rimmed glasses which were not part of the evidence at trial (C 42).

Landers made several pretrial requests or filed motions seeking discovery or disclosure (XC 28, 32, 62, 161). His requests included "tangible objects", "any other things ... which are intended for use by the State ... as evidence at trial", "objects or other tangible things which are relevant to this cause or are material to Defendant's defense", and "exculpatory evidence" (XC 33, 34). One of his motions showed the State had not produced a portion of a February 13, 1992 report of a post-mortem examination, tissue blocks and glass slides used in a post-mortem examination, and other materials relating to a post-mortem examination (XC 261-62). Landers also filed a motion to dismiss the indictment for the State's failure to produce blood samples (XC 266-70).

The State responded to the discovery requests by producing sundry materials which are described in its responses to discovery (XC 42-51, 65-66, 73-83, 135-50, 231-33). The responses do not list glasses, blood or tissue specimens, or February 13, 1992 post-mortem notes. The State

8

produced no glasses, blood or tissue specimens (C.13,14-15, 16, 17) or the dictated notes of the findings from the February 13, 1992 post-mortem examination (C 18).

The testimony of the Forensic Sciences Department medical examiner and a technician were a major part of the State's case (XR 1428-37, 1890-1997). The medical examiner testified that a blood specimen was drawn from the victim's body on February 13, 1992 (XR 1908) and transmitted to the technician (XR 1943). The medical examiner testified he examined the plastic rimmed glasses identified as Ex. 10 and used them in his examination of the victim's body (XR 1927-28). He described the victim's skull and the injuries to it and stated he reconstructed the skull from bone fragments (XR 1923-24, 1926-27). He illustrated his testimony by photographs (XR 1929-41;C 1068-1120). Except for a small portion, the victim's skull was not retained (XR 1966). It was disposed of at some undetermined time, possibly after Landers' indictment (XR 1966).

The medical examiner dictated a report of his February 13, 1992 examination of the victim's body onto a recording device (XR 1951). The dictation was not transcribed and has been destroyed (XR 1951).

A Forensic Sciences technician testified that blood taken

9

from the plastic rimmed glasses (Ex. 10) and a vial of blood given to her by the medical examiner were analyzed by the ABO method (XR 1432-34). The blood from the glasses was used up in the testing and the vial of blood obtained from the medical examiner was destroyed (XR 1437).

The medical examiner's work on this case, the primary foundation for the prosecution, was completed within three months after March 3, 1992 (XR 1952). A deposition of Landers taken in a civil case on November 5, 1992 was used as evidence by the State (XR 1481-1659; XC 1459-1546).

The bulldozer under which the victim's body was found was examined and used by the State in experiments conducted soon after February 12, 1992 (C 21; XC 1043-46, 1184-90, 1283-91, 1351-98). Because the bulldozer was no longer available after Landers' indictment he had no opportunity to conduct experiments with it and had no opportunity to conduct experiments at the unaltered scene (C 21-22). The trial court rejected experiments offered by Landers at trial, which were conducted after indictment in October 1996, because they were not conducted with the same bulldozer and the area where they were conducted was different from the area where the victim's body was found (XR 2043-46).

In the interim between November 1992, when the State

completed the collection of the evidence it used at trial, and the indictment in October 1996, three persons (Barry Worth, Rubin Jarrell, and Orender Jarrell) who could have offered testimony favorable to Landers died (C 21). Had the prosecution against Landers been instituted earlier: (1) the bulldozer, the subject of tests and experiments by the State, would have been available to Landers for tests and experiments (C 21-22); (2) the State would not have destroyed the blood and tissue specimens it destroyed before trial (C 22-23); (3) the notes of the medical examiner's original examination would not have been destroyed (C 23); and (4) the newly discovered evidence would have been remembered, found, and available for use as evidence at trial (C 23).

On the evening of May 7, 1997 the father of Landers' lead counsel died (XC 2298). The funeral was scheduled for Saturday, May 10, 1997. The trial judge refused to postpone closing arguments until after the funeral and scheduled them for May 9, 1997 (XR 2300, 2307). The State contended, and the memorandum of this Court entered with its December 15, 2000 decision finds, "the record reflects that the Judge was obligated to be in Baldwin County to preside over a case as a special judge on the following Monday" (See 12-15-00 Memo. p.36). This conclusion is incorrect; the trial judge was only

11

assigned as an "additional judge" in Baldwin County for the week beginning May 12, 1997 (C 166).

At trial the State offered no testimony from a witness who observed Landers at the time the victim was killed, or who saw Landers in possession of any blunt instrument that the State claimed killed the victim, or who heard Landers conspire with any other person to kill the victim (XR 1-2291).

LAW OFFICES OF

# REDDEN, MILLS & CLARK

940 FINANCIAL CENTER

505 TWENTIETH STREET NORTH

BIRMINGHAM, ALABAMA 35203

WILLIAM H. MILLS
WILLIAM N. CLARK
GERALD L. MILLER
STEPHEN W. SHAW
LAURA S. GIBSON
KEITH E. BRASHIER

TELEPHONE (205) 322-0457
FACSIMILE  (205) 322-8481

OF COUNSEL
L. DREW REDDEN

May 19, 2006

<u>CERTIFIED MAIL / RETURN RECEIPT REQUESTED</u>

Hon. Robert G. Esdale
Clerk
Supreme Court of Alabama
300 Dexter Avenue
Montgomery, Alabama 36104-3741

Dear Mr. Esdale:

     Re:  Mark Samuel Landers, Appellant VS.
         State of Alabama, Appellee
         Case Number: CR-05-0287

    Enclosed for filing in your court are an original and 12 copies of the petition for writ of certiorari in the above matter.

    Please return the enclosed extra copy to me stamped filed.  I have enclosed a self-addressed envelope for this purpose.

    Thank you for your assistance in this matter.

               Very truly yours,

               William H. Mills

WHM/lan
Enclosures
cc:  Troy King, Attorney General
     Clerk, Court of Criminal Appeals
     Randall V. Houston, District Attorney, Elmore County



# IN THE SUPREME COURT OF ALABAMA

June 7, 2006

**1051169**

Ex parte Mark Samuel Landers. PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS (In re: Mark Samuel Landers v. State of Alabama) (Elmore Circuit Court: CC96-421.60; Criminal Appeals : CR-05-0287).

## ORDER

IT IS ORDERED that the petition for writ of certiorari to the Court of Criminal Appeals is granted as to the issues of 1) whether the alleged variance between the indictment and proof at trial deprived the trial court of jurisdiction; and 2) whether, in responding to Landers's Rule 32 petition, the State was required to plead specific Rule 32 preclusion provisions.

IT IS FURTHER ORDERED that the petition for writ of certiorari to the Court of Criminal appeals is denied as to all other grounds.

See Rule 39(g)(1) - (3), Alabama Rules of Appellate Procedure, as amended effective June 1, 2005, for instructions regarding the filing of briefs. The petitioner may file a brief within 14 days from the date of this order. Thereafter, the respondent may file a brief in accordance with subsection (g)(2) of Rule 39. If the petitioner or the respondent chooses not to file a brief, that party must file a waiver of the right to file the brief within the time the brief is due under the appellate rules. See Rule 39(g)(1) and (2).

See Rule 39(h) with regard to oral argument.

PER CURIAM -Nabers, C.J., and Lyons, Woodall, Smith, and Bolin, JJ., concur. Parker, J., recuses.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this 7th day of June 2006

*Robert G Esdale Sr*

Clerk, Supreme Court of Alabama



EXHIBIT

J

## ORDER Cont.

**cc:**
William N. Clark, Attorney
William H. Mills, Attorney
Hon. Troy R. King, Attorney General
Hon. Stephanie N. Morman, Asst. Attorney General

No. 1051169

## In the SUPREME COURT of ALABAMA

### Ex parte Mark Samuel LANDERS.

———————◆———————

In re Mark Samuel LANDERS,
Petitioner-Appellant,

v.

STATE of Alabama,
Respondent-Appellee.

———————◆———————

*On Appeal from the Circuit Court of
Elmore County (CC-96-421.60)*

———————◆———————

On Writ of Certiorari to
the Court of Criminal Appeals (CR-05-0287)

## BRIEF OF RESPONDENT

Troy King
*Attorney General*

Kevin C. Newsom
*Solicitor General*

Stephanie N. Morman
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama   36130-0152
(334) 242-7300; 242-7380 *

July 18, 2006



## STATEMENT REGARDING ORAL ARGUMENT

The State does not request oral argument.  This case does not present this Court with any novel issues of law, nor do the facts warrant oral discussion.  Thus, "the decisional process would not be significantly aided by oral argument."  Ala. R. App. P. 34(a)(3).

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.......................... i

TABLE OF CONTENTS....................................... ii

TABLE OF AUTHORITIES.................................... iv

STATEMENT OF THE CASE................................... 1

  A. Conviction and direct appeal ...................... 1

  B. Present post-conviction proceedings ................. 2

ISSUES PRESENTED FOR REVIEW.............................. 6

STATEMENT OF THE FACTS.................................. 6

STANDARDS OF REVIEW..................................... 8

SUMMARY OF THE ARGUMENT................................. 9

ARGUMENT............................................... 10

  I.  Landers's "Variance" Argument - Which Is Predicated
On His Position That An Indictment Affects The Trial
Court's Subject-Matter Jurisdiction - Is Precluded From
Post-Conviction Review. ............................... 10

    A. Landers's indictment did not affect the trial
court's jurisdiction to adjudicate his capital murder
charge. ............................................. 11

    B. No variance exists between Landers's indictment
and the evidence introduced at trial. ................. 16

    C. Landers's claim is not "jurisdictional" and,
therefore, is precluded from review ................... 19

II.   Landers's Attack On The State's Pleading Of The
Grounds Of Preclusion Is Not Properly Before This
Court Because He Did Not Raise The Allegation Of Error
As A Basis For Relief In His Application For Rehearing.
Even If Landers Did Not Waive The Argument, He Is Not
Entitled To Relief Because The Record Shows That The
State Identified And Argued Specific Grounds For
Preclusion Applicable To Each Of Landers's Claims
Of Error. ........................................... 21

A. Landers's attack on the State's pleading is not
properly before this Court. .......................... 21

B. If this Court concludes that Landers did not waive
his attack on the specificity of the State's pleading,
a review of the State's Motion to Dismiss reveals that
his argument lacks merit. ............................ 23

C. Landers's constitutional attack on Rule 32.3 and
his contention that the ground of "newly discovered
evidence" is not subject to preclusion are not properly
before this Court because they were not initially
presented to the lower appellate court. .............. 25

D. Landers's attack on the summary dismissal of his
"federal constitutional" arguments falls outside the
scope of his ground for certiorari review. ........... 26

CONCLUSION........................................... 28

CERTIFICATE OF SERVICE................................ 29

## TABLE OF AUTHORITIES

**Cases**

Ash v. State, 843 So. 2d 213 (Ala. 2002)................ 14

Burgess v. State, 44 Ala. 190 (1870)................... 15

Department of Revenue v. Arnold, 909 So. 2d 192 (Ala.
    2005) ............................................. 12

Ex parte Cole, 842 So. 2d 605 (Ala. 2002).............. 13

Ex parte Linnell, 484 So. 2d 455 (Ala. 1986)........... 26

Ex parte Rice, 565 So. 2d 606 (Ala. 1990).............. 24

Ex parte Robertson, No. 1050061, 2005 WL 3344078 (Ala.
    Dec. 9, 2005) ..................................... 12

Ex parte Robey, 940 So. 2d 1069 (Ala. 2004)............ 18

Ex parte Seymour, No. 1050597, 2006 WL 1793747 (Ala.
    June 30, 2006) .................................... 11

Lamar v. United States, 240 U.S. 60 (1916)............. 13

Mason v. State, 259 Ala. 438, 66 So. 2d 557 (1953)....... 15

McCoo v. State, 921 So. 2d 450 (Ala. 2005)............. 21

Sheats v. State, 556 So. 2d 1094 (Ala. Crim. App. 1989)
    (on return to remand) ............................. 23

State v. Parkhurst, 845 S.W.2d 31 (Mo. 1992)........... 13

United States v. Cotton, 535 U.S. 625 (2002)........... 13

**Other Authorities**

Ala. Code (1975)

   § 12-11-30(2) ........................................ 12

Ala. Const. (1973)

   amend. 328 § 6.04(b) ................................ 12

**Rules**

Ala. R. App. P.

   39 ................................................. 21

   39(c)(1) ........................................... 21

   39(f) .............................................. 27

   40 ................................................. 21

   40(b) .............................................. 21

   40(d)(1) ........................................... 21

Ala. R. Crim. P.

   13.2 ............................................... 16

   13.2(a) ............................................ 14

   13.5(c)(1) ......................................... 19

   15.2(d) ............................................ 20

   32.1 ............................................... 19

   32.2 ............................................... 20

   32.2(a)(3) ......................................... 20

   32.3 ............................................... 23

## STATEMENT OF THE CASE

This Court granted the writ of certiorari to resolve two post-conviction issues involving Landers's 1997 conviction for murdering his father. First, this Court asks the parties to brief whether a variance exists between the murder charge alleged in the indictment and the evidence presented at trial that affects the trial court's subject-matter jurisdiction. Second, this Court asks the parties to explain whether the State violated Landers's due process rights when notifying him how that claims were precluded under Rule 32.2 of the Alabama Rules of Criminal Procedure. The answer, on both counts, is no.

### A.    Conviction and direct appeal

Landers was convicted on May 9, 1997 for the murder of his father. The crime was made capital because it was committed for pecuniary gain or other valuable consideration under Section 13A-5-40(a)(7) of the Alabama Code (1994). (C. 98) On July 1, 1997, Elmore County Circuit Court Judge John Bush accepted the jury's recommended sentence and ordered Landers imprisoned for a term of life without the possibility of parole. (C. 98)

Landers's conviction became final when this Court quashed the writ of certiorari on June 18, 2004.

## B.  Present post-conviction proceedings

Landers filed the Rule 32 petition presently on appeal in the Elmore County Circuit Court on May 31, 2005.  (C. 2, 4)  He raised seven grounds for relief in the petition, none of which is before this Court on certiorari review. (C. 9-25)  On June 10, 2005, Landers filed an amendment to his petition, in which he raised two additional claims for relief.  In the first of his two arguments, Landers contended that his constitutional rights were violated because the charge in his indictment - that he killed his father by crushing him with a bulldozer - varied from the evidence presented at trial that his father was also struck in the head.  (C. 52-54)

The State filed a Motion to Dismiss the petition on July 12, 2005.  (C. 2, 56)  In its motion, the State argued that each of Landers's claims was barred under a specific ground or grounds of Rule 32.2 of the Alabama Rules of Criminal Procedure.  (C. 60-77)  Following a brief hearing consisting of the parties' legal arguments on August 30, 2005 (C. 2, 144; R. 2-19), Judge Bush denied Landers post-

2

conviction relief.  In a thorough written order filed on September 23, 2005, the judge ruled that Landers's claims were precluded from review and did not warrant relief.  (C. 2, 167-71)

Landers appealed, raising five of the seven grounds from his original petition and both arguments made in the amendment to his petition.  Relevant to the present litigation, Landers challenged the circuit court's refusal to grant relief on his "variance" argument and the State's pleading of the grounds of preclusion.

The Court of Criminal Appeals affirmed the denial of post-conviction relief in an unpublished opinion filed on April 21, 2006.  The court denied each claim on a ground or grounds of preclusion.  As to the "variance" issue raised here, the court held the claim was precluded under Rule 32.2(a)(3) of the Alabama Rules of Criminal Procedure because it could have been raised at trial.  Landers v. State, CR-05-0287, mem. op. at 4 (Ala. Crim. App. Apr. 21, 2006).  The court did not address Landers's attack on the specificity of the State's motion to dismiss.

Landers filed an application for rehearing in which – as relevant to this proceeding – he challenged the court's

"fail[ure] to consider and rule on the issue raised by [him] that the indictment . . . did not create subject-matter jurisdiction for [his] conviction . . . on the evidence presented against him at trial." (Landers's applic. for reh'g at 1) Landers did not question the appellate court's failure to rule on his challenge to the adequacy of the State's pleading.[1] The Court of Criminal Appeals overruled Landers's application without an opinion on May 12, 2006.

Landers filed a petition for a writ of certiorari in this Court on May 19, 2006, raising ten grounds for relief. On June 7, 2006, this Court granted the writ of certiorari as to two claims. First, it permitted briefing on Landers's Issue A: Whether the Court of Criminal Appeals's

---

[1] Landers alluded to the pleading claim while making the separate argument that the circuit court improperly summarily dismissed his indictment. (Landers's Brief in Support of Applic. for Reh'g at 6-8) In the brief he stated, "It is doubtful that the State adequately plead [sic] grounds for preclusion for most of the issues raised in Landers' petition." (Id. at 7) He then acknowledged that, "if preclusion was adequately plead [sic], summary dismissal without a hearing denied Landers his due process rights to present evidence to disprove the preclusion allegations." (Id. at 7-8) The State has attached photocopies of Landers's application for rehearing and brief in support as Appendix A to this brief.

4

"decision [that] erroneously decided that the indictment in this case, which charged Petitioner with killing the victim by 'running over and crushing him with a bulldozer,' created subject-matter jurisdiction to try and convict Petitioner for killing the victim by a different instrumentality and conduct – a blow to the side of the head with a blunt instrument" conflicts with Ex parte Cole, 842 So. 2d 605 (Ala. 2002), Mason v. State, 66 So. 2d 557, 259 Ala. 438 (1953), Burgess v. State, 44 Ala. 190 (1870), Goetzman v. State, 844 So. 2d 1289 (Ala. Crim. App. 2002), and Gamble v. State, 758 So. 2d 1125 (Ala. Crim. App. 1999). (Landers's petition at 2-4)  Second, this Court instructed the parties to address Landers's Issue C: Whether the Court of Criminal Appeals's "decision [that] erroneously sanctioned dismissal of an A.R.Crim.P. 32 petition which included a jurisdictional claim and a newly discovered evidence claim without a hearing based on a blanket assertion of preclusion" conflicts with Ex parte Weeks, 611 So. 2d 259 (Ala. 1992), Ex parte Rice, 565 So. 2d 606 (Ala. 1990), and Alvis v. State, 762 So. 2d 380 (Ala. Crim. App. 1999). (Landers's petition at 5-6)

## ISSUES PRESENTED FOR REVIEW
### (Restated)

1. Is Landers's "variance" argument – which is predicated on his position that an indictment affects the trial court's subject-matter jurisdiction – precluded from post-conviction review?

2. Is Landers's attack on the State's pleading of the grounds of preclusion properly before this Court when he did not raise the allegation of error as a basis for relief in his application for rehearing? Even if Landers did not waive the argument, is he entitled to relief when the record shows that the State identified and argued specific grounds for preclusion applicable to each of Landers's claims of error?

## STATEMENT OF THE FACTS

In its motion to dismiss Landers's Rule 32 petition filed on July 12, 2005, the State cited specific grounds under Rule 32.2 of the Alabama Rules of Criminal Procedure that were applicable to Landers's individual claims of error. (C. 2, 56) In its motion, the State argued that: 1) Landers's claims involving blood specimens were precluded under Rules 32.2(a)(3) and (a)(5) (C. 60-61); 2)

6

Landers's claims involving disclosure of the medical examiner's notes, postponing closing arguments, and delay in obtaining an indictment were precluded from review under Rule 32.2(a)(4) (C. 62-68); 3) Landers's claim involving testimony from Vickie Goolsby and ABI Agent William Rhegness was precluded under Rule 32.2(a)(3) and insufficiently pleaded (C. 68-70); 4) Landers's claim involving his mother's alleged possession of his father's eyeglasses: (a) did not satisfy the "newly discovered evidence" test and, for that reason, lacked merit; (b) was precluded under Rule 32.2(a)(3) because the issue of Landers's father's eyeglasses was raised at trial and could have been explored at that point; and, (c) was precluded to the extent that Landers claimed the evidence established his "innocence," because that was discussed at trial and on appeal (C. 70-73); 5) Landers's constitutional attack on his indictment and the evidence presented at trial was precluded from review under Rule 32.2(a)(3) (C. 73-76); and, 6) Landers's challenge to the sufficiency of the evidence was precluded from review under Rule 32.2(a)(4) (C. 76-77).  Because Landers's various claims were

precluded and lacked merit, the State requested the circuit
court summarily deny the petition. (C. 78)

On August 30, 2005, Judge Bush held a hearing on the
State's motion to dismiss. Among other arguments, Landers
challenged the adequacy of the State's pleading under Ex
parte Rice, 565 So. 2d 606 (Ala. 1990). At the conclusion
of the hearing, the judge indicated that he would later
rule on the petition and the State's motion. On September
23, 2005, Judge Bush filed a written order in which he
declared each of Landers's claims precluded from review on
specific grounds under Rule 32.2, as well as meritless.
(C. 2, 167-71)

### STANDARDS OF REVIEW

1. "When the facts are undisputed and an appellate
   court is presented with pure questions of law,
   that court's review in a Rule 32 proceeding is *de
   novo*." However, where the facts in a
   postconviction proceeding are disputed and the
   circuit court has resolved those disputed facts,
   "[t]he standard of review on appeal in a post
   conviction proceeding is whether the trial judge
   abused his discretion when he denied the
   petition."

Ex parte Harris, No. 1041332, 2006 WL 1304904, at *1

(Ala. May 12, 2006).

8

2. This Court grants certiorari review in criminal cases only on those points of law argued with particularity in the petitioner's application for rehearing. <u>See</u> Ala. R. App. P. 39(c)(1); Ala. R. App. P. 40(b), (d)(1); <u>McCoo v. State</u>, 921 So. 2d 450, 456 n.2 (Ala. 2005).

## SUMMARY OF THE ARGUMENT

Landers presents two claims of post-conviction error, neither of which warrants relief. First, he contends that the trial court's jurisdiction stems from his indictment and that a "variance" between language in his indictment and the evidence presented at trial deprived the trial court of subject-matter jurisdiction to adjudicate his case. Just three weeks ago, this Court declared in <u>Ex parte Seymour</u>, No. 1050597, 2006 WL 1793747 (Ala. June 30, 2006), that the trial court's subject-matter jurisdiction is not affected by any defects in an indictment. Instead, such claims run only to the merits of the case and should be litigated at trial or on direct appeal and, for that reason, are precluded from post-conviction review. Additionally, and in any event, Landers has not presented a true "variance" claim. As this Court explained in <u>Ex parte</u>

9

Robey, 940 So. 2d 1069, 1072-74 (Ala. 2004), the
introduction of additional facts indicating guilt do not
impact the validity of the indictment.  Accordingly, such a
"variance" argument is precluded from post-conviction
review.

In his second allegation of error, Landers contends
that the State violated his due process rights by failing
adequately to plead the grounds of preclusion in the
circuit court.  As a preliminary matter, the claim is not
properly before this Court because Landers did not raise
this particular allegation of error in his application for
rehearing.  Moreover, his argument wholly lacks merit.  A
review of the State's Motion to Dismiss reveals that the
State explained in detail what ground of preclusion applied
to each of Landers's individual claims.


## ARGUMENT

I.   **Landers's "Variance" Argument - Which Is Predicated On
     His Position That An Indictment Affects The Trial
     Court's Subject-Matter Jurisdiction - Is Precluded From
     Post-Conviction Review.**

Landers contends that a trial court's subject-matter
jurisdiction is derived from the indictment.  (Landers's
brief at 12-25)  Applying this reasoning, he contends that

a "variance" existed between his indictment - which charged

him with the capital murder of his father by crushing him

with a bulldozer - and evidence introduced at trial -

establishing that his father died as a combination of a

blow to the head and being crushed by a bulldozer - that

deprived the trial court of subject-matter jurisdiction to

enter his conviction and sentence.  (Landers's brief at 25-

33)  Landers's argument lacks merit for two reasons.

First, as this Court held only three weeks ago, subject-

matter jurisdiction is not derived from - or affected by -

the charging instrument.  Second, the proof introduced at

trial did not materially vary from the charge contained in

Landers's indictment.  For these reasons, Landers's

argument did not protect him from the normal rules of

preclusion and did not warrant post-conviction relief.

A.   **Landers's indictment did not affect the trial
     court's jurisdiction to adjudicate his capital
     murder charge.**

This Court's decision in Ex parte Seymour, No. 1050597,

2006 WL 1793747 (Ala. June 30, 2006), fatally undercuts

Landers's argument that his indictment affects the trial

court's subject-matter jurisdiction.  In Seymour, this

Court recognized that courts derive their subject-matter

11

jurisdiction from the State constitution and from authority granted by the Legislature that has been compiled in the Alabama Code.  See also Ex parte Robertson, No. 1050061, 2005 WL 3344078, at *1 (Ala. Dec. 9, 2005); Department of Revenue v. Arnold, 909 So. 2d 192, 193 (Ala. 2005) (recognizing, in line with several previous decisions, that "[t]he jurisdiction of the probate court is limited to the matters submitted to it by statute").  The Constitution imparts authority to the circuit court to "exercise general jurisdiction in all cases except as may otherwise be provided by law."  Ala. Const. amend. 328 § 6.04(b) (1973). Its power is further defined by the legislature as encompassing "exclusive original jurisdiction of all felony prosecutions[.]"  Ala. Code § 12-11-30(2) (1975).  Based on these delegations of power to the circuit courts to resolve felony charges, the Elmore County Circuit Court possessed subject-matter jurisdiction to adjudicate Landers's capital murder crime.  The factual details – or lack thereof – included in Landers's indictment do not impact that conclusion.

In reaching its conclusion in Seymour, this Court adopted the reasoning of the United States Supreme Court in

United States v. Cotton, 535 U.S. 625, 630 (2002), that
"'defects in an indictment do not deprive a court of its
power to adjudicate a case'" and the rationale from Lamar
v. United States, 240 U.S. 60, 64 (1916), that an
"'objection that the indictment does not charge a crime
goes only to the merits of the case.'" Seymour, 2006 WL
1793747, at *3.  The lack of correlation between
jurisdiction and the charging instrument was — as this
Court noted — "succinctly" explained by the Supreme Court
of Missouri in State v. Parkhurst, 845 S.W.2d 31, 34-35
(Mo. 1992), where it stated, "'Subject matter jurisdiction
of the circuit court and the sufficiency of the information
or indictment are two distinct concepts.  The blending of
these concepts serves only to confuse the issue to be
determined.'"  Seymour, 2006 WL 1793747, at *3.

Like in Seymour, "the validity of [Landers's]
indictment is irrelevant to whether the circuit court had
jurisdiction over the subject matter of the case." Id.
Thus, Landers's reliance on Ex parte Cole, 842 So. 2d 605,
607 (Ala. 2002), for his assertion that the indictment "is
the source of the [trial court's] subject-matter
jurisdiction" is misplaced.  (Landers's petition at 2-3;

13

Landers's brief at 20, 31)  This Court explicitly – in Seymour – rejected that language when it specifically "overruled" Ash v. State, 843 So. 2d 213 (Ala. 2002) – the case from which the Cole Court drew its "jurisdictional" conclusion.  Seymour, 2006 WL 1793747, at *3.

Rather than having any effect on the court's jurisdiction, Landers's complaint "goes only to the merits of [his] case."  Lamar, 240 U.S. at 64.  As noted in sections B. and C. below, a debate of the "merits" of Landers's case should have been addressed during the trial proceeding, rather than in this post-conviction setting.

Aside from this insurmountable procedural hurdle, Landers's complaints that the indictment deprived him of sufficient "notice" to defend against the charges and thereby infringed on his due process rights lack credence. (Landers's brief at 30-33, 38-40)  The indictment – and related pre-trial discovery – obviously conveyed adequate information to Landers about all the facts underlying his crime for him to mount a substantial defense.  See Ala. R. Crim. P. 13.2(a)(purpose of indictment is to provide notice to enable preparation of the defense and to avoid a subsequent trial on the same charge(s)).  Defense counsel

14

was well-prepared and mounted effective challenges to the State's evidence about the reconstruction of the victim's skull and the expert witness's testimony related to the skull fractures.  Thus, this case stands in stark contrast to the situations in <u>Mason v. State</u>, 259 Ala. 438, 66 So. 2d 557 (1953) – where the defendant was not apprised that he would be expected to defend against evidence of three other unindicted robbery crimes – and <u>Burgess v. State</u>, 44 Ala. 190 (1870) – where the defendant was charged with "maliciously and unlawfully disabling and injuring a mare and an ox," seemingly in the same transaction, but the evidence showed that the damages were inflicted several months apart – that are relied on by Landers.  (<u>See</u> Landers's petition at 3)[2]

More to the point here, the State was not required to allege all factual details related to the crime in the indictment.  "In Alabama, the rule is that 'indictments are rather a statement of legal conclusion, than of facts,' and

---

[2] Landers cites to two other cases – <u>Gamble v. State</u>, 758 So. 2d 1125 (Ala. Crim. App. 1999), and <u>Goetzman v. State</u>, 844 So. 2d 1289 (Ala. Crim. App. 2002) – as "conflicting" with the Court of Criminal Appeals's ruling, but does not discuss the cases in his brief.

it is not required that an indictment plead evidentiary

facts necessary to a conviction." Ala. R. Crim. P. 13.2

committee comments. Thus, as discussed in section B.

below, the additional evidence explained as contributing to

the victim's death in this case did not affect the trial

court's jurisdiction to adjudicate Landers's conviction.

**B.    No variance exists between Landers's indictment
        and the evidence introduced at trial.**

Moreover, contrary to Landers's argument, the

introduction of additional information about the cause of

the victim's death did not create a "variance" between the

charging instrument and the evidence.  The indictment

charged Landers with killing his father by crushing him

with a bulldozer.  The evidence introduced at trial

established Landers's father died as a combination of being

struck with a blunt instrument in the head and being

crushed by a bulldozer.

> Dr. James Lauridson, the state medical
> examiner, testified that on Thursday, February 13,
> 1992, he performed an external examination of the
> body of Robert Richard Landers, Sr.  Dr. Lauridson
> testified that he observed severe crushing
> injuries and abrasions to the entire left side of
> the victim's body, including the left leg, left
> abdomen, left chest, neck and face; those
> injuries, he said were horizontally oriented and
> exhibited very little hemorrhaging.  According to
> Dr. Lauridson, the injuries were consistent with

being run over by a bulldozer; the horizontal
nature of the injuries were consistent with the
horizontal "cleats" on the track of a bulldozer.

. . .

In his testimony, Dr. Lauridson explained that
he found several vertically oriented fractures in
the left temple area of the victim's skull
associated with the vertical laceration in the
same area that were inconsistent with the
horizontal oriented fractures and abrasions on the
victim caused by the bulldozer track and
inconsistent with being run over by a bulldozer. .
. . Dr. Lauridson testified that the tissue
surrounding the vertically oriented injuries was
filled with blood, while the tissue surrounding
all but one of the horizontal injuries on the rest
of the victim's body showed very little
hemorrhaging. (*The injury to the victim's left
leg, he said also showed hemorrhaging, but less
than the vertical injuries to the skull.*) Dr.
Lauridson stated that the presence of hemorrhaging
in the vertical fractures of the skull and the
paucity of hemorrhaging in the horizontal injuries
indicated that the victim was still alive at the
time the vertical area was inflicted, and that the
victim's circulation had lowered or "nearly
stopped" by the time the other injuries were
inflicted.

Dr. Lauridson put forward two theories as to
why the victim's circulation had stopped by the
time the horizontal injuries were inflicted.
First, Dr. Lauridson stated that the blunt force
causing the vertical injuries to the victim's
skull could have killed the victim, thus stopping
circulation, before the bulldozer crushed him.
*Second, Dr. Lauridson stated that the bulldozer
could have crushed the victim's heart, causing
circulation to stop, thus preventing any
hemorrhaging in the injuries higher than the
heart.* Dr. Lauridson testified that, under either
theory, the vertically oriented fractures to the

17

left temple must have been inflicted <u>before</u> the victim was run over by the bulldozer.

(C. 101) (Emphasis added.)

The additional evidence that the blow to the victim's head contributed to his death does not create a "variance." This Court addressed that very question – the difference between facts included in the indictment and the proof offered at trial – in <u>Ex parte Robey</u>, 940 So. 2d 1069, 1072-74 (Ala. 2004). There, this Court rejected Robey's Rule 32 argument that a "variance" existed between his indictment – which charged him with murder while intoxicated by alcohol – and evidence presented at trial that showed he was intoxicated with both alcohol and drugs. <u>Id.</u> at 1072-73. Because, this Court reasoned, Robey's indictment included all essential elements of the murder offense, no "variance" existed to impact the trial court's authority to accept the jury's verdict. <u>Id.</u> at 1073-74.

Applying <u>Robey</u> to the case at hand leads to the same conclusion. Landers was indicted for the capital murder of his father by crushing him with a bulldozer. The evidence established that the combination of the blow to the head and crushing by the bulldozer resulted in the victim's death. As in <u>Robey</u>, "this is not a case in which the

18

defendant was convicted of a crime for which he had not been indicted." Id. at 1073. The evidence about the blow to the head merely supplied additional proof of Landers's misdeeds, it did not alter or affect the crime charged; the evidence still showed that Landers ran over and crushed his father with a bulldozer. "The trial court therefore did not lack jurisdiction to enter a judgment on the verdict finding [Landers] guilty of capital murder." Id.

### C. Landers's claim is not "jurisdictional" and, therefore, is precluded from review.

Notwithstanding the merits – or demerits – of Landers's claim, his claim of error is subject to very narrow scrutiny because it is being raised for the first time in a post-conviction proceeding. Rule 32.1 of the Alabama Rules of Criminal Procedure establishes that post-conviction claims are "[s]ubject to the limitations of Rule 32.2[.]" In this instance, Landers was aware – at least by the time he entered his motions for judgment of acquittal and filed his motion for a new trial – of his claimed "disparity" between the facts alleged in his indictment and the facts introduced at trial. Thus, he should have raised the present argument in one of those venues. See Ala. R. Crim. P. 13.5(c)(1) (permitting objections to the indictment

19

during the time permitted under Rule 15); Ala. R. Crim. P. 15.2(d) (mandating an objection "during the pendency of the proceeding").

Rule 32.2 "sharply limits the scope of review" and prohibits relief to Landers unless "[t]he trial court was without jurisdiction to render judgment or impose sentence." Seymour, 2006 WL 1793747, at *1-2 & n.3. As explained in sub-arguments A. and B., Landers's claim – whether treated as an attack on his indictment or as a true "variance" claim – does not implicate the trial court's jurisdiction. As a result, Landers's argument is subject to the normal rules of preclusion. Because he should have raised his "variance" claim during his trial proceedings, Landers is barred, under Rule 32.2(a)(3) of the Alabama Rules of Criminal Procedure, from post-conviction relief.

II. **Landers's Attack On The State's Pleading Of The Grounds Of Preclusion Is Not Properly Before This Court Because He Did Not Raise The Allegation Of Error As A Basis For Relief In His Application For Rehearing.  Even If Landers Did Not Waive The Argument, He Is Not Entitled To Relief Because The Record Shows That The State Identified And Argued Specific Grounds For Preclusion Applicable To Each Of Landers's Claims Of Error.**

A. **Landers's attack on the State's pleading is not properly before this Court.**

Rules 39 and 40 of the Alabama Rules of Appellate Procedure prohibit certiorari review of claims not raised in an application for rehearing.  Rule 39(c)(1) precludes review of a claim in a petition for a writ of certiorari unless the petitioner has filed an application for rehearing.  E.g., Ala. R. App. P. 40(d)(1).  Rule 40(b), in turn, requires the appellant filing the application for rehearing to "state with particularity the points of law or the facts [he] believes the court overlooked or misapprehended."  Thus, when combined, the rules require the petitioner to have raised a claim of error with specificity in the Court of Criminal Appeals before it can be reviewed by this Court.  See McCoo v. State, 921 So. 2d 450, 456 n.2 (Ala. 2005) (noting that the rules have been interpreted such that this Court "will consider a petition for a writ of certiorari only after the court of appeals

21

has overruled the application for rehearing on the point challenged in the petition").

Landers has failed to satisfy the particularity requirement of Rule 40(b). He did not complain about the State's alleged failure to specify which rules of preclusion applied to his claims as a ground on rehearing. In his brief in support of his application for rehearing, Landers alluded to the State's failure adequately to specify the rules of preclusion under the umbrella argument that the circuit court erred "[i]n concluding that a summary dismissal of [his] petition without a hearing was permissible under Rule 32.7(d) of the Alabama Rules of Criminal Procedure." (Landers's Applic. for Reh'g at 1; Landers's Brief in Support of Applic. for Reh'g at 6-8) In that document, Landers mentioned, "It is doubtful that the State adequately plead grounds for preclusion for most of the issues raised in Landers' petition." (Id. at 7) He did not develop that claim, but instead proceeded further to challenge the court's summary dismissal of his petition. (Id. at 7-8) Because Landers did not specifically challenge the Court of Criminal Appeals's failure to address his attack on the State's pleading, his present

argument is not properly before this Court for review.  See

McCoo, 921 So. 2d at 456 n.2.

> **B.    If this Court concludes that Landers did not waive his attack on the specificity of the State's pleading, a review of the State's Motion to Dismiss reveals that his argument lacks merit.**

Even if this Court were to determine that Landers

adequately presented his specificity argument to the Court

of Criminal Appeals, the claim nonetheless would not

warrant relief.  (See Landers's brief at 46-48)  In fact,

the argument is wholly meritless.  To satisfy due process

concerns, the State is expected (under circumstances where

a response is required) to explain the procedural grounds

applicable to each of the post-conviction petitioner's

claims so that the petitioner can respond to the arguments.

See Ala. R. Crim. P. 32.3 (requiring the petitioner to

"disprove" any ground of preclusion); Sheats v. State, 556

So. 2d 1094, 1095 (Ala. Crim. App. 1989) (on return to

remand).  The State complied with that requirement.

Landers misleadingly asserts that the State's "entire

motion" consists only of a request for the circuit court to

summarily deny Landers's claims.  (Landers's brief at 47

n.2)  In actuality, however, the State filed a 23-page

Motion to Dismiss (and two exhibits consisting of 64

23

pages), 18 pages of which contain the State's responses to each individual claim detailing the procedural history and facts and setting out the applicable rule(s) of preclusion and related case law.  (C. 60-78)

Landers inaptly likens the State's response to that filed in Ex parte Rice, 565 So. 2d 606 (Ala. 1990).[3] (Landers's petition at 5; Landers's brief at 43, 46-47) The petitioner in Rice was expected to respond to the State's "general allegation that the petition should be denied 'on grounds of preclusion as provided by [former] Rule 20.2.'"  565 So. 2d at 607.  By contrast, the State's detailed response in this case allowed Landers to ascertain and respond to each of the State's arguments to deny post-conviction relief.  Although not in question, the circuit court judge - who presided over Landers's trial - also provided Landers with a requisite explanation of the grounds of preclusion to satisfy due process.  The judge individually denied each of Landers's claims in a thorough five-page order and spelled out the specific ground of

---

[3] The State does not address the other case cited by Landers in his petition to support this claim of error - Alvis v. State, 762 So. 2d 380 (Ala. Crim. App. 1999) - because he does not argue it in his brief.

preclusion applicable to each claim.  (C. 167-71)  Because
the State satisfied the specificity requirement (and its
underlying purpose), Landers's attack on the State's
response lacks merit.

  C.  **Landers's constitutional attack on Rule 32.3 and
      his contention that the ground of "newly
      discovered evidence" is not subject to preclusion
      are not properly before this Court because they
      were not initially presented to the lower
      appellate court.**

  Landers challenges - for the first time in this Court -
the constitutionality of Rule 32.3 of the Alabama Rules of
Criminal Procedure and the application of the rules of
preclusion to a claim of "newly discovered evidence."
(Landers's brief at 43-45, 50-51)  As to the
constitutionality of Rule 32.3, Landers discussed Rule 32.3
as imposing a "pleading burden" on the State in his initial
and reply briefs filed in the Court of Criminal Appeals
(Landers's initial brief at 21-22; Landers's reply brief at
6-7), but never argued - as he does here - that the Rule
imposes an unconstitutional "burden [on him to] 'disprov[e]
the existence of [a ground of] preclusion the State has
pled."  (Landers's brief at 43)  Likewise, Landers did not
attack the application of the preclusionary rules to his
claim of "newly discovered evidence" below.  Instead,

                                                          25

Landers criticized the propriety of summarily dismissing his claim of "newly discovered evidence," argued that the ground "is not usually precluded," and contended that it should not have been adjudged precluded in his particular case because he satisfied the elements of Rule 32.1(e) of the Alabama Rules of Criminal Procedure (setting out the qualifications for a claim of "newly discovered evidence"). (Landers's initial brief at 41; Landers's reply brief at 19; see also Landers's brief in support of the applic. for reh'g at 9-13)  Because "a lower court may not be put in error for failure to rule on a matter which was not presented to it or decided by it[,]" Landers's arguments – being raised "for the first time on petition for certiorari" – are not properly before this Court.  Ex parte Linnell, 484 So. 2d 455, 457 (Ala. 1986).

> **D.  Landers's attack on the summary dismissal of his "federal constitutional" arguments falls outside the scope of his ground for certiorari review.**

Aside from Landers's attack on the trial court's subject-matter jurisdiction, this Court granted the writ of certiorari only to consider "whether, in responding to Landers's Rule 32 petition, the State was required to plead specific rule 32 preclusion provisions."  Landers attempts

26

to slip into his pleading argument the claim that "prior adverse state court adjudications of federal rights are not automatic grounds of preclusion." (Landers's brief at 48-50)  This claim is independent of – and unrelated to – whether the State satisfied its duty to specifically plead applicable grounds of preclusion under Rule 32.2. Landers's argument falls outside the scope of this Court's June 7, 2006 Order; accordingly, his attack on the application of the rules of preclusion to what he styles as "federal claims" is not properly before this Court.  <u>See</u> Ala. R. App. P. 39(f) (noting that court may limit the parties arguments to "*only* a particular issue or issues").

## CONCLUSION

For the above-stated reasons, the State respectfully requests that this Court quash the writ of certiorari or, in the alternative, issue an opinion affirming the lower courts' findings that Landers's "variance" argument did not affect the trial court's subject-matter jurisdiction.

Respectfully submitted,

Troy King
*Attorney General*

Kevin C. Newsom
*Solicitor General*
By-

Stephanie N. Morman
*Assistant Attorney General*
Counsel of Record *

## CERTIFICATE OF SERVICE

I hereby certify on this <u>18th</u> day of July, 2006, I have

served a copy of the foregoing on Counsel for the

Petitioner to the address listed on the brief filed in this

Court, by placing said copy in the United States mail,

first class, with postage prepaid:

> William H. Mills
> William N. Clark
> Redden, Mills & Clark
> 940 The Financial Center
> 505 20th Street North
> Birmingham, Alabama  35203

*Stephanie N. Morman*
Stephanie N. Morman
*Assistant Attorney General*
Counsel of Record *

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama  36130
(334) 242-7300; 242-7380 *

155751/87895-001

**A P P E N D I X**

**A**

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

Case Number - CR-05-0287

MARK SAMUEL LANDERS

Appellant

vs.

STATE OF ALABAMA

Appellee

Appeal from the Circuit Court of Elmore County, Alabama
Case Number CC-96-421.60

## APPLICATION FOR REHEARING

William H. Mills
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama  35203
(205)  322-0457

Attorneys for Appellant

TO THE COURT OF CRIMINAL APPEALS OF ALABAMA:

COMES NOW the Appellant and applies to the Court for a rehearing from the judgment entered on April 21, 2006. Appellant prays that the Court will withdraw and set aside its said judgment.

## I.

As grounds for this application for rehearing Appellant avers that the Court erred, separately and severally, in its April 21, 2006 judgment and memorandum as follows:

1.  In failing to consider and rule on the issue raised by the Appellant that the indictment in this case did not create subject-matter jurisdiction for a conviction of the Appellant on the evidence presented against him at trial.

2.  In concluding that a summary dismissal of Appellant's petition without a hearing was permissible under Rule 32.7(d) of the Alabama Rules of Criminal Procedure.

3.  In restricting the scope of relief mandated by 32.1(a) of the Alabama Rules of Criminal Procedure in cases based on rights guaranteed by the United States Constitution.

4.  In concluding that the Appellant did not make a prima facia showing in his petition of newly discovered evidence under Rule 32.1(e) of the Alabama Rules of Criminal Procedure.

5.   In ignoring an obvious due process flaw in this prosecution – the failure of the indictment to give the Appellant notice of the offense he was actually called on to defend against, thereby depriving him of due process rights guaranteed by the United States Constitution.

6.   In failing to consider and rule on several issues raised by the Appellant that prior State court adjudications did not preclude relief because the adjudications were in conflict with or unreasonable applications of established Federal law or were unreasonable determinations of fact based on the evidence presented.

## II.

The Appellant, being unsatisfied with the facts stated in the unpublished memorandum issued by the Court as the basis for its decision, submits the following as an appropriate statement of facts for this case:

The trial court conducted no evidentiary hearing (C 167; R 1-19). The facts for purposes of appellate review are those alleged in Landers' petition and the judicially noticed facts appearing in the appeal record of the underlying case (Case Number CR-97-0194) pursuant to the Court's order of December 29, 2005, which reads:

> Appellant's motion to supplement the record on appeal is denied. However, this Court

will take judicial notice of the records in
CR-97-0194.

Landers was indicted for the capital murder of Robert
Landers on October 4, 1996 for a homicide that allegedly
occurred on February 12, 1992 (XC 9-10).[1] The only *quo modo*
of the offense alleged in the indictment was:

> ...by running over and crushing him with a
> bulldozer. (XC 9).

This indictment was never amended.

Bond was denied pending trial and Landers has been
incarcerated at all times after indictment (XC 16-19).

The victim's body was found near a construction site on
the evening of February 12, 1992 (XR 1010-12). The body was
lying partially under the right track of a bulldozer (XR
1012). One of the first officers at the scene saw an eye
glasses case near the victim's head as he lay under the right
track of the bulldozer (XR 2201, 2202, 2203). This officer
did not retrieve the case (XR 2202).

On the night of February 12, 1992, at the scene where the
victim's body was found, Elmore County Sheriff Franklin handed
to Lenita Landers, the victim's wife, two rings, a wallet, and

---

[1] Reference to the prior appeal record (CC-96-421, CR-
97-0194, and 1001070) will be by "XC" followed by a page
number for reference to the Clerk's Record portion and "XR"
followed by a page number for reference to the Reporter's
Transcript portion of that record. Reference to the Court's
December 15, 2000 Memorandum will be by "12/15/00 Memo.".

a glasses case containing a pair of glasses, all of which belonged to the victim (C 25, 38). Mrs. Landers placed these items in her coat pocket (C 38). When she arrived home later that night she placed these items, including the glasses case, in a rarely used dresser drawer (C 39). She did not look in this drawer again for over five years, and forgot about the items she had placed there (C 39). She was never asked about the glasses (C 39). Had she been asked about the glasses at the time of Landers' trial she would have been unable, due to passage of time and loss of memory, to recall their existence or location (C 39).

Sometime shortly before or during Landers' trial Mrs. Landers was asked to locate photographs of her husband (C 40). She reasoned that his drivers license should have a photograph and should be in his wallet (C 41). She searched for a wallet and located the wallet the Sheriff had given her on February 12, 1992 in the drawer where she had placed it that night (C 41). The wallet was not obscured by other contents of the drawer (C 41). She removed the wallet and found a drivers license in it (C 41). She took the wallet to Landers' trial (C 41). Thirty days or more after Landers was sentenced, Mrs. Landers decided to put the wallet back into the drawer from which she had taken it (C 42). When she opened the drawer she

saw for the first time since she placed it there on February
12, 1992 the glasses case the Sheriff had given her on that
date (C 42). She recognized the case as the case in which her
husband regularly carried his glasses (C 42).  At that time
she opened the case and found a pair of wire rimmed glasses,
the glasses her husband regularly wore and used in the period
immediately preceding his death (C 42).  Upon seeing these
glasses on this occasion Mrs. Landers recalled for the first
time since February 12, 1992 that the Sheriff had handed her
these wire rimmed glasses and other items on that night (C
42).

Mrs. Landers never told anyone about these glasses (C
42).  Only she had access to the drawer where they were stored
(C 43).  Neither Landers nor his counsel ever saw and neither
was ever told about the glasses until they were told about
them shortly before the filing of the present petition (C 22,
43).  The condition of the wire rimmed glasses and case is
unchanged from the time they were given to Mrs. Landers by the
Sheriff on February 12, 1992 (C 22).  Neither Landers nor his
attorneys knew of the existence of the  glasses until well
after the completion of Landers' trial and post-trial motions
(C 25-26).  Neither Landers nor his attorneys could have
discovered the glasses at an earlier time because the only

person with any knowledge of their existence and whereabouts, Mrs. Landers, did not disclose their existence or whereabouts to anyone (C 26). Mrs. Landers did not discover them herself until she accidentally discovered them shortly before Landers' petition was filed (C 26).

On the evening of February 12, 1992 a large crowd - including spectators - gathered at the scene where the victim's body was found (XR 1172, 1191, 1192). The bulldozer was picked up by a wrecker to allow removal of the body (XR 1076). A truck and trailer that were near the bulldozer were moved (XR 1079, 1147). Between the evening of February 12, 1992 (when the body was discovered) and February 13, 1992 (when State's Exhibit 10, a pair of plastic rimmed glasses was discovered) the scene was not secured (XR 1068).

On February 13, 1992 investigators returned to the scene and moved the bulldozer; and at that time saw a pair of plastic rimmed glasses on the ground where the left track of the bulldozer had been (XR 1106-10). These plastic rimmed glasses were identified at trial as State's Exhibit 10 (hereafter "Ex.10") (XR 1011).

At trial the State introduced Ex. 10, eye glasses with thick plastic rims and a deformed left leg, into evidence (XR 1852). State's Exhibits 23-A and 23-B are photographs of

-6-

these glasses (XR 1928; XC 1063-66).  These glasses were turned over to the Department of Forensic Sciences after retrieval at the scene (XR 1927).  A blood stain on the frame was tested for blood type by a technician in the Department (XR 1431-33).  This technician also did an ABO blood test on a blood specimen taken from the victim's body (XR 1433).  The blood type of both was Type O (XR 1434).  Based on this blood typing the medical examiner assumed Ex. 10 was the victim's glasses and used the glasses in explaining his theory of how the victim was killed and the cause of death (XR 1927-28, 1940-41).

The medical examiner testified that the cause of death was being struck on the left temple with a blunt instrument(XR 1941). He explained this conclusion by describing two distinct sets of injuries on the victim's body (XR 1901-02).  One set was to the left temple where something blunt struck the head with sufficient force to break the skull and depress the skull bones down into the brain (XR 1901, 1910, 1919-21, 1922).  The temple injury occurred before the victim was run over by the bulldozer (XR 1922-24).  The bulldozer did not cause the fractures to the left temple (XR 1922).  The crushing injuries to the body, including to the skull, produced little bleeding, an indication the victim was dead when run over by the

bulldozer (XR 1904, 1910, 1921, 1923, 1929-40).

The medical examiner used the plastic rimmed glasses (Ex. 10) to illustrate and support his theory that the victim was killed by a blow to the temple before he was run over by the bulldozer (XR 1926-40). He reconstructed the victim's skull from bone fragments and placed the plastic rimmed glassed on the reapproximated skull (XR 1917). In his opinion, a deformity in the left leg of the plastic rimmed glasses (Ex. 10) matched the temple injury and showed the victim was struck in the temple by a blunt instrument (XR 1927, 1940-41; XC 1115-20).

In opening statement the State emphasized that a blow to the left temple killed the victim. The prosecutor stated that the victim was struck in the temple and was then dragged around and run over by the bulldozer as a means of concealing the blow to the head (XR 938, 946-47). The prosecutor emphasized the importance of the plastic rimmed glasses in this theory, and their connection to the victim, by pointing out that the blood on the glasses was the same type as the victim's (XR 944). The prosecutor referred to the fact that when the plastic rimmed glasses (Ex. 10) were placed on the victim's reconstructed skull a deformity in the left leg coincided with the temple injury (XR 947). In closing

-8-

argument the State reiterated the blow to the head theory (XR 287-89). The prosecutor again stressed the fact that the plastic rimmed glassed (Ex. 10) confirmed the theory by showing the point where the victim was struck on the head (XR 239). The prosecutor again pointed to the blood on Ex. 10, and the typing of it, as proof that the plastic rimmed glasses were the victim's glasses and were proof of the blow to the head theory (XR 2390, 2400, 2406).

There was testimony at the trial that the plastic rimmed glasses (Ex. 10) were not the victim's glasses. The victim's glasses were described as wire rimmed, not plastic rimmed, glasses (XR 2080, 2168-71). Photographs showed the victim wearing wire rimmed glasses (XC 1635-39). The proffered newly discovered evidence is the victim's wire rimmed glasses which were not part of the evidence at trial (C 42).

Landers made several pretrial requests or filed motions seeking discovery or disclosure (XC 28, 32, 62, 161). His requests included "tangible objects", "any other things ... which are intended for use by the State ... as evidence at trial", "objects or other tangible things which are relevant to this cause or are material to Defendant's defense", and "exculpatory evidence" (XC 33, 34). One of his motions showed the State had not produced a portion of a February 13, 1992

report of a post-mortem examination, tissue blocks and glass slides used in a post-mortem examination, and other materials relating to a post-mortem examination (XC 261-62). Landers also filed a motion to dismiss the indictment for the State's failure to produce blood samples (XC 266-70).

The State responded to the discovery requests by producing sundry materials which are described in its responses to discovery (XC 42-51, 65-66, 73-83, 135-50, 231-33). The responses do not list glasses, blood or tissue specimens, or February 13, 1992 post-mortem notes. The State produced no glasses, blood or tissue specimens (C.13,14-15, 16, 17) or the dictated notes of the findings from the February 13, 1992 post-mortem examination (C 18).

The testimony of the Forensic Sciences Department medical examiner and a technician were a major part of the State's case (XR 1428-37, 1890-1997). The medical examiner testified that a blood specimen was drawn from the victim's body on February 13, 1992 (XR 1908) and transmitted to the technician (XR 1943). The medical examiner testified he examined the plastic rimmed glasses identified as Ex. 10 and used them in his examination of the victim's body (XR 1927-28). He described the victim's skull and the injuries to it and stated he reconstructed the skull from bone fragments (XR 1923-24,

1926-27). He illustrated his testimony by photographs (XR 1929-41;C 1068-1120). Except for a small portion, the victim's skull was not retained (XR 1966). It was disposed of at some undetermined time, possibly after Landers' indictment (XR 1966).

The medical examiner dictated a report of his February 13, 1992 examination of the victim's body onto a recording device (XR 1951). The dictation was not transcribed and has been destroyed (XR 1951).

A Forensic Sciences technician testified that blood taken from the plastic rimmed glasses (Ex. 10) and a vial of blood given to her by the medical examiner were analyzed by the ABO method (XR 1432-34). The blood from the glasses was used up in the testing and the vial of blood obtained from the medical examiner was destroyed (XR 1437).

The medical examiner's work on this case, the primary foundation for the prosecution, was completed within three months after March 3, 1992 (XR 1952). A deposition of Landers taken in a civil case on November 5, 1992 was used as evidence by the State (XR 1481-1659; XC 1459-1546).

The bulldozer under which the victim's body was found was examined and used by the State in experiments conducted soon after February 12, 1992 (C 21; XC 1043-46, 1184-90, 1283-91,

-11-

1351-98). Because the bulldozer was no longer available after Landers' indictment he had no opportunity to conduct experiments with it and had no opportunity to conduct experiments at the unaltered scene (C 21-22). The trial court rejected experiments offered by Landers at trial, which were conducted after indictment in October 1996, because they were not conducted with the same bulldozer and the area where they were conducted was different from the area where the victim's body was found (XR 2043-46).

In the interim between November 1992, when the State completed the collection of the evidence it used at trial, and the indictment in October 1996, three persons (Barry Worth, Rubin Jarrell, and Orender Jarrell) who could have offered testimony favorable to Landers died (C 21). Had the prosecution against Landers been instituted earlier: (1) the bulldozer, the subject of tests and experiments by the State, would have been available to Landers for tests and experiments (C 21-22); (2) the State would not have destroyed the blood and tissue specimens it destroyed before trial (C 22-23); (3) the notes of the medical examiner's original examination would not have been destroyed (C 23); and (4) the newly discovered evidence would have been remembered, found, and available for use as evidence at trial (C 23).

On the evening of May 7, 1997 the father of Landers' lead counsel died (XC 2298). The funeral was scheduled for Saturday, May 10, 1997. The trial judge refused to postpone closing arguments until after the funeral and scheduled them for May 9, 1997 (XR 2300, 2307). The State contended, and the memorandum of this Court entered with its December 15, 2000 decision finds, "the record reflects that the Judge was obligated to be in Baldwin County to preside over a case as a special judge on the following Monday" (See 12-15-00 Memo. p.36). This conclusion is incorrect; the trial judge was only assigned as an "additional judge" in Baldwin County for the week beginning May 12, 1997 (C 166).

At trial the State offered no testimony from a witness who observed Landers at the time the victim was killed, or who saw Landers in possession of any blunt instrument that the State claimed killed the victim, or who heard Landers conspire with any other person to kill the victim (XR 1-2291).

## III.

Appellant prays that the Court will withhold its certificate of affirmance during the pendency of this application.

-13-

<u>IV.</u>

Appellant submits a brief in support of this application for rehearing.

Respectfully submitted,

William H. Mills
ASB-9841-M75W

and

William N. Clark
ASB-1260-C54W
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX

Attorneys for Appellant

-14-

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama, and the District Attorney for the 19th Judicial Circuit of Alabama, by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the 2nd day of May 2006.

Of Counsel for Appellant

Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

Case Number - CR-05-0287

MARK SAMUEL LANDERS

Appellant

vs.

STATE OF ALABAMA

Appellee

Appeal from the Circuit Court of Elmore County, Alabama
Case Number CC-96-421.60

## BRIEF IN SUPPORT OF APPLICATION FOR REHEARING

William H. Mills
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama  35203
(205)  322-0457

Attorneys for Appellant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . i-iii

STATEMENT OF CASE . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED BY APPLICATION FOR REHEARING . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 3

    Ground 1 . . . . . . . . . . . . . . . . . . . . 3

    Ground 2 . . . . . . . . . . . . . . . . . . . . 6

    Ground 3 . . . . . . . . . . . . . . . . . . . . 8

    Ground 4 . . . . . . . . . . . . . . . . . . . . 9

    Ground 5 . . . . . . . . . . . . . . . . . . . . 13

    Ground 6 . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . 14

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . 16

## TABLE OF AUTHORITIES

Baldwin County v. Palmtree Penthouses, Ltd., 831
    So.2d 603, 605 (Ala. 2002) . . . . . . . . . . . . 4

Branzburg v. Hayes, 408 U.S. 665, 687 (1972) . . . . . . 5

Burgess v. State, 44 Ala. 190, 192-93 (1870) . . . . . . 5

Cooper v. Watts, 280 Ala. 236, 191 So.2d 519,
    522 (1966) . . . . . . . . . . . . . . . . . . . 7

Davis v. State, 245 Ala. 589, 18 So.2d 282, 284 (1944) . 12

Deas v. State, 844 So.2d 1286, 1288
(Ala.Crim.App. 2002) . . . . . . . . . . . . . . . . . 4

i

Ex Parte Adams, 2005 WL 3506662 (Ala. 2005) . . . . . . . 8

Ex Parte Cole, 842 So.2d 605, 607 (Ala. 2002) . . . . . . 5

Ex Parte Dixon, 804 So.2d 1075, 1078 (Ala. 2000) . . . . 4

Ex Parte Gonzales, 686 U.S. 204, 206 (Ala. 1996) . . . . 5

Ex Parte Land, 775 So.2d 847, 852 (Ala. 2000) . . . . . . 11

Ex Parte Rice, 565 So.2d 606, 608 (Ala. 1990) . . . . . . 7

Ex Parte Smith, 438 So.2d 766, 768 (Ala. 1983) . . . . . 4

Ex Parte State, 899 So.2d 1025, 1033, 1034 (Ala. 2004) . 5

Ex Parte State, 922 So.2d 144 (Ala. 2005) . . . . . . . . 6

Ex Parte Walker, 800 So.2d 135, 138 (Ala. 2000) . . . . . 11

Ex Parte Weeks, 611 So.2d 259, 261 (Ala. 1992) . . . . . 7

Fincher v. State, 837 So.2d 876, 881
       (Ala.Crim.App. 2002) . . . . . . . . . . . . . . . . 4

Hamilton v. State, 828 So.2d 957, 959
       (Ala.Crim.App. 2002) . . . . . . . . . . . . . . . . 4

Hill v. Tucker, 889 So.2d 583, 586 (Ala.Civ.App. 2004) . 4

Johnson v. Johnson, 707 So.2d 161, 162-65
       (Ala.Civ.App. 1997) . . . . . . . . . . . . . . . . 12

Johnson v. State, 922 So.2d 137 (Ala.Crim.App. 2005),
       cert.denied . . . . . . . . . . . . . . . . . . . . 6

Mason v. State, 259 Ala. 438, 66 So.2d 557, 559 (1953) . 5

Pacifico v. Jackson, 562 So.2d 174, 177 (Ala. 1990) . . . 11

Parker v. State, 719 So.2d 259, 260 (Ala.Crim.App. 1997) 10

Rice v. State, 682 So.2d 484 (Ala.Crim.App. 1995) . . . . 10

<u>Russell v. United States</u>, 369 U.S. 749, 766, 770-71
    (1962) . . . . . . . . . . . . . . . . . . . . . . 5

<u>T.B. II v. State</u>, 819 So.2d 108, 110
    (Ala.Crim.App. 2001) . . . . . . . . . . . . . . . 7

U.S. CONST. Amend. 6 . . . . . . . . . . . . . . . . 13

U.S. CONST. Amend. 14 . . . . . . . . . . . . . . . . 13

28 U.S. Code §2254(d) . . . . . . . . . . . . . . . . 8

ALA. CONST. §6 (1901) . . . . . . . . . . . . . . . . 13

A.R.Crim.P. 32 . . . . . . . . . . 1, 4, 6, 7, 8, 14, 15

A.R.Crim.P. 32.1(a) . . . . . . . . . . . . . . 2, 8, 9

A.R.Crim.P. 32.1(a)(e) . . . . . . . . . . . . . . . 12

A.R.Crim.P. 32.1(e) . . . . . . . . . . . . 2, 10, 11, 13

A.R.Crim.P. 32.2 . . . . . . . . . . . . . . . . . 5, 7

A.R.Crim.P. 32.2(a)(3) . . . . . . . . . . . . . . . 4

A.R.Crim.P. 32.3 . . . . . . . . . . . . . . . . . . 7

A.R.Crim.P. 32.7(d) . . . . . . . . . . . . . . . . . 2

A.R.App.P. 40(g) . . . . . . . . . . . . . . . . . . 3

## STATEMENT OF THE CASE

On May 31, 2005 Appellant (hereinafter "Landers") filed a petition for post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure from a judgment of conviction for capital murder and a life sentence entered on July 1, 1997(C 4-43).  The conviction was affirmed by this Court on December 15, 2000 and re-hearing was denied on March 2, 2001 (Case Number CR-97-0194).  Landers timely petitioned for certiorari in the Supreme Court, which was granted on August 30, 2001, but which was quashed on June 18, 2004 (Supreme Court Case Number 1001070).

On June 10, 2005 Landers filed a motion for leave to amend his petition to assert additional grounds for relief (C 49-55).  The motion was not expressly ruled on by the trial court; however, the State's response (C 56-163) acknowledged and answered the amendment, the amendment was argued at the hearing of the State's motion (R 1-19), and the trial court ruled on the grounds contained in the amendment (C 171).

On July 12, 2005 the State filed a motion to dismiss the petition as amended (C 56-143).  The State's motion was set for argument (C 144).  Landers filed an opposition to the State's motion (C 145-66).  Following oral argument of the State's motion (R.1-19) the trial court denied Landers'

1

petition on September 23, 2005 (C 167-71). Landers filed notice of appeal on November 3, 2005 (C 172). On April 21, 2006 the judgment of the trial court was affirmed by memorandum.

## ISSUES PRESENTED BY APPLICATION FOR REHEARING

1.  Did the Court err in failing to consider and rule on the issue raised by the Appellant that the indictment in this case did not create subject-matter jurisdiction for a conviction of the Appellant on the evidence presented against him at trial?

2.  Did the Court err in concluding that a summary dismissal of Appellant's petition without a hearing was permissible under Rule 32.7(d) of the Alabama Rules of Criminal Procedure?

3.  Did the Court err in restricting the scope of relief mandated by 32.1(a) of the Alabama Rules of Criminal Procedure in cases based on rights guaranteed by the U.S. Constitution?

4.  Did the Court err in concluding that the Appellant did not make a prima facia showing in his petition of newly discovered evidence under Rule 32.1(e) of the Alabama Rules of Criminal Procedure?

5.  Did the Court err in ignoring an obvious due process flaw in this prosecution - the failure of the indictment to

give the Appellant notice of the offense he was actually called on to defend against, thereby depriving him of due process rights guaranteed by the U.S. Constitution?

6. Did the Court err in failing to consider and rule on several issues raised by the Appellant that prior State court adjudications did not preclude relief because the adjudications were in conflict with or unreasonable applications of established Federal law or were unreasonable determinations of fact based on the evidence presented?

## STATEMENT OF FACTS

A statement of facts is included in the application and is not included in this brief. See A.R.App.P. 40(g).

## ARGUMENT

The Court's April 21, 2006 memorandum concludes the trial court was correct in dismissing Landers' petition without a hearing because "all of the claims... were procedurally precluded from review". This conclusion is demonstratively wrong for several reasons.

## Ground 1 - Jurisdictional Defect

The most confounding error in the April 21, 2006 decision is its failure to recognize, deal with, discuss, and explicitly rule on the jurisdictional issue raised by the Appellant. An obvious jurisdictional flaw is present in this

3

prosecution which inculcates relief from the conviction.

The only comment in the April 21, 2006 memorandum regarding the jurisdictional flaw is the terse comment that "claim 8 could have been, but was not, raised at trial". Presumably, the Court is saying that the jurisdictional claim was waived. This position is contrary to well established precedents that jurisdictional flaws cannot be waived. See Fincher v. State, 837 So.2d 876, 881 (Ala.Crim.App. 2002); Deas v. State, 844 So.2d 1286, 1288 (Ala.Crim.App. 2002). Such defects may be raised for the first time on appeal. See Ex Parte Dixon, 804 So.2d 1075, 1078 (Ala. 2000); Hamilton v. State, 828 So.2d 957, 959 (Ala.Crim.App. 2002). A court has the duty to notice jurisdictional defects ex mero motu or sua sponte. See Baldwin County v. Palmtree Penthouses, Ltd., 831 So.2d 603, 605 (Ala. 2002); Ex Parte Smith, 438 So.2d 766, 768 (Ala. 1983); Hill v. Tucker, 889 So.2d 583, 586 (Ala.Civ.App. 2004). Any jurisdictional defect in this case could not have been waived by failure to raise it. This Court was duty bound to notice it - which it has not done.

Moreover, Rule 32 specifically provides that the preclusion doctrine does not apply to jurisdictional claims. A.R.Crim.P. 32.2(a)(3). Therefore, Landers' lack of jurisdiction claim was not waived by failure to raise it

4

earlier, Rule 32.2 expressly prohibits its preclusion, and should be noticed and ruled on by this Court.

The genesis and the boundary of jurisdiction for a felony prosecution are the words of a grand jury indictment. The jurisdiction to try and convict a defendant of an offense does not extend beyond the offense described by the words of an indictment. See Ex Parte State, 899 So.2d 1025, 1033, 1034 (Ala. 2004); Ex Parte Cole, 842 So.2d 605, 607 (Ala. 2002); Burgess v. State, 44 Ala. 190, 192-93 (1870). The jurisdiction created by an indictment is limited to the conduct alleged in the indictment. See Ex Parte Cole, supra. To extend the authority of a court to try a defendant for conduct not specified in an indictment - as is discussed in more detail in the Appellant's brief - is a denigration of the role of the grand jury in our system and emasculates the adherence of our jurisprudence to the ideal of due process and the rule of law. See Branzburg v. Hayes, 408 U.S. 665, 687 (1972); Russell v. United States, 369 U.S. 749, 766, 770-71 (1962); Ex Parte Gonzales, 686 U.S. 204, 206 (Ala. 1996); Mason v. State, 259 Ala. 438, 66 So.2d 557, 559 (1953); Burgess v. State, 44 Ala. 190, 192-93 (1870).

This doctrine is not new and is not eroded by passage of time. See cases cited in Appellant's brief, including Burgess

v. State, supra, and see Johnson v. State, 922 So.2d 137
(Ala.Crim.App. 2005), cert.denied, Ex Parte State, 922 So.2d
144 (Ala. 2005).  It should be applied in this case and the
judgment held void because it was based on proof of conduct
not alleged in the indictment.  If this Court's affirmance of
the trial court on this issue is allowed to stand it amounts
to the grant of a license to every prosecutor to ambush every
defendant at trial by proving unalleged conduct as the basis
for a conviction.

### Ground 2 - Limited Basis for Summary Dismissal

An obvious generally pervasive flaw in the April 21, 2006
memorandum is lack of regard for the nature of a Rule 32
proceeding, the due process rights guaranteed a petitioner in
such a proceeding, and the precedents which have defined these
rights.  A reading of the April 21, 2006 memorandum - where
the Court concludes all claims, regardless of type or nature,
were "procedurally precluded" - would lead one to believe that
a Rule 32 proceeding was designed as a mere academic, futile
exercise and an illusory process which confers no rights to a
petitioner and where a petition can properly be summarily
denied at whim.  This is not the case.  Rule 32 establishes a
real and substantive judicial proceeding in which rights can
be vindicated after judgment which were denied before

judgment. It is a proceeding in which a petitioner is entitled to due process of law. See *Ex Parte Rice*, 565 So.2d 606, 608 (Ala. 1990). It is a judicial proceeding in which due process means fair play and includes an opportunity to present evidence in support of claims asserted and an opportunity to controvert adversary claims. See *Ex Parte Weeks*, 611 So.2d 259, 261 (Ala. 1992); *Cooper v. Watts*, 280 Ala. 236, 191 So.2d 519, 522 (1966); *T.B. II v. State*, 819 So.2d 108, 110 (Ala.Crim.App. 2001).

Rule 32 does describe circumstances where relief is precluded. See A.R.Crim.P. 32.2. However, Rule 32.2 does not require a petitioner to preemptively negate preclusion. Rather, it places the burden on the State to plead a valid ground for preclusion and then gives a petitioner the opportunity to disprove the State's claim and makes the determination of the issue of preclusion dependent upon the proof. See A.R.Crim.P. 32.3. Where the determination of an issue is dependent upon proof an adversary hearing where evidence can be presented (and not a summary dismissal) is the obvious and certain precursor of a decision. It is doubtful that the State adequately plead grounds for preclusion for most of the issues raised in Landers' petition. However, even if preclusion was adequately plead, summary dismissal without

a hearing denied Landers his due process rights to present evidence to disprove the preclusion allegations.    Such a summary dismissal is contrary to both the letter and spirit of Rule 32.    Without an evidentiary hearing Rule 32 is transformed into something less than a judicial proceeding - a mere procedural apparition with no substance.

## Ground 3 - Scope of Relief Under Rule 32

The April 21, 2006 memorandum seems to assume that all issues which have been raised and decided by a State court are precluded as a ground for relief.  Common sense, as well as Federal law, tells us this is not, and cannot be, the law. Rule 32.1(a) mandates relief where the "constitution of the United States...requires" it.  The U.S. Constitution requires relief in some instances where a State court adjudication may have denied relief.    Federal constitutional rights are, of course, decided by Federal law, not by State law.    See Ex Parte Adams, 2005 WL 3506662 (Ala. 2005).    Some State court adjudications do not deprive a State prisoner of a Federal constitutional right to release from confinement.    Section 2254(d) of Title 28, U.S. Code, says that a State court adjudication is denied deference on the issue of Federal constitutional rights where the State court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

8

> established Federal law as determined by the Supreme
> Court of the United States; or (2) resulted in a
> decision that was based on an unreasonable
> determination of the facts in light of the evidence
> presented in the State court proceeding. 28 U.S.C.
> §2254(d).

Consequently, to preclude relief in this case by a State court

adjudication on the issues raised by Landers' petition the

State adjudication must meet the standards of Section 2254(d).

The State did not plead, or contend in argument, that the

adjudications it relied on met these standards. Without a

hearing there was no opportunity for proof on this issue.

Therefore, the summary dismissal of the issues involving prior

State court adjudications with no hearing to determine if

those adjudications met the Section 2254 standards was a

denial of due process and a denial of relief mandated by Rule

32.1(a). The blanket finding of preclusion by prior

adjudications in the April 21, 2006 decision is clearly

erroneous.

### Ground 4 - Newly Discovered Evidence

The discussion in the April 21, 2006 memorandum of the

newly discovered evidence ground is confusing. On pages 2-3

the memorandum identifies Ground 7 as the newly discovered

evidence ground. It follows, on pages 3-4, with references to

"appellant's claim 7(a)", "appellant's claim 7(b)", and

"appellant's claim 7(c)"., apparently treating each as a

9

separate ground for relief.  It is puzzling how these separate
claims were identified and ruled on.

The newly discovered evidence proffered by the petition
was one item - a pair of wire rimmed glasses.  These newly
discovered wire rimmed glasses were proffered as substantive
evidence contradicting  the State's evidence, and the theory
of the prosecution that the victim was killed by a blow to the
left temple rather than being run over by a bull dozer.  The
State's evidence relied on a pair of plastic framed glasses
with a deformed left leg, which the State contended coincided
with the site of the left temple injury, to support its theory
of the prosecution and the cause of the victim's death.

The assertion in the April 21, 2006 memorandum that
"claim 7(a)" did not satisfy the newly discovered evidence
test apparently means that the trial court correctly
concluded, without a hearing, that the wire rimmed glasses
were not newly discovered evidence within the meaning of Rule
32.1(e).  How the trial court could have reached this
conclusion without an evidentiary hearing is not explained -
for the obvious reason that it is not explainable.  When the
trial court made this ruling it had only the allegations of
the petition, which it was bound to take as true.  See Parker
v. State, 719 So.2d 259, 260 (Ala.Crim.App. 1997); Rice v.

10

State, 682 So.2d 484 (Ala.Crim.App. 1995).  The petition clearly shows newly discovered evidence within the meaning of Rule 32.1(e).  The petition showed the newly discovered evidence was not known by Landers at the time of trial and post-judgment motions, could not have been discovered by him by reasonable diligence, was contradictory evidence and not merely impeaching, and would have shown Landers' innocence by disproving the corpus delicti.  Under no perception of ordered and orderly jurisprudence - where due process is the rule - could this ground of the petition be summarily denied without a hearing.  See Ex Parte Walker, 800 So.2d 135, 138 (Ala. 2000); Ex Parte Land, 775 So.2d 847, 852 (Ala. 2000).

The April 21, 2006 memorandum makes the following unintelligible assertion: "The appellant's claim 7(b) was precluded because the issue of appellant's father's eye glasses was raised at trial and could have been investigated at that time".  If this is an assertion of non-diligence in discovering the wire rimmed glasses it is based on no evidence. If it is an assertion, as it seems to be, that if "investigated" all evidence will be revealed it is irrational. Newly discovered evidence must, of course, exist at the time of trial.  See Pacifico v. Jackson, 562 So.2d 174, 177 (Ala. 1990).  If every investigation were required to be perfect and

11

reveal all evidence there would be no need for a rule like Rule 32.1(a)(e) granting relief from a judgment based on newly discovered evidence. Diligence in investigating and discovering evidence is a relative term and must be resolved in view of the facts of each particular case. See Davis v. State, 245 Ala. 589, 18 So.2d 282, 284 (1944). There is no requirement that every possibility be considered and exhausted in order to make a post-judgment newly discovered evidence claim. See Johnson v. Johnson, 707 So.2d 161, 162-65 (Ala.Civ.App. 1997). Since the allegations of the petition were bound to be accepted as true, there is no basis in the record, or in the law, for denying the newly discovered evidence ground as precluded because of lack of diligence.

A third strange assertion in the April 21, 2006 memorandum is: "...claim 7(c)... was precluded because the issue was raised at trial and on appeal". This simply is a mistake. No issue was raised post-trial or on the appeal of newly discovered evidence in the form of wire rimmed glasses. No court has previously heard or ruled on this issue.

The petition clearly shows tangible evidence contradicting an important element of the State's case which was not available at the time of trial. This tangible evidence met all of the newly discovered evidence requirements

of Rule 32.1(e).  A denial of this ground of the petition without a hearing was manifestly erroneous.

### Ground 5 - Failure of Indictment to Give Notice

The U.S. Constitution, and the Alabama Constitution, require that an indictment give notice to a defendant of the offense that must be defended against.  See U.S.  CONST. Amends. 6, 14; ALA. CONST. §6 (1901).  This requirement includes an allegation describing the allegedly criminal conduct.  As was discussed in Appellant's brief, the indictment in this case charged Landers with conduct different from the conduct proved at trial.  The indictment provided no notice of the conduct on which his conviction is based.  He stands convicted of conduct the grand jury never charged. This is an ambush - and a clear violation of Federal constitutional rights as declared by the U.S. Supreme Court. Any prior decision of this Court or the trial court sanctioning this due process denial does not meet the standards of Section 2254 and cannot preclude relief for this constitutional violation.  For that reason the April 21, 2006 decision is clearly erroneous.

### Ground 6 - Unwarranted Dismissal of Federal Law Claims

The April 21, 2006 memorandum concludes that the claims based on the destruction of and failure of the State to

produce tangible evidence, the failure to delay closing arguments because of the death of the father of Landers' counsel, the 4½ year delay in the indictment, and the absence of evidence connecting Landers with the commission of a crime were precluded because they were raised and addressed on appeal. Again, as was discussed above, the cited adjudications can preclude relief only if they conform to the standards of Section 2254. As was discussed in the Appellant's brief, these rulings by the trial court and this Court conflict with established law declared by the U.S. Supreme Court, or are unreasonable applications of such law to the facts presented, or are unreasonable determinations of fact based on the evidence presented. Therefore, these prior adjudications cannot justify the summary dismissal of these grounds for relief.

## Conclusion

This rehearing request places this Court in somewhat of a "fork of the road" position as to the significance of Rule 32. The first fork - the fork taken by the April 21, 2006 decision - is: Rule 32 is a hollow exercise for the amusement of prosecutors because a petition can be denied at whim. The other fork is: Rule 32 establishes real, substantive post-judgment rights for the rectification of pre-judgment errors.

14

Surely, no rational mind could conclude that Rule 32 was promulgated for no substantive and remedial purpose and that taking the first fork is proper. The errant departure of the April 21, 2006 decision should be corrected by granting this application for re-hearing.

Respectfully submitted,


William H. Mills
ASB-9841-M75W


and


William N. Clark
ASB-1260-C54W
REDDEN, MILLS & CLARK
940 The Financial Center
505 - 20th Street North
Birmingham, Alabama 35203
(205) 322-0457
(205) 322-8481-FAX
Attorneys for Appellant

15

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing on the Attorney General of the State of Alabama, and the District Attorney for the 19th Judicial Circuit of Alabama, by mailing a copy of the same to them in the United States mail, properly addressed and with sufficient postage prepaid, this the $2nd$ day of May 2006.


Of Counsel for Appellant


Troy King, Attorney General
State of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Alabama 36130

Randall V. Houston
District Attorney
Elmore County
P.O. Box 700
Wetumpka, Alabama 36092

# IN THE SUPREME COURT OF ALABAMA



September 15, 2006

**1051169**

Ex parte Mark Samuel Landers.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: Mark Samuel Landers v. State of Alabama)   (Elmore Circuit Court: CC96-421.60; Criminal Appeals : CR-05-0287).

## <u>CERTIFICATE OF JUDGMENT</u>

### <u>Writ Quashed</u>

WHEREAS, on September 15, 2006, a writ of certiorari to the Court of Criminal Appeals was granted by this Court, and the cause was set down for submission pursuant to Rule 39, Alabama Rules of Appellate Procedure.

WHEREUPON, come the parties and the petition for writ of certiorari being submitted and duly examined and understood by the Court, it is considered by the Court that the writ heretofore issued should be quashed and that the petition should be denied.

IT IS, THEREORE, CONSIDERED AND ORDERED that the writ of certiorari heretofore issued to the Court of Criminal Appeals be, and the same is hereby, quashed, and the petition for writ of certiorari be, and the same is hereby, denied.

COST TAXED TO PETITIONER.

LYONS, J. -  Nabers, C.J., and Woodall, Smith, and Bolin, JJ., concur.  Parker, J., recuses.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.
Witness my hand this 15th day of September, 2006

*Robert G Esdale Sr*

Clerk, Supreme Court of Alabama



EXHIBIT

L